**E-FILED**
Monday, 08 November, 2004  03:54:33 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

|  |  |  |
|---|---|---|
| CENTURY CONSULTANTS, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-CV-3105 |
| | ) | |
| THE MILLER GROUP, INC., JOHN G. | ) | |
| MILLER, and THE SPRINGFIELD PUBLIC | ) | |
| SCHOOL DISTRICT 186, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Century Consultants Ltd. ("Century"), respectfully submits this Memorandum of Law in opposition to the motion of defendant, Springfield Public School District 186 (the "School District"), seeking summary judgment in its favor on the First Amended Complaint under Federal Rule of Civil Procedure 56.

## INTRODUCTION

Century filed this action against the School District and two other defendants, The Miller Group, Inc. and John G. Miller (the "Miller Defendants"), seeking damages and injunctive relief arising out of defendants' unlawful use of Century's flagship  student administration software product known as "Star_Base".  Century filed this action in May 2003, and immediately secured a Temporary Restraining Order from this Court, enjoining defendants from the further sale of an infringing product known as "InfoSystems 3".  That Temporary Restraining Order was turned into a preliminary injunction on consent, and the parties have been engaged in discovery for the last year

concerning Century's myriad claims, which include direct copyright infringement, contributory and vicarious infringement, misappropriation of trade secrets, unfair competition and breach of contract. Despite the fact that the School District defended the initial injunctive relief applications a year ago, and has engaged in extensive written discovery since that time, it  curiously moved to dismiss the First Amended Complaint in June 2004,[1] claiming that Century  failed to properly allege certain claims.   The School District contended that: 1) Century failed to properly plead a claim of direct infringement against the Miller Defendants, and therefore, Century's contributory and vicarious infringement claims against the School District are deficient; 2) Century's trade secret misappropriation and unfair competition claims are preempted by the Copyright Act; 3) Century failed to properly allege a trade secret misappropriation claim; and 4) Century failed to properly plead a claim for breach of contract.

However, because the School District accompanied its motion to dismiss with the Affidavit of Agnes Nunn (which merely attached copies of a few undisputed contracts), this Court converted the motion into one for summary judgment, and invited the School District to expand on its arguments with additional evidentiary submissions under Rule 56.   The School District declined, electing instead to rely exclusively on the pleadings and Nunn Affidavit to attack Century's claims. That reliance is surprising, because this Court has already concluded, in awarding Century a temporary restraining order at the outset of the case, that Century's initial pleadings established a substantial likelihood of success on the merits of its infringement claims:

---

[1]     With the exception of an added claim for vicarious infringement against the School District, and a few additional factual allegations surrounding the Miller Defendants' advertising of the infringing InfoSystems 3 product, the First Amended Complaint is identical to the original Complaint filed in May 2003.

2

> Century's Complaint identifies Star_Base as the subject of its claim, asserts that it owns the copyright to Star_Base and that Star_Base has been registered, and claims that the Defendants have infringed on the Star_Base copyright by duplicating the program's codes and tables. These facts are sufficient to establish Century's likelihood of succeeding on its copyright claim.

*See* Court's Order entered May 8, 2003 at 6-7. For the School District to now contend at this late date that Century's claims somehow fall short of properly alleging an infringement (as well as other claims) ignores the history of this lawsuit.

In all events, the School District's motion should be denied. Under the liberal pleading standards of Fed.R.Civ.P. 8, Century's First Amended Complaint more than adequately alleges claims for copyright infringement, trade secret misappropriation and breach of contract. Century alleges that it owns the copyright in Star_Base, that it registered the copyright with the U.S. Copyright Office, and that the Miller Defendants directly infringed that copyright by unlawfully copying the software. This is all that is required to allege an infringement claim under established 7th Circuit precedent. Moreover, Century has alleged in detail facts which, if proved, would sustain both contributory and vicarious infringement claims. Century's First Amended Complaint alleges that the School District deliberately gave the Miller Defendants access to the source code for Star_Base – which is a trade secret of Century's – for the purpose of developing InfoSystems 3, an infringing product in which the School District had a direct financial interest. In so doing, the School District violated its promises in a license agreement with Century to maintain the confidentiality of Century's source code. These allegations more than adequately allege the basis for contributory and vicarious infringement claims, as well as trade secret misappropriation and breach of contract. Finally, the School District is incorrect that the Copyright Act preempts any of Century's claims, because they are based on "extra elements" not encompassed within an

3

infringement claim and therefore, under well settled law, are not preempted.  Despite the fact that the School District focuses exclusively on Century's pleading, Century has also offered in response to this motion material facts which demonstrate, at the least, a genuine issue for trial under Fed.R.Civ.P. 56 on all of the claims of the Complaint.  Accordingly, the motion for summary judgment should be denied.

## RESPONSE TO ALLEGEDLY UNDISPUTED MATERIAL FACTS

The "material facts" listed in paragraphs 1-21 of the School District's moving papers are merely recitations of the allegations of Century's First Amended Complaint.  As such, Century does not dispute its own allegations.  With respect to paragraphs 22-23, Century does not dispute that the contracts attached to the Nunn Affidavit are accurate copies of those contracts.

## FACTS CLAIMED TO BE IMMATERIAL TO THE MOTION

Century does not contend that any of the "facts" listed as undisputed in the School District's moving papers are immaterial to the motion.

## ADDITIONAL MATERIAL FACTS CLAIMED TO DEFEAT THE MOTION

1.     Century began as a sole proprietorship in 1976.  In December 1977, Century was incorporated in New Jersey.  Since that time, Century has been engaged in the business of developing and marketing computer programs and associated software, including educational software packages.  *See* Declaration of Craig S. Hilliard (the "Hilliard Dec."), Exhibit "1", at para. 2.

2.     Star_Base is the trade name for Century's flagship computer software product that is marketed to elementary and secondary schools (both public and private).  Star_Base functions as an administrative tool to assist in all record keeping and reporting of

4

student information in various areas including, but not limited to, student demographics, attendance, class schedules, grades, discipline and test scores. *Id.* at para. 3.

3. Each of these areas of information is referred to as a "module". Each module may be used by one or all schools within a school district. For example, the attendance module is normally used to track enrollment throughout an entire district, since that information is key to a district's funding from the State. The scheduling module, on the other hand, might only be used in a high school or middle school where a complex set of course offerings makes the use of a computer scheduler desirable and often necessary. *Id.* at para. 4.

4. A single module is selected by a user (an employee of the licensed school district) from a menu displayed on a screen. The menu is provided by an associated main computer program. Each module is comprised of many individual computer sub-programs. The attendance module, as an example, contains between 20 and 25 unique sub-programs accessed by a main menu program. One sub-program would provide the capability to perform a specific function on the computer. In other words, there are functions, i.e. sub-programs, to enable input of and updates to the school calendar, student entries and withdrawals, and student absences. Other sub-programs report on the information that has been entered. These reports are designed to print detailed and/or summary information in the format and sequence that is required by school districts. *Id.* at para. 5.

5. The sub-programs that comprise Star_Base and are embodied in the copyright registration described below are written in a human-readable language. Many computer languages exist, so it is necessary for programmers to be trained and experienced in the language being used. The human-readable form of a program is referred to as the "source" program, or sometimes as the source code. In order for a computer to execute or run the programs, they must be translated into computer-readable form, usually called object code. This translation is accomplished through the use of another program known as an assembler or compiler. *Id.* at para. 6.

6. Although each program has a unique function, common elements must exist throughout all programs in the system in order for them all to work together accurately and efficiently. The common elements that all programs contain are the data files. Data files contain the records of information that are managed and processed by the programs. The structure of these records is vital to the functioning of the entire system. Much of the effort in designing a complex system goes into the layout, organization, composition and interrelationship of the records in the data files. Every record is composed of individual data elements, or fields. These fields must be organized and grouped both logically and functionally. Each field must be given a unique name. The size and type of each data element must be established. The resulting "record layout" or "file definition" becomes the basic component of every program in the system. *Id.* at para. 7.

7. It is certainly possible for any other software developer to create or design independent programs that would achieve the same result as the Star_Base programs.

6

By directly copying Century's tables and database programs for the purpose of making derivative works, however, another software developer would save enormous time and expense. Century spent years, thousands of man-hours and hundreds of thousands of dollars developing and refining the Star_Base programs. As of today, a majority of Century's revenues is based on the Star_Base programs. *Id.* at para. 8.

8.     The Star_Base source code and screen outputs are registered as copyrights with the U.S. Copyright Office. The screen outputs for all of the Star_Base modules also bear a notice of copyright. When a Star_Base user at the school level accesses the main menu program for any of the modules, a copyright symbol appears on the screen. *Id.* at para. 9. *See also* Hilliard Dec. Ex. "10", at 63-65.

9.     Century licenses individual Star_Base modules (often as a package of many modules) to school districts under a written license agreement. The School District is one such licensee. Star-Base was first licensed to the School District in 1995, and the parties entered into 3 separate license agreements over the last decade. *See* Hilliard Dec. Ex. "10", at 26-29. Although the form of license agreement has been modified slightly over the years, all of the form agreements (including Springfield's) contain confidentiality terms that severely restrict the licensee's right and ability to disclose the modules to unlicensed third parties, to ensure to the greatest extent possible that the trade secret protection for the modules is maintained. *See* Hilliard Dec. Ex. "1", at para. 10.

11.     The license agreement with Springfield, for example, provides as follows:

7

<u>Confidentiality</u> - The [computer] package and any permitted copies contain valuable trade secrets of **CENTURY** and shall at all times remain the property of **CENTURY**; and Licensee, by this license, acquires no rights in and to the package except the right to use the package at the location indicated herein. **Licensee shall not use the package for the benefit of any other party, whether or not for a consideration; shall not sell, rent, loan, disclose, or otherwise communicate or make available the package, or any part or modification thereof to any person, and shall maintain the confidentiality of the package**, unless otherwise agreed to by **CENTURY** in writing.

*See id.* at para. 11 (emphasis added). *See also* Hilliard Dec., Exhibit "2", at Exhibit "A".

12.     As the emphasized language above reflects, Century considers the source and object code for the Star_Base programs to be protected trade secrets, and was therefore careful in its licensing of the Star_Base software to bind its licensees to an obligation of confidentiality. *See* Hilliard Dec., Exhibit "1", at para. 12.

13.     The School District's information technology staff was well aware of the confidentiality provisions in Century's license agreement. *See* Hilliard Dec. Ex. "10", at 25-29.

14.     When a school or school district licenses one or more of the Star_Base modules from Century, all of the object code and most of the source code for the licensed modules are transferred to the school's computer system. The source code for certain security programs is not delivered. These programs contain key routines that are designed to protect the system as a whole, but not individual programs, from being copied to another computer and used by an unlicensed customer. Nevertheless, the source code and object code transferred to the licensees are protected from disclosure by the provisions of the license agreement. *See* Hilliard Dec. Ex. "1", at para. 13.

15.     The School District employs several people who work in an information technology department and who are generally responsible for the day-to-day administration of Star_Base and other software applications which meet the needs of the schools. Henry Stuckey, David Williams and Brent Qualls were all employed by the School District in this capacity.   *See* Hilliard Dec., Exhibit "2", at para. 4.  Hilliard Dec. Exhibit "10' at 29-30.  Stuckey was the Information Systems Director and supervised Williams and Qualls.

16.     In or around the Summer of 1998, the Miller Defendants were introduced to the School District.  Hilliard Dec. Ex. "11" at 77.  Before that introduction, the Miller Defendants had been engaged in the business of internet website design and/or site hosting for a variety of clients.  None of those clients, however, were school districts.  Hilliard Dec. Ex. "11" at 31-32.  Before the Miller Defendants' work with the School District, therefore, they had never before designed or written any software application for a school system.  *Id*

17.     Despite having no prior experience, the School District and the Miller Defendants entered into a written contract in December 1998 under which the Miller Defendants agreed to develop an "internet-based information system" for the School District. *See* Hilliard Dec. Exhibit "4".  That agreement expressly provided that in exchange for the Miller Defendant's ownership of the new software package, the School District would receive 10% of the revenues "generated by Miller for developing similar applications and software solutions and rendering the same or similar services to any third party."  *Id.*  This provision was not originally in the draft negotiated by

the parties, *see* Hilliard Dec. Ex. "5". However, the School District complained that other vendors had used products developed for the district as a springboard to profits with third parties, and it lamented the loss of those profit opportunities. So it insisted on a "piece" of the Miller Defendant's future business. *See* Hilliard Dec. Exhibit "11", at 89-107. *See also* Hilliard Dec. Exhibit "6".

18.    The School District viewed its own relationship with the Miller Defendants as a "partnership". *See* Hilliard Dec. Ex. "14", at M-3 (Board of Education minutes referring to the "partnership with The Miller Group").

19.    Thus, from the outset of the Miller Defendants' relationship with the School District, both parties expected and intended to develop a software application that would be sold for financial gain outside the School District. *See* Hilliard Dec. Ex. "11" at 101-02. *See also* Hilliard Dec. Ex. "6" at 3-4 ("We feel that an internet/intranet based ... information system is not only appropriate for Springfield School District #186, but also for other school districts as well. We are comfortable enough with the viability of this solution that we intend to market this solution to other school districts in Illinois and other states.")

20.    Incredibly, the contract between the Miller Defendants and the School District further *required* that the Miller Defendants develop this new information system using Century's Star_Base database structures. *See* Hilliard Dec. Ex. "4", at para. 2 ("Features of the System shall include: use of existing data structures (StarBase)"). Indeed, it was clear that the School District wanted the Miller Defendants to build the new system based on the critically important data files contained in Star_Base.

10

*See* Hilliard Dec. Ex. "9" at 1 ("Star_Base will supply us with newer versions and it will be different from what it is today. It will not give the instructional side what it needs. *We have to take the data structures now and build on the existing system and add features we want."*)(emphasis added). *See also* Hilliard Dec. Ex. "10" at 39-40 (Stuckey's testimony referring to the "integrated" relationship between the coded database structures of Star_Base and the other program modules such as student scheduling).

21.    The School District supervised and controlled the Miller Defendants' performance of its work under the contract. Not only is that suggested by the language of the contract itself, but Miller testified that he "worked according to the desires of the Springfield School District". *See* Hilliard Dec. Ex. "11" at 113. In fact, the School District established regular weekly meetings with the Miller Defendants for the purpose of supervising the work. *See* Hilliard Dec. Ex. "10" at 57-58.

22.    Early in the development of the new system, the School District also decided to move one of its own employees, Brent Qualls ("Qualls"), to the Miller Defendants' offices to assist in the development of the software. Qualls was a programmer intimately familiar with Star_Base. In fact, it was precisely because of his familiarity with Star_Base that he was moved over to the Miller Defendants' offices. *See* Hilliard Dec. Ex. "10" at 58-61 ("Q: Do you know why Mr. Qualls was spending all of this time over at the Miller Group's offices working on this project? A: I think initially to help them understand what was in Star_Base....").

11

23.     Qualls had access to the source code for Star_Base.  *See* Hilliard Dec. Ex. "10" at
        36.

24.     For a nearly two-year period, Qualls worked almost exclusively on-site at the Miller
        Defendant's offices, while still employed by the School District, coding programs for
        the new information system.  Hilliard Dec. Ex. "10" at 35-36 and 60-61; *see also*
        Hilliard Dec. Ex. "12", at 37-38.

25.     During that same period of time, the School District established dial-up access from
        Miller's offices to the server at the School District on which the Star_Base programs
        (including the source code) resided.  Consequently, Qualls and the Miller Defendants
        had direct access to the Star_Base source code during the critical period of time
        when the new information system was being developed.  *See* Hilliard Dec. Ex. "10"
        at 47-48.

26.     Stuckey and another School District programmer familiar with Star_Base, David
        Williams ("Williams") raised concerns at several meetings that the School District's
        actions in permitting Miller access to Star_Base might be a violation of the School
        District's license agreement and also might infringe on Century's copyrights.  *See*
        Hilliard Dec.  Ex. "10" at 50-55; Ex. "12", at 57-60.  Not only were key School
        District employees present at these meetings, but Miller himself was as well.  *Id.*

27.     During the time period Miller was working on the new system, he offered jobs to
        Qualls and other employees at the School District.  *See* Hilliard Dec. Ex. "11", at
        182-85, 201-204.  In fact, the key supervisory official at the School District over
        Miller's work for the district, Mike Holinga, became Miller's "Sales & Projects

Manager" after his retirement from the School District. *See* Hilliard Dec. Exhibit "8", at p. 12.

28.     In February 2003, a Century employee, Robert Magan, received an unsolicited phone call from Don Randle, a former information technology employee of the School District. Randle asked Magan: "How would you feel if someone was stealing your software?" When Magan asked what he meant, Randle explained: 1) that he had left his employment at the School District about 6 months earlier; 2) that while still employed, he was aware that the School District had retained The Miller Group to write some front-end programs to interface with the Star_Base database; and 3) that he "knew for sure" that The Miller Group was using Century's database structures, and that he was fairly certain that The Miller Group was also using Century's scheduler program (a component of the Star_Base software). *See* Hilliard Dec. Ex. "2" at para. 7.

29.     Randle further told Magan that Qualls had been "reassigned" within the School District to assist the The Miller Group in developing this new software. Randle then told Magan that if he wanted further information, he should contact Williams at the School District. *Id.*

30.     Following this conversation with Randle, Magan discovered that the Miller Defendants had posted information on its internet website concerning a product called InfoSystems 3. The InfoSystems 3 product was marketed on the website as an "online student information system", which is precisely the type of system Century licensed to the School District. *See* Hilliard Dec. Ex. "2" at para. 8.

31.     Magan then received an unsolicited phone call from Williams shortly after his conversation with Randle.   Williams (a then current employee of the School District)  told Magan that the Miller Defendants "stole" Century's software, that employees of the School District (including Williams) had told the Miller Defendants that they didn't think that what they were doing was right, and that the Miller Defendants' response was: "we are here and [Century] is in New Jersey", and "they will never find out".  Williams further told Magan that he and others cautioned the Miller Defendants that Century's software was copyrighted.  *See* Hilliard Dec. Ex. "2" at para. 9.

32.     Following this last conversation, Williams mailed to Century a list of the table definitions from The Miller Group's InfoSystems 3 product.  Upon comparing these definitions with Star_Base, Century discovered that virtually all of the definitions were identical.  *See* Hilliard Dec. Ex. "2" at para. 9; *see also* Ex. "12" at 52-57.

33.     Williams also mailed to Century the program listing from a portion of The Miller Group's product – the "student scheduler".  Once again, in comparing this to Star_Base, Century discovered that the source code used in InfoSystems 3 has verbatim references to Century's Star_Base tables.  *See* Hilliard Dec. Ex. "2" at para. 10; *see also* Ex. "12" at 61-64.

34.     Century's expert, P.G. Lewis & Associates ("Lewis"), has issued a written report opining, among other things, that: a) the software programs developed by the Miller Defendants are substantially similar to Star_Base in their structure, sequence and organization; b) that the Miller Defendants' scheduler program, which is one of the

core Star_Base programs, is substantially similar to Star_Base's scheduler program, both in its literal source code and in its structure, sequence and organization; and c) the database structures of the Miller Defendants' software package are substantially similar to Star_Base's database structures.  *See* Hilliard Dec. Exhibit "7", at 51-53 ("Summary of Findings").

35. The Miller Defendants have successfully sold and installed the InfoSystems 3 software at several area school districts.  *See* Hilliard Dec. Ex. "3" and Ex. "13".

36. At least $15,000 is still owed by the Miller Defendants to the School District under their "partnership" agreement.  *See* Hilliard Dec. Ex. "13", at #8; Ex. "14", at page M-4.

## THE STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

The School District accurately recites the basic standard under the plain language of Rule 56, but neglects to cite the law governing how that standard is applied.   The School District bears the burden of demonstrating the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1363 (7th Cir. 1988). The Court must examine all of the evidence on a summary judgment motion in a light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. *Bowyer v. United States Air Force*, 804 F.2d 428, 430 (7th Cir. 1986).

## ARGUMENT

## CENTURY HAS PROPERLY PLED AND DEMONSTRATED A TRIABLE CLAIM FOR COPYRIGHT INFRINGEMENT

The School District first contends that Century has failed to properly plead a claim for direct infringement against the Miller Defendants, and therefore, Century's claims of contributory and

15

vicarious infringement must also fail because they derive from the underlying direct infringement claims.   To state a claim for copyright infringement, a plaintiff need only allege ownership, registration and infringement. *Mid America Title Company v. Kirk*, 991 F.2d 417, 421-22 (7th Cir. 1993)(reversing district court's dismissal of copyright infringement claim  where plaintiff had alleged ownership, registration and infringement); *Reinke + Associates Architects Inc. v. Cluxton*, 2003 WL 1338485 at *1 (N.D. Ill. March 18, 2003); *Store Decor Division v. Stylex Worldwide Industries, Ltd.,* 767 F. Supp. 181, 184-85 (N.D. Ill. 1991)(denying motion to dismiss copyright infringement claim where plaintiff alleged ownership of a valid copyright and copying by defendant); *Friedman, Eisenstein, Raemer & Schwartz,* 599 F. Supp. 902, 903-04 (N.D. Ill. 1984)(denying Fed.R.Civ.P. 12(b)(6) motion to dismiss copyright infringement claim where plaintiff alleged ownership, registration and infringement). *See also Scholz Design, Inc. v. Buralli*, 2001 WL 1104647 (N.D. Ill. Sept. 18, 2001)(denying motion to dismiss copyright infringement claim where plaintiff alleged ownership, registration and copying by defendants)("These facts allow Defendants to determine what Plaintiff's claim is and the grounds for the claim. The parties may through discovery inquire further into details underlying the claim").

In *Mid America*, the Seventh Circuit reversed the district court's dismissal of a copyright infringement claim, concluding that the district court took too narrow a view of what Rule 8 requires in the pleading of an infringement claim. *Mid America*, 991 F.2d at 417.  Here, Century has alleged ownership, registration and infringement, and has done so in detail:

- • Century alleges that many years ago, it developed an initial set of computer programs known as S.T.A.R.S., an acronym for "Student Academic Records System".   In 1983, the company applied for and received copyright registrations for the S.T.A.R.S. programs, including the source and object code of those programs.  The programs were registered as <u>unpublished</u> works because they were considered trade secrets of Century and were disclosed

16

only to school district customers that executed license agreements. *See* First Amended Complaint, para. 10.

• Century alleges that in or around 1990, Century upgraded the S.T.A.R.S. student software platform, and renamed it "Star_Base." The Star_Base screens have been registered with the U.S. Copyright Office. The Star_Base source code has also been registered as an unpublished work. The effective date of the copyright registration is November 22, 1995. *See* First Amended Complaint, para. 11.

• Century alleges that it licenses the Star_Base copyrighted software to school districts under a standard license agreement which contains strict confidentiality provisions. The license agreements prohibit the licensees from disclosing the source code of the Star_Base programs to any third party. The School District is one such district which entered into a license agreement with Century. *See* First Amended Complaint, paras. 14-15.

• Century alleges that in February 2003, a Century employee received two phone calls, one from a former School District employee, and one from a current employee, who told Century that: 1) the School had retained the Miller Defendants to write some front-end programs to interface with the Star_Base database; 2) that the Miller Defendants were using Century's database structures and Century's scheduler program (both components of the Star_Base software); and 3) that the Miller Defendants "stole" Century's software. *See* First Amended Complaint, paras. 21-22.

• Century alleges that it received from the current School District employee a list of the table definitions from the Miller Defendants' InfoSystems 3 product, which were virtually identical to the Star_Base tables. Century further alleges that it also received a portion of one of the programs of InfoSystems 3 – the "student scheduler" – which contained identical source code to Century's Star_Base tables. *See* First Amended Complaint, paras. 23-24.

Century alleges: 1) that it is the owner of the registered copyrights in Star_Base; 2) that the Miller Defendants had access to the source code of Star_Base; 3) that this access was achieved through the Miller Defendants' relationship with the School District; 4) that indeed, the contracts between the School District and the Miller Defendants *required* the Miller Defendants to develop for the School District a software product *using crucial source code from Star_Base*; 5) that the Miller

Defendants knowingly and willfully copied the copyrighted Star_Base programs in creating their InfoSystems 3 product; and 6) that InfoSystems is based on the copyrighted Star_Base programs, is identical or substantially similar to the copyrighted programs in their literal source code, and in their structure, sequence and organization.  *See* First Amended Complaint, paras.  19, 27-30.

These detailed statements plainly state a claim for copyright infringement, because they allege ownership, registration and infringement (and indeed, they allege a great deal of detail not even required under Rule 8).  Nothing more is required.  *See Mid America*, 991 F.2d at 421 ("We cannot accept the argument that plaintiffs in cases such as this one [alleging copyright infringement] must be held to a particularity requirement akin to Federal Rule of Civil Procedure 9(b)").  To be sure, the School District's belated challenge to the sufficiency of the pleadings is an exercise in semantics.  The School District pulls selected phrases from the First Amended Complaint and contends that they fail to allege an infringement.  For example, it contends that the allegation of "use" is qualitatively different from an allegation of "copying", that references to "code" are somehow deficient because they do not explicitly say "*source* code", and that allegations which refer to "crucial components" say nothing because they do not also explicitly say "*copyrightable* components".  The School District's parsing of selected excerpts of the First Amended Complaint misses the clear picture drawn by the entire pleading: that the Miller Defendants gained access to the copyrighted computer programs of Star_Base through their contract with the School District, and copied both the literal source code and the structure and logic of the programs in creating a competing product.  This picture was not lost on this Court, however, because it was this Court which concluded that these same allegations (coupled with the evidentiary proof submitted by

18

Century) not only stated a claim for infringement, but proved a *substantial likelihood of success* on

the merits of that claim:

> Century's Complaint identifies Star_Base as the subject of its claim, asserts that it owns the copyright to Star_Base and that Star_Base has been registered, and claims that the Defendants have infringed on the Star_Base copyright by duplicating the program's codes and tables. These facts are sufficient to establish Century's likelihood of succeeding on its copyright claim.

*See* Court's Order entered May 8, 2003 at 6-7.

Indeed, although the School District's motion continues to focus exclusively on Century's

pleading (despite the conversion of its motion to dismiss into one for summary judgment), Century

has come forward with facts supporting all of its allegations. Century has demonstrated: 1) that it

owns the Star-Base software, *see* Hilliard Dec. Ex. "1"; 2) that the Miller Defendants had direct

access to the software, *see* Hilliard Dec. Ex. "10", at 47-48; and 3) that elements of both the literal

source code and the structure, sequence and organization of the Miller Defendants' InfoSystems 3

product are substantially similar to Star_Base, *see* Hilliard Dec. Ex. "7". The lengthy report of

Century's expert, which examined the programs in detail, summarized the breadth of the

infringement:

> [We are] of the opinion, to a reasonable degree of certainty, that substantial portions of the [InfoSystems 3] system are a copied and translated duplicate of the Century Consultants Star_Base system. In almost all areas explored, [we] found identical or substantially similar logic, table names, field names, definitions, and source code between the two applications.

*See* Hilliard Dec. Ex. "7", at 53. This evidence, coupled with the additional evidence that 2

different employees of the School District actually contacted Century to alert the company to the

infringements, easily creates issues of fact which compel the denial of summary judgment.

## <u>CENTURY HAS PROPERLY PLED AND DEMONSTRATED A TRIABLE CLAIM FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT</u>

Century has pled a proper claim against the School District for contributory infringement. A party can be liable for contributory infringement where the party "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." *Design Craft Fabric Corp. v. K-Mart Corp.,* 1999 WL 1256258, at *4 (N.D. Ill. Dec. 21, 1999)(*quoting Gershwin Publ'g Corp. v. Columbia Artists Mgt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971)).

Here, Century alleges that the School District knowingly and intentionally entered into a contract with the Miller Defendants under which the School District *required* the Miller Defendants to develop a student administration software product which *used* Century's Star_Base source code. In fact, that requirement was *written into the contract itself.  See* Hilliard Dec. Ex. "4" ("Features of the System shall include: use of existing data structures (StarBase)").  Moreover, that same contract provided that the School District would share in the revenues generated by the sale of this new product.  *Id.* at ¶ 8.  Based on these allegations, Century has pled a claim for contributory infringement because it alleges that the School District has knowingly induced, caused or materially contributed to the infringing conduct of the Miller Defendants.

And the evidence developed so far in discovery leads inescapably to the conclusion that triable issues of fact exist on this claim.  That evidence reveals that the School District embarked upon a course of conduct designed to give the Miller Defendants direct access to Century's software for the purpose of building a new system which would benefit the School District.  *See* Hilliard Dec. Ex. "4", Ex. "9"; Ex. "10".  The School District materially contributed to the Miller Defendants' actions, and did so in part because it wanted a share in the revenues generated by the Miller Defendants on future sales of InfoSystems 3 to third parties.  It is difficult to imagine a stronger case

20

for contributory infringement.  Accordingly, the School District's motion for summary judgment on

Count II of the First Amended Complaint must be denied.

## CENTURY HAS PROPERLY PLED AND DEMONSTRATED A TRIABLE CLAIM FOR VICARIOUS COPYRIGHT INFRINGEMENT

The School District contends that Century has failed to properly plead a claim for vicarious

copyright infringement.  The School District is incorrect.  A claim for vicarious liability requires a

plaintiff to plead that the defendant is liable for the infringing conduct of another party because it

has "the right and ability to supervise the infringing activities [of the other party] as well as a direct

financial interest in those activities." *F. E. L. Publications, Ltd. v. National Conference of Catholic

Bishops*, 466 F.Supp. 1034 (N.D. Ill. 1978).  *See also Hard Rock Cafe Licensing Corp. v.

Concession Services, Inc.,* 955 F.2d 1143, 1150 (7th Cir.1992) (vicarious copyright infringement is

established when a defendant has "the right and ability to supervise infringing activity and also has

direct financial interest in such activities.")

Century has explicitly pled, not in conclusory fashion but with specific facts, that the School

District had the right and ability to supervise the Miller Defendants' infringing activities, and had a

direct financial interest in those activities.  *See* First Amended Complaint, paras. 19, 36-37.   Under

its agreement with the Miller Defendants, the School District *required* the Miller Defendants to

develop a product that used Century's Star_Base source code.  *See* Hilliard Dec. Ex. "4", at ¶ 2

("Features of the System shall include: use of existing data structures (StarBase)").  Importantly, the

contract also: a) contained other requirements for the development of the software (dictated by the

School District); b) gave the School District the right to review development progress on a monthly

basis; and c) accorded the School District the "right to terminate this Agreement at any time if it is

not satisfied with development progress or the pace of System development".  *Id.* at ¶¶ 2 and 6.

Clearly, the contract itself demonstrates that the School District had the "right and ability" to supervise the development of the infringing software.  Miller testified that the School District actually exercised supervisory authority over how he developed the software.  *See* Hilliard Dec. Ex. "11" at 113.  *See also* Hilliard Dec. Ex. "10", at 57-61.  Clearly, Century has demonstrated a triable issue of fact on the "supervisory" element of a vicarious infringement claim.  *See also Seals v. Compendia Media Group*, 290 F.Supp.2d 947, 953 (N.D. Ill. 2003) ("Although plaintiff in the instant case does not allege that defendants directly supervised the distribution of plaintiff's copyrighted works, the fourth amended complaint does allege that defendants supervised and directed the copying of plaintiff's works and delivered those copies to [co-defendant], essentially setting the alleged infringement in motion").

Moreover, the contract provided that the School District would share in the revenues generated by the sale of the new software product.  *Id.* at ¶ 8.  Under the contract, then, the School District had a direct financial interest in the sale of the software.   These allegations plainly are enough to satisfy the "financial interest" element of a vicarious infringement claim.  And the evidence developed during discovery has sustained these allegations.  *See* Hilliard Dec. Ex. "4", Ex. "5", Ex. "11", at 89-107; Ex. "14".   The motion for summary judgment on Count III of the First Amended Complaint should be denied.

## CENTURY HAS PROPERLY PLED AND DEMONSTRATED A TRIABLE ISSUE OF FACT ON  THE EXISTENCE OF AN IDENTIFIABLE TRADE SECRET

Next, the School District argues that Century's trade secret misappropriation claim in Count IV has been inadequately pled.   To state a claim for misappropriation of a trade secret under the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/1 *et seq.,* the Complaint must allege that

information was (1) a trade secret, (2) misappropriated and (3) used by defendant. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir.1992).[2]

Here, the School District argues that Century has failed to properly plead the existence of an identifiable trade secret. A virtually identical set of circumstances was presented in ***AutoMed Technologies, Inc. v. Eller***, 160 F.Supp.2d 915 (N.D. Ill. 2001), and the district court in *AutoMed* concluded that the complaint sufficiently pled a trade secret claim even though it did not identify the trade secret with detailed specificity:

> [T]he original complaint was by no means a model of specificity. It alleged generally that AutoMed's software, design plans and research and development, related to OptiFill, Next Generation and the MegaPharmacy Project, were trade secrets. 'It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets.' *Composite Marine*, 962 F.2d at 1265. The amended complaint is not much better, but it does meet minimal ***Fed.R.Civ.P.*** 8(a) requirements. 'Courts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets.' ***Leucadia, Inc. v. Applied Extrusion Technologies, Inc.***, 755 F.Supp. 635, 636 (D. Del.1991). Although it

---

[2]     In responding to this motion, Century does not concede that its common law trade secret claims should be decided under Illinois law.  Indeed, the license agreement between Century and the School District expressly provided that New Jersey law governed.  *See* Affidavit of Agnes Nunn, Exhibit "D".  Nevertheless, because the basic elements of a trade secret claim under New Jersey common law are not substantially different from those under the Illinois Trade Secrets Act, the Court's analysis of the sufficiency of the Complaint should be the same under either state's law.

repeats the general allegations, it also specifies Staffing Simulation software and the source code for PPS software as trade secrets (cplt.¶¶ 42-43). These are much more specific. And although the generic references to the three research projects are problematic for discovery, they do provide defendants with some notice as to the substance of the claims.... [P]laintiff will ultimately need to identify which specific designs, software or research defendants allegedly misappropriated. But for withstanding a motion to dismiss, the amended complaint suffices.

*Id.* at 920-21.  The district court in *AutoMed* also observed:

> The cases rejecting trade secret claims for lack of specificity are predominantly at later stages in the litigation process. *See, e.g., Lear Siegler, Inc. v. Glass Plastics Corp.*, 1987 WL 15749 (N.D.Ill. Aug.12, 1987) (granting summary judgment to defendant); *Composite Marine*, 962 F.2d at 1266 (overturning jury verdict). *Courts only dismiss a claim for lack of specificity on the pleadings in the most extreme cases. See, e.g., Thermal Zone Products Corp. v. Echo Eng., Ltd.*, 1993 WL 358148 at *5-6 (N.D.Ill. Sept.14, 1993) (dismissing complaint that merely recited statutory language).

*Id.* at n. 3 (emphasis added).

Century has pled the existence of an identifiable trade secret – the source code of the Star_Base software package.  *See* First Amended Complaint, paras. 10, 25, 39-42.  Moreover, Century identified specific aspects of the source code which were unlawfully used by the School District and the Miller Defendants – for example, the "student scheduler" program.  *See* First Amended Complaint, para. 24.  Any more detail would be inappropriate in a pleading because it would involve public disclosure of the source code.  *See AutoMed*, 160 F. Supp. 2d at 920-21.  Nevertheless, that detail has been provided to the School District.  A complete cd containing Century's programs has been provided to the School District's counsel in discovery, and has already been examined by the School District's expert.  Moreover, the report of Century's expert (which has

24

been produced in discovery and is filed under seal on this motion) provides an exhaustive, 75-page long comparison of InfoSystems 3 with the Star_Base software package. *See* Hilliard Dec. Ex. "7". The School District is hardly in the dark about Century's trade secret claim. Accordingly, the School District's motion for summary judgment on Count IV should be denied.

## CENTURY'S MISAPPROPRIATION OF TRADE SECRETS AND UNFAIR COMPETITION CLAIMS ARE NOT PREEMPTED BY THE COPYRIGHT ACT

Next, the School District contends that Century's trade secret and unfair competition claims are preempted by the Copyright Act.[3] It is well settled that equivalent state causes of action are expressly barred under Section 301 of the Copyright Act if the Act already protects those rights. *Alcatel USA, Inc. v. DGI Techs. Inc.,* 166 F.3d 772, 785 (5th Cir.1999). The Seventh Circuit has established a two-pronged test to determine whether a state law claim is equivalent to one protected by the federal copyright law: (1) the work in which the right is asserted must be fixed in a tangible form and come within the subject matter of copyright as specified in Sections 102 or 103 of the Copyright Act, and (2) the right asserted must be equivalent to any of the rights specified in Section 106. *Baltimore Orioles v. Major League Baseball Players Ass'n,* 805 F.2d 663, 674 (7th Cir.1986).

For the purposes of this motion, Century concedes that the computer programs and associated educational software at issue are fixed in a tangible medium and come within the subject matter of copyright. Thus, to avoid preemption, Century's state law claims must incorporate an

---

[3]    For some reason, the School District's latest Memorandum of Law omits any argument that the trade secret claims are preempted, and argues exclusively that the unfair competition claims are preempted. Apparently, the arguments concerning preemption of the trade secret claims have been abandoned. Nevertheless, we will address both arguments here because they are so interrelated.

"extra element" which makes the claims qualitatively different from a copyright infringement claim. *Id.* at 677.

This extra element is explicitly pled by Century's allegation that the School District intentionally breached its contractual confidentiality obligations to maintain the secrecy of the source code of the Star_Base package it licensed from Century. *See* First Amended Complaint, at paras. 14, 15, 41, 42. Century's claims against the School District for misappropriation and unfair competition are founded on this basic factual allegation, and in its motion, the School District fails to cite a *single case* holding that in these circumstances, misappropriation claims are preempted. This failure is not surprising, for a number of decisions hold that such claims are *not* preempted. *See Computer Associates Int'l v. Quest Software, Inc.,* 2003 WL 21799259 at *2 (N.D. Ill. July 24, 2003)("A claim that defendants breached a contractual duty of confidentiality is qualitatively different than a claim of copyright infringement"*); Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales, Inc.,* 223 F. Supp.2d 953, 957-58 (N.D. Ill. 2002)("a trade secret claim based on breach of confidentiality qualitatively changes the nature of a copyright infringement action" and therefore is not preempted); *Pivot Point International, Inc. v Charlene Products, Inc.*, 1994 WL 330347 at *8 (N.D. Ill. July 1, 1994)("[A] claim alleging that Defendants breached a trust or confidential relationship and misappropriated a trade secret would not be preempted and would be actionable"); *Warrington Associates, Inc. v Real-Time Engineering Systems, Inc.*, 522 F.Supp. 367, 368-69 (N.D. Ill. 1981)("An analysis of the interests secured by Copyright and trade secret law makes plain that the claims are not 'equivalent' as intended by the Congress....[I]t is hardly surprising that neither Congress nor the courts have viewed the federal Copyright Act as preempting

26

the common law of trade secret misappropriation"). *See also Bishop v. Wick*, 1988 WL 166652 at *6 (N.D. Ill. Dec. 29, 1988).

In addition, Century alleges that the School District was not only involved in the copying of Star_Base, but in the use of the content of the program to develop a competing product. Thus, for example, the use of the data contained in the source code to construct a competing product constitutes an action different in kind from that based upon the mere copying of components of a computer program and claims based on such unauthorized "use" are not preempted. *See McNabb Bennett & Associates, Inc. v Terp Meyers Architects*, 1987 WL7817 (N.D. Ill. March 10, 1987)(citing *Rand McNally & Company v Fleet Management Systems, Inc.*, 591 F.Supp. 726, 739 (N.D. Ill. 1983) ("While the copyright laws attempt to prevent the copying of another's work, the cause of action for misappropriation focuses on the question of whether the defendant actually used, not copied, another's property and thereby profited from the plaintiff's expenditure of time, labor and expense."). Century has properly and sufficiently pled allegations of such use. *See* First Amended Complaint, paras. 11, 12, 13 and 25. Accordingly, for all of the above reasons, Century's misappropriation of trade secrets and unfair competition claims, which are based on the breach of the School District's contractual obligations of confidentiality, are not preempted by the Copyright Act.

### CENTURY HAS PROPERLY PLED AND DEMONSTRATED A TRIABLE CLAIM FOR BREACH OF THE LICENSE AGREEMENT

In its initial motion to dismiss, the School District contended that Century failed to plead performance of conditions precedent in connection with its claim for breach of the license agreement, and it sought dismissal under Fed.R.Civ.P. 9(c). Now, on this motion for summary

judgment, the School District has apparently abandoned this argument,[4] and instead contends that Century's pleading is insufficient because it fails to specifically allege a breach of the license agreement by the School District.

The School District's tortured reading of the First Amended Complaint is hardly persuasive. Even though it need only put the School District on notice of the nature of the claim, Century actually pled in detail the facts supporting its breach of contract claim.     The First Amended Complaint ("FAC") alleges: 1) that the School District is a licensee of the Star_Base software under a written license agreement, *see* FAC para. 15; 2) that the license agreement provides that the software is the trade secret of Century, and prohibits the School District from disclosing the package to a third party, *id.*; 3) that the School District contracted with the Miller Defendants, a third party, to design a new software package for its student information needs, *see* FAC paras. 18-19; 4) that the School District not only required the Miller Defendants to use Star_Base to develop the new system, but derived a financial benefit from it, *see* FAC para. 19; 5) that School District employees told Century that the Miller Defendants in fact were copying portions of Century's source code and using the software to build the new system, *see* FAC paras. 21-25; and 6) that the School District knowingly disclosed Century's programs to the Miller Defendants, *see* FAC para. 42, and knowingly contributed to the Miller Defendants' activities, *see* FAC at paras. 33-34.  These allegations support Century's claim that the School District breached the license agreement by disclosing Century's proprietary software to a third party.  Accordingly, the School District's motion for summary judgment on Count VII of the First Amended Complaint should be denied.

---

[4]     If the School District were to contend that it was not abandoning this argument, Century relies on the Memorandum of Law opposing the initial motion to dismiss, which demonstrated that Century's pleading complied with Rule 9's requirements.

28

## **CONCLUSION**

For all of the foregoing reasons, Century respectfully requests that the Court deny the

School District's motion for summary judgment.

Respectfully submitted,

**CENTURY CONSULTANTS, LTD.**,
Plaintiff

By:   /s/ David A. Herman
         One of its Attorneys

Lead Counsel
Craig S. Hilliard
STARK & STARK
A Professional Corporation
P.O. Box 5315
Princeton, NJ 08543-5315
(609) 896-9060

Local Counsel
David A. Herman
GIFFIN, WINNING, COHEN & BODEWES, P.C.
One West Old State Capitol Plaza
Myers Building - Suite 600
P.O. Box 2117
Springfield, IL   62705
(217) 525-1571

## **PROOF OF SERVICE**

Service of the foregoing document was made by providing a copy thereof, via electronic

filing, to:

Almon A. Manson, Jr.
Brown, Hay & Stephens
205 S. Fifth Street, Suite 700
P.O. Box 2459
Springfield, Illinois 62705

Lance T. Jones
Law Offices of Lance T. Jones
1100 S. Fifth Street
Springfield, IL  62703

this 8th day of November, 2004.

**_____/s/ David A. Herman_____**