E-FILED
Friday, 15 July, 2005  03:28:30 PM
Clerk, U.S. District Court, ILCD

EXHIBIT

11

```
             IN THE UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF ILLINOIS
                    SPRINGFIELD DIVISION


CENTURY CONSULTANTS, LTD.,        )
                                  )
     Plaintiff,                   )
                                  )
vs.                               )   No. 03-CV-3105
                                  )
THE MILLER GROUP, INC., JOHN G.   )
MILLER, and THE SPRINGFIELD       )
PUBLIC SCHOOL DISTRICT 186,       )
                                  )
     Defendants.                  )
```

The Deposition of:

JOHN G. MILLER
October 19, 2004


JULIE L. BLOOME REPORTING
104 Maple Street
Post Office Box 264
Raymond, Illinois 62560
217/229-3309

Page 30

```
1       A. Not to my knowledge. There may have been
2   but not to my knowledge.
3       Q. You don't recall --
4       A. Not to my memory, excuse me.
5       Q. Okay. You indicated a few minutes ago
6   that you hired Jennifer Danzinger to do website design
7   work, and she was paid through The Miller Group,
8   correct?
9       A. Yes.
10      Q. And am I correct then she received a W-2?
11      A. Yes.
12      Q. Did you eventually hire anyone else to do
13  work for The Miller Group?
14      A. Yes.
15      Q. Who did you hire?
16      A. Dr. William Choat. Do you want a list of
17  everybody we've ever hired?
18      Q. I'd like to go through a little bit of a
19  list here. When did you hire Mr. - Dr. Choat?
20      A. I would estimate it was 1999.
21      Q. And why did you hire him?
22      A. To work on the Springfield School
23  District project.
24      Q. Specifically for that project?
```

```
1       Q. Before you became involved with the
2   Springfield School District through The Miller Group,
3   had you had any experience at all working with a
4   school or a school district on any business
5   application?
6       A. No.
7       Q. You personally had not been involved in
8   any way prior to getting involved with the Springfield
9   School District in designing or writing any software
10  application for use in a school; is that correct?
11      A. Before getting involved with the
12  Springfield School District?
13      Q. Yes.
14      A. No.
15      Q. So it would be accurate to say that for
16  you getting involved with the Springfield School
17  District was new ground?
18      A. Yes.
19      Q. At least in terms of the client, right?
20      A. Yes.
21      Q. You just mentioned hiring Dr. Choat in
22  1999, and he was hired specifically to work with the
23  Springfield School District project?
24      A. Yes.
```

Page 31

```
1       A. Yes.
2       Q. At that time, did The Miller Group have
3   any other projects it was working on?
4       A. Yes.
5       Q. It had other clients, correct?
6       A. Yes.
7       Q. How many other clients? Can you give me
8   an approximation of the number?
9       A. Yes, estimate between 10 and 20.
10      Q. In 1999 when Mr. -- Dr. Choat was hired?
11      A. Uh-huh.
12      Q. 10 to 20?
13  MR. JONES: Is that a yes?
14  THE WITNESS: Yes, I'm sorry.
15  BY MR. HILLIARD:
16      Q. And were you doing primarily website
17  design and/or hosting for those 10 to 20 clients?
18      A. Yes.
19      Q. And do you recall how -- approximately
20  how much in revenues you generated in 1999 from those
21  10 to 20 clients?
22      A. It would be difficult for me to guess.
23      Q. Were any of those clients schools?
24      A. No.
```

```
1       Q. Anyone else that you hired after Ms.
2   Danzinger in or around the time you hired Dr. Choat?
3       A. No. There were other people subsequent
4   to that but not around that time.
5       Q. I'm trying get a sense of the progression
6   of your business. You hired Ms. Danzinger first then
7   you brought on Dr. Choat for Springfield work,
8   correct?
9       A. Yes.
10      Q. Were you bringing on anyone else at that
11  time for the Springfield work?
12      A. Not at that time.
13      Q. Did you eventually?
14      A. Yes.
15      Q. Who did you eventually bring on?
16      A. Michael David.
17      Q. When did you hire Mr. David?
18      A. I cannot honestly remember. I would
19  guess that it was 2000, 2001, somewhere in that area.
20      Q. Okay. Why did you hire Mr. David?
21      A. Mr. David possessed unique Lenix and Unix
22  networking skills that we needed, some programming
23  skills.
24      Q. Why did you need that?
```

### Page 38

```
 1   for maintenance of their site, and so we would not
 2   bill at an hourly basis.
 3       Q. Okay. Dr. Choat was salaried, correct?
 4       A. Yes.
 5       Q. Was Mr. David and Mr. Borecky also
 6   salaried?
 7       A. No, they were part-time employees.
 8       Q. So they were paid by the hour?
 9       A. Yes.
10       Q. Okay. And they had to submit time
11   sheets?
12       A. Yes.
13       Q. Do you still maintain those records?
14       A. I don't know. I think we might. I can't
15   be certain.
16       Q. Okay. Have you in the normal course of
17   your business discarded or destroyed any records going
18   back to let's say 1999 or 2000? Really what I'm
19   asking you is --
20       A. Yeah.
21       Q. -- do you believe that some of those time
22   records might have been discarded or destroyed in the
23   normal course of your business?
24       A. Yes.
```

### Page 39

```
 1       Q. Okay.
 2       A. We may be missing one or two, but I think
 3   we have many of them.
 4       Q. You believe you have many of them?
 5       A. Uh-huh.
 6       Q. Okay. When Mr. David was brought on in
 7   2000 to 2001, were you still doing work for those 10
 8   to 20 other clients?
 9       A. Yes.
10       Q. You said that you were doing website work
11   for in 1999?
12       A. Yes.
13       Q. So you maintained that client base; is
14   that correct?
15       A. Yes.
16       Q. Did you also add clients?
17       A. We would add and lose clients in the
18   course of normal events.
19       Q. Did you hire anyone else in the time
20   frame 1999 to 200, 2001 other than Dr. Choat, Mr.
21   David, and Mr. Borecky. You've given me a list of
22   employees --
23       A. Again that one referral from Mr. David.
24       Q. Okay.
```

### Page 38 (right column continued)

```
 1       A. His name I cannot remember. He was o
 2   there for a month or two.
 3       Q. Okay.
 4       A. Dougal Walker was an employee, but did
 5   --
 6       Q. What's the first name, I'm sorry.
 7       A. Dougal, D-o-u-g-a-l. He didn't work on
 8   the Springfield project though.
 9       Q. Dougal Walker?
10       A. Uh-huh.
11       Q. Okay. Programmer?
12       A. Website designer, programmer.
13       Q. How long -- is that a Mr. or Ms.
14       A. Mr.
15       Q. All right. How long was Mr. Walker
16   employed by The Miller Group?
17       A. Probably two years, part-time basis.
18       Q. Two years, part-time?
19       A. Uh-huh.
20       Q. Do you recall approximately what years?
21       A. Would I say '97 to '99.
22       Q. '97 to '99?
23       A. Uh-huh. '98, maybe, somewhere in that
24   area.
```

### Page 39 (right column continued)

```
 1       Q. Anyone else that you can recall?
 2       A. Up to 2000? I can't recall anybody.
 3   There may have been other employees.
 4       Q. Okay. Now let me take you forward to --
 5   let's use the date May 2003 which was when this
 6   lawsuit was filed.
 7           Up through May 2003, did you add any
 8   other employees for The Miller Group in addition to
 9   the ones we've already discussed?
10       A. Yes.
11       Q. Okay.
12       A. We added Sara Hill in a marketing
13   capacity.
14       Q. Sara Hill?
15       A. Uh-huh.
16       Q. Okay. When you say "marketing capacity,"
17   what do you mean?
18       A. To develop marketing materials for The
19   Miller Group, to help with demonstrations and
20   presentations and anything we could find to increase
21   our business.
22       Q. Do you recall when you hired her?
23       A. No. She was an employee of the
24   Springfield School District and left the Springfield
```

## Page 42

1  School District, and it took me about six months to
2  get her to return to work. So she had a child at
3  home, so...
4     Q. Ise related in any way to Dr. Hill?
5     A. Yes.
6     Q. Daughter?
7     A. Wife.
8     Q. Wife, okay. Dr. Hill is Dr. Robert Hill,
9  correct?
10    A. Yes.
11    Q. And he at one time was the superintendent
12 of schools, correct?
13    A. Of Springfield schools.
14    Q. Of the Springfield School District,
15 correct?
16    A. Yes.
17    Q. Do you consider yourself a personal
18 friend of Dr. Hill's?
19    A. Um, yes, good acquaintance.
20    Q. Was it through Dr. Hill that you first
21 got involved with the Springfield School District?
22    A. No.
23    Q. Went through someone else?
24    A. Yes.

1  work directed towards Springfield?
2     A. Um, no, I can't recall any.
3     Q. Okay.
4     A. It's possible, but I can't recall any.
5     Q. Before you hired Sara Hill, were you
6  doing anything in the way of marketing or advertising
7  your business to the public?
8     A. Yes.
9     Q. What were you doing?
10    A. We had a website ourselves, we did some
11 e-mail marketing, some direct mail.
12    Q. Okay. When did you set up your website
13    A. My estimate would be 1997.
14    Q. Fairly early on in the business, correct?
15    A. Uh-huh.
16    Q. You have to verbalize, sir, I'm sorry?
17    A. Yes.
18    Q. And that website address was
19 Miller-Group.net?
20    A. Yes.
21    Q. From the beginning days of the business?
22    A. Yes.
23    Q. Website address hasn't changed, has it?
24    A. No.

## Page 43

1     Q. Had you known Dr. Hill before you got
2  involved in the Springfield School District?
3     A. No.
4     Q. You met him through your work?
5     A. Yes.
6     Q. On the project for the School District?
7     A. Yes.
8     Q. All right. So, you don't recall
9  approximately when you hired Dr. Hill's wife, Sara?
10 Sorry to be pressing you on this there is a method to
11 my madness.
12    A. No. I don't recall. I would guess 1999,
13 2000, somewhere in that area.
14    Q. Okay. And then she became -- she was not
15 a programmer, correct?
16    A. No, she was not a programmer.
17    Q. She did strictly marketing work for the
18 business, right?
19    A. That's correct.
20    Q. And was that marketing work directed at
21 the work you were doing for the other clients,
22 nonSpringfield School District clients?
23    A. Some it, yes.
24    Q. All right. And was some of the marketing

1     Q. When you first started the website, you
2  didn't have a product called Infosystems 3, correct?
3     A. That's correct.
4     Q. What was on your website, if you can
5  recall?
6     A. Information about the company, our skills
7  and website design and application development for
8  Internet.
9     Q. What type of e-mail marketing were you
10 doing? Current clients, prospective clients, both?
11    A. Yes.
12    Q. Were you doing any other type of
13 advertising or marketing back then?
14    A. I would guess that we did some direct
15 mail as well.
16    Q. Is that a guess though?
17    A. Yes.
18    Q. All right. You're not sure?
19    A. That's correct.
20    Q. Any mass media advertising?
21    A. No.
22    Q. Have you ever done any mass media
23 advertising?
24    A. In my life?

70

1   A. We needed revenue very badly.
2   Q. What was the -- what were the terms of
3 the agreement?
4   A. It would settle -- this was the price
5 mutually agreed for for work we had done.
6   Q. So the contract was for $150,000. You
7 were paid --
8   A. Again, there was no contract.
9   Q. The agreement was for a 150,000?
10  A. There was no agreement.
11  Q. There was no agreement. There was an
12 invoice?
13  A. There were invoices sent for billed hours
14 we performed work.
15  Q. And did some of the invoices cover the
16 list price for the product?
17  A. The original invoice covered the list
18 price for the product.
19  Q. And they paid that?
20  A. They paid that.
21  Q. And there were additional invoices for
22 what I'll call time and materials work that you did
23 for them?
24  A. For hours we billed, that's correct.

71

1   Q. Okay. In connection with the --
2   A. For customizations.
3   Q. Installation and customization?
4   A. Customization.
5   Q. Okay. So was that -- those amounts you
6 agreed to compromise?
7   A. Yes.
8   Q. And did you compromise them because you
9 wanted some up-front cash?
10  A. It was the end of the contract.
11  Q. And you wanted the cash?
12  A. Yes.
13  Q. What did you compromise the amount at?
14  A. 90-some-odd-thousand dollars, 97.
15  Q. I understand. So you waived the balance
16 of 60,000 which you claim was owed under the invoices
17 you sent?
18  A. Again, this was an approximation of the
19 amount that was going to be paid to us in 2003.
20  Q. As of today, you don't believe Adlai
21 Stevenson owes you anymore money?
22  A. That's correct.
23  Q. You still have a copy of that written
24 agreement with Stevenson?

1   A. Yes.
2   MR. HILLIARD: I'll make a follow-up
3 production request on some of these things at the en(
4 I'm not going to go through this. I'll send you a
5 letter.
6   MR. JONES: That's fine.
7 BY MR. HILLIARD:
8   Q. What about Marengo, $35,000 listed, was
9 that all paid?
10  A. Yes. I'm not sure that theirs was that
11 high, but yes, 25,000 initial purchase price, and some
12 customization work. I don't know if it was quite 35.
13  Q. What about Kewanee, 55,000 was listed in
14 your affidavit?
15  A. 50,000 was the purchase price with
16 installation enhancement, however, that was paid.
17  Q. You believe all that was paid?
18  A. Yes.
19  Q. Okay. As you sit here today, you do not
20 believe that you are owed any money by any of these
21 school districts; is that correct?
22  A. That's correct.
23  Q. What about Springfield, does Springfield
24 owe you any money?

1   A. No.
2   Q. Do you owe Springfield any money?
3   A. Yes.
4   Q. What do you owe Springfield?
5   A. 10 percent of the sales of this product.
6   Q. Okay. And what do you believe that
7 number to be?
8   A. I don't know that number.
9   Q. Have you ever received any written
10 communication from Springfield asking you to pay that
11  A. No.
12  Q. Has anyone from Springfield asked you to
13 pay it?
14  A. No.
15  Q. Has anyone from Springfield told you that
16 they would be willing to forego payment of that?
17  A. No.
18  Q. Have you had any discussions at all with
19 anyone for Springfield in the last two years about
20 paying that sum of money?
21  A. Yes.
22  Q. With whom have you talked?
23  A. The last two years, probably Sue Rowe.
24  Q. What do you recall about those

74

1 discussions?
2 A. Very little, but I recall discussing it
3 with her.
4 Q. Did she ask you when you expected to be
5 making a payment to Springfield based on the sales of
6 Infosystems 3?
7 A. No, not when.
8 Q. How much?
9 A. How much was probably asked.
10 Q. I'm going to ask you to look at paragraph
11 8 on the next page of the affidavit.
12 (Witness so doing.)
13 Who is Matt Sparks?
14 A. A student who worked part-time for a us.
15 Q. A programmer?
16 A. Yes.
17 Q. What projects did he work?
18 A. Certainly when this was produced, he was
19 working on commercial websites.
20 Q. Nonschool related?
21 A. Nonschool related.
22 Q. Do you know who Brent Qualls is?
23 A. Yes.
24 Q. Who is Brent Qualls?

1 Q. Did he spend any time at your offices
2 South Second Street?
3 A. Certainly.
4 Q. Was there a period of time when he w:
5 spending a lot of time at your offices?
6 A. Yes.
7 Q. The rent you have listed for The Miller
8 Group, you said owned the building, correct?
9 A. That's correct.
10 Q. So you paid the rent to yourself?
11 A. Yes. Technically, I believe that we paid
12 the rent directly to the bank for the mortgage
13 payment.
14 Q. The last item in paragraph 8 says:
15 "Business Debt Service, $7,000."
16 A. Yes.
17 MR. JONES: I'm sorry, paragraph what?
18 MR. HILLIARD: It's the last page of the
19 affidavit. It's actually paragraph 9..
20 MR. JONES: Yeah, I think you said 8, so...
21 MR. HILLIARD: I did.
22 BY MR. HILLIARD:
23 Q. Do you see that number?
24 A. Yes.

75

1 A. Employee of the Springfield School
2 District, manager of their information department, I
3 believe.
4 Q. Did he ever work for you?
5 A. No.
6 Q. Did you ever pay him?
7 A. No. That's not true. I think we gave
8 him a hundred dollars at Christmas one year as a gift
9 but not payment.
10 Q. Okay. Why did you give him a hundred
11 dollars at Christmas?
12 A. Because he was very nice to us.
13 Q. Was this during the time when you were
14 working on the Springfield School District project?
15 A. Yes.
16 Q. He was actively working with you on that
17 project?
18 A. Yes.
19 Q. As a Springfield School District
20 employee?
21 A. Yes.
22 Q. Did he work on the development of
23 Infosystems 3?
24 A. Yes.

1 Q. What is that? What do you mean by th
2 A. Money we owe to banks.
3 Q. That The Miller Group owes?
4 A. Yes.
5 Q. What was that a line of credit?
6 A. In some cases, a small business
7 administration loan.
8 Q. Did this debt service cover more than o:
9 loan?
10 A. Yes.
11 Q. And that financed the operations of the
12 entire business?
13 A. Yes.
14 Q. When did you first get involved in doing
15 any work for the Springfield School District?
16 A. I had a relationship with Springfield
17 School District, I believe, beginning in 1998, summer
18 of 1998.
19 Q. A personal relationship --
20 A. Might have been the summer of 1999. I
21 can't remember exactly, but it was a business
22 relationship.
23 Q. Okay. Did it start as a personal
24 relationship?

**Page 86**

1 the features and benefits they'd like included in the
2 system. We had discussions on our hourly rate. We
3 had discuss on numerous items of a business
4 relationship.
5     Q. Were you talking during this time
6 primarily with particular people at the School
7 District?
8     A. Yes.
9     Q. And who were those people?
10    A. Mike Holinga was my main point of
11 contact.
12    Q. All right. Did you present any type of a
13 written proposal for this work on a new information
14 system?
15    A. Yes.
16    Q. Was it -- -- strike that.
17         What form did it take?
18    A. I don't understand. Did it have words?
19    Q. Was it a -- was it a demonstration
20 program; was it a concept proposal? What form did the
21 proposal take?
22    A. It was -- we had done the proof of
23 concept. They agreed that it worked. And this was a
24 proposal concerning the business relationship, what

1 web, less dependent upon single point of failure with
2 hardware.
3     Q. Realtime access?
4     A. Realtime access. Numerous benefits,
5 training and the ability to access anywhere that you
6 are whether at home or a trip or in your attorneys
7 office, make it much more convenient than a client
8 server based product.
9     Q. So you presented all this in some type of
10 a concept form, correct?
11    A. Uh-huh.
12    Q. And do you still have the document? Did
13 you do --
14    A. Again, it was verbal.
15    Q. It was all verbal?
16    A. Yes.
17    Q. All right. Nothing really committed to
18 writing at that point?
19    A. No.
20    Q. And they told you they liked the concept?
21    A. Yes.
22    Q. Did you tell them you needed to learn
23 anything about how their existing information system,
24 their database and other information systems were --

**Page 87**

1 our hourly rate was, what equipment I would need, how
2 long the contract would last, breach
3 and cure, that kind of thing.
4     Q. Well, let's go back to the concept,
5 though. How did you present the concept for this new
6 information system?
7     A. I indicated that there was a whole new
8 world of opportunity out there with the notion of a
9 web-based system as opposed to a client server based
10 system.
11        And I indicated there were now products that
12 could be used as middlewear that would interface
13 between a website and various forms on a website and
14 an Oracle database, which was the prime problem they
15 had. They wanted to use Oracle. And so with that
16 middlewear, I indicated we would be able to develop a
17 website they wanted.
18    Q. And what, in your view, were the
19 advantages of developing this web interface with their
20 existing database?
21    A. They indicated they wanted it on the
22 existing database. I didn't. They -- the advantages
23 would be that less training is required. People are
24 familiar with a point and click interface with the

1     A. Not at that point, no.
2     Q. -- were structured?
3     A. Not at that point.
4     Q. At some later point you did?
5     A. Yes.
6     Q. So then as you testified you went from
7 concept to discussions with them about an actual
8 contract, business terms, correct?
9     A. Yes.
10    Q. Did you eventually sign a contract?
11    A. We signed an agreement, yes.
12         (Whereupon Miller 4 and Miller 5
13         were marked for identification
14         by the Court Reporter.)
15    Q. Mr. Miller, you have in front of you
16 what's been marked as Miller 4 and Miller 5. Would
17 you take a moment, please, to look at those
18 agreements.
19    A. Uh-huh.
20    Q. Have you had a chance to look at Miller 4
21 and 5?
22    A. Yes.
23    Q. Do you recognize those to be copies of
24 two different contracts between The Miller Group and

Page 90

```
 1  Springfield School District?
 2      A. Yes.
 3      Q. And one is dated September 1, 1998, and
 4  the other one, Miller 5, is dated December 21, 1998,
 5  correct?
 6      A. Yes, that's correct.
 7      Q. And you signed both agreements, correct?
 8      A. Yes.
 9      Q. Are you aware of any other contracts
10  between The Miller Group and Springfield School
11  District, any other written agreements other than
12  these two documents?
13      A. Not to my knowledge.
14      Q. What was the purpose from your
15  perspective, what was the purpose of the first
16  agreement dated September 1, 1998?
17      A. The first agreement was, as we discussed
18  earlier for me to provide consulting services for the
19  DNS and the web server.
20      Q. So this was the outgrowth of your initial
21  discussions with Karen Thompson and then Ms. Thompson
22  and Mr. Holinga?
23      A. That's correct.
24      Q. All right. And you actually provided
```

Page 91

```
 1  services under this contract, correct?
 2      A. Yes.
 3      Q. Now, am I correct that under this
 4  September agreement, Miller 4, if you'll look at
 5  paragraph 7. It appears to me that you agreed that
 6  any of the work that you did under this contract would
 7  belong to the School District, correct?
 8      A. Yes.
 9      Q. Was that something that the School
10  District requested?
11      A. Yes.
12      Q. Okay. You agreed to that, right?
13      A. Yes.
14      Q. Now what was the purpose of the December
15  21, 1998, agreement in your view?
16      A. To develop a new interface information
17  system for Springfield School District with the
18  features indicated here.
19      Q. Now, was this agreement you signed, you
20  believe you signed it sometime on or around December
21  21, 1998? It's not dated.
22      A. No, I believe it was a little later than
23  that, but it was –
24      Q. A little bit later meaning weeks or
```

Page 90 (right column)

```
 1  months or...
 2      A. Maybe, yes.
 3      Q. Sometime –
 4      A. Sometime right around that date.
 5      Q. Around the holidays in 1998?
 6      A. Yes, yes.
 7      Q. Was this agreement the product of several
 8  weeks and months of discussions between you and peo
 9  at the School District?
10      A. Certainly some length of time, but it
11  wasn't very long. Certainly not months.
12      Q. Do you recall seeing any prior drafts of
13  this December 21, 1998, agreement?
14      A. Yes.
15      Q. Did you have counsel representing you in
16  the negotiation of that agreement?
17      A. Not that I can recall. I would have to
18  refresh my memory.
19      Q. Was there counsel who represented the
20  School District?
21      A. Yes.
22      Q. Do you know who it was?
23      A. Yes.
24      Q. Who?
```

Page 91 (right column)

```
 1      A. Eric Grenzebach.
 2      Q. He's an attorney at Brown, Hay &
 3  Stephens?
 4      A. That's correct.
 5      Q. Did you keep any prior drafts of the
 6  contract?
 7      A. I don't know.
 8      Q. But you do recall seeing them?
 9      A. I certainly did. There was no breach and
10  cure clause in it.
11      Q. Breach and cure meaning what?
12      A. Termination of consulting services.
13      Q. Paragraph 6?
14      A. Yes.
15      Q. What became paragraph 6?
16      A. Yes.
17      Q. So you have a recollection of there being
18  no paragraph 6 or something.
19      A. There was a different paragraph 6.
20      Q. A different paragraph 6 in an initial
21  draft?
22      A. Yes.
23      Q. Okay.
24      A. It did not allow me to cure.
```

### Page 94

1   Q. Okay. You actually anticipated my next
2   question which was: Do you recall what, if anything,
3   were the subject of discussions back and forth of
4   changes in the draft. You just mentioned paragraph 6.
5   A. I did.
6   Q. Was there anything else that you recall
7   being a subject of negotiation between you and
8   Springfield?
9   A. Difference in drafts?
10   Q. Uh-huh.
11   A. That was certainly the largest point.
12   There may have been others, but I can't recall at this
13   time.
14   (Whereupon Miller 6 was marked
15   for identification by the Court
16   Reporter.)
17   Q. Do you recognize Miller 6?
18   A. Yes.
19   Q. Okay. What is it?
20   A. It appears to be two different versions
21   of this -- of Miller 5.
22   Q. Okay. And it's dated -- the fax cover
23   sheet is dated December 16th, correct?
24   A. Yes.

### Page 95

1   Q. And the second page appears to be a memo
2   to you from Mr. Grenzebach. Do you see that?
3   A. Yes.
4   Q. And it says on the subject line, "Second
5   Draft." Do you see that?
6   A. Yes.
7   Q. Okay. And then just below that in the
8   memo to you, it says, "Enclosed is a second draft of
9   the above referenced agreement which incorporates the
10   changes discussed earlier today." Do you see that?
11   A. Yes.
12   Q. Do you recall what changes were
13   discussed?
14   A. If I look at page 5 of 6 of the fax, I
15   recognize my handwriting, it's where it says breach
16   and cure, 30 days.
17   Q. That is your handwriting?
18   A. That is my handwriting.
19   Q. Okay.
20   A. The other handwriting I don't recognize.
21   Q. Okay. So you have a specific
22   recollection of discussing the termination provisions
23   with them?
24   A. Yes.

### Page 94 (right column)

1   Q. Okay. Now staying with that draft, I
2   will tell you that the top draft appears to be the
3   same form of agreement which was actually signed. A
4   it's the second draft attached, which we were you just
5   look at, that is a bit different. That's where it has
6   your handwriting.
7   A. I think that's incorrect.
8   Q. Okay.
9   A. I think the one I was looking at was the
10   first draft.
11   Q. I hear what you're saying. The bottom
12   document, the one you have in front of you.
13   A. Bottom document, I believe was the first
14   draft.
15   Q. You believe that was the first draft of
16   the agreement?
17   A. Yes.
18   Q. Okay. And it appears to me that there
19   were some changes made in the second draft other tha
20   the breach and cure termination provisions you
21   discussed. Do you agree?
22   A. Yes.
23   Q. All right. And am I correct that one of
24   the differences is contained in paragraph 9?

### Page 95 (right column)

1   A. Yes.
2   Q. Under ownership of applications and
3   software solutions, do you see that?
4   A. Yes.
5   Q. Okay. Do you agree with me there was a
6   change between the first and second drafts?
7   A. Certainly was.
8   Q. All right. In the first draft, there
9   does not appear to be any provision for a payment to
10   the School District by The Miller Group of 10 percent
11   of any of the revenues made by The Miller Group on th
12   sale of Infosystems 3, do you agree?
13   A. Specifically 10 percent, yes.
14   Q. Right. So was that the subject of some
15   discussion?
16   A. Yes.
17   Q. What do you recall about those
18   discussions?
19   A. I can recall specifically that I wanted
20   The Miller Group to own the application developed.
21   Q. Okay. That's what you wanted from the
22   beginning?
23   A. Regarding this point, yes.
24   Q. So from the beginning of the negotiations