E-FILED
Friday, 15 July, 2005 03:29:12 PM
Clerk, U.S. District Court, ILCD

98

1 for this agreement, if you were going to develop a
2 Internet-based information systems application for the
3 School District, it was your desire to own that
4 product; is that correct?
5     A. No.
6     Q. That's not correct?
7     A. No.
8     Q. Okay. What did I get wrong?
9     A. I certainly didn't think of that from the
10 beginning of these negotiations.
11     Q. At some point you did?
12     A. Yes.
13     Q. Why?
14     A. Mr. Holinga had indicated that they had
15 developed another product which the guy kept ownership
16 and made a lot of money off of. And he thought that
17 this would be equally or greater more successful than
18 the other product was, the product we were developing.
19     Q. What was this other product.
20     A. I'm sure he told me. I can't remember.
21     Q. But Mr. Holinga indicated to you that he
22 was aware of another product that had been developed
23 for the School District?
24     A. Yes.

99

1     Q. And that the owner of that product was
2 able to make a lot of money?
3     A. Yes.
4     Q. From its sale to other third parties?
5     A. Sale, license, use, some of those things.
6     Q. Okay. So Mr. Holinga indicated to you
7 that it was his desire to have a piece of this product
8 that he was -- that the School District was going to
9 develop with you?
10     A. No, he didn't want a piece of it.
11     Q. No, I don't mean him, the School
12 District, right?
13     A. Yes.
14     Q. And when he told you that, what, if
15 anything, was your response?
16     A. That I indicated that, I believe I
17 indicated, that if they were to help us in this regard
18 the would be an acceptable relationship.
19     Q. Why did you agree to that?
20     A. We weren't knowledgeable in schools, in
21 school districts, and being able to do this product,
22 project rather, and develop it fully, required that we
23 spent a lot of time with the School District and
24 really get to know their -- the way they work and what

1 they do. And Springfield seemed willing to develop
2 that relationship with us.
3     Q. You hadn't done that up to that point,
4 had you?
5     A. Done what?
6     Q. Spent the time necessary to learn about
7 their existing other information system?
8     A. No.
9     Q. Up to this point?
10     A. No.
11     Q. Okay. So you realize that you were abou
12 to invest a lot of time in the project, correct?
13     A. More than their existing system which
14 didn't matter much at all was the way the School
15 District worked. That was the key element for us is
16 what the workflow was and how people wanted to wor
17     Q. Were you at all reluctant to agree to
18 give the School District a percentage of the revenues
19 of this product you were going to develop?
20     A. Certainly.
21     Q. But you eventually agreed to it?
22     A. Yes.
23     Q. And why did you do that?
24     A. In exchange for ownership of the product

1 It was a compromise.
2     Q. During these negotiations, did you tell
3 Mr. Holinga that it was your intention at the time to
4 sell the product you were going to develop for them?
5     A. No.
6     Q. Let me finish me question.
7     A. Okay. I'm sorry.
8     Q. To other parties?
9     A. No.
10     Q. Well am I correct that you at least had
11 to have some discussion with him about that subject
12 because otherwise you wouldn't have been talking abou
13 a 10 percent?
14     A. That's right we had discussion about it.
15     Q. All right. So you and Mr. Holinga at
16 least discussed the possibility that you would be
17 selling this product which became Infosystems 3,
18 correct?
19     A. Yes.
20     Q. You at least discussed with Mr. Holinga
21 at the time of these negotiations the possibility
22 that down the road you would be selling the product
23 that you developed for their School District to third
24 parties?

**102**

1     A. Yes.

2     Q. To other people, other businesses, other

3 schools?

4     A. Other schools.

5     Q. Okay. You just didn't know whether that

6 was ever going to come fruition or not at the time,

7 right?

8     A. Absolutely.

9     Q. Because you hadn't even developed the

10 product yet?

11     A. Exactly.

12     Q. All right. So did you think by entering

13 into this agreement you were forming in essence a

14 partnership with the School District for the

15 development if this product?

16     MR. JONES: I would object insofar as it

17 calls for a legal description with respect to the

18 definition of partnership.

19     MR. MANSON: Certainly relationship. A

20 longer-term relationship that a simple one-year

21 contract might indicate.

22 BY MR. HILLIARD:

23     Q. With the possibility of potential

24 benefits to the School District from the work of your

**103**

1 business down the road selling this product, right?

2     A. Yes, though that seemed remote at the

3 time.

4     Q. Did it?

5     A. Yes.

6     Q. You believed it was remote?

7     A. Yes.

8     Q. Why did you think it was remote?

9     A. I had no idea of the scope of the project

10 or the difficulty of the project or the how much we'd

11 have to learn. I was more focused on the project.

12     Q. So am I correct then that the compromise

13 that was reached between the first draft and the

14 second draft was that you were now going to own the

15 product rather than the School District, and in

16 exchange for that, the School District was going to

17 receive 10 percent of any revenues you generated from

18 the sale of the product down the road to third

19 parties?

20     A. Regarding that one paragraph, yes, that

21 is the distinction.

22     Q. Okay. All right. I notice that the —

23 that there is a paragraph in the first draft which

24 says quote District shall have the rights to copyright

---

1 any product, services, and applications and secure

2 such servicemarks and/or trademarks as are appropri

3 to identify and protect its proprietary interests.

4 Do you see that?

5     A. Uh-huh. Yes, I do.

6     Q. That provision came out for the second

7 draft, correct?

8     A. I have to see.

9     Q. Because you were now going to own th

10 product?

11     A. Yes, it did come out.

12     Q. At the time you were going through thes

13 negotiations, had you ever had any experience in

14 filing any copyright registration for any of the other

15 programs that you had written in the past year?

16     A. No.

17     Q. Had you ever contemplated it?

18     A. I had contemplated it.

19     Q. You had in the past?

20     A. I had contemplated it.

21     Q. Did you ever consider filing any

22 copyright registration with the US Copyright Office

23 for Infosystems 3 after it was developed?

24     A. Yes.

---

1     Q. You considered it?

2     A. Yes.

3     Q. Did you ever file any such application?

4     A. No.

5     Q. Why not?

6     A. To the best of my recollection, Mrs. Hill

7 did not get to it.

8     Q. Who didn't?

9     A. Mrs. Hill.

10     Q. While she was employed by you?

11     A. Yes.

12     Q. Did you give her instructions to do so?

13     A. We did a trademark, and I believe there

14 was copyright discussions with her.

15     Q. With her?

16     A. Yes.

17     Q. Okay. And did you ever ask her to if sh

18 thought it appropriate to move forward with the filing

19 of a copyright registration on the Infosystems 3

20 software package?

21     A. I don't remember. I don't know if I was

22 that specific.

23     Q. What did you mean by we, and I may be

24 misquoting you, we filed for a trademark or we sought

**106**

1 a trademark, what did you mean by that?
2      A. I believe we used an attorney to file a
3 trademark with the logo IS3 as Infosystems 3. That's
4 all it means.
5      Q. Okay. Were you issued a trademark?
6      A. Yes.
7      Q. Registration?
8      A. Yes.
9      Q. On the logo IS3?
10      A. Yes, or the name Infosystems 3, I can't
11 remember which one.
12      Q. Okay. You believe that you own
13 Infosystems 3, correct?
14      A. Yes.
15      Q. You believe that today, right?
16      A. Yes.
17      Q. Do you believe that if anyone copied the
18 source code of any of the programs of IS3 that that
19 would be a violation of your rights?
20      A. If anyone copied it?
21      Q. Yes.
22      A. Or if any of the schools that had
23 purchased our services?
24      Q. Anyone?

1      Q. Mr. Miller, if I could ask you to stay
2 with Miller 5 again. If you look towards the bottom
3 of the first page you'll see a paragraph entitled
4 "Scope of Services," do you see that?
5      A. Yes.
6      Q. Okay. And the second sentence says the
7 following: "Features of the system shall include use
8 of existing data structures (Star_Base)," do you see
9 that?
10      A. Yes.
11      Q. Okay. Do you know why that particular
12 provision was in this agreement?
13      A. It was what the Springfield School
14 District wanted.
15      Q. So it was the School District's idea to
16 have that language in this agreement?
17      A. Yes, they wanted to continue using their
18 existing application while the new one was being
19 developed.
20      Q. Is that how you interpret that phrase?
21      A. Yes, and they expressed that to me as
22 well.
23      Q. What did you understand the term "data
24 structures" to mean?

**107**

1      A. Yes. That would appear to be a
2 violation.
3      Q. If someone copied the source code of
4 Infosystems 3, sold it to someone else?
5      A. Yes.
6      Q. Okay. Did anyone from the Springfield
7 School District tell you that they would -- would have
8 ben unwilling to enter into the December 21, 1998,
9 agreement with you if you had not agreed to provide
10 them with a percentage of any gross revenues for the
11 sale of the product?
12      A. I'm not a hundred percent confident with
13 that regard, but I believe Mr. Holinga might have
14 indicated something like that.
15      Q. So as you sit here today, you believe it
16 was a potential deal breaker?
17      A. Yes.
18      MR. HILLIARD: Let's break now.
19      MR. JONES: What time do you want to come
20 back?
21      MR. HILLIARD: 1:30. We'll come back at
22 1:30. Is that all right? Okay.
23          (Whereupon a break was taken.)
24 BY MR. HILLIARD:

1      A. Um, at the time, it meant that whatever
2 software they were using would continue to input data
3 into their existing database. We would in turn pull
4 that same data out from that existing database and
5 show it in different ways.
6      Q. For example, on the web?
7      A. For example, on the web.
8      Q. Okay. Did you believe at the time that
9 you were going to need -- strike that.
10      Did you understand that the phrase
11 "existing data structures" meant a computer program
12 programs?
13      A. No.
14      Q. Did you understand the phrase "existing
15 data structures" to mean any type of software
16 application?
17      A. Any type of software application...
18      Q. In other words, my question is what, if
19 anything, did you understand the term "existing data
20 structures" to mean a particular form of information?
21      A. I understood that -- the question you're
22 asking now, I understood existing data structures to
23 mean the database that they had installed on their
24 system.

110

1      Q. And by database did you understand that
2 to mean a program?
3      A. No.
4      Q. Did you understand it to mean something
5 that contained source code?
6      A. No.
7      Q. All right. Did your understanding change
8 at any point after the contract was signed?
9      A. As far as The Miller Group went, no.
10      Q. What about Springfield?
11      A. They did programming on their own. Brent
12 was in my office, but he programmed his own stuff.
13      Q. What do you mean by that?
14      A. My job was --
15      Q. Brent Qualls?
16      A. Brent Qualls. My job was to say that the
17 next project here that we are going to work on is
18 assessment or attendance or transcripts or scheduling.
19      Q. Uh-huh.
20      A. Then, I would divide the work up
21 according to what knowledge they had in each of those
22 areas, and Mr. Qualls, because he was not my employee
23 nor, in fact, subject to my direction, though he did
24 listen to it, did his own programming on the projects

1      Q. Was it? How was it divided?
2      A. The IT people they referred to were Henn
3 Stuckey and Dave Williams and Brent Qualls and other
4 people that worked in that small area.
5      Q. Okay.
6      A. The technology people, or a word similar
7 to that, included Holinga and Karen Thompson and oth
8 that worked in that area. They were more
9 curriculum-based, but, in fact, Holinga was head of
10 the project.
11      Q. Did the people in Mr. Stuckey's group
12 report to Mr. Holinga?
13      A. At some point in time they did, yes.
14      Q. All right. In other words, in terms of
15 the management structure as you understood it in the
16 School District --
17      A. When he was named -- yeah, when he was
18 named chief information officer, they reported to him.
19      Q. Mr. Stuckey did and his group?
20      A. Yes. Mr. Stuckey and his group reported
21 to Mr. Holinga.
22      Q. Now under this contract then, how was th
23 -- how did you understand the structure of direction
24 and control to be set up?

111

1 that he was either requested by Springfield to do or
2 the ones that I suggested he do.
3      Q. So there were times when you directed his
4 activities on the development of the new information
5 system for the District?
6      A. I never directed his activities. Would I
7 suggest that this might be the next step in our
8 progress, but he attended the same meetings I did.
9      Q. Wasn't The Miller Group under this
10 contract to be the project coordinator?
11      A. In fact, Mr. Holinga and the Information
12 System Task Force was the project coordinator. We
13 were the provider of the services.
14      Q. Does that mean that you understood that
15 you were to take direction from the IT personnel at
16 the School District on how the new system was going to
17 be developed?
18      A. Not -- when you say the IT people who do
19 you mean by that?
20      Q. Well by IT people, like I'm speaking
21 generically about information technology personnel in
22 the school district?
23      A. In the Springfield School District, it
24 was divided a little differently.

1      A. We worked according to the desires of the
2 Springfield School District.
3      Q. You provided input and recommendations,
4 correct?
5      A. Yes. That's correct.
6      Q. But ultimately the decisions were made by
7 the School District, correct?
8      A. By the client, yes.
9      Q. And did you understand that there was a
10 person or persons making those decisions?
11      A. Yes.
12      Q. In other words, was it the Board, was it
13 a particular committee, was it Mr. Holinga? About the
14 development, the decisions on how this new information
15 system was going to be developed?
16      A. The answer is yes.
17      Q. And who was making those decisions?
18      A. Various people according to the decision
19 that had to be made.
20      Q. Okay. What do you mean by that?
21      A. Mr. Holinga made some if it was decision
22 he could make on his own. The Information Systems
23 Task Force that met regularly made a lot of decisions
24 by vote. The superintendent made decisions in

146

1 　　A. It's an agreement between Caledonia
2 community schools and The Miller Group.
3 　　Q. What did this agreement provide for?
4 　　A. It provided that as it indicates here we
5 would implement a Internet-base student information
6 system that included futures listed on page 2 and page
7 3.
8 　　Q. Isn't one of those futures a scheduling?
9 　　A. Again, it says when it becomes available
10 and they never requested it. This was a proposal and
11 agreement. The never requested the Stanford 9 testing
12 either or the Athletic Eligibility module.
13 　　Q. In the agreement though, am I correct
14 that you were agreeing to provide that to them for a
15 fee if they want it, correct?
16 　　A. Yes.
17 　　Q. Now why did you put when it becomes
18 available in the contract?
19 　　A. Because at that point, there wasn't one
20 available.
21 　　Q. Infosystems 3 did not have a scheduling
22 module?
23 　　A. No.
24 　　Q. Did you develop one?

1 working well, things weren't working well, but I'm not
2 sure by what you mean by "work product." The finish
3 product itself?
4 　　Q. Yes. Well, both.
5 　　A. It was on our servers. I don't know that
6 I have ever looked at it.
7 　　Q. Was he also working on any other
8 application for Infosystems 3?
9 　　A. He worked on many of them.
10 　　Q. What others do you recall he worked on,
11 other than the scheduling application?
12 　　A. I mean his hand, his imprint, his vision
13 is seen in many of the applications. To specifically
14 name them all, I mean, attendance, assessment, and
15 many of the applications.
16 　　Q. Okay. He was involved?
17 　　A. Yeah.
18 　　Q. And many of those applications became a
19 part of the Infosystems 3 product that was ultimately
20 offered for sale to the public, correct?
21 　　A. That's a reach. That's a reach.
22 　　Q. Why is that a reach?
23 　　A. Because a lot of that work we discarded
24 and used other newer work when we began to offer

147

1 　　A. Mr. Qualls developed one that worked with
2 the Springfield School District's system. We have
3 subsequently developed one that works with the
4 Infosystems 3.
5 　　Q. Mr. Qualls -- is it your understanding
6 Mr. Qualls wrote a scheduling application that
7 eventually became part of Infosystems 3?
8 　　A. In a broad sense, yes.
9 　　Q. Why did he do that?
10 　　A. So that Springfield public schools could
11 schedule there students.
12 　　Q. Do you know if anyone supervised his work
13 in creating that scheduling application?
14 　　A. Again, Mr. Holinga and the Monday morning
15 work group meetings and the Information Systems Task
16 Force people were really the ones responsible for
17 watching the progress.
18 　　Q. Did you have occasion during the time he
19 was doing the work on the schedule application to talk
20 with him about how he was going about doing it?
21 　　A. Yes.
22 　　Q. Did he share with you any of his work
23 product?
24 　　A. We discussed concepts that things were

1 Infosystems 3. There is a lot of his code that is
2 residual, but unless he specifically noted that he did
3 that coding, it would have been impossible for us to
4 tell. Well, that's not true. There is some subtle
5 things you can tell by people's code, but...
6 　　Q. What do you mean by "residual"?
7 　　A. Things that are left over.
8 　　Q. From what?
9 　　A. From his work.
10 　　Q. That is still in Infosystems 3?
11 　　A. I don't know, might be. We don't have
12 anybody using Infosystems 3.
13 　　Q. Do you know whether or not Mr. Qualls
14 borrowed or copied any code from any of the Star_Base
15 applications to use in connection with his work on the
16 development of Infosystems 3?
17 　　A. I don't know that. I mean I would doubt
18 it, but I don't know that.
19 　　Q. Why do you say you doubt it?
20 　　A. Because to my knowledge of what the
21 Star_Base code would appear to be is I don't even know
22 what language it's written in, but it's certainly not
23 web based. It's certainly not PHP, the language we
24 wrote in. It's certainly a client server application,

150

1   and not a web-based application.  And as such, the two
2   are so totally different that I'm not sure you can
3   gain any benefit seeing one to the other.
4          Q.  Are you certain of that or is that just
5   your opinion?
6          A.  No, that's my opinion.
7          Q.  That's your opinion?
8          A.  Yes.
9          Q.  But you don't know one way or the other?
10         A.  No, I don't.
11         Q.  And as you sit here today, you don't know
12  whether Mr. Qualls borrowed or copied actual source
13  code from one of Star_Base applications?
14         A.  Absolutely I don't know that.
15         Q.  You don't know it?
16         A.  That's what I said earlier, yes, I don't
17  know.
18         Q.  I never told that?
19         A.  Never told me what?
20         Q.  That he had used code from Star_Base?
21         A.  Know he never told me that.
22         Q.  Did anyone you ever employed such as Dr.
23  Choat ever express to you their opinion that some of
24  the source code from Star_Base appeared in Infosystems

1   available, it just says student scheduler, correct?
2          A.  That's correct.
3          Q.  Was the student scheduling application
4   for Infosystems 3 now available as of September 2000?
5          A.  No.
6          Q.  It was still not available?
7          A.  No, it was not available.  This, of
8   course –
9          Q.  Was still being developed?
10         A.  The scheduler was still being developed.
11         Q.  By Mr. Qualls?
12         A.  Yes.
13         Q.  Okay.
14         A.  I don't know if Mr. Qualls was still
15  developing it at that point I don't know that.
16         Q.  To your knowledge, was he the only perso
17  involved in the programming of the student scheduler
18  for Infosystems 3?  In other words, did anyone else
19  write code?
20         A.  Michael David or Borecky may have
21  corrected or helped him in some fashion.  I don't
22  know.  I would assume they might have, possibly not.
23  That's a guess on my part.
24         Q.  Was Dr. Choat writing any code?

151

1   3?
2          A.  No.  Again, I don't know that their – the
3   code is so different would I assume, that there is no
4   way one can be in the other.  It wouldn't work.
5                    (Whereupon Miller 15 was marked
6                     for identification by the Court
7                     Reporter.)
8          Q.  Mr. Miller, I'm showing you what's been
9   marked Miller 15.  Do you recognize Miller 15?
10         A.  Yes.
11         Q.  It appears to be a copy of the contract
12  between The Miller Group and Oswego School District;
13  is that correct?
14         A.  Yes, that's correct.
15         Q.  And this one appears to have been entered
16  into about three or four months after the Caledonia
17  contract marked Miller 14, correct?
18         A.  Yes.
19         Q.  And am I correct that this agreement like
20  the Caledonia agreement also listed a student
21  scheduler application in the scope of services of the
22  contract?
23         A.  Yes.
24         Q.  This one doesn't say when it becomes

1          A.  Yes, not for the scheduling.
2          Q.  For other applications?
3          A.  Yes.
4          Q.  Was he overseeing Mr. Qualls work in any
5   way?
6          A.  No.
7          Q.  Were you aware that after this lawsuit
8   was filed, Century Consultants retained someone to do
9   a report, what lawyers referred as an expert report?
10         A.  Yes.
11         Q.  You've seen a copy of that have report,
12  haven't you ?
13         A.  Just briefly.  It wasn't allowed to leave
14  my attorney's office, so I didn't get a chance to
15  study that.
16         Q.  Did you read it?
17         A.  Most it have, yes.
18         Q.  Did you understand that the report in
19  part compared table names from IS3 against table names
20  for Star_Base?
21         A.  Yes.
22         Q.  And did you also understand when you read
23  that report that it in part compared lines of source
24  code for IS3 against lines of source code from

154

1 Star_Base?
2        A.  Yes.
3        Q.  When you read that report, sir, did you
4 come to any opinion in your mind about the conclusions
5 that the gentlemen who prepared that report had
6 reached on those two subjects?
7        A.  Certainly.
8        Q.  What did you conclude?
9        A.  I concluded that the use of table names,
10 column names, because we had been required by the
11 Springfield School District to use their existing data
12 structure, that would only be natural.  I also knew
13 that we were in the midst of trying to move strongly
14 away from that structure and table names.  We were
15 glad to be free of the constraints of using the
16 Springfield system and wanted to develop our own
17 system called IS3.  And we've never got a chance to do
18 that.
19        Q.  Why would you even want to move away
20 from, you just referred to the table names, why would
21 you even want to move away from the table names as
22 they had existed to something else?
23        A.  Structure was not advantageous to us.  It
24 wasn't very good.

1 children lived at that particular address.
2        Under the structure we had to use with
3 Springfield, there were  numerous addresses, one for
4 each child or several for each child.  We felt that
5 one address, for example, if you changed it in
6 kindergarten, it would also change the high school
7 kids.  And it worked out very nicely.
8               (Whereupon Miller 16 was marke
9               for identification by the Court
10              Reporter.)
11        Q.  You have in front of you what's been
12 marked as Miller 16.  Am I correct that this is a copy
13 of the report that you read through in your attorney's
14 office?
15        A.  Yes.
16        Q.  While we are on the subject of the table
17 names, may I ask you to take a look at page 31 of the
18 report.  Are you there, sir?
19        A.  Yes.
20        Q.  Okay.  And this compares two tables, one
21 for your product IS3 and one for Star_Base.  Your
22 table is SKED_STU and the Star_Base table SX_PRI.  [
23 you see that?
24        A.  Okay.

155

1        Q.  Then why did you use it in the first
2 place?
3        A.  Because we were required to under our
4 contract agreement with Springfield.
5        Q.  But am I correct that those same -- that
6 same structure of table names was also used in the
7 version of the product that you sold to certain other
8 school districts?
9        A.  No.
10       Q.  That's not correct?
11       A.  No.  I mean there may have been one or
12 two that were coincidences, yes, but Oswego was a
13 totally different structure, for example.  Stevenson
14 was a totally different structure.
15       Q.  But there may have been one or two
16 that --
17       A.  Sure, yes.
18       Q.  -- coincidentally had the same table
19 structure?
20       A.  Yeah, I mean, student to student.  What
21 are you going to call them?  Child?  Address is
22 address.  But there were significant differences in
23 the address table, for example.  We believe the
24 address should only be entered once no matter how many

1        Q.  And do you see that this gentleman has
2 concluded that the two tables are identical in terms
3 of table names and characters.  Do you see that?
4        A.  Yes.
5        Q.  Do you have any reason to disagree with
6 that conclusion that the tables are identical?
7        A.  No.
8        Q.  Do you know whether or not these tables
9 were part of the Infosystems 3 product, SKED_STU tabl
10 as it was sold to any of the school districts you sold
11 your product to?
12       A.  No, I don't know that.  I don't know
13 that.  I don't know that.
14       Q.  Okay.  You just indicated a lot of the
15 names were just common like school?
16       A.  Some were, yes.
17       Q.  What about this fourth line down SPMN.
18 Do you know what that means?
19       A.  No.
20       Q.  What about REQPRI?
21       A.  Request priority.  Would be a guess on m
22 part, but that's more than likely it.
23       Q.  Is that just a guess?
24       A.  Uh-huh.

158

1    Q. Okay. What about the last one?
2 Has_Requests. Do you know what that is?
3    A. Yes, does the student have requests.
4    Q. Do you know who developed the IS3 table?
5    A. No. Again, the table structure was
6 brought to our office intact from the Springfield
7 School District product. We were in the midst of
8 winnowing that down, of altering it and changing it
9 into what we were actually going to use when the
10 lawsuit occurred. So whether we ever use that
11 particular table that you mentioned here or not, I
12 don't know. I'd have to go back and look at the code.
13    Q. I'm going to ask you to look at pages 17
14 through 19 of the report. Marked Miller 16. Are you
15 there?
16    A. Uh-huh.
17    Q. Do you recall reading through this in
18 your attorney's office?
19    A. Yes.
20    Q. Did this surprised you when you read it?
21    A. Yes.
22    Q. Why did it surprise you?
23    A. Again, Mr. Qualls had written SKED mass
24 details on PHP, and I didn't have any sense that he

1    A. Yes.
2          (Whereupon Miller 17 was marke
3          for identification by the Court
4          Reporter.)
5    Q. Okay. I'm going to show you what's beer
6 marked as Miller 17 for identification. Do you
7 recognize Miller 17?
8    A. Yes.
9    Q. Okay. And do you recognize it to be a
10 copy of the decision issued by Judge Mills granting
11 that temporary injunction application of Century at
12 the beginning of the case?
13    A. I assume that it is, yes.
14    Q. And the decision is dated May 8, 2003; dc
15 you see that?
16    A. Yes.
17    Q. Do you recall getting a copy of this on
18 or about May 8th, 2003?
19    A. Subsequent to that date, yes.
20    Q. Very quickly after that date, wasn't it?
21    A. Yes.
22    Q. And you were served by a process server
23 with this decision, weren't you?
24    A. I believe so.

159

1 had followed the existing structure so closely.
2    Q. So do I take that to mean that you were
3 shocked by what you were seeing on these pages?
4    A. Yes. I can --
5    Q. After the lawsuit was filed, Mr.
6 Miller...
7          (Whereupon Miller 17 and Miller
8          18 were marked for
9          identification by the Court
10          Reporter.)
11    I believe you indicated, Mr. Miller, that
12 you learned about the filing of the lawsuit when you
13 received the complaint in May 2003, correct?
14    A. Yes.
15    Q. Now I'm going to show you -- -- strike
16 that.
17          Did you learn almost immediately upon the
18 filing of the lawsuit that Century had made a request
19 of a judge here in Springfield, Judge Mills, to enter
20 an immediate order to stop all marketing and sales of
21 Infosystems 3?
22    A. Yes.
23    Q. Okay. And did you learn that the judge
24 granted that initial application?

1    Q. Okay. Now, do you also recall receiving
2 from Century a copy of Miller 18, which is a  request
3 for production of documents?
4    A. Yes.
5    Q. Okay. Do you see that the request for
6 production of documents in Miller 18 is dated May 9,
7 2003, the day after Judge Mills' decision granting
8 TRO?
9    A. Yes.
10    Q. Did you get a copy of this first request
11 for production of documents, Miller 19, excuse me,
12 Miller 18, from a Denise Drewhaught? Do you know wh
13 Denise Drewhaught is?
14    A. Yes. An attorney with Brown, Hay &
15 Stephens. I don't know if she gave this to us or not.
16    Q. She was the, at the time, she was the
17 registered agent for The Miller Group, correct?
18    A. Yes, that's correct.
19    Q. All right.
20    A. Miller Group, Incorporated.
21    Q. Do you recall getting this on or about
22 May 9, 2003, from Brown, Hay & Stephens?
23    A. I remember seeing this in Chip
24 Schmadeke's office. I don't remember before that.

178

1    District.
2         Q.  Did he work with Mr. Stuckey?
3         A.  Yes.
4         Q.  Did he report to Mr. Stuckey as you
5    understood his position?
6         A.  Yes.
7         Q.  Did he work on the information -- the new
8    information system you were working on for the School
9    District?
10        A.  Not at that time that I was involved with
11   it.
12        Q.  No?
13        A.  No.
14        Q.  So he was not involved in the same way
15   Mr. Qualls was involved?
16        A.  That's correct.
17        Q.  Okay.  Did you have any interaction with
18   him at all concerning the Infosystems 3 product?
19        A.  We may have had discussions at an
20   Infosystems 3 task force meeting, but that would have
21   been it.
22        Q.  In other words, to the extent that Mr.
23   Williams may have attended one of those Infosystems
24   task force meetings, he may have participated in the

1    19?
2         A.  Yes.
3         Q.  Is this a copy of the proposal that you
4    actually submitted to Northbrook?
5         A.  Yes.
6         Q.  Did you participate in the drafting of
7    this proposal?
8         A.  Yes.
9         Q.  And you approved it to go out, correct?
10        A.  Yes.
11        Q.  On page 2 of the proposal, it says "The
12   Miller Group, Inc. makes the following assumption."
13   Do you see that?
14        A.  No.
15        Q.  Under assumptions.  "In submitting this
16   proposal --
17        A.  Yes.
18        Q.  -- for review, The Miller Group, Inc.
19   Makes the following assumptions."  Do you see that?
20        A.  Uh-huh.
21        Q.  We discussed this had this morning about
22   the activities of The Miller Group, Inc.  Do you know
23   why that appears in the document?
24        A.  No.

179

1    discussions?
2         A.  Exactly.
3         Q.  Did he ever work on the product itself,
4    Infosystems 3?
5         A.  No.
6         MR. MANSON:  January 1 to answer your
7    question.
8         MR. HILLIARD:  January 1.  Certainly we need
9    to push that back, but all right.
10                    (Whereupon at this point in the
11                    proceedings a short break was
12                    taken.)
13        MR. HILLIARD:  Back on the record.  Mr.
14   Miller, do you recall submitting a proposal on behalf
15   of The Miller Group to the Northbrook/Glenview School
16   District in Northbrook, Illinois, for the sale of
17   Infosystems 3.
18        A.  Yes.
19        Q.  Okay.
20                    (Whereupon Miller 19 was marked
21                    for identification by the Court
22                    Reporter.)
23        I am showing you what's been marked as
24   Miller 19 for identification.  Do you recognize Miller

1         Q.  Is that a mistake?
2         A.  It's a mistake.  As you can see from the
3    front cover the proposal submitted by The Miller
4    Group.
5         Q.  Right.
6         A.  And then down below that is also The
7    Miller Group.
8         Q.  Right?
9         A.  It doesn't refer to The Miller Group,
10   Inc. again.  It must be type error.
11        Q.  Well, there's a reference to The Miller
12   Group, Inc. again in a couple of places.  At page ten,
13   the back, where you provide background on the compan
14   do you see that?
15        A.  Uh-huh.
16        Q.  It appears twice there, in the heading
17   and in the first sentence?
18        A.  First sentence.
19        Q.  Is that a mistake?
20        A.  Yes.
21        Q.  All right.  Now, stay with that section.
22   Turn two more pages for me, please, page 12?
23        A.  Uh-huh.
24        Q.  Am I correct that this document at the

182

1 end of the proposal sort of summarizes the entity The
2 Miller Group?
3         A. And the people that are would be
4 consultant employees with us, not employees, but
5 consultants with us as well.
6         Q. All right. Do you notice Mike Holinga's
7 name?
8         A. Yes.
9         Q. All right. This proposal states that
10 Mike Holinga is the sales and projects manager for The
11 Miller Group; do you see?
12         A. Yes. Uh-huh.
13         Q. Is that accurate?
14         A. Uh-huh.
15         Q. Did you pay him?
16         A. No.
17         Q. What did he do as sales and projects
18 manager for The Miller Group?
19         A. He would help us make demonstrations. He
20 would help with training.
21         Q. Uh-huh.
22         A. Give us ideas on additions to the product
23 that might be helpful. That sort of thing.
24         Q. How was he compensated?

183

1         A. He was compensated, if did he training he
2 would receive those fees.
3         Q. From the customers?
4         A. Yes.
5         Q. All right. So if he did training work,
6 you would include his time in a bill to the customer?
7         A. Yes.
8         Q. And pay him for that?
9         A. Yes. Or he would bill them directly.
10         Q. Okay. The Miller -- you didn't pay him
11 directly?
12         A. No.
13         Q. Other than -- was he in fact paid for
14 providing training to some of your customers?
15         A. I believe so.
16         Q. Do you recall which ones?
17         A. I believe he trained at Marengo.
18         Q. Any others?
19         A. Might have trained at Kewanee, but I'm
20 not sure. I believe he did.
21         Q. What about Stevenson?
22         A. No.
23         Q. Is he still doing any work for you today?
24         A. No.

1         Q. When was the last time he did any work
2 for you?
3         A. Summer and fall of 2003.
4         Q. This document --
5         A. Would have done Marengo training.
6         Q. Okay. This document indicates that he
7 was, at the time it was prepared and unfortunately the
8 document isn't dated, but am I correct in assuming
9 that this proposal for Northbrook would have been
10 prepared sometime in the late 2002 at the earliest
11 since you weren't launching --
12         A. Yes.
13         Q. You weren't launching Infosystems 3 until
14 2002?
15         A. More likely 2003.
16         Q. Okay. And at that point and time he had
17 retired from the --
18         A. Yes.
19         Q. -- Springfield Public School District?
20         A. Yeah.
21         Q. Do you recall when he retired?
22         A. I believe it was the summer of 2002.
23         Q. Okay. And of course up to that point and
24 time for the three or four years before that, as you

1 described earlier in your testimony, he was working
2 actively with you in the development of the new
3 information system?
4         A. Yes.
5         Q. For the School District, correct?
6         A. Yes.
7         Q. Did you ever talk with him during that
8 three or four period, four-year period leading up to
9 his retirement about the possibility of his working as
10 a consultant for your company after he retired?
11         A. I cannot recall any specific instances,
12 but we probably did. In general terms. No concrete
13 offers but in general terms.
14         Q. What do you mean by "in general terms"?
15         A. If you retire, I want you to consider
16 sort of thing.
17         Q. Come to go work with my group?
18         A. That's right. Thinking about helping
19 out.
20         Q. Okay. And did he express some enthusias
21 for that idea?
22         A. He did.
23         Q. Was he the one that brought it up, or did
24 you bring it up?

198

Q. – be able to testify to that?

A. – 2002, line 26 with 2001 is a little less, but the income is substantially less.

Q. Uh-huh.

A. The wages in 1999 paid, on line 26, were $72,000 versus 155,000 in 2002. And in year 2000, the wages were one 132,000 on a gross income of 455 verse 155,000 in wages on a gross income of 262.

Q. Do you have any belief as to why your gross receipts went down between 2001 and 2002?

A. Yes, we did less work for the Springfield School District.

Q. You were nearing the end of that contract?

A. That's correct.

Q. And that had been more or less the lifeblood of the company for the first few years, correct?

A. Absolutely correct.

Q. Were you taking steps at that time in 2002 to replace the Springfield work?

A. Yes.

Q. And did those steps include marketing the Infosystems 3 product to other school districts?

199

A. Yes.

Q. Before this lawsuit was filed, what did you think the prospects for your business were?

A. Thought they were excellent.

Q. And what made you think that?

A. Because we had indications from many of the people we had given proposals to they were going to work with us and buy our services. Usually thereafter, as I understand, never mind. The suit stopped all that.

Q. After the suit was filed did you approach anyone at the Springfield School District and question what any of the employees had done in connection with the work on the School District's project which lead to the lawsuit?

A. I'm sorry. Ask that again.

Q. It's a badly-phrased question. Am I correct that when the lawsuit was filed and you read the complaint and the other documents, you understood that Century was claiming that you stole some of its proprietary software, correct?

A. Yes.

Q. And I think you've already indicated in your testimony that you were surprised by that,

correct?

A. Yes.

Q. And when you looked at Mr. Lewis' report, you were surprised to see some of the things in that report, correct?

A. Yes, that's correct.

Q. Did that lead you to think that someone at the School District had done something that you had not been aware of that landed you in a lawsuit?

A. I was – I could suppose some of those things.

Q. Did you?

A. Some people at the School District said things that were not accurate, and some people might have done things I was unaware of.

Q. Okay. Well, let's start with the some things that may have been said that were inaccurate. What do you mean by that?

A. I never had the conversation with Mr. Williams as he indicated that I did. I very seldom spoke to Mr. Williams. He was not a very entertaining character, troll-like.

We -- it was our understanding that the attorneys for the Springfield District had approved

this relationship of this moving forward over the objections of Mr. Stuckey and Mr. Qualls. Not over Mr. Williams objection but Mr. Stuckey and Mr. Qualls.

Q. What do you mean by the objections of Mr. Stuckey and Mr. Qualls?

A. They didn't want to change. They wanted to keep there position and influence in the situation in the Springfield School District intact, and so they did not want to use the web base. They didn't want the web-based product to move forward.

Q. Mr. Stuckey and Mr. Qualls were both against it in the beginning?

A. Yes.

Q. Did that remain against it throughout the process?

A. Mr. Stuckey did. Mr. Qualls was sent to our office and saw what we were doing and he embraced it.

Q. Did you ever offer Mr. Qualls a position in your company?

A. No.

Q. Did you ever talk about it with him?

A. Yes.

Q. Did he bring it up, or did you bring it

202

1  up?
2          A.  I brought it up.
3          Q.  What did you say to him?
4          A.  I said if we get through the Springfield
5  project and if we're making any money, I'd like to
6  consider hiring you.  I don't know if I can afford
7  you.
8          Q.  When did you make that statement to him?
9          A.  Toward the end of our contract period.
10         Q.  Sometime about 2002?
11         A.  2002.
12         Q.  Right around the time that Infosystems 3
13 was being launched?
14         A.  Uh-huh.
15         MR. JONES:  Is that yes?
16         THE WITNESS:  Yes.
17 BY MR. HILLIARD:
18         Q.  And did he express enthusiasm for that
19 interest to expressed to him to make him a job offer?
20         A.  No.  I wouldn't say there was enthusiasm.
21 I would say he might have had some interest, sort of.
22         Q.  He didn't rule it out?
23         A.  He didn't rule it out; he didn't rule it
24 in.

1          Q.  You talked with Ms. Rowe about that?
2          A.  Yes.
3          Q.  How did that come up?  In other words,
4  did you bring it up with her?
5          A.  Yes.
6          Q.  Okay.  What did you say?
7          A.  I thought she'd be a good marketing
8  representative with her knowledge of school districts.
9          Q.  So you said that to her?
10         A.  Yes.
11         Q.  And what was her response?
12         A.  I like what I'm doing.
13         Q.  A few moments ago, I asked you if you h
14 talked to anyone at the School District after the suit
15 was filed, and I'm not sure if I gave you a chance to
16 finish your answer completely.  You indicated that you
17 did not have a conversation that was attributed to you
18 by Mr. Williams, correct?
19         A.  Correct.
20         Q.  Did you talk with anyone at the School
21 District after the suit was filed?
22         A.  Yes.
23         Q.  With whom did you speak?
24         A.  I called Sue Rowe and said you're going

203

1          Q.  Okay.  Did you actually make him a job
2  offer?
3          A.  No.
4          Q.  Did you ever talk with anyone else at the
5  School District about the possibilities of them come
6  to work for you after Infosystems 3 was launched?
7          A.  At the School District?
8          Q.  Right.  You just mentioned Mr. Qualls,
9  and you -
10         A.  One young lady who is a part-time
11 employee of the District, at the time I believe she
12 was, I don't know if she is now or not, Sherrie
13 Hibbard.
14         Q.  Did you talk with her about joining you?
15         A.  Just briefly in passing.
16         Q.  Was she in Mr. Stuckey's group?
17         A.  No.  She works in the discipline area.
18         Q.  I see.  Did you ever talk with Mr.
19 Stuckey about his doing work for you?
20         A.  No.
21         Q.  What about Sue Rowe, did you ever talk
22 with her about her joining you in some capacity?
23         A.  Again, possibility.  A discussion of a
24 possibility after our contract ended.

1  to be served papers today.
2          Q.  Okay.  And what if anything did she say?
3          A.  I think she was outraged and shocked.
4          Q.  Okay.  After those papers were served,
5  did you have occasion to talk with her again about the
6  allegations made in the lawsuit?
7          A.  I don't remember that we did.  She
8  studious avoided that.  We've had only a couple of
9  conversations in the last year and half and mostly
10 about her daughter at the University of Kentucky.
11         Q.  Okay.  Have you talked with anyone else
12 at the School District about the lawsuit after it was
13 filed?
14         A.  No.
15         Q.  None at all?
16         A.  No.
17         Q.  So one brief conversation with Ms. Rowe,
18 and that's it?
19         A.  That's it.  Other than to use the word
20 lawsuit once in a while.
21         Q.  Uh-huh?
22         A.  That's it.
23         Q.  Mr. Miller, I have no further questions.
24 Thank you.