EXHIBIT

16

**Page 2**

1         STIPULATION
2         IT IS STIPULATED AND AGREED by and between the parties herein, through their respective attorneys, that the deposition of AGNES NUNN may be taken pursuant to Subpoena, before Julie L. Bloome, Certified Shorthand Reporter, upon oral interrogatories, on the 27th day of January, A.D., 2005, commencing at the hour of 9:00 a.m. thereof, at the offices of Giffin, Winning, Cohen & Bodewes, P.C., One West Old State Capitol Plaza, Myers Building, Suite 600, Springfield, Illinois;
          that the oral interrogatories and the answers of the Deponent may be taken down in shorthand by the reporter and afterwards transcribed;
          that the deposition transcript, or any portions thereof, may be introduced into evidence for any purpose for which such depositions are rendered competent by Statute or Rule of Court and without foundation or proof;
          that the reading over and signing of the deposition transcript by the Deponent is not waived;
          that any party hereto may be furnished copies of the deposition transcript at his or her own expense.

                JULIE L. BLOOME
                Certified Shorthand Reporter
                Illinois CSR License #084-003524

**Page 3**

APPEARANCES:

For Plaintiff:
(Lead Counsel)
    MR. CRAIG S. HILLIARD
    STARK & STARK
    A Professional Corporation
    P.O. Box 5315
    Princeton, NJ 08543-5315

For Plaintiff:
(Local Counsel)
    MR. DAVID A. HERMAN
    GIFFIN, WINNING, COHEN & BODEWES
    One West Old State Capitol Plaza
    Myers Building - Suite 600
    P.O. Box 2117
    Springfield, IL 62705

For Defendant:
(Counsel for Springfield School District #186)
    MESSRS. ALMON A. MANSON, JR.
    and ROBERT M. SHUPENUS
    BROWN, HAY & STEPHENS
    205 South Fifth Street - Suite 700
    P.O. Box 2459
    Springfield, IL 62705

**Page 4**

                INDEX
Examinations                    Page
By Mr. Hilliard                  5

Exhibits              Page Identified
Nunn 1                          21
Nunn 2                          93

"Counsel retained all exhibits.

**Page 5**

            TRANSCRIPT OF DEPOSITION
        (Whereupon the witness was
        sworn by the Court Reporter.)
                AGNES NUNN
the Deponent herein, having been first duly sworn, was examined and testified as follows:
            DIRECT EXAMINATION
BY MR. HILLIARD:
    Q. Ms. Nunn, good morning.
    A. Good morning.
    Q. My name is Craig Hilliard. I am an attorney with a firm called Stark and Stark in New Jersey, and we represent Century Consultants, Limited in a lawsuit that's pending right now in federal court in Springfield. Do you understand that?
    A. Yes, I do.
    Q. And you are aware that the lawsuit was filed, correct?
    A. Yes.
    Q. And we're here today to take your deposition in connection with that lawsuit. You're here to testify and answer questions that I give to you, and questions that you will be answering, and your answers that you give will be under oath. You've

just been sworn by the court reporter. Do you understand that you've taken an oath to tell the truth?

A. Yes, I do.

Q. And you understand that if you knowingly give any false testimony under oath that could be considered perjury?

A. Yes, I do.

Q. Okay. So you should treat this proceeding, even though we're in the informal setting of a conference room, just as seriously as if you were sitting in a courtroom testifying in front of a judge. Do you understand that?

A. Yes.

Q. Have you ever had your deposition taken before?

A. No.

Q. You are very lucky. As I said, I'll be asking you some questions and you'll be providing the answers, and everything that's said in the room, including any objections raised by District 186's counsel, Mr. Shupenus, will be recorded by the court reporter. A transcript will be prepared, you will have an opportunity to the review that transcript and then sign it at the end as a final certification.

A. Okay.

Q. Is that acceptable?

A. Yes.

Q. If you don't understand a question that I've asked, and I often ask confusing questions, just tell me and I'll be happy to rephrase it. I'm not here to try to trick you. I'm here to try to get you to answer certain questions about your recollection of events and circumstances, so it's important that if you don't understand a question, ask me to rephrase it.

A. Okay.

Q. Unless I ask you to make an estimation or approximation, for example, a month or a year, approximately, when something happened, I don't want you to guess or speculate. If you don't know the answer, tell me that. If you don't recall the answer, tell me that, but if you do, you're expected to answer the question. Is all that acceptable?

A. Yes.

Q. You're employed currently by the Springfield Public School District 186, correct?

A. Yes.

Q. Okay. I'll refer to that as District 186 for short, which is, I'm sure, what a lot of people do around the office.

A. Okay.

Q. What is your current position at District 186?

A. Director of Business Services.

Q. And how long have you held that position?

A. This particular position?

Q. Yes.

A. Okay.

Q. Director of Business Services.

A. Since 1991, I think.

Q. Is that the only position you have held at District 186?

A. No.

Q. What other positions have you held?

A. Assistant Director of Business Services.

Q. And during what period of time were you the Assistant Director of Business Services?

A. That was since April 1st of 1981.

Q. '81?

A. Uh-huh.

Q. Are those the only two positions you've held at District 186?

A. Yes.

Q. So you started at District 186 as an employee in 1981?

A. Correct.

Q. Can you briefly describe for me your educational background?

A. I have a Bachelor of Science degree in management information systems, my Master's in education administration with a chief school business official endorsement.

Q. And what institution did you get your BS?

A. Southern Illinois University at Edwardsville. Both degrees, I should say. Bachelors and Masters.

Q. And Masters?

A. Correct.

Q. When did you receive your Bachelors?

A. Oh, gosh. September of 1976.

Q. And your Masters?

A. October of '77.

Q. Have you taken courses in computer programming?

A. Not since I've graduated, no.

**Page 14**

1  Q. And the Director of the Data Processing
2  department at one time reported to you?
3  A. Correct.
4  Q. And that -- at least for a period of
5  time, Henry Stuckey was the head of the Data
6  Processing department, correct?
7  A. Yes.
8  Q. So Mr. Stuckey for a period of time
9  reported directly to you?
10 A. Yes.
11 Q. Is there still a Data Processing
12 department?
13 A. It's called something else.
14 Q. Okay.
15 A. But --
16 Q. What is it called now?
17 A. I think Information Technology, I'm not
18 for sure.
19 Q. Okay. When did that department name
20 change?
21 A. I would have to guess. Just off the top
22 of my head, I really...
23 Q. If you can approximate, that's fine,
24 but --

**Page 15**

1  A. About three to four years ago.
2  Q. Three to four years ago?
3  A. Right.
4  Q. Was there a reorganization of the
5  department, or was it just a name change?
6  A. Reorganization.
7  Q. And what was the reorganization?
8  A. Well, at that time, data processing was
9  taken from under me and given to Mike Holinga.
10 Q. Okay. So when the data processing
11 department was reorganized, the name changed and the
12 reporting line changed from you to Mr. Holinga?
13 A. Correct.
14 Q. And approximately when did that happen?
15 A. I'm saying three to four years ago.
16 Probably more like four.
17 Q. So somewhere in or around 2000, the
18 direct report changed from you to Mr. Holinga?
19 A. I think. I can't be for certain.
20 Q. Okay. At that time, when Mr. Holinga
21 assumed supervisory responsibilities over this data
22 processing department, changed to whatever name it
23 was, was he a new employee at the school district?
24 A. No.

**Page 16**

1  Q. Do you know when Mr. Holinga first
2  started working at District 186?
3  A. No, I don't.
4  Q. Do you have any idea of approximately
5  when?
6  A. He was there before me, so...
7  Q. Oh, he was?
8  A. Yes.
9  Q. Okay.
10 A. Uh...
11 Q. So he was there --
12 A. Seventies...
13 Q. -- going back to the 1970s?
14 A. I would say, yes.
15 Q. At the time that the functions of the
16 data processing department were shifted over to his
17 supervision, was he -- do you know whether or not he
18 was assuming a new position at that point? In other
19 words, had he been doing something else and now he was
20 taking over?
21 A. It was not a new position.
22 Q. It was not?
23 A. No.
24 Q. Do you know why this change occurred?

**Page 17**

1  A. The explanation --
2  Q. And by "change," I mean moving the
3  department from your supervision to Mr. Holinga's?
4  A. Right, the superintendent, Bob Hill,
5  wanted all the information to be in one spot. He
6  wanted -- because at that time we had business, I
7  guess, data processing or technology, and also the
8  educational side, and he wanted it all under one
9  umbrella.
10 Q. Prior to 2000 when this change occurred,
11 had you, since 1991, had supervisory responsibility
12 over the data processing department?
13 A. Yes.
14 Q. During the period of time that you
15 supervised the data processing department, did you
16 require any type of written reports from Mr. Stuckey?
17 A. No.
18 Q. Did you require any type of informal non-
19 written reports from Mr. Stuckey?
20 A. May I ask a question? When you say
21 "require," are you asking was that a mandate from me,
22 or -- no, I...
23 Q. What, what I'm asking is, did you meet
24 regularly with Mr. Stuckey?

**Page 46**

1  out of the file to attach to your affidavit, do you
2  believe that was the first time you were ever seeing
3  this particular agreement?
4      A. No, it was not the first time.
5      Q. Okay. When do you recall having seen it
6  before?
7      A. When they would have sent it over for
8  payment, I would have seen it at that time.
9      Q. All right. Did you read it at that time?
10     A. I may have perused it, but...Well, I
11 guess yes, I would have read it.
12     Q. Okay. Let me direct your attention to
13 page 4 of the December 21, 1998 agreement.
14     A. Okay.
15     Q. Do you see it's signed by Doctor Hill for
16 the District, correct?
17     A. Yes.
18     Q. There is a paragraph marked paragraph
19 eight, it's number eight at the top of that page. May
20 I ask you to read that?
21     A. Ownership of application and software
22 solution?
23     Q. Yes.
24     A. "Any and all" --

**Page 47**

1      Q. Well, you don't need to read it aloud.
2  I'm sorry. I just wanted you to read it.
3      A. (So doing.)
4      Q. Have you read paragraph eight?
5      A. Yes, I have.
6      Q. Okay. At or about the time this contract
7  was entered into with the Miller Group, so, in or
8  around December, 1998, were you aware of any
9  discussions between the Miller Group and District 186
10 about who was going to own the application that the
11 Miller Group was working with District 186 to develop?
12     A. No.
13     Q. Were you aware of any discussions about
14 whether District 186 would receive some form of
15 payment if the Miller Group then sold whatever
16 application it was working on with the District to
17 other school districts?
18     A. No.
19     Q. You never -- you don't recall those
20 discussions ever coming up?
21     A. Can I ask a question?
22     Q. Sure.
23     A. You said --
24     Q. Back in that time period.

**Page 48**

1      A. In 1998 was I aware of it?
2      Q. Right.
3      A. No, I was not.
4      Q. Okay. So you weren't aware that this was
5  the subject of negotiation and agreement back in that
6  time frame?
7      A. No.
8      Q. No one brought that to your attention?
9      A. No.
10     Q. Do you recall that even coming up at an
11 Information Systems Task Force meeting?
12     A. No.
13     Q. At some later point in time, though, you
14 became aware of it, correct?
15     A. Yes.
16     Q. When?
17     A. I can't recall.
18     Q. In what context did you become aware of
19 it?
20     A. Probably a conversation that Henry and I
21 were -- may have been discussing.
22     Q. So you believe that you first became
23 aware that there was a contract between District 186
24 and the Miller Group under which District 186 was

**Page 49**

1  going to receive some form of payment from the Miller
2  Group if it sold a software application to other
3  school districts? Your testimony is the first time
4  you became aware of that, it was sometime after this
5  agreement was signed?
6      A. Right.
7      Q. And in the context of a discussion you
8  had with Mr. Stuckey?
9      A. Correct.
10     Q. Okay. Did Mr. Stuckey give you a copy of
11 this contract and point this out to you?
12     A. No.
13     Q. Were you surprised when you learned that?
14     A. No.
15     Q. In this conversation you had with Mr.
16 Stuckey when you learned this information about the
17 agreement between the Miller Group and District 186,
18 did Mr. Stuckey also share with you concerns he had
19 about what the Miller Group was doing?
20     A. Yes.
21     Q. What do you recall Mr. Stuckey telling
22 you?
23     A. He had concerns that some of the software
24 that we were using with Star_Base were being used by

## Page 50

1  the Miller Group to write their product.
2      Q. Do you have any recollection of
3  approximately when this conversation with Mr. Stuckey
4  occurred?
5      A. No, I don't.
6      Q. What happened? Did he come in to your
7  office and say, 'I've got something on my mind I want
8  to talk about with you,' or...
9      A. We were just talking, and he just
10  indicated that there was some concerns. He did not
11  feel comfortable with what was going on, and he
12  addressed those to me.
13      Q. Okay. Was anyone else present for this
14  conversation?
15      A. No.
16      Q. Did he tell you whether or not anyone
17  else shared his concern?
18      A. Yes.
19      Q. What did he tell you?
20      A. Dave Williams, who was also a programmer
21  at that time.
22      Q. But Mr. Williams wasn't with you when you
23  had that conversation?
24      A. No.

## Page 51

1      Q. Did Mr. Stuckey tell you that anyone else
2  other than he and Mr. Williams had these concerns?
3      A. No.
4      Q. Was he any more specific that you can
5  recall? Was he any more specific in telling you what
6  his concerns were other than he had some concerns
7  about what the Miller Group was doing?
8      A. No, I don't
9      Q. But he did express to you that his
10  concern related to what the Miller Group was doing in
11  connection with the use of Star_Base?
12      A. Correct.
13      Q. Did he tell you whether he knew that
14  Star_Base was in fact being used by the Miller Group?
15      A. Can you repeat that.
16      Q. Sure. Did Mr. Stuckey tell you that he
17  knew that there was some component or element of
18  Star_Base that was being used by the Miller Group?
19      A. That he --
20      Q. That he knew, right.
21      A. I would have to say no.
22      Q. Did you have any knowledge at that time
23  about whether the Miller Group was using any component
24  or element of Star_Base in its work for the District?

## Page 52

1      A. No.
2      Q. Did you ever acquire any knowledge on
3  that?
4      A. Knowledge, no.
5      Q. Okay. Belief?
6      A. Yes.
7      Q. Okay. What was your belief?
8      A. Well, it was based on hearsay, I would
9  have to say, that what Henry and Dave had told me,
10  because I considered them the experts --
11      Q. Okay.
12      A. -- in what was going on. It was just
13  what they had said.
14      Q. All right. So, in other words, you took
15  the concerns that Mr. Stuckey was expressing to you
16  seriously?
17      A. Yes.
18      Q. Because you were relying on what he was
19  reporting to you as someone with knowledge of what was
20  going on within his group, correct?
21      A. Exactly.
22      Q. So once you received this knowledge about
23  Mr. Stuckey's concerns, what, if anything, did you do?
24      A. Henry and I met with Bob Hill and Mike

## Page 53

1  Holinga.
2      Q. Okay. Was it shortly after your
3  conversation with Mr. Stuckey?
4      A. I can't say shortly. It may have been
5  within a month.
6      Q. Okay. It was during a period of time
7  when the Miller Group was actually doing work with the
8  District, correct?
9      A. Yes.
10      Q. Did the meeting occur with just the four
11  of you?
12      A. Yes.
13      Q. Where did it occur?
14      A. At Bob's office.
15      Q. Did you request the meeting?
16      A. No.
17      Q. Do you know who did?
18      A. Bob requested to meet with us.
19      Q. And do you know if Doctor Hill requested
20  the meeting because you had already shared those
21  concerns with him - Mr. Stuckey's concerns?
22      A. I don't know what his reasoning was.
23      Q. Did you give anything to Doctor Hill in
24  writing in advance of the meeting?

## Page 54

    A. Not that I can recall, no.
    Q. Did you send him an e-mail telling him about Mr. Stuckey's concerns?
    A. No.
    Q. Do you know why Doctor Hill was the one who requested the meeting?
    A. I can speculate, but I don't know.
    Q. No, I don't want you to?
    A. No, I can't. No.
    Q. I guess what I'm trying to understand is where the communications link occurred. Mr. Stuckey talked with you about his concerns?
    A. Uh-huh.
    Q. And then you had a meeting with Doctor Hill sometime thereafter --
    A. Uh-huh.
    Q. -- and Mr. Holinga to discuss those concerns. But, you said Doctor Hill requested the meeting. Did he request the meeting specifically to discuss those concerns?
    A. No, it was not specifically to discuss those concerns.
    Q. It was about other things?
    A. It was other concerns that he had.

## Page 55

    Q. That who had?
    A. Doctor Hill, Bob Hill had.
    Q. Okay. So when you got in to this meeting, is it accurate to say then -- strike that. When you got in to this meeting, did Mr. Stuckey raise his concerns with Doctor Hill --
    A. I did.
    Q. And Mr. Holinga? You did?
    A. Yes.
    Q. Okay. What do you recall saying?
    A. Well, I would probably have to relate the whole --
    Q. Please do.
    A. -- part of the conversation, because... We were talking, he felt that Henry and I were not being cooperative; we were not on board, because we were - as he said, "dragging our feet," and at that time, I explained to him why, because we did not feel comfortable with what was going on based on what Henry had said to me about what he thought was happening at that time with Star_Base being used to write the Miller Group program, so that's when we said to him we didn't like what was going on.
    Q. You said Doctor Hill made some statement

## Page 56

at the meeting to suggest that you and Henry weren't on board with the program?
    A. Correct.
    Q. Did he elaborate on what he meant by that?
    A. We were dragging our feet, with like supplying --
    Q. With what?
    A. Well, supplying information, um...
    Q. To whom?
    A. Like at the IS, information System Groups, we would just basically sit there, not say anything, wouldn't offer our opinion on a lot of things. He thought we were being antagonistic at times, and so --
    Q. These were all Doctor Hill's views as expressed to you?
    A. Correct.
    Q. Okay.
    A. And just said we needed to -- this was a district-wide effort. We needed to come on board, and I explained to him why it was difficult for us, based on what Henry had thought was being used by Miller Group, you know, and I just said, you know, I don't

## Page 57

feel comfortable in this possible, and that was the extent of the conversation.
    Q. Okay. Well, what, if anything, when you expressed those views to Doctor Hill, what, if anything, did Doctor Hill say?
    A. He indicated our attorney, which was Rick Grenzeback, had reviewed everything and thought everything was fine; that our not feeling comfortable was unfounded. He just basically said --
    Q. Was he anymore specific than that?
    A. No. He said there is no way we would enter into a contract without our attorneys reviewing it. They thought everything was fine, and so we're doing it, and I just said, well, that's not what we think, and...
    Q. So you disagreed with Doctor Hill?
    A. Yes.
    Q. Did Doctor Hill indicate whether the attorneys had provided the District anything in writing in terms of --
    A. Not to us, he did not. He just said it had been reviewed.
    Q. Had been reviewed sometime before your meeting?

**Page 58**

1  A. Correct, and not to worry about it.
2  Q. Do you believe that this meeting with
3  Doctor Hill was the first time that you or Mr. Stuckey
4  were raising these specific concerns with him?
5  A. Yes.
6  Q. Are you aware of whether those concerns
7  had been raised by anyone else with Doctor Hill in the
8  past?
9  A. No.
10 Q. Did Mr. Holinga say anything at the
11 meeting, if you recall?
12 A. No. He said something, but I don't
13 recall what.
14 Q. Do you know whether he shared Doctor
15 Hill's views as you just expressed them?
16 A. No, I don't.
17 Q. But you disagreed with Doctor Hill?
18 A. Yes.
19 Q. Did he say anything at the meeting to
20 change your view?
21 A. No.
22 Q. Even when he told you that the attorneys
23 had reviewed it, it still didn't change your view?
24 A. No.

**Page 59**

1  Q. Why not?
2  A. Well, I was trusting what Henry and Dave
3  had said. I mean, he wasn't a programmer. They were.
4  Well, Dave was, so...
5  Q. Did you ever talk with Dave Williams
6  directly about this subject?
7  A. Yes.
8  Q. Was it before your meeting with Doctor
9  Hill?
10 A. I can't recall.
11 Q. What do you recall about your
12 conversations with Mr. Williams on this subject?
13 A. Well, he felt that the source code that
14 we had for Star Base was being used by the Miller
15 Group, was basically the extent of our conversation.
16 Q. Did you ever talk with Doctor Hill again
17 about that subject?
18 A. No.
19 Q. Did you ever talk with Mr. Holinga again
20 about the subject?
21 A. No.
22 Q. Did that subject of Mr. Stuckey's and Mr.
23 Williams' concerns ever come up again with you?
24 A. Yes. I mean, they talked to me about it,

**Page 60**

1  yes.
2  Q. After your meeting with Doctor Hill?
3  A. Yes.
4  Q. What do you recall about that? I mean,
5  did they continually repeat those concerns to you?
6  A. Yes.
7  Q. Okay. So it kept coming up?
8  A. Yes.
9  Q. And did you take any steps to address
10 them further?
11 A. No, I did not.
12 Q. And why not?
13 A. Well --
14 Q. Because you had already been --
15 A. Right. I mean, Doctor Hill felt he had
16 done whatever was necessary to make sure that the
17 District was protected, and he was the ultimate one
18 who would have responsibility, so, there was nothing
19 else for us to do.
20 Q. Uh-huh. Have you ever seen anything in
21 the way of a report in writing addressing these
22 concerns in any way?
23 A. No.
24 Q. Did Doctor Hill request anything in

**Page 61**

1  writing?
2  A. No.
3  Q. Did you ever put down in writing in any
4  fashion your concerns?
5  A. No, I did not.
6  Q. Whether it be in e-mail, a memo to the
7  file, anything along those lines?
8  A. No, I did not.
9  Q. Did the subject of Mr. Stuckey's and Mr.
10 Williams' concerns ever come up at a Board of
11 Education meeting?
12 A. Not that I can recall, no.
13 Q. Do you recall if anyone at a Board of
14 Education meeting ever raised any concerns on their
15 own about what the Miller Group was doing?
16 A. Yes.
17 Q. What do you recall?
18 A. I think it was -- more so had to do with
19 the cost, more so than what they were doing, as far as
20 if you're talking about source code. It was more
21 dealing with cost and possibly why it was taking long,
22 concerns they had heard from teachers, things along
23 that line.
24 Q. Other that what you've already told me

Page 74

Q. If he had been disciplined in any fashion, would you have been aware of it?
A. Yes.
Q. Did you consider Mr. Williams to be a competent employee?
A. Very.
Q. Did you consider him to be truthful?
A. Yes.
Q. An honest person?
A. Yes.
Q. Mr. Stuckey, same views?
A. Yes.
Q. What do you recall Mr. Williams' reaction being to the lawsuit when you were present with him talking about it?
A. He was upset about -- I can't say about the lawsuit, about what appeared in the paper that day.
Q. Did he tell you why he was upset?
A. He didn't know his conversation was being recorded. I mean, I don't know if it was just that day or conversations we had later, but I do know he was upset about conversations being recorded, and him not being aware of it.

Page 75

Q. Okay. Did he tell you that he was upset about anything else?
A. I can't recall.
Q. Did he tell you that what was reported about the lawsuit concerning his communications with Century was not true?
A. I can't recall.
Q. Did he ever say to you, 'I don't know what they're talking about. I never told him that.' Did he ever say that?
A. He could have. I can't recall.
Q. Well, do you recall him being defiant about the lawsuit in the sense that he thought any of it was untrue?
A. No.
Q. What about Mr. Stuckey?
A. No.
Q. Did you speak with anyone else at District 186 about the lawsuit, other than Mr. Williams and Mr. Stuckey?
A. We may have talked about it with some of the employees in our office. I mean, everybody that read the paper so, there was, you know, some discussion about it.

Page 76

Q. Were you asked to do anything to investigate the allegations in the lawsuit?
A. No.
Q. Did you have any meeting with anyone to discuss the lawsuit?
MR. SHUPENUS: Don't talk about meetings with us.
A. So I say no?
MR. SHUPENUS: Other than that.
Q. Well, you can tell me that you had a meeting with counsel. I'm trying to understand the chronology of your involvement --
A. Other than counsel, no.
Q. Okay. I'm trying to understand the chronology of your involvement, if any, in addressing, investigating the basis of the claims in the lawsuit and addressing the lawsuit after you learned it was filed. You learned it was filed by reading it in the paper...
A. Correct.
Q. You talked with Mr. Stuckey and Mr. Williams about it immediately after you read it in the paper?
A. Yes.

Page 77

Q. And then what happened next in terms of your involvement at all in addressing the lawsuit?
A. Other than conversations I had with counsel, that was it.
Q. That was it?
A. Yes.
Q. How many conversations did you have with counsel?
A. I don't recall.
Q. Okay.
A. Ten, eleven.
Q. Okay. Did you ever talk with Ms. Ruff about it?
A. During that time that it was filed?
Q. At any period of time after the lawsuit?
A. Yes.
MR. SHUPENUS: And we're going to claim control group privilege over that, not the substance.
Q. When did you first talk with Ms. Ruff about the lawsuit?
A. I don't recall.
Q. In what context did you have this discussion?
A. It may have -- what context?