Page 38

1  field names?
2  A   No.
3  Q   Did you consult any reference or source
4  to develop the structure of the tables?
5  A   No.
6  Q   So is it fair to say that everything in
7  the Star_Base tables from the field names to the
8  structure are original and created by Century?
9  A   Yes.
10 Q   You indicated that you don't know who
11 the initial contact was at Century with District 186,
12 right?
13 A   Yes.
14 Q   Do you know anyone who communicated with
15 District 186 or any representatives of District 186
16 prior to entering into a license agreement with
17 District 186?
18 A   No. I don't recall who our marketing
19 person was at the time.
20 Q   Did you participate in the marketing to
21 District 186 of Star_Base?
22 A   I don't believe so.
23 Q   Did you have any contact at all with
24 District 186 or anyone on behalf of District 186 prior
25 to the execution of a license agreement?

Page 39

1  A   I don't believe so.
2  Q   Did you provide District 186 with any
3  advertising of your product?
4  A   No.
5  Q   What was provided, if anything, by
6  Century?
7  A   I really don't know.
8  Q   Who would have knowledge regarding what
9  documents or advertising was given to District 186?
10 A   I don't know.
11 Q   Do you know anyone who would know the
12 answer?
13 A   I'm not sure.
14 Q   Exhibit 57 has Exhibit A attached to it
15 and Part D seeks the identity of each person who acted
16 on behalf of plaintiff with respect to District 186's
17 procurement and/or use of Star_Base together with the
18 nature and extent of each person's involvement. Are
19 you the person who has the most knowledge of the
20 identity of each person who interacted with District
21 186 regarding the procurement of Star_Base?
22     MR. SCHRAMA: If I can just ask you to
23 qualify the question. You mean the person with the
24 most knowledge at Century Consultants or do you mean
25 the person with most knowledge in the world?

Page 40

1      MR. SHUPENUS: The nature of a 30B-6
2  notice is to get people from the corporation, not
3  other fact witnesses. So my question is within those
4  parameters.
5      MR. SCHRAMA: I know that. It's just
6  that I don't think he knows the FRCP too well. Do you
7  understand the question?
8      THE WITNESS: Um-hum.
9  Q   Say yes for the court reporter.
10 A   Yes.
11 Q   Why don't we take a break while you
12 think about that so we are not wasting time.
13 A   Honestly, I don't know who would know
14 that, who would have that information at this point.
15     MR. SHUPENUS: Okay. Let's take a
16 break.
17     (Recess, 10:21 a.m..)
18     (Deposition resumes, 10:36 a.m..)
19 Q   Mr. LaMantia, we discussed the fact that
20 you know of no one who participated in the discussions
21 with District 186 regarding their procurement of
22 Star_Base prior to the time the license agreement was
23 signed, right?
24 A   Correct.
25 Q   Okay. And you also testified, I

Page 41

1  believe, that you do not know of anyone who would have
2  that knowledge, correct?
3  A   Correct.
4  Q   What was the nature of your involvement,
5  if any, with District 186?
6  A   Well, in my role at Century, I manage
7  the technical staff but I don't get into direct
8  contact with customers for the most part, so my
9  involvement would be to manage the people who are
10 actually involved with Springfield.
11 Q   Now, you said for the most part.
12 Specifically with respect to District 186, did you
13 have any contact with District 186?
14 A   From time to time I would have
15 conversations with Henry Stuckey.
16 Q   How many times did you have
17 conversations with Henry?
18 A   I really don't recall.
19 Q   More than ten?
20 A   Probably less than ten.
21 Q   Less than five?
22 A   No. I would just say less than ten.
23 Q   Okay. Did you have any communication
24 with anyone else at District 186?
25 A   Not that I can recall.

Page 42

1  Q   When was your last conversation with
2  Henry Stuckey?
3  A   I really don't recall the last date but
4  it was many years ago.
5  Q   Was it before Century filed this
6  lawsuit?
7  A   Oh, definitely.
8  Q   What matters would you discuss with
9  Henry Stuckey?
10 A   Typically, it would involve any issues
11 they were having with using the software.
12 Q   Do you recall any specific issues being
13 discussed?
14 A   No, I don't recall.
15 Q   Who did communicate with District 186 on
16 behalf of plaintiff?
17 A   In what matters?
18 Q   Matters regarding District 186's use of
19 Star_Base?
20 A   For the most part, Bob Magan.
21 Q   Would you characterize him as the
22 primary contact at Century?
23 A   Yes, I would.
24 Q   Who else had contact with District 186
25 on behalf of Century?

Page 43

1  A   Well, I'm sure other staff members were
2  but I think I would only be guessing if I gave you
3  names. I don't think I could say for certain.
4  Q   Are you aware of the date and substance
5  of every communication between Century and District
6  186?
7  A   No.
8  Q   Are you aware of any dates and substance
9  of Century's communications with District 186?
10 A   Well, I'm aware there was communication
11 but I couldn't give you the exact dates off the top of
12 my head.
13 Q   Is there a document in Century's
14 possession or control that would assist you in
15 answering that question?
16 A   I believe we provided all those
17 documents.
18 Q   Is there a document that would provide
19 that information?
20 A   Yes.
21 Q   Okay. Describe that document to me.
22 A   There are certainly E-mails that went
23 back and forth and I'm sure there are meeting notes.
24 Q   Are there telephone logs?
25 A   I don't believe so.

Page 44

1  Q   Are there any records other than E-mails
2  and meeting notes that would describe who or describe
3  the date and substance of Century's communications
4  with District 186?
5  A   I'm not aware of anything beyond that.
6  Q   Okay. Is there anyone at Century
7  besides Bob Magan who would have that knowledge?
8  A   Can you ask that question again?
9  Q   Is there anyone at Century besides Bob
10 Magan who would have that knowledge?
11 A   What knowledge?
12 Q   Knowledge regarding the date and
13 substance of Century's communications with District
14 186?
15 A   Well, other people provided information.
16 I guess they would have knowledge of their
17 information.
18 Q   When you say other people provided
19 information, could you be more specific?
20 A   At the time we gathered all of our notes
21 and E-mails regarding Springfield, different members
22 of the staff were asked to go through their files and
23 produce that.
24 Q   Who was asked to go through their files?
25 A   Well, other than Bob and myself, I'm

Page 45

1  pretty sure Karen Yoder, who was one of our staff
2  members went through her files and produced whatever
3  notes she had. I don't recall anyone else producing
4  anything.
5  Q   Earlier I believe you stated, correct me
6  if I am wrong, that you do not know what the first
7  contact was between District 186 and Century, is that
8  correct?
9  A   Yes.
10 Q   Do you know whether Century was
11 approached at a trade show or convention regarding
12 District 186 and its needs for product like what you
13 have to offer?
14 A   No, I don't know.
15 Q   Was there a request for proposal
16 submitted by District 186 or anyone on behalf of
17 District 186?
18 A   I don't recall.
19 Q   Okay. Are there any documents or other
20 things that would assist you in recalling whether
21 District 186 submitted a request for proposal?
22 A   I don't believe so.
23 Q   Are there entities who sell applications
24 that are similar to Star_Base?
25 A   Yes.

Page 46

```
 1    Q    Who are those entities?
 2    A    I can name a few.
 3    Q    Go ahead.
 4    A    Chancery. NCS Pearson. Pentmation.
 5  There's quite a few. How many would you like?
 6    Q    As many as you know.
 7    A    There's a company called AAL. Maximus.
 8  STI. Power School. I'm sure there are 20 more but I
 9  don't recall right now.
10    Q    Okay. What's the name of Chancery's
11  product that's similar to Star_Base?
12    A    I'm not sure.
13    Q    What's the name of the NCS Pearson
14  product that's similar to them?
15    A    SASI. That's S-A-S-I.
16    Q    What's the name of Pentmation's product
17  that's similar to Star_Base?
18    A    That I don't recall.
19    Q    What is the name of AAL's product that
20  is similar to Star_Base?
21    A    I don't remember.
22    Q    What's the name of Maximus's product
23  that's similar to Star_Base?
24    A    I believe it's School Max.
25    Q    What is the name of STI's product that
```

Page 47

```
 1  is similar to Star_Base?
 2    A    That I don't know.
 3    Q    What is the name of Power School's
 4  product that is similar to Star_Base?
 5    A    I don't know that, either.
 6    Q    Do you know anything about what District
 7  186 requested from Century, if anything, with respect
 8  to the characteristics it wanted its student
 9  information software to have?
10    A    No, I wouldn't have access to those
11  details.
12    Q    Do you know of any restrictions Century
13  placed on District 186 regarding its ability to modify
14  Star_Base software?
15    A    What do I know about it?
16    Q    Yes. What do you know about that?
17    A    We allow school districts to make
18  changes to our system so the restriction is that they
19  keep our software confidential in making the changes.
20    Q    That they keep your software
21  confidential?
22    A    Correct.
23    Q    Are there any aspects of the software
24  specifically that need to remain confidential?
25    A    All the aspects. And if they make
```

Page 48

```
 1  changes to the software, then we do not support the
 2  changed component, meaning whatever portion they
 3  changed.
 4    Q    Does Century consider the modifications
 5  of its software by a school district to be trade
 6  secrets?
 7    A    Yes.
 8    Q    Does Century consider the modifications
 9  to its software to be copyrighted?
10    A    I don't know how to answer that.
11    Q    Are there any restrictions to school
12  districts on who can see their modifications?
13    A    Yes.
14    Q    What restrictions are there?
15    A    Employees of the school district.
16    Q    Just to clarify, are you saying that
17  only employees of the school district can see the
18  modifications?
19    A    Yes.
20    Q    Where is that restriction contained, if
21  anywhere?
22    A    In our license agreement.
23    Q    Okay. Anywhere else?
24    A    I don't believe so.
25    Q    What version of Star_Base did Century
```

Page 49

```
 1  sell to District 186?
 2    A    I believe they were running Version 2.
 3    Q    When you say they were running Version
 4  2, does that mean that's the version that was
 5  sold by Century to District 186?
 6    A    I don't remember what version they came
 7  up on.
 8    Q    Who would have that knowledge, if
 9  anyone?
10    A    Bob probably would know.
11    Q    Does Century still sell Version 2 to
12  anyone?
13    A    No.
14    Q    Does Century support Version 2?
15    A    Yes.
16    Q    How many school districts still use
17  Version 2?
18    A    Between 15 and 20, I would guess.
19    Q    Does Century still support Version 1?
20    A    No.
21    Q    Are you aware of any school districts
22  who still use Version 1?
23    A    Not that I can think of, no.
24    Q    I'm sorry if I already asked this and
25  I'm sure I did. It was in a different order. Did you
```

Page 50

1  tell me that Version 2 has approximately 75 percent of
2  the source code from Version 1?
3      A    Yes. You did ask it a different way and
4  I wasn't sure of the exact percentage so we sort of
5  settled between 75 and 90. I said not more than -- I
6  don't think more than 90 but certainly more than 75.
7      Q    Now, I thought that you said between 75
8  and 90 percent with respect to Version 2 and Version 3
9  but I may be wrong. What's the -- let's just clear it
10 up. How much of the source code of Version 1 is used
11 in Version 2?
12     A    Okay. I'm going to stay with the same
13 answer. It is the same process was used in going from
14 1 to 2 and 2 to 3. So again, it's between 75 and 90
15 percent the code was used.
16     Q    Moving forward, would it follow, then,
17 that between Version 1 and Version 3 the amount of
18 source code that remained the same would be 50 to 80
19 percent?
20     A    No. I'm going to say it's still within
21 75 and 90 percent.
22     Q    From Version 1 to Version 3?
23     A    Yes. Again, we are talking about the
24 user interface changing, not the core of the system.
25     Q    And the core of the system is the source

Page 51

1  code?
2      A    No. The source code is the system
3  except for data base schema and the algorithms and
4  logic that make the system functional moves forward
5  from 1 to 2 to 3. The user interface is well, how do
6  you paint the screen, how do you input information,
7  hit a function key instead of your click on your
8  mouse, instead of hitting a function key, that kind of
9  thing.
10     Q    Now, I know you told me that all of the
11 components of each version of Star_Base are
12 copyrighted, based on your understanding?
13     A    Yes.
14     Q    How much of Version 3 does Century
15 consider to be its trade secret, if you know?
16          MR. SCHRAMA: I'm just going to lodge an
17 objection while you're thinking about that to the term
18 trade secret because I believe it calls for a legal
19 conclusion and that will be a continuing objection but
20 if you understand the question, you can answer it.
21     A    In my opinion, 100 percent.
22     Q    Okay. Is your answer the same with
23 respect to what Century considers to be proprietary
24 information?
25     A    Yes.

Page 52

1      Q    And is your answer the same with respect
2  to each version of Star_Base?
3      A    Yes.
4      Q    Is your answer the same with respect to
5  the predecessor of Star_Base, the STARS application?
6      A    Yes.
7      Q    What procedures are in place, if any, at
8  Century to prohibit disclosure of trade secrets or
9  proprietary information? In other words, what do you,
10 you meaning Century, what do you do to protect these
11 trade secrets from disclosure to those who are not
12 customers?
13     A    Well, it's more what we don't do rather
14 than what we do. We don't allow any of the code or
15 information about the code and the design to be given
16 out to anyone without the appropriate protection.
17     Q    What do you mean by an appropriate
18 protection?
19     A    If we are going to give information to
20 someone, we have them sign a nondisclosure agreement
21 or in the case of our customers, they sign a license
22 agreement.
23     Q    So non-customers sign a nondisclosure
24 and customers sign a license agreement, right?
25     A    Right.

Page 53

1      Q    What other things does Century do or not
2  do to protect its trade secrets and/or proprietary
3  information?
4      A    Well, our employees also sign an -- I am
5  not sure what the right term is.
6      Q    A non-compete?
7      A    Yes. When they are hired, which
8  prevents them from giving any of our information away.
9      Q    Anything else?
10     A    Not that I can think of, no.
11     Q    Now, I'm assuming that Century will
12 release certain information regarding Star_Base
13 without a nondisclosure agreement, such as
14 advertising?
15     A    Correct.
16     Q    Where is the line drawn with respect to
17 when a nondisclosure agreement would be needed versus
18 when it would not be needed?
19     A    Any information that gives technical
20 insight into how the system is designed or how it runs
21 internally.
22     Q    That would include source code and
23 object code, right?
24     A    And also, the data base schema.
25     Q    Let's just go through this. Source code

```
                                    Page 54
 1   and object code, right?
 2       A    Correct.
 3       Q    And the schema?
 4       A    Yes.
 5       Q    Okay.
 6       A    The tables and field definitions.
 7   That's what I mean by the schema.
 8       Q    You probably heard we had a pretty long
 9   day yesterday. During that deposition, it seemed to
10   me that a schema is a document that describes the
11   relationship between tables. Is that right?
12       A    It's both the content of the tables and
13   the relationship of the tables, correct.
14       Q    Okay. So the tables are one category
15   and the schema is the tables and how they relate to
16   each other?
17       A    Correct.
18       Q    Because you need to have the tables
19   listed to show how they relate, right?
20       A    Yes.
21       Q    What about your data dictionary, is that
22   a trade secret or is it proprietary?
23       A    That is the tables and field names.
24   That's the data dictionary.
25       Q    Would the data dictionary be the table
```

```
                                    Page 55
 1   and field names but not in a structure? Let me ask it
 2   this way. My understanding is a table would show
 3   field names in a certain order?
 4       A    Correct.
 5       Q    And that would be a structure?
 6       A    That is correct.
 7       Q    And a data dictionary would be field
 8   names but not necessarily in a certain order, right?
 9       A    It could possibly be shown that way,
10   you're right.
11       Q    Okay.
12       A    You could have a structure list data
13   dictionary.
14       Q    So in its most base form, you could have
15   a data dictionary that's not structured?
16       A    Um-hum.
17       Q    Yes?
18       A    Yes.
19       Q    And that's proprietary, right?
20       A    Yes.
21       Q    What about SQL prompts, are those
22   proprietary, SQL code?
23       A    Yes. SQL code is proprietary.
24       Q    Are there different levels of protection
25   used to card all of these different elements of the
```

```
                                    Page 56
 1   Star_Base product that are proprietary?
 2       A    I think we guard them all the same way
 3   and consider them all the same way.
 4       Q    Do you have any expertise in the area of
 5   data forensics?
 6       A    No.
 7       Q    If you are presented with two separate
 8   source codes, are you able to determine whether one
 9   set is a copy of the other?
10       A    I might be able to.
11       Q    Have you ever tried it?
12       A    Oh, yes, as a matter of fact.
13       Q    Okay. When have you tried it?
14       A    As it relates to the source code for
15   Star_Base and Miller software.
16       Q    Have you seen the source code for Miller
17   software?
18       A    A portion of it, yes.
19       Q    Where did you see that? And by where,
20   I'm not talking about the building. I'm talking about
21   the medium. What did you see?
22       A    I saw a listing for their scheduler
23   program.
24       Q    Was it contained in a document?
25       A    It was a printed copy.
```

```
                                    Page 57
 1       Q    A printed copy of what?
 2       A    Of the source listing.
 3       Q    What was the source of the source
 4   listing?
 5       A    It was printed from a file.
 6       Q    Where was the file?
 7       A    On a disk, I believe.
 8       Q    Where did you get the disk?
 9       A    It was sent to us.
10       Q    By whom?
11       A    I believe it was Don Randall from
12   Springfield.
13       Q    Don Randall sent you a disk, right?
14       A    He either sent it or E-mailed it.
15   Honestly, I don't recall, but we got an electronic
16   copy.
17       Q    And Don Randall provided you with a copy
18   of Miller's source code?
19       A    Yes.
20       Q    And to make sure we are all on the same
21   page, is it IS3, Info System 3 source code?
22       A    That's correct.
23       Q    Have you seen IS3 source codes anywhere
24   else?
25       A    No, I have not.
```

Page 58

1   Q   Have you ever seen the source code to
2   District 186's student information system?
3   A   The only source code I saw was the
4   scheduler program and it came from District 186.
5   Q   Is this the same program that you
6   referred to immediately prior to my question about the
7   student information system?
8   A   Yes.
9   Q   So you have seen a scheduler program
10  provided by Don Randall, right?
11  A   Correct.
12  Q   And what is your understanding of what
13  Don Randall provided you?
14  A   That it was a scheduler program that
15  Springfield was running in their student information
16  system.
17  Q   Is it your understanding that the
18  scheduler program that Springfield was running in its
19  student information system came from or was Info
20  System 3?
21  A   Yes.
22  Q   Why do you think that is true?
23  A   Because that's what we were told.
24  Q   By whom?
25  A   By Don Randall.

Page 59

1   Q   Okay. Did Century take any steps to
2   confirm the truthful of what Don Randall said?
3   A   Which part?
4   Q   That -- well, Don Randall told you that
5   he was -- he provided you with IS3 source code, right?
6   I thought that's what you just said.
7   A   He provided the scheduler program that
8   was running on their system that was provided by
9   Miller's company.
10  Q   Did Don Randall tell you that the source
11  code he provided to you was a portion of IS3 source
12  code?
13  A   Well, I'm pretty sure it indicates that
14  on the listing, so I don't know if Don actually said
15  it himself but there is certainly a good indication
16  that that's what it is.
17  Q   Okay. Did Century do anything to
18  confirm that the source code provided by Don Randall
19  actually did come from Info System 3?
20  A   Other than file a lawsuit?
21  Q   Right.
22  A   No.
23  Q   No investigation was done prior to
24  filing the lawsuit, correct, to determine the
25  truthfulness of Don Randall's statements?

Page 60

1   A   Not that I can recall.
2   Q   Okay.
3   A   I would like to amend that answer.
4   Q   Okay.
5   A   We did have further conversations with
6   employees at Springfield School District.
7   Q   Employees plural or singular?
8   A   Plural.
9   Q   Okay. Who are the employees of District
10  186 that were contacted by or on behalf of Century to
11  determine the truthfulness of Don Randall's
12  representation that the source code he provided you
13  came from Info System 3?
14  A   Dave Williams.
15  Q   Okay. Who else?
16  A   And Henry Stuckey.
17  Q   When did Century communicate with Dave
18  Williams regarding the source code provided by Don
19  Randall?
20  A   Within a short time of the conversation
21  with Don. I don't remember exactly when.
22  Q   When was the conversation with Don
23  Randall?
24  A   I don't recall the date.
25  Q   Who did Don Randall speak with?

Page 61

1   A   Bob Magan.
2   Q   Did Don Randall speak with anyone else?
3   A   No.
4   Q   And you don't know when that
5   conversation took place?
6   A   No.
7   Q   When did or who spoke with Dave
8   Williams?
9   A   Bob Magan.
10  Q   Did anyone else speak with Dave
11  Williams?
12  A   No.
13  Q   Who spoke with Henry Stuckey?
14  A   Bob.
15  Q   When was that conversation?
16  A   Right around the same time.
17  Q   Before the lawsuit was filed?
18  A   Yes.
19  Q   Did Henry Stuckey confirm that the
20  source code provided by Don Randall was, in fact, IS3
21  source code or Info System 3 source code?
22  A   Yes.
23  Q   Did Dave Williams confirm for you or for
24  Bob that the source code provided by Don Randall was,
25  in fact, Info System 3 source code?

**Page 62**

1   A   Yes.
2.  Q   Sitting here today, do you believe that
3   the source code provided to you by Don Randall is Info
4   System 3 source code?
5   A   Yes.
6   Q   At some point, Century learned that The
7   Miller Group offered a product that competes or
8   competed with Star_Base, right?
9   A   Correct.
10  Q   When did Century learn that Miller
11  offered a competing product?
12  A   I'm not sure exactly when it was, awhile
13  before this all began.
14  Q   When you say before this all began, are
15  you referring to the initial communication with Don
16  Randall?
17  A   Yes. Um-hum. Yes.
18  Q   How did Century learn that Miller
19  offered a competing product?
20  A   Well, we were still marketing in
21  Illinois and he was one of the software companies that
22  we would compete against in that marketplace.
23  Q   How do you know that?
24  A   When you go into a competitive
25  situation, you know who your competitors are.

**Page 63**

1   Q   Specifically, how did you know that The
2   Miller Group offered a competing product? Did you see
3   Miller at trade show? Did you compete with Miller in
4   response to a specific request for a proposal? What?
5   A   I think all of the above.
6   Q   How did you first learn that Miller
7   offered a competing product?
8   A   I don't recall.
9   Q   Did Century research Miller's product
10  prior to its conversation with Don Randall?
11  A   Not to any great extent.
12  Q   Prior to the initial contact with Don
13  Randall, what was your understanding of the difference
14  between Info System 3 and Star_Base?
15  A   I didn't really have any detailed
16  knowledge of his product.
17  Q   Did you have any non-detailed knowledge
18  of his product?
19  A   I knew it was a student information
20  system.
21  Q   Anything else?
22  A   No.
23  Q   Did Miller beat Century with respect to
24  obtaining certain clients?
25  A   I don't recall.

**Page 64**

1   Q   Is there a document or other information
2   that would help you to recall whether Miller got any
3   contracts that were sought after by Century?
4   A   No, there isn't.
5   Q   Are you aware of any districts to whom
6   both The Miller Group and Century submitted responses
7   to requests for proposals?
8   A   I'm not aware of that.
9   Q   Do you know anyone at Century who would
10  know the answer to that question?
11  A   I don't think anybody does at this
12  point.
13  Q   Are there any former employees of
14  Century who would know the answer to that question?
15  A   Possibly.
16  Q   Who might possibly know this
17  information?
18  A   We did have a marketing rep who was
19  stationed out in that area.
20  Q   I'm not going to be able to figure out
21  who this is based on that. I need more identifying
22  information.
23  A   I don't recall his name.
24  Q   Do you know it is a male?
25  A   Yes.

**Page 65**

1   Q   Where did the male marketing
2   representative live?
3   A   We had gone through several in a short
4   period of time and I don't recall which one it was.
5   Q   I'm trying to ascertain who would be
6   able to answer this question. Do you have any
7   information to help me to determine who could answer
8   this question?
9   A   No, I don't. I can't help you. I'm
10  sorry.
11  Q   Who is Paul G. Lewis?
12  A   He is a professional who our attorney
13  employed to examine source code.
14  Q   Have you ever spoken with Mr. Lewis?
15  A   Yes, I have.
16  Q   When did you speak with Mr. Lewis?
17  A   On a couple of occasions.
18  Q   Okay. Tell me about both of them.
19      MR. SCHRAMA: I'm just going to launch
20  an objection and caution the witness we are not going
21  to be disclosing any conversations you had with
22  counsel present. You can identify the conversation
23  but I'm going to object to you disclosing any of the
24  substantive part of the conversation.
25      MR. SHUPENUS: Just to get this out of

Page 66

1  the way now, are you asserting that the
2  attorney-client privilege extends between you and your
3  client when the expert witness is present?
4      MR. SCHRAMA: Yes, I am because it is my
5  understanding that any such meeting, litigation theory
6  and the way to proceed with the case was discussed and
7  that is privileged.
8      MR. SHUPENUS: I'm not going to ask him
9  about litigation theory. I'm going to ask him about
10 things besides litigation theory, so we shouldn't have
11 a problem.
12     MR. SCHRAMA: We will cross that when we
13 get to it but when he asks the question, I ask you to
14 hold off for a second before answering.
15   A  I can answer that. Mostly our
16 discussions centered around how much time did we want
17 him to spend on this and how much he was going to
18 charge us.
19   Q  Well, that's certainly open for
20 discussion.
21   A  And we needed to supply him with our
22 information so we talked to him about how we should
23 supply our source code to him so that he could use it
24 in his work.
25   Q  When did you discuss with Mr. Lewis how

Page 67

1  much money would be spent?
2    A  I don't know when.
3    Q  Approximately when?
4    A  I don't know.
5    Q  You can't give me an approximate date?
6    A  No, I don't recall.
7    Q  Was it after the Complaint was filed?
8    A  Of course it was.
9    Q  And before the report was submitted?
10   A  The report?
11   Q  The initial report.
12   A  His report?
13   Q  Yes.
14   A  Of course it was, yes.
15   Q  Then we have got a three week time
16 period now, Mr. LaMantia.
17   A  All right. Good.
18   Q  So based on that, you still can't give
19 me an estimate of when this conversation took place?
20   A  No.
21   Q  Okay.
22   A  I didn't write it down. I don't recall
23 it.
24   Q  Tell me about the substance of that
25 conversation? What topics did you discuss?

Page 68

1    A  How much time we wanted him to spend and
2  how much he was going to charge us and what format we
3  were going to give him our programs in so that he
4  could have access to them for comparison.
5    Q  Specifically, what was discussed
6  regarding how much time you wanted him to spend?
7    A  How much more specific can I be?
8    Q  Well, what services did you ask for?
9    A  He was going to do a comparison of our
10 schema and our source code.
11   Q  Did he offer to perform any other
12 services for you?
13   A  I don't believe so.
14   Q  Did Mr. Lewis mention perhaps examining
15 the computers used by The Miller Group and/or District
16 186?
17   A  I don't recall that being the topic of
18 discussion, no.
19   Q  Was there any other discussion regarding
20 the amount of time Lewis was to spend?
21   A  I don't believe so.
22   Q  What was the discussion regarding how
23 much you wanted to spend on this utilization of
24 Mr. Lewis as an expert?
25   A  Well, obviously we wanted to keep it to

Page 69

1  a minimum and still have him do a competent job.
2    Q  Did Mr. Lewis tell you how much it would
3  take to do a competent job at a minimum?
4    A  He gave us a fair estimate of what time
5  he thought he would have to spend, yes.
6    Q  What was the estimate?
7    A  I don't remember the number of hours
8  that he thought he would have to use.
9    Q  What was the approximate number of
10 hours?
11   A  I don't remember.
12   Q  Who would know that besides you and
13 Century?
14   A  There are probably billing records with
15 what he billed us for.
16   Q  So a bill tells you what the estimate
17 was?
18   A  No. You're right. It doesn't. I don't
19 recall. I don't know that anybody would have that
20 written down.
21   Q  Well, I'm not asking if they have it
22 written down. I'm asking if they would know.
23   A  I don't think so.
24   Q  Is there anyone else who would have any
25 additional information regarding what services, if

Page 70

1  any, Mr. Lewis offered to perform?
2  A    Well, the only other person in the room
3  in the conversation was Joe Shearn and our attorney.
4  Q    Does that mean Mr. Shearn would know?
5  A    Well, if his memory is better than mine,
6  he might but I don't think so.
7  Q    What was your -- when did your second
8  conversation with Mr. Lewis take place, approximately?
9  A    It was probably within a few days of the
10 first call because he tried to get his work done
11 within a short amount of time for us.
12 Q    What did you discuss in the second
13 conversation?
14      MR. SCHRAMA: This is the same
15 objection. Anything dealing with conversations with
16 the attorney, especially dealing with anything
17 regarding the theory of the case or litigational
18 strategy.
19 Q    Well, then we are going to have to still
20 have to ask you this. Was litigation strategy
21 discussed in the second telephone call with Mr. Lewis?
22      MR. SCHRAMA: Insofar as you understand
23 what litigation strategy is.
24 A    No. I'm pretty sure we just discussed
25 the contents of his findings. I don't think we

Page 71

1  discussed how we were going to proceed.
2  Q    Okay. Tell me what you discussed.
3  A    I'm pretty sure he said he found
4  substantial similarities between our product and the
5  source information he had received from Miller.
6  Q    What else did he say?
7  A    That's the basis of the conversation.
8  Q    How long did the conversation take?
9  A    I don't think more than half an hour.
10 Q    Well, during that half hour
11 conversation, what else did Mr. Lewis say besides
12 there were substantial similarities between the two
13 products? Did he tell you what the similarities were?
14 A    Yes, I'm sure that was discussed to a
15 certain extent.
16 Q    What similarities did Mr. Lewis tell you
17 existed?
18 A    Well, I think they extended to the data
19 elements and some of the core algorithms that were in
20 the program he looked at.
21 Q    Data elements and core algorithms?
22 A    Um-hum.
23 Q    Yes?
24 A    Yes, I'm sorry.
25 Q    Did Mr. Lewis tell you of any other

Page 72

1  substantial similarities between the two products?
2  A    Not that I can recall.
3  Q    What else do you recall about this half
4  hour conversation?
5  A    I think that was the substance of the
6  conversation.
7  Q    Do you recall anything other than the
8  substance? Do you recall any specifics? Where were
9  you when the conversation took place?
10 A    Probably in Joe Shearn's office.
11 Q    Were you on speaker phone?
12 A    Yes, I'm sure.
13 Q    Did Mr. Lewis tell you how much of the
14 source code he analyzed?
15 A    I don't recall that.
16 Q    Which version of Star_Base did Mr. Lewis
17 compare with Info System 3?
18 A    Version 3.
19 Q    Did District 186 have Version 3?
20 A    I don't recall what the last set of
21 programs was we sent to them. It may have been
22 Version 3.
23 Q    Who knows that information from Century?
24 A    I think Bob would be able to answer that
25 question.

Page 73

1  Q    So sitting here today, you don't even
2  know if District 186 had Version 3 of Star_Base,
3  right? I think that's what you just told me.
4  A    I'm trying to remember the last instance
5  of when we sent them information. I'm pretty sure it
6  was the Web based version.
7  Q    You're pretty sure?
8  A    Yes, I am.
9  Q    What do you base that on?
10 A    I think one of the last things we did
11 for them was to set up like a pilot system for them so
12 they could look at the Web based version.
13 Q    What is involved in setting up a pilot
14 system?
15 A    Basically, it's installing Star_Base on
16 the computer for them to run. It wasn't going to be a
17 live system. It was going to be something for them to
18 check out.
19 Q    Do you have any malady or any health
20 problem that effects your memory? I have to ask.
21 A    That's fine. No, I don't.
22 Q    Are you on any medication that would
23 affect your memory?
24 A    No.
25 Q    I'm going to show you what's been marked

Page 74

1  as Defendant's Exhibit 9 and I'm going to tell you
2  that's a copy of the first Amended Complaint that
3  Century filed against District 186, The Miller Group
4  and John G. Miller. Have you ever seen that document
5  before?
6     A    It looks familiar. I would say I've
7  seen it before.
8     Q    Do you have that document or does
9  Century maintain a copy of that document at its
10 office?
11    A    I believe we do, yes.
12    Q    When your law firm sends documents to
13 you, is there a contact person?
14    A    Yes.
15    Q    Who is the contact person?
16    A    Joe Shearn.
17    Q    Okay. Keep that document because we are
18 going to talk about it.
19    A    All right.
20    Q    Who reviewed this document at Century
21 prior to it being filed, if anyone?
22    A    I'm sure both he and I did.
23    Q    Keep that in front of you but I have a
24 couple questions I forgot to ask. When you get a new
25 client and you're installing your Star_Base system,

Page 75

1  how do you or do you convert your client's data so
2  that it will work with Star_Base?
3     A    Yes.
4     Q    How is that done?
5     A    Typically, we will tell them how they
6  need to format the data from their old system when
7  they are extracting it from their old system. They
8  send it to our office. They send their data to our
9  office and we put it in a format to be able to be
10 loaded onto our system when it's installed.
11    Q    When you receive a data format, what
12 information about the prior software used by a certain
13 school district will you learn?
14    A    Well, sometimes nothing.
15    Q    Okay. What do you learn other times?
16    A    The order of the fields within the set
17 of data and the length of the fields.
18    Q    Anything else?
19    A    No.
20    Q    If one of your customers who owns
21 Star_Base wants to convert to a new system, is it
22 necessary or likely that the person installing the new
23 system will see the Star_Base fields and length of
24 fields in the course of doing a data conversion?
25    A    Not necessarily.

Page 76

1     Q    In what circumstances would that not
2  happen?
3     A    To do a conversion, say from Star_Base
4  to another system, the school district would have to
5  extract the data from the data base into some flat
6  file format and give that file to another company and
7  tell them what order the fields are in the file. That
8  does not reveal anything about our data structures.
9     Q    The order of the fields doesn't reveal
10 anything?
11    A    No, because they could extract it almost
12 any way they like.
13    Q    But when you do it, sometimes you can
14 see the order of a competitor's fields, right?
15    A    That's a possibility.
16    Q    Does that give you -- does that give
17 Century an advantage over its competitors?
18    A    Not usually, no.
19    Q    Can't Century benefit somehow from
20 seeing a competitors -- seeing the field, the order of
21 the fields in a competitor's product?
22    A    No. We already have our structure so we
23 really couldn't care less what order they are coming
24 to us in. We are not going to change our order and
25 our structure because somebody else does theirs

Page 77

1  differently.
2     Q    But you could, right?
3     A    Yes. If we are crazy, we could.
4     Q    Could you do it even if you weren't
5  crazy?
6     A    That means rewriting the system to match
7  someone else's schema and we certainly wouldn't do
8  that.
9     Q    Do you believe that in the industry your
10 competitors's fields and the order that they are in
11 are proprietary for your competitors?
12    A    Yes, I do.
13    Q    But you see the order of their fields
14 anyway, right?
15    A    I didn't say that.
16    Q    Okay. Do you see the order of their
17 fields?
18    A    No.
19    Q    Okay. Have you ever seen any of your
20 competitors's fields?
21    A    That's a possibility that I have over
22 the years, yes.
23    Q    When?
24    A    I'm sure I don't recall.
25    Q    Whose fields did you see?

Page 78

1   A   I'm sure I don't recall.
2   Q   Are there any documents that would help
3   you to recall?
4   A   No.
5   Q   If one of your customers has their data
6   converted to a new system and the fields are revealed
7   in the process, is that a violation of your agreement
8   with the client?
9   A   Well, I would have to make a distinction
10  between the fields and the table layouts and schema.
11  Q   What's the distinction?
12  A   Certainly the fields are the raw data,
13  first name, last name, middle name, birth date,
14  gender, ethnic code, address.
15  Q   Are the fields standing alone prohibited
16  from being disclosed?
17  A   A field is a piece of data. To say that
18  we have certain fields in our system I don't think
19  could be protected anywhere. You certainly have to
20  have fields in your system. Otherwise, you don't have
21  a system. In our advertising brochures, we show that
22  we have student information and we have schedules and
23  we have courses, we have sections, we have teachers.
24  Those are fields of information relating to those
25  things. That's what makes up the system. So that

Page 79

1   certainly can't be protected or you can't advertise.
2   Q   Okay. Let's go ahead and look at
3   Defendant's Exhibit 8. Or actually, I'm sorry, 9.
4   Paragraph 11, Century -- well, actually, the way
5   things are going, let's do this. Which paragraphs in
6   the Amended Complaint do you have knowledge about?
7   A   Okay. I know about paragraph one.
8   Q   Excuse me?
9   A   I know about paragraph one.
10  Q   Okay.
11  A   I don't think paragraph two relates to
12  me at all. Paragraph three doesn't relate to me.
13  Q   I'm not asking about what relates to
14  you. I'm asking what you have knowledge about so we
15  can skip the ones that you don't have any knowledge
16  about.
17  A   Okay.
18      MR. SCHRAMA: Just to clarify, are you
19  asking if he has knowledge of the facts contained
20  within the paragraphs? Is that your question?
21      MR. SHUPENUS: No.
22  A   All right. I know about paragraph four.
23  Okay. So I know paragraph five.
24  Q   What did you say?
25  A   I know paragraph five. I know paragraph

Page 80

1   six. Okay with paragraph seven. Paragraph eight.
2   Paragraph nine.
3   Q   Just to shorten the transcript a little
4   bit, just tell us the numbers that you don't have
5   knowledge about.
6   A   Okay.
7       MR. SHUPENUS: In fact, it's 10 to 12.
8   Why don't you just be prepared to tell me when we come
9   back which paragraphs you don't have knowledge about
10  and we will launch into the rest of it. Okay.
11      (Lunch recess, 11:48 a.m..)
12      (Deposition resumes, 12:27 p.m..)
13  Q   Mr. LaMantia, during the break, you were
14  to identify each paragraph of the Amended Complaint
15  about which you have no knowledge. Can you identify
16  those paragraphs starting with the general allegations
17  on page three?
18  A   I would say I'm familiar with everything
19  from page three down.
20  Q   Through the end of the allegations?
21  A   Yes.
22  Q   On paragraph 13, it states that Century
23  has invested hundreds of thousands of dollars in the
24  development of its student administration software.
25  How much did Century invest, approximately, in the

Page 81

1   development of its data tables and field names?
2   A   On that? That portion is not broken out
3   independently.
4   Q   That's why I'm asking.
5   A   I would have no way of calculating that.
6   It's not broken out in our tracking of information.
7   Q   Okay. And I don't need an exact number
8   but how about this. Tell me what percentage of time
9   is devoted by the Century employees to development of
10  data base structures and field names? That's probably
11  a confusing question because you earlier testified
12  this work was done mostly at the end of the seventies,
13  right?
14  A   Yes. You're right. It would certainly
15  have to have been done early on to base everything
16  else upon. So to say 10 or 15 percent of our effort
17  in developing Star_Base was in developing the tables
18  might be a good estimate.
19  Q   Do you believe that your Star_Base
20  product has an edge over the competition because of
21  the way your data base structures are designed?
22  A   Yes.
23  Q   Okay. How does the structure in
24  Star_Base make your product better?
25  A   It enables all of the unique features