Page 82

1  that are part of Star_Base.
2      Q    What features depend on the specific
3  structure of the data base tables?
4      A    All of them.
5      Q    Each and every feature depends on the
6  structure?
7      A    Absolutely.
8      Q    Can your competitors's products form the
9  same functions as your product with different
10 structures?
11     A    Similar functions.
12     Q    Okay. So if IS3 is to perform the same
13 functions as Star_Base, it would have to have the same
14 table structures, right?
15     A    That is correct.
16     Q    How many table structures in IS3 are the
17 same as the table structure in Star_Base?
18     A    I don't have that information. I didn't
19 perform that analysis.
20     Q    I didn't ask if you performed it. I'm
21 asking if you know?
22     A    I don't know.
23     Q    Have you ever known?
24     A    No.
25     Q    How much of the Star_Base source code is

Page 83

1  contained in Info System 3?
2      A    I don't know that.
3      Q    Do you know -- do you have an estimate?
4      A    No.
5      Q    How many lines of source code are in
6  Star_Base, approximately?
7      A    I don't think I could even guess at that
8  and --
9      Q    Is there a way to find out?
10     A    The system is not, in developing the
11 more recent systems, it is not an additional sit down
12 and write a book. We are using programming tools that
13 use objects and pockets of code embedded within
14 objects so it would be extremely difficult to sit down
15 and say well, how many lines of code are there. It
16 just is not done that way.
17     Q    Can that be determined without counting
18 them one by one?
19     A    I doubt it. I doubt it.
20     Q    In paragraph 17, who contacted Century
21 in March of 2002?
22     A    Well, I can't say for sure but --
23     Q    I don't want you to speculate.
24     A    All right. I won't speculate then.
25     Q    You don't know?

Page 84

1      A    I only know the most likely person but
2  if you don't want me to speculate, I won't.
3      Q    You're under oath and so I want you to
4  not speculate.
5      A    Okay.
6      Q    With respect to the allegation in
7  paragraph 18, how did you learn that the school
8  district had contracted with MGI?
9      A    Only after we were contacted by Don
10 Randall.
11     Q    Did Don Randall tell you that District
12 186 entered into a contract with MGI?
13     A    Well, I didn't have the conversation
14 with Don. Bob Magan did.
15     Q    Did you talk to Bob Magan about that
16 conversation?
17     A    Yes, I did.
18     Q    What did Bob tell you?
19     A    Bob said that it was The Miller Group.
20     Q    What is The Miller Group?
21     A    Who had done the work for Springfield.
22     Q    I'm asking about the contract. How did
23 you learn that District 186 had contracted with MGI?
24     A    As far as a contract goes, I don't think
25 we were aware of the contract until we started the

Page 85

1  discovery process.
2      Q    Okay. I'm going to show you what's been
3  marked as Defendant's Exhibit number eight. I'll
4  represent to you that that is a copy of your original
5  Complaint rather than your Amended Complaint. Okay?
6      A    All right.
7      Q    Review paragraph 18 on page 4, please.
8      A    Um-hum. Okay. It says the same thing,
9  pretty much.
10     Q    Well, given the fact that your initial
11 Complaint was filed before any discovery was done --
12     A    Um-hum, yes.
13     Q    -- your answer, I don't think, can be
14 correct. Is it? When did you learn that the school
15 district had contracted with MGI? If you don't know,
16 that's fine.
17     A    No. I'm having a problem with the word
18 contract. And my thinking and the reason I'm
19 answering the way I am is we certainly were aware that
20 The Miller Group was doing work for the district and
21 there was some type of arrangement between them but as
22 far as knowing that there was, that a contract
23 existed, we certainly didn't know that until after
24 discovery but we certainly knew they were doing work
25 for the district and that's why I answered the way I

Page 86

1 did.
2 Q  Is paragraph 18 -- let me back up. At
3 the time your Complaint was filed, did you know that
4 paragraph 18 was a true statement?
5     MR. SCHRAMA: I'm just going to put an
6 objection on the record before you answer. He's
7 already answered that he doesn't know the meaning of
8 the word contract.
9     MR. SHUPENUS: That is not what he said.
10    THE WITNESS: Yes, it is what I am
11 saying.
12    MR. SCHRAMA: Let me just put this.
13    THE WITNESS: I am sorry. Go ahead.
14    MR. SCHRAMA: That's okay. The contract
15 is a legal term of art and you know that, Counsel, and
16 when it was drafted into this allegation, it's used as
17 legal term of art. You can keep on this line of
18 questioning if you want but he is not an attorney. If
19 you understand the question you can answer it.
20 Q  Go ahead. Do you need me to ask it
21 again?
22 A  No. I can answer the same way. We were
23 aware that The Miller Group was doing work for the
24 district but we had no idea, I have to say, I had no
25 idea what the form of that work was. There was some

Page 87

1 type of arrangement. You might say in order for
2 somebody to do work for a district, they have to have
3 a contract that could be a good assumption but I don't
4 think I can make that assumption.
5 Q  Did you review a draft of this Complaint
6 before it was filed?
7 A  Yes, I did.
8 Q  In paragraph 19?
9 A  Which document are you in now?
10 Q  You know what? Thanks for pointing that
11 out. Paragraph 21 of the Exhibit 9.
12 A  9. Okay.
13 Q  It states that a Century employee
14 received an unsolicited phone call from Don Randall.
15 Who did Don Randall call?
16 A  That would be Bob Magan.
17 Q  Was that call, in fact, unsolicited?
18 A  Yes, it was.
19 Q  How do you know that?
20 A  Bob told me it was.
21 Q  Did Randall tell you that Miller or The
22 Miller Group or Miller Group, Inc. had been retained
23 by the school district?
24 A  I didn't speak with Randall.
25 Q  I didn't ask if you spoke with him.

Page 88

1 A  You said did Randall tell me.
2 Q  You meaning Century. It says -- these
3 are Century's allegations. So did Randall tell that
4 to Century?
5 A  Yes.
6 Q  Okay. Now, in the next paragraph, it
7 says that Dave Williams made an unsolicited call in
8 February of 2003. Was Dave Williams's call, in fact,
9 unsolicited?
10 A  What do you mean by unsolicited?
11 Q  I mean the same way you mean it in
12 paragraph 22. It's your word.
13    MR. SCHRAMA: Objection. It's not his
14 word. He didn't draft the Complaint. As counsel
15 knows, we drafted the Complaint.
16 Q  And you reviewed this Complaint, right?
17 A  Yes, I did.
18 Q  Do you understand it? I'm having a hard
19 time to thinking the word unsolicited is legal. Did
20 you adopt this Complaint as being on behalf of
21 Century?
22 A  Yes.
23 Q  Okay. Then did you know what
24 unsolicited meant?
25 A  We did not prompt Dave to call us.

Page 89

1 Q  That's not my question. Do you know
2 what the word unsolicited meant at the time you
3 approved this Complaint?
4 A  I'm sure I interpreted it in a certain
5 way.
6 Q  How did you interpret it?
7 A  That we did not call Dave Williams. He
8 called us.
9 Q  Did you interpret it to mean that
10 Century didn't contact Dave Williams?
11 A  Yes.
12 Q  In paragraph 23, it states that Williams
13 mailed you, Century, a list of table definitions from
14 Info System 3. Are you reasonably certain that that
15 statement is true, as you sit here today?
16 A  Yes.
17 Q  Have you read Mr. Williams's deposition?
18 A  No.
19 Q  Do you know what Mr. Williams testified
20 to at his deposition?
21 A  No.
22 Q  Who performed the comparison for Century
23 that revealed that virtually all of the definitions
24 were identical, as you put it in paragraph 23?
25 A  Bob did the initial comparison and I

Page 90

1  also looked into listings.
2  Q  When you looked at the listings, did you
3  compare them?
4  A  Yes.
5  Q  Did you discover that virtually all of
6  the definitions were identical?
7  A  Yes.
8  Q  Have you reviewed any deposition
9  transcripts in this case?
10  A  Not that I can remember, no.
11  Q  Did you know that Dave Williams's
12  deposition was taken?
13  A  Yes.
14  Q  Are you at all curious about what his
15  testimony was?
16  MR. SCHRAMA: I'm going to object to the
17  form of the question. It's argumentative. You can
18  answer it, if you know.
19  Q  Okay.
20  A  I suppose so, sure.
21  Q  If Mr. Williams testified that he is not
22  sure that what he provided you was, in fact, IS3 or
23  was from Info System 3, would that change your belief
24  that the documents he provided to you, in fact, came
25  from Info System 3?

Page 91

1  A  I believe you're splitting hairs.
2  Q  I don't care if I am splitting hairs. I
3  want you to answer my question. If Dave Williams no
4  longer believed that the documents came from Info
5  System 3, would that affect your belief that the
6  documents came from Info System 3?
7  A  No.
8  Q  If Dave Williams believed that he, in
9  fact, never even had access to Info System 3, would
10  that change your belief that the documents he sent you
11  were from Info System 3?
12  A  No.
13  Q  Why not?
14  A  In my opinion?
15  Q  Yes.
16  A  They are derivative works of one another
17  and in my opinion, that's just as good as being the
18  same system. One would not exist without the other
19  and I see them as the same.
20  Q  Can you make that determination without
21  seeing the tables from IS3?
22  A  Can I make what determination?
23  Q  That they are the same.
24  A  No, I can't but someone else already
25  has.

Page 92

1  Q  You allege in paragraph 20 that the
2  mirrored display of the demonstration program of Info
3  System 3 is, itself, an infringing act under federal
4  copyright laws. What is that statement, that
5  allegation from Century, based upon?
6  MR. SCHRAMA: Objection to form. This
7  calls for a legal conclusion.
8  A  I was going to say --
9  MR. SCHRAMA: That's all right. If you
10  understand the question, you can answer it but the
11  objection stands.
12  Q  Go ahead.
13  A  I don't know the point of law so I
14  really couldn't address that.
15  Q  Okay. It says here that: This
16  demonstration program used by Miller embodies and
17  reflects elements of Star_Base software.
18  What elements of Star_Base are embodied
19  and reflected in the demonstration program?
20  A  I don't recall.
21  Q  Have you seen the demonstration program?
22  A  I'm not sure that I have, no.
23  Q  Do you know whether Miller or any of the
24  defendants ever used a demonstration program to sell
25  Info System 3?

Page 93

1  A  I don't have any direct knowledge of
2  that.
3  Q  Do you have any knowledge at all?
4  A  Excuse me?
5  Q  Do you have any knowledge at all
6  regarding that?
7  A  Oh, thank you.
8  Q  And while we are talking about splitting
9  hairs, I think the reasonable inference can be drawn
10  from that question that I'm referring to the
11  demonstration program.
12  A  I wasn't quite sure. Sorry. No, I
13  don't believe I have any information or any knowledge
14  of the demonstration program.
15  Q  Who does?
16  A  I don't recall who looked at it at the
17  time Bob may have some more information about that.
18  Q  Well, do you know whether Bob has more
19  information about that?
20  A  No, I'm not sure.
21  Q  Okay. It also states that MGI and
22  Miller intend the widespread distribution of the
23  demonstration program to the general public. Do you
24  know that to be true?
25  A  Well, it's a reasonable inference.

Page 94

1  Q   I'm asking if you know that to be true.
2  A   I couldn't know what is in their mind,
3  no.
4  Q   Upon what do you base that allegation?
5  A   As I said, it's a reasonable inference
6  if you create a demonstration program, you intend to
7  distribute it.
8  Q   What do you mean by widespread?
9  A   Well, within the educational community.
10 Q   Well, it says in here it's to the
11 general public. Which is it?
12 A   I can only answer what I would do. I
13 certainly don't know what is in Miller's mind.
14 Q   What trade shows was the demonstration
15 program displayed at as referenced in paragraph 20 of
16 your Amended Complaint?
17 A   The educational trade shows and I
18 couldn't be more specific than that.
19 Q   How do you know that it was displayed at
20 trade shows? Or let me back up. Do you know that the
21 demonstration program was displayed at trade shows?
22 A   I believe our marketing rep, who I
23 referred to earlier, mysteriously, unfortunately, did
24 see this at a trade show in Illinois.
25 Q   When?

Page 95

1  A   Before the time of this action.
2  Q   I think it's safe to assume that the
3  allegations in here that you claim occurred would have
4  to have occurred before you filed this Complaint?
5  A   Okay.
6  Q   Can you be more specific than that?
7  A   No, I can't.
8  Q   What information do you have that the
9  demonstration program was displayed at trade shows?
10 A   I don't have that information.
11 Q   Who does?
12 A   Honestly, I don't know.
13 Q   Who does know, if anyone?
14     MR. SCHRAMA: Objection. I think that
15 was asked and answered but you can answer the
16 question.
17 Q   Are you aware of anyone who knows or has
18 information that the demonstration program was
19 displayed at trade shows?
20 A   I don't recall where we got the
21 information from.
22 Q   In paragraph 25, it appears that you
23 claim that MGI and Miller copied substantial portions
24 of your copyrighted source code, correct?
25 A   Yes.

Page 96

1  Q   When you say substantial, how much do
2  you mean?
3  A   I believe they had a copy of all of our
4  source code.
5  Q   Upon what do you base that belief at the
6  time this was filed?
7  A   I don't recall if that -- I don't
8  recall. I would only be guessing. You may want to
9  ask Bob that tomorrow.
10 Q   Did Dave Williams, to your knowledge,
11 have access to the Info System 3 source code?
12 A   Yes.
13 Q   How do you know that?
14 A   That's the system they were running.
15 Q   Who was running that system?
16 A   Springfield School District.
17 Q   How do you know?
18 A   Well, because Don and Dave told us that.
19 Q   Is it fair to say that your knowledge is
20 limited to the extent that Don and Dave know that
21 District 186 was running Info System 3? Let me
22 rephrase. If Don and Dave are wrong, do you have any
23 other knowledge that would indicate that Williams had
24 access to the IS3 source code?
25 A   Well, we still have the source code

Page 97

1  comparison done by our witness.
2  Q   I'm asking about Williams's access to
3  the IS3 source code. You stated that you knew that
4  Williams had access to the IS3 source code, right?
5  A   Yes.
6  Q   And you based that knowledge on the fact
7  that Williams told you that he accessed the IS3 source
8  code, right?
9  A   Yes.
10 Q   If that information is wrong, do you
11 have any other information that would support your
12 belief that Williams had access to the IS3 source
13 code?
14 A   I'm going to go back to my previous
15 statement. The source code comparison was done
16 between what Springfield has, IS3, and there were
17 substantial similarities, which in my mind means they
18 were derivative works and in my mind, that's the same
19 product. So I don't care what you're calling it. In
20 my mind, that's IS3. And I don't care what Williams
21 calls it or Randall calls it.
22 Q   Well, you cared when you made your
23 initial allegations, didn't you?
24     MR. SCHRAMA: Same objection. He didn't
25 write the Complaint, once again.

Page 98

1  Q  Go ahead.
2  A  In my mind, there is no difference
3  between the products. That's what I mean by I don't
4  care. I don't care what they think about it. It's
5  the same.
6  Q  When you say the same, though, you don't
7  mean identical, right?
8  A  They are derivative works.
9  Q  Which is different than being identical,
10  correct.
11  A  Obviously, yes.
12  Q  Well, I have to understand what's in
13  your mind here.
14  A  If it is identical, it is not a
15  derivative. It's the same.
16  Q  Okay. You claim in paragraph 25 that an
17  imminent danger was created that your source code
18  would be disclosed to third parties who do not know
19  the trade secret and who might be given a competitive
20  advantage by learning it. To your knowledge, did any
21  third parties obtain the trade secret?
22  A  You mean like all of Miller's employees?
23  Q  Well, you acknowledge in this paragraph
24  that MGI and Miller gained access to the source code?
25  A  Um-hum. I'm sure. Yes.

Page 99

1  Q  And then you reference third parties
2  after that. Who do you mean by third parties?
3  A  Anybody that is not Springfield School
4  District in this case.
5  Q  Okay. Did anyone who you identify as a
6  third party learn Century's trade secrets?
7  A  Well, let's see. Miller sold IS3 to a
8  number of other school districts, so I guess now they
9  have access to the system as well.
10  Q  These are your allegations, sir. I want
11  you to tell me.
12  A  You asked me the question. I'm
13  answering you. There were a number of others.
14  Q  Don't interrupt me because the court
15  reporter can't take both of our statements down.
16  A  Sorry. Go ahead.
17  Q  Who are the third parties who gained
18  access to your trade secret?
19  A  That I have knowledge of would be other
20  school districts that have purchased IS3 and who are
21  running IS3.
22  Q  Is that as specific as you can be in
23  your answer?
24  A  Yes. I'll stand on that.
25  Q  Okay. You claim that MGI and Miller

Page 100

1  physically removed parts of the programs from District
2  186's premises for editing off-site. How do you know
3  that?
4  A  Again, I think you will have to ask Bob
5  that question.
6  Q  So you don't know that to be true?
7  A  I believe it to be true but I don't have
8  any evidence of it. Bob, I'm sure, had that
9  conversation.
10  Q  Is it fair to say that your belief is
11  based on what you learned from Bob Magan?
12  A  Absolutely.
13  Q  Okay. And you have no other information
14  to substantiate that allegation?
15  A  Correct.
16  Q  Okay. Upon what do you base your
17  allegation in paragraph 28 that MGI and Miller had
18  access to the Star_Base copyrighted programs,
19  including the source codes and object code of those
20  programs?
21  A  Well, again, we go back to what was told
22  to us by Randall and Williams and, you know, we
23  haven't brought up the last name of Brent Qualls, who
24  jumped ship, as it were, from Springfield and worked
25  for Miller.

Page 101

1  Q  What do you mean by jumped ship?
2  A  He was an employee of Springfield and
3  became an employee of Miller, as I understand it.
4  Q  Upon what do you base that
5  understanding?
6  A  Information that was given to us.
7  Q  What information did you get?
8  A  That he was working for Miller.
9  Q  Did someone tell you that Qualls was
10  employed by Miller?
11  A  Yes.
12  Q  Who told you that?
13  A  I believe both Don and Dave.
14  Q  Do you know where Qualls is employed
15  now?
16  A  No, I don't.
17  Q  In paragraph 30, it seems that you
18  allege that Info System 3 is either identical or
19  substantially similar to Star_Base in its literal
20  code. What do you mean by literal code?
21  A  Many of the statements are word for word
22  the same in both IS3 and in Star_Base.
23  Q  What do you mean by literal codes? Is
24  it source codes or object codes or what?
25  A  Certainly the source code.

Page 102

1  Q  Anything else?
2  A  Well, the table definitions.
3  Q  Do you believe that the source code in
4  Info System 3 is identical to the source code in
5  Star_Base?
6  A  Portions of it are.
7  Q  Okay. How much?
8  A  I couldn't tell you.
9  Q  Can you estimate?
10 A  No.
11 Q  When you state at the end of paragraph
12 30 various other respects, what do you mean by that?
13    We're taking an awful lot of time to
14 answer questions here, for the record and once again,
15 I want to let you know, Marty, that I'm concerned that
16 the amount of time this is taking is eating into the
17 allotted time that I have.
18    MR. SCHRAMA: Just for the record, I
19 mean, it appeared to me like we have only been taking
20 about less than 15 seconds actually contemplating the
21 answer to the question, which I don't think is
22 unreasonable, especially since we are going through
23 the entire Amended Complaint line by line, which seems
24 to be a little irregular to me but if you want to make
25 a motion, that's fine with me.

Page 103

1  Q  Okay. It's ten after one.
2  A  There are certain distinguishing
3  features in Star_Base, the functionality portion of
4  the system, which have been carried over into IS3 and
5  so other than the fact that the code is similar or in
6  some cases identical, it's organized the same way but
7  all the features that we have, not all of them, of
8  course, but most of the features that we have in
9  Star_Base are also included in IS3, so that similarity
10 also exists.
11 Q  Are there any features that exist in
12 IS3, Star_Base and no other software product? In
13 other words --
14 A  I could not pinpoint any, so I don't
15 know how I can answer that.
16 Q  You know of no features that are
17 exclusive to Star_Base and Info System 3, correct?
18 A  I could not pinpoint any because I don't
19 know every other person's system. So it would be hard
20 for me or impossible for me to make that
21 determination.
22 Q  Well, I'm not asking you to state it as
23 an absolute truth. I'm just asking about what you
24 know. Do you know of any feature, as you just
25 described the word feature, that is exclusive to

Page 104

1  Star_Base and Info System 3?
2  A  You just said exclusive.
3  Q  Right.
4  A  And that goes back to my same answer. I
5  could not say that we have a feature that nobody else
6  has.
7  Q  Okay. How much revenue has Century lost
8  because of the acts of MGI and Miller?
9  A  Well, it's hard to say how many sales we
10 would have gotten in Illinois had Miller not had their
11 product but we have certainly lost our maintenance
12 revenue from Springfield for the last several years.
13 I'm not sure what that number comes to. We probably
14 have calculated that somewhere.
15 Q  Is there any other revenue loss you can
16 identify as referenced in your paragraph 31?
17 A  Well, certainly if Springfield had
18 continued to use Star_Base, had they wanted to have
19 other services done by us, we would have had that
20 revenue as well. So in addition to the maintenance,
21 there would have been some ongoing work done for them.
22 Q  Any other revenue that you lost as
23 stated in paragraph 31?
24 A  Nothing that comes to mind.
25 Q  Is Info System 3 structure the same as

Page 105

1  Star_Base's structure?
2  A  What do you mean by structure? The data
3  base schema?
4  Q  However, you used it in paragraph 30,
5  the same definition.
6  A  Okay. Let me go back there. Yes.
7  Because I'm sure we meant the data base structure.
8  Q  How much of the data base structure in
9  Star_Base is identical to the data base structure in
10 Info System 3?
11 A  Well, from what I have seen, 98 percent.
12 Q  How much have you seen? How much of
13 Info System 3's structure have you seen?
14 A  Personally, I have probably looked at a
15 few dozen tables.
16 Q  Somewhere between 24 and 36 tables?
17 A  Okay.
18 Q  Is that right?
19 A  That's a few dozen. Okay.
20 Q  Is that how many you've seen?
21 A  That's what I'm saying, yes.
22 Q  And of these 24 to 36 tables, how many
23 were identical to Star_Base tables?
24 A  Of the content of the table, they were
25 99 percent, '98, '99 percent similar.

Page 106

1    MR. SHUPENUS: Can you repeat my
2 question, please, ma'am?
3    (Whereupon, the pending question is
4    read.)
5  Q   Is your answer the same?
6  A   There were minor changes made to some of
7 the tables, so that not all of them were 100 percent
8 identical.
9  Q   How many were identical?
10 A   I couldn't tell you off the top of my
11 head.
12 Q   Were any of them identical?
13 A   To the best of my knowledge, yes.
14 Q   Now, I think you testified earlier that
15 all of the copyrights that we have referenced thus far
16 are owned by Century, correct?
17 A   Yes.
18 Q   And Century owns all of the rights to
19 Star_Base, correct?
20 A   Yes.
21 Q   Now, how many applications, how many
22 times did Century attempt to copyright Star_Base?
23 A   I don't know that.
24 Q   Was there ever a failed attempt to
25 copyright Star_Base?

Page 107

1  A   Not that I'm aware of.
2  Q   Okay. You were the only person listed
3 in the 30B-6 disclosure who would have, on behalf of
4 Century, who took part in obtaining copyright
5 protection for any portion of Star_Base, correct? Do
6 you have the documents in front of you? It's part C
7 of Exhibit A.
8  A   I think you took the other one back but
9 I think I have my own copy back here.
10 Q   It's right here, sir. You can look at
11 it.
12 A   Which part did you say?
13 Q   Part C.
14 A   Yes.
15 Q   3.
16 A   Well, as I said earlier, I did not
17 interface with Ken Watov for the most part, who was
18 the attorney who filed the copyrights.
19 Q   Did anyone from Century interface with
20 your copyright attorney?
21 A   Yes.
22 Q   Who did?
23 A   Joe Shearn.
24 Q   Why isn't, to your knowledge, why isn't
25 Joe listed as the designee in topic C?

Page 108

1  A   Well, I certainly can't answer that.
2    MR. SHUPENUS: Who can answer that?
3 Marty, you're raising your hand. Is 30B-6, are your
4 designations in 30B-6 or in response to my 30B-6
5 request accurate or not?
6    MR. SCHRAMA: I'm not here to answer
7 questions. You can ask the witness whatever you like.
8  Q   Okay. Mr. LaMantia, is the 30B-6
9 designation provided by your counsel correct or not?
10 I thought we had already been through this at the
11 beginning of the deposition. This is taking an awful
12 long time and there aren't too many words here.
13   MR. SCHRAMA: It's an awful long time
14 because it's an improper question. You're asking
15 about copyright issues. He's not here as a copyright
16 expert. He's here as a fact witness.
17   MR. SHUPENUS: I don't think that any
18 questions have been asked regarding copyright
19 expertise. I'm asking questions regarding the
20 identity of each person who took part in obtaining
21 copyright protection for Star_Base. There are three
22 copyright counts in the Amended Complaint and it is
23 entirely proper to find out the substance of the
24 copyright protection alleged.
25   MR. SCHRAMA: He gave you the identity

Page 109

1 of his copyright attorney. Why don't you notice the
2 dep?
3    MR. SHUPENUS: I think it was wrongful
4 for you, Counsel, to identify a person as being the
5 designee for Part C who is sitting here telling me he
6 shouldn't be the person and he doesn't have any
7 knowledge.
8    MR. SCHRAMA: I don't agree with you.
9 He didn't say that and why don't we just proceed with
10 the questioning.
11   MR. SHUPENUS: I need to get to the
12 bottom of this because we are going to have to get a
13 remedy for this. If I am not talking to the right
14 person, then I need to make arrangements to talk to
15 the right person. And I have flown a long way and I'm
16 staying here a long time and I expect to get this
17 deposition of the corporation done. How do you
18 propose I do that?
19   MR. SCHRAMA: Your line of questioning
20 with regard to copyrights and not the facts underlying
21 those copyrights is improper and I object to it. If
22 you want to file a motion, file a motion.
23   MR. SHUPENUS: So I can't get this done
24 on the spot? You can't, Marty, give me access to a
25 witness who can testify regarding topic C3, is that

Page 110

1  correct?
2      MR. SCHRAMA: This witness just did
3  testify that his copyright attorney took care of the
4  copyright. If you want to try to depose the copyright
5  attorney, that would be fine. But the Century
6  representative just told you who took care of all the
7  copyright work. I don't really know what else you
8  want and what else would be relevant or proper at this
9  juncture.
10     MR. SHUPENUS: Well, Marty, I want the
11 Century representative who has the knowledge regarding
12 topic C3. Who is that person? Your client is saying
13 that it is Joe Shearn and you're saying that it is the
14 witness here. There is a conflict and I want to talk
15 to the right person.
16     MR. SCHRAMA: That's not what he
17 testified to. He testified that Mr. Shearn had some
18 interface with the copyright attorney. He didn't say
19 that he didn't have any knowledge of who handled the
20 copyright issues.
21     MR. SHUPENUS: He said that he is not
22 the proper designee for topic C3.
23     MR. SCHRAMA: I don't remember him
24 saying that and I don't think that's his testimony.
25     (Whereupon, the last three

Page 111

1  questions and answers were read.)
2  Q  Mr. LaMantia, are you the person from
3  Century who is best equipped to respond to the matters
4  contained in topic C3 in Exhibit A?
5  A  Well, the question is the identity of
6  each person who took part in obtaining copyright
7  protection.
8  Q  And?
9  A  So I'm certainly aware of the copyrights
10 being filed.
11 Q  Sir, do you see where it says together
12 with all actions undertaken by each person?
13 A  Okay.
14 Q  So what's your answer to my question?
15 A  I don't know. I don't know -- I don't
16 understand it. I mean, certainly, I don't know that
17 anybody knows all actions undertaken by each person
18 and I think that's where we are at with this.
19 Q  Who knows the identity of each person
20 who took part in obtaining copyright protection for
21 any portion of Star_Base?
22 A  I know that.
23 Q  Okay. Identify each person?
24 A  Joe Shearn took part and Ken Watov took
25 part.

Page 112

1  Q  Did you take part?
2  A  If it was necessary to gather
3  information to supply for the copyrights, I certainly
4  did.
5  Q  You qualified your answer. Did you take
6  part in obtaining copyright protection for any portion
7  of Star_Base?
8  A  Yes, I did.
9  Q  What actions did you undertake?
10 A  I gathered information that needed to be
11 supplied for the copyright protection.
12 Q  What information did you gather?
13 A  Typically, some form of the source code
14 that needed to be filed.
15 Q  What do you mean by typically?
16 A  All right. I'll strike that word. In
17 each case where I was called upon to take an action,
18 it was to gather information to be filed along with
19 the copyright filing.
20 Q  What actions were you called upon to
21 take?
22 A  I think I just answered that.
23 Q  Answer it again.
24 A  Produce the necessary code, source code
25 listings, whatever was required in order to complete

Page 113

1  the filing.
2  Q  What was filed?
3      MR. SCHRAMA: Objection to form. Calls
4  for a legal conclusion.
5  Q  What documents did you compile for the
6  purpose of having them filed?
7  A  Documents describing Star_Base
8  sufficient to obtain the copyright.
9  Q  What documents are those?
10 A  I believe they were limited to source
11 listings and possibly some screen captures.
12 Q  When you say source listings, what does
13 that mean? I don't know what source listings is.
14 A  Pieces of paper that have code on them.
15 Q  Did you submit the entire source code?
16 A  I don't recall.
17 Q  Who would know at Century what documents
18 were submitted by Century?
19 A  Honestly, I'm not sure.
20 Q  When you were noticed about the
21 deposition, did you undertake any investigation to see
22 who would know that information?
23 A  No.
24 Q  Did you hold yourself out to anybody to
25 be the person who could best respond to topic C3?

**Page 114**

1  A  No.
2     MR. SCHRAMA: I'm going to object to
3  form in case this indicates any conversations that you
4  had with counsel.
5  Q  Go ahead and answer.
6  A  If I am understanding what you mean by
7  hold myself out, like did I offer myself? Is that
8  what you are saying?
9  Q  Did you tell anyone that you were the
10 person from Century who should testify regarding topic
11 C3?
12 A  No.
13 Q  Do you have any idea why you are the
14 person designated to testify regarding topic C3?
15 A  Because I do have knowledge of that
16 information.
17 Q  What information?
18 A  The filing of the copyrights.
19 Q  Was anything filed under seal when
20 Century sought copyright protection? And by under
21 seal, I mean was it filed in a manner so that the
22 general public couldn't have access to it, if you
23 know?
24 A  I don't recall.
25 Q  Did Century obtain copyright protection

**Page 115**

1  of its data base tables?
2     MR. SCHRAMA: Objection to form. Calls
3  for a legal conclusion. You can answer.
4  A  The specific thing that I can offer,
5  going back to your other question, is that it's
6  copyrighted as an unpublished work and that was done
7  specifically so it would not be available to the
8  general public.
9  Q  Now, did you indicate to me that some
10 source code was filed?
11 A  Yes.
12 Q  Okay. Were table structures filed?
13 A  I don't recall.
14 Q  Was the data dictionary filed?
15 A  I don't recall.
16 Q  Were the field names filed?
17 A  I don't recall.
18 Q  Was the entire source code filed?
19 A  I don't recall.
20 Q  Would anyone at Century know the answers
21 to the last four questions I posed?
22 A  I think we would have to research our
23 filing.
24 Q  I'm not sure that answered my question.
25 Do you know of anyone at Century who would know the

**Page 116**

1  answer to my questions?
2  A  And my answer is not without going back
3  to the files and looking it up. If we produced all of
4  our employees in front of you today, I don't think one
5  can answer any better than I have without going back
6  and looking in the files.
7  Q  Well, is Joe Shearn an employee?
8  A  Yes, he is.
9  Q  Okay. And he can't answer any better
10 than you, right?
11 A  I would agree with that, yes.
12 Q  In paragraph 36, you indicate that the
13 school district possessed the right, ability and
14 authority to supervise MGI in MGI's performance under
15 certain agreements. Do you have any knowledge
16 regarding District 186's right, ability and authority
17 to supervise MGI in this regard?
18     MR. SCHRAMA: I'll just object insofar
19 as it calls for a legal conclusion but you can answer
20 the question, if you understand it.
21 A  Can you ask that again? I'm sure --
22     MR. SHUPENUS: Ma'am, can you read it
23 back, please?
24     (Whereupon, the pending question is
25     read.)

**Page 117**

1  A  Yes, I do.
2  Q  What knowledge do you have?
3  A  Well, I'm aware of the contents of the
4  contract between the school district and MGI.
5  Q  Okay. What do the contracts say about
6  this subject?
7  A  There were several employees of
8  Springfield School District that were part of a
9  committee that were directing MGI to develop software
10 for them built upon the Star_Base tables.
11 Q  I asked about what was in that contract
12 and your answer, I don't think, responded to my
13 question. I'm having a hard time understanding your
14 response. Is your response based upon a contract or a
15 committee?
16 A  You're right. I probably mixed
17 information from two different documents.
18 Q  I think you did.
19 A  But the contract states that MGI will
20 perform those services I described and other documents
21 related the fact that a committee would be directing
22 MGI.
23 Q  Okay. Do the contracts, to your
24 knowledge, address District 186's right, ability and
25 authority to supervise MGI?

Page 118

1  MR. SCHRAMA: Same objection.
2  A   I believe they did.
3  Q   Okay. I'll show you what's been marked
4  as Defendant's Exhibit No. 37. Just tell me, is this
5  the document that you believe gives District 186 the
6  right, ability and authority to supervise MGI?
7  MR. SCHRAMA: Same objection.
8  Q   You can go ahead and answer it.
9  A   I don't believe this is the contract I'm
10 referring to.
11 Q   Okay. Let me show you what's been
12 marked as Defendant's Exhibit No. 38. Is this the
13 contract you're referring to?
14 A   Well, it certainly says that The Miller
15 Group will perform services as required by the client,
16 so it sounds to me like the client is directing The
17 Miller Group.
18 Q   Is this the contract that you believe --
19 oh, well, back up. I thought that we had already
20 discussed the fact you didn't know of any contracts at
21 the time?
22 A   Aren't we on the Amended?
23 Q   We are on the Amended Complaint.
24 A   Okay.
25 Q   You reviewed a certain contract,

Page 119

1  correct, that told you that District 186 possessed the
2  right, ability and authority to supervise MGI,
3  correct?
4  A   Yes.
5  Q   Is that the contract that you're
6  referring to in paragraph 36?
7  A   I'm not sure if this is the exact one.
8  Were there other contracts?
9  MR. SCHRAMA: You can't ask me.
10 A   I can't you ask that. I don't recall if
11 this is the one.
12 Q   There is another one. This is Exhibit
13 39. Is that the contract that Century asserts gives
14 District 186 the right, ability and authority to
15 supervise MGI?
16 A   Well, hang on. This one, I believe,
17 does. I'm not sure that's the one I was thinking of
18 when I read this.
19 Q   Well, I want to know --
20 A   I believe that this one does.
21 Q   Okay. Which one were you thinking of
22 when you adopted this, the allegations in the Amended
23 Complaint? We have been looking at these contracts
24 for a little while. Do you know the answer to the
25 question or are you just reading the contracts

Page 120

1  searching for language that might support your
2  allegation?
3  A   Well, I haven't seen these in quite some
4  time, so I need some time to refamiliarize myself with
5  them. Yes. This is the contract that I was thinking
6  of. So exhibit 39.
7  Q   Okay. In paragraph 41, Century alleges
8  that the school district disclosed Century's trade
9  secrets without its express or implied consent. What
10 are you referring to in paragraph 41 as Century's
11 trade secrets?
12 MR. SCHRAMA: Objection to form as it
13 calls for a legal conclusion. If you understand the
14 question, you can answer it.
15 A   Springfield gave access to our Star_Base
16 code to The Miller group.
17 Q   Which code?
18 A   Didn't I say the Star_Base code?
19 Q   Source code, object code or other code?
20 A   Source code, which includes in my
21 description of source code the data schemas. That's
22 an all-inclusive term as far as I'm concerned.
23 Q   Are you familiar with the common usage
24 of the term source code?
25 A   I would debate that there is a specific

Page 121

1  usage of it.
2  Q   I'm asking about a common usage. Is
3  your usage of the term source code consistent with
4  common usage as you know common usage to be?
5  A   I believe it is, yes.
6  Q   Okay. In paragraph 44, Century claims
7  that it will suffer irreparable harm and damage
8  because of the actions or action and conduct of
9  defendants. What irreparable harm has occurred to
10 Century as a result of actions and conduct of any of
11 the defendants?
12 MR. SCHRAMA: Objection to form and that
13 it calls for a legal conclusion. You can answer the
14 question, if you understand.
15 A   Well, in my opinion, it falls into
16 several areas. First, we lost Springfield as a
17 customer. Secondly, our trade secrets were exposed to
18 the public; and third, we lost the possibility of
19 business to districts within Illinois because now we
20 had a new competitor; and fourthly, we are wasting our
21 time here and at considerable expense.
22 Q   I agree with you. Now, Century learned
23 about this exposure of its trade secrets in February
24 2003, right?
25 A   When Don Randall first called us,

Page 122

1  whatever that date was.
2  Q    I allege it was in February of 2003.
3  A    Okay. I will agree with you, then.
4  Q    It seems like it took about three months
5  to get a Complaint on file but at the time the
6  Complaint was filed, it was represented to be an
7  emergency. What happened between February 2003 and
8  May of 2003 that turned this matter into an emergency?
9       MR. SCHRAMA: I'm just going to lodge an
10 objection.
11 Q    If you know.
12      MR. SCHRAMA: And I caution you that any
13 of the discussion you had with your counsel are
14 privileged. Any of the things you talked about as far
15 as litigation strategy is also privileged, before you
16 answer the question.
17 A    Well, as far as we were concerned, it
18 was an emergency immediately but we just don't jump
19 into a lawsuit without having sufficient information
20 at hand, so it took us time to put the information
21 together.
22 Q    Are there any other matters that delayed
23 Century in seeking relief?
24 A    Not that I can recall, no.
25 Q    I'm going to show you what's been marked

Page 123

1  as Defendant's Exhibit 10. Do you recognize that
2  document?
3  A    Yes.
4  Q    Describe that document for me.
5  A    Well, it was quite a long description
6  about what Star_Base is and looks like a copyright
7  registration and screen prints.
8  Q    In paragraph eight, you state that by
9  directly copying Century's tables and data base
10 program for the purpose of making derivative works,
11 however, another software developer would save
12 enormous time and expense. Did someone directly copy
13 the information listed in paragraph eight?
14 A    Yes.
15 Q    Who copied it?
16 A    MGI.
17 Q    What's the difference between copying
18 and directly copying, if any?
19 A    I don't know how you can indirectly copy
20 something, so just an adjective.
21 Q    Well, I'm curious because Century's
22 tables are not identical to the Info System 3 tables,
23 right?
24 A    Excuse me? Say that again.
25 Q    Century's tables and Miller's tables

Page 124

1  aren't identical?
2  A    They are substantially identical.
3  Q    How can something be substantially
4  identical. It either is or it isn't, right?
5       MR. SCHRAMA: Objection. Argumentative.
6  A    There are substantial similarities.
7  Q    Okay. On page five in paragraph 11 and
8  this language is at the top of page five, it says: As
9  the underscored language above reflects, Century
10 considers the source and object code for the Star_Base
11 program to be protected trade secrets.
12      Why are the source and object codes the
13 only things referenced in this paragraph and not the
14 remainder of the Star_Base elements that we discussed
15 earlier?
16 A    I believe that goes back to our
17 definition of the source code as being both the
18 language code and the data schema. We consider that
19 to be the source code of the system.
20 Q    Well, did you describe through the word
21 source and object code the entire Star_Base
22 application?
23 A    Do we describe it?
24 Q    When you say source and object code,
25 does that mean the entire Star_Base application?

Page 125

1  A    Yes.
2  Q    There is no part of the Star_Base
3  application that is not either source codes or object
4  code, in your view, correct?
5  A    Correct.
6  Q    Okay. In paragraph nine, it seems that
7  you reference Exhibit A as the registration
8  certificate for the copyright, correct?
9  A    Yes.
10 Q    And it indicates that the copyright
11 became effective in November of 1995, correct?
12 A    Yes.
13 Q    Well, is that copyright for the screen
14 or for a different element of Star_Base?
15 A    I'm sorry. Ask that question again.
16 Q    Well --
17 A    What are you asking me?
18 Q    I'm asking what the copyright that you
19 reference as Exhibit A covers?
20      MR. SCHRAMA: Objection to form.
21 A    It says code and screen outputs.
22 Q    Is Exhibit A the copyright for the
23 screen outputs and the code?
24 A    I don't think I can answer that. I
25 don't know if this is what is in the file or not. I

Page 126

1  think we are showing this as an example of what was
2  displayed and how the copyrights are being displayed,
3  making it obvious that it is a copyrighted work. I
4  believe that's what we are showing here.
5     Q     All your screen names are showing a
6  copyright of 1990, right?
7     A     Um-hum. I'm sorry. Yes.
8     Q     And your copyright application is dated
9  1995 and I'm trying to figure out how these, how the
10 copyright application is related to the screens that
11 are printed out and attached as Exhibit B?
12    A     To the best of my knowledge, in
13 displaying the fact that we have a copyrighted work,
14 that is not all that important, to the best of my
15 knowledge. I'm not a copyright attorney.
16    Q     Right. And I'm not asking you about
17 what's important. I'm asking you what the
18 relationship is in your mind. This is your
19 declaration. I'm asking what the relationship is
20 between Exhibit A and Exhibit B?
21    A     I think, as it says in the second line
22 of paragraph nine, the screen outputs bear a copyright
23 notice and I think that's what it's saying.
24    Q     I understand that. Is the copyright
25 referenced in Exhibit B related to the copyright that

Page 127

1  is set forth in Exhibit A?
2     A     I couldn't answer that.
3     Q     Okay. District 186 is accused of
4  vicarious and contributory copyright infringement.
5  What copyright does Century allege we infringed?
6           MR. SCHRAMA: Objection to form. Calls
7  for a legal conclusion. You can answer it, if you
8  understand the question.
9     A     As we have developed our systems over
10 the years, we have copyrighted our software a number
11 of times and it has always remained protected under
12 copyright. So I'm not sure your question is relevant
13 at all.
14    Q     Sir, it is not for you to determine
15 relevance here and relevance isn't a proper objection
16 in a discovery deposition anyway.
17    A     All right.
18    Q     What copyright does Century allege
19 District 186 infringed?
20    A     Our copyright.
21    Q     Which one?
22    A     I don't know.
23    Q     You don't know?
24    A     I don't know.
25    Q     Okay.

Page 128

1  .  A     Our copyright.
2     Q     Have you reviewed Paul Lewis's report?
3     A     The source code comparison?
4     Q     Yes.
5     A     I think I've seen a little bit of it,
6  yes.
7     Q     What portion did you see? Let me back
8  up.
9     A     I looked through some of his source code
10 comparisons and table comparisons.
11    Q     Have you read any of Mr. Lewis's
12 marketing materials or advertising?
13    A     Not that I can remember, no.
14    Q     Okay. You aren't aware of any facts
15 relating to a rejected application for copyright
16 protection, correct?
17    A     No.
18    Q     Am I correct?
19    A     Yes, you are.
20    Q     Okay. Have you reviewed the discovery
21 propounded by or the discovery answers and responses
22 propounded by Century?
23    A     I don't know what stuff you're talking
24 about.
25    Q     Century produced documents in response

Page 129

1  to some requests that we made?
2     A     Yes.
3     Q     Did you review the documents that were
4  produced to us?
5     A     I'm sure I did not see all of it.
6     Q     Okay.
7     A     I may be familiar with some of it.
8     Q     Are you aware of anyone at Century who
9  reviewed the document production supplied to District
10 186 in response to our discovery request?
11    A     As far as I know, it was pulled together
12 by different people. I don't know that any one person
13 reviewed it all.
14    Q     Which people pulled it together?
15    A     Mostly our administrative staff.
16    Q     Who?
17    A     It would be Denise Pelkey, possibly Geri
18 Shearn.
19    Q     Anyone else?
20    A     Not that I can think of. Joe Shearn
21 probably pulled some things out. That's a guess.
22    Q     Please don't guess because we have got
23 to make sure this is right. I don't want to come back
24 here.
25    A     Okay. I take it back.

Page 130

1  MR. SCHRAMA: I just want to make sure
2  I'm not confused. Are we sure we are talking about
3  the same thing? You are talking about the discovery
4  responses to your requests, Counsel?
5  MR. SHUPENUS: Yes.
6  MR. SCHRAMA: Do you understand what he
7  is saying?
8  MR. SHUPENUS: He was discussing the
9  documents that they gathered, it sounds like, so I
10 think that we are on the same page.
11 MR. SCHRAMA: Okay. I just wanted to
12 make sure.
13 MR. SHUPENUS: Thanks.
14 MR. SCHRAMA: That's okay. You don't
15 have to answer. I just wanted to make sure what we
16 are talking about because you used the word
17 propounded, which kind of got me hung up which means
18 actually to ask the question as far as I'm concerned.
19 You're talking about discovery requests made by you to
20 the plaintiff, is that what you are asking? Maybe I'm
21 just confused.
22 MR. SHUPENUS: Made on behalf of any of
23 the defendants.
24 MR. SCHRAMA: Okay. I'm sorry. And
25 maybe you can just ask your question again because

Page 131

1  maybe I didn't understand. You are asking if he has
2  seen the documents produced by the plaintiff to the
3  school district or any of the defendants?
4  MR. SHUPENUS: Yes.
5  MR. SCHRAMA: Okay. That's fine.
6  Q  I'm going to show you what's been marked
7  as Defendant's Exhibit 41. Have you ever seen this
8  document?
9  A  Well, I don't recall ever having seen it
10 before but doesn't mean I haven't.
11 Q  Well, if you don't recall seeing this
12 before, then we will set it aside for now. Who at
13 Century is responsible, if anyone, for insuring that
14 all of the documents requested have been provided to
15 counsel? Is it the contact person we discussed
16 earlier?
17 A  I think in the final analysis, Joe
18 Shearn probably made sure that everything was
19 responded to.
20 Q  Okay. I'm going to show you Defendant's
21 Exhibit 43. Have you ever seen this document? It
22 was, by the way, produced by Century. I didn't want
23 either of you to think I was pulling out something
24 that hasn't been produced. Mr. LaMantia, have you
25 ever seen this letter referenced as Defendant's

Page 132

1  Exhibit 43?
2  A  I don't recall.
3  Q  Well, in this letter, the copyright
4  office rejected Century's application for copyright
5  protection stating that it doesn't have or that it is
6  not an original work of authorship. Do you have any
7  idea why such a conclusion could have been reached?
8  MR. SCHRAMA: I'm going to object to the
9  form of the question in that this is or at least
10 appears to be an official correspondence from the
11 copyright office, a legally active document that
12 speaks for itself. If you understand the question as
13 it's posed, you can answer it.
14 Q  Go ahead and answer, if you can.
15 A  I'm sure. I was trying to read while
16 you were speaking. Can you ask that again?
17 Q  Do you have any idea why the initial --
18 why the copyright application referenced in this
19 letter was initially rejected?
20 A  No, I don't, really. I mean, other than
21 what it says on the page.
22 Q  Now, at the time or -- at the time this
23 letter was apparently received by Century, you were a
24 one-half owner just like today, right?
25 A  Correct.

Page 133

1  Q  I'm just kind of surprised that if your
2  flagship product was rejected for copyright
3  protection, you wouldn't know. Is there any reason
4  that such information might not be conveyed to you?
5  A  Not in particular, no.
6  Q  Are you surprised by Defendant's Exhibit
7  43?
8  A  Well, certainly I didn't have -- I don't
9  recall having knowledge of it. So I'm surprised to
10 see this document.
11 Q  I'm going to show you Defendant's
12 Exhibit 45. Have you ever seen this document? And
13 just for the interest of not tricking you, this isn't
14 the one that's attached to your declaration. I'm not
15 here to trick you.
16 A  I think I have. I'm looking at the
17 dates on the front, November 22, '95. I remember
18 seeing the document dated that way.
19 Q  Compare that with the one you attached
20 to your declaration, okay?
21 A  This one?
22 Q  Yes.
23 A  Okay. Yes. This one is different.
24 Q  Right. Specifically --
25 A  But then why is it typed in? That's