Page 134

1  interesting.
2  Q    What are you referring to?
3  A    There's a typed in 11/22/95.
4  Q    Well, I think that the first one was
5  rejected but then Exhibit 45 -- strike that. I think
6  Defendant's Exhibit 45 was rejected but then the
7  copyright registration certificate attached to your
8  declaration has a different nature of authorship and
9  was then accepted. Does it appear that way to you?
10       MR. SCHRAMA: Objection to form. It
11  calls for a legal conclusion.
12  A    Well, granted, there's different
13  information typed in the boxes.
14  Q    Do you have any knowledge or
15  understanding regarding why there is different
16  information typed in the nature of authorship section
17  on these two documents?
18  A    Well, since you have all these documents
19  in front of me and I can read this letter of
20  rejection, it says that the nature of authorship is
21  wrong.
22  Q    What's your understanding?
23  A    I can put two and two together.
24  Q    What's your understanding of the
25  difference between the two descriptions of nature of

Page 135

1  authorship as it pertains to your product Star_Base?
2       MR. SCHRAMA: Same objection.
3  A    Well, I would only be guessing so I
4  don't think I'll answer because I'm really not sure.
5  I don't want to guess.
6  Q    Is your answer that you're not sure?
7  A    Yes.
8  Q    Okay.
9       (Recess, 2:17 p.m..)
10      (Deposition resumes, 3:35 p.m..)
11  Q    Mr. LaMantia, we have just finished a
12  break and we have been looking at the two copyright
13  registration forms for Star_Base, correct?
14  A    Yes.
15  Q    And one of them is attached to your
16  declaration and the other one is Defendant's Exhibit
17  45, right?
18  A    Yes.
19  Q    Now, the form that's attached to your
20  declaration indicates that it was completed, that
21  Star_Base was created in 1991. If you look at part
22  three, you'll see that, right?
23  A    Okay.
24  Q    In Defendant's Exhibit 45, that date was
25  changed, right?

Page 136

1  A    Yes.
2  Q    Do you know why that date changed?
3  A    No.
4  Q    Did you know the date of completion was
5  changed prior to today?
6  A    I was not aware of it.
7  Q    On page two of Exhibit 45, it states
8  that Star_Base -- it appears to me that it states that
9  Star_Base wasn't a derivative work. You see where
10 that no box is checked in part five?
11 A    Yes, I do see it.
12 Q    Was an earlier version of this work,
13 Star_Base, made in the copyright office or registered
14 in the copyright office?
15 A    I couldn't tell you if this was the
16 first one for Star_Base.
17 Q    Well, earlier you testified that all
18 versions including STARS, Version 1, Version 2 and
19 Version 3 were copyrighted. Do you still believe
20 that?
21 A    Yes.
22 Q    Are all of the versions I just mentioned
23 registered?
24      MR. SCHRAMA: I'm just going to put an
25 objection on the record before you answer. I know we

Page 137

1  were talking about the time of the deposition, how
2  long it was taking, that sort of thing and I imagine
3  this is going to become the subject of a motion at
4  some point. But it seems like most of this
5  questioning and, in fact, a lot of the questioning
6  today, by my count over a third of it, surrounds the
7  status of copyright registration and in my experience,
8  I've never seen a fact witness asked these type of
9  questions and I've certainly never seen a registration
10 form put in front of a fact witness. The status of
11 the registration is fairly easy to confirm. I just
12 don't see the point of the questioning. If you want
13 to go on with this line of questioning you can, but
14 I'm going to bring it to the court's attention when
15 you ask for more time in the deposition. With that
16 said, you can answer the question if you understand
17 it.
18 A    It's my belief that all versions are
19 copyrighted.
20 Q    Are all versions registered?
21 A    It's my belief that all versions are
22 registered.
23 Q    Is it your belief that representation in
24 part five of Defendant's Exhibit 45 is incorrect?
25 A    No.

Page 138

1  Q   Do you believe that is a correct
2  representation in section five?
3  A   Yes, I do.
4  Q   Why?
5  A   Star_Base is an unique product.
6  Q   That's it?
7  A   That's my answer.
8  Q   What version of Star_Base was completed
9  in 1991?
10 A   The Version 1.
11 Q   When was Version 2 completed?
12 A   It would have been around '95, '96,
13 somewhere around there.
14 Q   Okay. Earlier you said that Version 2
15 was completed around 1995, right?
16 A   Yes.
17 Q   Well, I don't understand why Version 1
18 wouldn't be registered until the completion of the --
19 approximate completion time of Version 2? Do you
20 understand why that is?
21 A   No.
22 Q   Is there anyone who would understand
23 that who is employed by or owns Century?
24 A   No.
25 Q   It's just a mystery as far as you're

Page 139

1  concerned?
2  A   I would have to say that, yes.
3  Q   Now, when I did the copyright search
4  that your attorney just discussed, I only found a
5  registration for one version of Star_Base. Do you
6  have any idea why the other registrations wouldn't
7  come up?
8  A   No.
9  Q   Has Century been known by another name,
10 perhaps?
11 A   No.
12 Q   So I guess it's not that easy to verify
13 whether a copyright is registered?
14     MR. SCHRAMA: Don't answer that.
15 A   I wouldn't know.
16     MR. SCHRAMA: Don't answer the question.
17 It is argumentative. This is getting ridiculous and
18 it's not contemplated to lead to discoverable
19 evidence.
20     MR. SHUPENUS: The lawsuit is based on
21 copyright infringement and I have yet to hear of a
22 copyright that we infringed. I'm trying to find that
23 out.
24     MR. SCHRAMA: And this is not an expert
25 on copyrights. This is a fact witness.

Page 140

1       MR. SHUPENUS: You guys haven't named an
2  expert on copyrights. All I have is fact witnesses,
3  right?
4       MR. SCHRAMA: He is not here to answer
5  questions about the status of the copyright
6  registration.
7       MR. SHUPENUS: Yes, he is, Counsel.
8       MR. SCHRAMA: That's what your notice
9  says but it's objectionable.
10 Q   Counsel he attached the copyright
11 certificate to his declaration?
12      MR. SCHRAMA: That doesn't mean that he
13 is a copyright attorney now does it.
14 Q   Are you going to instruct him not answer
15 further questions about the copyright status?
16      MR. SCHRAMA: He is not going answer
17 that last argumentative question that you posed.
18 Q   Okay. I'm going to ask it a different
19 way. Even though that's in the a privileged area is
20 it counsel? Tell me if it is because I don't want to
21 step on any privilege here?
22      MR. SCHRAMA: In actuality, that
23 question was not contemplated to lead to discoverable
24 evidence and I am not permitting him to answer it
25 because it was argumentative and inflammatory.

Page 141

1       MR. SHUPENUS: Well, that's the first
2  inflammatory copyright question I've ever heard of but
3  we will move on.
4  Q   If one of your customers wanted to know
5  whether Star_Base was registered, do you know how they
6  would find out?
7  A   No.
8  Q   Okay. And as you sit here today, you're
9  saying that every version of Star_Base that we have
10 talked about is registered with the copyright office,
11 right?
12 A   Yes.
13 Q   Okay. Now, did you tell me earlier that
14 you may not have seen all documents that have been
15 produced?
16 A   Correct.
17 Q   Are you aware of any documents that have
18 been produced that you haven't actually seen, i.e.
19 have any of them be described to you?
20 A   I would have to say yes.
21 Q   What documents have been produced to us
22 that have been described to you but that you haven't
23 seen?
24 A   Notes that were taken by other people.
25 Q   Like for whom? Whose notes?

Page 142

1  A   E-mails. I think earlier I described
2  the fact that information was collected from Bob
3  Magan, from possibly Karen Yoder. I believe Joe
4  Shearn had notes that were included. I didn't have
5  access to those.
6  Q   I'll just be another short moment. I
7  want to make sure that I've presented the documents
8  that I want to present. Is there any element or code
9  contained in Star_Base that was written by Brent
10 Qualls?
11 A   Not to my knowledge.
12 Q   Would you know, in the course of your
13 duties at Century, whether any code was written by
14 someone other than a Century employee?
15 A   Yes.
16 Q   Okay. I've got to get something out of
17 my briefcase. I had some periodicals. Here there
18 are. I'm going to show you what's been marked as
19 Defendant's Exhibit 75. I want to ask have you ever
20 seen that document before?
21 A   If I did, I don't recall having seen it
22 before.
23 Q   Does Century maintain files of requests
24 for proposals that it receives?
25 A   We do save some, yes.

Page 143

1  Q   Which ones do you save? What determines
2  whether or not a request for proposal gets saved?
3  A   I think after a certain amount of time,
4  they get cycled out, if you will.
5  Q   Do you know how long your company
6  maintains requests for proposals?
7  A   No, I don't know.
8  Q   Do you recall ever seeing this request
9  for proposal?
10 A   I don't recall, no.
11 Q   Do you recall ever hearing about this
12 request for proposal?
13 A   No.
14 Q   So is this request for proposal brand
15 new to you?
16 A   To the best of my recollection, yes.
17 Q   Well, we are not going to dig through it
18 then. I'm going to show you what's been marked as
19 Defendant's Exhibit 76. Have you ever seen this
20 document?
21 A   Yes, it looks familiar.
22 Q   What is it?
23 A   Well, I'm not sure what it would have
24 been used for.
25 Q   Well, what is it?

Page 144

1  A   It's a set of screen prints and
2  definitions for Star_Base, not the entire system, of
3  course.
4  Q   Is this document made available to
5  people outside of Century?
6  A   Yes.
7  Q   What category of people or entities
8  would this report be sent to or provided to?
9  A   I don't remember what the usage would
10 have been.
11 Q   Well, look at page three.
12 A   It almost looks like a training guide
13 because of the notes page on the back of each screen.
14 Q   Would Century ever provide this document
15 to an entity who wasn't bound to a license agreement?
16 A   I wouldn't think so.
17 Q   Do you know of any instance where this
18 document may have been provided to someone or an
19 entity that didn't have a license agreement with
20 Century?
21 A   No. I certainly wouldn't know of that.
22 Q   Because this document contains what are
23 called field lists, right?
24 A   That is correct.
25 Q   And Century views such lists as

Page 145

1  proprietary, right?
2  A   That is correct.
3  Q   Is there any other proprietary
4  information that you see in Exhibit 76?
5  A   Some of the information on the screens I
6  would consider proprietary.
7  Q   And I want to be very clear here that
8  this document is just pages 1 through 28. There is a
9  separate section that is not photocopied but these are
10 documents provided by Century to us.
11 A   Okay.
12 Q   So I'm just using this as an exhibit.
13 A   Okay.
14 Q   So you agree that Defendant's Exhibit 76
15 contains proprietary information, right?
16 A   Yes.
17 Q   I'll show you what's been marked as
18 Defendant's Exhibit 77. Have you ever seen this
19 Exhibit 77, Mr. LaMantia?
20 A   Honestly, I don't recall having seen it
21 before.
22 Q   Does it appear to be related to your
23 Star_Base product?
24 A   Well, the fact that it says Star_Base on
25 the front, if you tore this off and asked me to take

Page 146

1  out all references to Star_Base, it would be very hard
2  for me to do that.
3  Q   Well, I'm certainly not asking you to
4  delete all references to Star_Base. Is the first page
5  your letterhead?
6  A   Yes, it is. That is our logo.
7  Q   Do you have any reason to doubt the fact
8  that this document was created by your company?
9  A   Not at this moment.
10 Q   In fact, if you look at the third page,
11 you see the numbers above each space?
12 A   Yes.
13 Q   Are those categories consistent with any
14 table structures in Star_Base?
15 A   I would say not.
16 Q   Look under, on page two, under the
17 heading general, and the second sentence says: The
18 order of the fields matches the order these fields
19 appear in Star_Base.
20     Do you think that statement is correct
21 or not?
22 A   It's the way they appear to the screen.
23 The order they appear on the screen.
24 Q   But that doesn't match any of your
25 tables?

Page 147

1  A   The order does not.
2  Q   Okay. And this is the first time you
3  have seen Defendant's Exhibit 77, right?
4  A   I don't recall having seen it before.
5  Q   I'm going to show you what I've marked
6  Defendant's Exhibit 78. Have you ever seen this
7  document? I'll represent to you it was supply by
8  Century to District 186.
9  A   Again, I don't recall having seen it
10 before. Looks like it's been taken out of a bid, a
11 bid response, just by the bullet items.
12 Q   You're right. Do you believe that this
13 document may have been created by Century based on the
14 form and your experience with your bid responses?
15 A   Yes.
16 Q   Okay. Who prepares such documents at
17 Century? And more precisely around 1995, who would
18 have been in charge of this?
19 A   Well, it's almost always a collaboration
20 between marketing representative, somebody from
21 technical department and somebody in administration.
22 Q   Now, look on the first page under
23 3.8.1.3, and then look at the second asterisk down.
24 It states that: With respect to data conversion,
25 Century will identify, among other things, field

Page 148

1  lengths that do not appear or that do not match
2  Star_Base. Correct?
3  A   I see it.
4  Q   Is that something that Century looks at
5  when doing a data conversion?
6  A   Yes.
7  Q   And are field lengths proprietary based
8  on your definition?
9  A   Not individually.
10 Q   At what point do they become
11 proprietary?
12 A   When they are combined together into the
13 system.
14 Q   Is there any certain number of field
15 lengths that it would take to constitute proprietary
16 information?
17     MR. SCHRAMA: Objection. Calls for a
18 legal conclusion. You can answer the question, if you
19 understand it.
20 A   And there is a difference here in the
21 length of the data we are receiving and the length of
22 the field that the data came out of.
23 Q   Okay. What would the match be that's
24 referred to in that line?
25 A   Certainly if someone has a data field

Page 149

1  that is longer than we can fit into the Star_Base
2  field, we are going to have a problem with that.
3  That's a mismatch.
4  Q   Okay. Is that all that's referred to in
5  that line, do you believe?
6  A   Yes.
7  Q   Okay. I show you what's been marked as
8  Defendant's Exhibit 79. Have you ever seen this
9  document?
10 A   No.
11 Q   Does it appear to be a response by
12 Century to a request for bid?
13 A   Yes.
14 Q   If you look at the first line, 3.3.7.3,
15 it states that: Source code is provided with the
16 software with the exception of the menu program for
17 security reasons. The user can extract code modules
18 from the files that are delivered.
19     Why is there a differentiation between
20 different types of source code here?
21 A   You mean the exception?
22 Q   Sure.
23 A   The intent of not releasing the menu
24 program is so that a school district could not lift
25 the entire set of code, carry it to the school

Page 150

1  district next door and let them run it intact.
2  Q   Did District 186 get the menu program at
3  any point?
4  A   No. Not to my knowledge, I should say.
5  Q   Okay. I'm going to show you what's been
6  marked as Defendant's Exhibit 80. Does this also
7  appear to be Century's response to a bid proposal?
8  A   Yes.
9  Q   Under 3.5.6.2, it states that Star_Base
10 interfaces with other software packages. All right?
11 A   Yes.
12 Q   The last sentence of that paragraph
13 says: Century could also interface to other similar
14 packages if the district has a certain package already
15 installed or has plans to purchase another package.
16     Based on that, is a district prohibited
17 from using a portion of Star_Base and having that
18 interact with another package that's not created by
19 Century?
20 A   Are they prohibited?
21 Q   Yes.
22 A   No.
23 Q   I'm going to show you Exhibit 81. Do
24 you recognize that?
25 A   Well, I recognize the content, yes.

Page 151

1  Q   Well, is this a document that could be
2  provided to an entity that is not party to a license
3  agreement with Century?
4  A   No.
5  Q   This is only provided to someone who has
6  a license, right?
7  A   Or has signed a nondisclosure.
8  Q   Okay. Did District 186 sign a
9  nondisclosure, to your knowledge?
10 A   Not to my knowledge.
11 Q   I'm going to show you what I have marked
12 as Defendant's Exhibit No. 82. Whose signature is at
13 the bottom of this page?
14 A   Well, looking at that, it's my
15 signature.
16 Q   Look at that. And what is this
17 document?
18 A   It says it's a nondisclosure.
19 Q   Have you ever seen this document?
20 A   I guess I must have since I signed it.
21 Q   That is your signature, then?
22 A   Yes, it is.
23 Q   Okay. Do you know why this
24 nondisclosure was executed by the parties referenced?
25 A   No. I don't recall why we did this at

Page 152

1  this time.
2  Q   Do you think it could be because you
3  were submitting proprietary information with respect
4  to your bid proposal?
5  A   That's what it seems to say at the top.
6  Q   Okay.
7  A   It's hard to read but that's what it
8  looks look it's saying.
9  Q   Well, at the top, I believe that it's
10 just stating that District 186 is using a consulting
11 firm to assist in the evaluation of RFP's and that the
12 district wants to be able to show it to their
13 consultant. Is that how it appears to you?
14 A   I am sure -- say that again.
15 Q   To me, it appeared that the handwritten
16 language at the top was for the purpose of allowing
17 the district to let a consultant evaluate RFP's. Does
18 it appear to be the same thing to you?
19 A   It seems reasonable.
20 Q   Okay. Is this a standard nondisclosure
21 form, other than the handwriting at the top?
22 A   It looks like one we used at the time.
23 I'm sure it's changed over time.
24 Q   Okay. Well, it looks to me that at the
25 time this was executed, the length of the

Page 153

1  nondisclosure was for three years. Is that right?
2  A   Okay. That's what it says.
3  Q   And when was this signed?
4  A   January of '95.
5  Q   Now, the first contract between District
6  186 and Miller, I believe, was in August of '98, is
7  that right?
8  A   I don't recall.
9  Q   Well, let's look at the exhibits.
10     MR. SHUPENUS: I believe it was 37, 38
11 and 39. Marty, am I right on that?
12     MR. SCHRAMA: I'm going to have to look
13 through.
14 A   I certainly don't have those here.
15 Q   Well, we looked at them.
16 A   We did?
17 Q   Yes.
18 A   This is Miller's contracts?
19 Q   Yes. 37, 38 and 39?
20 A   Okay.
21 Q   Do you have any reason to believe that
22 Miller received any information from District 186
23 prior to the execution of any of these agreements in
24 exhibits 37, 38 and 39?
25 A   I have no way of knowing that.

Page 154

1  Q   Why is the length of a standard
2  nondisclosure for Century three years or more,
3  precisely why was it three years in 1995?
4  A   I wouldn't say that that's our standard
5  length of time.
6  Q   Okay.
7  A   As a matter of fact, I would probably
8  say the opposite.
9  Q   Why would you -- why would Century
10 change the period of time? What factors would
11 influence your decision to vary the length of time
12 that a nondisclosure agreement would be in effect?
13 A   Typically, that would be negotiated
14 before we wrote the nondisclosure and it would be
15 changed to suit the needs of the situation.
16 Q   What's the range of time in your
17 standard nondisclosure agreements that you make these
18 agreements effective? Is three years the minimum or
19 have you entered into agreements for a shorter
20 nondisclosure period?
21 A   This is exceptionally long. Typically,
22 it would be a lot shorter. Most likely one year.
23 Q   Okay. Explain for me, please, if the
24 information that we just went through, I think it was
25 Exhibits 77 through 81, if Century would suffer

Page 155

1  irreparable harm if the materials referenced in these
2  exhibits was released to third parties, why would you
3  allow it to be disclosed after a year?
4      MR. SCHRAMA: Objection to form. Calls
5  for a legal conclusion. You can answer it, if you
6  understand the question.
7  A   I have no answer.
8  Q   Okay. Do you provide the Star_Base
9  schema to entities who are not a party to a license
10 agreement with Century?
11 A   After they have signed a nondisclosure.
12 Q   At any time? Is that the condition?
13 They have to sign a nondisclosure?
14 A   Or a license, yes.
15 Q   Okay.
16 A   And then we certainly would allow them
17 to see the schema.
18 Q   Who creates the schema? More
19 accurately, who created the Star_Base schema?
20 A   Dial back to 10 o'clock this morning.
21 Q   Okay. You have a better memory than me.
22 I'm shocked I just said that but go ahead. Tell me
23 who.
24 A   Group of programmers, myself, Bob Magan,
25 Frank Schittone. Do you remember that discussion when

Page 156

1  we originally started creating Star_Base?
2  Q   Okay. When was the Star_Base schema
3  made?
4  A   Around 1990.
5  Q   Has it changed since 1990?
6  A   Yes.
7  Q   When did it change?
8  A   It changes all the time.
9  Q   Is there always -- well, since 1990, is
10 there always a Star_Base schema in existence?
11 A   There has to be, yes.
12 Q   There has to be?
13 A   Sure.
14 Q   I'm going on to show you Defendant's
15 Exhibit 83. Does this document also appear to be a
16 response to a bid proposal by Century?
17 A   Yes.
18 Q   Section 3.3.6 is labeled data base
19 design, correct?
20 A   Yes.
21 Q   What is the difference between a schema
22 and an entity relationship diagram?
23 A   A diagram is just a big picture that
24 describes the schema.
25 Q   So can a schema exist without having a

Page 157

1  big picture of it?
2  A   Oh, absolutely.
3  Q   Is a schema tangible?
4  A   I'm sorry. I can't answer that
5  question.
6  Q   Well, is a schema an idea or is it
7  something that you can touch?
8  A   Well, it's a lot of things.
9  Q   Like what?
10 A   I can almost get into a philosophical
11 discussion about what a schema is.
12 Q   I'm not good with philosophy.
13 A   Me, neither. I think we discussed
14 earlier that it is the set of tables and the
15 interrelationship between the tables.
16 Q   Well --
17 A   It can be printed out and it can be
18 seen. Does that mean you can touch it? I guess so.
19 You can touch the paper that it's on. It's not an
20 object like you would put in inventory.
21 Q   Was an entity relationship diagram
22 available in 1995?
23 A   No.
24 Q   When did it become available?
25 A   Never.

Page 158

1  Q    Okay. It says here that Century is
2  planning to develop such documentation in the near
3  future using Oracle's case asterisk tools. Did that
4  happen?
5  A    No.
6  Q    Was a schema for Star_Base provided to
7  your expert by you?
8  A    Yes.
9  Q    Where did it come from?
10 A    I'm sorry.
11 Q    Where did the -- who created the schema
12 that was provided to your expert, the schema of
13 Star_Base?
14 A    It's the set of all the tables that make
15 up Star_Base.
16 Q    That's not what I asked.
17 A    Who provided it?
18 Q    Right.
19 A    Okay. Most likely that would have been
20 Bob Magan.
21 Q    When was the diagram that was provided
22 to your expert created?
23 A    It's not a diagram.
24 Q    Okay. What is it?
25 A    I answered that question already.

Page 159

1  Q    Answer it again.
2  A    It's the set of tables and
3  interrelationships between the tables.
4  Q    What's the difference between the
5  document that you provided to your expert regarding
6  entity relationships and the entity relationship
7  diagram that's referenced in Exhibit 83?
8  A    It's a picture with blocks and arrows on
9  it.
10 Q    What is a picture with blocks and
11 arrows?
12 A    The entity relationship diagram is a
13 picture with blocks and arrows on it.
14 Q    Did you provide a picture with blocks
15 and arrows on it to your expert?
16 A    No.
17 Q    But you did provide him with a schema,
18 right?
19 A    Yes.
20 Q    In what form?
21 A    The list of tables.
22 Q    Okay. Was the documentation referenced
23 in Section 3.3.6.1 developed following the
24 representation made in Exhibit 83?
25 A    No.

Page 160

1  Q    Why not?
2  A    It wasn't.
3  Q    We established that.
4  A    Okay.
5  Q    Why not?
6  A    Because.
7  Q    That's not good enough. Tell me why
8  not, if you know. And if you don't know, tell me that
9  you don't know.
10 A    We didn't do it. Do we need a reason
11 for not doing something?
12 Q    Yes. What is it?
13 A    Because we didn't.
14     MR. SHUPENUS: Counsel, will you
15 instruct your witness to answer the question?
16     MR. SCHRAMA: What was the question?
17     THE WITNESS: Why did we not create an
18 entity relationship diagram. We were doing other
19 things.
20 Q    Do you know why the documentation
21 referred to in Section 3.3.6.1 was not developed?
22 A    We were doing other things and we
23 decided not to do that.
24 Q    Why did you decide not to do that?
25 A    Because that's our right.

Page 161

1  Q    Why else?
2  A    That's the only reason I have.
3     MR. SHUPENUS: Counsel, again --
4  A    It is our damn company. We can do
5  whatever the hell we want to do. We decided not to do
6  it. What more do you want?
7  Q    An answer.
8  A    That is the answer. There is no other
9  answer.
10 Q    Did you ever have plans to develop this
11 documentation using Oracle's case tools?
12 A    Yes.
13 Q    Whose plan? Who developed that plan?
14 A    Me.
15 Q    Why?
16 A    It's a nice set of technical
17 documentation to have in addition to everything else
18 that we had.
19 Q    Let's look at Exhibit 75, the request
20 for proposal. What is described on page five in
21 Section 3.3.6.1?
22 A    It describes an entity relationship
23 diagram.
24 Q    When was it decided by Century that the
25 documentation referenced in Exhibit 83 would not be

Page 162

1  created?
2  A    I couldn't tell you.
3  Q    Approximately?
4  A    I couldn't tell you.
5  Q    Well, it appears that Century
6  represented it would be done in Exhibit 83, right?
7  A    Yes, it does.
8  Q    Was it a true statement at the time it
9  was made?
10 A    It was our intention to do that.
11 Q    And you don't know when that intention
12 changed?
13 A    Correct.
14 Q    And you don't know why that intention
15 changed other than it's your right to change your
16 intention?
17 A    That is correct.
18 Q    This is Defendant's Exhibit 84. Have
19 you ever seen this document?
20 A    Yes.
21 Q    What is it?
22 A    Corporate overview.
23 Q    Of?
24 A    Century Consultants.
25 Q    Who created it?

Page 163

1  A    I couldn't tell you for sure.
2  Q    Is this something that is consistent
3  with the document you would prepare?
4  A    Not typically.
5  Q    Is this a document created by Century?
6  A    Yes.
7  Q    In the second paragraph, fourth line
8  down, it seems to indicate that Star_Base was
9  introduced in the late eighties, correct?
10 A    That's what it says.
11 Q    Was Star_Base introduced in the late
12 eighties?
13 A    From a marketing standpoint, yes.
14 Q    So it was introduced but not available,
15 is that what you are saying?
16 A    Absolutely.
17 Q    Okay. Do you know when this document
18 was created?
19 A    No, I would have no way of knowing that.
20 Q    Is it still distributed to clients or
21 prospective clients?
22 A    No.
23 Q    When was this document phased out, if
24 ever?
25 A    I have no idea.

Page 164

1       THE WITNESS: Excuse me one second.
2       (Off the record, 3:30 p.m..)
3       (Deposition resumes, 3:33 p.m..)
4  Q    I'm going to show you Defendant's
5  Exhibit 85. Have you ever seen this document?
6  A    I don't recall.
7  Q    As far as you know, this is the first
8  time you've seen this document?
9  A    To the best of my knowledge, yes.
10 Q    Is there anyone at Century who, based on
11 the contents of this document, would be familiar with
12 its content and representations made in here?
13 A    I don't think so, based on the age of
14 this document.
15 Q    Is this a document created by Century?
16 A    I believe it to be, yes.
17 Q    Okay. Do you review your company's
18 advertisements and documents produced to prospective
19 clients?
20 A    Some of them. Not all of them.
21 Q    What affects whether you review such
22 documents?
23 A    I couldn't say that there is a fixed set
24 of reasons why I would get to see something or not.
25 Q    I'm just curious because it seems like

Page 165

1  we have had a lot of documents as exhibits today that
2  you've never seen and I don't understand the function
3  that you have in the company as it compares to the
4  documents that you have and haven't seen. Isn't it
5  part of your job to know what representations are
6  being made regarding your company?
7  A    To a large extent. I'm not the type to
8  micro-manage things.
9  Q    I'm going to show what's been marked as
10 Defendant's Exhibit 86. Have you ever seen this
11 document?
12 A    It looks very familiar.
13 Q    Is this the organizational structure of
14 Century as it existed in 1995?
15 A    Well, I couldn't swear to the date
16 but --
17 Q    I'll represent to you that it was
18 supplied by Century to District 186 in 1995?
19 A    Okay.
20 Q    Given that knowledge, is this an
21 accurate organizational structure for Century as it
22 existed in 1995?
23 A    I recognize all the names.
24 Q    Who is listed on this document who is no
25 longer at Century?

Page 166

1  A    Okay. Starting from the upper left,
2  Brian and Ed and Frank and going down, Ken Holland.
3  Moving to the right, Rob Berneck, Dianna Harris, Kevin
4  Donohue. Next column, Kristine Kaminski, Eileen
5  Tressler. Next column, as a matter of fact, everybody
6  to the right is gone and even Jeff down below.
7  Q    Where did Regina Hayes end up?
8  A    She took a job somewhere else.
9  Actually, she went into teaching.
10 Q    Where does she live?
11 A    I have no idea.
12 Q    What is the last place you know of that
13 she lived?
14 A    I never kept track of her residence and
15 she got married and I doubt if that's her last name
16 any more.
17 Q    Do you know who she married?
18 A    I don't recall, no.
19 Q    What's Bob Magan's position with the
20 company now?
21 A    He is the Manager of Development.
22 Q    This is Defendant's Exhibit 86?
23 A    This is 86.
24 Q    And then this is 87. Do you recognize
25 this document?

Page 167

1  A    Yes. It looks familiar.
2  Q    What is it?
3  A    It is a statement of our investment, if
4  you will, in Oracle technology and the importance of
5  Oracle technology.
6  Q    Is this document one that would have
7  normally been provided in conjunction with a bid
8  response in 1995?
9  A    I would think so, yes.
10      MR. SHUPENUS: Let's go off the record.
11      (Off the record, 3:40 p.m..)
12      (Deposition resumes, 3:52 p.m..)
13 Q    Mr. LaMantia, you testified earlier, I
14 believe, that part of the reason you believe the
15 source code for Star_Base was copied by Miller was
16 because Brent Qualls had access to the source code and
17 then went to work for Miller as an employee, right?
18 A    Yes.
19 Q    Do you believe that as an employee,
20 Brent Qualls naturally just would have produced the
21 source code to Miller?
22 A    Well, he certainly had access to it more
23 easily than anyone else would have outside of
24 Springfield.
25 Q    And you believe that he accessed the

Page 168

1  source code while he was an employee of Miller, right?
2  A    Yes.
3  Q    I would like to show you what's marked
4  in the prior deposition as Defendant's Exhibit 12.
5  Have you ever seen that document?
6  A    I believe I have, yes.
7  Q    Okay. Is that a memorandum that was
8  submitted on Century's behalf in support of an
9  application for a temporary restraining order?
10      MR. SCHRAMA: Objection to form. It
11 calls for a legal conclusion. You can answer it, if
12 you understand the question.
13 A    It says it's an application for the
14 Order To Show Cause For Temporary Restraints and
15 Expedited Discovery. So I assume that's what it is.
16 Q    Okay. What is SIS in the context of
17 this lawsuit, if you know?
18 A    Student Information System.
19 Q    Okay. That's what it stands for. What
20 is it?
21 A    A set of programs that would allow a
22 school district to store student information relating
23 to all aspects of a student, attendance, schedules,
24 grades, transcripts, discipline information, et
25 cetera, and allows them to manipulate that

Page 169

1  information.
2  Q    Is that the system that is in place at
3  Springfield Public School System 186?
4  A    Yes.
5  Q    Okay. To your knowledge, is there a
6  difference between SIS and IS3 or Info System 3?
7  A    Well, Info System 3 is an SIS.
8  Q    Is the system used by District 186
9  different from Info System 3, to your knowledge?
10 A    Well, I'm having a hard time answering
11 the question phrased that way. It's my belief more
12 than my knowledge that it is Info System 3.
13 Q    Why do you believe that?
14 A    Because it was derived from the same set
15 of code.
16 Q    And do you believe that to be true or do
17 you know that to be true?
18 A    I believe that to be true.
19 Q    Okay. Do you know whether or do you
20 know what code Springfield's system is written in?
21 A    To the best of my understanding, it's
22 written in something called PHP.
23 Q    Okay. Is that the same as Star_Base's
24 code?
25 A    Different language.

**Page 170**

1  Q   What does that mean to you, the fact
2  that SIS and Star_Base are written in different
3  languages?
4  A   It means somebody rewrote it in a
5  different language.
6  Q   Is that an easy task, in your opinion?
7  A   It's fair amount of effort in doing
8  that.
9  Q   Okay. I believe that District 186 has
10 submitted what's called an affidavit indicating that
11 it doesn't use IS3. What facts does Century know that
12 indicate that District 186 does, in fact, use Info
13 System 3?
14 A   The fact that it was developed by MGI
15 and subsequent to the development for Springfield, it
16 became IS3.
17 Q   Are you sure that The Miller Group
18 developed SIS?
19 A   Being Springfield's version, you're
20 calling that SIS, is that what you are saying?
21 Q   I'm not saying that --
22 A   SIS is a generic term. It doesn't mean
23 anything to me, specifically.
24 Q   Okay. I thought we covered that. Maybe
25 we didn't. Are you sure that The Miller Group

**Page 171**

1  developed the system used at District 186?
2  A   I believe that to be true.
3  Q   Why?
4  A   Well, I've seen the contract that states
5  that they were hired to do that and we have other
6  information from employees at Springfield that says
7  the same thing. So I'm reasonably sure that that's
8  the truth.
9  Q   Is there a contract between District 186
10 and The Miller Group for The Miller Group to develop a
11 student information system for District 186?
12 A   Right, Exhibit 39.
13 Q   Now, it says on Exhibit 39, that bottom
14 of the first page, top of the second, that features of
15 the system shall include use of existing data
16 structures and then in parenthesis it states
17 (Star_Base), right?
18 A   Yes.
19 Q   I am sure I thought you had that in
20 front of you.
21 A   I had his copy. Now I have my copy.
22 Okay. I'm good.
23 Q   Do you see the language I'm pointing to?
24 A   Existing data structures (Star_Base).
25 Q   Now, because this contract is part of

**Page 172**

1  what you base your belief on that The Miller Group
2  developed Springfield's system, tell me this. If
3  Springfield has a system for itself that includes
4  Star_Base data structures, is that a violation of your
5  agreement with District 186, in your opinion? In
6  other words, can District 186 use Star_Base data
7  structure, existing Star_Base data structures if it is
8  not on a maintenance plan with Century?
9  A   Yes.
10 Q   And can The Miller Group assist District
11 186 in the development of such a system for use by
12 District 186?
13 A   Not without getting our okay to do that.
14 Q   When did Century first learn that
15 District 186 was getting help with its development of
16 a new system using Star_Base?
17 A   I don't recall the exact date.
18 Q   Was it before February of 2003?
19 A   To my recollection, we were aware that
20 they were developing some new front ends, if you will,
21 which is exactly what you described, a new interface
22 to the structures but not that it was being done by an
23 outside company.
24 Q   When did you first learn that an outside
25 company was involved, you meaning Century?

**Page 173**

1  A   The first phone calls from Don Randall.
2  Q   And Century had no knowledge that
3  District 186 was involved with a consultant to develop
4  a new system prior to Don Randall's February 2003
5  telephone calls, correct?
6  A   I can only say that I didn't have that
7  knowledge. I'm not sure if anyone else at Century
8  did.
9  Q   Well, are you the only one who can give
10 approval to work with a consultant or can your
11 employees do that for you?
12 A   No. They can't. It would be either Joe
13 Shearn or myself.
14 Q   Is that ever conveyed to your clients,
15 that approval has to come from one of you two?
16 A   Not specifically, no.
17 Q   So is it fair to say that if one of your
18 employees gave or knew that District 186 was working
19 with a consultant and didn't object to that, that
20 would be wrongful action on the part of your employee
21 to not inform you? Let me rephrase. That's not a
22 good question. If one of your employees knew that
23 District 186 was using a consultant to develop a new
24 system prior to February 2003, would you expect them
25 to tell you?

Page 174

1   A   Yes, I would.
2   Q   If one of your employees gave District
3   186 permission or consented to District 186 using a
4   consultant to help it develop a new system using
5   Star_Base data structures, do you believe that
6   District 186 would be entitled to act on that consent?
7   A   I am sorry. Run that by me again. I
8   missed that.
9   Q   If one of your employees consents to
10  District 186 using a consultant to develop a new
11  system, what's wrong with District 186 going ahead and
12  using that consultant?
13  A   In my opinion, that's violating our
14  license agreement.
15  Q   Okay. So is that a problem between you
16  and your employee or a problem between District 186
17  and Century?
18      MR. SCHRAMA: Objection to form. Calls
19  for a legal conclusion. You can answer it, if you
20  understand the question.
21  A   My opinion that it's a problem in both
22  cases.
23  Q   How many of your clients have you sued?
24  A   I can't remember suing any of them. You
25  can't answer, can you?

Page 175

1       MR. SCHRAMA: No.
2   Q   Are you aware of any other customer of
3   Century infringing on any copyright of Century?
4   A   There is none that come to mind right
5   now. I really can't think of any.
6   Q   Are you aware of any communication by
7   Century to any of its customers warning one of your
8   customers that their actions constitute violation of
9   your copyright?
10  A   I believe we may have sent a letter or
11  two out over the years.
12  Q   And who were those letters sent to?
13  A   I really couldn't put a name on it but I
14  seem to recall that situation coming up.
15  Q   Who at Century would know which clients
16  or customers may have violated Century's copyright?
17  A   Again, I don't know that anybody would
18  remember the details and we would have to search our
19  files.
20  Q   Where would that file be? Where would
21  that information be kept or stored?
22  A   Probably in our customer files, which
23  would mean looking through every single one.
24  Q   Well, that's pretty significant, isn't
25  it, if a customer violates your copyright?

Page 176

1   A   Yes. If we believe they had already
2   violated it, that's true.
3   Q   Are there any instances where, besides
4   with District 186, where Century believed that the
5   copyright had already been infringed?
6   A   No, not that I can recall.
7   Q   Now, Century has been party to some
8   litigation recently or within the last several years,
9   correct?
10  A   Do I answer that?
11      MR. SCHRAMA: You can answer the
12  question.
13  Q   You can answer it.
14      MR. SCHRAMA: You are not allowed to
15  talk about any of the conversations that you had with
16  your attorney but you can answer that question.
17  A   All right. Yes.
18  Q   How many lawsuits? Were there two of
19  them or were there more?
20  A   Over the years, we have had two.
21  Q   When was the first one?
22  A   I guess it dates back to the early
23  nineties.
24  Q   Were you a plaintiff or defendant?
25  A   Plaintiff.

Page 177

1   Q   Who did you sue?
2   A   Our former partner.
3   Q   Why?
4   A   He was creating derivative works.
5   Q   Derivative of Star_Base?
6   A   At the time, it was probably STARS
7   because he had no knowledge of Star_Base, so it was
8   STARS, the cobol based product.
9   Q   Were these derivative works created
10  after he left?
11  A   Yes, of course. Yes.
12  Q   Were the derivative works sold to
13  people?
14  A   Yes.
15  Q   Did Century's proprietary information
16  make it into the hands of people who were not
17  Century's customers?
18  A   No.
19  Q   Who did get it?
20  A   Well, in plain English, he was doing
21  work for existing customers and creating derivative
22  works for them.
23  Q   Do you know that your proprietary
24  information never made it into or never made it out
25  past your former clients or your existing clients?

Page 178

1  A  I really have no way to know that.
2  Q  Did that case settle?
3      MR. SCHRAMA: Objection. I'm just going
4  to caution you because I don't have any settlement
5  agreements in front of me and I'm not familiar with
6  the case, many times a settlement agreement will have
7  a confidentiality aspect to it. I don't know if there
8  is one in this case. You might have some knowledge of
9  that but if you are at all apprehensive about the fact
10 there might be some sort of confidentiality agreement
11 with regard to the settlement, I would advise you not
12 to answer the question.
13 A  Yes. I don't recall if there was an
14 agreement or not, so.
15 Q  You don't even know if there was an
16 agreement?
17 A  A confidentiality agreement.
18 Q  Do you know of any facts to indicate
19 that there is a confidentiality agreement?
20 A  No, I don't know. I don't recall.
21 Q  On what terms did that case settle?
22 Well, first, I forgot the other question wasn't
23 answered. Did that case settle?
24 A  I thought we were not going to answer
25 that.

Page 179

1      MR. SCHRAMA: I don't have the
2  settlement agreement in front of me and just to
3  protect my client, I can't, in all good conscience,
4  allow him to answer details about the settlement
5  because I really don't know if there is a
6  confidentiality agreement. I think that's pretty
7  fair.
8      MR. SHUPENUS: Well, we can't finish up,
9  though, if we don't get answers. That's the problem
10 and that's fine, we will leave the deposition open.
11     MR. SCHRAMA: You would have to file a
12 motion for that. I'm just not letting him answer any
13 questions about the details of any settlement. That's
14 reasonable.
15     MR. SHUPENUS: I haven't heard a basis
16 for it. There might be confidentiality agreements
17 regarding a number of things we have discussed today.
18 In fact, most of the topics we have discussed today
19 are subject to confidentiality agreements and all of
20 the subjects could arguably be made subject to a
21 protective order. It seems to me that the existence
22 of the protective order as we have it now adequately
23 safeguards Century's interests and I would ask that
24 you go ahead and instruct your client to answer.
25     MR. SCHRAMA: I'm going to have to look

Page 180

1  at the protective order before I can advise him to
2  answer.
3      MR. SHUPENUS: As counsel for Century, I
4  think you have got an obligation to already know that.
5  We shouldn't have to suspend the deposition because
6  you are not familiar with the case.
7      MR. SCHRAMA: We have suspended the
8  deposition a few times so you could look through your
9  materials. I don't think it's unfair that I do the
10 same thing at all.
11     MR. SHUPENUS: My materials aren't on
12 file with the court.
13     MR. SCHRAMA: Much of it is, really.
14     MR. SHUPENUS: That is not really the
15 issue. Are you instructing your client not to answer?
16 And are you going to make me file a motion to compel?
17     MR. SCHRAMA: What I am doing right now
18 is I am taking a break and I'm going to look at the
19 protective order. That's exactly what I am doing
20 right now. Until I see the protective order, he is
21 not answering anything about any settlement
22 agreements. That's exactly what's happening right
23 now.
24     MR. SHUPENUS: Okay. It's 4:20 and we
25 are going to have to break until counsel gets the

Page 181

1  protective order.
2      (Off the record, 4:20 p.m..)
3      (Deposition resumes, 4:28 p.m..)
4      MR. SCHRAMA: I'll represent that I just
5  spoke to the attorney that handles the case that we
6  are speaking about and he advised me there was a
7  confidentiality provision in the settlement or the
8  stipulation of settlement in that matter. Therefore,
9  I'm advising the client not to answer questions with
10 regard to the substantive details of that settlement
11 agreement.
12     MR. SHUPENUS: Did the attorney -- who
13 did you speak with?
14     MR. SCHRAMA: I'm not here to answer
15 questions.
16     MR. SHUPENUS: Well, in order to
17 determine whether this is a valid instruction not to
18 answer, I would like to speak with the attorney as
19 well. I don't get to see the settlement or this
20 confidentiality agreement. I think it would be unfair
21 to tie my hands unquestioning based on a
22 representation that you talked to somebody about
23 essentially something. I don't think that's a strong
24 objection and I think a court would want to know who
25 the person is with whom you spoke and what the

Page 182

1 confidentiality agreement says. Are you willing to
2 disclose that?
3     MR. SCHRAMA: Simply stated, so that we
4 don't have to go over this again, I have been advised
5 that there is a confidentiality provision in the
6 settlement agreement. Therefore, he won't be
7 answering the question. If you wish to call the
8 judge, the phone is right there.
9     MR. SHUPENUS: Counsel, let's not get
10 into pointing at the phone. I think we can keep the
11 discourse a little higher than that. I'm just asking
12 you to tell me what the confidentiality agreement says
13 and I'm asking you to tell me your source for this
14 information. I don't think that's asking too much.
15     MR. SCHRAMA: I'm not going to tell you
16 what it says on the basis it's confidential and that's
17 the reason I'm not showing it to you.
18     MR. SHUPENUS: The confidentiality
19 agreement --
20     MR. SCHRAMA: In the settlement of the
21 case, we are seeking confidentiality. Therefore, you
22 are not going to see it and unless I see a court order
23 or the judge tells me otherwise, the witness is not
24 going to talk about the substantive issues involved in
25 that settlement.

Page 183

1     MR. SHUPENUS: Are you saying that you
2 won't reveal the extent of the confidentiality
3 agreement unless the court tells you to do that?
4     MR. SCHRAMA: Yes, that's exactly what I
5 am saying.
6  Q   Okay. Mr. LaMantia, are you following
7 your counsel's advice and not answering questions
8 regarding the settlement of the first lawsuit we
9 discussed?
10 A   Yes.
11 Q   Okay. Tell me about the second lawsuit,
12 who were the parties?
13 A   I believe that's East Windsor School
14 District.
15 Q   And they were the plaintiff?
16 A   Yes.
17 Q   And was Century the only defendant?
18 A   Yes.
19 Q   Why did Century get sued in that matter?
20 A   I don't think I'm allowed to talk about
21 that, either.
22 Q   Where was the case filed?
23 A   In, well, Hightstown, East Windsor.
24 Q   Is that in state court or federal court?
25 A   I don't recall.

Page 184

1     MR. SHUPENUS: I don't know where the
2 federal courthouse is around here.
3     MR. SCHRAMA: There's a few of them, but
4 not in Hightstown, from my knowledge.
5  Q   When was the lawsuit filed?
6  A   Three or four years ago.
7  Q   Did it involve Star_Base?
8  A   Yes, it did.
9  Q   Did it involve Star_Base and allegations
10 that it didn't work properly?
11    MR. SCHRAMA: I'm just going to caution
12 the witness.
13 A   I don't think I can speak to that.
14 Q   Why can you not speak to that?
15    MR. SCHRAMA: Before you answer, I'm
16 just going to caution the witness that it's my
17 understanding there is a confidentiality agreement
18 with regard to the settlement in this matter that
19 precludes you from talking about the substantive
20 matters of the case. Anything that is a matter of
21 public record, obviously you would be able to talk
22 about.
23    MR. SHUPENUS: Well, I don't think I
24 inquired about anything that is not public record.
25 Q   Tell me what the substantive allegations

Page 185

1 are or were in the Complaint against Century?
2     MR. SCHRAMA: That is a matter of public
3 record because the Complaint is on file, to my
4 knowledge. So as far as I'm concerned, you can talk
5 about the allegations, insofar as you recall them.
6  A   Okay. Yes. East Windsor claimed that
7 Star_Base did not work as advertised.
8  Q   Okay. And the lawsuit eventually
9 settled, correct?
10 A   Yes.
11 Q   When did it settle?
12 A   I don't recall the date. It didn't go
13 on for very long. That's all I can say.
14    MR. SHUPENUS: Just so we are clear,
15 Marty, are you personally aware that this settlement
16 agreement contains a confidentiality provision that
17 would prevent your client from answering the questions
18 or is this an assumption? I just need to know that
19 you know this.
20    MR. SCHRAMA: I am not here to answer
21 questions but I am telling the witness not to answer
22 those questions.
23    MR. SHUPENUS: Based on what?
24    MR. SCHRAMA: Based upon the fact that
25 I'm telling him not to. If you don't agree with me,

Page 186

1  you can file a motion.
2      MR. SHUPENUS: I need to know what your
3  basis is. That's all.
4      MR. SCHRAMA: No, you don't because I am
5  not here to answer questions. I said that he's not
6  allowed to answer questions with regard to the
7  stipulation of settlement due to the fact they are
8  confidential. That is my objection. That is what is
9  on the record and he is not going to answer questions.
10     MR. SHUPENUS: I am not talking to him
11 about it, Marty. I'm talking to you. I just wanted
12 to get your representation that you know that there is
13 a confidentiality agreement. I'm going to assume,
14 unless you tell me otherwise, I'm going to assume you
15 have knowledge of this.
16     THE WITNESS: There is a confidentiality
17 agreement. Okay.
18  Q    I think your counsel is instructing you
19 not to talk about that.
20  A    Right.
21  Q    So I would encourage you to follow his
22 advice.
23  A    Um-hum.
24  Q    Are you Bob Magan's boss?
25  A    Yes.

Page 187

1   Q    Were you Bob Magan's boss in 1995?
2   A    Ultimately, yes.
3   Q    Were you?
4   A    There may have been a layer in between.
5   Q    Was Bob Magan subordinate to you in
6  2003?
7   A    Yes.
8   Q    To your knowledge, did Bob Magan record
9  a call or a telephone call between himself and Dave
10 Williams?
11  A    Yes.
12  Q    Did you know that Bob Magan was going to
13 record that call before he reported it?
14  A    Yes.
15  Q    Did you authorize Bob Magan to record
16 that call?
17  A    Yes.
18  Q    Did you direct him to record that call?
19  A    Yes.
20  Q    Did you direct Bob Magan to record that
21 call secretly, i.e. did you tell him not to let Dave
22 Williams know that he was being recorded?
23  A    I don't believe so.
24  Q    Do you believe that was Bob Magan's
25 understanding when you gave him that direction?

Page 188

1   A    I am sure -- ask that again.
2   Q    Did you believe that Bob Magan's
3  understanding was that he was to not disclose to
4  Mr. Williams the fact that he was being recorded?
5   A    I don't know.
6   Q    You don't know whether Magan intended to
7  tell Bob or intended to tell Dave Williams he was
8  being recorded; is that what you are saying?
9   A    I'm pretty sure he intended not to tell
10 him.
11  Q    Okay. Is it a common practice for
12 Century employees to secretly tape telephone calls
13 with other people?
14  A    No.
15  Q    And you're aware that this recording has
16 been submitted as discovery in this case, correct?
17  A    Yes.
18  Q    Has Century ever told Dave Williams that
19 they reported him?
20  A    I don't know. I'm not sure.
21  Q    Are you aware of any conversations
22 between Dave Williams and any of your employees or
23 anyone at Century regarding the fact that this call
24 was recorded?
25  A    Yes.

Page 189

1   Q    Okay. What are you aware of?
2   A    I think one or more people at Century
3  knew that it was being recorded.
4   Q    Maybe I didn't phrase that question
5  right. Did anyone have a conversation with, a
6  subsequent conversation, with Dave Williams about the
7  fact that the call was recorded?
8   A    Not to my knowledge.
9   Q    Does Century have any recordings of
10 conversations that have anything to do with the
11 allegations contained in your Amended Complaint?
12  A    Not to my knowledge.
13  Q    Are the representations made by Dave
14 Williams in the recorded conversation part of the
15 reason that you believe that the Star_Base program was
16 copied?
17  A    Yes.
18  Q    Okay. At the time you authorized this
19 recording to be made, was it your understanding that
20 such a recording could be made legally?
21  A    I am sorry. Ask that again.
22  Q    When you authorized Mr. Magan to
23 secretly record this call, was it your understanding
24 that that was a legal act?
25      MR. SCHRAMA: Objection to form.

**Page 190**

1  Q  Go ahead and answer.
2  A  I really don't know.
3  Q  Did you seek any counsel regarding
4  whether Century could, in fact, secretly tape a
5  telephone conversation with another party in Illinois?
6  A  I don't recall.
7  Q  Do you have an understanding now
8  regarding whether that was a legal act?
9  A  No, I don't.
10  Q  Okay. Since the time the secret
11  recording was made, has Century recorded additional
12  telephone calls with others outside of Century?
13  MR. SCHRAMA: Objection to form.
14  Q  Go ahead and answer.
15  A  Not to my knowledge.
16  MR. SHUPENUS: Just give me a moment. I
17  want to make sure I have everything wrapped up.
18  (Off the record.)
19  Q  Who came up with the field name
20  student_id?
21  A  Well, I couldn't say with 100 percent
22  accuracy but it was most likely me.
23  Q  I'm referring to the Prentice-Hall PTR
24  Oracle Series Book entitled Oracle PLSQL By Example,
25  Third Edition and I'm going to show you page 640,

**Page 191**

1  which is labeled a Student Data Base Schema. Do you
2  see that?
3  A  Yes, I do.
4  Q  Okay. And then underneath that there is
5  an additional section called Student: Profile
6  information for a student. Do you see that?
7  A  Yes, I do.
8  Q  And then what is the first field name
9  that you see?
10  A  Student_id.
11  Q  Do you have any suspicions that the
12  authors of this book may have stolen your intellectual
13  property?
14  A  No, I don't.
15  Q  Do you believe that this field name is
16  common?
17  A  It is ubiquitous.
18  Q  Have you ever seen it before you came up
19  with it?
20  A  I don't believe in that format.
21  Q  What format are you talking about?
22  A  Using the _ between student and id.
23  Q  So to your knowledge, you are the first
24  person to use that field name, correct?
25  A  Could very well be. What is the

**Page 192**

1  copyright of that book? Maybe I can sue them.
2  MR. SHUPENUS: Based on the suit you had
3  on file now, I assumed you already had. 2004.
4  Here's the deal. I'm going to release
5  you from the deposition inasmuch as it pertains to you
6  personally and I am going to suspend the deposition
7  with respect to the 30B-6 notice and reserve my right
8  to recall the corporation to answer questions that it
9  either could not or refused to answer today and that
10  issue will be taken up with the court and unless your
11  counsel has questions, the deposition is suspended.
12  Okay.
13  MR. SCHRAMA: That's fine. And as you
14  know, we will resist that application.
15  MR. SHUPENUS: I don't care if you
16  resist it. I'm just saying it's suspended. The
17  resistance is well known, given what's on the record.
18  So with that, we will terminate the deposition. Thank
19  you.
20  (Deposition adjourned, 4:46 p.m..)

**Page 193**

1  C E R T I F I C A T E
2
3
4  I, KIM A. GHILARDI, a Notary Public,
5  Registered Professional Reporter and Certified
6  Shorthand Reporter of New Jersey, do hereby certify
7  the foregoing to be an accurate and true
8  transcription of my stenographic notes as taken at
9  the aforementioned place, date and time.
10  I FURTHER CERTIFY that the witness was
11  duly sworn according to law prior to testifying.
12  I FURTHER CERTIFY that I am neither
13  attorney for nor counsel to any of the parties;
14  that I am not related to or employed by any of the
15  parties or any of the attorneys in this action; and
16  that I am not financially interested in this action.
17
18
19
20  KIM A. GHILARDI, C.S.R.
    LICENSE NO. XI00765
    NOTARY PUBLIC
21
22
23  DATED: January 19, 2005