E-FILED
Thursday, 04 August, 2005 04:55:27 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CENTURY CONSULTANTS, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2005-CV-3147 |
| | ) | |
| THE MILLER GROUP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM IN SUPPORT OF MOTION TO BAR PLAINTIFF'S EXPERT WITNESS

NOW COMES, Defendant, SPRINGFIELD PUBLIC SCHOOL DISTRICT 186 ("District 186"), through its counsel, Brown, Hay & Stephens, LLP, and hereby moves this Court for an Order barring testimony of the expert witness retained by Plaintiff, CENTURY CONSULTANTS, LTD. ("Century"), and in support thereof states:

In order to support its allegations of copyright infringement and related claims with respect to its computer software product, Century retained Paul G. Lewis of P.G. Lewis & Associates, Inc. ("Lewis"), who claims to be a "data forensics" expert.[1] Lewis allegedly prepared a report, titled "Application Analysis," wherein he claims that substantial portions of the software product sold by Defendants The Miller Group and John G. Miller (collectively "Miller") known as InfoSystems 3 "are a copied and translated duplicate" of Century's Star_Base software product.[2] Lewis also claims to have prepared a second report, titled "Rebuttal Report," wherein he addresses certain opinions of District 186's expert.[3]

---

[1] Application Analysis of Paul G. Lewis, p. 72, submitted via hand delivery and incorporated herein as Exhibit A.
[2] Id., p. 53.
[3] Submitted via hand delivery and incorporated herein as Exhibit B.

Lewis' opinions are largely based on assumptions derived through analysis of "data sets" submitted to him by the parties, which consist of copies of the allegedly infringing works (Miller's InfoSystems 3 software product and District 186's Student Information System), as well as a version of Century's Star_Base software.[4] Lewis never performed a physical examination of any computers allegedly utilized to copy Century's source code.[5] As a result, Lewis' methodology is incompatible with acceptable minimum standards Lewis advocates in his own published articles.

In one article, for example, Lewis boldly asserts that an attorney's failure to obtain a physical inspection of computers allegedly used in cases involving theft of intellectual property "is at best inexcusable, and at worst, ineffective assistance of counsel and malpractice."[6] Lewis suggested such an inspection of the computers involved in the purported copying of Century's Star_Base product, but Century refused to authorize such action.[7]

Had Lewis performed a competent physical inspection of the computers, he would have certainly learned a crucial fact that has eluded Century until well after it filed suit, which is that InfoSystems 3 was never installed at District 186.[8] Lewis' findings are instead founded on his flawed assumption that District 186's Student Information System is the same as InfoSystems 3. This critical error not only renders Lewis' findings worthless, but also stands testament to the

---

[4] Exhibit A, p. 3.
[5] Exhibit C, pp. 60-61. A copy of pertinent excerpts of Lewis' deposition testimony is submitted via hand delivery and is incorporated by reference as Exhibit C. District 186 will provide the entire 250 page transcript of Lewis' deposition to the Court upon request.
[6] Lewis, Paul G. *Data Forensics, The Smoking Gun May Be A Click Away*, <u>Forensic Focus</u>, October 8, 2004, attached hereto and incorporated herein as Exhibit D; Lewis deposition Exhibit 19.
[7] Exhibit C, pp. 27, 215-16.
[8] See, District 186's Memorandum in Support of its Motion to Suppress and supporting exhibits, previously filed herein.

importance of the rule requiring that expert testimony meet a minimum threshold of legitimacy prior to being considered by the Court.

Application of Lewis' own standards, combined with the myriad of additional flawed analysis as set forth below, necessarily results in this Honorable Court finding that Lewis' testimony is unreliable and inadmissible, and should therefore be barred.

## LEGAL STANDARD

Admissibility of expert testimony is governed by FRE 702, which states:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Application of Rule 702 involves a two-part test. First, the Court must determine whether the expert testimony has been subjected to the scientific method rather than based upon subjective belief or unsupported speculation. Cummins v. Wile Industries, 93 F.3d 362, 367-68 (7th Cir. 1996). Second, the Court must determine whether the expert's testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. Id. Lewis' analysis fails both tests, and therefore cannot meet the reliability threshold mandated by the Seventh Circuit Court of Appeals.

## ARGUMENT

In its Amended Complaint, Century alleges Miller copied substantial portions of Century's copyrighted source code, which Century considers a trade secret.[9] Lewis, however, makes no ascertainable effort to determine whether Miller copied substantial portions of source

---

[9] Amended Complaint, paragraph 25.

3

code. Instead, Lewis states that "[t]he purpose of this report is to determine if any intellectual property belonging to Century Consultants is found in the competing product from The Miller Group."[10] Lewis' report stems from his assumption that the entire Star_Base application is Century's intellectual property, despite the fact that Century makes no such allegation in its Amended Complaint.[11]

Even if the purpose of Lewis' report was consistent with the allegations in Century's Amended Complaint, the methodology used by Lewis to fulfill his stated purpose is equally misplaced. Lewis states that his analysis will include comparison of five data sets that were submitted to him on compact disks by the parties.[12] Specifically, Lewis claims that he will compare each of the data sets received from Miller and District 186 to the "control" data set Lewis received from Century.[13]

It is undisputed that Miller's InfoSystems 3 software was never installed on District 186's computer system.[14] Nonetheless, Lewis identifies the data set he received from District 186 as "IS3 Application installed at Springfield School."[15] Furthermore, Lewis identifies the author of data set 3 as "The Miller Group," even though District 186, rather than Miller, submitted data set 3 to Lewis.[16] Lewis fails to identify any legitimate basis for his erroneous belief that Miller, rather than District 186, authored data set 3. This fundamental lack of understanding on the part of Lewis undoubtedly arises out of his reliance on the same false assumptions referenced in District 186's pending Motion to Suppress, as revealed in Lewis' deposition testimony.

---

[10] Exhibit A at p. 3.
[11] Exhibit C at p. 52.
[12] Exhibit A, p. 3.
[13] Id.
[14] See District 186's Memorandum in Support of its Motion to Suppress, previously filed herein.
[15] Exhibit A, p. 3.
[16] Id.

4

A.  **LEWIS' METHODOLOGY IS FLAWED.**

Lewis appeared for deposition on January 12, 2005 in Lawrenceville, New Jersey.[17] The deposition, which began at 9:30 a.m. and concluded at 8:11 p.m., revealed that Lewis' various opinions, viewed in light of his previously disclosed reports and other evidence, are based in conjecture and assumption rather than science. Lewis' erroneous assumption regarding authorship of data set 3 is illustrative of the weak foundation upon which his opinions rest:

> "Q:  [Referring to page 3 of Lewis' Application Analysis] Data Sets 2, 3, and 4 appear in your table to be authored by The Miller Group. How do you know that The Miller Group authored Data Sets 2, 3 and 4?
>
> A:  Again, there is a general assumption that was made based on either verbal communication or markings on the C.D.s that led me to the reasonable conclusion that The Miller Group was the author of Data Sets 2, 3 and 4.
>
> Q:  But you don't know specifically what it is that led you to that conclusion, is that correct?
>
> A:  At the time I didn't feel that it was necessary to doubt that these files or these data sets were authored by The Miller Group.
>
> Q:  I don't mean to beat a dead horse here but, in fact, it doesn't sound like anyone told you that these people were or these entities were the authors of these data sets. It rather appears, it's just an assumption, which is fine, but I want you to tell me whether this is an assumption or whether someone told you this is true?
>
> A:  All of the C.D.s that I received were labeled and I had ownership type of markings on the original C.D.s, handwritten messages or notes on the C.D.s claiming to be the property of an entity. In the case of Century Consultants, they were marked as claiming to be the property of Century Consultants. And in the case of The Miller Group, they claimed to be the property of The Miller Group."[18]

---

[17] Exhibit C.
[18] Id., pp. 55-56.

Lewis makes no indication regarding what markings existed on data set 3 give rise to his assumption of authorship by Miller.

If Lewis followed his own methodology, this error would have undoubtedly been revealed in the course of his physical inspection of the computers at issue. Lewis did not, however, follow through on his methodology, and instead continued to operate under his mistaken belief that data set 3 was Miller's product. Upon eventually learning of his error, Lewis deletes references to authorship of the respective data sets in his Rebuttal Report.[19]

The shortcut in Lewis' methodology, however, lends credence to his published assertions regarding why physical inspection of the computers allegedly used to accomplish the supposed theft of intellectual property is necessary, and why failure to do so is "inexcusable."

Lewis initially suggested to Century's attorney that Lewis travel from New Jersey to Illinois to physically examine the computers at issue so that he could determine whether the alleged acts occurred.[20] Among other things, Lewis testified that without physically inspecting the computers, he would not be able to determine whether the data set provided to him by Century contained the same product that Century sold to District 186.[21] Lewis also testified that physical inspection of the computers would be necessary to determine whether the data sets presented to him were modified, as he alleges was done in this case.[22] Lewis reveals that this inspection was not performed because Century did not want to pay for it.[23]

Although Century opted for cheaper, (yet "inexcusable") methodology, Century still did not receive the benefit of its bargain. Lewis initially claimed that the discounted analysis would

---

[19] Exhibit B.
[20] Exhibit C, p. 27
[21] Id. at 60-61
[22] Id. at 81.
[23] Id. at 215-16.

6

be performed through comparing <u>each</u> of the data sets received from Miller and District 186 to the data set he received from Century. This time, however, it was Lewis who decided to take a shortcut. Given Lewis' erroneous assumption that Miller authored all of the data sets provided by Defendants, Lewis simply compared Century's data set to the data sets he received from District 186 and Miller interchangeably, rather than perform separate and distinct comparisons.[24]

The problem with Lewis' approach is that District 186's data set rightfully contains elements of Century's Star_Base product that District 186 continued to use![25] Therefore, on the occasions where Lewis compares data set 3 to the Star_Base data set, he uncovers what he believes to be evidence of theft of intellectual property. Lewis' failure and inability to identify which of his comparisons involve District 186's data set (which would necessarily contain elements of Star_Base) rather than data sets provided by Miller renders it impossible, at this point, to determine whether the comparisons are valid.

Similarly, Lewis claims in his report to have performed a "Table by Table Analysis" in the course of forming his opinions.[26] Lewis testified that Star_Base contains over 100 tables, but he does not recall how many tables exist in Miller's InfoSystems 3 product or in District 186's system.[27] Lewis testified that he compared four tables between Star_Base and what he believed to be InfoSystems 3, but he cannot identify the data set from which he obtained those tables.[28] Later in his deposition, Lewis testified that he compared seven tables, but wholly omitted his analysis of three of the comparisons from his report.[29] Lewis claims that he only discovered one

---

[24] Id., pp. 56-57.
[25] See, District 186's Memorandum in Support of its Motion to Suppress, together with Affidavit of David Williams attached thereto.
[26] Exhibit A, p. 5
[27] Exhibit C, p. 148.
[28] Id. at p. 149.
[29] Id. at p. 192-93.

7

set of tables that were identical.[30] Lewis failed to consider that his discovery of identical tables likely results from the fact that he was comparing Star_Base to Star_Base.[31]

**B. LEWIS DID NOT PERFORM MOST OF THE ANALYSIS DETAILED IN HIS REPORT**

Perhaps Lewis' failure to follow his own prescribed methodology arises from the fact that he did not write the report. Initially, Lewis claimed that he drafted and typed the entire report.[32] Lewis testified that three of his employees helped him prepare the report, but at the time of his deposition, two of the three employees no longer worked for Lewis.[33]

Curiously, the identities of Lewis' two former employees who assisted him are virtually unknown. One of these employees is simply identified by Lewis as "Dinesh."[34] Although Lewis does not know whether "Dinesh" is the alleged employee's first name or last name, he was able to disclose that "Dinesh" may or may not currently reside in Sri Lanka.[35] The second alleged employee is simply identified by Lewis as "Liang."[36] Again, Lewis does not know whether "Liang" is the first or last name of this alleged employee, and does not know where "Liang" can be located.[37] The third employee, Lynn Gula, simply served as an "evidence custodian."[38]

Lewis initially testified that "Liang" played "a very cursory role" in preparing the analysis contained in Lewis' report.[39] Later in his testimony, however, Lewis' story changed. Specifically, when confronted with his own "Client Activity Log" produced by Century, Lewis

---

[30] Id. at p. 149.
[31] See, District 186's Memorandum in Support of its Motion to Suppress.
[32] Exhibit C at p. 41.
[33] Id. at p.41- 42.
[34] Id. at p. 41.
[35] Id. at p. 42.
[36] Id. at p. 41.
[37] Id. at p. 43.
[38] Id. at p. 43-44.
[39] Id. at p. 43.

disclosed that the initial analysis was actually prepared by "Liang," who logged twenty five hours of "cursory" analysis over a two day period.[40]

Lewis' report indicates that he received Century's first data set on May 15, 2003, and received data sets from Miller the following day.[41] Lewis received the data set from District 186 on May 22, 2003.[42] The Client Activity Log indicates that the initial analysis was completed without any input from Lewis.[43] In fact, the log indicates that <u>after</u> the initial analysis was completed (by "Liang"), Lewis spent nine hours and forty five minutes assessing the data and creating a findings report, but Liang spent twenty five hours "performing analysis."[44] The log also indicates that Lewis revised his findings based on his discussions with Century's attorney.[45]

Despite the time entries noted in his Client Activity Log, Lewis continued to characterize the input from "Liang" as "cursory."[46]

The log also indicates that "Dinesh" billed Century for 8.5 hours of analysis, and that "Dinesh" was the person who actually performed the table comparisons.[47] As a result, in order to substantiate Lewis' claims regarding alleged similarities between tables in Star_Base and InfoSystems 3, we may have to travel to Sri Lanka.

C.  **LEWIS' ALLEGATIONS OF SPOLIATION OF EVIDENCE ARE BASELESS.**

Lewis attempts to mask the inadequacy of his report by claiming that Miller intentionally altered the data sets it produced to Lewis. In his report, Lewis claims that he is:

> "[a]lso of the opinion to a reasonable degree of certainty that The Miller Group modified substantial portions of the IS3 source codes between the

---

[40] Id. at p. 157-58; Lewis' deposition Exhibit 71, attached hereto and incorporated herein as Exhibit E.
[41] Exhibit A, p. 3.
[42] Id.
[43] ExhibitE.
[44] Id.
[45] Id.
[46] Exhibit C, p. 157.
[47] Exhibit E.

9

dates of May 9, 2003 and May 14, 2003, modifying table names and variable names in their code because the 2003 IS3 system used most of the names defined and assigned by the Star_Base system."[48]

This assertion of sinister behavior on the part of Miller is directly contrary to Lewis' deposition testimony. Despite Lewis' representation in his report of his "reasonable degree of certainty" that "substantial portions" of source code were modified by Miller, <u>Lewis subsequently testified that he has no way of knowing what was modified without physical access to the computer that was used.</u>[49]

In fact, Lewis' suspicion that files were modified by Miller was initially based on the fact that certain files showed file modification dates subsequent to the date the Court entered the Order requiring Miller to produce data sets to Lewis.[50] Lewis concedes, however, that the simple act of copying the files for the purpose of delivering them to Lewis for inspection triggers the change in the file modification date![51] In his deposition, Lewis admits that <u>the actual basis for his assumption that Miller altered evidence is the fact that some of the file modification times were early in the morning.</u> According to Lewis:

> "Additionally, there's some unique file times in here, 2:14 a.m., 3:22 a.m. Just seems like an odd time for someone to copy a file, just to wake up and decide that they are now going to add the next file in the list to a C.D. that they have been copying files to for several days without making any modifications to those files. It just doesn't make any sense to me."[52]

Perhaps most significant to Lewis' "analysis" is the fact that Miller actually disclosed information to Lewis and Century indicating what modifications, if any, it made. Specifically, in response to Century's Interrogatory Number 4, wherein Century asked Miller to "identify and

---

[48] Exhibit A at p. 53.
[49] Exhibit C. at p. 78-79.
[50] Id. at p. 87-91.
[51] Id. at p. 85.
[52] Id. at p. 90.

describe each and every modification and/or change made to the source code of IS3," Miller directed Century to the Concurrent Versioning System ("CVS"), which allows tracking of every change to the software in the data set provided.[53] Lewis concedes that no one, from Century or otherwise, asked him to follow up and track the unidentified modifications he asserts were made.[54]

Miller then provided the CVS reporting information to Lewis, <u>but Lewis refused to analyze it</u>. When questioned about his failure to review the information provided to him by Miller, Lewis testified:

> Q: Well, don't you think that if you get new information that would change an opinion, that you should point that out?
>
> A: The new information wasn't requested and it appeared to contain IS3 CVS reporting information.
>
> Q: Which is what?
>
> A: I'm not certain why it was sent.
>
> Q: Do you think it could have been in response to The Miller Group's interrogatory answer where they tried to explain why the files were modified?
>
> A: I wouldn't be able to comment on that.
>
> Q: Well, yes, you would. I showed you the answer, where they told you that the modifications could be determined using this CVS information, right?
>
> A: Correct.
>
> Q: But you didn't do it, right?
>
> A: I was not directed to do so.

---

[53] Miller's answers to Century's Interrogatories, attached hereto and made a part hereof as Exhibit F.
[54] Exhibit C, p. 83.

11

Q: Okay. So your opinions in your reports are limited to the direction that you get from your client?

A: Yes.

Q: Okay. If information is provided to you that could shed light on aspects of your report, that doesn't mean that you'll use it then, right?

A: If I make a request for information as part of an analysis or if I am directed to analyze specific information, then I will do so.

Q: You assert in your initial report, in summary, that The Miller Group set out to deceive you, right?

A: I would agree with that.

Q: And that they altered evidence, right?

A: Modified files.

Q: Altered evidence?

A: Correct.

Q: Those are pretty serious accusations, wouldn't you agree?

A: I agree.

Q: So I can't understand how you can make those [accusations] yet be presented with possible exonerating evidence and not look at it. That's what happened here, though, isn't it?

A: No.

Q: I guess you wouldn't know if it was exonerating because you didn't look at it, right?

A: I didn't request it. I didn't have a meeting with anyone to tell me to analyze that information. I had already submitted my report and I was awaiting further direction.[55]

---

[55] Id. at p. 197-199.

12

Clearly, if Lewis is prohibited from reviewing information contrary to the findings Century wants Lewis to make, his opinions cannot satisfy any of the elements set forth in FRE 702.

### D. LEWIS' QUALIFICATIONS ARE SUSPECT AT BEST

Century alleges Miller and District 186 violated its copyright through the unlawful copying of the Star_Base source code. Lewis concedes, however, that District 186's source code is written in a programming language called "PHP."[56] On the other hand, none of the Star_Base source code is written in PHP.[57] Lewis also admits that his report cannot be construed to indicate that substantial portions of source code from Star_Base were copied.[58] Instead, Lewis' report is little more than a weak attempt to disparage Miller and District 186 through unsubstantiated claims of evidence tampering that fail under their own weight.

Lewis' testimony plainly indicates that he is not averse to making dubious claims. On his website, and in an effort to bolster his contention that he is an expert in the area of intellectual property theft, Lewis claims to have experience with respect to a case that is strikingly similar to the case at bar.[59] In a case study referenced by Lewis on his website, he describes a scenario wherein a client invested millions of dollars in the development of a proprietary software package.[60] The client's employees left the company and started a new one, wherein they sold a "sexy new software application" that "looked better and had more features, but nonetheless

---

[56] Exhibit C, p. 170.
[57] Id.
[58] Id. at p. 177.
[59] Lewis deposition Exhibit 17, attached hereto and incorporated herein as Exhibit G.
[60] Id.

13

appeared different."[61]  As in the case at bar, the infringers referenced in Lewis' case study used a different code language in order to disguise their identical product.

Lewis could not be fooled, however, because he had "proprietary tools" at his disposal that enabled him to uncover the scheme:

> "We next compared the 'digital DNA' of the two applications and discovered something startling--both applications were identical. While on the surface they looked very different, we were able to prove sufficient evidence to receive a search warrant demanding [the former employees'] to turn over their source code. The former employees stole the code from [Lewis' client] and then cleverly concealed their tracks by adding a new user interface, changing variables, and adding new functionality. PG Lewis proved that almost a million lines of code were exactly the same!"[62]

This is precisely the type of action alleged in Century's Amended Complaint, yet Lewis is unable to identify a single line of source code in any data set produced by either Defendant that is "exactly the same" as the source code in Star_Base.[63]

On his website immediately under the heading "Theft of Intellectual Property," and above the narrative, Lewis discloses the following information:

> "All case studies are summaries of cases managed by PG Lewis & Associates.
>
> (References to Personal Names and Client Firm Names are fictional)."[64]

In reality, Lewis admits in his deposition testimony that his company never handled such a case at all, and that contrary to the assertion that the fact scenario constitutes a summary of a case managed by PG Lewis & Associates, it is actually every bit as fictional as the names used. According to Lewis:

---

[61] Id.
[62] Id.
[63] Exhibit C at p. 174.
[64] Id.

14

"It was dreamed up in someone's mind to be placed on our Web site to attract business to the firm. This is not an actual matter, to the best of my knowledge, that the firm was involved with."[65]

## CONCLUSION

As set forth above, in the course of his deposition, Lewis admits:

  a) that Century did not give him sufficient latitude to conduct a proper investigation;

  b) that he has no evidence whatsoever that Miller modified or altered data sets;

  c) that when presented with evidence that could disprove one of his theories, he will not examine such evidence without his client's approval;

  d) that his advertisements are not accurate; and

  e) reliance on the type of methodology he used in this case is "inexcusable."

Lewis is not an expert, and his opinions are not based on legitimate science. The Court should bar his testimony accordingly.

WHEREFORE, Defendant SPRINGFIELD PUBLIC SCHOOL DISTRICT 186 respectfully requests the Court enter an Order finding that Paul G. Lewis is not qualified as an expert for purposes of supporting Plaintiff's claims, requiring Plaintiff to pay any expert witness fees incurred by District 186 as a result of Lewis' deposition, and awarding Defendant all other relief the Court deems proper.

---

[65] Exhibit C at p. 211.

SPRINGFIELD PUBLIC SCHOOL
DISTRICT 186, Defendant,


By: s/ Robert M. Shupenus
      One of Its Attorneys


**BROWN, HAY & STEPHENS, LLP**
ALMON A. MANSON, JR.
Registration No. 1756761
ROBERT M. SHUPENUS
Registration No. 6238096
205 S. Fifth Street, Suite 700
P.O. Box 2459
Springfield, IL 62705-2459
(217) 544-8491

**PROOF OF SERVICE**

I, the undersigned, hereby certify that on August 5, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorney of record:

Lance T. Jones
Law Offices of Lance T. Jones
1100 South Fifth Street
Springfield, IL 62703
ltj@warpnet.net

Craig Hilliard
Stark & Stark, P.C.
993 Lenox Drive
Lawrenceville, NJ 08648
chilliard@stark-stark.com

David A. Herman
Giffin, Winning, Cohen & Bodewes, P.C.
One West Old State Capitol Plaza
Myers Building – Suite 600
P.O. Box 2117
Springfield, IL 62705
dherman1@gifwinlaw.com

                                                                                     s/ Robert M. Shupenus

August 4, 2005\4:22 PM\LJS\I:\Enichols\wpwin60\RMS\Lit\CENTURY\District 186's Memorandum in Support of Motion to Bar Expert Witness.doc