Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

CENTURY CONSULTANTS, LTD.,   )
                             )
        Plaintiff,           )
                             )
   -vs-                      )  No. 2003-CV-3105
                             )
THE MILLER GROUP, INC.,      )
JOHN G. MILLER, and          )
SPRINGFIELD PUBLIC SCHOOL    )
DISTRICT NO. 186,            )
                             )
        Defendants.          )

DEPOSITION

OF

JOSEPH LAMANTIA

Deposition of JOSEPH LAMANTIA, taken via video conference at the instance of the Defendants, on the 25th day of April, 2006, at University of Illinois Springfield, Brookens Library, Springfield, Illinois, before Karin Paisley, CSR.

Page 2

APPEARANCES:

Representing The Plaintiff:
(via video conference)

    Stark & Stark
    By Mr. Craig S. Hilliard, Attorney
    P. O. Box 5315
    Princeton, New Jersey 08543

Representing The Miller Group, Inc.,
and John G. Miller:

    Law Offices of Lance T. Jones
    By Mr. Lance T. Jones, Attorney
    100 South Fifth Street
    Springfield, Illinois 62703

Representing Springfield Public
School District No. 186:

    Brown, Hay & Stephens, LLP
    By Mr. Robert M. Shupenus, Attorney
    205 South Fifth Street, Suite 700
    Springfield, Illinois 62705-2459

__INDEX

Examination                    Page
By Mr. Shupenus                   3

Page 3

1  JOSEPH LAMANTIA,
2  produced, sworn, and examined upon his oath, on behalf of
3  the Defendants, testified and deposed as follows:
4            DIRECT EXAMINATION
5            BY MR. SHUPENUS:
6     Q.  Sir, please state your name.
7     A.  Joseph LaMantia.
8     Q.  Mr. LaMantia, did you receive a Notice of
9  Deposition for today's deposition?
10           MR. HILLIARD:  Yes.  Rob, we did get your Amended
11 Notice of Deposition; and just to streamline this, if you'd
12 like, I'll put a copy of that in front of the witness.
13           MR. SHUPENUS:  Yes, Exhibit A.
14           MR. HILLIARD:  This will be Exhibit A or do you
15 want to continue with the markings where you left off since
16 this is a continued deposition?
17           MR. SHUPENUS:  No.  I'm saying it's Exhibit A of
18 the Notice of Deposition.
19           MR. HILLIARD:  Understood.
20           MR. SHUPENUS:  Okay.
21           MR. HILLIARD:  And what I have in front of the
22 witness is an Amended Notice of Deposition that was e-filed
23 with the court on March 9, 2006.
24           MR. SHUPENUS:  Okay, and I'm referring to --

Page 4

1            MR. HILLIARD:  Is that the one you have, because
2  you amended it?
3            MR. SHUPENUS:  Yes.  I'm referring to Exhibit A
4  that's got letters A through J on it that is two pages?
5            MR. HILLIARD:  Correct.
6            MR. SHUPENUS:  Okay.
7            MR. HILLIARD:  He has the Exhibit A in front of
8  him.
9     Q.  (Mr. Shupenus) Mr. LaMantia, did you review
10 Exhibit A prior to today's deposition?
11    A.  I believe I had originally received this quite a
12 while ago, right?  The first version of this, was this sent
13 a while ago?
14           MR. HILLIARD:  Yes.
15    A.  I'm just trying to make sure it was the same
16 document I had reviewed a while ago.
17           MR. HILLIARD:  There were a couple of different
18 versions of it.
19    Q.  (Mr. Shupenus ) Does the version in front of you
20 have letters A through J?
21    A.  Yes, it does.
22    Q.  Okay.  Did you, in fact, review all of the topics
23 set forth in Exhibit A lettered A through J?
24    A.  Yes, I did.

Page 5

1  Q. Okay, and sir, you'll recall that at your first
2  deposition in January of 2005, you did not have knowledge
3  regarding a number of issues that came up during your
4  deposition, correct?
5      MR. HILLIARD: Objection to the form.
6  Q. (Mr. Shupenus) Go ahead and answer.
7  A. I did not have recall of some of the facts,
8  correct.
9  Q. Okay. Since that time, have you undertaken an
10 investigation on behalf of Century to be able to truthfully
11 testify regarding the topics set forth in this Exhibit A?
12 A. Yes, I have.
13 Q. What investigation, what did you do in the course
14 of your investigation to learn such facts?
15 A. Well, I went back through many of the documents
16 that we had produced and spoke with some of my co-workers a
17 little bit to try to remember some of the facts, so, just to
18 try to get my memory back on some of the items that had
19 happened.
20 Q. With whom did you speak?
21 A. Well, it would have been Joe Shearn and really
22 some conversations with Craig.
23 Q. S-H-E-A-R-N?
24 A. That's correct.

Page 6

1  Q. Did you review any documents?
2  A. Yes.
3  Q. What documents did you review?
4  A. The bid with Springfield, the copyright forms,
5  the copyright deposit, other letters and emails.
6  Q. Anything else?
7  A. Yes. I guess I was asked to prepare this
8  document of program changes. So, I searched for that and
9  forwarded that along.
10 Q. Anything else?
11 A. Nothing in particular comes to find.
12 Q. Okay. Did you review your deposition transcript
13 from January of 2005?
14 A. A little bit, yes. I won't say a hundred
15 percent.
16 Q. Other than the questions to which you had lack of
17 knowledge, is there any testimony that you gave in your
18 January 2005 deposition that you now believe is incorrect?
19     MR. HILLIARD: Objection to the form.
20 Q. (Mr. Shupenus) Go ahead and answer.
21 A. I'm trying to--any of any specifics off the top
22 of my head, I really couldn't say.
23 Q. You're unaware of any incorrect answers in your
24 prior deposition testimony; is that correct?

Page 7

1  A. I can't recall any at this time.
2  Q. Okay. Now, to streamline this a little bit, sir,
3  there are four versions of Star_Base; is that correct?
4      MR. HILLIARD: Are you asking him current through
5  today?
6  Q. (Mr. Shupenus) Well, how about up to the time of
7  the filing of your complaint in this matter, there were four
8  versions of Star_Base, correct?
9  A. No. Formerly, we call them three versions,
10 Version 1, 2, and 3.
11 Q. Now, Version 1 was a character-based version,
12 correct?
13 A. That's correct.
14 Q. And the second version was the client server
15 version, correct?
16 A. That's correct.
17 Q. And then there was a Version 2(i) that was never
18 released, correct?
19 A. We still call that Version 2. I don't want to
20 confuse the technical oracle version jargon with what
21 Century considered its product, you know. Star_Base Version
22 2 was client server.
23 Q. And then Version 3 was Star_Base 6(i), correct?
24 A. Yeah. Again, the 6(i) designation is an oracle

Page 8

1  designation. We refer to that as Star_Base Version 3, the
2  web-based version.
3  Q. And again, did you say that the client server
4  version is Version 2(i)? I just want to make sure that we
5  have the same terms down here, sir.
6  A. Yeah. I understand. I believe that was the tool
7  that was used, the correct designation for the tool that was
8  used for client server, yes.
9  Q. So, we will-- How about if we just refer to it
10 as client server?
11 A. That's--that's fine.
12 Q. Okay, and the first version is character-based
13 again, correct?
14 A. Correct.
15 Q. Okay. Was the character-based version of
16 Star_Base copyrighted?
17 A. Yes.
18     MR. HILLIARD: And do you mean by copyrighted,
19 was a registration filed with the U.S. Copyright Office or
20 did Century consider it copyrighted? I'm going to object to
21 the form of the question. I just want to clarify the term
22 you're using.
23     MR. SHUPENUS: Okay.
24     MR. HILLIARD: You mean did Century consider it

Page 9

1 copyrighted in the sense that it owns the rights to the
2 software or that it filed a physical application with the
3 U.S. Copyright Office?
4     MR. SHUPENUS: I'm going to ask all of that right
5 now, Craig.
6     MR. HILLIARD: That's fine.
7     MR. SHUPENUS: And we'll get that out.
8     MR. HILLIARD: Okay.
9 Q. (Mr. Shupenus) I'll back up. When was the
10 character-based version of Star_Base created or completed
11 actually?
12 A. Well, somewhere in the early 1990's.
13 Q. And did Century seek copyright protection for the
14 character-based version of Star_Base?
15     MR. HILLIARD: Objection to the form. You can
16 answer.
17 A. We filed a copyright registration for the
18 character-based version.
19 Q. (Mr. Shupenus) When was that filed?
20 A. I believe it was 1995.
21 Q. Is the registration that you attached to your
22 declaration at the outset of this case that is dated--that
23 has an effective date of registration November 22, 1995, is
24 that Certificate of Registration for the character-based

Page 10

1 version of Star_Base?
2     MR. HILLIARD: Well, from the video feed, I can
3 tell you're looking at a particular document, Rob. Can
4 you --
5     MR. SHUPENUS: Yes. It's the one attached to the
6 declaration as Exhibit A.
7     MR. HILLIARD: He does not have that in front of
8 him. I'll look --
9 A. Well, we have the registration. It's attached
10 right to the front.
11     MR. HILLIARD: He's asking you first about--
12 It's not. See. That is the deposit. He's asking you about
13 the-- Does it have, does the document you're looking at
14 have Bates number of Century 0022 at the bottom right hand
15 corner?
16     MR. SHUPENUS: I don't have the Bates numbered
17 one, 'cause this is the one that came with the declaration.
18 I don't think you had Bates stamped them yet, but it has TXU
19 number at the top, XDN 760-019.
20     MR. HILLIARD: Okay. He has that in front of
21 him.
22 Q. (Mr. Shupenus) Okay. Sir, does this Certificate
23 of Registration pertain to the character-based version of
24 Star_Base?

Page 11

1 A. Yes, it does.
2 Q. Okay, and in conjunction with Century's copyright
3 application, did Century deposit document numbers 0879
4 through 1050 with the copyright office?
5     MR. HILLIARD: You said 0879. I believe it
6 should be 0873.
7     MR. SHUPENUS: You're right, Craig. I have got
8 0872 as the certificate.
9     MR. HILLIARD: Right.
10 Q. (Mr. Shupenus) And then 0873 is the beginning of
11 the documents that were submitted, I believe; is that right,
12 sir?
13 A. Through 1050?
14     MR. HILLIARD: Through Century 1050?
15 Q. (Mr. Shupenus) Correct.
16 A. Okay.
17     MR. HILLIARD: Your answer to his question is?
18 A. Yes.
19 Q. (Mr. Shupenus) Did Century deposit the complete
20 source code for the character-based version of Star_Base
21 with the U.S. Copyright Office?
22 A. No.
23 Q. Describe the documents that were filed 07--or
24 0873 through 1050. What do those documents comprise?

Page 12

1 A. This is the listing, a source listing for the
2 menu program for Star_Base.
3 Q. Anything else?
4 A. Well, yes, and it is all the screens that are
5 part of the menu program.
6 Q. Okay, and sir, when was the client server version
7 of Star_Base completed?
8 A. Yeah. I'm just trying to remember the
9 chronology. Give me a second.
10 Q. Sure.
11 A. The difficulty with answering these questions is
12 because the versions kind of ran parallel to one other. You
13 don't just stop one and start another. The development was
14 going along kind of side by side. I would say we stopped
15 working on client server about '96, '97 as we transitioned
16 over to the web version.
17 Q. Did Century apply for copyright protection for
18 the client server version?
19     MR. HILLIARD: And by apply for copyright
20 protection, Rob, just so we are clear, do you mean file a
21 physical application for registration with the United States
22 Copyright Office?
23 Q. (Mr. Shupenus) Yes.
24 A. No. We did not.

Page 13

1 Q. Is it your understanding that the client server
2 version of Star_Base is protected by copyright?
3 A. Yes.
4 Q. What is the basis of your understanding?
5 A. Well, my understanding is that you're protected
6 by copyright as soon as you put the word copyright on a
7 document. It's registered once we register it with the
8 copyright office.
9 Q. But the client server based version of Star_Base
10 was never registered with the copyright office, correct?
11 A. Correct.
12 Q. Now, when did Century release Version 6(i) or the
13 web-based version of Star_Base?
14 A. Sometime around late nineties, '99, somewhere in
15 there.
16 Q. Did Century file an application for a copyright
17 registration for Version 6(i) or the web-based version of
18 Star_Base?
19 A. No. We did not.
20 Q. Is it your understanding that Version 6(i), which
21 is the web-based version of Star_Base, is it your
22 understanding that that is also copyrighted?
23 A. Yes.
24 Q. And again, what is your understanding based on?

Page 14

1 A. Well, the subsequent versions of Star_Base are
2 derivatives and based on the original or the client server
3 version. So, it's my belief that they are still covered
4 under that same copyright registration.
5 Q. Your understanding is that both the client server
6 version and the web-based version of Star_Base are
7 derivative works of the character-based version of
8 Star_Base?
9 A. That's correct.
10 Q. And it's your understanding that both the client
11 server version and the web-based version are unregistered
12 derivative works, correct?
13 A. We did not file separate registrations for them,
14 that's correct.
15 Q. Now, Century alleges that its copyrighted
16 material was copied by The Miller Group, correct?
17 A. Yes.
18 Q. What copyrighted material was copied?
19 A. You mean such as source code?
20 Q. I don't know. What do you believe, what does
21 Century claim was copied?
22 A. I'm not sure if you're asking what version of
23 Star_Base or what components or what materials, you know.
24 I'm not sure exactly what your question is alluding to.

Page 15

1 Q. I don't know what was copied by or allegedly
2 copied by The Miller Group. I want to know what Century
3 alleges was copied.
4 A. Okay. Well, Springfield School District had our
5 client server version and also had a copy of our web
6 version. As time went on, Miller Group certainly had access
7 to the client server version; and I'm sure they had a look
8 at our web-based version as time went on.
9 Q. You're pretty sure?
10 A. Yes.
11 Q. But you're not certain, correct?
12 A. No. I'm not certain.
13 Q. Okay.
14 A. I know they at least had access to the client
15 server code.
16 Q. With reference to Document Numbers 0873 through
17 1050, with respect to those documents, is there anything in
18 there that Century alleges was copied by any of the
19 Defendants in this case?
20 MR. HILLIARD: Objection to the form of the
21 question. You mean anything in terms of the printed words
22 on the pages?
23 MR. SHUPENUS: Yes.
24 MR. HILLIARD: Okay. I wasn't sure by what you

Page 16

1 meant by anything in there.
2 Q. (Mr. Shupenus ) Well, if there is something other
3 than printed words on the pages that exist in those
4 documents, I want to know what it is that was allegedly
5 copied.
6 A. So, as far as these pieces of paper go in front
7 of me and the contents of what is on these pieces of paper?
8 Q. What was deposited with the copyright office?
9 A. Right. I understand. Well, I really can't say
10 for sure whether they had access to this particular set of
11 code that I'm looking at in front of me.
12 Q. Sir, I'm not asking whether they had access to
13 that code. I'm asking what, if anything, from those
14 documents does Century allege was copied?
15 MR. HILLIARD: Just these pages.
16 A. Uh-huh, yeah. I don't think they copied anything
17 from these pages.
18 Q. (Mr. Shupenus ) Okay. With respect to the amended
19 complaint that Century filed in this matter, do you have
20 that in front of you, sir?
21 MR. HILLIARD: I can get it.
22 MR. SHUPENUS: Well, I can --
23 MR. HILLIARD: Just bear with me. I don't need
24 to leave the room.

Page 17

1  MR. SHUPENUS: Okay.
2  MR. HILLIARD: I can probably pull it out quickly
3  enough. Just bear with me. Rob, I'm sorry. I don't have
4  that particular one in front of me.
5  Q. (Mr. Shupenus) Okay. I will quote from Paragraph
6  25. Century alleged, quote, upon information and belief in
7  the course of copying substantial portions of the
8  copyrighted source code, MGI and Miller have not only gained
9  access to the source code, they have physically removed
10 copies of the programs from the licensees premises for
11 editing off site, unquote. Sir, by your reference to
12 substantial portions of the copyrighted source code, what
13 source code are you referring to?
14 A. I believe at the time Springfield schools had our
15 client server version. So, that would be the source code
16 I'm referring to.
17 Q. Again, by copyrighted source code then, Century
18 was not referring to source code that was deposited with the
19 U.S. Copyright Office, correct?
20 A. Our deposit was only the menu program, and that
21 was to register our entire application. So, I'm not sure I
22 understand your question.
23 Q. Well, I'm trying to figure out what copyrighted
24 source code was allegedly copied; and it appears, sir, that

Page 18

1  the source code your--that Century referenced in Paragraph
2  25 was source code that was never deposited with the
3  copyright office; is that correct?
4  A. That's correct.
5  Q. In Paragraph 20 of the amended complaint, Century
6  alleges that MGI and Miller used a demonstration program and
7  that, quote, upon information and belief, the demonstration
8  program is also displayed at trade shows. This
9  demonstration program embodies and reflects elements of the
10 Star-Base software, which as alleged throughout the
11 complaint, was and is an infringement of Century's
12 copyrights, unquote. Does Century know that allegation to
13 be true?
14 A. Yes.
15 Q. And how does Century know that to be true?
16 A. This was reported to us by our marketing
17 representative who attended some trade shows in the Illinois
18 area.
19 Q. Who is the marketing representative?
20 A. Robert Canny, C-A-N-N-Y.
21 Q. C-A-N-N-Y?
22 A. That's correct.
23 Q. When did he report this to Century?
24 A. That, I couldn't remember. I'm sorry.

Page 19

1  Q. Is there any reason that Mr. Canny's name hasn't
2  been disclosed to us prior to today?
3  A. Well, he hasn't been an employee of Century for
4  quite some time.
5  Q. Any other reason?
6  A. Well, last time we spoke, I could not remember
7  his name.
8  Q. And how did you come to remember his name?
9  A. When I went back to the office, I spoke with Joe
10 Shearn and asked him to remind me who our marketing rep was
11 in Illinois at the time.
12 Q. And what elements of Star_Base were reflected in
13 the demonstration program as reported by Mr. Canny?
14 A. I don't recall that detail. I don't have that.
15 Q. Who does have that detail?
16 A. Yeah. At this point, I would say only Mr. Canny.
17 Q. Well, at the time the complaint was filed, who
18 had that knowledge?
19 A. Again, that was reported to us by Mr. Canny. So,
20 he was the only one that had the detailed knowledge; and he
21 relayed it to us.
22 Q. So, Century made this allegation that the
23 demonstration program embodies and reflects elements of
24 Star_Base; but Century didn't know what elements were

Page 20

1  reflected in the demonstration program; is that correct?
2  MR. HILLIARD: Objection to the form.
3  A. Well, Mr. Canny was an employee of Century. So,
4  by extension, Century did know the knowledge was contained
5  by Mr. Canny.
6  Q. (Mr. Shupenus  ) And he was an employee at the time
7  this complaint was filed originally in May of 2003?
8  A. I'm not sure exactly when he left the company.
9  Q. Are you aware of approximately when he left the
10 company?
11 A. It was right around that time frame. I'm not
12 sure if it was either just before or just after.
13 MR. HILLIARD: To be clear, just after the filing
14 of the complaint?
15 A. Yes, I am sorry. Yes.
16 MR. SHUPENUS: I'm referring to the original
17 complaint, just so we are clear.
18 MR. HILLIARD: That was made-- We agree that was
19 May 2003?
20 MR. SHUPENUS: Right.
21 MR. HILLIARD: Correct, Rob.
22 Q. (Mr. Shupenus ) Okay. With respect to Topic F in
23 Exhibit A, it states that InfoSystems 3 is precisely the
24 type of system Century licenses to the School District. By

Page 21

1  using the phrase precisely the type of system, what does
2  Century mean?
3      A. Well, it's a student information system.
4      Q. Is that it?
5      A. I mean I can break that down into what a student
6  information system is.
7      Q. Well, I'm trying to determine why the word
8  precisely was used instead of generally, if that is the only
9  similarity.
10         MR. HILLIARD: Well, objection to the form. The
11 complaint was not drafted by Mr. LaMantia, but it was
12 drafted by counsel. However, you can certainly explore this
13 line of questioning. I'm not objecting to your asking the
14 questions, Rob.
15     Q. (Mr. Shupenus) Okay. Sir, tell me how
16 InfoSystems 3 is precisely the type of system that Century
17 licensed to the School District?
18     A. Well, there are student information systems that
19 are not as functional as Star_Base is, you know. We run
20 into a lot of these all the time, not that I can give you
21 any particular ones. There is a lot of free ware out there
22 that does not go into all the detail that Star_Base has.
23 InfoSystems 3 had many, many of the functional areas that
24 Star_Base has, attendance, schedules, grades, discipline

Page 22

1  information, test scores, you know. It was a full fledged
2  system, and that's what Star_Base is.
3      Q. Are you aware of any other software products that
4  perform the same functions with respect to attendance,
5  scheduling, grades, and test scores?
6      A. Yes.
7      Q. So, how many other systems are you aware of that
8  are precisely the type of system Century licensed to the
9  School District?
10     A. I'm sure there are several dozen in the
11 marketplace.
12     Q. Are you aware of the existence of any third party
13 who learned any trade secret of Century as a result of the
14 actions of any of the defendants?
15        MR. HILLIARD: And by third party, you mean
16 someone other than The Miller Group itself and its
17 employees?
18     Q. (Mr. Shupenus) Yes.
19     A. Well, since IS 3 was licensed to other school
20 districts, I'm not sure the exact number, half a dozen or
21 so; and it contained our trade secrets. So, now, the
22 employees of those school districts have access to our trade
23 secrets as well.
24     Q. And what trade secrets are those?

Page 23

1      A. I'm not sure how to define that. I don't know
2  how to answer that question. I mean our source code and our
3  technology is our intellectual property. Those are our
4  trade secrets.
5      Q. Is that as specific as you can get, sir?
6      A. There is the design of the database structures,
7  our algorithms, the functionality that we have within the
8  system.
9      Q. And those are all present in InfoSystems 3?
10     A. No. I won't say they are all present.
11     Q. What is in InfoSystems 3 that constitutes
12 Century's trade secret?
13     A. Well, I did not do a line-by-line comparison of
14 InfoSystems 3 and Star_Base. I couldn't answer that
15 question a hundred percent.
16     Q. Well --
17     A. But I know for a fact that it's built on our data
18 structures; and I know for a fact that their scheduling
19 program is almost line-for-line the same as ours; and I know
20 that all their calls to the database, all the I/O has to be
21 the same as ours since it's using our structures; and I
22 think a lot of these things are outlined in the presentation
23 by our expert.
24     Q. What materials did you give your expert?

Page 24

1      A. We gave him a copy of our source code; and I
2  guess, I don't know exactly the means, but he received a
3  copy of InfoSystems 3 and a copy of source from Springfield.
4         MR. HILLIARD: Rob, I would ordinarily have
5  registered an objection to that particular question; because
6  I do think it's beyond the scope of the continued deposition
7  ordered by the court; but I want to give you every
8  opportunity to ask all the questions that you want to ask.
9  So, I'm not--I'll give you some latitude on that; but I
10 didn't want you to go into a whole line of questioning about
11 what information was shared with the expert, how he went
12 about doing his report; but go ahead. I'm just letting you
13 know that I think that is beyond the scope of this
14 deposition.
15        MR. SHUPENUS: And just for the record, I
16 disagree. Exhibit A, Topic A fairly encompasses this, but
17 we'll move forward.
18        MR. HILLIARD: As you know, we had a disagreement
19 over whether Exhibit A, Topic A is part of what the court
20 ordered in terms of addressing the objections that you had
21 raised in your prior motion; but again, I'm not instructing
22 him not to answer.
23        MR. SHUPENUS: Right.
24        MR. HILLIARD: I just want the objection on the

Page 25

1  record. Go ahead. Ask your questions and he'll answer.
2     Q. (Mr. Shupenus) Right. What materials did you
3  give to your expert? By you, I mean Century.
4     A. A copy of our source code.
5     Q. For what?
6     A. Well, at the time, it would have been the Version
7  3 source code.
8     Q. The web-based version?
9     A. Yes.
10    Q. Did anyone from Century inform your expert that
11 there were multiple versions of Star_Base?
12    MR. HILLIARD: Objection to the form to the
13 extent it calls for privileged communications, but the
14 witness can answer as to any communications that Century had
15 directly with the expert --
16    MR. SHUPENUS: Well, and just so --
17    MR. HILLIARD: -- on the advice of counsel.
18    MR. SHUPENUS: Just so we're clear --
19    MR. HILLIARD: Yes.
20    MR. SHUPENUS: I asked what Century gave to the
21 expert. That can't be privileged.
22    MR. HILLIARD: Right. No. I agree. I'm just
23 registering an objection to the extent the witness may start
24 to talk about conversations that they had with me, because I

Page 26

1  may have shared certain information with the expert, but go
2  ahead. Again, I'm not instructing him not to answer.
3     MR. SHUPENUS: Just so we are clear on the
4  record, because I don't want the witness to limit his answer
5  in any way, Century's expert has never been disclosed as a
6  consultant; and so, those conversations aren't privileged
7  anyway. So, we want to get all of that information out that
8  Century knows with respect to what materials were provided
9  to Century's expert, Mr. Lewis.
10    Q. (Mr. Shupenus) Mr. LaMantia, what materials were
11 provided?
12    A. Okay. So, again, we provided him a copy of the
13 Star_Base source code.
14    Q. So, for the web-based version, correct?
15    A. That is what would have been available at the
16 time, yes.
17    Q. Okay, and what else?
18    A. I'm just trying to remember. I'm sure we would
19 have given him the database structures; but to me, that is
20 part of the source code. I know we are splitting hairs a
21 little bit, but just to be clear and that's it.
22    Q. Besides those materials, did you give the expert
23 any other information?
24    A. I'm sure we had discussions with him about

Page 27

1  Star_Base and how it works, just to give him some idea of
2  what he was looking at; but other than that, I don't recall.
3     Q. Did Century provide any documents or information
4  that it received from any current or former employees of
5  District 186?
6     A. I don't recall if we did that or not.
7     MR. HILLIARD: Just so we are clear, Rob, I think
8  the witness is answering for he and the company in terms of
9  what materials the company provided to the expert. Other
10 materials may have been provided by my office to Mr. Lewis,
11 and you have gone over that in Mr. Lewis' deposition.
12    MR. SHUPENUS: Right.
13    MR. HILLIARD: They may have come from me rather
14 than directly from Century, and this witness would not
15 necessarily know or recall that.
16    MR. SHUPENUS: Well, if it happened, I'm sure we
17 would have learned from the written responses to discovery
18 what was turned over. I guess that I need to know if you're
19 claiming privilege on that or not, Craig; 'cause I don't see
20 a privilege. I just want to make sure we know everything
21 that the expert received.
22    MR. HILLIARD: Well, I think you covered that in
23 Mr. Lewis' deposition what materials he reviewed and relied
24 upon in preparing his expert report.

Page 28

1     MR. SHUPENUS: Well, in fact, in Mr. Lewis'
2  deposition, your co-counsel, Mr. Schrama, S-C-H-R-A-M-A, had
3  a privilege objection at that time. Subsequently, we
4  haven't found the basis for any privilege; and so, I'm
5  asking Century now whether there was anything else provided.
6     MR. HILLIARD: Well, you're correct. He did have
7  a privilege objection, but I believe the privilege objection
8  centered around communications between the lawyers and the
9  experts concerning strategy issues and not centered around
10 what documents were turned over to the expert to review to
11 prepare his report; and he produced those documents; and I'm
12 not aware of any documents we withheld that would have been
13 the basis for the conclusions reached in his report.
14    MR. SHUPENUS: Specifically, Craig, I'm looking
15 for information that was disclosed that might not be in a
16 document.
17    MR. HILLIARD: I mean to cut to the chase, do you
18 want to know whether Mr. Lewis received the materials that
19 had been sent by Dave Williams to Bob Magan?
20    MR. SHUPENUS: Yes.
21    MR. HILLIARD: Is that what you're driving at?
22    MR. SHUPENUS: Yes, that is. Let's get to it
23 then. What representations --
24    MR. HILLIARD: I thought that you asked Mr. Lewis

Page 29

1  about that in his deposition.
2      MR. SHUPENUS: I may have, but I'm going to ask
3  Century.
4      MR. HILLIARD: Frankly, I don't recall as I sit
5  here. It's been a while since I have looked at that
6  transcript, and I don't recall what he testified to and what
7  actually was turned over, but I'll be happy to provide you
8  with an answer on that. I will be happy to tell you
9  whether, in fact, we turned over what was, for example, what
10 was marked as William's 3 at Mr. Williams' deposition, which
11 is excerpts from the scheduler code, the scheduler program.
12     MR. SHUPENUS: Well --
13     MR. HILLIARD: And let me finish. I'm sorry, and
14 that was marked as--I believe it was Exhibit Williams 2,
15 which was the table information from certain of the tables
16 which were represented to us were IS 3 tables. That type of
17 information, if you want to know whether I turned that over
18 to my expert, I will be happy to tell you that.
19     MR. SHUPENUS: Okay.
20     MR. HILLIARD: I don't think-- My only point is
21 for purposes of this deposition I'm not sure if that witness
22 knows that.
23     MR. SHUPENUS: Well, I would like to find out.
24     MR. HILLIARD: Sure. Ask him.

Page 30

1   A. And I believe I did---again, that that-- I'm not
2  sure that we turned over any other information to him other
3  than the source code.
4   Q. (Mr. Shupenus ) Did Century represent to anyone
5  that the documents it obtained from Mr. Williams came from
6  InfoSystems 3?
7   A. I would have to say yes to that, because our
8  belief is that the system that Springfield is running is
9  InfoSystems 3. We view those as all being one in the same.
10  Q. Why?
11  A. Well, there were certain indications on listings
12 we had seen that lead us to believe or led us to believe
13 that it was InfoSystems 3.
14  Q. Like what?
15  A. Directory names and also, I believe in Millers'
16 marketing materials, a reference to the system running at
17 Springfield as being InfoSystems 3.
18  Q. Anything else?
19  A. Not that I can recall at this time.
20  Q. Well, Mr. Williams told you it was from
21 InfoSystems 3, correct?
22     MR. HILLIARD: This particular witness?
23  Q. (Mr. Shupenus  ) Century. My understanding is that
24 you're appearing today on behalf of Century as its corporate

Page 31

1  representative. Go ahead and answer.
2   A. I don't recall if Mr. Williams ever made that
3  statement.
4   Q. Now, before the expert report even came out in
5  the--I believe it was in the original complaint, Century
6  alleged that the InfoSystems 3 product and Star_Base were
7  identical or substantially similar in their literal code,
8  correct?
9   A. Correct.
10  Q. And what literal code was identical or
11 substantially similar?
12  A. Well, the piece that is most identical is the
13 code for the scheduler program; but in every other program,
14 the code references our data structures.
15  Q. And when did you learn that?
16  A. Well, the first we heard of it was in Bob Magan's
17 conversations with the employees at Springfield; and I don't
18 recall who he spoke with first, whether it was Williams or
19 Randle, but one or the other of them.
20  Q. And have you read the affidavits from Williams
21 and Randle that were made subsequent to the filing of your
22 amended complaint?
23  A. I know I read at least one of them. I don't
24 recall which one at this time. It's been a while.

Page 32

1   Q. In fact, at the time Century filed its original
2  complaint, the only basis for Century's belief that the code
3  had been copied was from Dave Williams, correct?
4   A. No. I thought we had spoken with more than one
5  person at Springfield.
6   Q. Don Randle?
7   A. I believe so.
8   Q. Did Century at the time it filed its complaint
9  and sought injunctive relief, did Century have any
10 information other than what it received from Dave Williams
11 and Don Randle regarding similarities between InfoSystems 3
12 and Star_Base?
13  A. So, we're talking about the documentation that
14 was sent to us?
15  Q. I don't know.
16  A. The listings, the listings that were sent to us
17 and the data structures that were sent to us, is that what
18 you're referring to?
19  Q. I want to know all information Century had at the
20 time it filed its complaint and sought injunctive relief --
21  A. Spoke with Don Randle and Dave Williams.
22  Q. -- and a way to get information contained in this
23 complaint regarding copying. Was there any other
24 information that Century had at the time it filed its

Page 33

1 complaint and sought injunctive relief?
2   A. Well, and the fact that our marketing
3 representative had seen a demonstration program and had
4 reported that back to us.
5   Q. Anything else?
6   A. Not that I can recall.
7   Q. And in fact, sir, Dave Williams informed Century
8 that he wasn't sure whether the information he provided
9 Century came from InfoSystems 3 or not, correct?
10      MR. HILLIARD: Objection to the form.
11   A. I don't recall that at the same time myself.
12   Q. (Mr. Shupenus) Well, did you listen to the tape
13 recording that's made of the conversation?
14      MR. HILLIARD: Is it your representation that
15 that is in the tape recording, Rob?
16      MR. SHUPENUS: Yes. Go ahead and answer, sir.
17   A. I'm sure I listened to it, but I don't recall
18 that statement.
19   Q. (Mr. Shupenus  ) Has Century suffered any damage as
20 a result of the allegations in its amended complaint?
21   A. Such as loss of sales in Illinois?
22   Q. Why don't you tell me about all damages that
23 Century suffered as a result of the allegations in the
24 amended complaint? How has Century been damaged?

Page 34

1   A. Okay. We lost revenue from Springfield. We lost
2 revenue from sales in Illinois.
3   Q. Like what?
4   A. Well, there were several school districts we had
5 put in some bids for and did not receive.
6   Q. Like which ones?
7   A. I'm sorry. I don't have the list in front of me.
8   Q. Does a list exist somewhere?
9      MR. HILLIARD: Well, Rob, to be clear, you can
10 ask these questions; but I will indicate for the record that
11 we are, as I think I indicated in court at our last hearing,
12 that we are not advancing any claim for damages based on any
13 lost sales to any customers. In other words, we are not
14 claiming that we suffered particular damages and are not
15 seeking recovery of the damages based on lost sales;
16 although, the witness can certainly answer your questions,
17 that is not part of our claim.
18      MR. SHUPENUS: So, you have a count that you have
19 alleged for unfair competition; but you're making no claim
20 for lost sales; is that correct, sir?
21      MR. HILLIARD: We are not making any claim for
22 lost sales. That's correct.
23   Q. (Mr. Shupenus) And you will agree with that, Mr.
24 LaMantia?

Page 35

1   A. Yes, I would.
2   Q. What damage has Century incurred as a result of
3 the allegations in the amended complaint?
4   A. Loss of revenue from Springfield and lost sales
5 in Illinois.
6   Q. And you don't know where the lost sales in
7 Illinois were? You don't know what school districts or what
8 customers or anything, correct?
9   A. I don't have a list of those at this time.
10   Q. Has a list ever been created? Does Century have
11 a list somewhere?
12   A. I don't know that we could resurrect that
13 information and put it together for you.
14   Q. But you want the defendants to pay you for that
15 lost revenue, correct?
16   A. Is that what we are asking for?
17      MR. HILLIARD: No. I thought I made it clear.
18 We are not making a claim for lost sales in Illinois.
19      MR. SHUPENUS: Okay. What other damage --
20      MR. HILLIARD: The claim for damages was outlined
21 in a Rule 26 Disclosures; and in my letter to you of last
22 week, I tried to flush it out a bit more. The witness is
23 aware of that.
24      MR. SHUPENUS: Okay. I just don't want there to

Page 36

1 be any --
2      MR. HILLIARD: I understand, Rob.
3      MR. SHUPENUS: I'm sorry. We can show a running
4 objection here; and from there on, I want to ask Century --
5      MR. HILLIARD: Right.
6      MR. SHUPENUS: -- about its calculation and
7 amount of damages as we set forth as a topic in Letter B of
8 the Notice of Deposition.
9      MR. HILLIARD: Right. I'm not objecting to it.
10 I just--I understand you're going through what you need to
11 go through.
12      MR. SHUPENUS: Right.
13      MR. HILLIARD: You want --
14   Q. (Mr. Shupenus) Let's go ahead and get that answer
15 out. We need to know what Century's calculation and amount
16 of damages are regarding each count of plaintiff's amended
17 complaint. Mr. LaMantia, are you prepared to tell me that
18 today?
19   A. I'm sorry. I don't understand your question.
20 Can you repeat that again?
21   Q. With respect to Topic B in the Notice of
22 Deposition, we asked Century, once again, to produce a
23 corporation representative to explain, quote, plaintiff's
24 calculation and amounts of damages regarding each count of

Page 37

1 the amended complaint, unquote. Are you prepared to do that
2 today on behalf of Century?
3    A. Well, Miller received revenues.
4    Q. Let's back up. Are you prepared to do that on
5 behalf of Century today?
6    A. I can discuss the items that were put together
7 and sent to you this past week.
8    Q. And are those responsive to Topic B?
9    A. I believe so, yes.
10    Q. Okay. Tell me what damages Century has incurred
11 as a result of the allegations in the amended complaint.
12 And you're referring to a document, sir?
13        MR. HILLIARD: He's referring to the letter I
14 have sent to you on Friday, as well as a Rule 26, part of
15 the Rule 26 Disclosure.
16    A. Okay. As I was going to say, Miller received
17 revenues from Springfield for the development of IS 3 and
18 other services; and he also licensed IS 3 and received
19 revenues for services and training and whatever else to
20 several other districts.
21    Q. (Mr. Shupenus) But you don't know what districts
22 those are?
23    A. Well, yes, Oswego, Kewanee, Merango. That is
24 outlined in this letter.

Page 38

1    Q. And as outlined in that letter where Century
2 alleges that it's entitled to $1,605,891, how are these
3 damages related to the infringement alleged by Century?
4    A. Well, Miller used Star_Base as the basis for his
5 work --
6    Q. What version of Star_Base?
7    A. -- and his system, excuse me.
8    Q. What version of Star_Base?
9    A. Version 2.
10    Q. The client server version?
11    A. Thank you. The client server version.
12    Q. And is InfoSystems 3 the same as the client
13 server version of Star_Base?
14    A. What do you mean by the same?
15    Q. Well, whatever you mean. Which --
16    A. No. You're asking the question. What do you
17 mean?
18    Q. I'm basing this on your allegations. What do you
19 allege is the same between InfoSystems 3 and the client
20 server version of Star_Base?
21    A. InfoSystems 3 is based on our data structures and
22 contains a lot of our code and in some cases identical
23 portions of our code. So, in that sense to me, it is the
24 same.

Page 39

1    Q. What functions, specifically, is InfoSystems 3
2 able to perform because of copying from the client server
3 version of Star_Base?
4    A. Attendance storage, student information,
5 schedules, GPA calculations, report cards, transcripts,
6 discipline information, special ed information, test scores.
7    Q. And is it Century's assertion that those
8 functions in InfoSystems 3 are wholly dependent on the
9 client server version of Star_Base?
10        MR. HILLIARD: Objection to the form.
11    A. They are dependent on the database structure
12 which is a part of Version 2 of Star_Base.
13    Q. (Mr. Shupenus) Does Century allege that the
14 underlying code regarding the functioning you just mentioned
15 is identical to the client server version of Star_Base?
16    A. No. It's not a hundred percent identical.
17    Q. What percent identical is it?
18    A. I couldn't tell you that. I did not look at the
19 code.
20    Q. Approximately, what percentage?
21    A. I couldn't give you an approximation. It would
22 take a tremendous analysis to do that.
23    Q. And Century's unwilling to undertake that
24 tremendous analysis; is that correct?

Page 40

1    A. I don't think we need to.
2    Q. Okay.
3        MR. HILLIARD: Rob, can we take a break?
4        (Whereupon a brief recess was taken.)
5    Q. (Mr. Shupenus) Okay. Again, looking at Mr.
6 Hilliard's correspondence dated April 21, 2006, did Century
7 submit requests for proposal to all of the school districts
8 referenced in this letter?
9    A. No. We did not.
10    Q. Which ones did Century send requests for
11 proposals to?
12    A. From the list that is in this letter?
13    Q. Yes.
14        MR. HILLIARD: And that includes No. 2 and 3.
15 Just referring the witness back to the documents that were
16 referenced in the letter too.
17        MR. SHUPENUS: Okay.
18        MR. HILLIARD: Which is Miller 2 and Miller 3.
19 Just bear with me.
20    Q. (Mr. Shupenus) I was going to go there, Craig;
21 but instead, why don't we just redo the question. Sir, how
22 many customers or potential customers are there that Century
23 and Miller both submitted requests for proposals to?
24    A. I think over this time period maybe only two or

Page 41

1 three that we both bid on.
2   Q. Okay, and what school districts are those or what
3 customers are those?
4   A. I believe Adlai Stevenson and Oswego.
5   Q. Now, are there any customers from whom Miller
6 received revenue that Century did not submit a request for
7 proposal to at all?
8   A. Yes. The best of my knowledge, it would be all
9 the other ones that are listed.
10   Q. And was Century aware that the other school
11 districts wanted to purchase a student information system?
12   A. I don't know. I really couldn't answer that.
13   MR. HILLIARD: I'm going to object to the form of
14 that question. You mean based on something that the school
15 district would have communicated to Century, correct?
16   MR. SHUPENUS: Right.
17   MR. HILLIARD: Otherwise, your question asks
18 Century to get into the heads of other school districts and
19 what they wanted; but I think he answered the question. I
20 think he answered the question that he doesn't know whether
21 any school, any of these particular districts communicated
22 anything to Century.
23   Q. (Mr. Shupenus) And so, does Century assert that
24 even if it didn't submit a request for proposal and Miller

Page 42

1 did, that Century is now entitled to that revenue?
2   A. Yes.
3   Q. Now, you noted two school districts to whom
4 Century submitted requests for or to whom Century tried to
5 get business and Miller also tried to get business from; and
6 that is Stevenson and Oswego, correct?
7   A. That's correct.
8   Q. And what is Century's understanding regarding why
9 Miller got the business instead of Century?
10   A. I don't know. I don't have an answer for that.
11 We don't always get that information. As a matter of fact,
12 we rarely get that information.
13   Q. Well, you saw how much Miller received from these
14 two clients through the prior disclosures, correct?
15   A. Yes.
16   Q. Well, was Century's bid higher perhaps?
17   MR. HILLIARD: Objection to the form. You can
18 answer.
19   A. It could have been.
20   Q. (Mr. Shupenus) Do you know?
21   A. Not off the top of my head, no. I don't know
22 that we would have a record of that at this time.
23   Q. Sir, is it fair to say that you don't know
24 whether the Stevenson or Oswego school districts went with

Page 43

1 Miller instead of Century because of something that had
2 nothing to do with the alleged infringement, correct?
3   A. That would be correct, yes.
4   Q. So, the lost revenue for Century may or may not
5 be connected with the allegations of infringement, right?
6   A. Well, other than the fact --
7   MR. HILLIARD: Objection to the form of the
8 question. You can answer.
9   A. Other than the fact that Miller had a product to
10 sell them.
11   Q. (Mr. Shupenus) In general, yes. Let me reask it
12 so it's clean on the record. The reason, well, Century
13 doesn't know the reason that Stevenson and Oswego went with
14 Miller instead of Century, right?
15   A. That's correct. That's correct.
16   Q. The reasoning behind Stevenson and Oswego using
17 Miller's product instead of Century's product may have
18 nothing to do with the alleged infringement at all?
19   MR. HILLIARD: Objection to the form.
20   A. Well, I don't know how to answer that. I mean I
21 have got to believe that these districts did not know that
22 IS 3 was an infringing product. So, to them, it certainly
23 had nothing to do with it. So, I don't understand the
24 question.

Page 44

1   Q. (Mr. Shupenus) Let me ask it a different way.
2 They certainly made a decision based on other factors other
3 than they were buying an infringing product. So, as you sit
4 here today, Century is not aware of any nexus between the
5 infringement and the lost revenue, correct?
6   MR. HILLIARD: Objection to the form.
7   A. I'm sorry. I don't understand your question.
8   Q. (Mr. Shupenus) As you sit here today on behalf of
9 Century, you don't have any idea whether the loss of sales
10 to Oswego and Stevenson have anything to do with the
11 infringement or not, correct?
12   A. Like I said, other than the fact that Miller had
13 a product to sell them.
14   MR. HILLIARD: Rob, to be clear, I thought I had
15 indicated before on the record that we are not making a
16 claim for lost sales. In other words, we are not claiming
17 that we lost the sale to Adlai Stevenson or Oswego. So, we
18 are not alleging anything that would require a causation
19 nexus, which is where I think you're going with your
20 question. Our claim is statutorily based on that. Does
21 that make sense?
22   MR. SHUPENUS: Perhaps, would you agree with
23 me, Mr. Hilliard, that there is no nexus between the gross
24 revenue figures in your letter and the infringement?

Page 45

1  MR. HILLIARD: No. I would not agree with that.
2  MR. SHUPENUS: Okay.
3  MR. HILLIARD: There is a nexus in the sense that
4  we claim that the infringing product was sold to school
5  districts A, B, and C. The evidence in the record indicates
6  that school districts A, B, and C paid The Miller Group X
7  dollars. Our claim is that we are entitled to those X
8  dollars paid to The Miller Group because the law provides
9  that we can recover those gross revenues, and that is what I
10 laid out in my letter. We are not claiming that we lost the
11 contract or lost the opportunity because of something The
12 Miller Group did or did not do. Does that make sense to
13 you?
14 MR. SHUPENUS: Yes. It appears that Century --
15 MR. HILLIARD: That is why I'm trying to lay it
16 out in my letter.
17 MR. SHUPENUS: Right, and then are we in
18 agreement that Century is simply pointing to the gross
19 revenue of The Miller Group in general as the basis for its
20 claim rather than --
21 MR. HILLIARD: Yes.
22 MR. SHUPENUS: -- rather than specifically to
23 the--to the material copied?
24 MR. HILLIARD: No. Again, I'm hung up on your--

Page 46

1  We are pointing to the fact that The Miller Group sold IS 3
2  to other school districts, made certain gross revenues; and
3  we claim that we are entitled to those profits, those gross
4  revenues as profits under the Copyright Act as our damages.
5  MR. SHUPENUS: Are you claiming that the loss of
6  profits though are directly attributable to the infringement
7  or --
8  MR. HILLIARD: Yes.
9  MR. SHUPENUS: Okay, and my question for the
10 witness is in what manner are these lost profits directly
11 attributable to the infringement?
12 MR. HILLIARD: That was your question.
13 A. Yeah. I know. I'm kind of lost in the
14 difference between what we're saying and what you're asking.
15 Q. (Mr. Shupenus ) Well, sir, so far Century has been
16 unable to tell me how much of its program was allegedly
17 copied.
18 A. Well --
19 MR. HILLIARD: Well, I disagree, Rob; but go
20 ahead.
21 Q. (Mr. Shupenus) How much of its program was
22 allegedly copied then?
23 A. To my knowledge and belief, Miller had access to
24 our entire system. Now, whether they copied it line for

Page 47

1  line, I'm sure they did not; but they did use our data
2  structures almost in tact. They made some changes, and they
3  built another system upon ours; and for certain parts of the
4  system and particularly the scheduler, the code was used
5  line for line. I don't know how much more specifically we
6  can get than that, and they needed to understand how our
7  system worked in order to create IS 3. So, I'm sure they
8  pored over all of our source code to try to get an
9  understanding of how our system worked in order to put
10 theirs together. Otherwise they would not be able to create
11 the proper access to the data structures.
12 Q. So, is it the allegation that the understanding
13 that was obtained allegedly by The Miller Group is
14 copyrighted? Is the logic copyrighted?
15 MR. HILLIARD: Objection to the form.
16 A. Well, the copyright, my understanding of a
17 copyright is, correct, is for the source code, not for an
18 understanding. It's our intellectual property. Our
19 intellectual property's what is being protected by the
20 copyright as far as I understand. Once they have access to
21 the source code, they have access to our intellectual
22 property as well our algorithms and our design.
23 Q. (Mr. Shupenus) And I appreciate that, sir; but
24 I'm still trying to figure out what copyrighted elements of

Page 48

1  Star_Base are connected to the revenues received by The
2  Miller Group, and I don't see a connection here. I'm trying
3  to ascertain that. Is there a connection between the gross
4  revenues of Miller and the copying of copyrighted material?
5  A. Well, let's see. They were licensing IS 3 to the
6  school districts, and IS 3 was based on Star_Base. I think
7  that is a connection.
8  Q. Well, I'm trying to find the elements that are
9  copyrighted that IS 3 is allegedly based on.
10 A. I guess you should pull out the testimony of our
11 expert witness and look at the code comparisons that were
12 made, and maybe that would be an answer for you.
13 Q. Sir, you already testified that the allegations
14 of copying are based on a version of Star_Base that you
15 didn't even give your expert. So, I need to ask you this
16 question: What copying of copyrighted materials caused
17 this--caused your damages?
18 MR. HILLIARD: Object to that question, Rob. I
19 think that mischaracterizes his testimony.
20 A. Version 3 is a derivative of Version 2 which is a
21 derivative of Version 1. The data structures have remained
22 in tact fairly well along the way, and the algorithms and
23 the logic of the programs have remained in tact along the
24 way. The movements from character mode to client server to

Page 49

1  web based is a user interface change, not a structural
2  change in the system. So, although we categorize it as
3  Version 1, Version 2, and Version 3, and I guess we started
4  this whole conversation with talking about Version 1, 2, and
5  3, I think the comparison is still a fair examination of our
6  code and our system and what has been copyrighted and what
7  has been stolen.
8     Q. (Mr. Shupenus) Are the data structures in
9  Star_Base copyrighted?
10    A. Yes, they are.
11    Q. Were the data structures submitted to the U.S.
12 Copyright Office and deposited in conjunction with
13 application for copyright protection?
14    A. No. They were not.
15    Q. But Century claims a copyright of them anyway,
16 correct?
17    A. We claim a copyright over the entire Star_Base
18 system. Only one program was deposited, the menu program.
19    Q. And you don't allege that any of the defendants
20 here copied the menu program, do you?
21    A. No. Since this was a character mode program, I
22 don't think they have had access to this particular item.
23    Q. And you don't allege that they copied that
24 particular item, correct?

Page 50

1     A. That's correct.
2     Q. In Paragraph 31 of Century's amended complaint,
3  Century alleges that it has lost and will lose licensed
4  revenues for the Star_Base programs and has sustained and
5  will sustain damages as a result of defendant's aforesaid
6  wrongful conduct and their marketing of any infringing
7  products. Is it your testimony --
8        MR. HILLIARD: What paragraph was that? I'm
9  sorry, Rob. What paragraph was that? Because I have put my
10 hands on a copy of the amended complaint. 31?
11       MR. SHUPENUS: Yes.
12       MR. HILLIARD: Okay. Thank you.
13    Q. (Mr. Shupenus ) Sir, do you have Paragraph 31 in
14 front of you?
15    A. Yes, I do.
16    Q. Is it your testimony today that Century is no
17 longer seeking damages based on its own lost revenues?
18       MR. HILLIARD: That's correct.
19    A. Yes. That's correct.
20    Q. (Mr. Shupenus) Paragraph 31 also states, quote,
21 the defendants aforesaid wrongful conduct has also deprived
22 and will continue to deprive Century of opportunities for
23 expanding its goodwill, unquote. Does Century still seek
24 damages based on loss of goodwill?

Page 51

1        MR. HILLIARD: I will stipulate, Rob, that we are
2  not seeking any monetary damages as a result of lost
3  goodwill. That does not waive the argument that we would
4  make that the defendants overall and their conduct has
5  impacted on Century's goodwill, but we are not making a
6  claim for any damages based on that.
7        MR. SHUPENUS: Okay. Let's --
8        MR. HILLIARD: Does that make sense? In other
9  words, we are not stipulating that we didn't lose goodwill;
10 but we're not making a claim for damages.
11    Q. (Mr. Shupenus) That is fine. Let's go to
12 Paragraph 44 then, and this is --
13       MR. HILLIARD: 44?
14    A. 44?
15    Q. (Mr. Shupenus) Yes. In Count 4, the
16 misappropriation of trade secrets count, do you have
17 Paragraph 44 in front of you, sir?
18    A. Yes, I do.
19    Q. Has Century suffered any irreparable harm or
20 damage as a result of the alleged misappropriation of trade
21 secrets?
22       MR. HILLIARD: Rob, I'm going to register an
23 objection to that question.
24       MR. SHUPENUS: Okay.

Page 52

1        MR. HILLIARD: Really because I think it's a
2  legal term of art that would be very difficult for a fact
3  witness to answer. The term of irreparable harm, as we all
4  know, it has a particular meaning in the law.
5        MR. SHUPENUS: I agree with you, Craig.
6        MR. HILLIARD: I think it's a hard --
7        MR. SHUPENUS: I agree. I just want to know if
8  he knows of any irreparable harm; and if he does, I want to
9  know about it. Otherwise, I do understand that it is
10 difficult.
11       MR. HILLIARD: Well, I think you need to define
12 the term irreparable harm, even though it appears in our
13 complaint, you know. It's a lawyer's term that is put in
14 complaints.
15    Q. (Mr. Shupenus) Why don't I clear it up. Has
16 Century suffered any damages as a result of the alleged
17 misappropriation of trade secrets?
18    A. Other than monetary damages?
19    Q. Well, if there are monetary damages, tell me
20 about them.
21    A. Well, I think we have just went over that for the
22 last 20 minutes.
23    Q. In fact, we haven't.
24       MR. HILLIARD: Well, he's referring to my letter

Page 53

1 and the other documents referenced in my letter.
2   Q. (Mr. Shupenus) Right, but those are copyright
3 things, sir. Now, I'm talking about Century's
4 misappropriation of trade secrets claim. Has Century
5 incurred any damage as a result of the alleged
6 misappropriation of trade secrets?
7   A. Yeah. To the best of my knowledge, the damage,
8 if I'm going to interpret what damage I would see as harmful
9 to Century, I don't know that any of our secrets have been
10 linked to any of our competitors other than to Miller. So,
11 from that point of view, I don't know that we have been
12 damaged in any other way; but again, I don't know or have
13 not been informed of any of that happening.
14   MR. HILLIARD: Rob, to be clear, my letter
15 outlines our damages claim, not--for the entire complaint.
16   MR. SHUPENUS: Okay.
17   (Whereupon a brief recess was taken.)
18   Q. (Mr. Shupenus) Sir, who else besides yourself
19 from Century took part in obtaining copyright protection for
20 Star_Base, if anyone?
21   A. Well, a couple of people, you know. Joe Shearn
22 worked on it, and we certainly had someone prepare the
23 deposit, one of our programmers, most likely Bob Magan at
24 the time; and we worked with an attorney, Ken Wottof to help

Page 54

1 us with the filing.
2   Q. Well, since January of 2005, has Century become
3 involved in any new lawsuits at all?
4   A. No.
5   Q. Is Century aware of any other instances where its
6 trade secrets have been compromised other than set forth in
7 your amended complaint?
8   A. Not that I'm aware of.
9   Q. Is Century aware of any other infringement of
10 Century's copyrights other than as set forth in the amended
11 complaint?
12   A. Not that I'm aware of.
13   Q. And finally, with respect to your former
14 employee, Robert Canny, what were the circumstances
15 surrounding his termination of employment with Century? Did
16 he voluntarily quit or was he fired?
17   A. I'm trying to remember. I, honestly, don't
18 recall.
19   Q. Do you have a personnel file?
20   A. I'm sorry?
21   Q. Do you have a personnel file on Mr. Canny?
22   A. I'm sure we do.
23   MR. SHUPENUS: Mr. Hilliard, is there any problem
24 with just producing that for us so we can track him down and

Page 55

1 find out about the circumstances regarding the end of his
2 employment?
3   MR. HILLIARD: Well, I would have no objection to
4 providing to you his last known address and telephone
5 number; but I would not simply produce his personnel file.
6   MR. SHUPENUS: How about if we do it subject to a
7 protective order?
8   MR. HILLIARD: I'm not sure the relevance of his
9 cessation of employment with Century to the claim that is
10 made in this complaint, but I would certainly turn over to
11 you identifying information. Whether I would have an
12 objection to you're talking with him or not, I'm not sure if
13 I would; but I would certainly have no objection to
14 providing you with his last known address if, in fact, you
15 wish to subpoena him.
16   MR. SHUPENUS: Well, given the fact that's the
17 only source of Century's knowledge regarding the use of this
18 demonstration program, I would expect that details of what
19 he turned over would be present in his personnel file; and
20 the only way that I'm going to be able to determine that is
21 if I get a complete copy of his personnel file so I could
22 see exactly what records Century has.
23   MR. HILLIARD: I understand your request now.
24 Does his personnel file or, more broadly, does Century's

Page 56

1 records contain any written documentation memorializing what
2 he relayed to Century about the demonstration program, and I
3 would not have any objection to turning that information
4 over to you. So, I would be happy to look at--have my
5 client look at his personnel file to the extent it exists,
6 determine whether that information is contained in the
7 personnel file, and make a recommendation to you. Either it
8 doesn't exist or if it does, I'll turn it over.
9   MR. SHUPENUS: Can we --
10   MR. HILLIARD: But not to cut you off, but a
11 personnel file, as you know, contains quite a bit of
12 personal information about an employee who has no relevance
13 to what is being alleged here, and I would object to just
14 turning over a employee or former employee personnel
15 information. So, I guess my position is I'll give you last
16 known address and phone number to the extent we have that.
17 I don't know if he lived in Illinois or --
18   A. Wisconsin.
19   MR. HILLIARD: Lives in Wisconsin, I'm told.
20 I'll turn that over to you and tell you whether or not his
21 file contains information about his report on the
22 demonstration program.
23   MR. SHUPENUS: I just need to figure out how or
24 if Century can substantiate this claim and --

Page 57

1  MR. HILLIARD: The witness has testified to that
2  they received a call from one of their employees in the
3  field who reported a demonstration program that they saw
4  that looked like Century's and that was reported to the
5  management at Century.
6  MR. SHUPENUS: Well, I don't have the realtime
7  transcript in front of me.
8  MR. HILLIARD: That was his testimony.
9  MR. SHUPENUS: But I'm pretty sure that the
10 deponent testified that he doesn't remember specifics. I
11 need to find those out so.
12 MR. HILLIARD: Right. No. I think he did
13 testify that he knows who it was, who made the report, that
14 there was such a report about a demonstration program by The
15 Miller Group in the field at the time, at or around the time
16 of the filing of the complaint and he does not recall any of
17 the details of that conversation. In fact, I think the
18 witness said that he did not have the actual conversation
19 with Mr. Canny, that it was someone else.
20 Q. (Mr. Shupenus) Mr. LaMantia, did Century
21 undertake any additional investigations since January 2005
22 regarding the facts and matters alleged in the amended
23 complaint?
24 MR. HILLIARD: Do you mean other than preparing

Page 58

1  for the deposition?
2  MR. SHUPENUS: Well, we have discussed that
3  already.
4  MR. HILLIARD: Right.
5  MR. SHUPENUS: And if there are additional
6  activities undertaken by Century to investigate the facts
7  alleged in the amended complaint, I want to know about those
8  investigations.
9  MR. HILLIARD: Other than discovery in the
10 lawsuit, obviously, that constitutes an investigation.
11 Q. (Mr. Shupenus) Anything else, Mr. LaMantia?
12 A. Not that I'm aware of.
13 Q. Did you check before the deposition today?
14 A. I'm sorry, what?
15 Q. Prior to today's deposition?
16 A. Did I what?
17 Q. Did you undertake any effort to determine the
18 nature, extent, type, and results of all investigations
19 regarding the allegations in the amended complaint?
20 MR. HILLIARD: You're quoting from something,
21 Rob. I don't know what you're quoting from.
22 MR. SHUPENUS: Exhibit A, what he's supposed to
23 be here to testify about as the corporate representative of
24 Century.

Page 59

1  MR. HILLIARD: Which one are you referring to?
2  MR. SHUPENUS: The Notice of Deposition, Topic A.
3  MR. HILLIARD: Topic A. Okay.
4  Q. (Mr. Shupenus) I'll ask again so it's clear.
5  A. Yeah. Yeah. I, you know, we started today with
6  that question. I reviewed many of the documents that had
7  been prepared and collected. I spoke with Mr. Shearn to jog
8  my memory a little bit more about the copyright filing.
9  MR. HILLIARD: I don't think he's asking you to
10 go over that again, correct? Rob, I think you're asking
11 other than what he told you already that he did in order to
12 prepare to continue to testify today and other than what we
13 have been doing in the course of formal discovery in the
14 lawsuit, has Century undertaken any other additional
15 investigation since January 2005 I think is your question?
16 In other words, did we call witnesses outside of the
17 confines of discovery and talk to them?
18 MR. SHUPENUS: Or anything else.
19 MR. HILLIARD: Right. No. I think that is
20 what-- I just want to cut to the chase. I think that is
21 your question, right?
22 Q. (Mr. Shupenus) Good job. It is, except I don't
23 want to limit it just to witnesses that he called.
24 A. Good. My answer then is no.

Page 60

1  MR. SHUPENUS: Okay. Okay. I think that is all
2  I have got. Lance, do you have anything?
3  MR. JONES: I got a whole boat load of questions.
4  I'm not going to ask you any of them so.
5  MR. SHUPENUS: Well, I'd agree with Lance,
6  actually. I have got a lot of questions.
7  MR. HILLIARD: You will save them for trial.
8  MR. SHUPENUS: Right. Thanks again, Craig, for
9  all this, and Mr. LaMantia, thank you, and we may or may not
10 see you in court. Waive signature or reserve?
11 MR. HILLIARD: I want him to read before--read
12 and sign; and just so we're clear, the deposition is now
13 concluded and closed?
14 MR. SHUPENUS: Yes.
15 MR. HILLIARD: Lance, you're waiving your right
16 to ask any questions, correct?
17 MR. JONES: I'm not going to ask any questions,
18 no.
19 MR. HILLIARD: Okay. I just want to make that
20 clear for the record.
21      DEPOSITION CONCLUDED
22      SIGNATURE RESERVED
23
24

Page 61

```
STATE OF ILLINOIS     )
                      ) SS
COUNTY OF CHRISTIAN   )
```

I, KARIN PAISLEY, a Certified Shorthand Reporter in and for the County of Christian, State of Illinois, DO HEREBY CERTIFY that pursuant to agreement of counsel, there appeared before me on the 25th day of April, 2006, via video conference at Springfield, Illinois, JOSEPH LAMANTIA, who was first duly sworn by me to testify the whole truth of his knowledge touching upon the matter in controversy aforesaid so far as he should be interrogated concerning the same; that he was examined and his examination was taken down in shorthand by me and afterwards transcribed upon the computer; that the deposition is a true record of the testimony given by the witness.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of April, 2006.

*[signature]*
KARIN PAISLEY
CSR #084-003568

Page 62

In re: Century Consultants, Ltd. v. The Miller Group, Inc., et al

I, JOSEPH LaMANTIA, deponent herein, do hereby certify that I have read the foregoing deposition and that it is a true and accurate translation of the questions asked of me and the answers given by me, with the following change(s):

Page/Line     Change     Reason

_____
Joseph LaMantia
Date:_____

kp