## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CENTURY CONSULTANTS, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | No. 2003-CV-3105 |
| | ) | |
| v. | ) | |
| | ) | |
| THE MILLER GROUP, INC., JOHN G. MILLER, | ) | |
| and the SPRINGFIELD PUBLIC SCHOOL | ) | |
| DISTRICT NO. 186, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT SPRINGFIELD PUBLIC SCHOOL DISTRICT 186'S
### MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**NOW COMES,** Defendant, SPRINGFIELD PUBLIC SCHOOL DISTRICT 186

("District 186"), through its counsel, Brown, Hay & Stephens, LLP, and hereby moves this Court

for an Order awarding summary judgment in its favor and against Plaintiff, CENTURY

CONSULTANTS, LTD. ("Century") pursuant to Fed.R.Civ.P. 56, and in support thereof states:

### INTRODUCTION

Century asserts various state and federal claims against District 186 and defendants The

Miller Group, Inc. and John G. Miller (collectively "Miller") based on the alleged infringement of

Century's copyright to certain computer software known as "Star_Base". Century correctly

asserts that District 186 purchased a version of Star_Base from Century in 1995. Century alleges

that District 186 provided Miller with Century's Star_Base source code for the purpose of

creating and selling a competing software product known as "InfoSystems 3."

Although this case involves complex copyright issues and facts, the material facts are

undisputed. As set forth herein, Century now admits through its designated witnesses that

substantially all of the material allegations set forth in its First Amended Complaint and corresponding declarations are false.

District 186 purchased a software license from Century to use Star_Base. The license agreement explicitly allows District 186 to make changes to the software if it wishes, and also allows District 186 to continue to use Star_Base in any manner it wishes even after it ceases "maintenance" payments to Century.

After District 186 purchased the Star_Base license, it paid Century for maintenance support for a period in excess of two years. Thereafter, District 186 notified Century that it was going "off-maintenance," and that it had decided to switch to a web-based student administration system. District 186 was unable to locate a vendor who offered a web-based system that could be used with District 186's Macintosh computers and, therefore, District 186 hired Miller to work with District 186 to design such a system. District 186 informed Century that it was working with a consultant to develop a web-based system.

District 186 assigned one of its employees to work with Miller to ensure that the system could be used with District 186's existing Star_Base database structures, among other things. The resulting one-of-a-kind system is known as District 186's Student Information System ("SIS").

There was no Mac-compatible web based student information system on the market, and Miller therefore developed InfoSystems 3 and marketed it to other school districts. Although District 186 worked in conjunction with Miller to develop InfoSystems 3, District 186 neither purchased nor used the product. Rather, District 186 continued to use the database structures it already had in place, exactly as disclosed in District 186's contract with Miller, and exactly as authorized in District 186's license agreement with Century. Significantly, <u>District 186 has never used InfoSystems 3</u>. Instead, District 186 continues to use its custom-made SIS software, which

2

incorporates the database structures it purchased from Century, elements of InfoSystems 3 to make its Mac system web based, and elements created exclusively for District 186 by its own employees.

Quite simply, this case arises from the fact that certain employees of District 186 formed the unfounded belief that District 186's SIS software is the same as InfoSystems 3 and that the same system was marketed to other school districts. These employees formed their belief after recognizing that certain elements of SIS came from Star_Base. They therefore assumed that InfoSystems 3 contained the same elements.

The District 186 employees were unaware that the license agreement between District 186 and Century entitled District 186 to continue to use Star_Base after it stopped paying maintenance fees to Century. These employees incorrectly believed that District 186's continued use of Star_Base was prohibited. The uncontradicted testimony of these District 186 employees, combined with the testimony of Century's witnesses and the agreements themselves, unequivocally establish that the allegations made against Miller and District 186 are based in false assumptions that Century wrongfully converted into sworn statements for the purpose of obtaining injunctive relief.

The unsworn "declarations" submitted by Century at commencement of this case are a result of mis-informed employees of District 186 relaying their unfounded assumptions to others, who then presented the same assumptions to the Court in the form of sworn, firsthand testimony. In 2003, a former employee and a current employee of District 186, both of whom were unaware of the substance of District 186's license agreement and the rights afforded District 186 therein, relayed suspicions of District 186's wrongful conduct directly to Century. Century requested that a District 186 employee print and forward certain source code which source code the employee

3

advised Century was being used in Miller's InfoSystems 3 product. The employee complied and again represented to Century that the source code was obtained from InfoSystems 3. Century compared the source code it believed came from InfoSystems 3 to its own Star_Base source code and concluded that Miller had copied Century's product.

In the course of gathering its evidence in anticipation of filing suit, Century secretly recorded certain phone calls with District 186's current employee. The recordings reveal a critical fact. The District 186 employee specifically told Century that his belief regarding the origin of the supposed InfoSystems 3 source code was based on secondhand information. Indeed, the tape recordings clearly establish without doubt that Century knew the information it received from the District 186 employee was merely an assumption.

Nonetheless, armed with what it believed to be a "smoking gun", Century filed a Complaint against District 186 and Miller in May, 2003, and sought injunctive relief. Even though Century knew that the information received from the District 186 employee was unsubstantiated, Century submitted sworn statements to the Court indicating that the source code definitely came from InfoSystems 3, and that the copied elements were protected by a registered copyright. In fact, Century represented to the Court that unlike the typical copyright infringement case where copying must be proven through indirect evidence that this was a rare copyright infringement case wherein there was direct evidence of copying. Based on Century's sworn representations, including submission of source code allegedly obtained from InfoSystems 3, the Court granted Century's request for injunctive relief and enjoined Miller from continuing to market their software. Unable to sell its product, Miller ultimately went bankrupt.

The facts obtained in discovery clearly establish that the allegedly infringed source code was printed directly from District 186's Star_Base software it purchased from Century, not from

4

InfoSystems 3. District 186 obtained an affidavit from the employee upon whom Century relied

in framing its case against District 186. The affidavit demonstrates without doubt that there never

existed a legitimate factual basis for Century's allegations. The evidence establishes that Century

rushed to the courthouse with purportedly sworn allegations that have subsequently been proven

false. Indeed, contrary to Century's allegations, the undisputed facts indicate that the alleged

infringement did not occur. Rather, Century merely submitted a copy of source code printed

directly from its own product, with full knowledge that District 186 was entitled to continue to

use it. Furthermore, the non-literal elements of Star_Base allegedly copied by Miller are not

protected by copyright law, and Century is unable to demonstrate damages resulting from the

alleged infringement.

### UNDISPUTED MATERIAL FACTS

**DEVELOPMENT OF STAR_BASE**

1.      Century alleges that it developed computer programs known as "S.T.A.R.S." and
received copyrights for them. (First Amended Complaint, Paragraph 10).

2.      Century upgraded the S.T.A.R.S. programs in 1990 and renamed them
"Star_Base." (First Amended Complaint, Paragraph 11).

3.      Century alleges that the Star_Base screens and source code were copyrighted.
(First Amended Complaint, Paragraph 11).

4.      Star_Base software is used by various school districts as student administration
software. (First Amended Complaint, Paragraphs 13-14).

5.      Century co-owner Joseph LaMantia testified that various incarnations of the
Star_Base software were created over a number of years. (Second LaMantia deposition, P.7,
L.11-24).

6.     On or about November 22, 1995, Century deposited the menu portion of the Star_Base source code with the United States Copyright Office.    (LaMantia declaration, Paragraph 9).

7.     The first version of Star_Base, known as the "character-based" version, is the subject of Century's 1995 copyright registration application referenced in its First Amended Complaint.  (Second LaMantia deposition, P.11, L.1).

8.     The Certificate of Registration attached to LaMantia's declaration filed by Century at the outset of this case pertains to the character-based version of Star_Base.  (Second LaMantia deposition, P.11, L.1).

9.     Century's copyright registration pertains to a work that was completed in 1991. (LaMantia declaration, Exhibit A).

10.     Century subsequently released a second version of Star_Base known as the "client server" version. (LaMantia deposition, P.7, L.16).

11.     Century released a third version of Star_Base, known as "version 6i," or the "web-based" version, around 1999. (Second LaMantia deposition P.13, L.14).

12.     At the time of LaMantia's second deposition, Century had not submitted new applications for copyright registration for the second and third versions of Star_Base.  (Second LaMantia deposition, P.14, L.13).

13.     Until May, 2006, the second and third versions of Star_Base were merely unregistered derivative works based on the original copyrighted version of Star_Base. (Second LaMantia deposition, P.14, L.13).

14.    By May 26, 2006, Century applied for and received copyright protection for the web-based version of Star_Base. (Century's Response to District 186's Motion to Dismiss Pursuant to Rule 12(b)(1), Declaration of Joseph E. LaMantia).

**DISTRICT 186'S RELATIONSHIP WITH CENTURY**

15.    Plaintiff granted District 186 a license to use Star_Base software and agreed to provide District 186 with support services in exchange for an initial license fee and periodic payments. (First Amended Complaint, Paragraphs 15-16).

16.    In or about May 2002, District 186 elected to forego Plaintiff's support services and ceased making payments for such services. (First Amended Complaint, Paragraphs 15, 17; Magan declaration, paragraph 5).

17.    The contract between Plaintiff and District 186 allowed District 186 to continue to use Star_Base without making ongoing maintenance payments. (First Amended Complaint, Paragraph 17).

18.    District 186 informed Century at the time the software was purchased that District 186 planned to modify Star_Base to meet District 186's needs. (Qualls affidavit, Paragraph 3).

19.    Representatives of Century traveled to Springfield, Illinois several times to train District 186 employees how to make modifications to Star_Base. (Qualls affidavit, Paragraph 3).

20.    District 186 performed hundreds of modifications to Star_Base before Miller's involvement with District 186's system. (Qualls affidavit, Paragraph 4).

21.    In November, 2000, District 186 notified Century that it was working with an outside consultant to write a "front-end" program to make District 186's system web-based. (Qualls affidavit, Paragraph 7).

22.    District 186 actually demonstrated the web-based version of its system to Century in November, 2000.  (Qualls affidavit, Paragraph 7).

23.    InfoSystems 3 is not the same as District 186's system.  In fact, InfoSystems 3 cannot work with District 186's system.  (Qualls affidavit, Paragraph 8).

**DISTRICT 186'S RELATIONSHIP WITH MILLER**

24.    District 186 entered into two contracts with Miller.  (First Amended Complaint, Paragraph 19).

25.    The first contract, dated August 17, 1998, requires Miller to provide consultation to District 186 on web site development services and web server software implementation. (August 17, 1998 Consulting Agreement).

26.    The second contract, dated September 1, 1998, provides that Miller will assist in the development and implementation of an internet-based information system for use by District 186.  (September 1, 1998 Agreement).

27.    Century alleges Miller utilized a certain "demonstration program" that "embodies and reflects elements of the Star_Base software which, as alleged throughout this Complaint, was and is an infringement of Century's copyrights."  (First Amended Complaint, Paragraph 20).

28.    In February, 2003, Don Randle, an employee of District 186, called Plaintiff and informed Plaintiff that District 186 hired Miller Group to write "front-end" programs to interface with the Star_Base database, and that Randle "knew for sure" that Miller Group was using Plaintiff's "database structures."  Randle claimed to be "fairly certain" that Miller Group was "using Century's scheduler program (a component of the Star_Base software)."  (First Amended Complaint, Paragraph 21).

8

**DISTRICT 186 EMPLOYEES' INTERACTION WITH CENTURY**

29.     Prior to his retirement, Dave Williams was employed by District 186 as its lead systems analyst. (Williams affidavit, paragraphs 2-3).

30.     In the course of his employment, Williams became familiar with the Star_Base software that District 186 purchased from Century. (Williams affidavit, Paragraph 4).

31.     Star_Base was but one of many elements comprising District 186's student information system. (Williams affidavit, Paragraph 11).

32.     A few years after District 186 purchased Star_Base, Williams learned that District 186 wanted to convert its existing student information system to a web based system, but that District 186 could not find a commercially available web based system that was compatible with District 186's Macintosh computers. (Williams affidavit, Paragraph 11).

33.     Williams then learned that District 186 and Miller entered into an agreement to develop web based system that was compatible with District 186's Macintosh computers. (Williams affidavit, Paragraph 12).

34.     Williams also learned that Miller intended to market a student information system to other school districts. (Williams affidavit, Paragraph 17).

35.     At that time, Williams assumed that Miller intended to market the same student information system to other school districts that was being developed for District 186, but he had no first hand knowledge to support this assumption.  (Williams affidavit, Paragraph 17).

36.     Williams then discovered that Miller was marketing a student information system known as InfoSystems 3, and incorrectly assumed that InfoSystems 3 was the system used by District 186. (Williams affidavit, Paragraph 18).

9

37.    Williams knew that District 186's student information system still utilized portions of Century's Star_Base product; therefore, Williams incorrectly assumed that Miller's InfoSystems 3 product also used a portion of Star_Base, which Williams believed was improper. (Williams affidavit, Paragraph 20).

38.    In the course of his employment, Williams had frequent contact with Century employee Bob Magan. (Williams affidavit, Paragraph 21).

39.    After Williams formed his belief that Miller was using Century's Star_Base software in its InfoSystems 3 product, Williams told Magan about his concerns (Williams affidavit, Paragraph 21).

40.    Magan conveyed the information he obtained from Williams to his superiors at Century.  Century instructed Magan to obtain additional information from Williams and secretly record his conversations with Williams. (Magan deposition, pp. 113-115).

41.    Magan and Williams each verified the accuracy of a transcript of the recorded conversations subsequently created by District 186.    (Magan deposition, pp. 113-115; Williams affidavit, Paragraph 21 and Exhibit A).

42.    Williams confirmed that he did not realize Magan was recording the conversations. (Williams affidavit, Paragraph 21).

43.    Century alleges that Williams called Magan and advised that Miller "stole" Century's Star_Base software, despite Miller's knowledge that Century's Star_Base software was copyrighted. (First Amended Complaint, Paragraph 22).

44.    Pursuant to Magan's request during these secretly recorded conversations, Williams obtained and printed certain documents from District 186's student information system,

10

including table definitions and a program listing, and mailed these documents to Magan. (Williams affidavit, Paragraphs 24-29).

45. Williams represented to Magan that he obtained these documents from InfoSystems 3. (Williams affidavit, Paragraphs 24-29).

46. Century alleges Williams mailed a list of "table definitions" together with the "program listing" from the "student scheduler" portion of Miller's InfoSystems 3 product to Century. (First Amended Complaint, Paragraphs 23-24).

47. Williams later realized, however, that the documents were actually from the portion District 186's own system that continued to use Star_Base, rather than from InfoSystems 3. (Williams affidavit, Paragraphs 24-29).

48. Century alleges that it compared the materials received from Williams to their Star_Base program, and determined that the table definitions in the competing products were virtually identical, and that the code used in InfoSystems 3 has verbatim references to Century's Star_Base tables. (First Amended Complaint, Paragraphs 23-24).

**ALLEGATIONS OF INFRINGEMENT**

49. On May 27, 2003, Century filed its original Complaint, together with a Memorandum of Law in Support of Application for Order to Show Cause with Temporary Restraints and Expedited Discovery ("TRO application"), among others. (Docket Entry of May 27, 2003).

50. In its Complaint, Century claimed that "Williams mailed Century a list of the table definitions from [Miller's] InfoSystems 3 product," and that the definitions were identical to those from Star_Base. (Complaint, Paragraph 22).

51.    Century also alleged that Williams mailed a portion of the "student scheduler" program listing from InfoSystems 3 which shows "verbatim references to Star_Base tables." (Complaint, Paragraph 23).

52.    Century also alleges that Miller copied the Star_Base programs generally. (Complaint, Paragraph 28).

53.    Furthermore, Century claims that the InfoSystems 3 is "based on" Star_Base, and is "identical or substantially similar" to Star_Base in its literal code, structure, sequence and organization, as well as "various other respects." (Complaint, Paragraph 29).

54.    Magan did not disclose to the Court in his declaration that the operative facts therein were based on second hand knowledge, despite the fact that his source explicitly told him the same. (Magan declaration; Williams affidavit, Exhibit A).

55.    In his declaration submitted to the Court in support of Century's claim for injunctive relief, Magan claims:

> 11.    *Mr. Williams also mailed to me the program listing from a portion of the Miller Group's product—the 'student scheduler.' Once again, in comparing this to Star_Base, I discovered that the code used in InfoSystems 3 has verbatim references to Century's Star_Base tables.*
>
> 12.    *I declare under penalty of perjury that the foregoing is true and correct.*
>
> (Magan Declaration, Paragraphs 11-12)

56.    The tape recording ultimately produced by Century indicates that Williams explicitly told Magan that Williams <u>did not know</u> whether InfoSystems 3 actually incorporated Century's student scheduler:

> Williams:    *But, you know, we tried to say. All the documentation, everything, says this is copyrighted material. And even, basically, there, I know that, well, this is second hand, this is*

> *sketchy, they were about to, they were going to use the [student] scheduler. I never heard that face to face.*

Magan:      *Right.*

Williams:      *But it came out, (inaudible) and Henry told me they found the [student] scheduler, and it was yours.*

Magan:      *Hmm.*

Williams:      *But you know, I got it second hand, so I mean, that's...*

(Magan deposition, p. 110)

57.    Magan testified in his deposition that Williams was his sole source of knowledge regarding the evidence of alleged copying set forth by Magan in his declaration, and that Magan's erroneous belief arose from what he learned in the secretly recorded conversations:

Q.      *Well, look at paragraph eleven of your declaration. The second sentence says: Once again, in comparing this – meaning the program listing – to Star_Base, I discovered that the code used in Info System 3 has verbatim reference to Star_Base tables. Do you see that?*

A.      *Yes, I do.*

Q.      *From where did you obtain the codes used in Info System 3?*

A.      *I was relying on the code that Dave had sent me.*

Q.      *And the same thing with respect to your representation in paragraph ten?*

A.      *Yes.*

Q.      *Okay. Do you know that what Dave Williams sent you is from Info System 3?*

A.      *I only know based on what he told me. So I have no way to confirm that. I was basing it on what Dave had told me.*

(Magan deposition, pp. 148-49)

13

58.    In his deposition, Magan affirmatively stated that if Williams was wrong about his assumptions with respect to the origin of the source code allegedly obtained from InfoSystems 3, Magan's assertions would be wrong as well. (Magan deposition, p. 149).

59.    In his declaration, Magan asserted under oath that former District 186 employee Don Randle told Magan that Randle was "fairly certain" that Miller was "using" certain Star_Base components. (Magan declaration, Paragraph 7).

60.    However, Magan testified in his deposition that Randle did not specify whether he believed Miller was "using" Star_Base components in District 186's system versus whether Miller was "using" them in InfoSystems 3:

> Q.    And in the following line [in paragraph 7 of Magan's declaration], when you refer to this new software, are you referring to District 186's software or the software being used at District 186?
>
> A.    No.  At that point, he is referring to the software that The Miller Group created.  Now, he is not being specific to Springfield or District 186 in that line.  So I got the impression that this was something that The Miller Group was using and marketing outside of District 186.
>
> (Magan deposition, p. 129)

61.    In his deposition, Magan admitted that Randle never told Magan that Miller was using components of Star_Base in software Miller marketed to other school districts:

> Q.    In fact, you don't identify anything that Don Randle said [in the declaration] that would indicate that The Miller Group was using Century's software in the software Miller was selling to others, correct?
>
> A.    Don [Randle] could not provide any example.
>
> Q.    Well, I appreciate your candor but I'm asking—I'm not asking for example.  For instance, did Don Randle say to you that The Miller Group was using Century's Star_Base system in the programs wherein the software was selling to other school districts?

14

> *A.    No, they did not tell me that.*

> (Magan deposition, p. 130)

62.    Magan has never seen InfoSystems 3, and did not know whether there are any similarities or differences between InfoSystems 3 and Star_Base.  (Magan deposition, p. 154).

63.    Magan is unaware of anyone at Century who has ever seen InfoSystems 3 used or demonstrated.  (Magan deposition, p. 154).

64.    Magan is unaware of any financial damage suffered by Century resulting from the facts set forth in Century's First Amended Complaint.  (Magan deposition, p. 157).

65.    Magan is unaware of any clients or potential customers Century resulting from the facts set forth in Century's First Amended Complaint.  (Magan deposition, p. 157).

66.    During the time District 186 was making maintenance payments to Century, employees of District 186 informed Magan that District 186 was using a consultant to make modifications to Star_Base.  (Magan deposition, pp. 65-67).

67.    Upon learning that District 186 was working with a consultant to integrate Star_Base with another product, Magan passed this information along to LaMantia and a Century marketing representative.  (Magan deposition, p. 69).

68.    At the outset of this case, Century represented to the Court that it had direct evidence that InfoSystems 3 includes copied portions of Star_Base:

> Indeed, this is the rare case where there is direct evidence of copying.  As noted above, an employee and a former employee of one of the Defendants—the School District—has provided direct evidence of copying to Century.  Coupled with other evidence submitted on this application, Century submits that it is unnecessary for the Court to engage in any detailed examination of the "access" and "substantial similarity" tests of copying, because of the existence of this direct evidence.

> (emphasis theirs).

15

(Century's Memorandum of Law in Support of Application for Order to Show Cause with Temporary Restraints and Expedited Discovery, p.9)

69.    In its Notice of Deposition Pursuant to Rule 30(b)(6), District 186 requested that Century designate and produce a corporate representative to testify regarding the following:

L.    All facts supporting Plaintiff's allegation in paragraph 20 of the Amended Complaint that InfoSystems 3 "is precisely the type of system Century licenses to the School District."

(Notice of Deposition Pursuant to Rule 30(b)(6), Exhibit A, paragraph L)

70.    Century designated both LaMantia and Magan to testify regarding the topic set forth in Exhibit A, Paragraph L of the Notice of Deposition Pursuant to Rule 30(b)(6). (January 6, 2005 correspondence from Attorney Hilliard).

71.    In his discovery deposition, LaMantia testified as follows:

Q.    *So, how many other systems are you aware of that are precisely the type of system Century licensed to the School District.*

A.    *I'm sure there are several dozen in the marketplace.*

(Second LaMantia deposition, p. 22)

72.    In its Notice of Deposition Pursuant to Rule 30(b)(6), District 186 requested that Century designate and produce a corporate representative to testify regarding the following:

P.    All facts supporting Plaintiff's allegation in paragraph 25 of the Amended Complaint that:

"Upon information and belief, in the course of copying substantial portions of the copyrighted source code, MGI and Miller have not only gained access to the source code, they have physically removed copies of the programs from the licensee's premises for editing off-site."

(Notice of Deposition Pursuant to Rule 30(b)(6), Exhibit A, Paragraph P)

16

73.    Century designated Magan to testify regarding the topic set forth in Exhibit A, Paragraph P of the Notice of Deposition Pursuant to Rule 30(b)(6).    (January 6, 2005 correspondence from Attorney Hilliard).

74.    In his discovery deposition, Magan testified as follows:

Q.    *Paragraph 25:   Upon information and belief, in the course of copying substantial portions of the copyrighted source code, MGI and Miller have not only gained access to the source code, they have physically removed copies of the programs from the licensee's premises for editing off site.*

*First, do you know that allegation to be true?*

A.    *I do not know that.*

Q.    *Do you know what information and belief this allegation is based upon?*

A.    *It's based on what Dave [Williams] had told us.*

Q.    *Is it based on anything else?*

A.    *Not to my knowledge.*

(Magan deposition, pp. 152-53)

75.    In his discovery deposition, LaMantia testified as follows:

Q.    *In paragraph 25 [of the First Amended Complaint], it appears that you claim that MGI and Miller copied substantial portions of your copyrighted source code, correct?*

A.    *Yes.*

Q.    *When you say substantial, how much do you mean?*

A.    *I believe they had a copy of all of our source code.*

Q.    *Upon what do you base that belief at the time this was filed?*

> *A.*     *I don't recall if that – I don't recall.  I would only be guessing.*
> *You may want to ask Bob [Magan] that tomorrow.*

                            (LaMantia deposition, pp. 95-96)

## CENTURY'S EXPERT TESTIMONY

76.    In order to support its allegations of copyright infringement and related claims

with respect to its computer software product, Century retained Paul G. Lewis of P.G. Lewis &

Associates, Inc. ("Lewis"), who claims to be a "data forensics" expert. (Application Analysis of

Paul G. Lewis, p. 72).

77.    Lewis participated in preparing a report wherein he claims that substantial portions

of Miller's InfoSystems 3 software "are a copied and translated duplicate" of Century's Star_Base

software product. (Application Analysis of Paul G. Lewis, p. 53).

78.    Lewis was provided with copies of District 186's Student Information System

("SIS"), Miller's InfoSystems 3 software, and Century's Star_Base software for analysis and

comparison. (Application Analysis of Paul G. Lewis, p. 3).

79.    Lewis identifies the data set he received from District 186 as "IS3 [InfoSystems 3]

Application installed at Springfield School." (Application Analysis of Paul G. Lewis, p. 3).

80.    In forming his conclusions, Lewis believed that the source code he obtained from

Century through Williams was source code from InfoSystems 3 software installed at District 186:

> *Q.*     *[referring to the source code sent to Century by Williams] And how*
> *are these documents – well, let me back up.  Was it source code*
> *that you received?*
>
> *A.*     *[Lewis]  Yes.*
>
> *Q.*     *Source code for what?*
>
> *A.*     *Source code for the district, the application installed at District*
> *186.*

18

Q.    *Of what?*

A.    *What my belief of their student information system.*

Q.    *Were you told what that portion of source code was?*

A.    *I was told that the source code allegedly referenced tables that were created by Century Consultants.*

Q.    *Were you told where the source code was obtained?*

A.    *I believe I was told that the source code was obtained from District 186.*

Q.    *Were you told that the source code was source code of the Info System 3 that was being marketed and sold by The Miller Group?*

A.    *I believe I was told that it was The Miller Group's product that was installed at District 186.*

(Lewis deposition, pp. 31-33)

81.    At the subsequent <u>Daubert</u> hearing, Lewis testified as follows:

Q.    *...Before you came to conclusions, did you just assume that IS3 was installed at the Springfield School District?*

A.    *That is—yes, that's an assumption that was made here, that's something that was told to me.*

Q.    *So you just believed it?*

A.    *Well, I mean I have to understand the basic parameters of a case so that I know how to conduct analysis.*

Q.    *Who told you that the IS3 program was installed at the Springfield School District?*

A.    *I don't recall.*

Q.    *Just someone?*

A.    *In think in a conversation, it could have been Mr. Hilliard. I'm not certain.*

(Transcript of <u>Daubert</u> hearing, pp. 135-36)

19

82.    Lewis identifies the author of data set 3 as "The Miller Group," even though District 186, rather than Miller, submitted data set 3 to Lewis. (Application Analysis of Paul G. Lewis, p. 3).

83.    Lewis testified that he simply assumed that Miller authored data set 3:

Q.    *[Referring to page 3 of Lewis' Application Analysis] Data Sets 2, 3, and 4 appear in your table to be authored by The Miller Group. How do you know that The Miller Group authored Data Sets 2, 3 and 4?*

A.    *Again, there is a general assumption that was made based on either verbal communication or markings on the C.D.s that led me to the reasonable conclusion that The Miller Group was the author of Data Sets 2, 3 and 4.*

Q.    *But you don't know specifically what it is that led you to that conclusion, is that correct?*

A.    *At the time I didn't feel that it was necessary to doubt that these files or these data sets were authored by The Miller Group.*

Q.    *I don't mean to beat a dead horse here but, in fact, it doesn't sound like anyone told you that these people were or these entities were the authors of these data sets. It rather appears, it's just an assumption, which is fine, but I want you to tell me whether this is an assumption or whether someone told you this is true?*

A.    *All of the C.D.s that I received were labeled and I had ownership type of markings on the original C.D.s, handwritten messages or notes on the C.D.s claiming to be the property of an entity. In the case of Century Consultants, they were marked as claiming to be the property of Century Consultants. And in the case of The Miller Group, they claimed to be the property of The Miller Group.*

(Lewis deposition, pp. 55-56)

84.    Nothing on data set 3 indicates that it was authored by Miller. Data set 3 was previously submitted for the Court's inspection on January 12, 2006.

85.    Lewis testified that Star_Base contains over 100 tables, but he does not recall how many tables exist in Miller's InfoSystems 3 product or in District 186's system.  (Lewis deposition, p. 148).

86.    In his report, Lewis claims to have performed a "Table by Table Analysis" in the course of forming his opinions. (Application Analysis of Paul G. Lewis, p. 5).

87.    Lewis testified that he compared four tables between Star_Base and what he believed to be InfoSystems 3, but he cannot identify the data set from which he obtained those tables. (Lewis deposition, p. 149).

88.    Later in his deposition, Lewis testified that he compared seven tables, but wholly omitted his analysis of three of the comparisons from his report.  (Lewis deposition, pp. 192-93).

89.    Lewis claims that he only discovered one set of tables that were identical. (Lewis deposition, p. 149).

90.    Century alleges Miller and District 186 violated its copyright through the unlawful copying of the Star_Base source code.  (First Amended Complaint, Paragraph 25).

91.    Lewis admits that District 186's source code is written in a programming language called "PHP." (Lewis deposition, p. 170).

92.    Lewis admits that none of the Star_Base source code is written in PHP.  (Lewis deposition, p. 170).

93.    Lewis admits that his report cannot be construed to indicate that substantial portions of source code from Star_Base were copied. (Lewis deposition, p. 177).

**DAMAGES**

94.    Century's disclosure regarding its alleged damages pursuant to Rule 26(a)(1)(c) is as follows:

21

"Century is still gathering information necessary to provide defendants with an itemization of damages, and will supplement these disclosures accordingly...."

and:

"Based on the information produced to date by The Miller Group concerning gross revenues, Century will seek damages in an amount not less than $1,313,000."

(Century's Initial Rule 26 Disclosures dated May 27, 2003)

95.    District 186 submitted the following discovery request to Century, and Century responded as follows:

REQUEST NO. 4:    All documents referring, reflecting, relating to, or establishing the damages allegedly sustained as referenced in Plaintiff's Answers to Interrogatories.

RESPONSE:  Century will produce for inspection and copying any non-privileged responsive documents.

(Century's Response to District 186's First Request for Production of Documents dated May 22, 2003)

96.    District 186 submitted the following discovery request to Century, and Century responded as follows:

REQUEST NO. 3:    Any and all documents of any kind, including, but not limited to, computerized records, or other tangible evidence relating, in any manner, to any damages, of any kind, allegedly suffered or sustained by Plaintiff, as a result of the acts alleged in the Complaint filed herein.

RESPONSE: Century objects to this Request to the extent it seeks documents protected by the attorney-client and work product privileges.  Notwithstanding the foregoing objection, and subject to the General Objections above, Century will produce for inspection and copying nonprivileged, responsive documents.

(Century's Response to District 186's Second Request for Production of Documents dated April 5, 2004)

22

97.    District 186 submitted the following discovery request to Century, and Century responded as follows:

> REQUEST NO. 22:   Any and all documents referring, reflecting, relating to or establishing Plaintiff's allegation that it has lost or will lose license revenues for Star_Base programs and has sustained damages as a result Defendant's alleged conduct. Such documents include, but are not limited to, all documents establishing any and all lost revenues as a result of the allegations contained in the Amended Complaint filed herein.

> RESPONSE:  Subject to the General Objections listed below, Century will produce for inspection and copying any non-privileged responsive documents in its possession.

> > (Century's Response to District 186's Third Request for Production of Documents dated November 22, 2004)

98.    District 186 submitted the following interrogatory to Century, and Century responded as follows:

> INTERROGATORY NO. 13:  Identify each and every instance wherein plaintiff incurred any damage as a result of the facts alleged in the Complaint.

> RESPONSE: Century responds to this interrogatory by referring to Century's Rule 26(a)(1)(C) disclosure statement.

> > (Century's Answers to District 186's Interrogatories dated June 2, 2003)

99.    Through its first Rule 30(b)(6) notice of deposition, District 186 requested Century designate a witness to testify on its behalf regarding the following:

> B.    Plaintiff's calculation and amount of damages regarding each Count of the Amended Complaint;

> > * * *

> H.    The location and substance of all written or computerized documents and other tangible evidence relating in any

23

manner to Plaintiff's allegations and/or damages incurred
resulting from any act or omission of any defendant herein.

> (District 186's Notice of Deposition to Century Pursuant to
> Rule 30(b)(6))

100.    Century designated Joseph LaMantia to testify on these topics.

> (Century's Rule 30(b)(6) designations (through
> correspondence from Attorney Hilliard dated January 6,
> 2005)

101.    Thereafter, District 186 deposed LaMantia regarding Century's damages, but LaMantia claimed lack of knowledge. District 186 sought relief from the Court, and the Court ordered Century to produce a corporate representative to testify regarding Century's alleged damages, among other things. (District 186's Motion for Sanctions Pursuant to Rule 37; Court's Order regarding same).

102.    Century once again designated LaMantia to testify regarding its alleged damages. (See Amended Notice of Deposition filed with the Court on March 9, 2006).

103.    Immediately prior to LaMantia's second deposition, Century tendered a modified Rule 26 disclosure to District 186. (Correspondence from Attorney Hilliard dated April 21, 2006).

104.    In response to District 186's inquiries of LaMantia regarding damages in the course of the second deposition, Century's attorney indicated that Century was no longer seeking damages for lost sales resulting from the alleged infringement; however, Century's designated witness regarding the alleged damages could not identify any other damages:

Counsel for Century:          Well, Rob, to be clear, you can ask these
                              questions; but I will indicate for the record
                              that we are, as I think I indicated in court at
                              our last hearing, that we are not advancing
                              any claim for damages based on any lost
                              sales to any customers. In other words, we

are not claiming that we suffered particular damages and are not seeking recovery of the damages based on lost sales; although the witness can certainly answer your questions, that is not part of our claim.

Counsel for Dist. 186:    So, you have a count that you have alleged for unfair competition; but you're making no claim for lost sales; is that correct, sir?

Counsel for Century:    We are not making any claim for lost sales. That's correct.

Counsel for Dist. 186:    And you agree with that, Mr. LaMantia?

LaMantia:    Yes, I would.

Counsel for Dist. 186:    What damage has Century incurred as a result of the allegations in the amended complaint?

LaMantia:    Loss of revenue from [District 186] and lost sales in Illinois.

(Second LaMantia deposition, p.34)

## ARGUMENT

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Lee v. Keith, 463 F.3d 763, 767 (7th Cir. 2006). In order to prevail, the moving party must show "that there is an absence of evidence to support the nonmoving party's case." National Union Fire Co. of Pittsburgh, PA v. Pontiac Flying Service, Inc., 2006 WL 3422166 (C.D.Ill.), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In order to survive summary judgment once the movant has met its burden, the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [it] bears the burden of proof at trial." National Union Fire Co. of Pittsburgh, PA at * 3, quoting Warsco v. Preferred Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001).

25

In the context of cases wherein a plaintiff asserts infringement of copyrighted elements of a computer program in particular, the moving party is not required to negate an essential element of plaintiff's claim that plaintiff must prove at trial. Rather, the plaintiff bears the burden of showing that defendant did, in fact, copy plaintiff's software. <u>NLFC, Inc. v. Devcom Mid-America, Inc.</u>, 45 F.3d 231, 235 (7th Cir. 1995). Furthermore, a copyright owner must do more than merely show copying of copyrighted works. A copyright owner must rather show copying that took place "beyond the scope of a license" to do so. <u>Id.</u>

## I. CENTURY CANNOT PROVE DIRECT COPYRIGHT INFRINGEMENT; THEREFORE, ITS CLAIMS OF CONTRIBUTORY AND VICARIOUS INFRINGEMENT MUST FAIL.

Century alleges causes of action for both contributory and vicarious copyright infringement against District 186. Contributory infringement is demonstrated upon showing:

(1)    direct infringement by a primary infringer;

(2)    knowledge of the infringement by the defendant; and

(3)    material contribution to the infringement by the defendant.

<u>Monotype Imaging, Inc. v. Bitstream, Inc.</u>, 376 F.Supp.2d 877, 883 (N.D.Ill. 2005).

Similarly, in order to prove vicarious infringement, a plaintiff must establish:

(1)    direct infringement by a primary infringer;

(2)    direct financial benefit to the defendant; and

(3)    the defendant's right and ability to supervise the infringer.

<u>Bosch v. Ball-Kell</u>, 2006 WL 2548053, *13 (C.D.Ill.).

"Copying" of a computer program in violation of the Copyright Act, 17 U.S.C. §101 et seq., occurs when a computer program is transferred from a permanent storage device to a computer's random access memory ("RAM"). <u>MAI Systems Corp. v. Peak Computer, Inc.</u>, 991

26

F.2d 511 (9th Cir. 1993). A copyright owner can establish infringement of a computer program either through direct evidence or indirect evidence. Gates Rubber Co. v. Bando Chemical Industries, Ltd., 9 F.3d 823, 832 (10th Cir. 1993). It is rare that a copyright owner is able to prove infringement through direct evidence of copying; rather, most plaintiffs establish copying through indirect evidence. Id.

A.    DIRECT INFRINGEMENT

Direct copyright infringement is established upon showing:

(1)    ownership of a valid copyright; and

(2)    copying of constituent elements of the copyrighted work that are original.

Incredible Technologies, Inc. v. Virtual Technologies, Inc.,
400 F.3d 1007, 1011 (7th Cir. 2005).

Century cannot establish either element of its claim against Miller for direct infringement. Therefore, its contributory and vicarious infringement claims against District 186 must fail. Simply put, the materials Century alleges were taken from InfoSystems 3were not, in fact, from InfoSystems 3. Rather, the materials were taken directly from District 186's Student Information System program ("SIS"). Century's license agreement authorizes District 186 to use Star_Base in any manner District 186 wishes. Thus, Century cannot, as a matter of law, establish direct copyright infringement.

Century alleges that in February, 2003, a then-current employee of District 186 named Dave Williams contacted Century and informed Century that Miller "stole" Century's software and that Miller knew Century's software was copyrighted. (Undisputed Fact No. 43).

Century claims that Williams obtained source code from Miller's InfoSystems 3 product and mailed it to Century, and that upon comparison with the Star_Base definitions, "Century has discovered that virtually all of the definitions were identical." (First Amended Complaint,

27

Paragraph 23; Undisputed Fact No. 50). Century has not and cannot substantiate its original assertion.

Williams actually obtained the source code he sent to Century from SIS, District 186's web-based version of Star_Base. (Undisputed Fact No. 47). District 186's system contained certain elements of Century's Star_Base program that District 186 had a right to use. (Undisputed Fact No. 17). In fact, Century has made no allegation that District 186 was not permitted to continue use of the Star_Base system in connection with the development of SIS for its own use. At the time Williams sent the source code to Century, he believed that District 186 was using Miller's InfoSystems 3 product, but later realized that he had actually copied and sent Star_Base source code from SIS to Century. (Undisputed Fact No. 47). At that time, however, Williams did not realize that InfoSystems 3 was never installed at District 186. (Undisputed Fact Nos. 36, 37).

Century alleges that Williams also mailed the "student scheduler" portion of Miller's InfoSystems 3 product to Century, which showed "verbatim references to Century's Star_Base tables." (Undisputed Fact No. 51). Again, Williams' sworn testimony indicates that he did not, in fact, mail anything from InfoSystems 3 to Century. Rather, he actually mailed materials he obtained from Century's Star_Base product, which Century admits District 186 was perfectly entitled to use. (Undisputed Fact Nos. 17, 47).

The false assumptions upon which Century relied when initiating this suit are the same false assumptions it relayed to its expert witness, Paul Lewis. Lewis admits that he simply assumed the code submitted to him by District 186 was a version of InfoSystems 3, and that he relied solely upon the information provided by Century and its attorneys. (Undisputed Fact Nos. 80, 81).

Century admits that the allegations of infringement contained in its First Amended Complaint are based on information provided to Century by Dave Williams. (Undisputed Fact No. 57). Century also admits that if Williams incorrectly identified the source code he delivered to Century as source code from Miller's InfoSystems 3 software, the material allegations set forth in the First Amended Complaint would also be incorrect. (Undisputed Fact No. 58). It is uncontradicted that Williams obtained the source code he sent to Century from District 186's SIS software, and that InfoSystems 3 was never installed at District 186. (Undisputed Fact Nos. 23, 47). It is uncontradicted that Century relied solely on Williams' representations regarding the origin of the source code it received. (Undisputed Fact Nos. 57, 58). Century admits that District 186 informed Century that District 186 was working with a consultant to integrate Star_Base with other software to accommodate its need for a web-based system. (Undisputed Fact No. 21). This is, of course, exactly what District 186 accomplished in the development of SIS. Indeed, there is no dispute that Century's allegations actually arose from their comparison of Star_Base source code to the same Star_Base source code lawfully incorporated into SIS. Therefore, there exists no direct evidence that InfoSystems 3 contains Star_Base source code. As a consequence, Century's claim of direct copyright infringement must fail as a matter of law.

B.    INDIRECT INFRINGEMENT

In order to show copying through indirect evidence, a plaintiff must demonstrate:

1)    that defendant had access to the copyrighted program; and

2)    that probative similarities exist between the copyrighted program and the allegedly copied material.

Gates Rubber at 833.

In cases where there is no direct evidence of copying and the copyright owner instead attempts to show copying through indirect evidence, the probative similarities between the two

3:03-cv-03105-RM-BGC    # 172    Page 30 of 39

programs should normally be done through comparison of the entire programs. <u>Atari Inc. v.</u> <u>North American Philips Consumer Electronics Corp.</u>, 672 F.2d 607, 618 (7th Cir. 1982).The first opportunity for any actual comparison to be performed between Star_Base and InfoSystems 3 was when copies of both products were delivered to Century's expert, P.G. Lewis for analysis, along with a copy of District 186's Student Information System. However, Lewis began his analysis under the same erroneous assumption as Williams and Century; specifically, that District 186's SIS *was* InfoSystems 3. Once again, given the fact that District 186 lawfully used certain elements of Star_Base in SIS, certain similarities existed between portions of Star_Base and SIS. Furthermore, because District 186 also used portions of InfoSystems 3 in SIS, similarities certainly existed between the SIS and InfoSystems 3.

It is uncontradicted that Miller's InfoSystems 3 software was never installed on District 186's computer system. Nonetheless, Lewis identifies the data set he received from District 186 as "IS3 Application installed at Springfield School." Furthermore, Lewis identifies the author of data set 3 as "The Miller Group," even though District 186, rather than Miller, submitted data set 3 to Lewis. Lewis fails to identify any legitimate basis for his erroneous belief that Miller, rather than District 186, authored data set 3. There is no genuine dispute regarding the fact that data set 3 is not InfoSystems 3. Rather, District 186's SIS program lawfully contains portions of Star_Base. Century admits that its belief that InfoSystems 3 contains portions of Star_Base is based on the information supplied to it by Dave Williams. (Undisputed Fact Nos. 57, 58). Williams admits that his belief that an infringement took place is unfounded. (Undisputed Fact No. 47). Century admits that if Williams was incorrect regarding his claims of infringement, Century's belief would be incorrect as well. (Undisputed Fact No. 58). Because no infringement took place, District 186 is entitled to judgment as a matter of law.

30

Indeed, the case at bar presents a remarkably similar fact pattern to that in qad, Inc. v. ALN Associates, Inc., 770 F.Supp.1261 (N.D.Ill. 1991), which also centers on a dispute between competing computer software developers.

In qad, as in the case at bar, plaintiff alleged that defendant, who was one of its competitors, infringed upon plaintiff's copyrighted software in that defendant's software embodied and reflected elements of plaintiff's software in areas such as design, structure, sequence, organization, code, and graphic interfaces, and in turn marketed the same software to others. Id. at 1262-63. Plaintiff in qad requested substantially identical relief as Century seeks, including injunctive relief, which it received. Id. at 1264-65. The plaintiffs in qad and the case at bar both used the Copyright Act for improper purpose, to wit: using untrue and unsupported allegations of copyright infringement to obtain injunctive relief against a competitor. The difference is that the plaintiff in qad was not the original author of the work for which it sought protection, while in this matter, Century submitted its own allegedly copyrighted materials to the Court while improperly claiming that the materials were actually from a competing product. In doing so, Century persuaded the Court to exercise control over Miller's InfoSystems 3 product through issuance of an injunction that eventually resulted in Miller's bankruptcy.

In qad, the Court eventually discovered that plaintiff made false representations for the purpose of using the Copyright Act and the judicial process to wrongfully obtain injunctive relief, and:

> [F]or nearly three years, qad has prosecuted its copyright infringement suit against ALN asserting that [plaintiff's software] is a completely original work. This improper extension and overstatement of qad's copyrights is a misuse which this Court should remedy by declaring qad's rights unenforceable against [defendant].
>
> Id. at 1266.

31

Significantly, and consistent with Century's latest position in this matter, discovery of the facts negating plaintiff's claim in qad resulted in plaintiff alleging an alternate theory rather than concluding the litigation:

> qad's effort at a 180° turnabout in its new argument is perhaps the worst possible example of a plaintiff "mending the hold"—once it has committed to one. Harbor Insurance Co. v. Continental Bank Corp., 922 F.2d 357, 362-64 (7th Cir. 1990) teaches that a party cannot change its litigation position—that is, "mend the hold"—once it has committed to one. Equitable principles—the source of that doctrine—call on this Court to respond to qad's new argument by not allowing it to change its position on the source of the field and program names in question.
>
> Id. at 1270.

In a footnote, the Court further noted that plaintiff argued one position at the injunction hearing, even through it knew true facts to the contrary at that time. Furthermore, the Court held:

> It would be impermissibly inequitable for this Court to allow a plaintiff to assert certain facts to win an injunction and then assert the opposite of those "facts" to fend off an affirmative defense.
>
> Id.

Century came before the Court with purported direct evidence of copyright infringement, forcing District 186 to refute the allegations through protracted discovery. In doing so, District 186 discovered that Century's claim is based on unsubstantiated hearsay rather than sworn, truthful statements of fact. It would be inequitable, at a minimum, to allow Century the fruits of an injunction improperly obtained together with the relief it now seeks.

## II.    CENTURY CANNOT SHOW THAT A SUBSTANTIAL PORTION OF STAR_BASE WAS COPIED.

Liability cannot attach pursuant to the Copyright Act unless plaintiff can show that a substantial portion of the work is included in the allegedly copied work. Gates Rubber at 833, citing Autoskill at 1496-98. Initially, Century asserted it possessed direct evidence of literal

32

copying of "substantial portions" of Star_Base source code.    (First Amended Complaint, Paragraph 25).  If true, the Court could quickly determine that the copied portion of Star_Base is protectable under the Act, as source code is almost always held to be protectable.

Century designated Magan to testify regarding the facts supporting Century's claim that Miller copied substantial portions of Star_Base source code.  Magan testified, however, that his assumptions in that regard were based solely on what Williams told him.  Furthermore, Century's own expert witness testified that his conclusions could not be used to support Century's claim that "substantial portions" of Star_Base source code were copied.  LaMantia was also unable to identify the "substantial portions" of Star_Base source code that Century alleges was copied.  In fact, Century cannot submit any competent evidence supporting the truth of its sworn claim that Miller copied substantial portions of Star_Base source code.

## III.    CENTURY CANNOT DEMONSTRATE DAMAGES.

In the context of summary judgment motions in particular, it is well settled that "a non-movant's failure to produce sufficient evidence of the damages element of its claim calls for the entry of summary judgment against that party."  Dunkin' Donuts, Inc. v. N.A.S.T. Inc., 2005 WL 3557940 (N.D.Ill.).

In Dunkin' Donuts, plaintiff's Rule 26 disclosures and other discovery responses were quite similar to those of Century.  For example, plaintiff vaguely alluded to the location of certain documents that could substantiate its damage claims, but made no attempt to specify which documents were actually relevant to damages.

The Court held that plaintiff's reference to documents in lieu of answering an interrogatory is impermissible unless the burden of deriving an answer from the records is just as great for the producing party as it is for the inquiring party.  Furthermore, when answering an

interrogatory through reference to documents, the party doing so has the burden to specify "by category and location, the records from which answers to interrogatories can be derived." FRCP 33(d), committee comments. As a result, the Court held that plaintiff's vague discovery response "totally flunks the Rule 56(e) requirement of *admissible* evidence."

Despite numerous attempts on the part of District 186 to ascertain the damages Century claims to have suffered, Century steadfastly refused to substantiate them. Century indicated in its initial Rule 26 disclosures that it was still gathering information for the purpose of itemizing its damages. Next, in response to District 186's request for production of documents regarding Century's alleged damages, Century indicated that it "will produce" non-privileged responsive documents. After receiving no such documents from Century, District 186 sent another request for documents showing the alleged damages. Once again, Century responded that it "will produce" non-privileged responsive documents.

District 186 also tendered an interrogatory to Century requesting information regarding Century's alleged damages. However, Century simply referred to its initial Rule 26 disclosures, which indicated that Century was still in the process of gathering information.

To date, Century has done nothing but simply disclose Miller's gross revenue figures in support of its claim for damages. While it is entirely permissible for a plaintiff to use such a figure as the basis for recovery of damages pursuant to section 504(b) of the Copyright Act, courts uniformly hold that a plaintiff must do significantly more in order to recover.

Section 504(a) of the Copyright Act provides that a copyright infringer is liable either for actual damages pursuant to subsection (b), or statutory damages pursuant to subsection (c). In its Amended Complaint, Century seeks damages pursuant to both subsections, but as set forth below, Century has elected to proceed under subsection (b).

34

Generally, in order to prove actual damages pursuant to subsection (b), the copyright owner is required to present proof of the infringer's gross revenue. It then becomes the duty of the infringer to prove deductible expenses, together with the elements of profit attributable to factors other than the copyrighted work. 17 U.S.C. 504(b); Fox Controls, Inc. v. Honeywell, Inc., 2005 WL 1705832 (N.D.Ill). However, when a plaintiff chooses to rely on the gross revenue of the alleged infringer as the measure of damages, more is required than mere disclosure of a number, and must instead identify a nexus between the alleged infringement and the gross revenues of the alleged infringer.

In Fox Controls, plaintiff attempted to simply base its damages on defendant's total gross revenues, just as Century attempts in this matter. The Court rejected this approach because plaintiff was unable to show any connection between such revenues and the alleged infringement:

> To obtain an award of a defendant's profits, a plaintiff bears the burden of connecting profits directly to the purported infringement. *See* 4 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* § 14.03[A] (2004) (hereinafter "Nimmer") (citing Taylor v. Meirick, 712 F.2d 1112, 1122 (7th Cir.1983) ("It was not enough to show [defendant's] gross revenues from the sale of everything he sold, which is all, really, that [plaintiff] did. If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.")).

Id. at *8.

The Taylor holding cited in Fox Controls was also relied upon by the Eighth Circuit in Andreas v. Volkswagen of America, Inc., 336 F.3d 789, 796 (8th Cir. 2003), wherein the Court distinguished the parties' duties with respect to how gross revenue can be used to establish damages. Before gross revenue can be relied upon by plaintiff to trigger defendant's duty to show deductible expenses, plaintiff must first show a nexus between the infringement and the resulting profits. In fact, this burden applies whether the alleged infringement is indirect (the infringer's

35

product incorporates elements of plaintiff's work) or direct (the infringing product is an exact duplicate). Id.

Taylor was also cited with approval by the Ninth Circuit in Polar Bear Productions Corp. v. Timex Corp., 384 F.3d 700, 711 (9th Cir. 2004) regarding a plaintiff's duty to produce more than a raw gross revenue figure before a defendant has the burden of showing deductible expenses:

> This appeal requires us to apply the fundamental standard articulated in our decision in Mackie: That a copyright infringement plaintiff seeking to recover indirect profit damages "must proffer some evidence...[that] the infringement is at least partially caused the profits that the infringer generated as a result of the infringement." (cite.) From this principle, it is implicit that the profits sought are those that arise from the infringement. Thus, a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement. (footnote.) The result is that a plaintiff seeking to recover indirect profits must formulate the initial evidence of gross revenue duly apportioned to relate to the infringement." 4 NIMMER ON COPYRIGHT section 14.03[B], 14-39.
>
> Although the statute only references the broad term "gross revenue," to conclude that a copyright plaintiff need only provide the company's overall gross revenue, without regard to the infringement, would make little practical or legal sense. Otherwise, the plaintiff in a copyright action against a multidivision, multi-product company such as General Mills, would need to do nothing more than offer an overall gross revenue number--like $11.5 billion-- and sit back.
>
> Polar Bear Productions Corp. at 711, quoting Mackie v. Rieser 296 F.3d 909, 914 (9th Cir. 2002), and citing Taylor at 1122.

Century has done nothing but employ the same failed tactic used by copyright owners in Fox Controls, Mackie, Polar Bear Productions Corp. and Taylor. Century simply presumes that all of Miller's revenue is attributable to the alleged infringement. However, "[a] plaintiff cannot

simply presume that sales of a defendant's products are due to copyright infringement." Fox Controls at *8.

## IV.     CENTURY'S STATE LAW CLAIMS MUST FAIL

In addition to its claims of copyright infringement, Century also asserts four pendant state law causes of action, namely, Misappropriation of Trade Secrets, Intentional Interference with Contractual Relations, Common Law Unfair Competition, and Breach of License Agreement. Each of Century's state law claims incorporate by reference the allegations made against defendants in the underlying copyright infringement claims.

The secret tape recordings by Century through Magan of certain conversations with Williams formed the basis of District 186's previously filed Motion to Suppress and Memorandum in support thereof, which District 186 incorporates herein by reference. In its opinion dated November 18, 2005, this Honorable Court granted District 186's Motion to Suppress with respect to Century's state law claims. Citing Glinski v. City of Chicago, 2002 WL 113884 at *5-7 (N.D.Ill), the Court held that because Williams did not know Magan was recording the conversations, contrary to and in violation of the Illinois Eavesdropping Act, 720 ILCS 5/14-1 et seq., the evidence would be suppressed. With respect to the federal copyright claims, however, the Court held that pursuant to Title II of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511 et seq., Magan was entitled to secretly record the conversations as long as the recording was not part of a criminal or tortious act. As a result, the Court ruled that the recordings could be used in support of Century's federal claims.

Section 5 of the Illinois Eavesdropping Act, which pertains to exclusion of evidence obtained in violation of the Act, is interpreted by courts as the Illinois Legislature's adoption of the "fruit of the poisonous tree" doctrine. In Re Marriage of Almquist, 229 Ill.App.3d 723, 737

(3rd Dist. 1998). In both civil and criminal cases, the "fruit of the poisonous tree" doctrine not only renders inadmissible the wrongfully obtained evidence, but has the same effect on derivative evidence as well. Id.

On the face of the First Amended Complaint, it is clear that Magan's secretly recorded conversations with Williams served as the catalyst for all subsequently discovered evidence. Century withheld important facts when disseminating what it learned through the illegally recorded telephone calls. The facts include that Williams told Magan that his assumptions were based on secondhand information. All evidence obtained thereafter derived from Williams' assumptions which he conveyed in the course of his conversations. Application of the "fruit of the poisonous tree" doctrine necessarily results in suppression of all derivative evidence. Therefore, Century's state law claims must fail.

**WHEREFORE**, Defendant SPRINGFIELD PUBLIC SCHOOL DISTRICT 186 respectfully requests the Court award summary judgment in its favor, assess costs and reasonable attorneys' fees against Plaintiff in an amount to be determined upon further hearing, and award all other relief the Court deems proper.

SPRINGFIELD PUBLIC SCHOOL
DISTRICT 186, Defendant


By:    /s/Almon A. Manson, Jr.
            One of Its Attorneys

BROWN, HAY & STEPHENS, LLP
Almon A. Manson, Jr.
Registration No. 1756761
Daniel K. Wright
Registration No. 6284291
205 S. Fifth Street, Suite 700
P.O. Box 2459
Springfield, IL 62705-2459
(217) 544-8491

## PROOF OF SERVICE

I, the undersigned, hereby certify that on January 16, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorney of record:

Lance T. Jones
Law Offices of Lance T. Jones
1100 South Fifth Street
Springfield, IL  62703
ltj@warpnet.net

Craig Hilliard
Stark & Stark, P.C.
993 Lenox Drive
Lawrenceville, NJ  08648
chilliard@stark-stark.com

David A. Herman
Giffin, Winning, Cohen & Bodewes, P.C.
One West Old State Capitol Plaza
Myers Building – Suite 600
P.O. Box 2117
Springfield, IL  62705
dherman1@gifwinlaw.com


_____ /s/Almon A. Manson, Jr. _____

1/16/2007 3:43 PM\MDB\F:\WORD\District 186\Century\District 186 final MISO MSJ -Clean.doc