E-FILED
Tuesday, 16 January, 2007  04:12:09 PM
Clerk, U.S. District Court, ILCD

# STATEMENT OF UNDISPUTED MATERIAL FACT NUMBERS
## 76-79

**Century Consultants, Ltd. V. The Miller Group, et al**
CONFIDENTIAL                                                    *May 29, 2003*

# About Paul G. Lewis

### Expert Witness
### Data Forensics



Mr. Paul G. Lewis is a well-seasoned Data Forensics Expert and has been asked to provide expert findings in well over a hundred cases. Lewis has testified for plaintiffs and defendants alike, and in both civil and criminal cases. He is well versed in Legal Technology and is considered a leader in his field by his peers. Lewis possesses over 18 years of executive management experience in communications, data forensics, computer security, corporate networking, and large-scale system integration. Mr. Lewis is the founder and former CEO of MC² Corporation, a world leader in information systems and an INC. 500 Company, which was wholly acquired by Volt Information Sciences (NYSE: VOL), a $2.5B technology conglomerate in 1999. He has been featured on CNBC-TV and a number of other broadcasts as an expert in computer security technologies and in numerous articles for *Forbes, INC.,* and *Technology Today.* Mr. Lewis was requested to advise The President and his White House staff on business issues related to technology, security, computer sabotage, and encryption schemes. He served as President and CEO of Mobilentity Technologies, a company formed around patented intellectual property in Voice Over IP (VOIP), RF Signaling, and Broadband Data Delivery. He is a former member of Cisco Systems' Steering Committee and Novell's Advisory Board. Mr. Lewis received his Bachelor of Science Degree in Computer Science in 1988 from Fairleigh Dickenson University and is the recipient of the university's 1997 Pinnacle Award for Outstanding Accomplishments. Mr. Lewis is a member of the HTCIA (High Technology Crime Investigation Association) and has been certified in the area of Data Forensics through the Intense School of IT Certification in Fort Lauderdale, Florida.

Lewis is the founding partner of PG Lewis & Associates, a highly skilled and sought after Data Forensics firm providing litigation support in cases involving computer systems. PG Lewis & Associates has educated many regional law firms in the area of Data Forensics and Digital Discovery. The firm has been involved with hundreds of cases across the United States.

P.G. Lewis & Associates LLC
DATA FORENSICS

Century Consultants, Ltd. V. The Miller Group, et al
CONFIDENTIAL                                              *May 29, 2003*

**Conclusion**

PGLA is of the opinion, to a reasonable degree of certainty, that substantial portions of
the IS3 system are a copied and translated duplicate of the Century Consultants
Star_Base system. In almost all areas explored, PGLA found identical or substantially
similar logic, table names, field names, definitions, and source code between the two
applications.

PGLA is also of the opinion to a reasonable degree of certainty that The Miller Group
modified substantial portions of the IS3 source codes between the dates of May 9, 2003
and May 14, 2003, modifying table names and variable names in their code because the
IS3 system used most of the names defined and assigned by the Star_Base system. The
Miller Group evidently forgot to change the C++ code received by our office on May 16
and worked for three days to produce another version. This new version contained the
same type of "search-and-replace" changes to assign different names to Century's tables,
fields, and software.

It is the opinion of PG Lewis & Associates, LLC that The Miller Group had access to the
source codes developed by Century Consultants while designing their system. PGLA is
of the further opinion that The Miller Group modeled their IS3 system after Star_Base
and probably used the Star_Base source code as a starting platform.

I remain available to discuss this report further.

P. Lewis
May 29, 2003

**Century Consultants, Ltd. V. The Miller Group, et al**
CONFIDENTIAL                                                                                *May 29, 2003*

**Introduction**

PG Lewis & Associates, LLC (*hereinafter, "PGLA"*) was contracted by Century Consultants, LTD to perform an analysis of their proprietary application known as Star_Base, and compare those findings against a similar analysis performed on a competing product offered by The Miller Group and known as Info System 3, or IS3.

Century Consultants alleges that The Miller Group used its intellectual property as the basis for a competing product. The purpose of this report is to determine if any intellectual property belonging to Century Consultants is found in the competing product from The Miller Group.

As part of this analysis, PG Lewis & Associates received a total of five (5) data sets. The data sets are defined as follows:

| Data Set | CD Title | CD Contents | Author | Date Received |
|---|---|---|---|---|
| 1 | Century 5/14/03 | Star_Base6i_frmts.zip | Century Consultants | May 15, 2003 |
| 2 | IS3 Tables | Text file listing of the tables used by IS3 | The Miller Group | May 16, 2003 |
| 2 | IS3 Source Code | Source codes of the IS3 application | The Miller Group | May 16, 2003 |
| 2 | IS3 Scheduler | IS3 Scheduler Application | The Miller Group | May 16, 2003 |
| 3 | Springfield District 186 | IS3 Application installed at Springfield School | The Miller Group | May 22, 2003 |
| 4 | IS3 Scheduler | A different version of IS3 Scheduler Application | The Miller Group | May 22, 2003 |
| 5 | Century Schema (ZIP file emailed on 5/17/03) | Not a CD. ZIP Contains the schema and "describe" information for the Century Application | Century Consultants | May 17, 2003 |

*Handwritten annotations in left margin:* 006, 003, 002, 001, 004, 005, 009 ZIP

This analysis compares each of the data sets received from The Miller Group and The Springfield School District to the "control" set of data received from Century Consultants.

*Handwritten:* 007 REC'D AFTER REPORT
008 REC'D AFTER REPORT

# STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 80

31

1    Q        Why don't I rephrase it.  I need to know
2    the facts as you understand them for the purpose of
3    compilation of your report.  First, let's discuss your
4    source of facts.  Where did you learn the facts that
5    are contained in your report outside of the data sets?
6    A        The conclusions reached in the report
7    were reached solely on the data sets.
8    Q        I don't think that's answering my
9    question.  Maybe I didn't phrase it correctly.  Your
10   report makes several references to the facts of this
11   case.  Where did you learn these facts?
12   A        In order to begin the analysis, I needed
13   general background knowledge of what was trying to be
14   discovered.  Based on a conversation or perhaps
15   conversations with Craig Hilliard, it was explained to
16   me that a company called Century Consultants existed
17   that had a product, a software product on the market
18   and potentially or allegedly another company had
19   copied some or all of that product and now had a
20   competing product on the market.
21   Q        What other facts were disclosed to you?
22   A        It was disclosed to me that the other
23   company's name was The Miller Group and that The
24   Miller Group had installed its software at the
25   Springfield District 186 School System.

1        Q        Any other facts that you learned?

2        A        I was provided with brief portions of

3   source code that was faxed to me that pointed out

4   superficial instances of possible infringement.

5        Q        When did you receive these portions of

6   source code?

7        A        I would estimate spring of 2003, at

8   about the time that the engagement was signed.

9        Q        Well, again, Mr. Lewis, I am not trying

10  to trick you but I will help you out here with the

11  dates.  That was signed after the lawsuit was filed

12  and that was signed in between your receipt of data

13  sets from various entities.  Before you received disks

14  pursuant to the court's order, did you receive smaller

15  portions of source code?  I assume you did if it was

16  faxed to you.

17       A        It was just a couple of, a few pages,

18  maybe, of some example, table comparison examples, I

19  believe.

20       Q        And how are these documents -- well, let

21  me back up.  Was it source code that you received?

22       A        Yes.

23       Q        Source code for what?

24       A        Source code for the district, the

25  application installed at District 186.

1          Q        Of what?

2          A        What my belief of their student

3    information system.

4          Q        Were you told what that portion of

5    source code was?

6          A        I was told that the source code

7    allegedly referenced tables that were created by

8    Century Consultants.

9          Q        Were you told where the source code was

10   obtained?

11         A        I believe I was told the source code was

12   obtained from District 186.

13         Q        Were you told that the source code was

14   source code of the Info System 3 product that was

15   being marketed and sold by The Miller Group?

16         A        I believe I was told that it was The

17   Miller Group's product that was installed at District

18   186.

19         Q        What other facts did he provide to you?

20   And just to make it clear, let's talk about the facts

21   that were told to you and then we will talk about the

22   documents that you relied on.  Okay.  What other facts

23   were you told?

24         A        I'm not certain if there was much

25   further discussion beyond that other than my request

# STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 81

```
 1              IN THE UNITED STATES DISTRICT

 2           FOR THE CENTRAL DISTRICT OF ILLINOIS

 3                   SPRINGFIELD DIVISION

 4

 5  CENTURY CONSULTANTS, LTD.,

 6               Plaintiff;

 7               -vs-                NO. 03-3105
                                     Daubert Hearing
 8
    THE MILLER GROUP, INC., JOHN
 9  G. MILLER and the SPRINGFIELD
    PUBLIC SCHOOL DISTRICT NO. 186,
10
                 Defendants.
11

12              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE RICHARD MILLS
13             UNITED STATES DISTRICT JUDGE

14
    January 12, 2006
15

16

17  APPEARANCES:
    FOR PLAINTIFF:          MR. CRAIG S. HILLIARD
18                          Attorney at Law
                            Princeton, New Jersey
19
    FOR DEFENDANT           MR. LANCE JONES
20  THE MILLER GROUP:       Attorney at Law
                            Springfield, Illinois
21
    FOR DEFENDANT           MR. ROBERT SHUPENUS and
22  SPRINGFIELD PUBLIC      MR. ALMON MANSON
    SCHOOL DISTRICT NO. 186 Attorneys at Law
23                          Springfield, Illinois

24  COURT REPORTER:         Susan Freeman, CSR, RPR
                            Capitol Reporting Service
25                          2021 Timberbrook Drive
                            Springfield, IL   62702
                            217-787-6167
```

1      Q.   So you understood from looking at the school

2   district's report that their own expert did not

3   physically examine the computers?

4      A.   Correct.

5      Q.   And did you understand that their expert

6   relied on the digital data that had been supplied in

7   CD rom format?

8      A.   Right.  In fact I believe I was requested to

9   forward copies of the evidence to the opposing expert,

10   the same exact CDs.

11          MR. HILLIARD:  Okay, that's all I have, Your

12   Honor.

13          THE COURT:  Fine, thank you, Mr. Hilliard.

14   Mr. Shupenus.

15          MR. SHUPENUS:  Thank you, Your Honor.

16              CROSS-EXAMINATION RESUMED

17              BY MR. SHUPENUS:

18      Q.   Mr. Lewis, at the outset of your analysis you

19   believed that the IS3 product was installed at the

20   Springfield School District, right?

21      A.   That's correct.

22      Q.   You just assumed that to be true, correct?

23      A.   Well, I think I proved it in my report.

24      Q.   Sir, I'm talking about at the outset of your

25   analysis.  Before you came to conclusions, did you

1    just assume that IS3 was installed at the Springfield

2    School District?

3        A.    That is -- yes, that's an assumption that was

4    made here, that's something that was told to me.

5        Q.    So you just believed it?

6        A.    Well, I mean I have to understand the basic

7    parameters of a case so that I know how to conduct

8    analysis.

9        Q.    Who told you that the IS3 program was

10   installed in the Springfield School District?

11       A.    I don't recall.

12       Q.    Just someone?

13       A.    I think in the conversation, it could have

14   been Mr. Hilliard, I'm not certain.

15       Q.    And in fact as you sit here today do you

16   still believe IS3 was installed at the Springfield

17   School District?

18       A.    I think it was called SIS, but I think it's

19   the same application, so yes.

20       Q.    So SIS, which is the Springfield School

21   District's computer system, is the same as IS3 in your

22   opinion?

23       A.    That's correct, logically.

24       Q.    Well, is that what you discovered in the

25   course of your analysis?

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 82**

Century Consultants, Ltd. V. The Miller Group, et al
CONFIDENTIAL                                                                              *May 29, 2003*

**Introduction**
PG Lewis & Associates, LLC (*hereinafter, "PGLA"*) was contracted by Century
Consultants, LTD to perform an analysis of their proprietary application known as
Star_Base, and compare those findings against a similar analysis performed on a
competing product offered by The Miller Group and known as Info System 3, or IS3.

Century Consultants alleges that The Miller Group used its intellectual property as the
basis for a competing product. The purpose of this report is to determine if any
intellectual property belonging to Century Consultants is found in the competing product
from The Miller Group.

As part of this analysis, PG Lewis & Associates received a total of five (5) data sets. The
data sets are defined as follows:

| Data Set | CD Title | CD Contents | Author | Date Received |
|---|---|---|---|---|
| 1 | Century 5/14/03 | Star_Base6i_frmts.zip | Century Consultants | May 15, 2003 |
| 2 | IS3 Tables | Text file listing of the tables used by IS3 | The Miller Group | May 16, 2003 |
| 2 | IS3 Source Code | Source codes of the IS3 application | The Miller Group | May 16, 2003 |
| 2 | IS3 Scheduler | IS3 Scheduler Application | The Miller Group | May 16, 2003 |
| 3 | Springfield District 186 | IS3 Application installed at Springfield School | The Miller Group | May 22, 2003 |
| 4 | IS3 Scheduler | A different version of IS3 Scheduler Application | The Miller Group | May 22, 2003 |
| 5 | Century Schema (ZIP file emailed on 5/17/03) | Not a CD. ZIP Contains the schema and "describe" information for the Century Application | Century Consultants | May 17, 2003 |

*Handwritten annotations in left margin, top to bottom:*
006
003
002
001
004
005
009
ZIP

This analysis compares each of the data sets received from The Miller Group and The
Springfield School District to the "control" set of data received from Century
Consultants.

*Handwritten:*
007  REC'D AFTER REPORT
008  REC'D AFTER REPORT

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 83**

54

1    Q    What I'm asking is how do you know that
2  Data Set 5 was authored by Century Consultants?
3    A    I worked on the assumption that it came
4  from Century Consultants and was authored by Century
5  Consultants.
6    Q    Is your assumption based on any facts?
7    A    I don't recall if there were specific
8  conversations confirming the origination of that zip
9  file other than the fact that I made a request for the
10  Century schema and it was delivered to me and labeled
11  as such.
12    Q    Is it fair to say you don't know who
13  authored Data Set 1 and Data Set 5?
14    A    As far as the specific individual or
15  individuals concerned, that is correct.
16    Q    What about with respect to the company
17  as a whole?  Isn't it true that -- let me rephrase
18  that.  You don't know that Century Consultants
19  authored Data Set 1 or Data Set 5, correct?
20    A    I was working under the assumption.
21    Q    Right.  But what I'm asking is whether
22  you know that to be true.
23    A    I was not present when Data Set 1 or
24  Data Set 5 was created or the files contained within
25  those data sets were created, so I would have no way

55

1  of knowing from personal knowledge or experience who
2  was involved in the creation of those files.
3    Q    What I'm asking you is if anyone told
4  you that Century Consultants authored either Data Set
5  1 or Data Set 5?
6    A    There was some basis for me to reach a
7  conclusion with a reasonable degree of certainty that
8  Century Consultants was the true author of Data Set 1
9  and Data Set 5.  I don't recall if that was via a
10  verbal communication or an indication on the CD or an
11  indication on an E-mail.  However, I did reach that
12  conclusion without thinking further analysis as to the
13  identity of the author was necessary.
14    Q    Data Sets 2, 3 and 4 appear in your
15  table to be authored by The Miller Group.  How do you
16  know that The Miller Group authored Data Sets 2, 3 and
17  4?
18    A    Again, there is a general assumption
19  that was made based on either verbal communication or
20  markings on the C.D.s that led me to the reasonable
21  conclusion that The Miller Group was the author of
22  Data Sets 2, 3 and 4.
23    Q    But you don't know specifically what it
24  is that led you to that conclusion, is that correct?
25    A    At the time, I didn't feel it was

56

1  necessary to doubt that these files or these data sets
2  were authored by The Miller Group.
3    Q    I don't mean to beat a dead horse here
4  but, in fact, it doesn't sound like anyone told you
5  that these people were or these entities were the
6  authors of these data sets.  It rather appears it's
7  just an assumption, which is fine but I want you to
8  tell me whether this is an assumption or whether
9  someone told you this is true?
10    A    All of the C.D.s that I received were
11  labeled and I had ownership type of markings on the
12  original C.D.s, handwritten messages or notes on the
13  C.D.s claiming to be the property of an entity.  In
14  the case of Century Consultants, they were marked as
15  claiming to be the property of Century Consultants.
16  And in the case of The Miller Group, they claimed to
17  be the property of The Miller Group.
18    Q    Underneath the table it says that your
19  analysis compares each of data sets from The Miller
20  Group and the Springfield School District to the
21  control set of data received from Century.  Did you,
22  in fact, compare each set of data received from The
23  Miller Group and District 186 to the control set that
24  you received from Century?
25    A    In various steps in the analysis, I made

57

1  individual comparisons between The Miller Group
2  application and the Century application, the
3  Springfield application and the Century application
4  and The Miller Group application and the Springfield
5  application.
6    Q    Well, is this a true statement that you
7  compared each of the data sets received from The
8  Miller Group and from District 186 to the control set
9  that you received from Century?
10    A    If the question is was every character
11  of every application compared to one another, the
12  answer is no.  If the question is was a reasonable
13  effort made to derive a conclusion based on comparing
14  data sets to one another, the answer is yes.
15    Q    Did Century create the tables in
16  Star_Base?
17    A    The tables in -- a comparison was made
18  with the tables in Star_Base to the other
19  applications.  I worked off of the same assumption
20  from earlier, that the Star_Base application is
21  authored by Century Consultants.
22    Q    But with respect to the data base tables
23  in particular, nobody told you that Century authored
24  those tables, correct?  For the record, could you
25  identify what document you're looking at to find the

58

1    answer to that question.
2        A    I'm looking at the Declaration of Robert
3    Magan, which -- and specifically, I'm looking at the
4    portions of code that I had reviewed prior to forming
5    a conclusion, that were faxed to me at the onset of my
6    engagement and I'm looking for markings, specifically
7    table elements belonging or allegedly belonging to the
8    Century application that appear in this source code.
9        Q    Let's break it down a little bit. Did
10    anybody tell you that Century authored the data base
11    tables?
12        A    I believe that was general knowledge
13    verbalized at the onset.
14        Q    By who?
15        A    I believe in the initial conversation
16    with Craig Hilliard.
17        Q    He told you specifically that the data
18    base tables in Star_Base were authored by Century
19    Consultants, is that correct?
20        A    Belonged to, were owned by Century
21    Consultants, I believe would be a more accurate
22    phrase.
23        Q    But not authored by or created by?
24        A    I don't recall.
25        Q    Okay. Are there any documents that

59

1    indicate to you that the data base tables were
2    authored by Century Consultants?
3        A    Can you repeat that?
4        Q    Are there any documents that indicate to
5    you that the data base tables are authored by Century
6    Consultants?
7        A    I don't recall.
8        Q    Okay. On page four, in your definition
9    section, you state that a CC file is a C file that
10    includes source codes, correct?
11        A    Correct.
12        Q    And you also indicate that a PHP file is
13    a source code file, correct?
14        A    Correct.
15        Q    What else, if anything, is a source code
16    file?
17        A    There are many different types of source
18    code files. I point out these two examples because
19    they are used frequently within my report.
20        Q    Are there any other source code files
21    referred to in your report besides CC files and PHP
22    files?
23        A    I believe I referred to FMT files, which
24    is another type of source code file.
25        Q    Why isn't that identified as a source

60

1    code file but a PHP file is in your definition
2    section?
3        A    I'm not certain.
4        Q    What version of Star_Base did District
5    186 purchase?
6        A    As far as the exact version number, is
7    that what you're --
8        Q    Yes. Or you can give me a different
9    description, if there is one, other than a version
10    number.
11        A    I don't have the version number in front
12    of me.
13        Q    Is Data Set 1 the same version as the
14    one that District 186 purchased?
15        A    That's my belief.
16        Q    Did anyone tell you that?
17        A    I don't recall.
18        Q    Did you base that belief on any
19    documents?
20        A    I performed an analysis of the data that
21    was provided to me.
22        Q    So you don't know if the data that was
23    provided to you is the same data that was purchased by
24    District 186, correct?
25        A    Without going to District 186 and

61

1    physically inspecting the computers, I couldn't make
2    that determination.
3        Q    Okay. You indicate that The Miller
4    Group is the defendant and the developer of IS3,
5    correct?
6        A    That is my belief.
7        Q    Why isn't there any definition here for
8    District 186? They are also a defendant, right?
9        A    Sorry.
10        Q    Why is there no -- it was a compound
11    question and it should be restated. Why isn't
12    District 186 included in your definitions section?
13        A    The definition section is a subset of
14    terms used throughout the report. Not all terms were
15    defined in the definition section.
16        Q    I'm just curious because you define two
17    out of the three parties and I wondered why you left
18    District 186 off of the definitions list.
19        A    I think I was simply trying to make a
20    clarification of the applications, the proper name of
21    the Star_Base application and who was the developer of
22    that application and the proper name of the IS3
23    application and who was the developer of that
24    application.
25        Q    Was it your understanding, though, that

# STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 85

```
 1                    UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF ILLINOIS
 2                    SPRINGFIELD DIVISION
                      NO. 2003-CV-3105
 3

 4     CENTURY CONSULTANTS, LTD.,            :

 5                 Plaintiff,                :     DEPOSITION OF:

 6            vs.                            :

 7     THE MILLER GROUP, INC., JOHN G.       :     PAUL G. LEWIS

 8     MILLER and the SPRINGFIELD            :

 9     PUBLIC SCHOOL DISTRICT NO. 186,       :

10                 Defendants.               :

11     - - - - - - - - - - - - - - - - - -

12

13                    TRANSCRIPT OF PROCEEDINGS, taken by
       and before KIM A. GHILARDI, a Notary Public, Certified
14     Shorthand Reporter of the State of New Jersey and
       Registered Professional Reporter, taken at the offices
15     of STARK & STARK, PC, 993 Lenox Drive, Lawrenceville,
       New Jersey, on Wednesday, January 12, 2005, commencing
16     at 9:30 a.m.

17

18

19

20                    GUY J. RENZI & ASSOCIATES

21        Certified Shorthand Reporters & Videographers

22                    824 West State Street

23                    Trenton, New Jersey 08618

24                       (609) 989-9199

25                    www.renziassociates.com
```

```
1    table comparison.  Let's go to page 29.  How many

2    tables are in Star_Base?

3         A         I believe there is over 100.

4         Q         Do you know how many tables are in IS3?

5         A         I don't recall.

6         Q         Do you know how many tables are in

7    District 186's system?

8         A         I don't recall.

9         Q         If IS3 is exactly the same as District

10   186's system except for field names, would that mean

11   that these two systems would have the same number of

12   tables?

13        A         Not necessarily, depending on how the

14   software was evolved or modified.

15        Q         Well, what I asked, though, is if the

16   only difference is the field names, then would you

17   have the same number of tables?  It seems to me that

18   you would.

19        A         I mean, we have already seen at least

20   one example of where a field, where tables were

21   consolidated.  We have seen examples where tables were

22   expanded upon.  New tables may have been created in

23   one version of the application and not the other or

24   deleted from one version of the application to the

25   other.  I didn't feel it was significant to compare
```

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 86**

**Century Consultants, Ltd. V. The Miller Group, et al**
CONFIDENTIAL                                                                    *May 29, 2003*

**Approach –**

The approach used during this analysis is as follows:
1. Analyze File Modification Dates of the IS3 Application
2. Analyzed the file SkdMassDetail.php
3. Analyzed Scheduler Schema
   a. Century Consultant Star_Base
   b. The Miller Group IS3
4. Perform a Table by Table Analysis
5. Comparison of Flow Diagrams
6. SQL Code Comparison
7. Similarities between code and status code
8. Analyze Star_Base C and IS3 C++ Code
9. Report Summary of Findings
10. Conclusion

# STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 87

142

1    A    I do. The actual name is SCHLINKS, so
2  the same typo that was in the above example.
3    Q    I'm not sure about that. This says
4  SCH-BASE is the parent of CRLINKS and did you really
5  mean to say that SCH_BASE is the parent of SCHLINKS?
6    A    That is correct.
7    Q    But you also indicate that in the same
8  comparison point that SCH_BASE is the parent of
9  COURSES, right? Do you see that?
10    A    SCH_BASE maps out to a table called
11  SCHOOLS, SCH, and Star_Base matches out to a table
12  called schools in IS3. The point I was trying to make
13  is that that table, which is actually called schools
14  in IS3 is the parent of courses. I'm showing the
15  similarities between schools and SCH_BASE.
16    Q    But SCH_BASE is not the parent of
17  courses in IS3, right?
18    A    The name of the table in IS3 is schools,
19  which is based on SCH_BASE Star_Base which we have
20  already discussed.
21    Q    And CRLINKS under the Star_Base section
22  is really supposed to say SCHLINKS, right?
23    A    Right.
24    Q    It doesn't look to me like the courses
25  table and the SCHLINKS table are anything alike, are

143

1  they?
2    A    They actually have the same shared
3  fields here. I can read them for you.
4    Q    Tell me which ones are shared?
5    A    On Star_Base, there is a field called
6  START_YY and in IS3, the same field is called SYEAR.
7    Q    We have been through this. We have been
8  through the first three lines on other matters,
9  haven't we?
10    A    Right.
11    Q    Okay. Well, let's go to the remainder.
12  There is one field in the SCHLINKS table, correct?
13    A    Right.
14    Q    And there are eight totally different
15  fields in the courses table, right?
16    A    Right.
17    Q    Does that mean that these tables are
18  similar?
19    A    The courses table in IS3 is a
20  consolidation of other tables. So it appears to me as
21  though a programmer started with Star_Base and
22  attempted to streamline or make the Star_Base
23  application more efficient by consolidating tables,
24  which I think is what we discussed just a couple
25  minutes ago.

144

1    Q    Okay. But you would agree that the
2  relationships between the tables are, in fact,
3  different, right?
4    A    I disagree. I think the relationships
5  between the tables are similar if we look at -- if we
6  break out the fields that belong in COURSES and map
7  them out across the other tables within Star_Base.
8    Q    In any event, that's a lot different
9  than copying, isn't it?
10    A    No. I believe that this is an attempt
11  to make the application maybe more efficient but I
12  believe it's starting out with this same foundational
13  information.
14    Q    And that, you believe, is theft of
15  intellectual property?
16    A    Yes.
17    Q    Okay.
18    MR. SCHRAMA: Same objection.
19    Q    Now, you changed the name of the table
20  again in the Courses-Student To Student Schedule
21  Relationship comparison point to CRSLINK, right?
22    A    Yes. I believe that is referring to
23  SCHLINKS.
24    Q    You state that you refer to the CRSLINK
25  STU_SCH relationship in the Star_Base portion of your

145

1  comparison, correct?
2    A    Okay.
3    Q    And that's supposed to be your SCHLINKS
4  to STU_SCHE relationship, right?
5    A    Correct.
6    Q    It says that START_YY, CLASS_CD and
7  SCHOOL are the foreign keys, right?
8    A    Right.
9    Q    Well, it looks like in the STU_SCHE
10  table, it has an additional foreign key of STUDENT_ID,
11  is that right?
12    A    Right. Which further, again, just
13  further supports the conclusion that I made. The
14  reason why it is not indicated is one matches to the
15  SCHLINKS -- I am sorry. The three fields that you
16  mentioned map to the SCHLINKS and the STUDENT_ID field
17  matches to the ASH_STU.
18    Q    Where do you get CRSLINK?
19    A    I don't understand the question.
20    Q    Well, you refer to CSRLINK in here and
21  you say that it's supposed to mean SCHLINKS but here's
22  the problem. Here's what I'm trying to figure out.
23  Your Star_Base schema refers to SCHLINKS and in your
24  Star_Base column, on page 27, in the Parent table
25  section, you call it CRLINK. In the School-Course

146

1  Relationship you call it CRLINKS, plural. In the
2  Courses-Student To Student Schedule Relationship, you
3  call it CRSLINK, and so we have got three different
4  names referring to a table that isn't named any of
5  them. Were you using a template of some sort or a
6  dictionary of some sort? I'm just trying to figure
7  out why there is all these different names?
8      A    I believe they all refer to SCHLINKS.
9      Q    I understand that.
10     A    It's difficult, given the complexity and
11 the variable names that are not words that would be
12 found in a dictionary, in writing a report like this.
13 I use Microsoft Word to write the report and if you
14 have ever used Microsoft Word, then you type a word
15 that is not a valid dictionary word or a word that's
16 in its dictionary, it's underlined in red and in some
17 cases Microsoft will try to correct the spelling of
18 that word automatically for you. And in some cases,
19 if you manually correct that, Microsoft will correct
20 it throughout the document. So given the large number
21 of variable names in putting together this report
22 using Microsoft Word, it's possible that it was typed
23 incorrectly and then when I went to correct it, I
24 retyped it incorrectly and then Microsoft Word put it
25 in throughout the document as the same incorrect word.

147

1  I believe it's just a typo. I don't think it's
2  anything more than that. And I think that CRLINKS and
3  CRSLINK all are intended to be SCHLINKS and I
4  apologize for having it be misleading, having the typo
5  be misleading.
6      Q    Well, Mr. Lewis, I don't want you to
7  think that I'm here seeking apologies. I'm just
8  trying to understand this and I just needed to know
9  the source because CRLINK, CRLINKS and CRSLINK are
10 nothing like SCHLINKS, in my opinion, and I'm trying
11 to find a source for any of the three derivatives
12 involving CR fields, for lack of a better term, if you
13 find that field in any reference or source.
14     A    In order to streamline the writing of
15 this report, I added certain field names to my
16 dictionary in Microsoft Word. That way they won't
17 come up with a red underline in them. If you add a
18 word to your dictionary, you make that word available
19 and other misspellings will be compared to the
20 dictionary and perhaps automatically replaced with a
21 word that is similar to it. And all I'm saying is
22 that the CRLINK and the CRSLINK and the CRLINKS all
23 refer to SCHLINKS. It's as simple as that and how it
24 showed up in this report, I'm not certain.
25     Q    Good enough. Next you did a table by

148

1  table comparison. Let's go to page 29. How many
2  tables are in Star_Base?
3      A    I believe there is over 100.
4      Q    Do you know how many tables are in IS3?
5      A    I don't recall.
6      Q    Do you know how many tables are in
7  District 186's system?
8      A    I don't recall.
9      Q    If IS3 is exactly the same as District
10 186's system except for field names, would that mean
11 that these two systems would have the same number of
12 tables?
13     A    Not necessarily, depending on how the
14 software was evolved or modified.
15     Q    Well, what I asked, though, is if the
16 only difference is the field names, then would you
17 have the same number of tables? It seems to me that
18 you would.
19     A    I mean, we have already seen at least
20 one example of where a field, where tables were
21 consolidated. We have seen examples where tables were
22 expanded upon. New tables may have been created in
23 one version of the application and not the other or
24 deleted from one version of the application to the
25 other. I didn't feel it was significant to compare

149

1  every single table when immediately upon comparing
2  tables, I found gross similarities that could not have
3  happened randomly.
4      Q    How many tables did you compare?
5      A    I have four tables, four table
6  comparisons included in my initial report. After
7  comparing these tables, I didn't think it was
8  necessary to continue comparing tables. Once such
9  massive similarities are identified, an examiner
10 quickly questions the point of diminishing returns.
11     Q    How many tables did you find to be the
12 same?
13     A    Of the four tables that I compared, one
14 of them was absolutely identical, which it is
15 impossible for that to happen at random, and the other
16 three tables had excessive similarities.
17     Q    The first table on page 30, you indicate
18 that CLASS_CD maps to the identical section in IS3,
19 right?
20     A    In this example, that's correct.
21     Q    What data base did you pull this table
22 from that's listed as IS3?
23     A    This had come from The Miller Group
24 application, I believe, which would be Data Set 2 or
25 Data Set 4. It's not indicated on this page.

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 88**

190

1    A    Right.

2    Q    What's the difference?

3    A    The difference between the District 186

4    schema and the IS3 schema?

5    Q    Why did you compare one and not other?

6    It says here you did it because it wasn't forwarded to

7    you but I just can't see that being correct given the

8    fact that you created one for IS3.

9    A    I created the schema for IS3 in order to

10    do a comparison between IS3 and Star_Base.

11    Q    I understand that.

12    A    The Springfield District 186 software

13    was not forwarded to me until May 22nd, well after

14    this analysis was underway. At the time that this

15    analysis had commenced, it was believed by me that

16    there was only one version of IS3.

17    Q    Why didn't you put that in the report

18    then? It says here that you didn't do it because it

19    wasn't forwarded to you?

20    A    Well, the request was made at some point

21    after the analysis had started.

22    Q    Okay. Who requested it?

23    A    I requested it, I believe, through Craig

24    Hilliard.

25    Q    Okay. Do you know what happened after

191

1    that?

2    A    I do not.

3    Q    All right. On page 52, you indicated

4    that you analyzed seven tables between Star_Base and

5    IS3, right?

6    A    That is correct.

7    Q    I only see four in this report. What am

8    I missing?

9    A    Actually, I have ten Star_Base tables

10    and nine IS3 tables in the schema.

11    Q    Okay. Where does the seven come from

12    then?

13    A    Seven of them were analyzed. If you

14    remember, some of the tables were consolidated. There

15    are cases where the tables are not identical. I guess

16    you could say they were still compared and they were

17    determined not to be similar so not included in the

18    report.

19    Q    So you're saying that your table

20    comparison was in the schemas?

21    A    The table comparison on-line and then

22    illustrated in the schemas.

23    Q    Okay. I find that odd because on page

24    29, after do you see a comparison of the schemas, that's

25    when you said that you did a table by table comparison

192

1    and in the section entitled Table by Table Comparison,

2    you have got four tables. On page 52, it says Table

3    by Table Comparison. Are you now saying that your

4    analysis on page 52 actually refers to a section of

5    the report other than the one that says Table by Table

6    Comparison?

7    A    No. I'm saying what's included in the

8    report is what I consider to be ample information to

9    reach the conclusion that I made.

10    Q    And I'm not asking about ample. I'm

11    asking about seven. Does that number seven in the

12    first line of the Table by Table Comparison summary on

13    page 52, does that seven include the tables on pages

14    29, 30, 31 and 32?

15    A    Yes. In addition to pages 25 and 26.

16    Q    You analyzed three tables on pages 25

17    and 26. Is that how you got your seven?

18    A    Well, the report analyzed a total of

19    seven tables. Four of them are explicitly detailed.

20    Q    The ones are -- go ahead. I am sorry.

21    A    29 through 32.

22    Q    And there's three more?

23    A    Correct. Three more which are not

24    explicitly detailed in the report because after

25    documenting these four, I believed that was

193

1    significant similarities and enough information in

2    order to base a conclusion.

3    Q    So when you say you analyzed seven, we

4    are supposed to take that as true because you showed

5    us four, right? Either that or it could possibly be a

6    mistake?

7    A    I don't think so. I think that I

8    decided to illustrate in detail four of the seven for

9    whatever reason. If you look through the four, it's

10    just the evidence supports itself. Actually, in

11    looking at one table, the evidence supports itself and

12    I decided to put four in any way.

13    Q    So your summary says seven but your

14    analysis has four in the Table by Table Comparison?

15    A    The analysis included seven but I

16    documented in detail four of the seven.

17    MR. SHUPENUS: Okay. Good enough. Off

18    the record.

19    (Off the record, 6:03 p.m..)

20    (Deposition resumes, 6:15 p.m..)

21    Q    On page 51 of your report indicated in

22    the SkdMassDetail section that The Miller Group

23    surrendered two versions of the Scheduler Application

24    front end program, one from the school district and

25    the other one from Data Set 2. Was there also one in

194

1 Data Set 4?
2 　A　Yes, there was. The Miller Group said
3 it was the same application, that they had
4 accidentally sent the wrong version of it, but there
5 actually was three versions of the Scheduler
6 application that was sent to us.
7 　Q　On page 16, you say that the data
8 forwarded to you which was authored by The Miller
9 Group contains two example of the SkdMassDetail file
10 and you also referred to the SkdMassDetail file from
11 Data Set 3. So why does your summary only discuss a
12 comparison of two but on page 16, you list three?
13 　A　In the summary, it's one version at use
14 in Springfield School District and two versions or I'm
15 differentiating between a Miller Group flavor of the
16 application and a District flavor of the application.
17 The Miller Group actually had two separate copies of
18 the application or versions of the application.
19 　Q　You state that of significance is the
20 fact that District 186's version was last modified on
21 March 24, 2003 but Data Set 2 was modified on May 14,
22 2003. In other words, they are different, right?
23 　A　Can you rephrase the question? I am not
24 sure.
25 　Q　Are the two versions that you reference

195

1 here different?
2 　A　The Springfield version was last
3 modified on March 24th, 2003 and the Data Set 2
4 version was last modified on May 14, 2003.
5 　Q　Does that mean they are different?
6 　A　They are different.
7 　Q　Okay. Now, you also state that District
8 186's software reveals a plethora of calls made to
9 tables authored by Century Consultants. Is that a
10 problem?
11 　A　It's an observation.
12 　Q　Okay. Why did you make that
13 observation?
14 　A　To point out that the District 186
15 software was dependent upon tables authored by Century
16 Consultants.
17 　Q　You didn't include that analysis for the
18 purpose of showing any wrongdoing, did you?
19 　A　It was a simple observation.
20 　Q　We discussed the fact that you did not
21 analyze the actual PC's that may have been used to
22 copy source code or logic or field names, right?
23 　A　That is correct.
24 　Q　Instead, you just analyzed the data sets
25 as set forth in this report, correct?

196

1 　A　That's correct.
2 　Q　I'm going to show you what's been marked
3 Defendant's Exhibit No. 15. Is this a copy of the
4 Rebuttal Report that you prepared for this matter?
5 　A　This is.
6 　Q　Did anyone else besides you participate
7 in the preparation of this report?
8 　A　No.
9 　Q　Did any of your firm's policies or
10 procedures regarding creation of expert reports change
11 between the time you drafted the first one and the
12 time you drafted this one? I'm referring to what we
13 discussed this morning with respect to quality control
14 or procedures for proofing, fact checking, things like
15 that.
16 　A　Well, it's a year and a half later.
17 　Q　That's why I'm asking.
18 　A　So my firm is constantly improving
19 systems, so there may have been -- there may have been
20 changes made to the systems but I wouldn't be able to
21 go into detail on what changes may have occurred, if
22 any.
23 　Q　At the time you drafted your Rebuttal
24 Report, did your understanding of the facts of the
25 case change compared to the time you drafted the

197

1 initial report?
2 　A　I had more information or more knowledge
3 about the matter.
4 　Q　What information did you have?
5 　A　Well, I had the opposing expert's
6 report, for one.
7 　Q　I'm talking about facts.
8 　A　I had received additional information,
9 additional data which was not analyzed in the original
10 report.
11 　Q　What data was that?
12 　A　Item on page four of the Rebuttal
13 Report, item number 007, item number 008.
14 　Q　Okay. Did you analyze that data?
15 　A　I did a cursory analysis. One of the
16 CDs was found to contain no data. 008 contained no
17 data and 007, I did not perform the same type of
18 analysis as I did on the other data sets because I had
19 already submitted my report.
20 　Q　Well, don't you think that if you get
21 new information that would change an opinion, that you
22 should point that out?
23 　A　The new information wasn't requested and
24 it appeared to contain IS3 CVS reporting information.
25 　Q　Which is what?

# STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 89

146

1  Relationship you call it CRLINKS, plural. In the
2  Courses-Student To Student Schedule Relationship, you
3  call it CRSLINK, and so we have got three different
4  names referring to a table that isn't named any of
5  them. Were you using a template of some sort or a
6  dictionary of some sort? I'm just trying to figure
7  out why there is all these different names?
8      A    I believe they all refer to SCHLINKS.
9      Q    I understand that.
10     A    It's difficult, given the complexity and
11 the variable names that are not words that would be
12 found in a dictionary, in writing a report like this.
13 I use Microsoft Word to write the report and if you
14 have ever used Microsoft Word, then you type a word
15 that is not a valid dictionary word or a word that's
16 in its dictionary, it's underlined in red and in some
17 cases Microsoft will try to correct the spelling of
18 that word automatically for you. And in some cases,
19 if you manually correct that, Microsoft will correct
20 it throughout the document. So given the large number
21 of variable names in putting together this report
22 using Microsoft Word, it's possible that it was typed
23 incorrectly and then when I went to correct it, I
24 retyped it incorrectly and then Microsoft Word put it
25 in throughout the document as the same incorrect word.

147

1  I believe it's just a typo. I don't think it's
2  anything more than that. And I think that CRLINKS and
3  CRSLINK all are intended to be SCHLINKS and I
4  apologize for having it be misleading, having the typo
5  be misleading.
6      Q    Well, Mr. Lewis, I don't want you to
7  think that I'm here seeking apologies. I'm just
8  trying to understand this and I just needed to know
9  the source because CRLINK, CRLINKS and CRSLINK are
10 nothing like SCHLINKS, in my opinion, and I'm trying
11 to find a source for any of the three derivatives
12 involving CR fields, for lack of a better term, if you
13 find that field in any reference or source.
14     A    In order to streamline the writing of
15 this report, I added certain field names to my
16 dictionary in Microsoft Word. That way they won't
17 come up with a red underline in them. If you add a
18 word to your dictionary, then that word available
19 and other misspellings will be compared to the
20 dictionary and perhaps automatically replaced with a
21 word that is similar to it. And all I'm saying is
22 that the CRLINK and the CRSLINK and the CRLINKS all
23 refer to SCHLINKS. It's as simple as that and how it
24 showed up in this report, I'm not certain.
25     Q    Good enough. Next you did a table by

148

1  table comparison. Let's go to page 29. How many
2  tables are in Star_Base?
3      A    I believe there is over 100.
4      Q    Do you know how many tables are in IS3?
5      A    I don't recall.
6      Q    Do you know how many tables are in
7  District 186's system?
8      A    I don't recall.
9      Q    If IS3 is exactly the same as District
10 186's system except for field names, would that mean
11 that these two systems would have the same number of
12 tables?
13     A    Not necessarily, depending on how the
14 software was evolved or modified.
15     Q    Well, what I asked, though, is if the
16 only difference is the field names, then would you
17 have the same number of tables? It seems to me that
18 you would.
19     A    I mean, we have already seen at least
20 one example of where a field, where tables were
21 consolidated. We have seen examples where tables were
22 expanded upon. New tables may have been created in
23 one version of the application and not the other or
24 deleted from one version of the application to the
25 other. I didn't feel it was significant to compare

149

1  every single table when immediately upon comparing
2  tables, I found gross similarities that could not have
3  happened randomly.
4      Q    How many tables did you compare?
5      A    I have four tables, four table
6  comparisons included in my initial report. After
7  comparing these tables, I didn't think it was
8  necessary to continue comparing tables. Once such
9  massive similarities are identified, an examiner
10 quickly questions the point of diminishing returns.
11     Q    How many tables did you find to be the
12 same?
13     A    Of the four tables that I compared, one
14 of them was absolutely identical, which it is
15 impossible for that to happen at random, and the other
16 three tables had excessive similarities.
17     Q    The first table on page 30, you indicate
18 that CLASS_CD maps to the identical section in IS3,
19 right?
20     A    In this example, that's correct.
21     Q    What data base did you pull this table
22 from that's listed as IS3?
23     A    This had come from The Miller Group
24 application, I believe, which would be Data Set 2 or
25 Data Set 4. It's not indicated on this page.

# STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 90

25.    Upon information and belief, in the course of copying substantial portions of the copyrighted source code, MGI and Miller have not only gained access to the source code, they have physically removed copies of the programs from the licensee's premises for editing off-site. This is not only a violation of the License Agreement, it creates an imminent danger that the source code, which is a trade secret, will be disclosed to third parties who do not know the trade secret and who might be given a competitive advantage by learning it.

## COUNT I
## (COPYRIGHT INFRINGEMENT)

26.    Plaintiff repeats the allegations of the preceding paragraphs of the Verified Complaint as if set forth fully herein.

27.    As hereinabove alleged, Century is the owner of the copyrights to the Star_Base programs. The programs are covered by valid registrations, and the main menu screens for all of the modules bear a notice of copyright.

28.    Defendants, MGI and Miller, had access to the Star_Base copyrighted programs, including the source code and object code of those programs.

29.    Defendants, MGI and Miller, have knowingly and willfully copied the copyrighted Star_Base programs, and have thereby created unauthorized derivative works. Alternatively, MGI and Miller have unintentionally copied the copyrighted Star_Base programs, and have thereby created unauthorized derivative works.

30.    The derivative works, including MGI's "InfoSystems 3" product, are based on the copyrighted Star_Base programs, and are identical or substantially similar to the copyrighted programs in their literal code, in their structure, sequence and organization, and in various other respects.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

-7-

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBERS
91-92**

166

1    Q    And then the last one, they both have
2 the word set and they both have the word head, right?
3    A    Right.
4    Q    Okay.  On page 34, which data set did
5 you get the IS3 SQL code from?
6    A    It's unclear from this.  I would assume
7 Data Set 2.
8    Q    Why do you assume that?
9    A    If I recall correctly, this analysis was
10 started early on in the process or this portion of the
11 analysis was started early on in the process, although
12 I can't confirm what data set it's from.
13    Q    Okay.  So if the IS3 section is from
14 Data Set 3, that wouldn't necessarily indicate theft
15 of intellectual property, right?
16        MR. SCHRAMA:  Continuing objection, just
17 in case we forgot.
18    A    If it were from Data Set 3, it would not
19 constitute theft of intellectual property.
20    Q    Okay.  On the Star_Base side of page 34,
21 are any of those SQL statements standard Oracle SQL
22 statements?
23    A    I believe they are all standard Oracle
24 statements.
25    Q    Okay.  Page 35, which data set did this

167

1 IS3 source code come from?
2    A    The exact source is not identified.
3    Q    Could it be from Data Set 3?
4    A    It's possible.
5    Q    When you state that IS3 is written in C,
6 are you referring to the whole application?
7    A    No.  Parts of the application are
8 written in C.
9    Q    So a very small part of the application,
10 comparing it to the whole, is written in C, right?
11    A    I don't have the ratio of C versus other
12 source codes, but I do believe you're correct.  I do
13 believe my understanding is that C++ did not
14 constitute the vast majority of the application.
15    Q    You state the identical conflict codes
16 are used.  Did you highlight the conflict codes?
17    A    I did.
18    Q    Are they identical?
19    A    There are three conflict codes that are
20 identical.
21    Q    What are the -- strike that.  Do the
22 highlighted portions of code constitute conflict codes
23 in their entirety?
24    A    The Star_Base application includes two
25 additional conflict codes.

168

1    Q    But I'm talking about the highlighted
2 portion.
3    A    Okay.  Repeat the question.
4    Q    Is everything that's highlighted in here
5 a conflict code?
6    A    There are three conflict codes that are
7 highlighted.
8    Q    Well, on the left side, the word
9 conflict is highlighted and on the right side, the
10 word case is highlighted, correct?
11    A    Correct.
12    Q    So that's not identical, right?
13    A    Well, there's two different, they are
14 two different programming languages.  Star_base is
15 written in C and IS3 is written in C, so the syntax
16 would be slightly different but we are talking about
17 three different, three of the same conflict codes.
18 The conflict codes that I have highlighted are C, P
19 and I.
20    Q    So C, P and I are the conflict codes,
21 right?
22    A    Yes.
23    Q    The other highlighted stuff is not
24 conflict code?
25    A    Right.

169

1    Q    Does any other portion of your report
2 contain comparison of course code between IS3 and
3 Star_Base?
4    A    Other than what we have covered?
5    Q    Right.  Well, no.  We have compared a
6 lot of the tables and we have compared logic and
7 schema.  I want to know everywhere in this report
8 where you compare source code between IS3 or what
9 appears to be IS3 and Star_Base.
10    A    Do you want to start from the first page
11 and flip through?
12    Q    Go ahead and do that.  You're going to
13 see that the first portion of the report doesn't have
14 any code at all, as far as I can tell, but go ahead
15 and do that.
16    A    So you're looking for examples of source
17 codes being compared?
18    Q    Between Star_Base and anything else.
19    A    Beginning on page 17, there is an
20 analysis of the Springfield School System source code
21 and we have already discussed this but I address where
22 it is interfacing or interacting with the same
23 component that Century Consultant's Star_Base
24 application would interact with.
25    Q    Well, it states in your comments that

170

1    the IS3 code is referring to Star_Base tables, right?
2        A    Right.
3        Q    So this isn't Star_Base code on page 17,
4    is it? Star_base source code, that is?
5        A    This is Springfield -- this is District
6    186 source code that is communicating directly with
7    the Century Consultants application, the tables
8    belonging to Century Consultants.
9        Q    But as we discussed earlier, there's a
10   difference between tables and source code, right?
11       A    Right. And this example is source code.
12       Q    This is source code of District 186's
13   system right?
14       A    Right.
15       Q    This is in PHP, right?
16       A    This is PHP.
17       Q    And there isn't any Star_Base source
18   code written in PHP, right?
19       A    There is not.
20       Q    Okay. Continue.
21       A    So that analysis conclusion through page
22   19. There is then a comparison made between the
23   Springfield version, District 186 version of the
24   source code to The Miller Group, IS3 version dated May
25   14 and again, it's highlighted where both of these

171

1    applications are accessing the same data in the tables
2    for Century Consultants.
3        Q    Between pages 20 and 22, you don't
4    identify any Star_Base source code, right?
5        A    Correct. On page 34, there is a source
6    code comparison between IS3 and Star_Base and on 35
7    there is a source code comparison between IS3 and
8    Star_Base.
9        Q    On page 34, if you compare that to the
10   definition section on page four, you call CC file a C
11   file or a program file which includes source codes.
12   Now, on page 34, this isn't Star_Base CC file, is it?
13       A    It's a C file.
14       Q    Right. But that's not identified as
15   source code in your definition section, is it?
16       A    In the definition section, I just -- I
17   defined CC file as being a C file.
18       Q    Okay. Now, on page 35, other than the
19   conflict codes that we discussed earlier, this isn't
20   indicative of copied source code, is it?
21       A    What was interesting here is with the
22   three -- there are three conflict codes which we have
23   already discussed.
24       Q    Right.
25       A    C, P and I. C is a total complete

172

1    conflict, P is a total partial conflict and I is a
2    total irresolvables conflict. They both appear with
3    those same descriptions in the same order in both
4    applications, which I thought was significant.
5        Q    Well, they are not in the same order,
6    are they?
7        A    They are in the same order, although
8    Star_Base has a T between the P and I and has an N at
9    the end. They are in the same logical order.
10       Q    Right. And we discussed the
11   similarities and conflict codes. I'm talking about
12   the rest of it now. The rest of it doesn't indicate
13   any copied source code, does it?
14       A    No.
15       Q    Okay. Now, where is the next source
16   code comparison? You can keep going all the way
17   through the report, if you want.
18       A    Beginning on page 37, there is a source
19   code comparison between Data Set 2 and Data Set 4.
20       Q    Right. I'm looking for Star_Base source
21   code, though. Where is the next occurrence of
22   Star_Base source code in this report?
23       A    It's important to point out, though,
24   that the comparison of Data Set 2 and Data Set 4 are
25   selected because they are things that I'm pointing out

173

1    that are different between those two but they both tie
2    directly back into the Century Consultants Star_Base
3    tables.
4        Q    And we can talk about that later but
5    what I'm looking for right now is Star_Base source
6    code in this report and we have identified some. Is
7    there any more Star_Base source code being compared in
8    this report?
9        A    I've got various other comparisons
10   between Data Set 2 and Data Set 4 we have already
11   discussed and then beginning on page 48, I show a
12   comparison, now a Three Way Comparison between the
13   Star_Base source code, the Data Set 2 source code and
14   the Data Set 4 source code.
15       Q    Okay. Now, there is only Star_Base
16   source code on pages 48 and 49, correct?
17       A    That is correct.
18       Q    And I hate to do this but tell me how
19   many lines of Star_Base source code are contained in
20   this section?
21       A    I thought you were going to say the
22   whole report. I will say approximately 26.
23       Q    That's what I counted as well.
24       A    Okay.
25       Q    And would you agree that there is a lot

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 93**

174

1   more source code for the other two data sets being
2   compared?
3       A    Yes.
4       Q    How many lines of source code on pages
5   48 through 50 from Star_Base are copied by either
6   version of IS3 listed?
7       A    The question is how many lines of
8   Star_Base appeared or seemed to appear in IS3?
9       Q    Right.
10      A    Well, in this example of the 26 or so
11  lines --
12      Q    Let's break this down.  How many lines
13  of source code are exactly the same?
14      A    I would not expect there to be lines of
15  source code that are exactly the same.
16      Q    Right.  And I understand that.  I
17  understand that's your expectation and it's mine, too.
18  With that in mind, how many are the same?
19      A    There wouldn't be, in this comparison,
20  there wouldn't be lines that are identical because,
21  one, the Star_Base application is a C application and
22  the IS3 application is a C++ application.
23      Q    Right.  And we will get to that.  We
24  will get to that, but I wanted to verify my belief
25  that none of these lines of source code that you have

175

1   referenced in here are exactly the same as IS3 source
2   code, right?
3       A    That is correct but that's not what is
4   significant about this comparison.
5       Q    And we will get to that, Mr. Lewis.  But
6   with that out of the way, how many lines of source
7   code in Star_Base are similar to lines of source code
8   in IS3, in either version of IS3, based on the
9   excerpts that you have in here?
10      A    Well, in the small example that I have
11  here, I have 11 lines highlighted in order to point
12  out what I think are significant similarities.
13      Q    Okay.  And do each one of those
14  highlighted lines have significant similarities?
15      A    They do.
16      Q    Okay.  Let's look at the ones on the top
17  of page 49.  The final two lines of highlighted source
18  code in Star_Base in the first box, do those match up
19  with IS3 as being substantially similar?  It doesn't
20  look like it to me.
21      A    What I'm highlighting here is there is a
22  sort routine in the Star_Base application in C that is
23  then illustrated in the IS3 application, so it's the
24  logic that I'm pointing out.  It's not a cut and paste
25  of source code but it's copying what I would consider

176

1   to be proprietary logic.
2       Q    Okay.  So in your entire report, for
3   whatever reason, the only identical portions of source
4   code are shown on page 35, right?
5       A    The purpose is not to show --
6       Q    We will get to the purpose.  I need -- I
7   don't mean to step on you here but the way the
8   question is asked, I need to have it answered like
9   that.  You know, I don't cut you off too often so I'll
10  let you explain but I need to have this in order.  On
11  page 35, this is the only instance of possible exact
12  copying of source code, right?
13      A    That's not true.
14      Q    Okay.  Tell me where I'm wrong or
15  actually tell me where else in the report shows exact
16  copying of source code?
17      A    Well, there are, I think, throughout the
18  report we talk about, the same fields being accessed.
19  I think that's --
20      Q    In the table structures, right?
21      A    Correct.  As far as source code cut and
22  pasted from one application to the other, that is not
23  what this report was attempting to illustrate.
24      Q    Right.
25      A    As far as using the same logic and using

177

1   the same foundation, that is what this report was
2   attempting to illustrate.
3       Q    So if Century alleges that substantial
4   portions of source code from Star_Base were copied,
5   that is the subject of a different expert report?
6   Yours is more along the line of logic being copied,
7   right?
8       A    Right.  But there is just one thing I
9   want to point out is the C programming language and
10  the C application can be converted to a C++
11  application automatically by using a system for that
12  purpose.
13      Q    Was that done here?
14      A    I am not able to make that determination
15  with 100 percent accuracy but given the logic and the
16  similarities in specific certain variable names, it is
17  apparent to me that the person that created the IS3
18  Code had access to the Star_Base code.
19      Q    And that's fine.  I understand your
20  point but I'm trying to get the copying element out of
21  the way and it doesn't appear to me that we can use
22  this report to demonstrate that substantial portions
23  of Star_Base source code were copied.  Am I wrong?
24      MR. SCHRAMA:  Just to probably help
25  things along here, I'm going to object to the form of

178

1 the question insofar as the term copied isn't defined.
2     Q    Okay. Go ahead and answer.
3        MR. SCHRAMA: You can answer it, if you
4 understand the question.
5     A    Yes, I'm not so sure I understand what
6 the point is.
7     Q    Well, okay. Mr. Lewis, again, don't try
8 to figure out my point. Just answer my questions.
9     A    I'm trying to figure out the question.
10    Q    All right. Can we use your report to
11 determine whether substantial portions of Star_Base
12 source codes were copied by Miller?
13    A    Yes.
14    Q    Okay.
15    A    You can. And the reason we can make
16 that determination is because we have identical logic,
17 we have identical table definitions.
18    Q    We have identical logic?
19    A    We have extremely similar logic.
20    Q    And how much of IS3 is there extremely
21 similar logic to Star_Base?
22    A    There is enough for me to make a
23 determination that the creator of IS3 had a
24 significant working knowledge of the Star_Base
25 application.

179

1        MR. SHUPENUS: Marty, did you have
2 something? You looked like you wanted to say
3 something.
4        MR. SCHRAMA: No. It got a little
5 choppy because you were cutting each other off. I
6 wanted to make sure that everybody said what they
7 wanted to say.
8        MR. SHUPENUS: Great.
9     Q    Now, Mr. Lewis, I'm looking at your
10 report with respect to how many or how much Star_Base
11 source codes is contained in the report and it looks
12 to me, without counting it line by line, that there is
13 not even 100 lines of Star_Base source code set forth
14 in this report. Based on what we have looked at over
15 the last few minutes, would you agree with that
16 statement?
17    A    I agree.
18    Q    Okay. On page 36, you do a comparison
19 of file modification dates between two versions of IS3
20 in order to determine which one was made first, right?
21    A    The file modification dates indicate
22 either the date that the files were last modified or
23 the date that they were copied. So I was doing a
24 comparison of those dates to see if any information
25 would exist that would be helpful in the report.

180

1     Q    And you stated in here that the version
2 contained in Data Set 2 is the most up-to-date version
3 of the nine files listed here, right?
4     A    I am sorry?
5     Q    I will --
6     A    I am sorry. Where are you reading from?
7     Q    The last two sentences on page 36.
8     A    I see.
9     Q    You concluded that the versions set
10 forth in Data Set 2 is the most up-to-date-version of
11 the files listed?
12    A    Yes. The point that I was making with
13 that is I was surprisingly sent Data Set 4 without
14 being requested and the explanation I received from
15 The Miller Group why I received Data Set 4 was the
16 files sent in Data Set 2 were about six months old and
17 not the most recent version. Upon examination of the
18 file modification dates in Data Set 2, I found that
19 there were files that were dated in May of '03
20 indicating that the files may have been modified or
21 copied in May of 2003, making them newer than six
22 months old.
23    Q    It says that the fact that three files
24 from Data Set 2 were modified in May of 2003 indicates
25 that the version in Data Set 2 is, indeed, the most

181

1 up-to-date version. I guess what I am having a hard
2 time with is the dates set forth in Data Set 4 are all
3 later than the latest date in Data Set 2?
4     A    Right. I think maybe you're missing the
5 point that I was trying to make. The Miller Group
6 explained that the files in Data Set 2 were about six
7 months old, which was their justification for sending
8 without being requested a Data Set 4 with the
9 instruction to destroy Data Set 2. Upon analysis of
10 the files, these files in Data Set 2, I found that
11 three of the files had a modification date in May
12 indicating that they were most likely the most recent
13 version as of the time that they were created. As of
14 the time, I am sorry, Data Set 2 was created.
15    Q    Is it not possible that the files in
16 Data Set 4 may have been modified on May 14, 2003?
17    A    They may have been but that's not the
18 point I was making in this.
19    Q    Okay.
20    A    I would agree with you that the files in
21 Data Set 4 are even newer than the files in Data Set
22 2, but that's not the point that I was making here.
23    Q    I'm not saying that they are newer. I
24 am saying they may be newer.
25    A    And I agree with that.

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 94**

STARK & STARK
A PROFESSIONAL CORPORATION
PO BOX 5315
PRINCETON, NJ 08543-5315
(609)896-9060
ATTORNEYS FOR PLAINTIFF

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

|  |  |
|---|---|
| CENTURY CONSULTANTS LTD.,<br><br>Plaintiff,<br><br>v.<br><br>THE MILLER GROUP, INC., JOHN G. MILLER, and THE SPRINGFIELD PUBLIC SCHOOL DISTRICT 186,<br><br>Defendants. | CIVIL ACTION NO. 2003-CV-3105<br><br>**PLAINTIFF'S RULE 26 DISCLOSURES** |

Plaintiff, Century Consultants Ltd. ("Century"), hereby makes the following disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure:

**Rule 26(a)(1)(A):**

The following is a list of individuals likely to have discoverable information that Century may use to support its claims:

1.    Joseph LaMantia
Vice President
Century Consultants Ltd.
150 Airport Road, Suite 1500
Lakewood, NJ 08701
(Mr. LaMantia has knowledge generally concerning the allegations of the Complaint)

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

JUN 2 2003

**Rule 26(a)(1)(C):**

Century seeks injunctive relief, an accounting, impoundment of infringing works and the related non-monetary items of relief alleged in the Complaint. Century also seeks damages and attorneys' fees. The claims for attorneys' fees are based on 17 U.S.C. § 505, and an appropriate application will be made consistent with Fed.R.Civ.P. 54 and the Local Rules of this Court. Century is still gathering information necessary to provide defendants with an itemization of damages, and will supplement these disclosures accordingly. Nevertheless, Century anticipates that it will seek actual damages under the Copyright Act, 17 U.S.C. §504(a)(1) and (b), consisting of: a) the loss of revenue from Springfield School District 186 caused by the infringement; and b) the profits of The Miller Group from the sale and/or license of the infringing software. Based on the information produced to date by The Miller Group concerning its gross revenues, Century will seek damages in an amount not less than $1,313,000. Moreover, Century reserves the right to elect, at any time before final judgment as permitted by statute, 17 U.S.C. §504(c), an award of statutory damages for infringement. Century would seek an amount not less than $150,000 as statutory damages based on the allegation of willful infringement.

**Rule 26(a)(1)(D):**

Century is not aware of any insurance policy which may be available to reimburse or indemnify Century for payments made as a result of any disposition of this action.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

-4-

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 95**

STARK & STARK
A PROFESSIONAL CORPORATION
PO BOX 5315
PRINCETON, NJ  08543-5315
(609)896-9060
ATTORNEYS FOR PLAINTIFF

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

CENTURY CONSULTANTS LTD.,

        Plaintiff,

v.

THE MILLER GROUP, INC., JOHN
G. MILLER, and THE
SPRINGFIELD PUBLIC SCHOOL
DISTRICT 186,

        Defendants.

CIVIL ACTION NO. 2003-CV-3105

## PLAINTIFF'S RESPONSES AND OBJECTIONS TO
## REQUEST TO PRODUCE DOCUMENTS OF DEFENDANT
## SPRINGFIELD PUBLIC SCHOOL DISTRICT 186

Plaintiff, Century Consultants Ltd. ("Century"), responds and objects as follows to the

Request To Produce Documents (the "Request") of defendant, Springfield Public School District

186 (the "School District"), served on May 13, 2003:

**REQUEST NO. 1:**    All contracts or agreements between Plaintiff and Defendants.

    **RESPONSE:**  To the extent this Request seeks contracts or agreements between Century

and the School District, and subject to the General Objections listed below, Century will

produce for inspection and copying any non-privileged responsive documents.  To the

extent this Request seeks contracts or agreements between Century and defendants The

Miller Group, Inc. and John G. Miller, Century has no responsive documents.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ  08543-5315

**REQUEST NO. 2:**    All documents or other tangible evidence Plaintiff intends to utilize as exhibits at trial or in support of any dispositive motion.

   **RESPONSE:** Century objects to this Request to the extent it seeks documents which Century is not required to disclose before trial, including but not limited to documents Century may use solely for impeachment. Century further objects to the term "utilize" in this Request on the ground that it is vague and ambiguous. Subject to the foregoing objections, and to the General Objections listed below, Century will produce for inspection and copying any non-privileged responsive documents.

**REQUEST NO. 3:**    All documents or other tangible evidence referenced in Plaintiff's Answers to Defendant's Interrogatories.

   **RESPONSE:** Century objects to this Request on the ground that the term "referenced" is overbroad, vague and ambiguous and to the extent it seeks the production of documents identified in Century's Answers and Objections to the School District's Interrogatories, but which are not discoverable. Subject to the foregoing objections, and to the General Objections listed below, Century will produce for inspection and copying any non-privileged responsive documents.

**REQUEST NO. 4:**    All documents referring, reflecting, relating to, or establishing the damages allegedly sustained as referenced in Plaintiff's Answers to Interrogatories.

   **RESPONSE:** Century will produce for inspection and copying any non-privileged responsive documents.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

-2-

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 96**

STARK & STARK
A PROFESSIONAL CORPORATION
PO BOX 5315
PRINCETON, NJ 08543-5315
(609)896-9060
ATTORNEYS FOR PLAINTIFF

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| CENTURY CONSULTANTS LTD., <br><br> Plaintiff, <br><br> v. <br><br> THE MILLER GROUP, INC., JOHN G. MILLER, and THE SPRINGFIELD PUBLIC SCHOOL DISTRICT 186, <br><br> Defendants. | CIVIL ACTION NO. 2003-CV-3105 <br><br> **CENTURY CONSULTANTS, LTD.'s RESPONSES AND OBJECTIONS TO SPRINGFIELD PUBLIC SCHOOL DISTRICT 186's REQUESTS FOR PRODUCTION OF DOCUMENTS** |

TO:    Almon A. Manson, Jr., Esq.
       Brown, Hay & Stephens, LLP
       205 Fifth Street, Suite 700
       P. O. Box 2459
       Springfield, IL 62705-2459

Plaintiff, Century Consultants, Ltd. ("Century") responds and objects as follows to Defendant, Springfield Public School District 186's, Request for Production of Documents (hereinafter "Request"):

## GENERAL OBJECTIONS

1.    The production of documents pursuant to this response is made without waiving, or intending to waive, but on the contrary preserving, and intending to preserve:

(a)    the right to object, on the grounds of competency, privilege, relevance or materiality, or any other proper grounds, to the use of the documents for any purpose, in whole or in part, in any subsequent step or proceeding in this action or any other action;

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

APR  8 2004

**REQUEST NO. 3**    Any and all documents of any kind, including, but not limited to, computerized records, or other tangible evidence relating, in any manner, to any damages, of any kind, allegedly suffered or sustained by Plaintiff, as a result of the acts alleged in the Complaint filed herein.

**RESPONSE**: Century objects to this Request to the extent it seeks documents protected from disclosure by the attorney-client and work product privileges. Notwithstanding the foregoing objection, and subject to the General Objections above, Century will produce for inspection and copying nonprivileged, responsive documents.

**REQUEST NO. 4**    Any and all documents, including, but not limited to, computerized records, correspondence of any kind, or other tangible evidence referring, reflecting, relating to, or constituting communication of any kind between any shareholder, officer, director, agent, or employee of Plaintiff, and any other person relating, in any manner, to the allegations contained in Plaintiff s Complaint.

**RESPONSE**: Century objects to this Request to the extent it seeks documents protected from disclosure by the attorney-client and work product privileges. Notwithstanding the foregoing objection, and subject to the General Objections above, Century will produce for inspection and copying nonprivileged, responsive documents.

**REQUEST NO. 5**    Any and all documents of any kind, including, but not limited to, computerized records, or other tangible evidence relating, in any manner, to any investigation or inquiry performed by, or on behalf of, Plaintiff relating, in any manner, to the allegations contained in Plaintiff s Complaint.

**RESPONSE**: Century objects to this Request to the extent it seeks documents protected from disclosure by the attorney-client and work product privileges. Notwithstanding the foregoing objection, and subject to the General Objections above, Century will produce for inspection and copying nonprivileged, responsive documents.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

-3-

# STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 97

STARK & STARK
A PROFESSIONAL CORPORATION
PO BOX 5315
PRINCETON, NJ 08543-5315
(609)896-9060
ATTORNEYS FOR PLAINTIFF

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS

CENTURY CONSULTANTS LTD.,

   Plaintiff,

v.

THE MILLER GROUP, INC., JOHN
G. MILLER, and THE
SPRINGFIELD PUBLIC SCHOOL
DISTRICT 186,

   Defendants.

CIVIL ACTION NO. 2003-CV-3105

### PLAINTIFF'S RESPONSES AND OBJECTIONS TO
### THIRD REQUEST TO PRODUCE DOCUMENTS OF DEFENDANT
### SPRINGFIELD PUBLIC SCHOOL DISTRICT 186

Plaintiff, Century Consultants Ltd. ("Century"), responds and objects as follows to the

Third Request To Produce Documents (the "Request") of defendant, Springfield Public School

District 186 (the "School District"):

**REQUEST NO. 1**:    Any and all written or computerized documents relating in any manner to

the claims at issue in this litigation.

**RESPONSE**: Century objects to this Request on the ground that it is overbroad.  Century further

objects to this Request on the ground that the scope of the Request on its face exceeds the scope

of discoverable information under Fed.R.Civ.P. 26.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

DEC 23 2004

**REQUEST NO. 21**: Any and all documents referring, reflecting, relating to, or supporting, in any manner, the allegation that MGI's "InfoSystems 3" products are based on copyrighted Star Base programs and are identical or substantially identical to the copyrighted programs in their literal code, in their structure, sequence and organization and various other respects.

**RESPONSE**: Subject to the General Objections listed below, Century will produce for inspection and copying any non-privileged responsive documents in its possession.

**REQUEST NO. 22**: Any and all documents referring, reflecting, relating to or establishing Plaintiff's allegation that it has lost or will lose license revenues for the Star_Base programs and has sustained and will sustain damages as a result of Defendant's alleged conduct. Such documents include, but are not limited to, all documents establishing any and all lost revenues as a result of the allegations contained in the Amended Complaint filed herein.

**RESPONSE**: Subject to the General Objections listed below, Century will produce for inspection and copying any non-privileged responsive documents in its possession.

**REQUEST NO. 23**: Any and all documents referring, reflecting, relating to or establishing that District 186 knew or should have known of the alleged infringement of MGI and Miller.

**RESPONSE**: Subject to the General Objections listed below, Century will produce for inspection and copying any non-privileged responsive documents in its possession.

**REQUEST NO. 24**: Any and all documents referring, reflecting, relating to, in any manner, or supporting the allegation that District 186 has either intentionally or unintentionally induced, caused and/or materially contributed to the alleged infringing conduct of MGI and Miller.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

-8-

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 98**

STARK & STARK
A PROFESSIONAL CORPORATION
PO BOX 5315
PRINCETON, NJ  08543-5315
(609)896-9060
ATTORNEYS FOR PLAINTIFF

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

CENTURY CONSULTANTS LTD.,

            Plaintiff,

v.

THE MILLER GROUP, INC., JOHN
G. MILLER, and THE
SPRINGFIELD PUBLIC SCHOOL
DISTRICT 186,

            Defendants.

CIVIL ACTION NO. 2003-CV-3105

**PLAINTIFF'S ANSWERS AND OBJECTIONS TO THE SPRINGFIELD**
**PUBLIC SCHOOL DISTRICT 186'S INTERROGATORIES**

Plaintiff, Century Consultants, Ltd. ("Century"), hereby answers and objects as follows to the interrogatories (the "Interrogatories") of defendant, Springfield Public School District 186 (the "Springfield School District"):

**GENERAL OBJECTIONS APPLICABLE TO ALL INTERROGATORIES**

1.     Century's responses are made without waiving any objections as to relevancy, privilege, or admissibility of any document or information provided in response to the Interrogatories in this or any subsequent proceeding or at the trial of this or any other action, on any ground.  A partial response to any interrogatory that has been objected to, in whole or in part, is not intended to be a waiver of the stated objection.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ  08543-5315

JUN  2 2003

**INTERROGATORY NO. 13**:    Identify each and every instance wherein plaintiff incurred any damage as a result of the facts alleged in the Complaint.

   **RESPONSE**:  Century responds to this interrogatory by referring to Century's Rule 26(a)(1)(C) disclosure statement.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 99**

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| CENTURY CONSULTANTS, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | No. 2003-CV-3105 |
| | ) | |
| v. | ) | |
| | ) | |
| THE MILLER GROUP, INC., JOHN G. MILLER, | ) | |
| and the SPRINGFIELD PUBLIC SCHOOL | ) | |
| DISTRICT NO. 186, | ) | |
| | ) | |
| Defendants. | ) | |

**NOTICE OF DEPOSITION**

TO:   Corporate Representative for         Guy Renzi Court Reporting
       Century Consultants, Ltd.            824 West State Street
       c/o Craig Hilliard                      Trenton, NJ 08618
       Stark & Stark
       P.O. Box 5315
       Princeton, NJ 08543-5315

       PLEASE TAKE NOTICE that the undersigned will take the deposition of Plaintiff Century Consultants, Ltd., on **Thursday, January 13, 2005 at 1:00 p.m.** at the offices of Stark & Stark, 993 Lenox Drive, Building Two, Lawrenceville, New Jersey, before a licensed court reporter, at which time testimony shall be recorded through stenographic means regarding the following topics listed in Exhibit A hereto, pursuant to Rule 30(b)(6) of the Code of Civil Procedure.

                                    **SPRINGFIELD PUBLIC SCHOOL
                                      DISTRICT NO. 186, Defendant**

                                    By:    s/ Almon A. Manson, Jr.

**ALMON A. MANSON, JR.**
Registration No. 1756761
**ROBERT M. SHUPENUS**
Registration No. 6238096
BROWN, HAY & STEPHENS, LLP
205 South Fifth Street, Suite 700
P.O. Box 2459
Springfield, IL 62705-2459
Telephone (217) 544-8491

## PROOF OF SERVICE

I, the undersigned, hereby certify that on December 29, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney of record for Plaintiff:

David A. Herman (dherman1@gifwinlaw.com)
Giffin, Winning, Cohen & Bodewes, P.C.
P.O. Box 2117
Springfield, IL 62705

Craig S. Hilliard (chilliard@stark-stark.com)
Stark & Stark
P.O. Box 5315
Princeton, NJ 08543-5315

Lance T. Jones (ltj@warpnet.net)
Law Office of Lance T. Jones
100 South Fifth Street
Springfield, IL 62703


s/Almon A. Manson, Jr.

## EXHIBIT A

A.   All facts which support or relate in any manner to the allegations in the Amended Complaint, including the nature, extent, type and results of all investigations regarding or relating in any manner to the allegations contained therein;

B.   Plaintiff's calculation and amount of damages regarding each Count of the Amended Complaint;

C.   The development of the Star_Base software that is the subject of Plaintiff's Amended Complaint, including:

   (1)   The identity of each person who took part in the development of each part of Star_Base that constitutes Plaintiff's original copyrighted work, together with the substance of their involvement;

   (2)   The identity of each person or entity from whom non-original portions of Star_Base were obtained, together with identification and substance of each such portion;

   (3)   The identity of each person who took part in obtaining copyright protection for any portion of Star_Base, together with all actions undertaken by each person;

   (4)   The factual basis for the allegation in paragraph 13 of the Amended Complaint, which states: "Over the years, Century has invested hundreds of thousands of dollars in the development of its student administration software."

D.   The identity of each person who acted on behalf of Plaintiff with respect to Defendant Springfield Public School District No. 186's procurement and/or use of Star_Base, together with the nature and extent of each person's involvement;

E.   The identity of each person who communicated with District 186 on behalf of Plaintiff in any way that relates to the allegations in the Amended Complaint, together with the date and substance of each such communication;

F.   The identity of each person who communicated with anyone other than District 186, including but not limited to The Miller Group, Inc., John G. Miller and/or The Miller Group, on behalf of Plaintiff in any way that relates to the allegations in the Amended Complaint, together with the date, substance and participants of each such communication;

G.   All measures undertaken by Plaintiff to protect the secrecy or confidentiality of all trade secrets allegedly disclosed or used by any defendant.

H. The location and substance of all written or computerized documents and other tangible evidence relating in any manner to Plaintiff's allegations and/or damages incurred resulting from any act or omission of any defendant herein.

I. The location and substance of all written or computerized documents and other tangible evidence relating in any manner to any investigation conducted by or on behalf of Plaintiff regarding any of the allegations contained in the Amended Complaint.

J. All facts supporting Plaintiff's allegation in paragraph 18 of the Amended Complaint, which states: "Century thereafter learned that the School District had contracted with another company, MGI, to assist in the design of a student software package," including but not limited to the date Plaintiff learned these facts, the person or entity who disclosed these facts to Plaintiff, the method of disclosure, and all actions taken by Plaintiff to discover these facts.

K. All facts supporting Plaintiff's allegation in paragraph 19 of the Amended Complaint, which states: "Upon information and belief, this 'new' system became a product known as 'InfoSystems 3', and as alleged below, this product infringes Century's rights in and to the Star_Base programs."

L. All facts supporting Plaintiff's allegation in paragraph 20 of the Amended Complaint that InfoSystems 3 "is precisely the type of system Century licenses to the School District."

M. All facts supporting Plaintiff's allegation in paragraph 20 of the Amended Complaint that:

> "Upon information and belief, the 'demonstration program; is also displayed at trade shows. This 'demonstration program' embodies and reflects elements of the Star_Base software which, as alleged throughout this Complaint, was and is an infringement of Century's copyrights. The mere display of this 'demonstration program' to the general public as a tool to advertise the availability of the InfoSystems 3 product is itself an infringing act under federal copyright laws."

N. All facts supporting Plaintiff's allegation in paragraph 23 of the Amended Complaint that:

> "Mr. Williams mailed to Century a list of the table definitions from MGI's InfoSystems 3 product. Upon comparing these definitions with Star_Base, Century has discovered that virtually all of the definitions were identical."

O. All facts supporting Plaintiff's allegation in paragraph 24 of the Amended Complaint that:

> "Mr Williams also mailed to Century the program listing from a portion of MGI's product – the 'student scheduler'. Once again, in comparing this to Star_Base, Century has discovered that the code used in InfoSystems 3 has verbatim references to Century's Star_Base tables."

P.     All facts supporting Plaintiff's allegation in paragraph 25 of the Amended Complaint that:

> "Upon information and belief, in the course of copying substantial portions of the copyrighted source code, MGI and Miller have not only gained access to the source code, they have physically removed copies of the programs from the licensee's premises for editing off-site."

Q.     All facts indicating the identity of any third party who learned any trade secret of Plaintiff as a result of any actions or omissions of any defendant, and/or any third party who received any competitive advantage by learning of each such trade secret, together with all damage incurred by Plaintiff as a result.

R.     All facts supporting Plaintiff's allegation in paragraph 43 of the Amended Complaint that: "Defendants' conduct was knowing and willful."

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 100**

# STARK & STARK
A PROFESSIONAL CORPORATION

CRAIG S. HILLIARD
DIRECT DIAL NUMBER
609-895-7346
DIRECT FAX NUMBER
609-895-7395
E-MAIL
chilliard@stark-stark.com

ATTORNEYS AT LAW

OFFICE:  993 LENOX DRIVE  LAWRENCEVILLE, NJ  08648-2389

MAILING:  PO BOX 5315  PRINCETON, NJ  08543-5315

609-896-9060 (PHONE)   609-896-0629 (FAX)

WWW.STARK-STARK.COM

January 6, 2005

## VIA TELEFAX AND REGULAR MAIL

Almon A. Manson, Jr., Esq.
Brown, Hay & Stephens
205 S. Fifth Street, Suite 700
P. O. Box 2459
Springfield, IL 62705-2459

JAN 1 0 2005

Re:  Century Consultants, Ltd. v. The Miller Group, et al
      Civil Action No. 2003-CV-3105

Dear Mr. Manson:

Enclosed is a listing of Century's designations under Rule 30(b)(6) in response to your Rule 30(b) deposition notice.  I would appreciate it if you would provide me, at your earliest convenience, with Springfield's designations in response to my Rule 30(b) notice.

Very truly yours,

STARK & STARK
A Professional Corporation

By:_____
      CRAIG S. HILLIARD
CSH/blj
enclosures
cc:    David A. Herman, Esq.(w/enc.)
        Joseph Shearn (w/enc.)

PRINCETON  •  PHILADELPHIA  •  CHERRY HILL

Century - Rule 30(b)(6) designees:

A.    Joseph LaMantia/Robert Magan
B.    Joseph LaMantia
C.    Joseph LaMantia
D.    Joseph LaMantia
E.    Joseph LaMantia/Robert Magan
F.    Joseph LaMantia/Robert Magan
G.    Joseph LaMantia
H.    Joseph LaMantia
I.    Joseph LaMantia
J.    Robert Magan
K.    Joseph LaMantia/Robert Magan
L.    Joseph LaMantia/Robert Magan
M.    Joseph LaMantia/Robert Magan
N.    Robert Magan
O.    Robert Magan
P.    Robert Magan
Q.    Joseph LaMantia/Robert Magan
R.    Joseph LaMantia/Robert Magan

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 101**

**E-FILED**
Wednesday, 02 February, 2005  09:21:08 AM
Clerk, U.S. District Court, ILCD

**IN THE UNTIED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

|  |  |  |
|---|---|---|
| CENTURY CONSULTANTS, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2003-CV-3105 |
| | ) | |
| THE MILLER GROUP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT SPRINGFIELD PUBLIC SCHOOL DISTRICT 186'S MOTION FOR RELIEF PURSUANT TO RULE 37

Defendant SPRINGFIELD PUBLIC SCHOOL DISTRICT 186 ("District 186"), through its counsel, Brown, Hay & Stephens, LLP, hereby moves this Court for an Order for relief in its favor and against plaintiff Century Consultants, Ltd. ("Century") and/or its attorneys pursuant to Fed.R.Civ.P. 37, and in support thereof states:

1.     On January 13, 2005, District 186 deposed Joseph E. LaMantia pursuant to Fed.R.Civ.P. 30(b)(6), following Century's designation of LaMantia to testify on its behalf regarding a number of topics set forth in the deposition notice.

2.     Century failed to adequately prepare LaMantia to testify on its behalf, and LaMantia claimed lack of knowledge regarding a substantial number of topics for which he was designated to testify, as well as matters that he should have reasonably known as Century's designee.

3.     Century's failure to produce a knowledgeable and prepared deponent to testify on its behalf results in substantial prejudice to District 186, as set forth in District 186's memorandum in support of this motion, filed contemporaneously herewith.

**WHEREFORE**, defendant SPRINGFIELD PUBLIC SCHOOL DISTRICT 186 respectfully requests the Court grant it relief pursuant to Fed.R.Civ.P. 37, and enter an Order:

a)    dismissing Century's cause of action against District 186 with prejudice; or in the alternative, barring Century from presenting any evidence regarding matters about which its designees were not prepared to testify, including damages;

b)    requiring Century and/or its counsel to pay attorneys' fees incurred by District 186 as a result of its investigating Century's claims, preparing for depositions, traveling to New Jersey and conducting depositions, and researching, drafting and submitting this motion; and

c)    awarding District 186 all other relief the Court deems proper.

SPRINGFIELD PUBLIC SCHOOL
DISTRICT 186, Defendant,


By:   s/ Robert M. Shupenus
          One of Its Attorneys

ALMON A. MANSON, JR.
Registration No. 1756761
ROBERT M. SHUPENUS
Registration No. 6238096
Brown, Hay & Stephens LLP
205 S. Fifth Street, Suite 700
P.O. Box 2459
Springfield, IL 62705-2459
Telephone (217) 544-8491

2

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon:

Lance T. Jones
Law Offices of Lance T. Jones
1100 South Fifth Street
Springfield, IL 62703

Craig Hilliard
Stark & Stark, P.C.
993 Lenox Drive
Lawrenceville, NJ 08648

David A. Herman
Giffin, Winning, Cohen & Bodewes, P.C.
One West Old State Capitol Plaza
Myers Building – Suite 600
P.O. Box 2117
Springfield, IL 62705

via electronic mail on this 2nd day of February, 2005.

s/Robert M. Shupenus

f:car\word\lit\rms\century\motion for relief – Rule 37

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 103**

# STARK&STARK
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

OFFICE: 993 LENOX DRIVE  LAWRENCEVILLE, NJ  08648-2389

MAILING: PO BOX 5315  PRINCETON, NJ  08543-5315

609-896-9060 (PHONE)   609-896-0629 (FAX)

WWW.STARK-STARK.COM

CRAIG S. HILLIARD
DIRECT DIAL NUMBER
609-895-7346
DIRECT FAX NUMBER
609-895-7395
E-MAIL
chilliard@stark-stark.com

April 21, 2006

*via telecopier & regular mail*

Robert Shupenus, Esq.
Brown, Hay & Stephens
205 S. Fifth Street, Suite 700
P. O. Box 2459
Springfield, IL 62705-2459

Re:   **Century Consultants, Ltd. v. The Miller Group, et al**
       **Civil Action No. 2003-CV-3105**

Dear Mr. Shupenus:

In several of our recent conversations, you have suggested that Century has not produced any documents or other evidence supporting its claims for damages against the School District.  In view of the fact that you are continuing the Rule 30(b)(6) deposition of Century next week on Century's damages claims, I am writing to clarify Century's position on its damages claims against the School District, at least with respect to Counts II and III of the Amended Complaint.

Counts II and III of the Amended Complaint, as you know, seek injunctive relief and damages against the School District for contributory and vicarious infringement.  Those claims, of course, are based on the Miller Defendants' primary infringement alleged in Count I of the Amended Complaint.  In Century's Rule 26 Disclosures and in its Amended Rule 26 Disclosures, we outlined the factual basis and calculation of damages, and made it clear that Century sought to recover in part:

> "[T]he profits of The Miller Group from the sale and/or license of the infringing software.  Based on the information produced to date by The Miller Group concerning its gross revenues, including but not limited to the "Statement of Losses" and accompanying Affidavit of John G. Miller filed with the Court as well as all documents marked as exhibits during the deposition of John G. Miller, and in accordance with Century's responses to written discovery requests in this action, Century will seek damages of $1,313,000.  Century reserves the right to elect, at any time before final judgment as

PRINCETON  •  PHILADELPHIA  •  CHERRY HILL  •  NEW YORK

# STARK&STARK

### A PROFESSIONAL CORPORATION

Robert Shupenus, Esq.
April 21, 2006
Page 2

permitted by statute, 17 U.S.C. §504(c), an award of statutory damages for infringement.
Century would seek an amount not less than $150,000 as statutory damages based on the
allegation of willful infringement."

A prevailing plaintiff in an infringement action is entitled to recover the infringer's profits
attributable to the infringement. Under 17 U.S.C. §504(b), the copyright owner "is required to
present proof only of the infringer's gross revenue, and the infringer is required to prove his or
her deductible expenses and the elements of profit attributable to factors other than the
copyrighted work". *See also Frank Music Corporation v. Metro-Goldwyn-Mayer Inc.*, 772 F.2d
505, 514 (9th Cir. 1985). Accordingly, Century has disclosed that it intends to seek the Miller
Defendants' profits, and relies on the documents and testimony provided by the Miller
Defendants to establish their gross revenues, including Mr. Miller's deposition transcript, and the
documents marked Miller-2 and Miller-3 at that deposition. This is all Century is required to do
under the statute.

Although our initial evaluation of those documents and testimony indicated that the gross
revenues were $1,313,000, a further examination reveals that they are actually higher. In the
document marked Miller-2 at the deposition of John Miller, the Miller Defendants summarized
their gross revenues on the sale of IS3 to school clients through the end of May 2003. The total
gross revenues (excluding the "non school related" clients) are $1,379,215. Mr. Miller testified
in his deposition (see pp. 59-72) that in addition to these gross revenues, the Miller Defendants
received: 1) the balance on their $120,000 contract with Oswego (an additional $46,676 above
the number disclosed in Miller-2); 2) $55,000 from Kewanee School District; and 3) at least
$25,000 from Marengo School District. Finally, as Mr. Miller testified, he received
approximately $100,000 in 2004, virtually all of which came on the balance of the Adlai
Stevenson School District contract. Accordingly, it appears that the Miller Defendants' gross
revenues on IS3 totalled at least:

| | |
|---|---|
| From Miller-2 and Miller-3 | $1,379,215 |
| Balance on Oswego contract | 46,676 |
| Kewanee | 55,000 |
| Marengo | 25,000 |
| Additional Revenues in 2004 | 100,000 |
| | |
| Total | $1,605,891 |

# STARK&STARK
### A PROFESSIONAL CORPORATION

Robert Shupenus, Esq.
April 21, 2006
Page 3


Century contends that the School District can be liable for this entire amount as a contributory and/or vicarious infringer. A co-infringer, as well as a contributory or vicarious infringer, can be held liable for all of the infringer's profits where the defendants were "engaged in a partnership, joint venture, or similar enterprise." 3 M. Nimmer, *Nimmer on Copyright* §12.04[C][3], at 12-50 to -51 (1984). *See also Belford, Clarke & Co. v. Scribner,* 144 U.S. 488, 507-08 (1892)(printer jointly liable for publisher's profits because they were "practically partners"); *Frank Music Corporation v. Metro-Goldwyn-Mayer Inc.,* 772 F.2d 505, 519 (9th Cir. 1985)(recognizing that co-infringers can be jointly and severally liable for all profits when they are "practically partners"). Here, of course, the School District held a direct, contractual financial stake in the success of IS3. Under its contract, it was entitled to receive 10% of the Miller Defendants' revenues from the sale of IS3. The more money the Miller Defendants made, the more money the School District made, and therefore the contract made them practically, if not for all purposes, partners in the development and sale of IS3 to other school districts.

This letter shall serve as a supplement to Century's Rule 26(a)(1) disclosures and its answers to interrogatories. Please call me if you wish to discuss these matters.

Very truly yours,

STARK & STARK
A Professional Corporation

By:_____
      CRAIG S. HILLIARD
CSH/blj
c.:    Joseph E. LaMantia (via telecopier & regular mail)
       David Herman, Esq.
       Lance Jones, Esq. (via telecopier & regular mail)

**STATEMENT OF UNDISPUTED MATERIAL FACT NUMBER 104**

```
 1                   UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF ILLINOIS
 2                       SPRINGFIELD DIVISION


 3

     CENTURY CONSULTANTS, LTD.,    )
 4                                 )
                  Plaintiff,       )
 5                                 )
                  -vs-             )     No. 2003-CV-3105
 6                                 )
     THE MILLER GROUP, INC.,       )
 7   JOHN G. MILLER, and           )
     SPRINGFIELD PUBLIC SCHOOL     )
 8   DISTRICT NO. 186,             )
                                   )
 9                Defendants.      )


10


11                         DEPOSITION


12                             OF


13                      JOSEPH LAMANTIA


14


15

          Deposition of JOSEPH LAMANTIA, taken via video
16   conference at the instance of the Defendants, on the 25th
     day of April, 2006, at University of Illinois Springfield,
17   Brookens Library, Springfield, Illinois, before Karin
     Paisley, CSR.
18


19


20


21


22


23


24
```

                                                                1

1          A.      Okay.  We lost revenue from Springfield.  We lost

2   revenue from sales in Illinois.

3          Q.      Like what?

4          A.      Well, there were several school districts we had

5   put in some bids for and did not receive.

6          Q.      Like which ones?

7          A.      I'm sorry.  I don't have the list in front of me.

8          Q.      Does a list exist somewhere?

9          MR. HILLIARD:  Well, Rob, to be clear, you can

10  ask these questions; but I will indicate for the record that

11  we are, as I think I indicated in court at our last hearing,

12  that we are not advancing any claim for damages based on any

13  lost sales to any customers.  In other words, we are not

14  claiming that we suffered particular damages and are not

15  seeking recovery of the damages based on lost sales;

16  although, the witness can certainly answer your questions,

17  that is not part of our claim.

18          MR. SHUPENUS:  So, you have a count that you have

19  alleged for unfair competition; but you're making no claim

20  for lost sales; is that correct, sir?

21          MR. HILLIARD:  We are not making any claim for

22  lost sales.  That's correct.

23          Q.      (Mr. Shupenus) And you will agree with that, Mr.

24  LaMantia?

34