E-FILED
Tuesday, 16 January, 2007  04:19:37 PM
Clerk, U.S. District Court, ILCD

STARK & STARK
A PROFESSIONAL CORPORATION
PO BOX 5315
PRINCETON, NJ 08543-5315
(609)896-9060
ATTORNEYS FOR PLAINTIFF

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| CENTURY CONSULTANTS LTD.,<br><br>Plaintiff,<br><br>v.<br><br>THE MILLER GROUP, INC., JOHN G. MILLER, and THE SPRINGFIELD PUBLIC SCHOOL DISTRICT 186,<br><br>Defendants. | CIVIL ACTION NO. 03-CV-3105 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY

NOW COMES the defendant, CENTURY CONSULTANTS LTD. ("Century"), by and through its attorneys and for its Memorandum of Law in support of Century's Motion for Summary Judgment, states as follows:

## PRELIMINARY STATEMENT

While the technology involved in this case is fairly complex, the facts supporting the underlying claims are not. Century licensed its copyrighted student software to the Springfield Public School District 186 ("Springfield") under a written license agreement which prohibited Springfield from sharing Century's protected source code and database structures with any third

parties. Despite the licensing agreement and copyright, Springfield secretly shared the software

program with one of Century's competitors, The Miller Group, Inc., and its principal John G. Miller

(collectively, "the Miller Group"), ostensibly for the purpose of developing a new software

application. So brazen was the unauthorized use of Century's software that Springfield and the

Miller Group entered into an agreement under which Springfield required the Miller Group to copy

and use Century's software. Moreover, that same agreement also provided that Springfield would

share in the revenues generated by The Miller Group's sale of this new software application to other

school districts. Century learned of this theft of its software directly from Springfield's own

employees, and thereafter filed this lawsuit and successfully secured a preliminary injunction from

this Court. The facts developed in discovery have only underscored the strength of Century's claims

as they stood when it first brought the lawsuit. Accordingly, Century now seeks summary judgment

as to liability for Springfield's breach of its licensing agreement with Century, and Springfield's and

the Miller Group's infringement of Century's copyright.


## STATEMENT OF FACTS

### A.    Century and Star_Base

Since 1976, Century has been engaged in the business of developing and marketing computer

programs and associated software, including educational software packages.  *See* Hilliard Decl. at

Exhibit "1"; LaMantia Decl. ¶ 2. Star_Base is the trade name for Century's flagship computer

software product that is marketed to elementary and secondary schools (both public and private).

Star Base functions as an administrative tool to assist in all record keeping and reporting of student

information in various areas including, but not limited to, student demographics, attendance, class

2

schedules, grades, discipline and test scores. *Id.* at ¶ 3.

Each of these areas of information is referred to as a "module". Each module may be used by one or all schools within a school district. For example, the attendance module is normally used to track enrollment throughout an entire district, since that information is key to a district's funding from the State. The scheduling module, on the other hand, might only be used in a high school or middle school where a complex set of course offerings makes the use of a computer scheduler desirable and often necessary. *Id.* at ¶ 4.

A single module is selected by a user (an employee of the licensed school district) from a menu displayed on a screen. The menu is provided by an associated main computer program. Each module is comprised of many individual computer sub-programs. The attendance module, as an example, contains between 20 and 25 unique sub-programs accessed by a main menu program. One sub-program would provide the capability to perform a specific function on the computer. In other words, there are functions, i.e. sub-programs, to enable input of and updates to the school calendar, student entries and withdrawals, and student absences. Other sub-programs report on the information that has been entered. These reports are designed to print detailed and/or summary information in the format and sequence that is required by school districts. *Id.* at ¶ 5.

The sub-programs that comprise Star Base and are embodied in Century's copyright registration are written in a human-readable language. Many computer languages exist, so it is necessary for programmers to be trained and experienced in the language being used. The human-readable form of a program is referred to as the "source" program, or sometimes as the source code. In order for a computer to execute or run the programs, they must be translated into computer-readable folin, usually called object code. This translation is accomplished through the use of

3

another program known as an assembler or compiler. *Id.* at ¶ 6. When a school or school district licenses one or more of the Star Base modules, all of the object code and most of the source code for the licensed modules are transferred to the school's computer system.

  The underlying database structures and much of the code for the sub-programs has changed little since Star Base was registered in 1995. *See* Hilliard Decl. at Exhibit "12"; LaMantia Decl. II at ¶ 6. Between 75% and 90% of the actual source code from the Star Base package registered in November 1995 still exists in the later Version 3 (which Century has now registered with the Copyright Office). Moreover, the database structures today are substantially the same as they were in November 1995 when Century filed its registration application for Star_Base. Although a few individual fields have been added to some of the tables, and some tables added, Century's tables (which number between 300-400 in the system) are substantially the same today as they were in 1995 when the original registration was filed. *Id.* Springfield's Director of Information Systems, Brent Qualls, has testified that it was his job to be aware of any changes to the existing Star Base software installed with Springfield in 1995, and that the only such change was merely to a class attendance module. *See* Hilliard Decl. at Exhibit "4"; Qualls dep. T200-21 to T203-12.

  Although each program has a unique function, common elements must exist throughout all programs in the system in order for them all to work together accurately and efficiently. The common elements that all programs contain are the data files. Data files contain the records of information that are managed and processed by the programs. The structure of these records is vital to the functioning of the entire system. Much of the effort in designing a complex system goes into the layout, organization, composition and interrelationship of the records in the data files. Every record is composed of individual data elements, or fields. These fields must be organized and

4

grouped both logically and functionally. Each field must be given a unique name. The size and type of each data element must be established. The resulting "record layout" or "file definition" becomes the basic component of every program in the system. *See* Hilliard Decl. at Exhibit "1"; LaMantia Decl. at ¶ 7.

While it is possible for any other software developer to create or design independent programs that would achieve the same result as the Star_Base programs, by directly copying Century's tables and database programs for the purpose of making derivative works, another software developer would save enormous time and expense. Century spent years, thousands of man-hours and hundreds of thousands of dollars developing and refining the Star_Base programs. As of today, a majority of Century's revenues is based on the Star Base programs. *See* Hilliard Decl. at Exhibit "1"; LaMantia Decl. ¶8.

The Star_Base code and screen outputs are registered as copyrights with the U.S. Copyright Office as of November 22, 1995.. *See* Hilliard Decl. at Exhibit "1"; LaMantia Decl. Exhibit "A". The screen outputs for all of the Star_Base modules also bear a notice of copyright. When a Star Base user at the school level accesses the main menu program for any of the modules, a copyright symbol appears on the screen. *Id.* at Exhibit "B".

During the course of these proceedings, the Defendants have made numerous, cumulative challenges to the propriety and sufficiency of Century's registration, the voluminous procedural history of which is contained in the parties' previous motion papers. These challenges culminated in this Court's July 13, 2006, Order stating, *inter alia:*

> The Court finds that Century has provided competent proof that it owns a copyright to the codes included in the original Star_Base program.

> Century's Star_Base program was a preexisting work that was properly registered in 1995. Any infringement of that program's original elements – i.e., its literal code, structure, sequence or organization – gives rise to a actionable claim. *See Qad, Inc. v. ALN Associates, Inc.,* 770 *F.Supp.* 1262, 1265 (N.D.Ill. 1991).

*See* Hilliard Decl. at Exhibit "10".

Century licenses individual Star_Base modules (often as a package of many modules) to school districts under a written license agreement. Springfield is such a licensee. *See* Hilliard Decl. at Exhibit "2"; Magan Decl. at Exhibit "A". Although the form of license agreement has been modified slightly over the years, all of the form agreements (including Springfield's) contain confidentiality terms that severely restrict the licensee's right and ability to disclose the modules to unlicensed third parties. *Id.*

The license agreement with Springfield, for example, provides as follows:

> Confidentiality - The [computer] package and any permitted copies contain valuable trade secrets of CENTURY and shall at all times remain the property of CENTURY; and Licensee, by this license, acquires no rights in and to the package except the right to use the package at the location indicated herein. Licensee shall not use the package for the benefit of any other party, whether or not for a consideration; shall not sell, rent, loan, disclose, or otherwise communicate or make available the package, or any part or modification thereof to any person, and shall maintain the confidentiality of the package, unless otherwise agreed to by CENTURY in writing.

*Id.* As the language above reflects, Century considers the source and object code for the Star_Base programs to be protected trade secrets, and was therefore careful in its licensing of the Star_Base software to bind its licensees to an obligation of confidentiality. *See* Hilliard Decl. at Exhibit "2"; Magan Decl. at ¶ 11.

6

**B.      Century, Springfield and the Miller Group**

Under the license agreement between Century and Springfield, Century licensed Star_Base to Springfield in exchange for an initial license fee and periodic maintenance fee payments. *See* Hilliard Decl. at Exhibit "2"; Magan Decl. at Exhibit "A". Springfield employs several people who work in an information technology department and who are generally responsible for the day-to-day administration of Star Base and other software applications which meet the needs of the schools. Henry Stuckey, David Williams and Brent Qualls were all employed by Springfield in this capacity. Century's Manager of Programming/Research & Development, Bob Magan, has had frequent communications with Springfield over the years leading up to this lawsuit, because he was the employee of Century primarily responsible for addressing any questions or issues Springfield had concerning the support of the Star Base package. *Id.* at 4.

In February 2003, Magan received a call from Mr. Stuckey, Springfield's Information Systems Director, who advised Magan that Springfield wanted to cease its maintenance contract with Century for Star_Base. Under Century's license agreement with Springfield, if the schools elect to go "off maintenance" (i.e. they elect to stop making periodic payments for support services), the district can still continue to use the software package, but they are no longer entitled to any updates nor are they entitled to receive any support. *Id.* at 115.

Magan thereafter learned that Springfield had contracted with a company unfamiliar to Magan, the Miller Group, to assist Springfield in the design of a student software package. *Id.* at ¶ 6. In early February 2003, Magan received an unsolicited phone call from Don Randle, whom he recognized as a former Springfield information technology employee. Randle said to Magan, "How would you feel if someone was stealing your software?" When Magan asked what he meant, Randle

explained: 1) that he had left his employment at Springfield about 6 months earlier; 2) that while still employed, he was aware that Springfield had retained the Miller Group to write some front-end programs to interface with the Star_Base database; and 3) that he "knew for sure" that The Miller Group was using Century's database structures, and that he was fairly certain that The Miller Group was also using Century's scheduler program (a component of the Star Base software). Randle further told Magan that Mr. Qualls, Springfield's Director of Information Systems, had been "reassigned" within Springfield to assist The Miller Group in developing this new software'. Randle went on to tell Magan that if he wanted further information, he should contact Mr. Williams, one of Springfield's systems analyst, at Springfield. *Id.* at ¶ 7.

## C.    Star_Base and InfoSystems 3

Following his conversation with Randle, Magan discovered that the Miller Group had posted information on its internet website concerning a product called InfoSystems 3. The InfoSystems 3 product was marketed on the website as an "online student information system," which is precisely the type of system Century licensed to Springfield. *See* Hilliard Decl. at Exhibit "2"; Magan Decl. at Exhibit "B".

Magan thereafter received an unsolicited phone call from Mr. Williams shortly after his conversation with Randle. Mr. Williams told Magan that the Miller Group "stole" Century's

---

'At his deposition, Mr. Qualls confirmed that he was physically stationed at the Miller Group's offices for a period of approximately two years. *See* Hilliard Decl. at Exhibit "4"; Qualls dep. T109-13 to T110-2. During that time, there was a "T1" connection between Springfield and the Miller Group *(Id.* at T112-20 to T113-4) which gave direct access to Qualls and the Miller Group personnel to all of the Star_Base software package including its protected source codes. *Id.* at T114-4 to T115-20.

8

software, that employees of Springfield (including Williams) had told the Miller Group that they didn't think that what they were doing was right, and that the Miller Group's response was: "we are here and [Century] is in New Jersey", and "they will never find out." Mr. Williams further told Magan that he and others cautioned The Miller Group that Century's software was copyrighted. *Id.* at II 9.

Mr. Williams then mailed to Magan a list of the table definitions from the Miller Group's InfoSystems 3 product. Upon comparing these definitions with Star_Base, Magan discovered that virtually all of the definitions were identical. *Id.* at Exhibit "C". Mr. Williams also mailed to Magan the program listing from a portion of The Miller Group's product — the "student scheduler". Once again, in comparing this to Star_Base, Magan discovered that the code used in InfoSystems 3 has verbatim references to Century's Star_Base tables. *Id.* at Exhibit "D".

Later on, during his deposition, Mr. Williams went on to detail the various meetings involving Springfield personnel where Springfield personnel raised continuing, specific concerns regarding the copying of copyrighted portions of Star_Base by Springfield and the Miller Group:

Q. So, am I correct that this situation, it bothered you when you learned of it?
A. Well, yeah. I mean, every — we had Monday morning meetings, and time after time, Henry [Stuckey] had brought up, you know, I think, you know, we might have issues here of what's going — they weren't concerned with it.
Q. What were you bringing up?
A. Well, this — we're duplicating, I felt, a product that exists.
Q. You brought that up at the meeting?
A. No, Henry brought — Henry bring — I was, you know, I just had to go to meetings.
Q. Henry brought that up at the Monday morning meetings?
A. Yes, that, you know, this stuff is copyrighted.
Q. Henry used the word "copyrighted?"
A. Yeah, he's used it before.
Q. Who was at these Monday morning meetings?
A. Mike Holinga, Karen Thompson, Brent [Qualls], Jack Miller, Henry, and myself.
Q. How regular were these Monday morning meetings?

9

A.      Every Monday morning.

Q.      For how long a period of time?

A.      I'm not for sure, but I knowed (sic) I went for over a year, because when they moved Brent over to the Miller Group, Henry asked me to start going to, you know, to sit in.

*See* Hilliard Decl. at Exhibit "5"; Williams Dep. at T57-2 to T58-7.

This same sentiment was shared by Mr. Stuckey:

Q.      Did you express any opinion about whether the district should be working with the Miller Group to develop a new information system?

A.      Yes.

Q.      And what was that opinion?

A.      Well, I think my opinion to them is that they needed to check the contract out to make sure we could do that with the clauses that was in our contract.

Q.      In what contract?

A.      In our –

Q.      Century's license agreement?

A.      That's correct.

Q.      You had some doubts about that?

A.      Yes, I did.

Q.      And why did you have those doubts?

A. Because I knew they was working, letting The Miller Group dial in to our District and looking at software, and with Brent being over there doing the same, I thought it might be a problem with that.

Q.      How do you know that the district was letting The Miller Group dial in?

A.      Because we had a connection, or they had a connection over to our servers.

Q.      So you knew that there was a direct connection between the Miller Group's offices, they were able to dial up into District 186's server?

A.      That's correct.

Q.      On which Star-Base's programs and source code resided?

A.      That's correct.

Q.      And that dial-up capability existed during a period of time when Mr. Qualls was physically working over at the Miller Group's offices?

A.      That's correct.

*See* Hilliard Decl. at Exhibit "3"; Stuckey Dep. at T46-14 to T48-4.

### D.     Further Confirmation of the Copying of Star_Base

As if such admissions on the part of Springfield's own employees were not enough, the actual copying of the Star Base software was specifically contemplated in Springfield's meetings (Hilliard Decl. at Exhibit "9") and then <u>required</u> in the provisions of the contract between the Miller Group and Springfield, in which the parties explicitly agreed that the Miller Defendants would use the existing database structures' of Star Base in developing what would become InfoSystems 3. *See* Hilliard Decl. Exhibit "7". Moreover, that same agreement also gives Springfield a percentage of the revenue generated from the sale of what would become InfoSystems. *Id.*

Furthermore, the admitted reproductive efforts on the part of Springfield and the Miller Group proved to be extremely successful, as manifested in the expert testimony in the record. *See* Hilliard Decl. at Exhibit "8". Century's expert report clearly demonstrates the substantial similarities between Star_Base and InfoSystems 3, including database structures, schema, tables, field names and the verbatim reproduction of code. Id.

Finally, if any doubt at all as to the Defendants' actions remained, there is the testimony of the Miller Group's chief architect of InfoSystems 3, Dr. William Choat, in which he clearly states that he copied the Star Base data structures to develop InfoSystems 3. In his own words:

> Q:     And Miller 9 [pp. 1-49 of the Star Base Data Dictionary]. Do you recognize those documents?
> A:     Oh yeah. Absolutely.
>
> Q.     Now, is this what you referred to before when you said – we talked about the database structures?
> A.     Yeah. Yeah, this is exactly what I was talking about. The columns and – within each

---

[2] Again, these are the same existing data structures which were part of Star_Base when it was registered in 1995.

11

table.

Q.    Did you use those documents in any way?

A.    Yeah. That's all I had. I used them like crazy. Yeah. It's kind of like seeing an old friend again. I forgot about these.

Q.    Do you believe that looking at these documents assisted you in being able to develop the front end application?

A.    That's all I had. Yeah. Oh, this was my – I carried it home at night.

*See* Hilliard Decl. at Exhibit "6", Choat Dep. T59-14 to T61-4.


**ARGUMENT**

## I. STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. Pro.* 56(c); *see Ruiz-Rivera v. Moyer,* 70 *F.3d* 498, 500-01 (7th Cir.1995). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 *U.S.* 317, 323-24 (1986). However, a genuine issue of material fact exists only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 249 (1986). In this matter, the evidence in the record is so one-sided as to render summary judgment on behalf of Century an inescapable conclusion.

12

## II. SPRINGFIELD'S BREACH OF LICENSING AGREEMENT

Under Illinois law the elements of a cause of action for breach of contract include: (1) an offer and acceptance, (2) consideration, (3) definite and certain contractual terms, (4) the plaintiffs performance of his contractual obligations, (5) the defendant's breach of the contract, and (6) damages resulting from the breach. *See Green v. Trinity Intern. University,* 801 *N.E.2d* 1208, 1214 (Ill.App.2d 2003) (citing *Barille v. Sears Roebuck & Co.,* 682 N.E.2d 118 (Ill.App.3d 1997)).

The licensing agreement between Century and Springfield was a valid contract and Century performed its obligations under the contract (as manifested in Springfield's possession of Star Base).

Furthermore, the confidentiality provisions of the licensing agreement are clear:

> Licensee shall not use the package for the benefit of any other party, whether or not for a consideration; shall not sell, rent, loan, disclose, or otherwise communicate or make available the package, or any part or modification thereof to any person, and shall maintain the confidentiality of the package, unless otherwise agreed to by CENTURY in writing.

*See* Hilliard Decl. at Exhibit "2"; Magan Decl. at Exhibit "A".

Undisputed as well are the following facts: 1) numerous Springfield employees admit that Springfield gave the Miller Group direct access to Star Base with the intention that Star_Base would be used to build a competing software package; 2) Springfield and the Miller Group entered into a contract that explicitly stated that Star_Base would be used to build a competing software package and that Springfield and the Miller Group would split the profits from the sale of that new software package *(See* Hilliard Decl. at Exhibit "2"; Magan Decl. at Exhibit "A"); and 3) the Miller Group did create and sell a competing software package *(See* Hilliard Decl. at Exhibit "11").

Therefore, summary judgment must be granted against Springfield as to liability, based upon Springfield's breach of its licensing agreement with Century.

13

## III. THE MILLER GROUP'S DIRECT COPYRIGHT INFRINGEMENT

To succeed in proving a claim of infringement under the Copyright Act, 17 U.S.C. §101 *et seq.,* Century must demonstrate two basic elements: 1) ownership of the copyrights; and 2) copying by the defendants. *See, e.g., Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.,* 797 *F.2d* 1222, 1231 (3d Cir. 1986); *Wickham v. Knoxville Int'l Energy Exposition,* 739 *F. 2d* 1094, 1097 (6th Cir. 1984); *Sid & Marty Krofft Television v. McDonald's Corp.,* 562 *F.2d* 1157, 1162 (9th Cir. 1977); *In re Aimster Copyright Litig.,* 252 *F .Supp.2d* 634, 648 (N.D.III.2002) (citing *Feist Pub., Inc. v. Rural Tel. Serv. Co.,* Inc., 499 *U.S.* 340, 361 (1991)); *Theotokatos v. Sara Lee Personal Products,* 971 *F. Supp.* 332, 338 (N.D. Ill. 1997).

### A.      Ownership of valid copyright

The United States Copyright Office has issued a registration certificate for the Star_Base code at issue in this action. *See* Hilliard Decl. at Exhibit "1"; LaMantia Decl. at Exhibit"A". That registration certificate constitutes *prima facie* evidence of the validity of the copyrights in the Star Base programs. *See* 17 *U.S.C.* §410(c); *Apple Computer, Inc. v. Formula Ina, Inc.,* 725 *F.2d* 521, 523 (9th Cir. 1984); *Balsamo/Olson Group v. Bradley Place Ltd. Partnership,* 966 *F. Supp.* 757, 761 (C.D. Ill. 1996); *Gallery House, Inc. v. Y i,* 582 *F. Supp.* 1294, 1297 (N.D. Ill. 1984). Furtheiinore, this Court has held that, "Century has provided competent proof that it owns a copyright to the codes included in the original Star_Base program." Hilliard Decl. at Exhibit "10." Accordingly, there is no dispute as to Century's ownership of a valid copyright in Star_Base.

14

B.    **Copying: Access and Substantial Similarity**

Normally, in addressing the proof necessary to establish unlawful copying, the courts have found that because "it is rarely possible to prove copying through direct evidence, ... copying may be proved inferentially by showing that the defendant had access to the allegedly infringed copyrighted work and that the allegedly infringing work is substantially similar to the copyrighted work." *Whelan Associates,* 797 F.2d at 1231-32 (citation omitted)(emphasis added). *See also, Atari Inc. v. North Am. Philips Consumer Elecs. Corp.,* 672 *F. 2d* 607, 614 (7th Cir. 1982). In this context, "substantial similarity" means sufficient similarity of the elements in the copyrighted programs to the elements in defendants' program to "support a reasoned inference that more probably than not the elements were copied from the copyrighted work." *See, e.g., Lotus Development Corp. v. Borland Int'l, Inc.,* 788 *F. Supp.* 78, 84 (D. Mass. 1992).

Century has submitted undisputed proofs that the Defendants had full access [3] to Star_Base, including the source code, and that elements of the Miller Group's InfoSystems 3 product are substantially similar to Century's copyrighted works. Here, there is no dispute that Springfield had possession of Century's source code, that Springfield gave the Miller Group a direct link to the code and that a Springfield employee worked directly with the Miller Group in using Star_Base to develop the software package that would become InfoSystems 3. Thus there is no question as to proof of access. *See Kamar International v. Russ Berrie & Co.,* 657 *F.2d* 1059, 1062 (9th Cir. 1981) ("Proof of access requires only an opportunity to view or to copy plaintiff's work"); *Johnson Controls v. Phoenix Control Systems,* 886 *F.2d* 1173, 1176 (9th Cir. 1989)(holding that access was "clear"

_____

[3]Here, the striking similarities -- indeed, verbatim identity -- between at least portions of the InfoSystems 3 program and Century's copyrighted programs obviates the need to show access. *See, e.g., Testa v. Janssen,* 492 *F. Supp.* 198, 202 (E.D. Pa. 1980).

because several employees of infringing company had worked for company holding copyrights and had been personally involved in authorship of the copyrighted work).

Moreover, Century's expert has issued a written report opining, among other things, that: a) the software programs developed by The Miller Group are substantially similar to Star_Base in their structure, sequence, and organization; b) that The Miller Group's scheduler program, which is one of the core Star_Base programs, is substantially similar to Star_Base's scheduler program, both in its literal source code and in its structure, sequence, and organization; and c) the database structures of The Miller Group's software package are substantially similar to Star_Base's database structures. Hilliard Decl. at Exhibit 8 at 51-53.

**C.     Direct evidence of actual copying**

Finally, Century submits that the above analysis is not even necessary, as this is the rare case where there is direct evidence of copying. As noted above, Springfield's and the Miller Group's own employees admitted that the Miller Group was actually copying Star Base, pursuant to the explicit provisions of the contract between Springfield and the Miller Group. Coupled with the other evidence in the record, Century submits that there can be no question that The Miller Group's actions constitute direct evidence of copyright infringement. Therefore, summary judgment must be granted against the Miller Group as to liability on the copyright infringement claims.

IV.    **SPRINGFIELD'S CONTRIBUTORY COPYRIGHT INFRINGEMENT**

    In order to prevail on a claim for contributory copyright infringement, the plaintiff must show that the defendant: (1) had knowledge of the direct infringer's conduct; and (2) materially contributed to the infringing conduct. *QSRSoft, Inc. v. Restaurant Technology, Inc.,* 2006 *WL* 3196928 at \*4 (N.D.Ill. 2006)(citing *Monotype Imaging, Inc. v. Bitstream, Inc.,* 376 *F.Supp.2d* 877, 883 (N.D.Il1.2005)); *In re Aimster Copyright Litigation,* 252 *F.Supp.2d* 634, 654 (N.D.Il1.2002)(stating that a contributory copyright infringement occurs when the defendant "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another); *Design Craft Fabric Corp. v. K-Mart Corp.,* 1999 WL 1256258, at \*4 (N.D. Ill. Dec. 21, *1999)(quoting Gershwin Publ'g Corp. v. Columbia Artists Mgt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971)).

    Here, the undisputed facts demonstrate that Springfield entered into a contract with The Miller Group under which Springfield required The Miller Group to develop a student administration software product which used the "existing data structures (StarBase)". *See* Hilliard Decl. at Exhibit "2"; Magan Decl. at Exhibit "A". Moreover, that same contract provided that Springfield would share in the revenues generated by the sale of this new product. *Id.*

    Further, Springfield set up a direct "Tl" link with the Miller Group so that the Miller Group personnel working on InfoSystems 3 would have immediate access to all of Star_Base. *See* Hilliard Decl. at Exhibit "4"; Qualls dep. at T112-20 to T113-4;T114-4 to T115-20. In fact, Springfield stationed one of its employees full-time at the Miller Group's offices to assist The Miller Group in creating InfoSystems 3 using, in part, the elements of Star_Base. *Id.* At T109-13 to T110-2. Based on the above undisputed facts, there can be no question that Springfield has knowingly induced,

caused and materially contributed to the infringing conduct of the Miller Group. Therefore, summary judgment must be granted against Springfield, based upon Springfield's contributory copyright infringement.

## V. SPRINGFIELD'S VICARIOUS COPYRIGHT INFRINGEMENT

The elements of vicarious copyright infringement require that the defendant: 1) at all material times possessed the right and ability to supervise the infringing activity; and 2) had a direct financial interest in the infringer's activity. QSRSoft, Inc., 2006 *WL* 3196928 at \*4 (citing *Aimster,* 252 *F.Supp.2d* at 654); *see, also, Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.,* 955 *F.2d* 1143, 1150 (7th Cir.1992) (vicarious copyright infringement is established when a defendant has "the right and ability to supervise infringing activity and also has direct financial interest in such activities.").

Springfield had the right and ability to supervise the Miller Group's infringing activities, and had a direct financial interest in those activities. Under its agreement with the Miller Group, Springfield required the Miller Defendants to develop a product that used copyrighted portions of Star_Base. *See* Hilliard Decl. at Exhibit "2"; Magan Decl. at Exhibit "A". Importantly, the agreement also: a) contained other requirements for the development of the software (dictated by Springfield); b) gave Springfield the right to review development progress on a monthly basis; and c) accorded Springfield the "right to terminate this Agreement at any time if it is not satisfied with development progress or the pace of System development". *Id.* Clearly, the agreement demonstrates that Springfield had the "right and ability" to supervise the development of the infringing software.

Indeed, one need look no further than the testimony of Springfield's own Information

Systems Director, Mr. Stuckey:

> Q. Who, if anyone, at the district was *supervising* the Miller Group's work?
> A. Mike Holinga [Springfield's Chief Information Officer].
> Q. Okay? You were not?
> A. That's correct.
> Q. How do you know it was Mr. Holinga who was *supervising* the Miller Group's work?
> A. Because he was the one that met with them at least once or more a week. They held weekly or twice a week meetings with the Miller Group.

*See* Hilliard Decl. at Exhibit "3", Stuckey Dep. at T57-23 to T58-8 (emphasis added).  *See, also,*

*Seals v. Compendia Media Group,* 290 *F.Supp.2d* 947, 953 (N.D. Ill. 2003) ("Although plaintiff in

the instant case does not allege that defendants directly supervised the distribution of plaintiffs

copyrighted works, the fourth amended complaint does allege that defendants supervised and

directed the copying of plaintiffs works and delivered those copies to [co-defendant], essentially

setting the alleged infringement in motion").

Moreover, the same contract between Springfield and the Miller group provided that

Springfield would share in the revenues generated by the sale of the new software product.  *Id.*

Thus, under the contract, Springfield had a direct financial interest in the sale of the software.

Therefore, summary judgment must be granted against Springfield, based upon Springfield's

vicarious copyright infringement.

19

## **CONCLUSION**

For all of the foregoing reasons, Century respectfully requests that the Court grant Century's

Motion for Summary Judgment.


        Respectfully submitted,

        CENTURY CONSULTANTS, LTD.,
        Plaintiff


        By: Craig Hilliard /s/ _____
                One of its Attorneys

Lead Counsel
Craig S. Hilliard
STARK & STARK
A Professional Corporation
P.O. Box 5315
Princeton, NJ 08543-5315
(609) 896-9060

Local Counsel
David A. Herman
GIFFIN, WINNING, COHEN & BODEWES, P.C.
One West Old State Capitol Plaza
Myers Building - Suite 600
P.O. Box 2117
Springfield, IL 62705
(217) 525-1571