## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

CENTURY CONSULTANTS LTD.,

                Plaintiff,

v.

THE MILLER GROUP, INC., JOHN
G. MILLER, and THE
SPRINGFIELD PUBLIC SCHOOL
DISTRICT 186,

                Defendants.

CIVIL ACTION NO. 03-CV-3105

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
### DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, Century Consultants Ltd. ("Century"), respectfully submits this Memorandum of Law in opposition to the motions of defendants, Springfield Public School District 186 (the "School District") and The Miller Group, Inc. and John G. Miller (collectively the "Miller Defendants"), seeking summary judgment in their favor on the First Amended Complaint under Federal Rule of Civil Procedure 56.[1]

### INTRODUCTION

Century filed this action against the School District and the Miller Defendants, seeking damages and injunctive relief arising out of defendants' unlawful use of Century's flagship

---

[1] Only the School District filed a Memorandum of Law and supporting exhibits. The Miller Defendants rely exclusively on the School District's papers in support of their own motion.

student administration software product known as "Star_Base".   Century filed this action in May 2003, and successfully secured a Temporary Restraining Order from this Court, enjoining defendants from the further sale of an infringing product known as "InfoSystems 3" or "IS3". That Temporary Restraining Order was turned into a preliminary injunction on consent, and the parties have been engaged in discovery for the last three years concerning Century's myriad claims, which include direct copyright infringement, contributory and vicarious infringement, misappropriation of trade secrets, unfair competition and breach of contract.

Defendants' contention that they are entitled to judgment as a matter of law on the infringement claims is insupportable.   The undisputed facts show: 1) that Century owns the copyrights in Star_Base; 2) that this lawsuit is founded on copyrighted elements of Star_Base derived from Century's original 1995 copyright registration; 3) that the School District gave the Miller Defendants direct access to Star_Base; and 4) that there are substantial similarities between Star_Base and the Miller Defendants' competing software product, InfoSystems 3. These facts are more than enough to demonstrate genuine issues for trial.   Moreover, because there is substantial evidence of the School District's participation and financial stake in the actions of the Miller Defendants, Century has demonstrated the viability for trial of its claims for contributory and vicarious infringement.

Defendants further contend that Century's damages claims are so speculative and unsupported that they cannot prevail at trial as a matter of law.   Defendants are wrong.   Under the Copyright Act, Century can recover all direct profits generated from the sale of the infringing product.   The statute expressly permits Century to make out a damages case by introducing evidence of The Miller Group's gross revenues from the sale of InfoSystems 3.   Century has

done exactly that, relying on The Miller Group's own sworn statements and documents demonstrating its gross revenues. Defendants attempt to muddy the damages waters by citing inapplicable precedent, but the record on close examination is clear that Century has made out a sufficient – indeed, strong – *prima facie* damages case for the recovery of direct profits. At the very least, the evidence is sufficient enough to be presented to a jury.

Finally, defendants' argument that Century's pendent state claims should be dismissed merely because the Court suppressed one piece of evidence – a tape recording of a single conversation – is incomprehensible. Defendants argue that the "fruit of the poisonous tree" doctrine compels the conclusion that every other piece of evidence presented by Century, after years of discovery, the production of thousands of documents, expert forensic analysis of the software applications and numerous depositions of School District employees and other witnesses, is "tainted" simply because one phone conversation was taped. Therefore, argues the School District, because all of the evidence should be suppressed, Century cannot prevail on its state claims. The argument is specious. Defendants cannot show that the mountain of evidence outlined in this Memorandum was all "derived" solely from the recording of a phone conversation between a Century employee and a School District employee. Virtually all of the evidence had nothing to do with the taped conversation. Accordingly, defendants' application to dismiss all of the state law claims on this narrow ground must be denied.

## CENTURY'S RESPONSE TO SCHOOL DISTRICT'S STATEMENT OF UNDISPUTED FACTS

1.    Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    Undisputed.

5.    Disputed. Mr. LaMantia did not testify that "various incarnations" of Star_Base were created over a number of years. The word "incarnation" might imply that completely different embodiments of the software were created, when in fact, Mr. LaMantia testified that successive versions of the Star_Base software, each a derivative work based on earlier versions, were developed. This Court has already held that Century owns the copyrights in the Star_Base programs at issue in this lawsuit, and therefore the cited facts are immaterial to the issues in dispute. *See* Order of July 13, 2006, at 7.

6.    Undisputed.

7.    Undisputed. Century further submits that this fact is immaterial to the issues on this motion because: 1) as this Court has already held, this lawsuit is based on claims arising from elements of Star_Base covered by the original 1995 registration, *see* Order of July 13, 2006 at 7; and 2) Century's subsequent registration of Star_Base (Version 3) in May 2006 covers any claims for actual damages based on any elements contained only in the derivative works.

8.    Undisputed. Century further submits that this fact is immaterial to the issues on this motion because: 1) as this Court has already held, this lawsuit is based on claims arising from elements of Star_Base covered by the original 1995 registration, *see* Order of July 13, 2006 at 7; and 2) Century's subsequent registration of Star_Base (Version 3) in May 2006 covers any claims for actual damages based on any elements contained only in the derivative works.

9.     Disputed to the extent the statement suggests or implies that Century's copyrights in the
       Star_Base software derive solely from the registration certificate filed by the company in
       1995.  This Court has already held that Century has a valid copyright in the original
       version of Star_Base registered in 1995.  Century has also received a registration on the
       derivative work known as Star_Base (Version 3), which was the version produced on cd-
       rom to defendants during discovery in this action.  *See* Declaration of Kenneth Watov
       filed on 5/26/06 (Docket Entry #144), Exhibits "F", "G" and "H".   Century further
       submits that this fact is immaterial to the issues on this motion because: 1) as this Court
       has already held, this lawsuit is based on claims arising from elements of Star_Base
       covered by the original 1995 registration, *see* Order of July 13, 2006 at 7; and 2)
       Century's subsequent registration of Star_Base (Version 3) in May 2006 covers any
       claims for actual damages based on any elements contained only in the derivative works.

10.    Undisputed.  Century further submits that this fact is immaterial to the issues on this
       motion because: 1) as this Court has already held, this lawsuit is based on claims arising
       from elements of Star_Base covered by the original 1995 registration, *see* Order of July
       13, 2006 at 7; and 2) Century's subsequent registration of Star_Base (Version 3) in May
       2006 covers any claims for actual damages based on any elements contained only in the
       derivative works.

11.    Undisputed.  Century further submits that this fact is immaterial to the issues on this
       motion because: 1) as this Court has already held, this lawsuit is based on claims arising
       from elements of Star_Base covered by the original 1995 registration, *see* Order of July
       13, 2006 at 7; and 2) Century's subsequent registration of Star_Base (Version 3) in May

2006 covers any claims for actual damages based on any elements contained only in the derivative works.

12.   Undisputed in that Century has filed two copyright registration applications in connection with its Star_Base software, the first in 1995 and the second in 2006. Century denies the statement to the extent it states or implies that Century's copyrights in the Star_Base programs at issue in this lawsuit derive solely from the 1995 registration. Century further submits that this fact is immaterial to the issues on this motion because: 1) as this Court has already held, this lawsuit is based on claims arising from elements of Star_Base covered by the original 1995 registration, *see* Order of July 13, 2006 at 7; and 2) Century's subsequent registration of Star_Base (Version 3) in May 2006 covers any claims for actual damages based on any elements contained only in the derivative works.

13.   Disputed to the extent the statement suggests or implies that Century's copyrights in the Star_Base programs at issue in this lawsuit derive solely from the 1995 registration. Century further submits that this fact is immaterial to the issues on this motion because: 1) as this Court has already held, this lawsuit is based on claims arising from elements of Star_Base covered by the original 1995 registration, *see* Order of July 13, 2006 at 7; and 2) Century's subsequent registration of Star_Base (Version 3) in May 2006 covers any claims for actual damages based on any elements contained only in the derivative works.

14.   Undisputed that Century filed in May 2006 and received a registration certificate for Version 3 of the Star_Base software. The statement is disputed to the extent that it implies that copyright "protection" derives solely from a registration certificate. Century further submits that this fact is immaterial to the issues on this motion because: 1) as this

6

Court has already held, this lawsuit is based on claims arising from elements of Star_Base covered by the original 1995 registration, *see* Order of July 13, 2006 at 7; and 2) Century's subsequent registration of Star_Base (Version 3) in May 2006 covers any claims for actual damages based on any elements contained only in the derivative works.

15.    Undisputed that the First Amended Complaint refers to a license agreement between Century and the School District, the terms of which speak for themselves.  It is undisputed that Century and the School District entered into several license agreements.

16.    Undisputed.

17.    Undisputed that the First Amended Complaint refers to a license agreement between Century and the School District, the terms of which speak for themselves.   It is undisputed that Century and the School District entered into several license agreements.

18.    Undisputed.  Nevertheless, Century submits that this fact is immaterial because Century does not allege in this lawsuit that the School District improperly made its own modifications to the software, only that the School District (without Century's permission) disclosed the software to a third party competitor – The Miller Group – which copied and created an infringing work.   *See also* Declaration of Robert Magan.

19.    Undisputed.   Nevertheless, Century submits that this fact is immaterial because Century does not allege in this lawsuit that the School District improperly made its own modifications to the software, only that the School District (without Century's permission) disclosed the software to a third party competitor – The Miller Group – which copied and created an infringing work.   *See also* Declaration of Robert Magan.

20.    Undisputed.    Nevertheless, Century submits that this fact is immaterial because Century does not allege in this lawsuit that the School District improperly made its own modifications to the software, only that the School District (without Century's permission) disclosed the software to a third party competitor – The Miller Group – which copied and created an infringing work.   *See also* Declaration of Robert Magan.

21.    Disputed.   *See* Declaration of Robert Magan.

22.    Disputed.   *See* Declaration of Robert Magan.

23.    Disputed.    *See* Hilliard Decl., Exhibits "7" and "22".  Moreover, the statement is immaterial because the central issue in this lawsuit is not whether InfoSystems 3 is the same as the School District's system, but whether InfoSystems 3 is substantially similar in its code, logic and database structures to Star_Base.  Century's expert reports, and the other evidence developed during discovery which is outlined below, demonstrates at the very least genuine issues of material fact on this central issue in the litigation.  *See generally* Century's "Additional Material Facts Claimed to Defeat The Motion" *infra*.

24.    Disputed only to the extent the statement misstates the number of separate written contracts.  The School District entered into at least three separate written agreements with The Miller Group, including agreements dated August 17, 1998, September 1, 1998 and December 21, 1998.  The August 1998 and September 1998 agreements were attached to defendants' moving papers.  *See also* Hilliard Declaration, Exhibit "4" (December 21, 1998 agreement).

25.     Undisputed that the School District and The Miller Group entered into a "Consulting Agreement" dated August 17, 1998, the terms of which speak for themselves.

26.     Undisputed that the School District and The Miller Group entered into a "Contract for Consulting Services" dated September 1, 1998, the terms of which speak for themselves.

27.     Undisputed.

28.     Undisputed.

29.     Undisputed.

30.     Undisputed, except that Century disputes the statement to the extent it suggests that the School District "purchased" Star_Base from Century. The Star_Base software was licensed, not sold, to the School District, under the terms of written license agreements. *See* Hilliard Decl., Exhibit "2", at Exhibit "A".

31.     Undisputed.

32.     Undisputed.

33.     Undisputed.

34.     Undisputed.

35.     Disputed. Williams indeed had "first hand knowledge" because he was familiar with Star_Base and the work of The Miller Group, he gathered information directly from the new system to provide to Century and gathered information from Henry Stuckey, his boss and the School District's Information Systems Director. *See* Hilliard Decl. Exhibit "12", at 23-24, 37-41, 50-68 (deposition testimony of David Williams). The Williams Affidavit on this and other points conflicts with Williams' earlier deposition testimony.

9

Because the Williams Affidavit on which the School District relies was prepared and executed after Williams gave deposition testimony on the same subject areas, the Affidavit is immaterial and inadmissible. *See Amadio v. Ford Motor Company,* 238 F.3d 919, 926 (7th Cir. 2001)(rejecting consideration of subsequent affidavit on summary judgment motion where affiant failed to provide explanation for why testimony was not given on same subject in prior deposition); *Russell v. Acme-Evans Company,* 51 F.3d 64, 67 (7th Cir. 1995)("We have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit").

36.    Disputed.   Williams testified in his deposition that he believed, based on information he gathered directly from within the School District's information systems group, that InfoSystems 3 was based on Star_Base and was developed using proprietary elements of Star_Base. *See* Hilliard Decl. Exhibit "12", at 23-24, 37-41, 50-68 (deposition testimony of David Williams).  In fact, it was this very belief that led him to provide information to Century.  The Williams Affidavit on this and other points conflicts with Williams' earlier deposition testimony.  Because the Williams Affidavit on which the School District relies was prepared and executed after Williams gave deposition testimony on the same subject areas, the Affidavit is immaterial and inadmissible. *See Amadio v. Ford Motor Company,* 238 F.3d 919, 926 (7th Cir. 2001)(rejecting consideration of subsequent affidavit on summary judgment motion where affiant failed to provide explanation for why testimony was not given on same subject in prior deposition); *Russell v. Acme-Evans Company,* 51 F.3d 64, 67 (7th Cir. 1995)("We have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit").

37.  Disputed.   Williams testified in his deposition that he believed, based on information he gathered directly from within the School District's information systems group, that InfoSystems 3 was based on Star_Base and was developed using proprietary elements of Star_Base.  *See* Hilliard Decl. Exhibit "12", at 23-24, 37-41, 50-68 (deposition testimony of David Williams).  In fact, it was this very belief that led him to provide information to Century.  The Williams Affidavit on this and other points conflicts with Williams' earlier deposition testimony.  Because the Williams Affidavit on which the School District relies was prepared and executed after Williams gave deposition testimony on the same subject areas, the Affidavit is immaterial and inadmissible.  *See Amadio v. Ford Motor Company,* 238 F.3d 919, 926 (7th Cir. 2001)(rejecting consideration of subsequent affidavit on summary judgment motion where affiant failed to provide explanation for why testimony was not given on same subject in prior deposition); *Russell v. Acme-Evans Company,* 51 F.3d 64, 67 (7th Cir. 1995)("We have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit").

38.  Undisputed.

39.  Undisputed.

40.  Undisputed.

41.  Undisputed.   Nevertheless, Century submits that this fact is immaterial because Century does not rely on the tape recording of the conversation to support its claims in this lawsuit.  Instead, Century relies on the statements and testimony of Robert Magan of his recollections of the actual conversation with David Williams, and the deposition testimony of David Williams of his recollections of the same conversation.  *See* Hilliard

Decl., Exhibit "2" and Exhibit "12", at 23-24, 37-41, 50-68.   Moreover, because the

Williams Affidavit on which the School District relies was prepared and executed after

Williams gave deposition testimony on the same subject areas, the Affidavit is immaterial

and inadmissible.  *See Amadio v. Ford Motor Company,* 238 F.3d 919, 926 (7th Cir.

2001)(rejecting consideration of subsequent affidavit on summary judgment motion

where affiant failed to provide explanation for why testimony was not given on same

subject in prior deposition); *Russell v. Acme-Evans Company,* 51 F.3d 64, 67 (7th Cir.

1995)("We have been highly critical of efforts to patch up a party's deposition with his

own subsequent affidavit").

42.     Undisputed.   Nevertheless, Century submits that this fact is immaterial because Century

does not rely on the tape recording of the conversation to support its claims in this

lawsuit.  Instead, Century relies on the statements and testimony of Robert Magan of his

recollections of the actual conversation with David Williams, and the deposition

testimony of David Williams of his recollections of the same conversation.  *See* Hilliard

Decl., Exhibit "2" and Exhibit "12", at 23-24, 37-41, 50-68.   Moreover, because the

Williams Affidavit on which the School District relies was prepared and executed after

Williams gave deposition testimony on the same subject areas, the Affidavit is immaterial

and inadmissible.  *See Amadio v. Ford Motor Company,* 238 F.3d 919, 926 (7th Cir.

2001)(rejecting consideration of subsequent affidavit on summary judgment motion

where affiant failed to provide explanation for why testimony was not given on same

subject in prior deposition); *Russell v. Acme-Evans Company,* 51 F.3d 64, 67 (7th Cir.

12

1995)("We have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit").

43.   Undisputed.

44.   It is undisputed that Magan requested that Williams mail to him certain documents, and that Williams indeed mailed the documents to Magan, and that the documents mailed are attached to the Magan Declaration as Exhibits "C" and "D". *See* Hilliard Decl. Exhibit "2". To the extent the statement suggests that the materials were solely from "District 186's student information system", the statement is disputed. Williams testified that the documents were obtained from the "new system" developed by The Miller Group. *See* Hilliard Decl., Exhibit "12", at 23-24, 37-41, 50-68. The program listing itself, mailed by Williams to Magan, refers to "IS3". Because the Williams Affidavit on which the School District relies was prepared and executed after Williams gave deposition testimony on the same subject areas, the Affidavit is immaterial and inadmissible. *See Amadio v. Ford Motor Company,* 238 F.3d 919, 926 (7th Cir. 2001)(rejecting consideration of subsequent affidavit on summary judgment motion where affiant failed to provide explanation for why testimony was not given on same subject in prior deposition); *Russell v. Acme-Evans Company,* 51 F.3d 64, 67 (7th Cir. 1995)("We have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit").

45.   Undisputed.

46.   Undisputed.

13

47.    Disputed.   The portion of the scheduler program provided by Williams to Magan

contains a file path identifier indicating that it was from "IS3" or InfoSystems 3.  *See*

Hilliard Decl., Exhibit "2", at Exhibit "D".  In any event, the fact is immaterial because

Century claims, and has submitted proof, that InfoSystems 3 is a translated duplicate of

the School District's student administration software.  *See* Hilliard Decl., Exhibit "7" and

"22".  Century submits, moreover, that because the Williams Affidavit on which the

School District relies was prepared and executed after Williams gave deposition

testimony on the same subject areas, the Affidavit is immaterial and inadmissible.  *See*

*Amadio v. Ford Motor Company,* 238 F.3d 919, 926 (7th Cir. 2001)(rejecting

consideration of subsequent affidavit on summary judgment motion where affiant failed

to provide explanation for why testimony was not given on same subject in prior

deposition); *Russell v. Acme-Evans Company,* 51 F.3d 64, 67 (7th Cir. 1995)("We have

been highly critical of efforts to patch up a party's deposition with his own subsequent

affidavit").   Williams' Affidavit directly conflicts with his deposition testimony on this

point and it should be disregarded.  *See* Hilliard Decl., Exhibit "12", at 23-24, 37-41, 50-

68.

48.    Undisputed.

49.    Undisputed.

50.    Undisputed.

51.    Undisputed.

52.    Undisputed.

14

53.     Undisputed.

54.     Disputed.   Mr. Magan's Declaration was accurate in that it explicitly recited

        conversations Mr. Magan had with others, including David Williams and Don Randle.

        Century submits, moreover, that because the Williams Affidavit on which the School

        District relies was prepared and executed after Williams gave deposition testimony on the

        same subject areas, the Affidavit is immaterial and inadmissible.  *See Amadio v. Ford

        Motor Company,* 238 F.3d 919, 926 (7th Cir. 2001)(rejecting consideration of subsequent

        affidavit on summary judgment motion where affiant failed to provide explanation for

        why testimony was not given on same subject in prior deposition); *Russell v. Acme-Evans

        Company,* 51 F.3d 64, 67 (7th Cir. 1995)("We have been highly critical of efforts to patch

        up a party's deposition with his own subsequent affidavit").   Williams' Affidavit directly

        conflicts with his deposition testimony on this point and it should be disregarded.  *See

        Hilliard Decl., Exhibit "12", at 23-24, 37-41, 50-68.

55.     Undisputed.

56.     Undisputed that the quoted references accurately recite the statements made on the tape

        recording.  Century disputes, however, the School District's statement that the quoted

        excerpts establish that Mr. Williams told Mr. Magan that he "did not know" whether IS3

        actually incorporated Century's student scheduler.  In fact, the tape recording

        demonstrates that Mr. Williams told Mr. Magan that he learned the information directly

        from another School District employee and his immediate supervisor, Henry Stuckey.

57.     Disputed to the extent the School District states or implies that Mr. Magan formed an

        "erroneous" belief based on his conversations with Mr. Williams.  However, the

                                            15

statement is undisputed to the extent that it quotes accurately from the deposition transcript of Mr. Magan.

58. Disputed. The statement is nothing more than a hypothetical question drawn from deposition testimony and therefore is immaterial. In fact, there is substantial evidence in the record that Williams was correct in his beliefs that The Miller Group had developed a new software application based on Star_Base. *See generally* Century's "Additional Material Facts Claimed to Defeat The Motion" *infra*.

59. Undisputed.

60. Undisputed.

61. Undisputed.

62. Disputed. Magan reviewed the materials he received from Williams, and compared them to Star_Base, and concluded that there were substantial similarities. *See* Hilliard Decl., Exhibit "2", at paras. 10 and 11.

63. Undisputed.

64. Undisputed. However, Magan was not designated by Century as the company's Rule 30(b)(6) witness on damages issues, and therefore, this fact is immaterial.

65. Undisputed. However, Magan was not designated by Century as the company's Rule 30(b)(6) witness on damages issues, and therefore, this fact is immaterial.

66. Undisputed.

67. Undisputed.

68. Undisputed.

69. Undisputed.

70.    Undisputed.

71.    Undisputed.

72.    Undisputed.

73.    Undisputed.

74.    Undisputed.   To the extent this statement suggests or implies that Century cannot demonstrate that The Miller Group had access to the Star_Base software and edited the programs off-site, the statement is disputed.  *See* #22-#25 of Century's "Additional Material Facts Claimed to Defeat The Motion" *infra*.  *See also* Hilliard Decl., Exhibits "7" and "22".

75.    Undisputed.  To the extent this statement suggests or implies that Century cannot demonstrate that The Miller Group had access to the Star_Base software and edited the programs off-site, the statement is disputed.  *See* #22-#25 of Century's "Additional Material Facts Claimed to Defeat The Motion" *infra*.  *See also* Hilliard Decl., Exhibits "7" and "22".

76.    Undisputed.

77.    Undisputed.

78.    Undisputed.

79.    Undisputed.

80.    The statement is undisputed in that it accurately quotes a portion of Mr. Lewis' testimony. However, to the extent the School District states or implies that Mr. Lewis' opinions and conclusions are flawed because he relied on the wrong data and/or made incorrect assumptions about the sources of the data, the statement is immaterial because the School

17

District's arguments were already made and rejected by the Court following the *Daubert*

hearing. *See* Order of March 21, 2006, at 5-6.

81.    The statement is undisputed in that it accurately quotes a portion of Mr. Lewis' testimony.

However, to the extent the School District states or implies that Mr. Lewis' opinions and

conclusions are flawed because he relied on the wrong data and/or made incorrect

assumptions about the sources of the data, the statement is immaterial because the School

District's arguments were already made and rejected by the Court following the *Daubert*

hearing. *See* Order of March 21, 2006, at 5-6.

82.    The statement is undisputed in that it accurately cites a statement in Mr. Lewis' initial

report. However, to the extent the School District states or implies that Mr. Lewis'

opinions and conclusions are flawed because he relied on the wrong data and/or made

incorrect assumptions about the sources of the data, the statement is immaterial because

the School District's arguments were already made and rejected by the Court following

the *Daubert* hearing. *See* Order of March 21, 2006, at 5-6.

83.    The statement is undisputed in that it accurately quotes a portion of Mr. Lewis' testimony.

However, to the extent the School District states or implies that Mr. Lewis' opinions and

conclusions are flawed because he relied on the wrong data and/or made incorrect

assumptions about the sources of the data, the statement is immaterial because the School

District's arguments were already made and rejected by the Court following the *Daubert*

hearing. *See* Order of March 21, 2006, at 5-6.

84.    Disputed.   As this Court has already concluded, Mr. Lewis justifiably relied on the

representations of the School District and The Miller Group as to the data sets delivered

in discovery to Century.  The Miller Group provided Data Set 3 directly to Century in

discovery in response to a request for a copy of the InfoSystems 3 application installed at

the School District.  *See* Hilliard Decl., Exhibit "23", at 137-139.   To the extent,

therefore, that the School District states or implies that Mr. Lewis' opinions and

conclusions are flawed because he relied on the wrong data and/or made incorrect

assumptions about the sources of the data, the statement is immaterial because the School

District's arguments were already made and rejected by the Court following the *Daubert*

hearing.  *See* Order of March 21, 2006, at 5-6.

85.     Undisputed in that the School District has merely cited a portion of Mr. Lewis' deposition

        testimony.

86.     Undisputed in that Mr. Lewis performed an analysis of certain sample tables in the course

        of framing his opinion.  To the extent the School District's statement suggests that Mr.

        Lewis was representing that he examined every table in the software applications, that

        statement is disputed.  No such representation was made in the report.  In fact, Mr. Lewis

        testified at the *Daubert* hearing that he did not believe such an exhaustive survey was

        necessary because the tables he reviewed were so similar that a further analysis was

        unnecessary.  *See* Hilliard Decl., Exhibit "23", at 157-58 and 163.

87.     Undisputed in that the School District has merely cited a portion of Mr. Lewis'

        deposition.  However, to the extent the School District states or implies that Mr. Lewis'

        opinions and conclusions are flawed because he relied on the wrong data and/or made

        incorrect assumptions about the sources of the data, the statement is immaterial because

the School District's arguments were already made and rejected by the Court following

the *Daubert* hearing.  *See* Order of March 21, 2006, at 5-6.

88.   Undisputed in that the School District has merely cited a portion of Mr. Lewis'

deposition.  To the extent the School District's statement suggests that Mr. Lewis

deliberately omitted reporting on his comparison of other tables in the software

applications, that statement is disputed.  Mr. Lewis testified at the *Daubert* hearing that

he reported on four tables, that he reviewed additional ones, and that he did not believe

any further exhaustive survey was necessary because the tables he reviewed were so

similar that a further analysis was unnecessary.  *See* Hilliard Decl., Exhibit "23", at 157-

58 and 163.

89.   Undisputed in that the School District has merely cited a portion of Mr. Lewis'

deposition.  To the extent the School District's statement suggests that Mr. Lewis

concluded that only one table in IS3 was infringing, that statement is disputed.  Mr. Lewis

opined that there were substantial similarities in all of the tables he compared, and he

further testified that he did not believe that further analysis of all of the tables was

necessary because of the substantial similarities in the tables he did examine.  *See* Hilliard

Decl., Exhibit "23", at 157-58 and 163.

90.   Undisputed in that the School District has merely cited one particular allegation of the

First Amended Complaint.  To the extent the School District's statement suggests that

Century's allegations of infringement were confined to unlawful copying of source code,

that statement is disputed.  The First Amended Complaint alleges that the "derivative

works, including [The Miller Defendants']"InfoSystems 3" product, are based on the

copyrighted Star_Base programs, and are identical or substantially similar to the copyrighted programs in their literal code, in their structure, sequence and organization, and in various other respects." *See* First Amended Complaint, para. 30. Century alleges that IS3 infringes Century's Star_Base programs not only in literal source code, but in other respects as well. *See* Hilliard Decl., Exhibits "7" and "22".

91.     Undisputed in that the School District has merely cited a portion of Mr. Lewis' deposition. To the extent the School District's statement suggests that Mr. Lewis concedes that there can be no substantial similarity between the software applications merely because they are written in different programming languages, the statement is disputed. As Mr. Lewis testified at the *Daubert* hearing, consistent with his reports, the structure and logic of the programs were substantially similar even though written in different languages. *See* Hilliard Decl., Exhibit "23", at 123-24.

92.     Undisputed in that the School District has merely cited a portion of Mr. Lewis' deposition. To the extent the School District's statement suggests that Mr. Lewis concedes that there can be no substantial similarity between the software applications merely because they are written in different programming languages, the statement is disputed. As Mr. Lewis testified at the *Daubert* hearing, consistent with his reports, the structure and logic of the programs were substantially similar even though written in different languages. *See* Hilliard Decl., Exhibit "23", at 123-24.

93.     Undisputed in that the School District has merely cited a portion of Mr. Lewis' deposition. To the extent the School District's statement suggests that Mr. Lewis concedes that there can be no substantial similarity between the software applications

merely because they are written in different programming languages, the statement is

disputed. As Mr. Lewis testified at the *Daubert* hearing, consistent with his reports, the

structure and logic of the programs were substantially similar even though written in

different languages. *See* Hilliard Decl., Exhibit "23", at 123-24. *See also* Hilliard Decl.,

Exhibits "7" and "22".

94.    Undisputed. However, the School District cites only Century's initial Rule 26

Disclosures. Century served Amended Rule 26 Disclosures which provided even more

detail on its damages claims. *See* Hilliard Decl., Exhibit "21".

95.    Undisputed.

96.    Undisputed.

97.    Undisputed.

98.    Undisputed.

99.    Undisputed.

100.   Undisputed.

101.   Disputed. Mr. LaMantia did not claim a "lack of knowledge" in all areas of questioning

on damages during the initial Rule 30(b)(6) deposition. In all events, Century submits

that this fact is immaterial because Mr. LaMantia submitted to further deposition

testimony at a later date, the School District does not contend that it did not have a full

and fair opportunity to explore the nature and basis of Century's damages claims, and

indeed Century laid out its damages claims in detail in a letter provided to the School

District's counsel before the conclusion of the Rule 30(b)(6) deposition. *See* Letter

attached to School District's motion papers under "Undisputed Material Fact #103".

102.    Undisputed.

103.    Undisputed.

104.    Undisputed that the School District accurately quotes a portion of the deposition

transcript of Mr. LaMantia.  The statement is disputed to the extent it states or implies

that Century was not seeking damages.  The basis and calculation of Century's damages

claim is outlined in the letter attached to the School District's motion papers under

"Undisputed Material Fact #103".

### FACTS CLAIMED TO BE IMMATERIAL TO THE MOTION

Century has listed in the preceding section those facts contained in defendants' motion

papers which it contends are immaterial to the motions.

### ADDITIONAL MATERIAL FACTS CLAIMED TO DEFEAT THE MOTION

1.    Century began as a sole proprietorship in 1976.  In December 1977, Century was

incorporated in New Jersey.  Since that time, Century has been engaged in the

business of developing and marketing computer programs and associated

software, including educational software packages.  *See* Declaration of Craig S.

Hilliard (the "Hilliard Dec."), Exhibit "1", at para. 2.

2.    Star_Base is the trade name for Century's flagship computer software product that

is marketed to elementary and secondary schools (both public and private).

Star_Base functions as an administrative tool to assist in all record keeping and

reporting of student information in various areas including, but not limited to,

student demographics, attendance, class schedules, grades, discipline and test

scores.  *Id.* at para. 3.

3.     Each of these areas of information is referred to as a "module".  Each module may

be used by one or all schools within a school district.  For example, the attendance

module is normally used to track enrollment throughout an entire district, since

that information is key to a district's funding from the State.  The scheduling

module, on the other hand, might only be used in a high school or middle school

where a complex set of course offerings makes the use of a computer scheduler

desirable and often necessary.  *Id.* at para. 4.

4.     A single module is selected by a user (an employee of the licensed school district)

from a menu displayed on a screen.  The menu is provided by an associated main

computer program.  Each module is comprised of many individual computer sub-

programs.  The attendance module, as an example, contains between 20 and 25

unique sub-programs accessed by a main menu program.  One sub-program would

provide the capability to perform a specific function on the computer.  In other

words, there are functions, i.e. sub-programs, to enable input of and updates to the

school calendar, student entries and withdrawals, and student absences.  Other

sub-programs report on the information that has been entered.  These reports are

designed to print detailed and/or summary information in the format and sequence

that is required by school districts.  *Id.* at para. 5.

5.     The sub-programs that comprise Star_Base and are embodied in the copyright

registration described below are written in a human-readable language.  Many

computer languages exist, so it is necessary for programmers to be trained and

experienced in the language being used.  The human-readable form of a program

24

is referred to as the "source" program, or sometimes as the source code. In order for a computer to execute or run the programs, they must be translated into computer-readable form, usually called object code. This translation is accomplished through the use of another program known as an assembler or compiler. *Id.* at para. 6.

6.    Although each program has a unique function, common elements must exist throughout all programs in the system in order for them all to work together accurately and efficiently. The common elements that all programs contain are the data files. Data files contain the records of information that are managed and processed by the programs. The structure of these records is vital to the functioning of the entire system. Much of the effort in designing a complex system goes into the layout, organization, composition and interrelationship of the records in the data files. Every record is composed of individual data elements, or fields. These fields must be organized and grouped both logically and functionally. Each field must be given a unique name. The size and type of each data element must be established. The resulting "record layout" or "file definition" becomes the basic component of every program in the system. *Id.* at para. 7.

7.    It is certainly possible for any other software developer to create or design independent programs that would achieve the same result as the Star_Base programs. By directly copying Century's tables and database programs for the purpose of making derivative works, however, another software developer would

25

save enormous time and expense.  Century spent years, thousands of man-hours and hundreds of thousands of dollars developing and refining the Star_Base programs.   As of today, a majority of Century's revenues is based on the Star_Base programs.  *Id.* at para. 8.

8.    The Star_Base source code and screen outputs are registered as copyrights with the U.S. Copyright Office.  The screen outputs for all of the Star_Base modules also bear a notice of copyright.  When a Star_Base user at the school level accesses the main menu program for any of the modules, a copyright symbol appears on the screen.  *Id.* at para. 9.   *See also* Hilliard Dec. Ex. "10", at 63-65.

9.    Century licenses individual Star_Base modules (often as a package of many modules) to school districts under a written license agreement.  The School District is one such licensee.   Star-Base was first licensed to the School District in 1995, and the parties entered into 3 separate license agreements over the last decade.  *See* Hilliard Dec. Ex. "10", at 26-29.  Although the form of license agreement has been modified slightly over the years, all of the form agreements (including Springfield's) contain confidentiality terms that severely restrict the licensee's right and ability to disclose the modules to unlicensed third parties, to ensure to the greatest extent possible that the trade secret protection for the modules is maintained.   *See* Hilliard Dec. Ex. "1", at para.  10.

11.    The license agreement with Springfield, for example, provides as follows:

Confidentiality - The [computer] package and any permitted copies
contain valuable trade secrets of **CENTURY** and shall at all times remain
the property of **CENTURY**; and Licensee, by this license, acquires no

26

rights in and to the package except the right to use the package at the location indicated herein. **Licensee shall not use the package for the benefit of any other party, whether or not for a consideration; shall not sell, rent, loan, disclose, or otherwise communicate or make available the package, or any part or modification thereof to any person, and shall maintain the confidentiality of the package**, unless otherwise agreed to by **CENTURY** in writing.

*See id.* at para. 11 (emphasis added). *See also* Hilliard Dec., Exhibit "2", at Exhibit "A".

12.     As the emphasized language above reflects, Century considers the source and object code for the Star_Base programs to be protected trade secrets, and was therefore careful in its licensing of the Star_Base software to bind its licensees to an obligation of confidentiality. *See* Hilliard Dec., Exhibit "1", at para. 12.

13.     The School District's information technology staff was well aware of the confidentiality provisions in Century's license agreement. *See* Hilliard Dec. Ex. "10", at 25-29.

14.     When a school or school district licenses one or more of the Star_Base modules from Century, all of the object code and most of the source code for the licensed modules are transferred to the school's computer system. The source code for certain security programs is not delivered. These programs contain key routines that are designed to protect the system as a whole, but not individual programs, from being copied to another computer and used by an unlicensed customer. Nevertheless, the source code and object code transferred to the licensees are protected from disclosure by the provisions of the license agreement. *See* Hilliard Dec. Ex. "1", at para. 13.

27

15. The School District employs several people who work in an information technology department and who are generally responsible for the day-to-day administration of Star_Base and other software applications which meet the needs of the schools. Henry Stuckey, David Williams and Brent Qualls were all employed by the School District in this capacity. *See* Hilliard Dec., Exhibit "2", at para. 4. Hilliard Dec. Exhibit "10" at 29-30. Stuckey was the Information Systems Director and supervised Williams and Qualls.

16. In or around the Summer of 1998, the Miller Defendants were introduced to the School District. Hilliard Dec. Ex. "11" at 77. Before that introduction, the Miller Defendants had been engaged in the business of internet website design and/or site hosting for a variety of clients. None of those clients, however, were school districts. Hilliard Dec. Ex. "11" at 31-32. Before the Miller Defendants' work with the School District, therefore, they had never before designed or written any software application for a school system. *Id.* Indeed, the School District was the "ground floor" client of the Miller Defendants' new business. <u>See</u> Hilliard Dec., Ex. "16", at 18.

17. Despite having no prior experience, the School District and the Miller Defendants entered into a written contract in December 1998 under which the Miller Defendants agreed to develop an "internet-based information system" for the School District. *See* Hilliard Dec. Exhibit "4". That agreement expressly provided that in exchange for the Miller Defendants' ownership of the new software package, the School District would receive 10% of the revenues

28

"generated by Miller for developing similar applications and software solutions and rendering the same or similar services to any third party." *Id.* This provision was not originally in the draft negotiated by the parties, *see* Hilliard Dec. Ex. "5". However, the School District complained that other vendors had used products developed for the district as a springboard to profits with third parties, and it lamented the loss of those profit opportunities. So it insisted on a "piece" of the Miller Defendants' future business. *See* Hilliard Dec. Exhibit "11", at 89-107. *See also* Hilliard Dec. Exhibit "6".

18.  The School District viewed its own relationship with the Miller Defendants as a "partnership". *See* Hilliard Dec. Ex. "14", at M-3 (Board of Education minutes referring to the "partnership with The Miller Group").

19.  Thus, from the outset of the Miller Defendants' relationship with the School District, both parties expected and intended to develop a software application that would be sold for financial gain outside the School District. *See* Hilliard Dec. Ex. "11" at 101-02. *See also* Hilliard Dec. Ex. "6" at 3-4 ("We feel that an internet/intranet based ... information system is not only appropriate for Springfield School District #186, but also for other school districts as well. We are comfortable enough with the viability of this solution that we intend to market this solution to other school districts in Illinois and other states.")

20.  Incredibly, the contract between the Miller Defendants and the School District further *required* that the Miller Defendants develop this new information system using Century's Star_Base database structures. *See* Hilliard Dec. Ex. "4", at para.

2 ("Features of the System shall include: use of existing data structures (StarBase)").  Indeed, it was clear that the School District wanted the Miller Defendants to build the new system based on the critically important data files contained in Star_Base.  *See* Hilliard Dec. Ex. "9" at 1 ("Star_Base will supply us with newer versions and it will be different from what it is today.  It will not give the instructional side what it needs.  *We have to take the data structures now and build on the existing system and add features we want.")*(emphasis added).  *See also* Hilliard Dec. Ex. "10" at 39-40 (Stuckey's testimony referring to the "integrated" relationship between the coded database structures of Star_Base and the other program modules such as student scheduling).

21.    The School District supervised and controlled the Miller Defendants' performance of its work under the contract.  Not only is that suggested by the language of the contract itself, but Miller testified that he "worked according to the desires of the Springfield School District".  *See* Hilliard Dec. Ex. "11" at 113.  In fact, the School District established regular weekly meetings with the Miller Defendants for the purpose of supervising the work.  *See* Hilliard Dec.  Ex. "10" at 57-58.

22.    Early in the development of the new system, the School District also decided to move one of its own employees, Brent Qualls ("Qualls"), to the Miller Defendants' offices to assist in the development of the software.  Qualls was a programmer intimately familiar with Star_Base.  In fact, it was precisely because of his familiarity with Star_Base that he was moved over to the Miller Defendants' offices.  *See* Hilliard Dec. Ex. "10" at 58-61 ("Q: Do you know why

30

Mr. Qualls was spending all of this time over at the Miller Group's offices

working on this project? A: I think initially to help them understand what was in

Star_Base....").

23. Qualls had access to the source code for Star_Base. *See* Hilliard Dec. Ex. "10" at

36.

24. For a nearly two-year period, Qualls worked almost exclusively on-site at the

Miller Defendant's offices, while still employed by the School District, coding

programs for the new information system. Hilliard Dec. Ex. "10" at 35-36 and

60-61; *see also* Hilliard Dec. Ex. "12", at 37-38.

25. During that same period of time, the School District established dial-up access

from Miller's offices to the server at the School District on which the Star_Base

programs (including the source code) resided. Consequently, Qualls and the

Miller Defendants had direct access to the Star_Base source code during the

critical period of time when the new information system was being developed.

*See* Hilliard Dec. Ex. "10" at 47-48. That access included not only the earlier

versions of Star_Base, but the latest web-based version known as Version 3,

which was licensed to the School District in November 2000. *See* Hilliard Dec.,

Exhibit "20".

26. Stuckey and another School District programmer familiar with Star_Base, David

Williams ("Williams") raised concerns at several meetings that the School

District's actions in permitting Miller access to Star_Base might be a violation of

the School District's license agreement and also might infringe on Century's

copyrights.  *See* Hilliard Dec.  Ex. "10" at 50-55; Ex. "12", at 57-60.  Not only were key School District employees present at these meetings, but Miller himself was as well.  *Id.*

27.    During the time period Miller was working on the new system, he offered jobs to Qualls and other employees at the School District.  *See* Hilliard Dec. Ex. "11", at 182-85, 201-204.  In fact, the key supervisory official at the School District over Miller's work for the district, Mike Holinga, became Miller's "Sales & Projects Manager" after his retirement from the School District.  *See* Hilliard Dec. Exhibit "8", at p. 12.

28.    In February 2003, a Century employee, Robert Magan, received an unsolicited phone call from Don Randle, a former information technology employee of the School District.  Randle asked Magan: "How would you feel if someone was stealing your software?"  When Magan asked what he meant, Randle explained: 1) that he had left his employment at the School District about 6 months earlier; 2) that while still employed, he was aware that the School District had retained The Miller Group to write some front-end programs to interface with the Star_Base database; and 3) that he "knew for sure" that The Miller Group was using Century's database structures, and that he was fairly certain that The Miller Group was also using Century's scheduler program (a component of the Star_Base software).  *See* Hilliard Dec. Ex. "2" at para. 7.

29.    Randle further told Magan that Qualls had been "reassigned" within the School District to assist the The Miller Group in developing this new software.  Randle

32

then told Magan that if he wanted further information, he should contact Williams

at the School District. *Id.*

30.     Following this conversation with Randle, Magan discovered that the Miller

Defendants had posted information on its internet website concerning a product

called InfoSystems 3. The InfoSystems 3 product was marketed on the website as

an "online student information system", which is precisely the type of system

Century licensed to the School District. *See* Hilliard Dec. Ex. "2" at para. 8.

31.     Magan then received an unsolicited phone call from Williams shortly after his

conversation with Randle. Williams (a then current employee of the School

District) told Magan that the Miller Defendants "stole" Century's software, that

employees of the School District (including Williams) had told the Miller

Defendants that they didn't think that what they were doing was right, and that the

Miller Defendants' response was: "we are here and [Century] is in New Jersey",

and "they will never find out". Williams further told Magan that he and others

cautioned the Miller Defendants that Century's software was copyrighted. *See*

Hilliard Dec. Ex. "2" at para. 9.

32.     Following this last conversation, Williams mailed to Century a list of the table

definitions from The Miller Group's InfoSystems 3 product. Upon comparing

these definitions with Star_Base, Century discovered that virtually all of the

definitions were identical. *See* Hilliard Dec. Ex. "2" at para. 9; *see also* Ex. "12"

at 52-57.

33

33.    Williams also mailed to Century the program listing from a portion of The Miller

Group's product – the "student scheduler".  Once again, in comparing this to

Star_Base, Century discovered that the source code used in InfoSystems 3 has

verbatim references to Century's Star_Base tables.  *See* Hilliard Dec. Ex. "2" at

para. 10; *see also* Ex. "12" at 61-64.

34.    Century's expert, P.G. Lewis & Associates ("Lewis"), has issued a written report

opining, among other things, that: a) the software programs developed by the

Miller Defendants are substantially similar to Star_Base in their structure,

sequence and organization; b) that the Miller Defendants' scheduler program,

which is one of the core Star_Base programs, is substantially similar to

Star_Base's scheduler program, both in its literal source code and in its structure,

sequence and organization; and c) the database structures of the Miller

Defendants' software package are substantially similar to Star_Base's database

structures.  *See* Hilliard Dec. Exhibit "7", at 51-53 ("Summary of Findings").

35.    The Miller Defendants have successfully sold and installed the InfoSystems 3

software at several area school districts.  *See* Hilliard Dec. Ex. "3" and Ex. "13".

36.    At least $15,000 is still owed by the Miller Defendants to the School District

under their "partnership" agreement.  *See* Hilliard Dec. Ex. "13", at #8; Ex. "14",

at page M-4.

37.    The underlying database structures and much of the code for the sub-programs has

changed little since Star_Base was registered in 1995.  *See* Declaration of Joseph

L. LaMantia dated 5/26/06 (Docket Entry #143)(hereinafter "LaMantia Decl.") at

¶ 6 and Exhibit "A".   Between 75% and 90% of the actual source code from the Star_Base package registered in November 1995 still exists in the later Version 3 (which Century has now registered with the Copyright Office).   Moreover, the database structures today are substantially the same as they were in November 1995 when Century filed its registration application for Star_Base.   Although a few individual fields have been added to some of the tables, and some tables added, Century's tables (which number between 300-400 in the system) are substantially the same today as they were in 1995 when the original registration was filed.   *Id.*

38.   Century's expert report demonstrated the substantial similarities between the IS3 scheduler code and schema and the Star_Base scheduler code and schema.   *See* LaMantia Decl. ¶ 7.   The scheduler code and schema for Star_Base is the same today as it was in November 1995 when Century registered its copyrights.   With the exception of minor bug fixes, Century has not changed the scheduler since it was registered in 1995.   *Id.*

39.   Century received from an employee of the Springfield Public School District 186 a copy of the scheduler which is identified as "IS3" in the file path marker.   *See* LaMantia Decl. Exhibit "C".   Although the programming language is different, the program is virtually identical to Century's scheduler in logic, conflict codes and calls to Century's database structures.   *See* LaMantia Decl. ¶ 8.

40.   Century's expert also reviewed 4 tables from the database structures of IS3 and Star_Base.   *See* LaMantia Decl. ¶ 9.   The Star_Base tables compared to IS3 were

all created before November 1995, and were part of the Star_Base package

registered in November 1995. *Id.*

41.    Moreover, Century's expert also reviewed the scheduler schema for both

Star_Base and IS3, and concluded that the logic flow was substantially similar.

*See* LaMantia Decl. ¶ 10. The schema and logic flow for the Star_Base scheduler

has not changed since the package was registered with the Copyright Office in

1995.

42.    The documents marked as "Miller-8" and "Miller-9" in depositions are printouts

of the Star_Base database structures, and contain detailed lists of the tables and

field names. *See* Hilliard Decl., Exhibits "17" and "18". The printouts are dated

October 1998. With the exception of a few additions of field names and tables,

these printouts show the database structures as they existed in the Star_Base

system when Century submitted the application for registration of Star_Base in

1995 with the U.S. Copyright Office.   LaMantia Decl. ¶ 11.

43.    The Miller Group's chief architect of the IS3 system, Dr. William Choat, testified

that he relied heavily on these same documents to develop the new system.  In his

own words:

Q:    And Miller 9.  Do you recognize those documents?
A:    Oh yeah.  Absolutely.
....
Q.    Now, is this what you referred to before when you said – we talked about
the database structures?
A.    Yeah.  Yeah, this is exactly what I was talking about.  The columns and –
within each table.
Q.    Did you use those documents in any way?
A.    Yeah.  That's all I had.  I used them like crazy.  Yeah.  It's kind of like

seeing an old friend again.  I forgot about these.

....

Q.    Do you believe that looking at these documents assisted you in being able to develop the front end application?

A.    That's all I had.  Yeah.  Oh, this was my – I carried it home at night.

*See* Hilliard Decl. Exhibit "16", at 59-61.

### THE STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

The School District accurately recites the basic standard under the plain language of Rule 56, but neglects to cite the law governing how that standard is applied.   The School District bears the burden of demonstrating the absence of genuine issues of material fact and its entitlement to judgment as a matter of law.  *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1363 (7th Cir. 1988).  The Court must examine all of the evidence on a summary judgment motion in a light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  *Bowyer v. United States Air Force*, 804 F.2d 428, 430 (7th Cir. 1986).

### ARGUMENT

### I.    CENTURY HAS DEMONSTRATED TRIABLE CLAIMS FOR COPYRIGHT INFRINGEMENT

#### A.    CENTURY CAN DEMONSTRATE TRIABLE CLAIMS FOR DIRECT INFRINGEMENT AGAINST THE MILLER DEFENDANTS

The School District first contends that Century cannot demonstrate a triable issue of fact on its claim for direct infringement against the Miller Defendants, and therefore, Century's claims of contributory and vicarious infringement against the School District must also fail because they derive from the underlying direct infringement claims.

37

The School District is wrong. To succeed in proving a claim of infringement under the Copyright Act, 17 U.S.C. §101 *et seq.*, Century must demonstrate two basic elements: 1) ownership of the copyrights; and 2) copying by the defendants. *See, e.g., Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*, 797 *F.2d* 1222, 1231 (3d Cir. 1986); *Wickham v. Knoxville Int'l Energy Exposition*, 739 *F. 2d* 1094, 1097 (6th Cir. 1984); *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 *F.2d* 1157, 1162 (9th Cir. 1977); *In re Aimster Copyright Litig.*, 252 *F.Supp.2d* 634, 648 (N.D.Ill.2002) (citing *Feist Pub., Inc. v. Rural Tel. Serv. Co.*, Inc., 499 *U.S.* 340, 361 (1991)); *Theotokatos v. Sara Lee Personal Products*, 971 *F. Supp.* 332, 338 (N.D. Ill. 1997).

### 1.    Ownership of valid copyright

The United States Copyright Office has issued a registration certificate for the Star_Base programs at issue in this action. *See* Hilliard Decl. at Exhibit "1"; LaMantia Decl. at Exhibit "A". That registration certificate constitutes *prima facie* evidence of the validity of the copyrights in the Star_Base programs. *See* 17 *U.S.C.* §410(c); *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 *F.2d* 521, 523 (9th Cir. 1984); *Balsamo/Olson Group v. Bradley Place Ltd. Partnership*, 966 *F. Supp.* 757, 761 (C.D. Ill. 1996); *Gallery House, Inc. v. Yi*, 582 *F. Supp.* 1294, 1297 (N.D. Ill. 1984). Furthermore, this Court has held that, "Century has provided competent proof that it owns a copyright to the codes included in the original Star_Base program." *See* Order of July 13, 2006, at 7. Century has further demonstrated that the core of its claims in this case derive from elements protected under the 1995 registration. *See* Declaration of Joseph LaMantia dated 5/26/06 (Docket Entry #143) at paragraphs 6-11. Accordingly, there is no dispute as to Century's ownership of a valid copyright in Star_Base.

### 2.    Copying: Access and Substantial Similarity

In most circumstances, because "it is rarely possible to prove copying through direct evidence, ... copying may be proved inferentially by showing that the defendant had access to the allegedly infringed copyrighted work and that the allegedly infringing work is substantially similar to the copyrighted work." *Whelan Associates*, 797 F.2d at 1231-32 (citation omitted)(emphasis added). *See also, Atari*, *Inc. v. North Am. Philips Consumer Elecs. Corp.*, 672 *F. 2d* 607, 614 (7th Cir. 1982). In this context, "substantial similarity" means sufficient similarity of the elements in the copyrighted programs to the elements in defendants' program to "support a reasoned inference that more probably than not the elements were copied from the copyrighted work." *See, e.g., Lotus Development Corp. v. Borland Int'l, Inc.*, 788 *F. Supp.* 78, 84 (D. Mass. 1992).[2]

Century has submitted undisputed proofs that the Miller Defendants had full access[3] to Star_Base, including the source code, and that elements of the Miller Group's InfoSystems 3 product are substantially similar to Century's copyrighted works. Here, there is no dispute that the School District had possession of Century's source code, that the School District gave the Miller Defendants a direct link to the code and that a School District employee worked directly with the Miller Defendants in using Star_Base to develop the software package that would

---

[2]    Century continues to maintain that direct evidence of copying indeed exists on these facts, for the reasons outlined in its own moving papers for summary judgment.

[3]    Here, the striking similarities -- indeed, verbatim identity -- between at least portions of the InfoSystems 3 program and Century's copyrighted programs obviates the need to show access. *See, e.g., Testa v. Janssen*, 492 *F. Supp.* 198, 202 (E.D. Pa. 1980).

become InfoSystems 3. Thus there is no question as to proof of access. *See Kamar International v. Russ Berrie & Co.*, 657 *F.2d* 1059, 1062 (9th Cir. 1981) ("Proof of access requires only an opportunity to view or to copy plaintiff's work"); *Johnson Controls v. Phoenix Control Systems*, 886 *F.2d* 1173, 1176 (9th Cir. 1989)(holding that access was "clear" because several employees of infringing company had worked for company holding copyrights and had been personally involved in authorship of the copyrighted work).

Moreover, Century's expert has issued a written report opining, among other things, that a) the software programs developed by The Miller Group are substantially similar to Star_Base in their structure, sequence, and organization; b) that The Miller Group's scheduler program, which is one of the core Star_Base programs, is substantially similar to Star_Base's scheduler program, both in its literal source code and in its structure, sequence, and organization; and c) the database structures of The Miller Group's software package are substantially similar to Star_Base's database structures. Hilliard Decl., Exhibit "7" at 51-53.

Century, therefore, has demonstrated at the very least genuine issues of material fact on all of the elements of a copyright infringement claim, to wit: 1) that it owns the Star-Base software, *see* Hilliard Dec. Ex. "1"; 2) that the Miller Defendants had direct access to the software, *see* Hilliard Dec. Ex. "10", at 47-48; and 3) that elements of both the literal source code and the structure, sequence and organization of the Miller Defendants' InfoSystems 3 product are substantially similar to Star_Base, *see* Hilliard Dec. Ex. "7". The lengthy report of Century's expert, which examined the programs in detail, summarized the breadth of the infringement:

> [We are] of the opinion, to a reasonable degree of certainty, that substantial portions of the [InfoSystems 3] system are a copied and translated duplicate of the Century Consultants Star_Base system. In almost all areas explored, [we] found identical or

> substantially similar logic, table names, field names, definitions, and source code between the two applications.

*See* Hilliard Dec. Ex. "7", at 53.   This evidence, coupled with the additional evidence that 2 different employees of the School District actually contacted Century to alert the company to the infringements, easily creates issues of fact which compel the denial of summary judgment.

Instead of addressing these elements of an infringement claim, the School District curiously devotes nearly its entire argument to worn out contentions and "smoke and mirrors" arguments.   The School District focuses principally on two contentions: 1) that Century's expert examined the wrong data sources and made incorrect assumptions which undermine all of his opinions and conclusions, *see* School District's Memorandum, at pp. 18-21 (Undisputed Material Facts #76-#93; and 2) that a recent affidavit signed by one of its former employees, David Williams, *after* Mr. Williams' deposition was taken, also undermines Century's case, *see* School District's Memorandum, at pp. 9-11 (Undisputed Material Facts #29-#48).

Defendants' arguments concerning Mr. Lewis' review of data and his methodology have already been roundly rejected by the Court:

> [Defendants] contend that Mr. Lewis' opinion is unreliable because he does not know where Data Sets 2, 3 and 4 came from.  He merely assumed that the data sets came from the Defendants because Century's attorneys told him that was so.  Furthermore, the Defendants contend that Mr. Lewis wrongly assumed that The Miller Group authored all three data sets.

> The Defendants' argument about the source of the data sets is a bit mystifying.  The data sets at issue were provided by both Miller and the [School] District during discovery.  Among these data sets was the source code for the InfoSystems 3 software that The Miller Group developed and marketed.  This data was copied to disks by the Defendants and given to Century's counsel.  Century then gave the disks to Mr. Lewis for his analysis.  Based on this, Mr. Lewis could reasonably assume that the data sets originally came from the Defendants.

41

> The more serious issue is not from whom Mr. Lewis received the disks, but whether he compared the correct data....Mr. Lewis' conclusions seem to be valid and they will certainly assist the trier of fact to understand the evidence and determine facts.  As such, Mr. Lewis' expert testimony is permissible under Fed.R.Evid. 702.

*See* Order of March 21, 2006, at 5-6.

Defendants' reliance on the Williams Affidavit also fails to help their cause.  Williams' recently-minted "Affidavit" does nothing to change what he said in his deposition, or what he said to Mr. Magan during Century's pre-suit investigation.  His deposition testimony, taken *before* this Affidavit was prepared for him by his former employer, the School District, confirmed that he told Mr. Magan before this lawsuit was filed that another vendor was developing a new system for the School District, that many of the database tables were simply being renamed with the same table and field structures as Star_Base, and that he believed it was "strange" that "two different products" could be so "similar".  *See generally* Hilliard Decl. Ex. "12".  The more recent affidavit should be viewed by this Court with great suspicion, and indeed should be disregarded entirely.  *See Amadio v. Ford Motor Company,* 238 F.3d 919, 926 (7th Cir. 2001)(rejecting consideration of subsequent affidavit on summary judgment motion where affiant failed to provide explanation for why testimony was not given on same subject in prior deposition); *Russell v. Acme-Evans Company,* 51 F.3d 64, 67 (7th Cir. 1995)("We have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit").

At best for defendants, the Williams Affidavit does nothing more than create additional issues of fact, instead of demonstrating the absence of those issues and defendants' entitlement to judgment as a matter of law.  Accordingly, defendants' motions for summary judgment on Count I of the First Amended Complaint should be denied.

_____**B.    CENTURY CAN DEMONSTRATE TRIABLE CLAIMS FOR CONTRIBUTORY INFRINGEMENT AGAINST THE SCHOOL DISTRICT**

Century has further shown, at the very least, genuine issues of material fact on its claim against the School District for contributory infringement.[4]  A party can be liable for contributory infringement where the party "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." *Design Craft Fabric Corp. v. K-Mart Corp.,* 1999 WL 1256258, at *4 (N.D. Ill. Dec. 21, 1999)(*quoting Gershwin Publ'g Corp. v. Columbia Artists Mgt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971)).

Here, Century has demonstrated that the School District knowingly and intentionally entered into a contract with the Miller Defendants under which the School District *required* the Miller Defendants to develop a student administration software product which *used* Century's Star_Base source code.  In fact, that requirement was *written into the contract itself.  See* Hilliard Dec. Ex. "4" ("Features of the System shall include: use of existing data structures (StarBase)").  Moreover, that same contract provided that the School District would share in the revenues generated by the sale of this new product.  *Id.* at ¶ 8.

Moreover, the School District embarked upon a course of conduct designed to give the Miller Defendants direct access to Century's software for the purpose of building a new system which would benefit the School District.  *See* Hilliard Dec. Ex. "4", Ex. "9"; Ex. "10".  The School District materially contributed to the Miller Defendants' actions, and did so in part

_____

[4]Once again, Century has filed its own motion for summary judgment on this claim, and contends that the undisputed facts entitle it to summary judgment.

43

because it wanted a share in the revenues generated by the Miller Defendants on future sales of InfoSystems 3 to third parties. It is difficult to imagine a stronger case for contributory infringement. Accordingly, the School District's motion for summary judgment on Count II of the First Amended Complaint must be denied.

### C. CENTURY CAN DEMONSTRATE TRIABLE CLAIMS FOR VICARIOUS INFRINGEMENT AGAINST THE SCHOOL DISTRICT

The School District further contends that Century has failed to present any genuine issues of fact on its claim for vicarious copyright infringement. The School District is incorrect.[5] A claim for vicarious liability requires a plaintiff to plead that the defendant is liable for the infringing conduct of another party because it has "the right and ability to supervise the infringing activities [of the other party] as well as a direct financial interest in those activities." *F. E. L. Publications, Ltd. v. National Conference of Catholic Bishops*, 466 F.Supp. 1034 (N.D. Ill. 1978). *See also Hard Rock Café Licensing Corp. v. Concession Services, Inc.,* 955 F.2d 1143, 1150 (7th Cir.1992) (vicarious copyright infringement is established when a defendant has "the right and ability to supervise infringing activity and also has direct financial interest in such activities.")

The evidence reveals that the School District had the right and ability to supervise the Miller Defendants' infringing activities, and had a direct financial interest in those activities. Under its agreement with the Miller Defendants, the School District *required* the Miller Defendants to develop a product that used Century's Star_Base source code. *See* Hilliard Dec. Ex. "4", at ¶ 2 ("Features of the System shall include: use of existing data structures (StarBase)"). Importantly, the contract also: a) contained other requirements for the development of the

_____

[5]     Again, Century has filed its own motion for summary judgment on this claim, and contends that the undisputed facts entitle it to summary judgment.

software (dictated by the School District); b) gave the School District the right to review

development progress on a monthly basis; and c) accorded the School District the "right to

terminate this Agreement at any time if it is not satisfied with development progress or the pace

of System development". *Id.* at ¶¶ 2 and 6. The contract itself demonstrates that the School

District had the "right and ability" to supervise the development of the infringing software.

Miller testified that the School District actually exercised supervisory authority over how he

developed the software. *See* Hilliard Dec. Ex. "11" at 113. *See also* Hilliard Dec. Ex. "10", at

57-61. Clearly, Century has demonstrated a triable issue of fact on the "supervisory" element of

a vicarious infringement claim. *See also Seals v. Compendia Media Group*, 290 F.Supp.2d 947,

953 (N.D. Ill. 2003) ("Although plaintiff in the instant case does not allege that defendants

directly supervised the distribution of plaintiff's copyrighted works, the fourth amended

complaint does allege that defendants supervised and directed the copying of plaintiff's works

and delivered those copies to [co-defendant], essentially setting the alleged infringement in

motion").

Moreover, the contract provided that the School District would share in the revenues

generated by the sale of the new software product. Hilliard Dec., Exhibit "4" at ¶ 8. Under the

contract, then, the School District had a direct financial interest in the sale of the software.

Indeed, when this lawsuit was filed, the Miller Defendants still owed the School District money

under its partnership arrangement. *See* Hilliard Dec., Exhibit "14", at page M-4. This and other

evidence developed during discovery plainly is enough to satisfy the "financial interest" element

of a vicarious infringement claim. *See also* Hilliard Dec. Ex. "4", Ex. "5", Ex. "11", at 89-107;

Ex. "14".   The motion for summary judgment on Count III of the First Amended Complaint

should be denied.

## II.　　CENTURY CAN DEMONSTRATE GENUINE ISSUES OF FACT ON WHETHER A SUBSTANTIAL PORTION OF STAR_BASE WAS COPIED

Defendants advance a separate argument that they are entitled to summary judgment

because Century cannot show that a "substantial portion" of the literal Star_Base source code

was copied.  In a cursory, two-paragraph argument, defendants resurrect the same tired

contentions they made in their unsuccessful *Daubert* challenge to Century's expert – specifically,

that only literal copying of a computer program's source code can constitute copyright

infringement.

Defendants are incorrect.  Copyright protection extends to non-literal elements of a

computer program, such as the structure, sequence and organization of the programs.  This

protection is analogous to protection extended to other literary works.  *See, e.g., Sheldon v.

Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 55 (2d Cir. 1936)(holding that "a play may be

pirated without using the dialogue").  Limiting copyright literally to the text – or, in this case, to

the source code – would permit "plagiarist[s to]...escape by immaterial variations." *Nichols v.

Universal Pictures Co.,* 45 F.2d 119, 121 (2d Cir. 1930).  Accordingly, in the realm of copyright

protection for computer software, federal courts uniformly recognize that the "non-literal

similarity of computer programs can constitute copyright infringement." *Softel, Inc. v. Dragon

Med. & Sci. Communs.,* 118 F.3d 955, 963 (2d Cir. 1997).  This is alternatively referred to as

protection of the "structure, sequence and organization" of computer programs.   *Qad, Inc. v.

ALN Associates, Inc.,* 770 F. Supp. 1261, 1265 (N.D. Ill. 1991)(recognizing that copyright

protection of computer programs "may extend beyond the programs' literal code to their structure, sequence, and orgnaization"). Therefore, the relationships between software modules and data structures can be protectable. *See, e.g., Harbor Software, Inc. v. Applied Systems, Inc.,* 925 F. Supp. 1042 (S.D.N.Y. 1996). Even purely structural elements like data flow and control flow within the programs can be protected under the copyright. *Id.*

Here, Century clearly pled infringement claims based not only on literal copying of elements of the programs, but on the replication of the structure, sequence and organization of the programs. *See* First Amended Complaint, at ¶30. Century's expert made a detailed examination of the non-literal similarities between the programs, and concluded that the logic flow and schema for the two systems are substantially identical. *See* Hilliard Decl., Exhibit "7", at 24-28, 33, 51-53. These non-literal elements of the Star_Base structure have not changed since the programs were registered in November 1995. *See* LaMantia Declaration dated 5/26/06 at ¶ 10 (Docket Entry #143).[6] Accordingly, defendants are just plain wrong in contending that Century must prove literal copying of program code to prove a case of infringement. Indeed, during the *Daubert* hearing conducted by the Court in January 2006, the same arguments were made and rejected. *See* Hilliard Decl., Exhibit "23", at 159-61. *See also* Order of March 21, 2006. Even so, as Century's expert also pointed out in his report and in his testimony at the *Daubert* hearing, because the IS3 software application was written in a different programming language from Star_Base, literal identity was difficult to determine (much like comparing an English text against its French translation), but Century's expert could still determine that IS3

---

[6]    Century incorporates herein the entire LaMantia Declaration and exhibits thereto in its opposition to these summary judgment motions.

was a translated duplicate of Star_Base in its structure and logic.  *See* Hilliard Decl., Exhibit

"23", at 123-24.   Moreover, there was substantial similarity between the database structures of

the software applications, as Century's expert outlined in detail in his table-by-table

comparisons.  For all of these reasons, Century has demonstrated genuine issues of material fact

on the issue of whether substantial portions of Star_Base were copied.

## III.    CENTURY CAN DEMONSTRATE DAMAGES ON ITS INFRINGEMENT CLAIMS

The School District next contends that Century cannot demonstrate a triable issue of fact

on its claims for damages under the Copyright Act.  The School District cites inapplicable

precedent and neglects to inform the Court of the evidence which establishes Century's *prima*

*facie* damages case under 17 U.S.C. §504(b).[7]

The School District's motion concedes that it is "entirely permissible" for a plaintiff to

use gross revenues from the sale of an infringing product as the cornerstone of a claim for actual

damages under the Copyright Act.  *See* School District's Memorandum, at 34.  Indeed, the statute

expressly permits a copyright plaintiff to do exactly that.  A prevailing plaintiff in an

infringement action is entitled to recover the infringer's profits attributable to the infringement.

Under 17 U.S.C. §504(b), the copyright owner "is required to present proof only of the

---

[7]        The School District's reliance on *Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 428 F. Supp.2d 761 (N.D. Ill. 2005), is misplaced.  There, the district court dismissed a franchisee's claims under Illinois' franchise practices statute because it failed to present "any competent evidence" at all to support its damage claims for lost profits and lost opportunity costs.  Even a quick reading of this case shows that the franchisee did nothing more than claim a number without any factual support. That is a far cry from this case.  Here, Century supports its damages calculation with specific documents generated *by the defendants themselves*, the accuracy of which has been established either through deposition testimony or, in the case of the "Statement of Losses", the Affidavit of John Miller.

infringer's gross revenue, and the infringer is required to prove his or her deductible expenses

and the elements of profit attributable to factors other than the copyrighted work". *See also*

*Frank Music Corporation v. Metro-Goldwyn-Mayer Inc.,* 772 F.2d 505, 514 (9th Cir. 1985).

Despite the School District's contention that Century has failed to identify the factual

basis for its damage claim, Century did so repeatedly. In its Rule 26(a)(1) disclosure statement,

Century not only identified the actual damages it sought under the statute, it identified the

sources of that calculation by referring to specific documents:

> Century seeks actual damages under the Copyright Act, 17 U.S.C. §504(a)(1) and (b),
> consisting of: a) the loss of revenue from Springfield School District 186 caused by the
> infringement; and b) the profits of The Miller Group from the sale and/or license of the
> infringing software. Based on the information produced to date by The Miller Group
> concerning its gross revenues, **including but not limited to the "Statement of Losses"**
> **and accompanying Affidavit of John G. Miller filed with the Court as well as all**
> **documents marked as exhibits during the deposition of John G. Miller,** and in
> accordance with Century's responses to written discovery requests in this action, **Century**
> **will seek damages of $1,313,000.**

*See* Hilliard Dec., Exhibit "21" (emphasis added).

Moreover, before the completion of the deposition of Century's Rule 30(b)(6) witness on

damages, Century's counsel sent the School District a letter amplifying on Century's damages

case, so that there would be no misunderstanding on the defendants' part of the factual basis for

the damages claim. In that letter[8], Century's counsel stated in part:

> Although our initial evaluation of those documents and testimony indicated that the gross
> revenues were $1,313,000, a further examination reveals that they are actually higher. In
> the document marked Miller-2 at the deposition of John Miller, the Miller Defendants
> summarized their gross revenues on the sale of IS3 to school clients through the end of
> May 2003. The total gross revenues (excluding the "non school related" clients) are
> $1,379,215. Mr. Miller testified in his deposition (see pp. 59-72) that in addition to these

---

[8]    The letter was attached to the School District's motion filings under "Statement of
Material Fact #103.

49

gross revenues, the Miller Defendants received: 1) the balance on their $120,000 contract with Oswego (an additional $46,676 above the number disclosed in Miller-2); 2) $55,000 from Kewanee School District; and 3) at least $25,000 from Marengo School District. Finally, as Mr. Miller testified, he received approximately $100,000 in 2004, virtually all of which came on the balance of the Adlai Stevenson School District contract. Accordingly, it appears that the Miller Defendants' gross revenues on IS3 totalled at least:

| | |
|---|---:|
| From Miller-2 and Miller-3[9] | $1,379,215 |
| Balance on Oswego contract | 46,676 |
| Kewanee | 55,000 |
| Marengo | 25,000 |
| Additional Revenues in 2004 | 100,000 |
| | |
| Total | $1,605,891 |

In the face of this detailed damages presentation, the School District now incredibly contends that "[d]espite numerous attempts on the part of [the School District] to ascertain the damages Century claims to have suffered, Century steadfastly refused to substantiate them." *See* School District's Memorandum, at 34. This argument is more than a little disingenuous. Century has informed the School District of the precise basis and calculation of its damages.

Moreover, Century's presentation demonstrates a "nexus" between the infringement and its damages. The gross revenue figures taken from The Miller Group's own documents are from the actual sales of the allegedly infringing software – IS3 – to competing school districts, and from the amounts actually paid by the School District to The Miller Group to develop the same software. The School District utterly fails to explain why this is not a sufficient "nexus" between the damages and the infringement to actually prevail at trial, let alone survive summary

---

[9]    "Miller-2" was a document prepared by Mr. Miller himself which listed separately his company's revenues generated strictly from the sale of IS3 to other school districts and those generated from the providing of website hosting services to non-school clients. *See* Hilliard Dec., Exhibit "15". "Miller-3" was the Statement of Losses which provided detail on Miller's sales of IS3. *See* Hilliard Dec., Exhibit "3".

judgment. Instead, the School District relies on inapplicable case law to advance its contention

that Century's evidence fails to demonstrate a sufficient connection between the infringement

and the damages flowing from that infringement. For example, the School District cites to cases

like *Andreas v. Volkswagen of America, Inc.,* 336 F.3d 789 (8th Cir. 2003),and *Polar Bear*

*Productions, Inc. v. Timex Corporation,* 384 F.3d 700 (9th Cir. 2004), but those cases are

distinguishable on several grounds. First, they involved appellate review of trial verdicts, and not

an assessment of whether a plaintiff had at least raised a triable issue of fact – the only

consideration on this summary judgment motion. Second, they involved claims for "indirect"

profits rather than direct profits, and therefore the required causal connection between the

infringement and damages in those cases was inherently more tenuous. Here, of course, Century

is presenting a claim for direct profits arising from the sale of the allegedly infringing product.

*See Andreas*, 336 F.3d at 796 (noting that the plaintiff's burden in a direct profits case is met by

showing the gross revenues from the sale of the infringing product)(citing *Taylor v. Meirick*, 712

F.2d 1112 (7th Cir. 1983). In a direct profits context, all Century need do (as it did here) is show

the gross revenues from the sale of the infringing product.

The School District quotes selectively from the Seventh Circuit's decision in *Taylor v.*

*Meirick*, 712 F.2d 1112 (7th Cir. 1983) , in which the Court noted that a plaintiff could not just

"put a copy of General Motors' corporate income tax return in the record and rest [its] case for an

award of infringer's profits". That is not what Century did at all. Century has demonstrated The

Miller Group's gross revenues from the sale of the allegedly infringing product. As the Seventh

Circuit noted in *Taylor*, the plaintiff there "could have made out a *prima facie* case for an award

of infringer's profits by showing [the defendant's] gross revenues from the sale of the infringing

maps." *Id.* at 1122.  What doomed the plaintiff in *Taylor* is that he simply showed the

defendant's gross revenues "from the sale of everything he sold" which included products other

than the infringing work.  It was this, the Seventh Circuit held, which failed to meet the statutory

standard.  Here, The Miller Group itself produced the gross revenue figures for the sales of the

infringing IS3, and Century has excluded the gross revenues on any "non-school" related sales,

which were minimal.  Virtually all of the Miller Group's business was built around IS3.   Indeed,

Miller admitted that IS3 was his only "product" at the time he started working for the School

District.  *See* Hilliard Dec., Exhibit "3" and Exhibit "11", at 58-59.  It is therefore a simple,

straightforward task for Century to show the Miller Defendants' gross revenues from the sale of

the only (and allegedly infringing) product the small company produced.   Under the Copyright

Act, this is all that is required in a direct profits case to then shift the burden to the defendants to

prove their deductible expenses and/or profits attributable to factors other than the infringing

product.  If the defendants do not meet their burden, the gross figure stands as the defendant's

profits recoverable by the plaintiff.  *Andreas*, 336 F.3d at 795.

　　　The School District can be liable for this entire amount as a contributory and/or vicarious

infringer.  A co-infringer, as well as a contributory or vicarious infringer, can be held liable for

all of the infringer's profits where the defendants were "engaged in a partnership, joint venture,

or similar enterprise."  3 M. Nimmer, *Nimmer on Copyright* §12.04[C][3], at 12-50 to -51

(1984).  *See also Belford, Clarke & Co. v. Scribner,* 144 U.S. 488, 507-08 (1892)(printer jointly

liable for publisher's profits because they were "practically partners"); *Frank Music Corporation*

*v. Metro-Goldwyn-Mayer Inc.,* 772 F.2d 505, 519 (9th Cir. 1985)(recognizing that co-infringers

can be jointly and severally liable for all profits when they are "practically partners").  Here, of

course, the School District held a direct, contractual financial stake in the success of IS3. Under its contract, it was entitled to receive 10% of the Miller Defendants' revenues from the sale of IS3. The more money the Miller Defendants made, the more money the School District made, and therefore the contract made them practically, if not for all purposes, partners in the development and sale of IS3 to other school districts. Accordingly, the School District's contention that Century's entire case should be dismissed because it cannot present sufficient evidence of its damages to warrant a trial should be summarily rejected.

## IV.     CENTURY'S STATE LAW CLAIMS ARE ALL VIABLE AND SUPPORTED BY THE EVIDENCE

The School District's final argument is that Century's four pendent state law claims are all doomed as a matter of law merely because this Court suppressed *one* piece of evidence – the tape recording of the Magan/Williams conversation – out of an otherwise massive volume of evidence consisting of affidavits, deposition testimony, expert reports and thousands of documents. The School District's argument is difficult to comprehend. Though it argues that the "fruit of the poisonous tree" doctrine necessarily means that every other piece of evidence developed during discovery must be suppressed, it offers no legal or factual support for such a sweeping argument.

Indeed, the School District's contention is flawed in many respects. First, the School District mistakenly argues that it was Century which relied on the tape recording to support its case. Not true. Century did not, and does not, rely on the recorded conversation to bolster its case. Century advised the School District *three years ago, near the outset of the litigation,* that it did not intend to rely on the recording to support its case. *See* Exhibit "A" attached to Century's

Memorandum of Law in Opposition to School District's Motion to Suppress (Docket Entries #97-101). The transcript was not attached to any of Century's papers filed in this Court. In fact, Century's opposition papers on the pending summary judgment motions recite all of the *other* evidence developed, both before and after the suit was filed, which supports its case. Rather, it is the *School District*, not Century, which is relying on the transcript of the recording to advance its position. It was the *School District*, not Century, which first raised the recording with Williams during his deposition, marking it as an exhibit and questioning him extensively about it. *See* Exhibit "B" attached to Century's Memorandum of Law in Opposition to School District's Motion to Suppress.

Second, and more importantly, the School District utterly ignores the fact that Century's claims are simply not based solely on the statements made by Williams. Century's case is built on many facts, all of which demonstrate a compelling case of infringement. Those facts include: 1) the deposition testimony of the School District's own Information Systems Director and Williams' supervisor, Henry Stuckey, who testified that the School District gave Miller direct access to Star_Base at the time he was developing InfoSystems 3, and that he believed that Miller was using Star_Base to develop the competing product, *see* Hilliard Declaration, Exhibit "10"; 2) the deposition testimony of the School District's own Director of Business Services, Agnes Nunn, who testified that both Stuckey and Williams informed her that they believed that Miller was copying Star_Base in the development of InfoSystems3, *see* Hilliard Decl. Ex. "19"; 3) the School District's own contracts with Miller, which *required* the use of Star_Base data structures to develop the new system, *see* Hilliard Decl. Exs. "4", "5" and "6"; 4) other documents plainly indicating that it was the School District's deliberate plan to give Miller access to Star_Base to

create a product which Miller could commercially exploit and share the profits from that

exploitation with the School District, *see* Hilliard Decl. Exs. "9", "13" and "14";[10] and 5) an 80-

page long exhaustive report from Century's expert, which compared Miller's InfoSystems 3

product and Star_Base (as well as the system in place at the School District), and concluded:

> [We are] of the opinion, to a reasonable degree of certainty, that substantial portions of
> the [InfoSystems 3] system are a copied and translated duplicate of the Century
> Consultants Star_Base system.  In almost all areas explored, [we] found identical or
> substantially similar logic, table names, field names, definitions, and source code between
> the two applications.

*See* Hilliard Decl. Ex. "7", at 53.  Moreover, Century's expert uncovered startling evidence of the

destruction of key evidence by Miller in an apparent attempt to hide his copying, right after this

Court entered the restraining order.   *See* Hilliard Dec. Ex. "7", at 6-23, 51.   *See also* Hilliard

Decl. Ex. "22".  As outlined in exhaustive detail in Century's expert report, during the brief two-

week period *after* this Court entered the Temporary Restraining Order and Century requested the

production of Miller's program files, and just *before* he turned them over in discovery, *hundreds*

*of files were modified* at all hours of the night to "change" the programs to make them look

different from Star_Base.  *See id.*   In many cases, "search and replace" functions were executed

to simply change variable names in the programs, for no plausible reason other than to "cover

up" the look of the preexisting programs.   The Miller Defendants' own chief programmer, and

Miller himself, could not even offer any facts to contradict Century's expert's conclusions on

spoliation.  *See* Hilliard Decl. Exhibit "11", at 159-65, 170-77; Exhibit "16", at 67-81.  And, of

---

[10]     So intertwined were the fortunes of the School District and Miller in developing
the new InfoSystems 3 product that when the primary supervisor of Miller's work
for the School District, Mike Holinga, retired from the School District, he went to
work for Miller as his Sales & Projects Manager, marketing the Star_Base
"knockoff" product to other school districts.   *See* Hilliard Decl. Ex. "8", at 12;
Ex. "11", at 86, 98-99, 111-13, 181-83.

course, this Court vetted Century's expert in a *Daubert* hearing, and concluded that his testimony was sufficiently reliable to present to a jury. All of these compelling facts the School District ignores in contending that the recorded conversation was so critical to Century's case, that its suppression will doom the claims as a matter of law. Plainly, the School District's position that all of the evidence "derived...from" the recorded conversation is insupportable and should be rejected.

Even the lone case cited by the School District in support of its "fruit of the poisonous tree" argument does not help defendants. In *In re Marriage of Almquist,* 299 Ill. App.3d 732 (3d Dist. 1998),[11] the Illinois Appellate Court *rejected* the appellant's "fruit of the poisonous tree" arguments. There, a tape recording was partially admitted over an Eavesdropping Act challenge. The recording of an actual conversation (in which one of the parties did not consent) was suppressed. However, a portion of the same phone call, during which no conversation occurred but another incriminating tape recording was heard in the background, was admitted into evidence. Although the appellant argued that the admitted portion also should have been excluded because the remainder of the phone call was illegally taped, the argument was rejected by the Court. Even in these circumstances, where the admitted evidence came out *during the same phone call*, the Court concluded that the evidence was not "derivative of" the illegally taped portion of the conversation. *Almquist*, therefore, underscores the fallacy of defendants' arguments.

Notwithstanding the School District's tortured arguments on the effect of the suppression of the tape recording, the evidence developed during discovery amply supports Century's state

---

[11]    The School District miscites this decision as 229 Ill. App. 3d 723.

56

law claims.  That evidence shows: 1) that the School District is a licensee of the Star_Base

software under a written license agreement, 2) that the license agreement provides that the

software is the trade secret of Century, and prohibits the School District from disclosing the

package to a third party, 3) that the School District contracted with the Miller Defendants, a third

party, to design a new software package for its student information needs, 4) that the School

District not only required the Miller Defendants to use Star_Base to develop the new system, but

derived a financial benefit from it, 5) that School District employees told Century that the Miller

Defendants in fact were copying portions of Century's source code and database structures and

using the software to build the new system, and 6) that the School District knowingly disclosed

Century's programs to the Miller Defendants, and knowingly contributed to the Miller

Defendants' activities.  These facts show the viability of Century's claim that the School District

breached the license agreement by disclosing Century's proprietary software to a third party, and

further show the viability of Century's other state law claims.  Accordingly, defendants' motions

for summary judgment on Counts IV, V, VI and VII of the First Amended Complaint should be

denied.

## **CONCLUSION**

For all of the foregoing reasons, Century respectfully requests that the Court deny the

defendants' motions for summary judgment.

                         Respectfully submitted,

                         CENTURY CONSULTANTS, LTD.,
                         Plaintiff


                         By:__s/Craig S. Hilliard_____
                              One of its Attorneys

Lead Counsel
Craig S. Hilliard
STARK & STARK
A Professional Corporation
P.O. Box 5315
Princeton, NJ 08543-5315
(609) 896-9060

Local Counsel
David A. Herman
GIFFIN, WINNING, COHEN & BODEWES, P.C.
One West Old State Capitol Plaza
Myers Building - Suite 600
P.O. Box 2117
Springfield, IL   62705
(217) 525-1571

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on March 6, 2007, I filed this Memorandum and the accompanying Declaration with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney of record for Defendants:

Almon A. Manson, Jr. Esq.
Brown, Hay Stephens
205 S. Fifth Street, Suite 700
P. O. Box 3459
Springfield, IL 62705-2459

Lance T. Jones, Esq.
Law Office of Lance T. Jones
356 N. Walnut Street
Rochester, IL    62563


      s/ Craig S. Hilliard
CRAIG S. HILLIARD