E-FILED
Tuesday, 06 March, 2007  04:35:31 PM
Clerk, U.S. District Court, ILCD

E

X

H

I

B

I

T

11

1    A. Not to my knowledge. There may have been
2    but not to my knowledge.
3        Q. You don't recall --
4        A. Not to my memory, excuse me.
5        Q. Okay. You indicated a few minutes ago
6    that you hired Jennifer Danzinger to do website design
7    work, and she was paid through The Miller Group,
8    correct?
9        A. Yes.
10       Q. And am I correct then she received a W-2?
11       A. Yes.
12       Q. Did you eventually hire anyone else to do
13   work for The Miller Group?
14       A. Yes.
15       Q. Who did you hire?
16       A. Dr. William Choat. Do you want a list of
17   everybody we've ever hired?
18       Q. I'd like to go through a little bit of a
19   list here. When did you hire Mr. -- Dr. Choat?
20       A. I would estimate it was 1999.
21       Q. And why did you hire him?
22       A. To work on the Springfield School
23   District project.
24       Q. Specifically for that project?

1        Q. Before you became involved with the
2    Springfield School District through The Miller Group,
3    had you had any experience at all working with a
4    school or a school district on any business
5    application?
6        A. No.
7        Q. You personally had not been involved in
8    any way prior to getting involved with the Springfield
9    School District in designing or writing any software
10   application for use in a school; is that correct?
11       A. Before getting involved with the
12   Springfield School District?
13       Q. Yes.
14       A. No.
15       Q. So it would be accurate to say that for
16   you getting involved with the Springfield School
17   District was new ground?
18       A. Yes.
19       Q. At least in terms of the client, right?
20       A. Yes.
21       Q. You just mentioned hiring Dr. Choat in
22   1999, and he was hired specifically to work with the
23   Springfield School District project?
24       A. Yes.

31

1        A. Yes.
2        Q. At that time, did The Miller Group have
3    any other projects it was working on?
4        A. Yes.
5        Q. It had other clients, correct?
6        A. Yes.
7        Q. How many other clients? Can you give me
8    an approximation of the number?
9        A. Yes, estimate between 10 and 20.
10       Q. In 1999 when Mr. -- Dr. Choat was hired?
11       A. Uh-huh.
12       Q. 10 to 20?
13       MR. JONES: Is that a yes?
14       THE WITNESS: Yes, I'm sorry.
15   BY MR. HILLIARD:
16       Q. And were you doing primarily website
17   design and/or hosting for those 10 to 20 clients?
18       A. Yes.
19       Q. And do you recall how -- approximately
20   how much in revenues you generated in 1999 from those
21   10 to 20 clients?
22       A. It would be difficult for me to guess.
23       Q. Were any of those clients schools?
24       A. No.

1        Q. Anyone else that you hired after Ms.
2    Danzinger in or around the time you hired Dr. Choat?
3        A. No. There were other people subsequent
4    to that but not around that time.
5        Q. I'm trying get a sense of the progression
6    of your business. You hired Ms. Danzinger first then
7    you brought on Dr. Choat for Springfield work,
8    correct?
9        A. Yes.
10       Q. Were you bringing on anyone else at that
11   time for the Springfield work?
12       A. Not at that time.
13       Q. Did you eventually?
14       A. Yes.
15       Q. Who did you eventually bring on?
16       A. Michael David.
17       Q. When did you hire Mr. David?
18       A. I cannot honestly remember. I would
19   guess that it was 2000, 2001, somewhere in that area.
20       Q. Okay. Why did you hire Mr. David?
21       A. Mr. David possessed unique Lenix and Unix
22   networking skills that we needed, some programming
23   skills.
24       Q. Why did you need that?

1    for maintenance of their site, and so we would not
2    bill at an hourly basis.
3            Q.  Okay.  Dr. Choat was salaried, correct?
4            A.  Yes.
5            Q.  Was Mr. David and Mr. Borecky also
6    salaried?
7            A.  No, they were part-time employees.
8            Q.  So they were paid by the hour?
9            A.  Yes.
10           Q.  Okay.  And they had to submit time
11   sheets?
12           A.  Yes.
13           Q.  Do you still maintain those records?
14           A.  I don't know.  I think we might.  I can't
15   be certain.
16           Q.  Okay.  Have you in the normal course of
17   your business discarded or destroyed any records going
18   back to let's say 1999 or 2000?  Really what I'm
19   asking you is --
20           A.  Yeah.
21           Q.  -- do you believe that some of those time
22   records might have been discarded or destroyed in the
23   normal course of your business?
24           A.  Yes.

1            A.  His name I cannot remember.  He was (
2    there for a month or two.
3            Q.  Okay.
4            A.  Dougal Walker was an employee, but dic
5    -
6            Q.  What's the first name, I'm sorry.
7            A.  Dougal, D-o-u-g-a-l.  He didn't work on
8    the Springfield project though.
9            Q.  Dougal Walker?
10           A.  Uh-huh.
11           Q.  Okay.  Programmer?
12           A.  Website designer, programmer.
13           Q.  How long -- is that a Mr. or Ms.
14           A.  Mr.
15           Q.  All right.  How long was Mr. Walker
16   employed by The Miller Group?
17           A.  Probably two years, part-time basis.
18           Q.  Two years, part-time?
19           A.  Uh-huh.
20           Q.  Do you recall approximately what years?
21           A.  Would I say '97 to '99.
22           Q.  '97 to '99?
23           A.  Uh-huh.  '98, maybe,somewhere in that
24   area.

---

39

1            Q.  Okay.
2            A.  We may be missing one or two, but I think
3    we have many of them.
4            Q.  You believe you have many of them?
5            A.  Uh-huh.
6            Q.  Okay.  When Mr. David was brought on in
7    2000 to 2001, were you still doing work for those 10
8    to 20 other clients?
9            A.  Yes.
10           Q.  You said that you were doing website work
11   for in 1999?
12           A.  Yes.
13           Q.  So you maintained that client base; is
14   that correct?
15           A.  Yes.
16           Q.  Did you also add clients?
17           A.  We would add and lose clients in the
18   course of normal events.
19           Q.  Did you hire anyone else in the time
20   frame 1999 to 200, 2001 other than Dr. Choat, Mr.
21   David, and Mr. Borecky.  You've given me a list of
22   employees --
23           A.  Again that one referral from Mr. David.
24           Q.  Okay.

1            Q.  Anyone else that you can recall?
2            A.  Up to 2000?  I can't recall anybody.
3    There may have been other employees.
4            Q.  Okay.  Now let me take you forward to --
5    let's use the date May 2003 which was when this
6    lawsuit was filed.
7                Up through May 2003, did you add any
8    other employees for The Miller Group in addition to
9    the ones we've already discussed?
10           A.  Yes.
11           Q.  Okay.
12           A.  We added Sara Hill in a marketing
13   capacity.
14           Q.  Sara Hill?
15           A.  Uh-huh.
16           Q.  Okay.  When you say "marketing capacity,
17   what do you mean?
18           A.  To develop marketing materials for The
19   Miller Group, to help with demonstrations and
20   presentations and anything we could find to increase
21   our business.
22           Q.  Do you recall when you hired her?
23           A.  No.  She was an employee of the
24   Springfield School District and left the Springfield

1  School District, and it took me about six months to
2  get her to return to work. So she had a child at
3  home, so...
4       Q. Ise related in any way to Dr. Hill?
5       A. Yes.
6       Q. Daughter?
7       A. Wife.
8       Q. Wife, okay. Dr. Hill is Dr. Robert Hill,
9  correct?
10      A. Yes.
11      Q. And he at one time was the superintendent
12  of schools, correct?
13      A. Of Springfield schools.
14      Q. Of the Springfield School District,
15  correct?
16      A. Yes.
17      Q. Do you consider yourself a personal
18  friend of Dr. Hill's?
19      A. Um, yes, good acquaintance.
20      Q. Was it through Dr. Hill that you first
21  got involved with the Springfield School District?
22      A. No.
23      Q. Went through someone else?
24      A. Yes.

1       Q. Had you known Dr. Hill before you got
2  involved in the Springfield School District?
3       A. No.
4       Q. You met him through your work?
5       A. Yes.
6       Q. On the project for the School District?
7       A. Yes.
8       Q. All right. So, you don't recall
9  approximately when you hired Dr. Hill's wife, Sara?
10  Sorry to be pressing you on this there is a method to
11  my madness.
12      A. No. I don't recall. I would guess 1999,
13  2000, somewhere in that area.
14      Q. Okay. And then she became -- she was not
15  a programmer, correct?
16      A. No, she was not a programmer.
17      Q. She did strictly marketing work for the
18  business, right?
19      A. That's correct.
20      Q. And was that marketing work directed at
21  the work you were doing for the other clients,
22  nonSpringfield School District clients?
23      A. Some it, yes.
24      Q. All right. And was some of the marketing

1  work directed towards Springfield?
2       A. Um, no, I can't recall any.
3       Q. Okay.
4       A. It's possible, but I can't recall any.
5       Q. Before you hired Sara Hill, were you
6  doing anything in the way of marketing or advertising
7  your business to the public?
8       A. Yes.
9       Q. What were you doing?
10      A. We had a website ourselves, we did some
11  e-mail marketing, some direct mail.
12      Q. Okay. When did you set up your website
13      A. My estimate would be 1997.
14      Q. Fairly early on in the business, correct?
15      A. Uh-huh.
16      Q. You have to verbalize, sir, I'm sorry?
17      A. Yes.
18      Q. And that website address was
19  Miller-Group.net?
20      A. Yes.
21      Q. From the beginning days of the business?
22      A. Yes.
23      Q. Website address hasn't changed, has it?
24      A. No.

1       Q. When you first started the website, you
2  didn't have a product called Infosystems 3, correct?
3       A. That's correct.
4       Q. What was on your website, if you can
5  recall?
6       A. Information about the company, our skills
7  and website design and application development for
8  Internet.
9       Q. What type of e-mail marketing were you
10  doing? Current clients, prospective clients, both?
11      A. Yes.
12      Q. Were you doing any other type of
13  advertising or marketing back then?
14      A. I would guess that we did some direct
15  mail as well.
16      Q. Is that a guess though?
17      A. Yes.
18      Q. All right. You're not sure?
19      A. That's correct.
20      Q. Any mass media advertising?
21      A. No.
22      Q. Have you ever done any mass media
23  advertising?
24      A. In my life?

58

1    MR. JONES:  And I'll just say for purposes of
2  the record, after a conversation off the record, I've
3  decided not to instruct my client not to answer.
4    MR. MILLER:  What's a product?
5  BY MR. HILLIARD:
6    Q.  What do you consider to be a product for
7  your group?
8    A.  Something we sell.
9    Q.  Did you sell Infosystems 3?
10    A.  Yes.
11    Q.  Have you sold anything else?
12    A.  No.
13    Q.  Ever?
14    A.  No.  No, that's not correct.  Before
15  Infosystems 3, there was HR3, a human resource
16  product.
17    Q.  Sold by The Miller Group?
18    A.  Yes.
19    Q.  HR3?
20    A.  Yes.
21    Q.  What type of product was it?
22    A.  Human resources.
23    Q.  Was it a software package?
24    A.  Yes.

59

1    Q.  And the website design and/or hosting
2  work you do for the numerous clients you've already
3  described, would you -- you would not describe that as
4  a product, correct, in your opinion?
5    A.  It's a service.
6    Q.  A service?
7    A.  Yes.
8    Q.  Okay.  I just want to make sure we
9  understand each other.  Other than HR3 and Infosystems
10  3, has The Miller Group ever had any other product
11  that's sold?
12    A.  No.
13    Q.  When did The Miller Group last sell HR3?
14    A.  1997, 1996.
15    MR. HILLIARD:  Can you mark that?
16    (Whereupon Miller 2 was marked
17    for identification by the Court
18    Reporter.)
19  BY MR. HILLIARD.
20    Q.  Mr. Miller, I'm showing you what has been
21  marked as Miller 2 for identification.
22    (Looking over document.
23    Do you recognize Miller 2?
24    A.  Yes.

60

1    Q.  Can you tell me what it is?
2    A.  It's a statement of revenues.
3    Q.  Gross revenues?
4    A.  Gross revenues from these clients to The
5  Miller Group through apparently sometime in 2003.
6    Q.  Okay.  Did you work on the preparation of
7  this document?
8    A.  Yes.
9    Q.  Did any one assist you in this?
10    A.  Yes.
11    Q.  Who assisted you?
12    A.  Barbara Miller, my wife.
13    Q.  So you and your wife put this together?
14    A.  Yes.
15    Q.  And am I correct that the bottom line
16  under total revenues lists the total gross revenues
17  that your business The Miller Group generated between
18  1998 and some date in 2003 from all customers?
19    A.  Yes.
20    Q.  Do you know when that date was in 2003
21  when this was cut off?
22    A.  No, but I believe it's at your request.
23  So it might be May or June of 2003.
24    Q.  Okay.  As you sit here today, can you

61

1  estimate for me what the total gross revenues from all
2  clients were in the year 2003 through December 31st?
3    A.  No.
4    Q.  After this document was prepared, did you
5  continue to generate revenues from any of the specific
6  clients listed here?
7    A.  Yes.
8    Q.  For the balance of 2003?
9    A.  Yes.
10    Q.  All right.  You would still have records
11  of those revenues?
12    A.  Yes.
13    Q.  Did you continue to generate revenues
14  from any of the clients, the specific clients here,
15  and really I'm talking about the clients other than
16  the ones that say other nonschool related, the
17  school-related clients, did you continue to generate
18  revenues in 2004 from the school-related clients?
19    A.  Yes.
20    Q.  As you sit here today, can you tell me
21  approximately how much?
22    A.  My estimate would be around a hundred
23  thousand dollars.
24    Q.  Through today, roughly through today?

Case Compress Deposition of: John G. Miller

62

1      A. Yeah.
2      Q. Okay.
3      A. But, again, it's an estimate.
4      Q. And that's from the school related
5  clients?
6      A. Yes.
7      Q. Was that all from Adlai Stevenson?
8      A. The great bulk.
9      Q. Now you have --just described for me
10 website design and/or hosting work you did for a
11 number of other clients, nonschool clients, correct?
12     A. Yes.
13     Q. Are the revenues from that business all
14 reflected in the line next to the words "other
15 nonschool related" for those years?
16     A. To the best of my knowledge, yes.
17     Q. So, for example, you said you had
18 approximately 10 to 20 clients or thereabouts in 1999,
19 approximately, for which you were doing website design
20 and/or hosting work, correct?
21     A. Yes.
22     Q. So that number of a hundred twenty-one
23 thousand five hundred twenty-one dollars in gross
24 revenues under 1999, is it your testimony that you

63

1  believe that to be the total gross revenues that you
2  generated from those 10 to 20 clients?
3      A. From the clients we had in 1999, yes.
4      Q. Okay.
5      A. Whatever that number might be, yes.
6      Q. What about the sale of the product HR3?
7  Where is that reflected on this document?
8      A. Again as I mentioned earlier, I think the
9  last sale was in 1996. So there wouldn't be any
10 results here.
11     Q. Okay. Do you maintain any records within
12 the business which breakdown the profit margin, the
13 gross profit margin, on the business that you did with
14 each school district?
15     A. No.
16     Q. So short of having an accountant or
17 someone like that go in and look at all your financial
18 records and actually do the work, you don't have
19 anything that you can provide that would reveal that
20 information, correct? Is that correct?
21     A. I'm a sole proprietor. The profit we
22 made showed on my income tax form.
23     Q. For the entire business, though, correct?
24     A. That's correct.

64

1      Q. On an annual basis, calendar year basis?
2      A. Correct. That's correct.
3  MR. HILLIARD:  Mark that No. 3.
4           (Whereupon Miller 3 was marked
5            for identification by the Court
6            Reporter.)
7  BY MR. HILLIARD:
8      Q. Mr. Miller, you have in front of you what
9  has been marked as Miller 3 for identification. Take
10 a moment to look at that.
11          (Witness so doing.)
12     Tell me when you're finished, sir. I didn't
13 want to -- I wanted to give you a chance to look at it
14 first. Do you recognize Miller 3?
15     A. I believe it's a document, it's
16 submitting by Charles Schmadeke at your request.
17     Q. It includes a document called an
18 affidavit which you have signed under oath, correct?
19     A. Okay, yes.
20     Q. And you signed it on May 17, 2003,
21 correct?
22     A. Yes.
23     Q. And at the time you signed it, did you
24 believe that everything in this affidavit was

65

1  accurate?
2      A. I believed it was. I see a mistake in it
3  now, but I believed it was.
4      Q. What's the mistake you see?
5      A. Barbara Miller was not compensated.
6      Q. You're referring to paragraph number 8.
7      A. Paragraph 8, item G.
8      Q. Which lists a rate of monthly
9  compensation for her as $2500?
10     A. Yes.
11     Q. That's not correct?
12     A. That's not correct.
13     Q. She received nothing?
14     A. That's correct.
15     Q. Let me ask you to turn back to paragraph
16 5. Do you see the reference to the list price for
17 Infosystems 3?
18     A. Yes.
19     Q. What do you mean by list price?
20     A. List price is the full retail price
21 before any discounts that are applied.
22     Q. And is this a list price for sale of the
23 product?
24     A. Yes.

66

1   Q.   Okay.  So you did not license the
2   Infosystems 3 product; is that correct?
3       A.   No.
4       Q.   You sold it?
5       A.   We sold it as product.
6       Q.   And you sold it to the school districts
7   which are listed in paragraph 6, correct?
8       A.   Yes.  That's correct.
9       Q.   Did you sell it to Springfield?
10      A.   We developed it for Springfield at their
11  request.  We did not sell it to Springfield.
12      Q.   Have you sold it to any other school
13  districts other than the ones listed in paragraph 6?
14      A.   No.
15      Q.   Do you see amounts -- -- strike that.
16          Did you enter into written contracts with
17  each of the school districts listed in paragraph 6A
18  through F?
19      A.   No.
20      Q.   Did you enter into written contracts with
21  some of the school districts listed in paragraph 6?
22      A.   Yes.
23      Q.   Do you recall which ones you had written
24  contracts with?

67

1       A.   I believe Caledonia.
2       Q.   Any others?
3       A.   No.
4       Q.   Did you have any type of written
5   agreement with any of the other school districts other
6   than Caledonia?
7       A.   No.
8       Q.   Not even a bill of sale for Infosystems
9   3?
10      A.   No.  Invoice for hours -- for the product
11  or hours billed, but that would be it.
12      Q.   Simple invoice that each of these school
13  districts paid?
14      A.   Yes.
15      Q.   Did you charge --
16          MR. JONES:  I want to clear something because
17  I think he answered before you finished.  And your
18  question was:  Did he have a simple invoice that each
19  of these school districts actually paid?  I just want
20  to make sure whether he understands that, whether each
21  of these school districts paid the invoice.
22          THE WITNESS:  No, they did not.  You're
23  absolutely correct.
24  BY MR. HILLIARD:

68

1       Q.   But you sent invoices to each of the
2   school districts?
3       A.   We sent invoices.
4       Q.   Look at the amounts under the  amount
5   column on paragraph 6.  You have listed $40,000 for
6   Caledonia.  Do you see that?
7       A.   Uh-huh.  Yes, I do.
8       Q.   Were you paid the full $40,000?
9       A.   I don't know that.  Close to that amount.
10      Q.   You believe Caledonia still owes you
11  money?
12      A.   No.
13      Q.   So as you sit here today, it's your
14  belief that the full $40,000 was paid?
15      A.   Again, as the document states, these are
16  approximate amounts.  And I know that the initial
17  price quoted to Caledonia was $30,000, and they asked
18  for some enhancements and some hosting agreement with
19  them.  And, again, a price paid total over several
20  years might have approached $40,000.
21      Q.   You gave Caledonia a discount off the
22  list price, though, correct?
23      A.   That's correct.
24      Q.   Oswego?

69

1       A.   Yes.
2       Q.   Did you receive the full $120,000 from
3   that district?
4       A.   I believe so.
5       Q.   What about Riverton, did you get $3,000?
6       A.   Yes.
7       Q.   Adlai Stevenson, $150,000, did you
8   receive that?
9       A.   No.
10      Q.   How much has been paid?
11      A.   I think $90,000.
12      Q.   Are you still owed about $60,000?
13      A.   No.
14      Q.   Why not?
15      A.   We agreed to settle it for 90,000.
16      Q.   Did you have a written agreement with
17  them to settled that?
18      A.   No.  Yes, we have written agreement to
19  settle it, I'm sorry.  I misheard you.
20      Q.   When was that agreement entered into?
21      A.   I can't recall, but I believe it's
22  January or February 2004.
23      Q.   Why did you enter into that agreement to
24  compromise $60,000 which was still owed to you?

1           A. We needed revenue very badly.
2           Q. What was the -- what were the terms of
3    the agreement?
4           A. It would settle -- this was the price
5    mutually agreed for for work we had done.
6           Q. So the contract was for $150,000. You
7    were paid --
8           A. Again, there was no contract.
9           Q. The agreement was for a 150,000?
10          A. There was no agreement.
11          Q. There was no agreement. There was an
12   invoice?
13          A. There were invoices sent for billed hours
14   we performed work.
15          Q. And did some of the invoices cover the
16   list price for the product?
17          A. The original invoice covered the list
18   price for the product.
19          Q. And they paid that?
20          A. They paid that.
21          Q. And there were additional invoices for
22   what I'll call time and materials work that you did
23   for them?
24          A. For hours we billed, that's correct.

1           A. Yes.
2           MR. HILLIARD: I'll make a follow-up
3    production request on some of these things at the en
4    I'm not going to go through this. I'll send you a
5    letter.
6           MR. JONES: That's fine.
7    BY MR. HILLIARD:
8           Q. What about Marengo, $35,000 listed, was
9    that all paid?
10          A. Yes. I'm not sure that theirs was that
11   high, but yes, 25,000 initial purchase price, and some
12   customization work. I don't know if it was quite 35.
13          Q. What about Kewanee, 55,000 was listed ir
14   your affidavit?
15          A. 50,000 was the purchase price with
16   installation enhancement, however, that was paid.
17          Q. You believe all that was paid?
18          A. Yes.
19          Q. Okay. As you sit here today, you do not
20   believe that you are owed any money by any of these
21   school districts; is that correct?
22          A. That's correct.
23          Q. What about Springfield, does Springfield
24   owe you any money?

71

1           Q. Okay. In connection with the --
2           A. For customizations.
3           Q. Installation and customization?
4           A. Customization.
5           Q. Okay. So was that -- those amounts you
6    agreed to compromise?
7           A. Yes.
8           Q. And did you compromise them because you
9    wanted some up-front cash?
10          A. It was the end of the contract.
11          Q. And you wanted the cash?
12          A. Yes.
13          Q. What did you compromise the amount at?
14          A. 90-some-odd-thousand dollars, 97.
15          Q. I understand. So you waived the balance
16   of 60,000 which you claim was owed under the invoices
17   you sent?
18          A. Again, this was an approximation of the
19   amount that was going to be paid to us in 2003.
20          Q. As of today, you don't believe Adlai
21   Stevenson owes you anymore money?
22          A. That's correct.
23          Q. You still have a copy of that written
24   agreement with Stevenson?

1           A. No.
2           Q. Do you owe Springfield any money?
3           A. Yes.
4           Q. What do you owe Springfield?
5           A. 10 percent of the sales of this product.
6           Q. Okay. And what do you believe that
7    number to be?
8           A. I don't know that number.
9           Q. Have you ever received any written
10   communication from Springfield asking you to pay that
11          A. No.
12          Q. Has anyone from Springfield asked you to
13   pay it?
14          A. No.
15          Q. Has anyone from Springfield told you that
16   they would be willing to forego payment of that?
17          A. No.
18          Q. Have you had any discussions at all with
19   anyone for Springfield in the last two years about
20   paying that sum of money?
21          A. Yes.
22          Q. With whom have you talked?
23          A. The last two years, probably Sue Rowe.
24          Q. What do you recall about those

1 discussions?

2     A. Very little, but I recall discussing it

3 with her.

4     Q. Did she ask you when you expected to be

5 making a payment to Springfield based on the sales of

6 Infosystems 3?

7     A. No, not when.

8     Q. How much?

9     A. How much was probably asked.

10     Q. I'm going to ask you to look at paragraph

11 8 on the next page of the affidavit.

12     (Witness so doing.)

13     Who is Matt Sparks?

14     A. A student who worked part-time for a us.

15     Q. A programmer?

16     A. Yes.

17     Q. What projects did he work?

18     A. Certainly when this was produced, he was

19 working on commercial websites.

20     Q. Nonschool related?

21     A. Nonschool related.

22     Q. Do you know who Brent Qualls is?

23     A. Yes.

24     Q. Who is Brent Qualls?

1     Q. Did he spend any time at your offices

2 South Second Street?

3     A. Certainly.

4     Q. Was there a period of time when he w

5 spending a lot of time at your offices?

6     A. Yes.

7     Q. The rent you have listed for The Miller

8 Group, you said owned the building, correct?

9     A. That's correct.

10     Q. So you paid the rent to yourself?

11     A. Yes. Technically, I believe that we paid

12 the rent directly to the bank for the mortgage

13 payment.

14     Q. The last item in paragraph 8 says:

15 "Business Debt Service, $7,000."

16     A. Yes.

17     MR. JONES: I'm sorry, paragraph what?

18     MR. HILLIARD: It's the last page of the

19 affidavit. It's actually paragraph 9..

20     MR. JONES: Yeah, I think you said 8, so...

21     MR. HILLIARD: I did.

22 BY MR. HILLIARD:

23     Q. Do you see that number?

24     A. Yes.

75

1     A. Employee of the Springfield School

2 District, manager of their information department, I

3 believe.

4     Q. Did he ever work for you?

5     A. No.

6     Q. Did you ever pay him?

7     A. No. That's not true. I think we gave

8 him a hundred dollars at Christmas one year as a gift

9 but not payment.

10     Q. Okay. Why did you give him a hundred

11 dollars at Christmas?

12     A. Because he was very nice to us.

13     Q. Was this during the time when you were

14 working on the Springfield School District project?

15     A. Yes.

16     Q. He was actively working with you on that

17 project?

18     A. Yes.

19     Q. As a Springfield School District

20 employee?

21     A. Yes.

22     Q. Did he work on the development of

23 Infosystems 3?

24     A. Yes.

1     Q. What is that? What do you mean by th

2     A. Money we owe to banks.

3     Q. That The Miller Group owes?

4     A. Yes.

5     Q. What was that a line of credit?

6     A. In some cases, a small business

7 administration loan.

8     Q. Did this debt service cover more than c

9 loan?

10     A. Yes.

11     Q. And that financed the operations of the

12 entire business?

13     A. Yes.

14     Q. When did you first get involved in doing

15 any work for the Springfield School District?

16     A. I had a relationship with Springfield

17 School District, I believe, beginning in 1998, summer

18 of 1998.

19     Q. A personal relationship –

20     A. Might have been the summer of 1999. I

21 can't remember exactly, but it was a business

22 relationship.

23     Q. Okay. Did it start as a personal

24 relationship?

1  the features and benefits they'd like included in the
2  system. We had discussions on our hourly rate. We
3  had discuss on numerous items of a business
4  relationship.
5      Q. Were you talking during this time
6  primarily with particular people at the School
7  District?
8      A. Yes.
9      Q. And who were those people?
10     A. Mike Holinga was my main point of
11 contact.
12     Q. All right. Did you present any type of a
13 written proposal for this work on a new information
14 system?
15     A. Yes.
16     Q. Was it -- -- strike that.
17         What form did it take?
18     A. I don't understand. Did it have words?
19     Q. Was it a -- was it a demonstration
20 program; was it a concept proposal? What form did the
21 proposal take?
22     A. It was -- we had done the proof of
23 concept. They agreed that it worked. And this was a
24 proposal concerning the business relationship, what

1  web, less dependent upon single point of failure with
2  hardware.
3      Q. Realtime access?
4      A. Realtime access. Numerous benefits,
5  training and the ability to access anywhere that you
6  are whether at home or a trip or in your attorneys
7  office, make it much more convenient than a client
8  server based product.
9      Q. So you presented all this in some type o
10 a concept form, correct?
11     A. Uh-huh.
12     Q. And do you still have the document? Di
13 you do --
14     A. Again, it was verbal.
15     Q. It was all verbal?
16     A. Yes.
17     Q. All right. Nothing really committed to
18 writing at that point?
19     A. No.
20     Q. And they told you they liked the concept
21     A. Yes.
22     Q. Did you tell them you needed to learn
23 anything about how their existing information system,
24 their database and other information systems were --

87

1  our hourly rate was, what equipment I would need, how
2  long the contract would last, breach
3  and cure, that kind of thing.
4      Q. Well, let's go back to the concept,
5  though. How did you present the concept for this new
6  information system?
7      A. I indicated that there was a whole new
8  world of opportunity out there with the notion of a
9  web-based system as opposed to a client server based
10 system.
11         And I indicated there were now products that
12 could be used as middlewear that would interface
13 between a website and various forms on a website and
14 an Oracle database, which was the prime problem they
15 had. They wanted to use Oracle. And so with that
16 middlewear, I indicated we would be able to develop a
17 website they wanted.
18     Q. And what, in your view, were the
19 advantages of developing this web interface with their
20 existing database?
21     A. They indicated they wanted it on the
22 existing database. I didn't. They -- the advantages
23 would be that less training is required. People are
24 familiar with a point and click interface with the

1      A. Not at that point, no.
2      Q. -- were structured?
3      A. Not at that point.
4      Q. At some later point you did?
5      A. Yes.
6      Q. So then as you testified you went from
7  concept to discussions with them about an actual
8  contract, business terms, correct?
9      A. Yes.
10     Q. Did you eventually sign a contract?
11     A. We signed an agreement, yes.
12              (Whereupon Miller 4 and Miller 5
13              were marked for identification
14              by the Court Reporter.)
15     Q. Mr. Miller, you have in front of you
16 what's been marked as Miller 4 and Miller 5. Would
17 you take a moment, please, to look at those
18 agreements.
19     A. Uh-huh.
20     Q. Have you had a chance to look at Miller 4
21 and 5?
22     A. Yes.
23     Q. Do you recognize those to be copies of
24 two different contracts between The Miller Group and

90

1  Springfield School District?
2       A. Yes.
3       Q. And one is dated September 1, 1998, and
4  the other one, Miller 5, is dated December 21, 1998,
5  correct?
6       A. Yes, that's correct.
7       Q. And you signed both agreements, correct?
8       A. Yes.
9       Q. Are you aware of any other contracts
10  between The Miller Group and Springfield School
11  District, any other written agreements other than
12  these two documents?
13       A. Not to my knowledge.
14       Q. What was the purpose from your
15  perspective, what was the purpose of the first
16  agreement dated September 1, 1998?
17       A. The first agreement was, as we discussed
18  earlier for me to provide consulting services for the
19  DNS and the web server.
20       Q. So this was the outgrowth of your initial
21  discussions with Karen Thompson and then Ms. Thompson
22  and Mr. Holinga?
23       A. That's correct.
24       Q. All right. And you actually provided

1  months or...
2       A. Maybe, yes.
3       Q. Sometime –
4       A. Sometime right around that date.
5       Q. Around the holidays in 1998?
6       A. Yes, yes.
7       Q. Was this agreement the product of severa
8  weeks and months of discussions between you and pe
9  at the School District?
10       A. Certainly some length of time, but it
11  wasn't very long. Certainly not months.
12       Q. Do you recall seeing any prior drafts of
13  this December 21, 1998, agreement?
14       A. Yes.
15       Q. Did you have counsel representing you in
16  the negotiation of that agreement?
17       A. Not that I can recall. I would have to
18  refresh my memory.
19       Q. Was there counsel who represented the
20  School District?
21       A. Yes.
22       Q. Do you know who it was?
23       A. Yes.
24       Q. Who?

91

1  services under this contract, correct?
2       A. Yes.
3       Q. Now, am I correct that under this
4  September agreement, Miller 4, if you'll look at
5  paragraph 7. It appears to me that you agreed that
6  any of the work that you did under this contract would
7  belong to the School District, correct?
8       A. Yes.
9       Q. Was that something that the School
10  District requested?
11       A. Yes.
12       Q. Okay. You agreed to that, right?
13       A. Yes.
14       Q. Now what was the purpose of the December
15  21, 1998, agreement in your view?
16       A. To develop a new interface information
17  system for Springfield School District with the
18  features indicated here.
19       Q. Now, was this agreement you signed, you
20  believe you signed it sometime on or around December
21  21, 1998? It's not dated.
22       A. No, I believe it was a little later than
23  that, but it was –
24       Q. A little bit later meaning weeks or

1       A. Eric Grenzebach.
2       Q. He's an attorney at Brown, Hay &
3  Stephens?
4       A. That's correct.
5       Q. Did you keep any prior drafts of the
6  contract?
7       A. I don't know.
8       Q. But you do recall seeing them?
9       A. I certainly did. There was no breach and
10  cure clause in it.
11       Q. Breach and cure meaning what?
12       A. Termination of consulting services.
13       Q. Paragraph 6?
14       A. Yes.
15       Q. What became paragraph 6?
16       A. Yes.
17       Q. So you have a recollection of there being
18  no paragraph 6 or something.
19       A. There was a different paragraph 6.
20       Q. A different paragraph 6 in an initial
21  draft?
22       A. Yes.
23       Q. Okay.
24       A. It did not allow me to cure.

94

Q. Okay. You actually anticipated my next question which was: Do you recall what, if anything, were the subject of discussions back and forth of changes in the draft. You just mentioned paragraph 6.

A. I did.

Q. Was there anything else that you recall being a subject of negotiation between you and Springfield?

A. Difference in drafts?

Q. Uh-huh.

A. That was certainly the largest point. There may have been others, but I can't recall at this time.

(Whereupon Miller 6 was marked for identification by the Court Reporter.)

Q. Do you recognize Miller 6?

A. Yes.

Q. Okay. What is it?

A. It appears to be two different versions of this -- of Miller 5.

Q. Okay. And it's dated -- the fax cover sheet is dated December 16th, correct?

A. Yes.

Q. Okay. Now staying with that draft, I will tell you that the top draft appears to be the same form of agreement which was actually signed. It's the second draft attached, which we were you just look at, that is a bit different. That's where it has your handwriting.

A. I think that's incorrect.

Q. Okay.

A. I think the one I was looking at was the first draft.

Q. I hear what you're saying. The bottom document, the one you have in front of you.

A. Bottom document, I believe was the first draft.

Q. You believe that was the first draft of the agreement?

A. Yes.

Q. Okay. And it appears to me that there were some changes made in the second draft other th the breach and cure termination provisions you discussed. Do you agree?

A. Yes.

Q. All right. And am I correct that one of the differences is contained in paragraph 9?

95

Q. And the second page appears to be a memo to you from Mr. Grenzebach. Do you see that?

A. Yes.

Q. And it says on the subject line, "Second Draft." Do you see that?

A. Yes.

Q. Okay. And then just below that in the memo to you, it says, "Enclosed is a second draft of the above referenced agreement which incorporates the changes discussed earlier today." Do you see that?

A. Yes.

Q. Do you recall what changes were discussed?

A. If I look at page 5 of 6 of the fax, I recognize my handwriting, it's where it says breach and cure, 30 days.

Q. That is your handwriting?

A. That is my handwriting.

Q. Okay.

A. The other handwriting I don't recognize.

Q. Okay. So you have a specific recollection of discussing the termination provisions with them?

A. Yes.

A. Yes.

Q. Under ownership of applications and software solutions, do you see that?

A. Yes.

Q. Okay. Do you agree with me there was a change between the first and second drafts?

A. Certainly was.

Q. All right. In the first draft, there does not appear to be any provision for a payment to the School District by The Miller Group of 10 percent of any of the revenues made by The Miller Group on th sale of Infosystems 3, do you agree?

A. Specifically 10 percent, yes.

Q. Right. So was that the subject of some discussion?

A. Yes.

Q. What do you recall about those discussions?

A. I can recall specifically that I wanted The Miller Group to own the application developed.

Q. Okay. That's what you wanted from the beginning?

A. Regarding this point, yes.

Q. So from the beginning of the negotiations

1  for this agreement, if you were going to develop a
2  Internet-based information systems application for the
3  School District, it was your desire to own that
4  product; is that correct?
5       A. No.
6       Q. That's not correct?
7       A. No.
8       Q. Okay. What did I get wrong?
9       A. I certainly didn't think of that from the
10 beginning of these negotiations.
11      Q. At some point you did?
12      A. Yes.
13      Q. Why?
14      A. Mr. Holinga had indicated that they had
15 developed another product which the guy kept ownership
16 and made a lot of money off of. And he thought that
17 this would be equally or greater more successful than
18 the other product was, the product we were developing.
19      Q. What was this other product.
20      A. I'm sure he told me. I can't remember.
21      Q. But Mr. Holinga indicated to you that he
22 was aware of another product that had been developed
23 for the School District?
24      A. Yes.

1  they do. And Springfield seemed willing to develop
2  that relationship with us.
3       Q. You hadn't done that up to that point,
4  had you?
5       A. Done what?
6       Q. Spent the time necessary to learn abou
7  their existing other information system?
8       A. No.
9       Q. Up to this point?
10      A. No.
11      Q. Okay. So you realize that you were ab
12 to invest a lot of time in the project, correct?
13      A. More than their existing system which
14 didn't matter much at all was the way the School
15 District worked. That was the key element for us is
16 what the workflow was and how people wanted to wc
17      Q. Were you at all reluctant to agree to
18 give the School District a percentage of the revenues
19 of this product you were going to develop?
20      A. Certainly.
21      Q. But you eventually agreed to it?
22      A. Yes.
23      Q. And why did you do that?
24      A. In exchange for ownership of the produc

99

1       Q. And that the owner of that product was
2  able to make a lot of money?
3       A. Yes.
4       Q. From its sale to other third parties?
5       A. Sale, license, use, some of those things.
6       Q. Okay. So Mr. Holinga indicated to you
7  that it was his desire to have a piece of this product
8  that he was -- that the School District was going to
9  develop with you?
10      A. No, he didn't want a piece of it.
11      Q. No, I don't mean him, the School
12 District, right?
13      A. Yes.
14      Q. And when he told you that, what, if
15 anything, was your response?
16      A. That I indicated that, I believe I
17 indicated, that if they were to help us in this regard
18 the would be an acceptable relationship.
19      Q. Why did you agree to that?
20      A. We weren't knowledgeable in schools, in
21 school districts, and being able to do this product,
22 project rather, and develop it fully, required that we
23 spent a lot of time with the School District and
24 really get to know their -- the way they work and what

1  It was a compromise.
2       Q. During these negotiations, did you tell
3  Mr. Holinga that it was your intention at the time to
4  sell the product you were going to develop for them?
5       A. No.
6       Q. Let me finish me question.
7       A. Okay. I'm sorry.
8       Q. To other parties?
9       A. No.
10      Q. Well am I correct that you at least had
11 to have some discussion with him about that subject
12 because otherwise you wouldn't have been talking abo
13 a 10 percent?
14      A. That's right we had discussion about it.
15      Q. All right. So you and Mr. Holinga at
16 least discussed the possibility that you would be
17 selling this product which became Infosystems 3,
18 correct?
19      A. Yes.
20      Q. You at least discussed with Mr. Holinga
21 at the time of these negotiations the possibility
22 that down the road you would be selling the product
23 that you developed for their School District to third
24 parties?

1     A. Yes.

2     Q. To other people, other businesses, other
3 schools?

4     A. Other schools.

5     Q. Okay. You just didn't know whether that
6 was ever going to come fruition or not at the time,
7 right?

8     A. Absolutely.

9     Q. Because you hadn't even developed the
10 product yet?

11     A. Exactly.

12     Q. All right. So did you think by entering
13 into this agreement you were forming in essence a
14 partnership with the School District for the
15 development if this product?

16     MR. JONES: I would object insofar as it
17 calls for a legal description with respect to the
18 definition of partnership.

19     MR. MANSON: Certainly relationship. A
20 longer-term relationship that a simple one-year
21 contract might indicate.

22 BY MR. HILLIARD:

23     Q. With the possibility of potential
24 benefits to the School District from the work of your

1 any product, services, and applications and secure
2 such servicemarks and/or trademarks as are approp
3 to identify and protect its proprietary interests.
4 Do you see that?

5     A. Uh-huh. Yes, I do.

6     Q. That provision came out for the secon
7 draft, correct?

8     A. I have to see.

9     Q. Because you were now going to own t
10 product?

11     A. Yes, it did come out.

12     Q. At the time you were going through th
13 negotiations, had you ever had any experience in
14 filing any copyright registration for any of the other
15 programs that you had written in the past year?

16     A. No.

17     Q. Had you ever contemplated it?

18     A. I had contemplated it.

19     Q. You had in the past?

20     A. I had contemplated it.

21     Q. Did you ever consider filing any
22 copyright registration with the US Copyright Office
23 for Infosystems 3 after it was developed?

24     A. Yes.

103

1 business down the road selling this product, right?

2     A. Yes, though that seemed remote at the
3 time.

4     Q. Did it?

5     A. Yes.

6     Q. You believed it was remote?

7     A. Yes.

8     Q. Why did you think it was remote?

9     A. I had no idea of the scope of the project
10 or the difficulty of the project or the how much we'd
11 have to learn. I was more focused on the project.

12     Q. So am I correct then that the compromise
13 that was reached between the first draft and the
14 second draft was that you were now going to own the
15 product rather than the School District, and in
16 exchange for that, the School District was going to
17 receive 10 percent of any revenues you generated from
18 the sale of the product down the road to third
19 parties?

20     A. Regarding that one paragraph, yes, that
21 is the distinction.

22     Q. Okay. All right. I notice that the --
23 that there is a paragraph in the first draft which
24 says quote District shall have the rights to copyright

1     Q. You considered it?

2     A. Yes.

3     Q. Did you ever file any such application?

4     A. No.

5     Q. Why not?

6     A. To the best of my recollection, Mrs. Hill
7 did not get to it.

8     Q. Who didn't?

9     A. Mrs. Hill.

10     Q. While she was employed by you?

11     A. Yes.

12     Q. Did you give her instructions to do so?

13     A. We did a trademark, and I believe there
14 was copyright discussions with her.

15     Q. With her?

16     A. Yes.

17     Q. Okay. And did you ever ask her to if sh
18 thought it appropriate to move forward with the filing
19 of a copyright registration on the Infosystems 3
20 software package?

21     A. I don't remember. I don't know if I was
22 that specific.

23     Q. What did you mean by we, and I may be
24 misquoting you, we filed for a trademark or we sought

1  a trademark, what did you mean by that?
2       A.  I believe we used an attorney to file a
3  trademark with the logo IS3 as Infosystems 3.  That's
4  all it means.
5       Q.  Okay.  Were you issued a trademark?
6       A.  Yes.
7       Q.  Registration?
8       A.  Yes.
9       Q.  On the logo IS3?
10      A.  Yes, or the name Infosystems 3, I can't
11  remember which one.
12      Q.  Okay.  You believe that you own
13  Infosystems 3, correct?
14      A.  Yes.
15      Q.  You believe that today, right?
16      A.  Yes.
17      Q.  Do you believe that if anyone copied the
18  source code of any of the programs of IS3 that that
19  would be a violation of your rights?
20      A.  If anyone copied it?
21      Q.  Yes.
22      A.  Or if any of the schools that had
23  purchased our services?
24      Q.  Anyone?

1        Q.  Mr. Miller, if I could ask you to stay
2  with Miller 5 again.  If you look towards the bottom
3  of the first page you'll see a paragraph entitled
4  "Scope of Services," do you see that?
5        A.  Yes.
6        Q.  Okay.  And the second sentence says t
7  following:  "Features of the system shall include use
8  of existing data structures (Star_Base)," do you see
9  that?
10       A.  Yes.
11       Q.  Okay.  Do you know why that particular
12  provision was in this agreement?
13       A.  It was what the Springfield School
14  District wanted.
15       Q.  So it was the School District's idea to
16  have that language in this agreement?
17       A.  Yes, they wanted to continue using their
18  existing application while the new one was being
19  developed.
20       Q.  Is that how you interpret that phrase?
21       A.  Yes, and they expressed that to me as
22  well.
23       Q.  What did you understand the term "data
24  structures" to mean?

107

1       A.  Yes.  That would appear to be a
2  violation.
3       Q.  If someone copied the source code of
4  Infosystems 3, sold it to someone else?
5       A.  Yes.
6       Q.  Okay.  Did anyone from the Springfield
7  School District tell you that they would – would have
8  ben unwilling to enter into the December 21, 1998,
9  agreement with you if you had not agreed to provide
10  them with a percentage of any gross revenues for the
11  sale of the product?
12      A.  I'm not a hundred percent confident with
13  that regard, but I believe Mr. Holinga might have
14  indicated something like that.
15      Q.  So as you sit here today, you believe it
16  was a potential deal breaker?
17      A.  Yes.
18      MR. HILLIARD:  Let's break now.
19      MR. JONES:  What time do you want to come
20  back?
21      MR. HILLIARD:  1:30.  We'll come back at
22  1:30.  Is that all right?  Okay.
23            (Whereupon a break was taken.)
24  BY MR. HILLIARD:

1        A.  Um, at the time, it meant that whatever
2  software they were using would continue to input dat
3  into their existing database.  We would in turn pull
4  that same data out from that existing database and
5  show it in different ways.
6        Q.  For example, on the web?
7        A.  For example, on the web.
8        Q.  Okay.  Did you believe at the time that
9  you were going to need – – strike that.
10            Did you understand that the phrase
11  "existing data structures" meant a computer program
12  programs?
13       A.  No.
14       Q.  Did you understand the phrase "existing
15  data structures" to mean any type of software
16  application?
17       A.  Any type of software application...
18       Q.  In other words, my question is what, if
19  anything, did you understand the term "existing data
20  structures" to mean a particular form of information?
21       A.  I understood that – the question you're
22  asking now, I understood existing data structures to
23  mean the database that they had installed on their
24  system.

1    Q. And by database did you understand that
2    to mean a program?
3    A. No.
4    Q. Did you understand it to mean something
5    that contained source code?
6    A. No.
7    Q. All right. Did your understanding change
8    at any point after the contract was signed?
9    A. As far as The Miller Group went, no.
10    Q. What about Springfield?
11    A. They did programming on their own. Brent
12    was in my office, but he programmed his own stuff.
13    Q. What do you mean by that?
14    A. My job was --
15    Q. Brent Qualls?
16    A. Brent Qualls. My job was to say that the
17    next project here that we are going to work on is
18    assessment or attendance or transcripts or scheduling.
19    Q. Uh-huh.
20    A. Then, I would divide the work up
21    according to what knowledge they had in each of those
22    areas, and Mr. Qualls, because he was not my employee
23    nor, in fact, subject to my direction, though he did
24    listen to it, did his own programming on the projects

1    Q. Was it? How was it divided?
2    A. The IT people they referred to were Henr
3    Stuckey and Dave Williams and Brent Qualls and other
4    people that worked in that small area.
5    Q. Okay.
6    A. The technology people, or a word similar
7    to that, included Holinga and Karen Thompson and otl
8    that worked in that area. They were more
9    curriculum-based, but, in fact, Holinga was head of
10    the project.
11    Q. Did the people in Mr. Stuckey's group
12    report to Mr. Holinga?
13    A. At some point in time they did, yes.
14    Q. All right. In other words, in terms of
15    the management structure as you understood it in the
16    School District --
17    A. When he was named -- yeah, when he wa
18    named chief information officer, they reported to him.
19    Q. Mr. Stuckey did and his group?
20    A. Yes. Mr. Stuckey and his group reported
21    to Mr. Holinga.
22    Q. Now under this contract then, how was th
23    -- how did you understand the structure of direction
24    and control to be set up?

111

1    that he was either requested by Springfield to do or
2    the ones that I suggested he do.
3    Q. So there were times when you directed his
4    activities on the development of the new information
5    system for the District?
6    A. I never directed his activities. Would I
7    suggest that this might be the next step in our
8    progress, but he attended the same meetings I did.
9    Q. Wasn't The Miller Group under this
10    contract to be the project coordinator?
11    A. In fact, Mr. Holinga and the Information
12    System Task Force was the project coordinator. We
13    were the provider of the services.
14    Q. Does that mean that you understood that
15    you were to take direction from the IT personnel at
16    the School District on how the new system was going to
17    be developed?
18    A. Not -- when you say the IT people who do
19    you mean by that?
20    Q. Well by IT people, like I'm speaking
21    generically about information technology personnel in
22    the school district?
23    A. In the Springfield School District, it
24    was divided a little differently.

1    A. We worked according to the desires of the
2    Springfield School District.
3    Q. You provided input and recommendations,
4    correct?
5    A. Yes. That's correct.
6    Q. But ultimately the decisions were made by
7    the School District, correct?
8    A. By the client, yes.
9    Q. And did you understand that there was a
10    person or persons making those decisions?
11    A. Yes.
12    Q. In other words, was it the Board, was it
13    a particular committee, was it Mr. Holinga? About the
14    development, the decisions on how this new information
15    system was going to be developed?
16    A. The answer is yes.
17    Q. And who was making those decisions?
18    A. Various people according to the decision
19    that had to be made.
20    Q. Okay. What do you mean by that?
21    A. Mr. Holinga made some if it was decision
22    he could make on his own. The Information Systems
23    Task Force that met regularly made a lot of decisions
24    by vote. The superintendent made decisions in

1    A.  It's an agreement between Caledonia
2    community schools and The Miller Group.
3    Q.  What did this agreement provide for?
4    A.  It provided that as it indicates here we
5    would implement a Internet-base student information
6    system that included futures listed on page 2 and page
7    3.
8    Q.  Isn't one of those futures a scheduling?
9    A.  Again, it says when it becomes available
10   and they never requested it.  This was a proposal and
11   agreement.  The never requested the Stanford 9 testing
12   either or the Athletic Eligibility module.
13   Q.  In the agreement though, am I correct
14   that you were agreeing to provide that to them for a
15   fee if they want it, correct?
16   A.  Yes.
17   Q.  Now why did you put when it becomes
18   available in the contract?
19   A.  Because at that point, there wasn't one
20   available.
21   Q.  Infosystems 3 did not have a scheduling
22   module?
23   A.  No.
24   Q.  Did you develop one?

1    working well, things weren't working well, but I'm not
2    sure by what you mean by "work product."  The finis
3    product itself?
4    Q.  Yes.  Well, both.
5    A.  It was on our servers.  I don't know that
6    I have ever looked at it.
7    Q.  Was he also working on any other
8    application for Infosystems 3?
9    A.  He worked on many of them.
10   Q.  What others do you recall he worked on,
11   other than the scheduling application?
12   A.  I mean his hand, his imprint, his vision
13   is seen in many of the applications.  To specifically
14   name them all, I mean, attendance, assessment, and
15   many of the applications.
16   Q.  Okay.  He was involved?
17   A.  Yeah.
18   Q.  And many of those applications became a
19   part of the Infosystems 3 product that was ultimately
20   offered for sale to the public, correct?
21   A.  That's a reach.  That's a reach.
22   Q.  Why is that a reach?
23   A.  Because a lot of that work we discarded
24   and used other newer work when we began to offer

147

1    A.  Mr. Qualls developed one that worked with
2    the Springfield School District's system.  We have
3    subsequently developed one that works with the
4    Infosystems 3.
5    Q.  Mr. Qualls -- is it your understanding
6    Mr. Qualls wrote a scheduling application that
7    eventually became part of Infosystems 3?
8    A.  In a broad sense, yes.
9    Q.  Why did he do that?
10   A.  So that Springfield public schools could
11   schedule there students.
12   Q.  Do you know if anyone supervised his work
13   in creating that scheduling application?
14   A.  Again, Mr. Holinga and the Monday morning
15   work group meetings and the Information Systems Task
16   Force people were really the ones responsible for
17   watching the progress.
18   Q.  Did you have occasion during the time he
19   was doing the work on the schedule application to talk
20   with him about how he was going about doing it?
21   A.  Yes.
22   Q.  Did he share with you any of his work
23   product?
24   A.  We discussed concepts that things were

1    Infosystems 3.  There is a lot of his code that is
2    residual, but unless he specifically noted that he did
3    that coding, it would have been impossible for us to
4    tell.  Well, that's not true.  There is some subtle
5    things you can tell by people's code, but...
6    Q.  What do you mean by "residual"?
7    A.  Things that are left over.
8    Q.  From what?
9    A.  From his work.
10   Q.  That is still in Infosystems 3?
11   A.  I don't know, might be.  We don't have
12   anybody using Infosystems 3.
13   Q.  Do you know whether or not Mr. Qualls
14   borrowed or copied any code from any of the Star_Base
15   applications to use in connection with his work on the
16   development of Infosystems 3?
17   A.  I don't know that.  I mean I would doubt
18   it, but I don't know that.
19   Q.  Why do you say you doubt it?
20   A.  Because to my knowledge of what the
21   Star_Base code would appear to be is I don't even know
22   what language it's written in, but it's certainly not
23   web based.  It's certainly not PHP, the language we
24   wrote in.  It's certainly a client server application,

150

1  and not a web-based application. And as such, the two
2  are so totally different that I'm not sure you can
3  gain any benefit seeing one to the other.
4          Q.  Are you certain of that or is that just
5  your opinion?
6          A.  No, that's my opinion.
7          Q.  That's your opinion?
8          A.  Yes.
9          Q.  But you don't know one way or the other?
10         A.  No, I don't.
11         Q.  And as you sit here today, you don't know
12  whether Mr. Qualls borrowed or copied actual source
13  code from one of Star_Base applications?
14         A.  Absolutely I don't know that.
15         Q.  You don't know it?
16         A.  That's what I said earlier, yes, I don't
17  know.
18         Q.  I never told that?
19         A.  Never told me what?
20         Q.  That he had used code from Star_Base?
21         A.  Know he never told me that.
22         Q.  Did anyone you ever employed such as Dr.
23  Choat ever express to you their opinion that some of
24  the source code from Star_Base appeared in Infosystems

1  available, it just says student scheduler, correct?
2          A.  That's correct.
3          Q.  Was the student scheduling application
4  for Infosystems 3 now available as of September 2000
5          A.  No.
6          Q.  It was still not available?
7          A.  No, it was not available.  This, of
8  course –
9          Q.  Was still being developed?
10         A.  The scheduler was still being developed.
11         Q.  By Mr. Qualls?
12         A.  Yes.
13         Q.  Okay.
14         A.  I don't know if Mr. Qualls was still
15  developing it at that point I don't know that.
16         Q.  To your knowledge, was he the only pers
17  involved in the programming of the student scheduler
18  for Infosystems 3?  In other words, did anyone else
19  write code?
20         A.  Michael David or Borecky may have
21  corrected or helped him in some fashion.  I don't
22  know.  I would assume they might have, possibly not.
23  That's a guess on my part.
24         Q.  Was Dr. Choat writing any code?

151

1  3?
2          A.  No.  Again, I don't know that their -- the
3  code is so different would I assume, that there is no
4  way one can be in the other.  It wouldn't work.
5          (Whereupon Miller 15 was marked
6          for identification by the Court
7          Reporter.)
8          Q.  Mr. Miller, I'm showing you what's been
9  marked Miller 15.  Do you recognize Miller 15?
10         A.  Yes.
11         Q.  It appears to be a copy of the contract
12  between The Miller Group and Oswego School District;
13  is that correct?
14         A.  Yes, that's correct.
15         Q.  And this one appears to have been entered
16  into about three or four months after the Caledonia
17  contract marked Miller 14, correct?
18         A.  Yes.
19         Q.  And am I correct that this agreement like
20  the Caledonia agreement also listed a student
21  scheduler application in the scope of services of the
22  contract?
23         A.  Yes.
24         Q.  This one doesn't say when it becomes

1          A.  Yes, not for the scheduling.
2          Q.  For other applications?
3          A.  Yes.
4          Q.  Was he overseeing Mr. Qualls work in any
5  way?
6          A.  No.
7          Q.  Were you aware that after this lawsuit
8  was filed, Century Consultants retained someone to do
9  a report, what lawyers referred as an expert report?
10         A.  Yes.
11         Q.  You've seen a copy of that have report,
12  haven't you ?
13         A.  Just briefly.  It wasn't allowed to leave
14  my attorney's office, so I didn't get a chance to
15  study that.
16         Q.  Did you read it?
17         A.  Most it have, yes.
18         Q.  Did you understand that the report in
19  part compared table names from IS3 against table names
20  for Star_Base?
21         A.  Yes.
22         Q.  And did you also understand when you read
23  that report that it in part compared lines of source
24  code for IS3 against lines of source code from

1  Star_Base?
2      A.  Yes.
3      Q.  When you read that report, sir, did you
4  come to any opinion in your mind about the conclusions
5  that the gentlemen who prepared that report had
6  reached on those two subjects?
7      A.  Certainly.
8      Q.  What did you conclude?
9      A.  I concluded that the use of table names,
10 column names, because we had been required by the
11 Springfield School District to use their existing data
12 structure, that would only be natural.  I also knew
13 that we were in the midst of trying to move strongly
14 away from that structure and table names.  We were
15 glad to be free of the constraints of using the
16 Springfield system and wanted to develop our own
17 system called IS3.  And we've never got a chance to do
18 that.
19     Q.  Why would you even want to move away
20 from, you just referred to the table names, why would
21 you even want to move away from the table names as
22 they had existed to something else?
23     A.  Structure was not advantageous to us.  It
24 wasn't very good.

1  children lived at that particular address.
2          Under the structure we had to use with
3  Springfield, there were  numerous addresses, one for
4  each child or several for each child.  We felt that
5  one address, for example, if you changed it in
6  kindergarten, it would also change the high school
7  kids.  And it worked out very nicely.
8              (Whereupon Miller 16 was marked
9              for identification by the Court
10             Reporter.)
11     Q.  You have in front of you what's been
12 marked as Miller 16.  Am I correct that this is a copy
13 of the report that you read through in your attorney's
14 office?
15     A.  Yes.
16     Q.  While we are on the subject of the table
17 names, may I ask you to take a look at page 31 of the
18 report.  Are you there, sir?
19     A.  Yes.
20     Q.  Okay.  And this compares two tables, one
21 for your product IS3 and one for Star_Base.  Your
22 table is SKED_STU and the Star_Base table SX_PRI.  Do
23 you see that?
24     A.  Okay.

155

1      Q.  Then why did you use it in the first
2  place?
3      A.  Because we were required to under our
4  contract agreement with Springfield.
5      Q.  But am I correct that those same – that
6  same structure of table names was also used in the
7  version of the product that you sold to certain other
8  school districts?
9      A.  No.
10     Q.  That's not correct?
11     A.  No.  I mean there may have been one or
12 two that were coincidences, yes, but Oswego was a
13 totally different structure, for example.  Stevenson
14 was a totally different structure.
15     Q.  But there may have been one or two
16 that –
17     A.  Sure, yes.
18     Q.  – coincidentally had the same table
19 structure?
20     A.  Yeah, I mean, student to student.  What
21 are you going to call them?  Child?  Address is
22 address.  But there were significant differences in
23 the address table, for example.  We believe the
24 address should only be entered once no matter how many

1      Q.  And do you see that this gentleman has
2  concluded that the two tables are identical in terms
3  of table names and characters.  Do you see that?
4      A.  Yes.
5      Q.  Do you have any reason to disagree with
6  that conclusion that the tables are identical?
7      A.  No.
8      Q.  Do you know whether or not these tables
9  were part of the Infosystems 3 product, SKED_STU table
10 as it was sold to any of the school districts you sold
11 your product to?
12     A.  No, I don't know that.  I don't know
13 that.  I don't know that.
14     Q.  Okay.  You just indicated a lot of the
15 names were just common like school?
16     A.  Some were, yes.
17     Q.  What about this fourth line down SPMN.
18 Do you know what that means?
19     A.  No.
20     Q.  What about REQPRI?
21     A.  Request priority.  Would be a guess on my
22 part, but that's more than likely it.
23     Q.  Is that just a guess?
24     A.  Uh-huh.

158

1    Q.  Okay.  What about the last one?
2  Has_Requests.  Do you know what that is?
3    A.  Yes, does the student have requests.
4    Q.  Do you know who developed the IS3 table?
5    A.  No.  Again, the table structure was
6  brought to our office intact from the Springfield
7  School District product.  We were in the midst of
8  winnowing that down, of altering it and changing it
9  into what we were actually going to use when the
10  lawsuit occurred.  So whether we ever use that
11  particular table that you mentioned here or not, I
12  don't know.  I'd have to go back and look at the code.
13    Q.  I'm going to ask you to look at pages 17
14  through 19 of the report.  Marked Miler 16.  Are you
15  there?
16    A.  Uh-huh.
17    Q.  Do you recall reading through this in
18  your attorney's office?
19    A.  Yes.
20    Q.  Did this surprised you when you read it?
21    A.  Yes.
22    Q.  Why did it surprise you?
23    A.  Again, Mr. Qualls had written SKED mass
24  details on PHP, and I didn't have any sense that he

159

1  had followed the existing structure so closely.
2    Q.  So do I take that to mean that you were
3  shocked by what you were seeing on these pages?
4    A.  Yes.  I can --
5    Q.  After the lawsuit was filed, Mr.
6  Miller...
7    (Whereupon Miller 17 and Miller
8    18 were marked for
9    identification by the Court
10    Reporter.)
11    I believe you indicated, Mr. Miller, that
12  you learned about the filing of the lawsuit when you
13  received the complaint in May 2003, correct?
14    A.  Yes.
15    Q.  Now I'm going to show you -- -- strike
16  that.
17    Did you learn almost immediately upon the
18  filing of the lawsuit that Century had made a request
19  of a judge here in Springfield, Judge Mills, to enter
20  an immediate order to stop all marketing and sales of
21  Infosystems 3?
22    A.  Yes.
23    Q.  Okay.  And did you learn that the judge
24  granted that initial application?

1    A.  Yes.
2    (Whereupon Miller 17 was marke
3    for identification by the Court
4    Reporter.)
5    Q.  Okay.  I'm going to show you what's bee
6  marked as Miller 17 for identification.  Do you
7  recognize Miller 17?
8    A.  Yes.
9    Q.  Okay.  And do you recognize it to be a
10  copy of the decision issued by Judge Mills granting
11  that temporary injunction application of Century at
12  the beginning of the case?
13    A.  I assume that it is, yes.
14    Q.  And the decision is dated May 8, 2003; do
15  you see that?
16    A.  Yes.
17    Q.  Do you recall getting a copy of this on
18  or about May 8th, 2003?
19    A.  Subsequent to that date, yes.
20    Q.  Very quickly after that date, wasn't it?
21    A.  Yes.
22    Q.  And you were served by a process server
23  with this decision, weren't you?
24    A.  I believe so.

1    Q.  Okay.  Now, do you also recall receiving
2  from Century a copy of Miller 18, which is a  request
3  for production of documents?
4    A.  Yes.
5    Q.  Okay.  Do you see that the request for
6  production of documents in Miller 18 is dated May 9,
7  2003, the day after Judge Mills' decision granting
8  TRO?
9    A.  Yes.
10    Q.  Did you get a copy of this first request
11  for production of documents, Miller 19, excuse me,
12  Miller 18, from a Denise Drewhaught?  Do you know who
13  Denise Drewhaught is?
14    A.  Yes.  An attorney with Brown, Hay &
15  Stephens.  I don't know if she gave this to us or not.
16    Q.  She was the, at the time, she was the
17  registered agent for The Miller Group, correct?
18    A.  Yes, that's correct.
19    Q.  All right.
20    A.  Miller Group, Incorporated.
21    Q.  Do you recall getting this on or about
22  May 9, 2003, from Brown, Hay & Stephens?
23    A.  I remember seeing this in Chip
24  Schmadeke's office.  I don't remember before that.

Case Compress Deposition of: John G. Miller

162

1    Q.  Do you recall it being very soon after
2   the judge had issued his decision?
3       A.  Yes.
4       Q.  Okay.  And do you recall that the Judge
5   had directed in his order that you respond to these
6   document requests on very short notice?
7       A.  It's possible.
8       Q.  Looking at Miller 18, you'll see that
9   it's dated May 9, and it requests that you produce
10  documents at this office, Giffin, Winning, Cohen, &
11  Bodewes by May 14; do you see that?
12      A.  Yes.
13      Q.  Did you understand when you first saw
14  this request for production of documents that you were
15  under a fairly tight time constraint to produce
16  documents?
17      A.  Yes.
18      Q.  Okay.  You knew that at the time, right?
19      A.  Yes.
20      Q.  That you only had a few days to put
21  together documents, correct?
22      A.  Yes.
23      Q.  And did you understand that one of the
24  documents requested, and I'm asking to you look at

163

1   page 6 of Miller 18, number 9 requests a copy of the
2   source code for IS3 in digital format; do you see
3   that?
4       A.  Yes.
5       Q.  And in addition, in paragraphs 15, 16,
6   and 17, it requested executables, any runtime demo,
7   and user manuals and instructions for IS3, correct?
8       A.  Yes.
9       Q.  You in fact produced the source code or
10  you produced a disk containing source code for IS3 in
11  digital format, correct?
12      A.  Yes.
13      Q.  You gave that to your attorneys to turn
14  over to Century, right?
15      A.  Yes.
16      Q.  Were you involved in putting together
17  that CD?
18      A.  Actually, I turned it to Century to turn
19  over to you.
20      Q.  To Century's counsel, correct?
21      A.  Right.
22      Q.  Were you involved in putting that CD
23  together?
24      A.  I believe I burned it.

164

1       Q.  You burned the CD?
2       A.  That was it, yes.
3       Q.  Okay.  And how did you do that?
4       A.  How did I burn the CD?
5       Q.  Correct.  Tell me what you did?
6       A.  I took data in a folder my desktop, drug
7   it to the CD, and then drug the CD to the trash which
8   on a Macintosh burns the CD.
9       Q.  Okay.  How long does that take?
10      A.  Two to five minutes, depends on the
11  amount of data.
12      Q.  When did you do that, if you recall?
13      A.  This request?
14      Q.  Yes.
15      A.  Um, the day before my attorney told me
16  that we had to have it in.
17      Q.  Okay.  Do you believe that to have been
18  May 13th?
19      A.  I would guess.  I don't know.
20      Q.  I don't want you to guess?
21      A.  I have to guess.  I don't know.
22      Q.  I'm really asking you if you recall when
23  you got this first request for production of documents
24  did you go back to your office and burn the CD, or a

165

1   few days passed, and then you burned them?
2       A.  I'm sure a few days passed.  We burn it
3   according to when our counsel told to us to deliver
4   the documents.
5       Q.  Okay.  Did you make any changes to the
6   source code IS3 before you burned the CD?
7       A.  From when.
8       Q.  From the date you received the first
9   request for production of documents?
10      A.  Yes.
11      Q.  You did make changes?
12      A.  Yes.  We were working on it constantly.
13      Q.  Did you make any of the changes
14  personally?
15      A.  No.
16      Q.  Do you know who did?
17      A.  The people that worked for me.
18      Q.  Who?
19      A.  Dr. Choat, Michael David, possibly Kent
20  Borecky.
21      Q.  You say possibly, are you not sure about
22  him?
23      A.  I don't know if he was in the office or
24  working with us at that time.

170

1     A. I would be able to estimate, yes.
2     Q. I don't want you to guess.
3     A. Okay.
4     Q. I'm asking you do you know?
5     A. Why each one of these particular files
6  were changed.
7     Q. Yes?
8     A. No, I do not.
9     Q. All right. Do you know who probably
10  would know that?
11     A. I would doubt anybody would know exactly
12  why those files were changed.
13     Q. Do you know --
14     A. Each one of them individually.
15     Q. Do you know who made the modifications?
16     A. Yes, my employees and Mr. Qualls.
17     Q. Your employees meaning who?
18     A. Dr. Choat.
19     Q. Yes.
20     A. Michael David.
21     Q. Yes.
22     A. Possibly Borecky.
23     Q. Okay. You believe those two or three
24  employees of The Miller Group are the people who

171

1  probably made some or all of the modifications listed
2  on these pages between May 9 and May 14?
3     A. Yes.
4     Q. Do you also believe Mr. Qualls was
5  involved in making those modifications?
6     A. It's possible.
7     Q. And --
8     A. He was not at our office at that time.
9  But as he worked on the same files even from his
10  office, it's very possible he made changes.
11     Q. Okay. But as you sit here today, you do
12  not know the reasons for any of the modifications
13  listed on these pages?
14     A. I would know the reasons for some of the
15  modifications.
16     Q. Okay. Which ones?
17     A. I can't tell you exact ones. I can till
18  the general purpose of modifications.
19     Q. What was the general purposes?
20     A. One was to make the code work within our
21  setting. Some of the code did not work. So we had to
22  keep work to go fix it. And the other was to clean
23  out table names and things and fields and columns that
24  we were not using because we were no longer using the

172

1  Springfield data structure.
2     Q. Who made the decision to no longer use
3  the Springfield data structure?
4     A. I did.
5     Q. When did you make that decision?
6     A. When our agreement with Springfield
7  terminated.
8     Q. When was that?
9     A. I don't remember. I think it was
10  December of 2001.
11     Q. December of 2001?
12     A. I think so. I don't know.
13     Q. So is there any reason why those tables
14  --
15     A. This was 2003.
16     Q. Yes.
17     A. So it was probably December of 2002.
18     Q. Are you guessing or...
19     A. I'm guessing. I'm estimating when it was
20  in relation to this situation.
21     Q. Okay. Even if it ended in December of
22  2000?
23     A. It might have been June or July of 2002.
24  I'd have to look and see.

173

1     Q. But you're not sure? But it was
2  certainly before January 1, 2003, correct?
3     A. Yes.
4     Q. All right. If that's the case, is there
5  any reason why you had not modified the table
6  structures before January 1 -- before May 2003?
7     A. I'm sure we had.
8     Q. Why do you say that?
9     A. Because we were working to move away from
10  that environment. We wanted our own table structure.
11     Q. Rather than Springfield's?
12     A. Exactly.
13     Q. Were you aware that sometime shortly
14  after you burned the CD containing the IS3 source code
15  to provide to Century's counsel, you provided a
16  follow-up CD with scheduler application on it?
17     A. Yes.
18     Q. Did you also burn that CD?
19     A. I don't know if I did or if Michael David
20  did.
21     Q. And why were you doing that?
22     A. Apparently it hadn't been included in the
23  first version that we provided.
24     Q. Well, were you aware that your counsel

Case Compress Deposition of: John G. Miller

174

1  had represented to us that we had been provided with
2  the IS3 scheduler application but that it was an old,
3  outdated version?
4        A. No.
5        Q. And that the one you were now providing
6  us was the correct version?
7        A. Very possibly, yes. Again, lots of files
8  existed in the file folder where we did our work, and
9  some we didn't use anymore, some we did. If we
10  provided an inappropriate or incorrect copy of the
11  application that went with the scheduler, then it was
12  our obligation to provide one that was correct. And
13  it could have been on a different machine.
14        Q. Do you know whether or not anyone working
15  for The Miller Group had executed search and replace
16  commands to replace code names with new characters?
17        A. We do that constantly, yes.
18        Q. Okay. Let me ask you to look at page 20
19  of Miller 16. Really pages 20 through 22. Do you see
20  that?
21        A. Uh-huh.
22        Q. When you read this in your counsel's
23  office, did you understand that Mr. Lewis, who wrote
24  this report, was offering an opinion that The Miller

175

1  Group executed and search and replace command on the
2  files in an attempt to change naming structures to
3  make them less similar to the Star_Base naming
4  structures?
5        A. I understand he was expressing his
6  opinion.
7        Q. Okay. Do you have any reason to dispute
8  that the search and replace commands were actually
9  executed to change the naming structures?
10        A. No.
11        Q. So, for example, in the top table on page
12  20, the code Start_yy becomes S_Year; do you see that?
13        A. Yes.
14        Q. And that appears to have been a search
15  and replace everywhere Start_yy appears and the
16  Springfield version of the program becomes S_Year in
17  the May 14, 2003, IS3 version. Do you see that?
18        A. Yes.
19        Q. Do you know why that change was made?
20        A. No, I don't. I can again hazard guess.
21  But I don't know why that's --
22        Q. I don't want you to guess. I want to
23  know, sir. Is there a programming reason that you're
24  aware of as to why that change was made from Start_yy

176

1  globally in IS3 to S_Year?
2        A. That particular change, no, I don't know
3  why. I know -- I remember discussing that particular
4  change with people in the office.
5        Q. You do?
6        A. Yes.
7        Q. Okay. With whom did you discuss it, Dr.
8  Choat, Mr. David?
9        A. I can't remember the reason why we
10  decided to change that.
11        Q. But you recall discussing specifically
12  the change from Start_yy to S_Year?
13        A. Yes. You have to have a year to
14  determine which school year you're in. So, we needed
15  some basis to begin discussions on what the best way
16  to approach selecting the year was. We want to look
17  at the current year's data, 2003,2004, 2002, 2003.
18  What year do we want to look at? And so that was a
19  way of naming the school year.
20        Q. But the Springfield version already had
21  Start_yy in it that worked, didn't it?
22        A. I don't think so, not for us.
23        Q. Oh, it didn't?
24        A. No.

177

1        Q. Why not?
2        A. Well, I think it only had two digits, if
3  I remember correctly. I'm just trying to remember
4  now.
5        Q. Did the code not run?
6        A. I don't know. It certainly didn't work
7  for us. I mean when I say it didn't work, it wasn't
8  flexible enough. It wasn't interesting enough. It
9  wasn't full enough in it's capabilities for us.
10        Q. It ran in the Springfield version though,
11  didn't it, to your knowledge?
12        A. To the best of my knowledge, yes.
13        MR. MANSON: Can we get a break?
14        MR. HILLIARD: Yes. Let's take the last one
15  of the day.
16                  (Whereupon at this point in the
17                  proceedings a short break was
18                  taken.)
19  BY MR. HILLIARD::
20        Q. Mr. Miller, do you know who David
21  Williams is?
22        A. Yes.
23        Q. Who is David Williams?
24        A. An ex-employee of the Springfield School

178

1   District.
2       Q.  Did he work with Mr. Stuckey?
3       A.  Yes.
4       Q.  Did he report to Mr. Stuckey as you
5   understood his position?
6       A.  Yes.
7       Q.  Did he work on the information -- the new
8   information system you were working on for the School
9   District?
10      A.  Not at that time that I was involved with
11  it.
12      Q.  No?
13      A.  No.
14      Q.  So he was not involved in the same way
15  Mr. Qualls was involved?
16      A.  That's correct.
17      Q.  Okay.  Did you have any interaction with
18  him at all concerning the Infosystems 3 product?
19      A.  We may have had discussions at an
20  Infosystems 3 task force meeting, but that would have
21  been it.
22      Q.  In other words, to the extent that Mr.
23  Williams may have attended one of those Infosystems
24  task force meetings, he may have participated in the

1   19?
2       A.  Yes.
3       Q.  Is this a copy of the proposal that you
4   actually submitted to Northbrook?
5       A.  Yes.
6       Q.  Did you participate in the drafting of
7   this proposal?
8       A.  Yes.
9       Q.  And you approved it to go out, correct?
10      A.  Yes.
11      Q.  On page 2 of the proposal, it says "The
12  Miller Group, Inc. makes the following assumption."
13  Do you see that?
14      A.  No.
15      Q.  Under assumptions.  "In submitting this
16  proposal --
17      A.  Yes.
18      Q.  -- for review, The Miller Group, Inc.
19  Makes the following assumptions."  Do you see that?
20      A.  Uh-huh.
21      Q.  We discussed this had this morning about
22  the activities of The Miller Group, Inc.  Do you know
23  why that appears in the document?
24      A.  No.

179

1   discussions?
2       A.  Exactly.
3       Q.  Did he ever work on the product itself,
4   Infosystems 3?
5       A.  No.
6       MR. MANSON:  January 1 to answer your
7   question.
8       MR. HILLIARD:  January 1.  Certainly we need
9   to push that back, but all right.
10              (Whereupon at this point in the
11              proceedings a short break was
12              taken.)
13      MR. HILLIARD:  Back on the record.  Mr.
14  Miller, do you recall submitting a proposal on behalf
15  of The Miller Group to the Northbrook/Glenview School
16  District in Northbrook, Illinois, for the sale of
17  Infosystems 3.
18      A.  Yes.
19      Q.  Okay.
20              (Whereupon Miller 19 was marked
21              for identification by the Court
22              Reporter.)
23      I am showing you what's been marked as
24  Miller 19 for identification.  Do you recognize Miller

1       Q.  Is that a mistake?
2       A.  It's a mistake.  As you can see from the
3   front cover the proposal submitted by The Miller
4   Group.
5       Q.  Right.
6       A.  And then down below that is also The
7   Miller Group.
8       Q.  Right?
9       A.  It doesn't refer to The Miller Group,
10  Inc. again.  It must be type error.
11      Q.  Well, there's a reference to The Miller
12  Group, Inc. again in a couple of places.  At page ten,
13  the back, where you provide background on the company
14  do you see that?
15      A.  Uh-huh.
16      Q.  It appears twice there, in the heading
17  and in the first sentence?
18      A.  First sentence.
19      Q.  Is that a mistake?
20      A.  Yes.
21      Q.  All right.  Now, stay with that section.
22  Turn two more pages for me, please, page 12?
23      A.  Uh-huh.
24      Q.  Am I correct that this document at the

182

1  end of the proposal sort of summarizes the entity The
2  Miller Group?
3       A.  And the people that are would be
4  consultant employees with us, not employees, but
5  consultants with us as well.
6       Q.  All right.  Do you notice Mike Holinga's
7  name?
8       A.  Yes.
9       Q.  All right.  This proposal states that
10  Mike Holinga is the sales and projects manager for The
11  Miller Group; do you see?
12       A.  Yes.  Uh-huh.
13       Q.  Is that accurate?
14       A.  Uh-huh.
15       Q.  Did you pay him?
16       A.  No.
17       Q.  What did he do as sales and projects
18  manager for The Miller Group?
19       A.  He would help us make demonstrations.  He
20  would help with training.
21       Q.  Uh-huh.
22       A.  Give us ideas on additions to the product
23  that might be helpful.  That sort of thing.
24       Q.  How was he compensated?

1       Q.  When was the last time he did any work
2  for you?
3       A.  Summer and fall of 2003.
4       Q.  This document --
5       A.  Would have done Marengo training.
6       Q.  Okay.  This document indicates that he
7  was, at the time it was prepared and unfortunately the
8  document isn't dated, but am I correct in assuming
9  that this proposal for Northbrook would have been
10  prepared sometime in the late 2002 at the earliest
11  since you weren't launching --
12       A.  Yes.
13       Q.  You weren't launching Infosystems 3 unti
14  2002?
15       A.  More likely 2003.
16       Q.  Okay.  And at that point and time he had
17  retired from the --
18       A.  Yes.
19       Q.  -- Springfield Public School District?
20       A.  Yeah.
21       Q.  Do you recall when he retired?
22       A.  I believe it was the summer of 2002.
23       Q.  Okay.  And of course up to that point and
24  time for the three or four years before that, as you

183

1       A.  He was compensated, if did he training he
2  would receive those fees.
3       Q.  From the customers?
4       A.  Yes.
5       Q.  All right.  So if he did training work,
6  you would include his time in a bill to the customer?
7       A.  Yes.
8       Q.  And pay him for that?
9       A.  Yes.  Or he would bill them directly.
10       Q.  Okay.  The Miller -- you didn't pay him
11  directly?
12       A.  No.
13       Q.  Other than -- was he in fact paid for
14  providing training to some of your customers?
15       A.  I believe so.
16       Q.  Do you recall which ones?
17       A.  I believe he trained at Marengo.
18       Q.  Any others?
19       A.  Might have trained at Kewanee, but I'm
20  not sure.  I believe he did.
21       Q.  What about Stevenson?
22       A.  No.
23       Q.  Is he still doing any work for you today?
24       A.  No.

1  described earlier in your testimony, he was working
2  actively with you in the development of the new
3  information system?
4       A.  Yes.
5       Q.  For the School District, correct?
6       A.  Yes.
7       Q.  Did you ever talk with him during that
8  three or four period, four-year period leading up to
9  his retirement about the possibility of his working as
10  a consultant for your company after he retired?
11       A.  I cannot recall any specific instances,
12  but we probably did.  In general terms.  No concrete
13  offers but in general terms.
14       Q.  What do you mean by "in general terms"?
15       A.  If you retire, I want you to consider
16  sort of thing.
17       Q.  Come to go work with my group?
18       A.  That's right.  Thinking about helping
19  out.
20       Q.  Okay.  And did you express some enthusias
21  for that idea?
22       A.  He did.
23       Q.  Was he the one that brought it up, or did
24  you bring it up?

Q. – be able to testify to that?

A. – 2002, line 26 with 2001 is a little less, but the income is substantially less.

Q. Uh-huh.

A. The wages in 1999 paid, on line 26, were $72,000 versus 155,000 in 2002. And in year 2000, the wages were one 132,000 on a gross income of 455 verse 155,000 in wages on a gross income of 262.

Q. Do you have any belief as to why your gross receipts went down between 2001 and 2002?

A. Yes, we did less work for the Springfield School District.

Q. You were nearing the end of that contract?

A. That's correct.

Q. And that had been more or less the lifeblood of the company for the first few years, correct?

A. Absolutely correct.

Q. Were you taking steps at that time in 2002 to replace the Springfield work?

A. Yes.

Q. And did those steps include marketing the Infosystems 3 product to other school districts?

199

A. Yes.

Q. Before this lawsuit was filed, what did you think the prospects for your business were?

A. Thought they were excellent.

Q. And what made you think that?

A. Because we had indications from many of the people we had given proposals to they were going to work with us and buy our services. Usually thereafter, as I understand, never mind. The suit stopped all that.

Q. After the suit was filed did you approach anyone at the Springfield School District and question what any of the employees had done in connection with the work on the School District's project which lead to the lawsuit?

A. I'm sorry. Ask that again.

Q. It's a badly-phrased question. Am I correct that when the lawsuit was filed and you read the complaint and the other documents, you understood that Century was claiming that you stole some of its proprietary software, correct?

A. Yes.

Q. And I think you've already indicated in your testimony that you were surprised by that,

correct?

A. Yes.

Q. And when you looked at Mr. Lewis' report you were surprised to see some of the things in that report, correct?

A. Yes, that's correct.

Q. Did that lead you to think that someone at the School District had done something that you ha not been aware of that landed you in a lawsuit?

A. I was – I could suppose some of those things.

Q. Did you?

A. Some people at the School District said things that were not accurate, and some people might have done things I was unaware of.

Q. Okay. Well, let's start with the some things that may have been said that were inaccurate. What do you mean by that?

A. I never had the conversation with Mr. Williams as he indicated that I did. I very seldom spoke to Mr. Williams. He was not a very entertaining character, troll-like.

We -- it was our understanding that the attorneys for the Springfield District had approved

this relationship of this moving forward over the objections of Mr. Stuckey and Mr. Qualls. Not over Mr. Williams objection but Mr. Stuckey and Mr. Qualls.

Q. What do you mean by the objections of Mr Stuckey and Mr. Qualls?

A. They didn't want to change. They wanted to keep there position and influence in the situation in the Springfield School District intact, and so they did not want to use the web base. They didn't want the web-based product to move forward.

Q. Mr. Stuckey and Mr. Qualls were both against it in the beginning?

A. Yes.

Q. Did that remain against it throughout the process?

A. Mr. Stuckey did. Mr. Qualls was sent to our office and saw what we were doing and he embrace it.

Q. Did you ever offer Mr. Qualls a position in your company?

A. No.

Q. Did you ever talk about it with him?

A. Yes.

Q. Did he bring it up, or did you bring it

1  up?
2        A. I brought it up.
3        Q. What did you say to him?
4        A. I said if we get through the Springfield
5  project and if we're making any money, I'd like to
6  consider hiring you. I don't know if I can afford
7  you.
8        Q. When did you make that statement to him?
9        A. Toward the end of our contract period.
10        Q. Sometime about 2002?
11        A. 2002.
12        Q. Right around the time that Infosystems 3
13  was being launched?
14        A. Uh-huh.
15        MR. JONES: Is that yes?
16        THE WITNESS: Yes.
17  BY MR. HILLIARD:
18        Q. And did he express enthusiasm for that
19  interest to expressed to him to make him a job offer?
20        A. No. I wouldn't say there was enthusiasm.
21  I would say he might have had some interest, sort of.
22        Q. He didn't rule it out?
23        A. He didn't rule it out; he didn't rule it
24  in.

1        Q. You talked with Ms. Rowe about that?
2        A. Yes.
3        Q. How did that come up? In other words,
4  did you bring it up with her?
5        A. Yes.
6        Q. Okay. What did you say?
7        A. I thought she'd be a good marketing
8  representative with her knowledge of school districts.
9        Q. So you said that to her?
10        A. Yes.
11        Q. And what was her response?
12        A. I like what I'm doing.
13        Q. A few moments ago, I asked you if you I
14  talked to anyone at the School District after the suit
15  was filed, and I'm not sure if I gave you a chance to
16  finish your answer completely. You indicated that you
17  did not have a conversation that was attributed to you
18  by Mr. Williams, correct?
19        A. Correct.
20        Q. Did you talk with anyone at the School
21  District after the suit was filed?
22        A. Yes.
23        Q. With whom did you speak?
24        A. I called Sue Rowe and said you're going

203

1        Q. Okay. Did you actually make him a job
2  offer?
3        A. No.
4        Q. Did you ever talk with anyone else at the
5  School District about the possibilities of them come
6  to work for you after Infosystems 3 was launched?
7        A. At the School District?
8        Q. Right. You just mentioned Mr. Qualls,
9  and you -
10        A. One young lady who is a part-time
11  employee of the District, at the time I believe she
12  was, I don't know if she is now or not, Sherrie
13  Hibbard.
14        Q. Did you talk with her about joining you?
15        A. Just briefly in passing.
16        Q. Was she in Mr. Stuckey's group?
17        A. No. She works in the discipline area.
18        Q. I see. Did you ever talk with Mr.
19  Stuckey about his doing work for you?
20        A. No.
21        Q. What about Sue Rowe, did you ever talk
22  with her about her joining you in some capacity?
23        A. Again, possibility. A discussion of a
24  possibility after our contract ended.

1  to be served papers today.
2        Q. Okay. And what if anything did she say?
3        A. I think she was outraged and shocked.
4        Q. Okay. After those papers were served,
5  did you have occasion to talk with her again about the
6  allegations made in the lawsuit?
7        A. I don't remember that we did. She
8  studious avoided that. We've had only a couple of
9  conversations in the last year and half and mostly
10  about her daughter at the University of Kentucky.
11        Q. Okay. Have you talked with anyone else
12  at the School District about the lawsuit after it was
13  filed?
14        A. No.
15        Q. None at all?
16        A. No.
17        Q. So one brief conversation with Ms. Rowe,
18  and that's it?
19        A. That's it. Other than to use the word
20  lawsuit once in a while.
21        Q. Uh-huh?
22        A. That's it.
23        Q. Mr. Miller, I have no further questions.
24  Thank you.