1                UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF ILLINOIS
2                     SPRINGFIELD DIVISION


3

      CENTURY CONSULTANTS, LTD.,     )
4                                    )
                      Plaintiff,     )
5                                    )
                 -vs-                )   No. 2003-CV-3105
6                                    )
      THE MILLER GROUP, INC.,        )
7     JOHN G. MILLER, and            )
      SPRINGFIELD PUBLIC SCHOOL      )
8     DISTRICT NO. 186,              )
                                     )
9                     Defendants.    )


10


11                            DEPOSITION


12                                OF


13                        JOSEPH LAMANTIA


14


15

          Deposition of JOSEPH LAMANTIA, taken via video
16    conference at the instance of the Defendants, on the 25th
      day of April, 2006, at University of Illinois Springfield,
17    Brookens Library, Springfield, Illinois, before Karin
      Paisley, CSR.
18

19

20

21

22

23

24

1    copyrighted in the sense that it owns the rights to the

2    software or that it filed a physical application with the

3    U.S. Copyright Office?

4            MR. SHUPENUS:  I'm going to ask all of that right

5    now, Craig.

6            MR. HILLIARD:  That's fine.

7            MR. SHUPENUS:  And we'll get that out.

8            MR. HILLIARD:  Okay.

9        Q.    (Mr. Shupenus) I'll back up.  When was the

10   character-based version of Star_Base created or completed

11   actually?

12       A.    Well, somewhere in the early 1990's.

13       Q.    And did Century seek copyright protection for the

14   character-based version of Star_Base?

15           MR. HILLIARD:  Objection to the form.  You can

16   answer.

17       A.    We filed a copyright registration for the

18   character-based version.

19       Q.    (Mr. Shupenus) When was that filed?

20       A.    I believe it was 1995.

21       Q.    Is the registration that you attached to your

22   declaration at the outset of this case that is dated--that

23   has an effective date of registration November 22, 1995, is

24   that Certificate of Registration for the character-based

1    version of Star_Base?

2              MR. HILLIARD:  Well, from the video feed, I can

3    tell you're looking at a particular document, Rob.  Can

4    you --

5              MR. SHUPENUS:  Yes.  It's the one attached to the

6    declaration as Exhibit A.

7              MR. HILLIARD:  He does not have that in front of

8    him.  I'll look --

9         A.   Well, we have the registration.  It's attached

10   right to the front.

11             MR. HILLIARD:  He's asking you first about--

12   It's not.  See.  That is the deposit.  He's asking you about

13   the--  Does it have, does the document you're looking at

14   have Bates number of Century 0022 at the bottom right hand

15   corner?

16             MR. SHUPENUS:  I don't have the Bates numbered

17   one, 'cause this is the one that came with the declaration.

18   I don't think you had Bates stamped them yet, but it has TXU

19   number at the top, XDN 760-019.

20             MR. HILLIARD:  Okay.  He has that in front of

21   him.

22        Q.   (Mr. Shupenus) Okay.  Sir, does this Certificate

23   of Registration pertain to the character-based version of

24   Star_Base?

1      A.     Yes, it does.

2      Q.     Okay, and in conjunction with Century's copyright

3   application, did Century deposit document numbers 0879

4   through 1050 with the copyright office?

5             MR. HILLIARD:  You said 0879.  I believe it

6   should be 0873.

7             MR. SHUPENUS:  You're right, Craig.  I have got

8   0872 as the certificate.

9             MR. HILLIARD:  Right.

10     Q.     (Mr. Shupenus) And then 0873 is the beginning of

11  the documents that were submitted, I believe; is that right,

12  sir?

13     A.     Through 1050?

14            MR. HILLIARD:  Through Century 1050?

15     Q.     (Mr. Shupenus) Correct.

16     A.     Okay.

17            MR. HILLIARD:  Your answer to his question is?

18     A.     Yes.

19     Q.     (Mr. Shupenus) Did Century deposit the complete

20  source code for the character-based version of Star_Base

21  with the U.S. Copyright Office?

22     A.     No.

23     Q.     Describe the documents that were filed 07--or

24  0873 through 1050.  What do those documents comprise?

1      A.    This is the listing, a source listing for the

2   menu program for Star_Base.

3      Q.    Anything else?

4      A.    Well, yes, and it is all the screens that are

5   part of the menu program.

6      Q.    Okay, and sir, when was the client server version

7   of Star_Base completed?

8      A.    Yeah.  I'm just trying to remember the

9   chronology.  Give me a second.

10      Q.    Sure.

11      A.    The difficulty with answering these questions is

12   because the versions kind of ran parallel to one other.  You

13   don't just stop one and start another.  The development was

14   going along kind of side by side.  I would say we stopped

15   working on client server about '96, '97 as we transitioned

16   over to the web version.

17      Q.    Did Century apply for copyright protection for

18   the client server version?

19            MR. HILLIARD:  And by apply for copyright

20   protection, Rob, just so we are clear, do you mean file a

21   physical application for registration with the United States

22   Copyright Office?

23      Q.    (Mr. Shupenus) Yes.

24      A.    No.  We did not.

1       Q.    Is it your understanding that the client server

2    version of Star_Base is protected by copyright?

3       A.    Yes.

4       Q.    What is the basis of your understanding?

5       A.    Well, my understanding is that you're protected

6    by copyright as soon as you put the word copyright on a

7    document.  It's registered once we register it with the

8    copyright office.

9       Q.    But the client server based version of Star_Base

10   was never registered with the copyright office, correct?

11      A.    Correct.

12      Q.    Now, when did Century release Version 6(i) or the

13   web-based version of Star_Base?

14      A.    Sometime around late nineties, '99, somewhere in

15   there.

16      Q.    Did Century file an application for a copyright

17   registration for Version 6(i) or the web-based version of

18   Star_Base?

19      A.    No.  We did not.

20      Q.    Is it your understanding that Version 6(i), which

21   is the web-based version of Star_Base, is it your

22   understanding that that is also copyrighted?

23      A.    Yes.

24      Q.    And again, what is your understanding based on?

1    A.    Well, the subsequent versions of Star_Base are

2    derivatives and based on the original or the client server

3    version.  So, it's my belief that they are still covered

4    under that same copyright registration.

5    Q.    Your understanding is that both the client server

6    version and the web-based version of Star_Base are

7    derivative works of the character-based version of

8    Star_Base?

9    A.    That's correct.

10    Q.    And it's your understanding that both the client

11    server version and the web-based version are unregistered

12    derivative works, correct?

13    A.    We did not file separate registrations for them,

14    that's correct.

15    Q.    Now, Century alleges that its copyrighted

16    material was copied by The Miller Group, correct?

17    A.    Yes.

18    Q.    What copyrighted material was copied?

19    A.    You mean such as source code?

20    Q.    I don't know.  What do you believe, what does

21    Century claim was copied?

22    A.    I'm not sure if you're asking what version of

23    Star_Base or what components or what materials, you know.

24    I'm not sure exactly what your question is alluding to.

1          Q.    I don't know what was copied by or allegedly

2    copied by The Miller Group.  I want to know what Century

3    alleges was copied.

4          A.    Okay.  Well, Springfield School District had our

5    client server version and also had a copy of our web

6    version.  As time went on, Miller Group certainly had access

7    to the client server version; and I'm sure they had a look

8    at our web-based version as time went on.

9          Q.    You're pretty sure?

10         A.    Yes.

11         Q.    But you're not certain, correct?

12         A.    No.  I'm not certain.

13         Q.    Okay.

14         A.    I know they at least had access to the client

15   server code.

16         Q.    With reference to Document Numbers 0873 through

17   1050, with respect to those documents, is there anything in

18   there that Century alleges was copied by any of the

19   Defendants in this case?

20              MR. HILLIARD:  Objection to the form of the

21   question.  You mean anything in terms of the printed words

22   on the pages?

23              MR. SHUPENUS:  Yes.

24              MR. HILLIARD:  Okay.  I wasn't sure by what you

*Springfield Public schools is using Levi, Ray
+ Shoup are Consulting services to assist in the
Process of evaluating these RFP's in respect to the
Student accounting software system.*



**Century**
**Consultants**

ADMINISTRATIVE SOLUTIONS FOR TODAY...AND BEYOND

*Except as otherwise authorized by Century Consultants in writing,
Springfield Public Schools and its employees and/or agents*

NON-DISCLOSURE OF BUSINESS INFORMATION

SPRINGFIELD PUBLIC SCHOOLS

530 West Reynolds   Springfield, Illinois   62702
and its employees and or agents specifically agree that they will not
for a period of three (3) years at any time, in any fashion, or
manner either directly or indirectly, divulge, disclose, or
communicate to any person, firm, or corporation in any manner
whatsoever, information of any kind, nature, or description
concerning matters affecting or relating to the business of Century
Consultants Ltd. located at 300 Main Street, Lakewood, New Jersey,
including, but without limitation any of the foregoing; the names of
any of the customers, the prices it obtains or has obtained or at
which it sells or has sold its products, or any other information of,
about, or concerning the business of Century Consultants Ltd., its
manner of operation, its plans, processes, or other data of any kind,
nature, or description without regard to whether any or all of the
foregoing matters would be deemed confidential, material, or
important, the parties hereto stipulate and agree that as between
themselves, the same are important, material, and confidential and
gravely affect the effect and successful conduct of the business of
Century Consultants Ltd. and its good will, and that any breach of
the terms of the Agreement is a material breach hereof. It is the
intent of this provision that SPRINGFIELD PUBLIC SCHOOLS (see above) and its *N.B.*
employees or agents are expressly prohibited from divulging any trade
secrets or processes or other business data in kind, nature or
description which may be characterized as a trade secret or
confidential information during the term of this Agreement. It is
recognized and agreed by the parties hereto that all trade secrets
which include all information concerning the manner of Century
Consultants Ltd.'s operation of its business, plans, processes or
other data in kind, nature or description are the property of Century
Consultants Ltd. It is implicit in this provision that
*N.B.* SPRINGFIELD PUBLIC SCHOOLS (see above), its' employees or agents will not use
or divulge to third persons or parties any of the matters setforth
herein which are regarded as trade secrets for the period setforth
and agreed to in this document.

Agreed by: _Henry Stucka  AP Manager_ ___ 1/25/95
                    (Authorized Signature)   Title        Date

for: _Springfield Public Schools_

Agreed by: _Joseph T. Marta  VicePres_ ___ 1-25-95
                    (Authorized Signature)   Title        Date

For: Century Consultants Ltd.

STARK & STARK
A PROFESSIONAL CORPORATION
PO BOX 5315
PRINCETON, NJ 08543-5315
(609)896-9550
ATTORNEYS FOR PLAINTIFF

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

CENTURY CONSULTANTS LTD.,

        Plaintiff,

v.

THE MILLER GROUP, INC., JOHN
G. MILLER, and THE
SPRINGFIELD PUBLIC SCHOOL
DISTRICT 186,

        Defendants.

CIVIL ACTION NO.

DECLARATION OF ROBERT MAGAN

ROBERT MAGAN, of full age, upon his oath, deposes and says:

1.    I am employed by plaintiff, Century Consultants Ltd. ("Century"), as the Manager of Programming/Research & Development. In that capacity, I am fully familiar with the student software package owned by Century and licensed to its customers known as Star_Base. I make this affidavit in support of Century's application against defendants for a temporary restraining order and related relief.

2.    The Springfield Public School District 186 in Springfield, Illinois (the "School District") has been a customer of Century's for several years under a license agreement. A copy of the license agreement is attached hereto as Exhibit "A".

3.    Under the license agreement, Century licensed Star_Base to the School District in exchange for an initial license fee and periodic maintenance fee payments.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

DEFENDANT'S
EXHIBIT

11

4.  The School District employs several people who work in an information technology department and who are generally responsible for the day-to-day administration of Star_Base and other software applications which meet the needs of the schools. It is my understanding that Henry Stukey, David Williams and Brent Quarles are all employed by the School District in this capacity. I have had frequent communications with the School District over the last several years, because I am the employee of Century who is primarily responsible for addressing any questions or issues the School District may have concerning the support of the Star_Base package.

5.  About a year ago, I received a call from Mr. Stukey, who advised me that the School District wanted to cease its maintenance contract with Century for Star_Base. Under our license agreement with the School District, if the schools elect to go "off maintenance" (i.e. they elect to stop making periodic payments for support services), the district can still continue to use the software package, but they are no longer entitled to any updates nor are they entitled to receive any support.

6.  I thereafter learned that the School District had contracted with another company, The Miller Group, to assist them in the design of a student software package.

7.  A few weeks ago, in early February 2003, I received an unsolicited phone call from Don Randle, whom I recognized as a former information technology employee of the School District. Don said to me, "How would you feel if someone was stealing your software?" When I asked what he meant, he explained: 1) that he had left his employment at the School District about 6

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

-2-

months earlier; 2) that while still employed, he was aware that the School District had retained The Miller Group to write some front-end programs to interface with the Star_Base database; and 3) that he "knew for sure" that The Miller Group was using Century's database structures, and that he was fairly certain that The Miller Group was also using Century's scheduler program (a component of the Star_Base software). He further told me that Mr. Quarles had been "reassigned" within the School District to assist the The Miller Group in developing this new software (Mr. Quarles is one of the School District employees who I know is authorized to have access to the source code and object code of Century's Star_Base software). Don went on to tell me that if I wanted further information, I should contact Dave Williams at the School District.

8.    Following this conversation with Don, I discovered that The Miller Group had posted information on its internet website concerning a product called InfoSystems 3. The InfoSystems 3 product was marketed on the website as an "online student information system", which is precisely the type of system we licensed to the School District. Attached hereto as Exhibit "B" are excerpts from the website describing the new product.

9.    I then received an unsolicited phone call from Dave Williams shortly after my conversation with Don. Mr. Williams (a current employee of the School District) told me that The Miller Group "stole" Century's software, that employees of the School District (including Williams) had told The Miller Group that they didn't think that what they were doing was right, and that The Miller Group's response was: "we are here and [Century] is in New Jersey", and "they will never find out".

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

-3-

Mr. Williams further told me that he and others cautioned The Miller Group that Century's software was copyrighted.

10.    Following this last conversation, Dave Williams mailed to me a list of the table definitions from The Miller Group's InfoSystems 3 product. Upon comparing these definitions with Star_Base, I discovered that virtually all of the definitions were identical. Attached hereto as Exhibit "C" is the list I received from Mr. Williams and the corresponding printout of the Star_Base table definitions.

11.    Mr. Williams also mailed to me the program listing from a portion of The Miller Group's product – the "student scheduler". Once again, in comparing this to Star_Base, I discovered that the code used in InfoSystems 3 has verbatim references to Century's Star_Base tables. Attached hereto as Exhibit "D" is the InfoSystems 3 program listing with the Star_Base table names highlighted.

12.    I declare under penalty of perjury that the foregoing is true and correct.

ROBERT MAGAN

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543-5315

-4-

E

X

H

I

B

I

T

A

# CENTURY CONSULTANTS LTD.

### 150 AIRPORT ROAD, SUITE 1500
### LAKEWOOD, NEW JERSEY 08701
### (732) 363-9500

## STAR BASE COMPUTER PACKAGE LICENSE
## STUDENT MANAGEMENT

*DATE:*     January 30, 2001                    *LICENSE NO: 202*

*LICENSEE:   SPRINGFIELD PUBLIC SCHOOL DISTRICT 186*

*LOCATION OF USE: SAME*

*ADDRESS:    530 WEST REYNOLDS STREET*

*CITY: SPRINGFIELD*           *STATE: IL*       *ZIPCODE: 62701*

*CENTURY CONSULTANTS LTD. ("CENTURY"), by its acceptance hereof, grants to the Licensee named above ("LICENSEE"), for the payments of the license fee and upon the terms and conditions hereinafter stated, a non-exclusive and non-transferable license to use the following listed software package (the "PACKAGE"). This license is governed by the terms and definitions contained in the Software Package Pricing and Support Policies marked EXHIBIT 'A' attached hereto, and made a part hereof.*

*PACKAGE WILL BE INSTALLED ON THE FOLLOWING EQUIPMENT*
*DATABASE SERVER:  SUN E 450 480 QUAD          OPERATING SYSTEM: UNIX/SOLARIS*
*ORACLE 8i Power Units:  n/a                   ORACLE 8i: 140 Concurrent Users - GF*

*WEB SERVER:  AMD Duron                        OPERATING SYSTEM: Windows NT*
*ORACLE WEB Power Units:      600              ORACLE WEB Named Users:  n/a*

*STUDENT POPULATION: 14,000*
*SOFTWARE DISTRIBUTION MEDIA: CD ROM*
*SOFTWARE PACKAGE AND LICENSE FEE*: See Attached Exhibit 'B'*
*NOTE:  CITRIX TERMINAL SERVER TECHNOLOGY NOT SUPPORTED BY CENTURY*

## CONTRACT ACCEPTED BY LICENSEE:

___Thomas Minsley, Information Systems Director___   DATE: 2/19/2001
(LICENSEE'S AUTHORIZED SIGNATURE AND TITLE)

## CONTRACT ACCEPTED BY CENTURY CONSULTANTS LTD:

___Joseph Wishcamper, President___              DATE: 2/23/01
(CENTURY'S AUTHORIZED SIGNATURE AND TITLE)

*SOFTWARE LICENSE FEES ARE EXCLUSIVE OF TRAVEL EXPENSES OF CENTURY CONSULTANTS' EMPLOYEES (TRANSPORTATION/MEALS/LODGING) WHICH WILL BE BILLED SEPARATELY.*

PAGE 1 OF 6

## STAR BASE COMPUTER PACKAGE LICENSE
## STUDENT MANAGEMENT

### TERMS AND CONDITIONS

1.    *PACKAGE DELIVERY AND MAINTENANCE* - CENTURY shall furnish the package to the licensee on the media designated herein and shall maintain the version of the package furnished free of charge for the term of ninety (90) days (excluding upgraded existing software – see paragraph 5. PACKAGE SUPPORT) which shall commence on the date the PACKAGE is delivered to the Licensee.

2.    *PAYMENT* - PAYMENT- Twenty percent (20%) of the license fee shall be paid on the execution of this license by the Licensee. Eighty percent (80%) of the license fee will be billed on delivery of package. All invoices must be paid within thirty (30) days after receipt of invoice. At the option of CENTURY, unpaid balances more than thirty (30) days overdue may accrue interest at the rate of 1.5% per month or, if less, the maximum rate allowed by law.

3.    *TAXES* - The license fee does not include any taxes, however designated and whether levied or based on the package, its use, the license fee, or this agreement. Any taxes, or amounts in lieu thereof or interest thereon paid or payable by CENTURY, except for personal property taxes and taxes based on net income, shall be borne by Licensee, and paid by Licensee upon presentation of invoice.

4.    *LICENSE TERM* - This license agreement shall remain in effect until such time as it is terminated pursuant to paragraph 9 herein.

5.    *PACKAGE SUPPORT* - CENTURY will offer Annual Maintenance Service to take effect ninety (90) days from the package delivery date. Existing software upgraded due to enhancements, changes in computer processor or level usage will be considered a continuation of use and excluded from the 90-day warranty policy. All other support will be contracted on a time and material basis at CENTURY'S then current system service rate plus expenses.

6.    *WARRANTY* - CENTURY warrants that the package will be free from any known errors when delivered. Except as provided above, THE PACKAGE IS PROVIDED ON AN 'AS IS' BASIS, AND THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Licensee shall be solely responsible for the selection, use, efficiency and suitability of the package and CENTURY shall have no liability therefor. CENTURY shall have no liability to Licensee for the infringement of proprietary rights by the package or any portions thereof.

7.    *ALTERATION OF PROGRAM* - In the event the Licensee changes or in any manner alters the package without the express written authority of CENTURY, all warranties by and obligations of CENTURY hereunder shall terminate and CENTURY may terminate this license pursuant to paragraph 9 hereof. Licensee is responsible for and shall indemnify and hold CENTURY harmless from and against any damages incurred by CENTURY arising out of such unauthorized alteration.

8.    *CONFIDENTIALITY* - (A) The package and any permitted copies contain valuable trade secrets of CENTURY and shall at all times remain the property of CENTURY; and Licensee, by this license, acquires no rights in and to the package except the right to use the package at the location indicated herein. Licensee shall not use the package for the benefit of any other party, whether or not for a consideration; shall not sell, rent, loan, disclose, or otherwise communicate or make available the package

PAGE 2 OF 6

# STAR BASE COMPUTER PACKAGE LICENSE
## STUDENT MANAGEMENT

### TERMS AND CONDITIONS

8.     **CONFIDENTIALITY** (CONTINUED)
or any part of modification thereof to any person, and shall maintain the confidentiality of the package, unless otherwise agreed to by CENTURY in writing. Licensee shall permit CENTURY representatives to inspect any location in which the package is being used at all times for the purpose of determining that Licensee is not in default of this agreement. (B) Licensee may prepare backup or archival copies of the Package for Licensee's use only. Except for such copies, Licensee shall not reproduce the package except in accordance with the written permission of CENTURY, and upon terms and conditions specified by CENTURY. Any such copies shall remain the property of CENTURY as provided in paragraph 8. (A) above.

9.     **TERMINATION** - In the event that Licensee should default in the performance of any obligation on its part to be performed or make an assignment for the benefit of creditors, or should any proceeding be instituted by or against Licensee under any provisions of the Federal Bankruptcy Code, or any State law for liquidation, dissolution or the appointment of a custodian or receiver, CENTURY may terminate this license with out prejudice to its right to collect any amount then due, its damages and any further relief to which it may be entitled. In the event of termination, Licensee shall thereafter cease to use the Package and any related materials or any copies thereof and shall promptly delete the Package from its library and return to CENTURY the Package, any material associated therewith and all copies. In the event of termination CENTURY shall have no obligation to refund any amount paid by Licensee.

10.    **ASSIGNMENT** - This license or any rights thereunder may not be assigned or sublicensed by Licensee without the prior written consent of CENTURY. CENTURY retains the sole and absolute right to refuse to consent to such assignment or sublicensing for any reason or for no reason.

11.    **LIMITATION OF LIABILITY** - (A) In no event shall CENTURY be liable to Licensee for any indirect, special or consequential damages or lost profits arising out of or related to this Computer Package License or the performance or breach hereof, even if CENTURY has been advised of the possibility thereof. CENTURY'S liability to Licensee hereunder, if any, shall in no event exceed the total of the license fees paid to CENTURY hereunder by Licensee. (B) In no event shall Licensor be liable to Licensee for any damages resulting from or related to any failure of the software products, including, but not limited to, loss of data or delay of CENTURY in the delivery of the package or in the performance of service under this License Agreement or related agreements. The intent of the web-based version of Star_Base is solely a browser version of Star_Base that is intranet only and solely under the school district's control. Century assumes no responsibility for the confidentiality of the district's data, nor is Century responsible for the confidentiality of the district's data should the district decide to provide access to their system through the world-wide web.

12.    **NOTICE** - Any notice of communication given or required to be given under this agreement shall be in writing and shall be deemed to have been given when mailed by certified mail, return receipt requested, postage prepaid, to the other party at the address contained herein.

13.    **APPLICABLE LAW** - In the event that any one or more of the provisions contained in this agreement shall for any reason be held to be unenforceable in any respect under the laws of any state, or of the United States of America, such unenforceable provisions shall not affect any other provisions of this agreement, but this agreement shall be construed as if such unenforceable provisions had never been contained herein. All questions of enforceability and interpretations which may arise under this agreement shall be determined by the laws of the State of New Jersey.

PAGE 3 OF 6

# STAR BASE COMPUTER PACKAGE LICENSE
## STUDENT MANAGEMENT

### TERMS AND CONDITIONS

14. **ENTIRE AGREEMENT** - This agreement and the attachments, if any, hereto constitute the entire agreement of the parties and supersedes all prior agreements, understandings, negotiations and proposals. No other licenses or rights are herein granted other than those specifically granted herein and no other representations, commitments, guarantees or statements shall be binding on either party. This agreement and the attachments hereto shall not be deemed or construed to be modified, amended, rescinded, canceled or waived in whole or in part, except by written agreement duly executed by both parties.

### END OF COMPUTER PACKAGE LICENSE

## SOFTWARE PACKAGE PRICING AND SUPPORT POLICIES
### EXHIBIT 'A'

*THE FOLLOWING PRICING AND SUPPORT POLICIES ARE EFFECTIVE JANUARY 1, 1999 AND SUPERSEDE ALL PREVIOUS PRICING AND SUPPORT POLICIES.*

### LICENSE FEES:
*These one-time fees license the Licensee to use the CENTURY proprietary software for the term and at the location specified on the CENTURY License Agreement. The Licensee does not "own" this software and cannot propagate the program to any other system. The license fee also entitles the LICENSEE to the first ninety (90) days of software maintenance support at no additional cost.*

### INSTALLATION
*All package installations will be on a contract basis at CENTURY'S current system services rate, plus incurred travel expenses, unless otherwise specified by an officer of CENTURY. The installation process will not be required if CENTURY in its discretion agrees that the Licensee has the adequate staff expertise to provide their own installation. Prior to Star_Base installation, a private telephone line and a modem, connected directly to the host computer, must be operational at the customer's site.*

### MODIFICATIONS AND ENHANCEMENTS:
*CENTURY will discuss any special needs the Licensee has for customized reports and/or program enhancements. CENTURY reserves the right to refuse to do any or all system changes. Any modifications and/or enhancements CENTURY agrees to perform will be on a contract basis at CENTURY'S then current system services rate and must be contracted separately prior to initiation of the work.*

### SOFTWARE MAINTENANCE (CUSTOMER SUPPORT):
*CENTURY'S software maintenance may be extended beyond the warranty period by annual service which entitles the Licensee to the following services:*

> *1.   Unlimited telephone consultations during normal business hours for any procedural or software problem related to CENTURY Star_Base software (one primary and one secondary district staff member).*
> *2.   Software updates, available on a scheduled basis;*
> *3.   Remote dial-in capabilities of your computer system which permits CENTURY to diagnose software issues.*

*Century will provide assistance for any procedural questions regarding Star_Base and the use of Oracle as it relates to Star_Base. Century will provide Oracle updates for the Oracle application specific products purchased through Century, but not restricted Development Tool products (e.g. Discoverer, Developer, etc)*

*CITRIX TERMINAL SERVER TECHNOLOGY IS NOT SUPPORTED BY CENTURY.*

*The annual maintenance service may require the Licensee to have installed the most current release of the CENTURY package to be supported. If the Licensee is not on the current package release, CENTURY can convert the customer to the current release. This conversion will be performed on a contract basis on a time and material basis at CENTURY'S then current system service rate plus expenses.*
*In order to insure successful Star_Base maintenance service, CENTURY requires designated client personnel to participate in Century's prepared and approved Star_Base training. CENTURY may suspend maintenance service in the event trained district personnel are not available to insure the daily operation of Star_Base software.*

### SOFTWARE DISTRIBUTION:
*CENTURY will distribute the software on magnetic media currently compatible with CENTURY'S in-house computer system. The Licensee is responsible for providing CENTURY with compatible magnetic media or assuming all cost incurred in converting the software to the user's magnetic media.*

PAGE 5 OF 6

## *PAYMENT SCHEDULE*

### *EXHIBIT 'B'*

### *LICENSEE: SPRINGFIELD PUBLIC SCHOOL DISTRICT #186*

### *STAR BASE APPLICATION SOFTWARE*

#### *STUDENT MANAGEMENT*

*Student Information*        *Grade Book*
*Daily Attendance*        *Interim Reporting*
*Scheduling*        *Discipline*
*Grade Reporting*        *Medical*
*Academic History*        *Census*
*Class/Period Attendance*        *Special Education*
*Testing*        *Master Class Schedule Optimizer*

#### *STANDARD INTERFACES*

*Banner*        *Busing*
*Course Requests*
*Grade Reporting*
*Homeroom Attendance*        *Dialers*
*Class/Period Attendance*
*Interim Reporting*        *Bar Coding*

*TOTAL STUDENT MANAGEMENT SOFTWARE LICENSE: N/A*

#### *ORACLE APPLICATION SPECIFIC LICENSE*

*Oracle8i Database Server 140 Concurrent Users – GF     N/A*

*Oracle 8i Application Server (WEB) 600    Power Units:     $18,000.00*
*(Reasonable, Unspecified # of Users) PU only*

*TOTAL ORACLE DATABASE LICENSE:*

### *TOTAL LICENSE AGREEMENT*     $18,000.00

*PAYMENT TERMS:*
*50% UPON SIGNING OF CONTRACT*
*50% UPON DELIVERY OF SOFTWARE*

*Cost Proposal Dated December 12, 2000 made part of this agreement.*

*PRICES EXCLUDE TRAVEL EXPENSES OF CENTURY EMPLOYEES*
      *(TRANSPORTATION/MEALS/LODGING) WHICH WILL BE BILLED SEPARATELY.*
*1/1/2000*

# STAR_BASE COMPUTER PACKAGE LICENSE
## ORACLE RIDER
## APPLICATION SPECIFIC LICENSE

LICENSEE:     SPRINGFIELD PUBLIC SCHOOL DISTRICT #186
DATE OF COMPUTER PACKAGE LICENSE:   JANUARY 30, 2001
COMPUTER PROGRAM LICENSE NUMBER: CCL-202

In the event the above captioned Computer Package License comprises a sublicense of programs licensed to CENTURY by ORACLE Corporation of Redwood City, California ("ORACLE"), this Rider shall be entered into by CENTURY and Licensee and shall become a part of the above-captioned Computer Package License. In the event of a conflict or inconsistency between the provisions of this Rider and the provisions of the above-captioned Computer Package License, the provisions of this Rider shall govern. For purposes of this Rider, the Term "Program" shall refer to any ORACLE program sublicensed to Licensee by CENTURY.

Licensee and CENTURY agree as follows:

1.   Licensee agrees to restrict its use of the Program to object code form on a single designated system for the Licensee's own internal data processing only;
2.   Licensee agrees that it shall not transfer or duplicate the Program except for temporary transfer in the event of computer malfunction and single backup for archival copies;
3.   Licensee agrees that it shall not enter into assignment, timesharing or rental of the Program;
4.   Licensee agrees that it shall not use the Program for any purpose outside the scope of the Computer Package License;
5.   Licensee agrees that it shall not cause or permit the reverse engineering, disassembly or decompilation of the Program;
6.   Licensee agrees that this Rider is subject in all respects to the terms and conditions of CENTURY'S Agreement with ORACLE, and that ORACLE is a third party beneficiary of the Computer Package License and this Rider, and that all rights and privileges running to CENTURY pursuant to the Computer Package License and this Rider, shall run in favor of ORACLE;
7.   Licensee agrees that it shall not publish the results of any bench mark tests run on the Programs without the advance consent of CENTURY;
8.   Licensee agrees that CENTURY may have access to its premises at reasonable times and during normal business hours to confirm Licensee's compliance with the terms and provisions of the Computer License and this Rider;
9.   Licensee agrees that any unauthorized use of the Program shall constitute cause for immediate termination of the Computer Package License and this Rider.

IN WITNESS WHEREOF, the parties hereto have executed this Rider to Computer Package License effective this  23  Day of  February , 2001.

LICENSEE:

_Thomas Stuebgen, Information System_     DATE: _2/19/2001_
(AUTHORIZED SIGNATURE AND TITLE)                    Director

CENTURY CONSULTANTS LTD.:

_Joel Widman          President_     DATE: _2/23/01_
(AUTHORIZED SIGNATURE AND TITLE)

12/22/98

*Springfield Public schools is using Levi, Ray + Shoup, Inc. Consulting services to assist in the process of evaluation these RFP's in respect to the Student accounting software system.*



## Century Consultants

### ADMINISTRATIVE SOLUTIONS FOR TODAY...AND BEYOND

*Except as otherwise authorized by Century Consultants in writing, Springfield Public Schools and its employees and/or agents*

## NON-DISCLOSURE OF BUSINESS INFORMATION

### SPRINGFIELD PUBLIC SCHOOLS

530 West Reynolds  Springfield Illinois  62702
and its employees and or agents specifically agree that they will not
for a period of three (3) years at any time, in any fashion, or
manner either directly or indirectly, divulge, disclose, or
communicate to any person, firm, or corporation in any manner
whatsoever, information of any kind, nature, or description
concerning matters affecting or relating to the business of Century
Consultants Ltd. located at 300 Main Street, Lakewood, New Jersey,
including, but without limitation any of the foregoing; the names of
any of the customers, the prices it obtains or has obtained or at
which it sells or has sold its products, or any other information of,
about, or concerning the business of Century Consultants Ltd., its
manner of operation, its plans, processes, or other data of any kind,
nature, or description without regard to whether any or all of the
foregoing matters would be deemed confidential, material, or
important, the parties hereto stipulate and agree that as between
themselves, the same are important, material, and confidential and
gravely affect the effect and successful conduct of the business of
Century Consultants Ltd. and its good will, and that any breach of
the terms of the Agreement is a material breach hereof. It is the
intent of this provision that SPRINGFIELD PUBLIC SCHOOLS (see Above) and its *P.S.*
employees or agents are expressly prohibited from divulging any trade
secrets or processes or other business data in kind, nature or
description which may be characterized as a trade secret or
confidential information during the term of this Agreement. It is
recognized and agreed by the parties hereto that all trade secrets
which include all information concerning the manner of Century
Consultants Ltd.'s operation of its business, plans, processes or
other data in kind, nature or description are the property of Century
Consultants Ltd. It is implicit in this provision that
*P.S.* SPRINGFIELD PUBLIC SCHOOLS (see Above), its' employees or agents will not use
or divulge to third persons or parties any of the matters setforth
herein which are regarded as trade secrets for the period setforth
and agreed to in this document.

Agreed by: Henry Stucke  VP Manager    1/25/95
(Authorized Signature)    Title    Date

for: Springfield Public Schools

Agreed by: Joseph F Matte  VicePres    1-25-95
(Authorized Signature)    Title    Date

For: Century Consultants Ltd.

1

1      IN THE UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
2             SPRINGFIELD DIVISION

3

4

CENTURY CONSULTANTS, LTD.,          )
5                                    )
       Plaintiff,                    )
6                                    )
vs.                                  ) No. 03-CV-3105
7                                    )
THE MILLER GROUP, INC., JOHN G.      )
8  MILLER, and THE SPRINGFIELD       )
   PUBLIC SCHOOL DISTRICT 186,       )
9                                    )
       Defendants.                   )
10

11

12

13

14

15

16

17                The Deposition of:

18              WILLIAM M. CHOAT
                October 20, 2004

19

20

21

             JULIE L. BLOOME REPORTING
22               104 Maple Street
               Post Office Box 264
23          Raymond, Illinois 62560
                 217/229-3309

24

46

1    A. (No audible response.)
2    Q. I'll withdraw that question, actually.
3    A. Yeah, I --
4    Q. Bad question. You don't need to answer
5 it.
6        Other than what you've already told me
7 about your conversations with Mr. Miller about the
8 lawsuit back in May 2003, when it was first filed, did
9 you have occasion to talk with him again about the
10 lawsuit in any way?
11    A. No. Well, not that I recall. Mr. Miller
12 and I formed a friendship over the years, but he
13 didn't share things like that with me. You know,
14 sometimes I took it personally and felt I was being
15 kept out of the loop.
16        I'm talking too much, but -- but, no, I
17 don't really recall any other things he told me. I
18 knew his frustration level was high. As a friend, I
19 could tell that.
20    Q. Uh-huh.
21    A. But...
22    Q. Other than Mr. David, Mr. Borecky and
23 you, were there any other programmers who worked on
24 the development of IS3?

47

1    A. The only other programmers -- we had Matt
2 Sparks, but he did our website stuff, our regular
3 website things.
4    Q. Uh-huh.
5    A. Andrew Schmadeke was a senior in high
6 school. They're not allowed to work on any of that.
7    Q. Uh-huh.
8    A. Both with Springfield, and after they
9 were gone with other databases. We had them doing
10 other things, and I don't recall any others. It
11 seems -- we may have, oh, Matt -- the other
12 programmers I'm recalling, to my knowledge, none of
13 them had any access to IS3.
14    Q. Okay. During the course of your work at
15 The Miller Group on the Springfield School District's
16 project, did you come to learn that the School
17 District had been using a student information
18 management package called Star_Base?
19    A. Yes.
20    Q. How did you first learn about Star_Base?
21    A. Well, I never really learned much about
22 it. I heard the name Star_Base when we started the
23 project. Well, what were they using before?
24 Star_Base.

48

1    Q. Was it your understanding that the work
2 that you were doing was directed toward the
3 development of a system that would replace Star_Base?
4    A. I don't recall being directed to think
5 anything about it. I believe I was told that they
6 wanted to do Internet access. They --
7    Q. The School District.
8    A. -- wanted to use the Internet. They
9 wanted to use browsers instead of software programs,
10 and we were front ending, writing a front ending to
11 the Oracle database.
12    Q. Okay. Did you learn anything about how
13 Star_Base was structured? In other words, what types
14 of modules or parts of the program existed.
15    A. No.
16    Q. What Star_Base was, in other words. Did
17 you learn what it was?
18    A. There were times I wanted to go to the
19 School District and say, what do you got now, let's
20 take a look at it, but what they wanted us to do was
21 they would -- Jack would have meetings, and they would
22 come back and say, here's what they want, and then we
23 would develop it, so...
24        And now I'm kind of thankful to tell you

49

1 I never saw a Star_Base screen, and I don't even know
2 the machines on which it ran.
3    Q. That was my -- going to be one of my next
4 questions. Did you ever see the screen outputs for
5 Star_Base?
6    A. Not that I recall. As a matter of fact,
7 I'm not even sure what machine ran it. Don't even
8 know the language, if there is one. I don't know. To
9 my knowledge, it was done with Oracle forms, which I
10 still don't know.
11    Q. Did you ever see any of the source code
12 for Star_Base?
13    A. (Witness shaking head in the negative.)
14    Q. You have to verbalize, sir.
15    A. I'm sorry. No.
16    Q. Did anyone working for The Miller Group
17 ever say in your presence that they had seen the
18 Star_Base source code?
19    A. No.
20    Q. You indicated earlier that Mr. Qualls had
21 done some work at The Miller Group's offices, correct?
22    A. He came over for training.
23    Q. He came over to you for training.
24    A. Uh-huh.

118

1  read in the contract that I had from Century. I don't
2  know if you have a contract here. I haven't seen it
3  — I haven't read it for the last couple years to
4  remember exactly what was in it.
5      Q. Was the data dictionary provided to
6  Miller?
7      A. I'm sure it was, yes.
8      Q. How do you know that?
9      A. Because they could not have done what
10 they've done without it.
11     Q. How do you know that?
12     A. Well, maybe I don't. I just don't feel
13 they could have done what they've done without it.
14     Q. You're under oath today, Mr. Stuckey —
15     A. I realize that.
16     Q. So it's very important that you speak
17 about what you know, and if you don't know, be sure
18 and tell me, because I don't want to trick you, and we
19 just need to keep the record very clean.
20         Is it fair to say that you're assuming
21 that Miller had the data dictionary?
22     A. (Long pause.) Yes.
23     Q. Do you know that Miller had the Star_Base
24 source code?

119

1      A. I do not know that Miller had it on their
2  site. It was on the server that it was being used
3  through The Miller Group. So I know they had access
4  to it, yes.
5      Q. But the source code was stored at
6  District 186, right?
7      A. Yes.
8      Q. Okay. Do you know of anyone at the
9  Miller Group who viewed the source code?
10     A. Not personally. I do not.
11     Q. Okay. And then what files were you
12 referring to that you believe could not have been
13 given to Miller?
14     A. I'm sorry?
15     Q. You said "files." Could you be more
16 specific with respect to what files shouldn't be shown
17 to the Miller Group?
18     A. Well, the system was made up of modules
19 of files for scheduling, attendance and grade
20 reporting, and all those different modules within the
21 system. And those definitions of those files and so
22 on was given with the data dictionary information.
23     Q. They were?
24     A. That's part of the data — that I assume

120

1  was given to them.
2      Q. Okay. Have you ever had any
3  conversations with Bob Megan about the arrangement
4  between the Miller Group and District 186?
5      A. Yes.
6      Q. What conversations — tell me the
7  substance — well, first, how many conversations did
8  you have with Bob Megan about the relationship between
9  the Miller Group and District 186?
10     A. I'm not exactly sure of the number.
11 Maybe two or three.
12     Q. Two or three?
13     A. Uh-huh.
14     Q. Approximately, when did the conversation
15 take place? What time frame?
16     A. Probably in '99, 2000 time frame. 2001
17 at the latest.
18     Q. But it's fair to say that as of '99, it's
19 your understanding that Bob Megan knew that there was
20 a relationship between the District and the Miller
21 Group?
22         MR. HILLIARD: Objection to the form.
23         MR. SHUPENUS: Go ahead and answer.
24     A. The only thing that I ever talked with

121

1  Bob Megan about with Miller Group that early, he —
2  was that the Miller Group was working on standard and
3  benchmarks for the District which was something that
4  Century did not have in their system at that point in
5  time.
6  BY MR. SHUPENUS:
7      Q. That's it?
8      A. That early, yes.
9      Q. Okay. Then you had another conversation,
10 at least one more?
11     A. That's correct.
12     Q. Tell me the substance of that
13 conversation.
14     A. I think it was around 2000, he come down
15 and installed — or come down and did a demo for the
16 graphic — or web based interface for Star_Base, and
17 at that time, we had a conversation about Miller and
18 where they was at with what they was doing.
19     Q. When you say "we had a conversation," who
20 were the parties to the conversation?
21     A. At that time I believe me and Bob and
22 Mr. Williams.
23     Q. Okay. What did you tell Megan during
24 that conversation?

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION
NO. 2003-CV-3105

CENTURY CONSULTANTS, LTD.,                :

                    Plaintiff,            :        DEPOSITION OF:

        vs.                               :

THE MILLER GROUP, INC., JOHN G.   :        PAUL G. LEWIS

MILLER and the SPRINGFIELD        :

PUBLIC SCHOOL DISTRICT NO. 186,   :

                    Defendants.           :        ORIGINAL

- - - - - - - - - - - - - - - - -

        TRANSCRIPT OF PROCEEDINGS, taken by
and before KIM A. GHILARDI, a Notary Public, Certified
Shorthand Reporter of the State of New Jersey and
Registered Professional Reporter, taken at the offices
of STARK & STARK, PC, 993 Lenox Drive, Lawrenceville,
New Jersey, on Wednesday, January 12, 2005, commencing
at 9:30 a.m.

GUY J. RENZI & ASSOCIATES

Certified Shorthand Reporters & Videographers

824 West State Street

Trenton, New Jersey 08618

(609) 989-9199

www.renziassociates.com

1    the same foundation, that is what this report was

2    attempting to illustrate.

3        Q       So if Century alleges that substantial

4    portions of source code from Star_Base were copied,

5    that is the subject of a different expert report?

6    Yours is more along the line of logic being copied,

7    right?

8        A       Right.  But there is just one thing I

9    want to point out is the C programming language and

10    the C application can be converted to a C++

11    application automatically by using a system for that

12    purpose.

13        Q       Was that done here?

14        A       I am not able to make that determination

15    with 100 percent accuracy but given the logic and the

16    similarities in specific certain variable names, it is

17    apparent to me that the person that created the IS3

18    Code had access to the Star_Base code.

19        Q       And that's fine.  I understand your

20    point but I'm trying to get the copying element out of

21    the way and it doesn't appear to me that we can use

22    this report to demonstrate that substantial portions

23    of Star_Base source code were copied.  Am I wrong?

24            MR. SCHRAMA:  Just to probably help

25    things along here, I'm going to object to the form of

1    Q       Why don't I rephrase it.  I need to know

2    the facts as you understand them for the purpose of

3    compilation of your report.  First, let's discuss your

4    source of facts.  Where did you learn the facts that

5    are contained in your report outside of the data sets?

6    A       The conclusions reached in the report

7    were reached solely on the data sets.

8    Q       I don't think that's answering my

9    question.  Maybe I didn't phrase it correctly.  Your

10   report makes several references to the facts of this

11   case.  Where did you learn these facts?

12   A       In order to begin the analysis, I needed

13   general background knowledge of what was trying to be

14   discovered.  Based on a conversation or perhaps

15   conversations with Craig Hilliard, it was explained to

16   me that a company called Century Consultants existed

17   that had a product, a software product on the market

18   and potentially or allegedly another company had

19   copied some or all of that product and now had a

20   competing product on the market.

21   Q       What other facts were disclosed to you?

22   A       It was disclosed to me that the other

23   company's name was The Miller Group and that The

24   Miller Group had installed its software at the

25   Springfield District 186 School System.

1    Q        Any other facts that you learned?

2    A        I was provided with brief portions of

3 source code that was faxed to me that pointed out

4 superficial instances of possible infringement.

5    Q        When did you receive these portions of

6 source code?

7    A        I would estimate spring of 2003, at

8 about the time that the engagement was signed.

9    Q        Well, again, Mr. Lewis, I am not trying

10 to trick you but I will help you out here with the

11 dates.  That was signed after the lawsuit was filed

12 and that was signed in between your receipt of data

13 sets from various entities.  Before you received disks

14 pursuant to the court's order, did you receive smaller

15 portions of source code?  I assume you did if it was

16 faxed to you.

17    A        It was just a couple of, a few pages,

18 maybe, of some example, table comparison examples, I

19 believe.

20    Q        And how are these documents -- well, let

21 me back up.  Was it source code that you received?

22    A        Yes.

23    Q        Source code for what?

24    A        Source code for the district, the

25 application installed at District 186.

1      Q        Of what?

2      A        What my belief of their student

3    information system.

4      Q        Were you told what that portion of

5    source code was?

6      A        I was told that the source code

7    allegedly referenced tables that were created by

8    Century Consultants.

9      Q        Were you told where the source code was

10   obtained?

11     A        I believe I was told the source code was

12   obtained from District 186.

13     Q        Were you told that the source code was

14   source code of the Info System 3 product that was

15   being marketed and sold by The Miller Group?

16     A        I believe I was told that it was The

17   Miller Group's product that was installed at District

18   186.

19     Q        What other facts did he provide to you?

20   And just to make it clear, let's talk about the facts

21   that were told to you and then we will talk about the

22   documents that you relied on.  Okay.  What other facts

23   were you told?

24     A        I'm not certain if there was much

25   further discussion beyond that other than my request

144

1   A. Some time, I believe, end of 1998. I'm
2  not exact sure of the time. Either '98 or '99.
3   Q. Does December 1998 sound correct to you?
4   A. It's possible, yes.
5   Q. And that would be more than three years
6  after this agreement was signed, right?
7   A. Yes.
8   Q. And following your execution of that
9  agreement, did District 186 receive the data
10 dictionary from Star_Base?
11   A. I do not recall. I don't remember this
12 – what I've always referred to as complete contract,
13 but I would assume we probably did.
14   Q. Did you tell anyone at the district that
15 you entered into that non-disclosure agreement?
16   A. Yes,
17   Q. Who did you tell?
18   A. At that time, it was probably Doctor Hill
19 and Agnes Nunn.
20   Q. Anyone else?
21   A. Um... Not that I can recall.
22   Q. So what was your understanding of the
23 length of time that the data dictionary would have to
24 remain confidential?

143

1   A. At the time this was given, for three
2  years.
3   Q. Okay. Did that ever change?
4   A. From my understanding, and I don't
5  remember when the actual contract was signed, that
6  probably -- this was a non-disclosure agreement. The
7  contract should supersede whatever this was.
8   Q. Okay. Did the contract contain the same
9  terms?
10   A. I don't recall three years being in that,
11 no, without having a contract here. I would have
12 to –
13   Q. Did the contract say that the same
14 materials were covered?
15   A. Without, again, having a contract here, I
16 cannot answer that. I don't remember word for word.
17   Q. Well, do you remember not necessarily
18 word for word, but generally what that contract said
19 about specific items that were being provided by
20 Century?
21   A. That they should not be given to a third
22 party, that's correct, yes.
23   Q. What items?
24   A. Any kind of data file layouts, data

dictionary, source code, and I can't remember, again
2  without having a contract here, anything else.
3   Q. Are you fairly confident that the
4  contract said the file layout, source code and data
5  dictionary couldn't be disclosed?
6   A. I cannot testify to that without seeing
7  the contract. I'm sorry. I do not remember.
8   Q. Okay. By the way, did you believe that
9  the Star_Base software that you received was
10 copyrighted?
11   A. Yes.
12   Q. Why did you believe that?
13   A. Because it was their prior software that
14 they was selling, so I figured it was copyrighted.
15   Q. You just figured?
16   A. Yes.
17   Q. Is there any other reason that you
18 believe it was copyrighted?
19   A. I don't remember without, again seeing
20 the contract, if there was anything in there about
21 being copyrighted, because that contract is three or
22 four or five pages long, and there might be something
23 in there, but again, without having that available, I
24 cannot answer that.

145

1   Q. Well, when you were expressing concerns
2  to the District about District 186s relationship with
3  Miller, at that time did you believe that Star_Base
4  was copyrighted?
5   A. Yes.
6   Q. Based upon what?
7   A. Well, normally any software that you do
8  buy is copyrighted, and the agreement stated we could
9  not give it to any third party and just from that
10 wording, I assumed it was copyrighted.
11   Q. If, when District 186 purchased
12 Star_Base, if you found out that it really wasn't
13 copyrighted, would that surprise you?
14   A. I never really thought about it.
15   Q. Oh, you didn't?
16   A. No, not at that point in time.
17   Q. You thought about it afterwards?
18   A. (No response)
19   Q. You just told me what you were thinking,
20 and then turned around and said you hadn't thought
21 about it. I'm trying to figure out which one it is.
22   A. The word "copyrighted" I do not remember
23 seeing written on their documentation. It may be in
24 the contract. My understanding is if you buy

## AFFIDAVIT OF DAVID WILLIAMS

STATE OF ILLINOIS        )
                                )   ss.

COUNTY OF SANGAMON    )

DAVID WILLIAMS, being duly sworn, hereby deposes and states as follows:

1.     I am over age 18, under no legal disability, and am able to truthfully testify regarding the facts and matters set forth herein.

2.     I was employed by Springfield Public School District 186 ("District 186") from 1970 until I voluntarily retired in 2004.

3.     When my employment with District 186 began, I was a computer programmer. When I retired, I was District 186's lead systems analyst.

4.     In the course of my employment with District 186, I became familiar with a computer software product known as Star_Base, which is a student information system. It is my understanding that District 186 obtained Star_Base from Century Consultants, Ltd. ("Century").

5.     At some point in the mid 1990's, District 186 submitted a Request for Proposal ("RFP") to several vendors for the purpose of obtaining computer software that would enable District 186 to switch from a mainframe information system to a database system.

6.     In the course of my employment with District 186, I attended meetings wherein vendors demonstrated their software products in response to District 186's RFP. I did not, however, participate in District 186's decision to enter into any agreement with Century, and was unaware of the terms of any contracts between District 186 and Century.

7.     Star_Base software was installed at District 186 in or around 1996. In the course of my employment, I routinely worked with Star_Base and interacted with employees of Century for the purpose of District 186's implementation and use of Star_Base.

8.     The Star_Base software installed at District 186 operated in conjunction with an Oracle database.

9.     The Star_Base software installed at District 186 could be modified in a manner so that District 186 could develop or purchase other programs that could interact with the Oracle database. This enabled District 186 to add functions to its system that could not be performed by Star_Base, without the necessity of recreating a separate database to perform such functions.

Initials: \_D W\_\_\_\_

10.    When requested, Century employees assisted me in making substantial modifications and additions to the Star_Base software, and Century was well aware that District 186 made such modifications and additions. In fact, Century supplied District 186 with the source code for Star_Base so that District 186 could make modifications and additions to Star_Base to suit its needs.

11.    A few years after Star_Base was installed at District 186, I learned that District 186 wanted to convert its existing student information system, which consisted of Star_Base and several other components, to a web based system that would be compatible with the Apple Macintosh computers utilized by District 186. It is my understanding that no such product was commercially available when District 186 decided to convert to a web based system.

12.    I was not involved in District 186's decision to convert to a web based system, and did not know that such a conversion was contemplated until after a decision had already been reached. At the same time, I learned that The Miller Group was hired by District 186 to assist in the development of District 186's new student information system.

13.    Upon learning of the decision to convert to a web based system, I assumed that the new system would replace the Star_Base software that was installed at District 186, but I did not know that to be true.

14.    When work first began on development of District 186's new web based student information system, I had no role in its development. Eventually, however, I wrote a substantial amount of source code for District 186's new system.

15.    In the course of my employment with District 186, learned the new programming language being utilized in the source code for District 186's new student information system, which is very different from the programming language used in District 186's version of Star_Base.

16.    While I am aware that The Miller Group participated in the development of District 186's new student information system, I did not have substantive interaction with anyone from The Miller Group regarding the nature of its involvement.

17.    Both during and after development of District 186's new student information system, I assumed that The Miller Group intended to market and sell the same student information system to other school districts, although no one told me that would be the case.

18.    My assumption that The Miller Group intended to market and sell copies of District 186's student information system was strengthened when I discovered that The Miller Group was marketing a student information system named InfoSystems 3 through a web page on the internet. I assumed that InfoSystems 3 was the same student information system that was being developed at District 186.

2

Initials: _N W_

19.    I have never had any basis, other than my own assumption, for believing that InfoSystems 3 is the same student information system that The Miller Group helped to develop for District 186. Still, I assumed that to be the case.

20.    At the time I discovered that The Miller Group was marketing a student information system to other school districts, District 186 was still utilizing elements of Star_Base. As a result, I assumed that InfoSystems 3 also utilized elements of Star_Base, which I thought was improper.

21.    In February 2003, I had conversations with Robert Magan ("Magan"), who was a Century employee with whom I had frequent contact prior to that time. During the conversations, Magan and I discussed concerns I had regarding District 186's continued use of Star_Base, as well as The Miller Group's marketing and sale of InfoSystems 3, among other things. While I did not know it at the time, I later learned that Magan was recording some of our conversations.

22.    On October 21, 2004, I appeared for deposition in the matter of "Century Consultants, Ltd. v. The Miller Group, Inc., John G. Miller and Springfield Public School District 186," United States District Court, Central District of Illinois case number 2003-CV-3105 ("the lawsuit"). I heard the recording of that conversation for the first time at the deposition. I believe that the transcript attached hereto as Exhibit A truly and accurately reflects the contents of this recording.

23.    The statements made by me to Magan were not made under oath. In fact, I did not and do not have sufficient knowledge to swear to the accuracy of the statements made therein. Instead, I merely conveyed certain assumptions to Magan. My remarks to Magan were made in confidence, and I had no idea that Magan or Century would use these remarks as the basis for a lawsuit.

24.    I have reviewed a document in the lawsuit titled "DECLARATION OF ROBERT MAGAN" ("Magan's Declaration"), together with attachments, and I recognize the attachments attached as Exhibit C as being documents I sent to Magan.

25.    I represented to Magan that the documents I sent to him were obtained and printed from District 186's student information system. I have neither seen nor had access to any student information system other than the student information system at District 186, other than during demonstrations of competing products in the course of my employment with District 186.

26.    I have never had actual knowledge of any elements, components, structures, source code, object code, data structures, field names, logic, or anything else from Star_Base that was used by The Miller Group to develop InfoSystems 3.

Initials: O W

27.    I sent Magan table definitions attached to his Declaration. I obtained these table definitions from District 186's student information system. I did not obtain these table definitions from InfoSystems 3.

28.    I sent Magan the program listing referenced in Magan's Declaration and attached thereto as Exhibit D. I obtained the program listing from District 186's student information system. I did not obtain the program listing from InfoSystems 3.

29.    In light of the fact that I obtained the materials I sent to Magan from District 186's student information system, the similarities discovered by Magan exist because Magan compared the Star_Base program listing and table definitions to District 186's program listing and table definitions, taken from a portion of District 186's student information system that continued to use elements of Star_Base.

30.    If Magan's belief that InfoSystems 3 contains elements of Star_Base is based on my representations to him, Magan's belief is incorrect. I merely conveyed assumptions to him that I had no basis to believe were true.

31.    While I regret the fact that this lawsuit is based upon the fact that I conveyed erroneous assumptions to Magan, I assumed that Magan and Century would undertake an investigation for the purpose of ensuring my assumptions were correct prior to filing a lawsuit. No one from Century told me that Century would file a lawsuit based on my unverified assumption that The Miller Group was marketing the same student information system that was developed for District 186.

32.    While I assumed it to be true at the time I spoke with Magan, I did not have any first-hand knowledge or basis for any belief that The Miller Group's InfoSystems 3 product incorporates any element of Star_Base whatsoever. To this day, I still do not have such knowledge.

_____
DAVID WILLIAMS

Signed and sworn before me this 28th day of January, 2005.

_____
Notary Public

OFFICIAL SEAL
CINDY STOCKER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4-3-2005

January 28, 2005\crs\I:\CRAPP\WORD\LIT\RMS\CENTURY\WILLIAMS AFFIDAVIT.wpd

Initials: DW

138

1  have signed, but ultimately, the District at that
2  contract was approved by the Board of Education and
3  signed by Doctor Hill, the final contract.
4      Q.  What did Century provide in response to
5  the request for proposal, if anything?
6      A.  A whole notebook probably about six
7  inches thick, with -- showing their database and the
8  fields within the database, what information the
9  database held, and then the screens and so on of what
10  the screens looked like on the -- for the users to
11  use, and I think we asked for a detailed breakdown of
12  every field in the database, how large it was, what
13  the description was, and all those type of technical
14  things.
15      Q.  Did Century provide that information to
16  you?
17      A.  Yes, they did.
18      Q.  Before you entered into the license
19  agreement?
20      A.  They provided the general information,
21  yes.
22      Q.  Okay.  And is that the same information
23  that you believed couldn't be shared to third parties?
24      A.  No.

139

1      Q.  What was different about it?
2      A.  That was general information showing
3  the -- what records was in their system, and what the
4  screens looked like.  What I was concerned about was
5  the data definitions, the file layouts, and the source
6  code that we received from Century once we signed the
7  final contract with them.
8      Q.  What about the database structures?  Were
9  you concerned about those being released to third
10  parties?
11      A.  Yes.
12      Q.  Were those provided to you before you
13  ever signed the license agreement?
14      A.  I don't believe the structures was, I
15  recall.  Again, it just listed what was in the
16  database and the size of the field, but as far as a
17  definite structure, I don't remember receiving
18  anything in detail on that, no.
19      Q.  Did you get the database or the data
20  dictionary prior to signing the license agreement?
21      A.  Not that I recall.  I don't remember
22  exact time of all those things, because again, that
23  was ten years ago.  What they provided every other
24  vendor that we asked for in our request for proposal

141

1  provided also.
2      MR. SHUPENUS:  Craig, I'm just going to use
3  the same exhibit number here.  I don't think it will
4  matter.
5      MR. HILLIARD:  Is that the first agreement?
6      MR. SHUPENUS:  Yes.
7  BY MR. SHUPENUS:
8      Q.  Mr. Stuckey, I'm going to show you what's
9  been marked Exhibit 82.
10      MR. HILLIARD:  Do you mind if I take a quick
11  look at that, because I haven't seen it.  I don't have
12  a copy of it.
13      MR. SHUPENUS:  I thought you had that.
14      MR. HILLIARD:  I do.  I just don't have it
15  with me.
16      MR. SHUPENUS:  Okay.
17      MR. HILLIARD:  I don't have your -- we
18  haven't made copies of those exhibits yet.
19      MR. SHUPENUS:  Sure.
20      MR. HILLIARD:  I knew the document, but I
21  just want to look at something.
22      MR. SHUPENUS:  Sure.
23      (Counsel Hilliard reviewing document.)
24

141

1  BY MR. SHUPENUS:
2      Q.  Mr. Stuckey, I'm going to ask you to
3  review that document and tell me what it is, if you
4  know.
5      A.  (Witness reviewing document.)  It's a
6  non-disclosure business information agreement with the
7  District and with Century.
8      Q.  Whose signature is on the bottom of that?
9      A.  Mine is.
10      Q.  Did you execute that document on behalf
11  of the District?
12      A.  Yes, I did.
13      Q.  When?
14      A.  January 25, 1995.
15      Q.  To your knowledge, what kind of things
16  couldn't be disclosed by the District under the terms
17  of that agreement?
18      A.  I believe anything that we was provided
19  from Century.
20      Q.  Okay.  And how long did you have to keep
21  that information confidential to the school district?
22      A.  This says for three years.
23      Q.  Okay.  And when did the District enter in
24  to a contract with Miller?

Page 1

1

        UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF ILLINOIS
        SPRINGFIELD DIVISION

3       NO. 2003-CV-3105

4   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

5   CENTURY CONSULTANTS, LTD.,

6           Plaintiff,              DEPOSITION OF:
        vs.

7                                   ROBERT MAGAN

    THE MILLER GROUP, INC., JOHN G.

8   MILLER and the SPRINGFIELD
    PUBLIC SCHOOL DISTRICT NO. 186,

9
        Defendants.                 COPY

10

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11

12

13           TRANSCRIPT OF PROCEEDINGS, taken by

14   and before KIM A. GHILARDI, a Notary Public, Certified

15   Shorthand Reporter of the State of New Jersey and

16   Registered Professional Reporter, taken at the offices

17   of STARK & STARK, P.C., 993 Lenox Drive,

18   Lawrenceville, New Jersey, on Friday, January 14,

19   2005, commencing at 9:20 a.m.

20

21

22           GUY J. RENZI & ASSOCIATES
                824 West State Street

23           Trenton, New Jersey  08618
        (609) 989-9199  1-800-368-7652   (TOLL FREE)

24           www.renziassociates.com

25

1    made by Mr. Williams to you as contained in this

2    transcript, is there any representation made by

3    Williams that indicates to you that Williams might not

4    have known proper facts with respect to the Star_Base

5    application and its use at Century?

6                MR. SCHRAMA:  Objection to form.  You

7    can answer the question, if you understand it.

8         A         Are you asking me did Dave have all the

9    facts from the source code that he delivered.

10        Q         Well, no.  I want to know if any of the

11   statements that Williams made to you as set forth in

12   this transcript, if any of those statements are

13   incorrect, to your knowledge?

14        A         Not to my knowledge, no.

15        Q         Okay.  For instance, Williams indicates

16   his interpretation of the license agreement right?

17        A         Yes.

18        Q         Do you share Williams interpretation as

19   he stated it in this transcript?

20        A         Well, the only thing that I would

21   disagree with was I believe Dave was under the

22   impression once you went off support, you were not

23   allowed to use the product and that's not true.

24   You're allowed to use the product if you're not on

25   support.  You just don't get support or get updates of

142

```
1        A.  Some time, I believe, end of 1998.  I'm
2   not exact sure of the time.  Either '98 or '99.
3        Q.  Does December 1998 sound correct to you?
4        A.  It's possible, yes.
5        Q.  And that would be more than three years
6   after this agreement was signed, right?
7        A.  Yes.
8        Q.  And following your execution of that
9   agreement, did District 186 receive the data
10  dictionary from Star_Base?
11       A.  I do not recall.  I don't remember this
12  -- what I've always referred to as complete contract,
13  but I would assume we probably did.
14       Q.  Did you tell anyone at the district that
15  you entered into that non-disclosure agreement?
16       A.  Yes.
17       Q.  Who did you tell?
18       A.  At that time, it was probably Doctor Hill
19  and Agnes Nunn.
20       Q.  Anyone else?
21       A.  Um... Not that I can recall.
22       Q.  So what was your understanding of the
23  length of time that the data dictionary would have to
24  remain confidential?
```

143

```
1        A.  At the time this was given, for three
2   years.
3        Q.  Okay.  Did that ever change?
4        A.  From my understanding, and I don't
5   remember when the actual contract was signed, that
6   probably -- this was a non-disclosure agreement.  The
7   contract should supersede whatever this was.
8        Q.  Okay.  Did the contract contain the same
9   terms?
10       A.  I don't recall three years being in that,
11  no, without having a contract here.  I would have
12  to --
13       Q.  Did the contract say that the same
14  materials were covered?
15       A.  Without, again, having a contract here, I
16  cannot answer that.  I don't remember word for word.
17       Q.  Well, do you remember not necessarily
18  word for word, but generally what that contract said
19  about specific items that were being provided by
20  Century?
21       A.  That they should not be given to a third
22  party, that's correct, yes.
23       Q.  What items?
24       A.  Any kind of data file layouts, data
```

144

```
1   dictionary, source code, and I can't remember, again
2   without having a contract here, anything else.
3        Q.  Are you fairly confident that the
4   contract said the file layout, source code and data
5   dictionary couldn't be disclosed?
6        A.  I cannot testify to that without seeing
7   the contract.  I'm sorry.  I do not remember.
8        Q.  Okay.  By the way, did you believe that
9   the Star_Base software that you received was
10  copyrighted?
11       A.  Yes.
12       Q.  Why did you believe that?
13       A.  Because it was their prior software that
14  they was selling, so I figured it was copyrighted.
15       Q.  You just figured?
16       A.  Yes.
17       Q.  Is there any other reason that you
18  believe it was copyrighted?
19       A.  I don't remember without, again seeing
20  the contract, if there was anything in there about
21  being copyrighted, because that contract is three or
22  four or five pages long, and there might be something
23  in there, but again, without having that available, I
24  cannot answer that.
```

145

```
1        Q.  Well, when you were expressing concerns
2   to the District about District 186s relationship with
3   Miller, at that time did you believe that Star_Base
4   was copyrighted?
5        A.  Yes.
6        Q.  Based upon what?
7        A.  Well, normally, any software that you do
8   buy is copyrighted, and the agreement stated we could
9   not give it to any third party, and just from that
10  wording, I assumed it was copyrighted.
11       Q.  If, when District 186 purchased
12  Star_Base, if you found out that it really wasn't
13  copyrighted, would that surprise you?
14       A.  I never really thought about it.
15       Q.  Oh, you didn't?
16       A.  No, not at that point in time.
17       Q.  You thought about it afterwards?
18       A.  (No response.)
19       Q.  You just told me what you were thinking,
20  and then turned around and said you hadn't thought
21  about it.  I'm trying to figure out which one it is.
22       A.  The word "copyrighted" I do not remember
23  seeing written on their documentation.  It may be in
24  the contract.  My understanding is if you buy
```

1  A. Yes.
2  Q. Handed to anyone at the Miller Group?
3  A. I do not know that.
4  Q. Did Dave Williams tell you that someone
5  at the Miller Group saw that?
6  A. I do not know that, no. He didn't say
7  anybody saw it, he just knew that it was taken over
8  there.
9  Q. So if Brent Qualls took the data
10  dictionary with him, he had it with him at the Miller
11  Group, but didn't show anyone, what would the problem
12  be?
13  A. I do not know if he showed anyone. I
14  cannot testify to that.
15  Q. Okay. Well, tell me your understanding
16  of what the problem would be if -- well, let me back
17  up. You don't know if Qualls showed the data
18  dictionary to anyone at the Miller Group, right?
19  A. That's correct.
20  Q. And no one has ever told you that Qualls
21  showed the data dictionary to anyone at the Miller
22  Group, correct?
23  A. That's correct.
24  Q. Yet, you were concerned?

151

1  A. Yes, I was.
2  Q. Right. Have you ever had occasion to
3  believe that your concerns were founded on anything
4  that -- any results that you thought may happen?
5  A. None other than this lawsuit.
6  Q. So you assumed that these things might be
7  revealed to the Miller Group, and then someone accused
8  the District of the same things, correct?
9  A. No. I assume The Miller Group was
10  working with them since they was taken over there and
11  Brent was over there working with them each day.
12  Q. But you never asked Brent about that?
13  A. I never asked him if he personally gave
14  the data dictionary to someone at the Miller Group. I
15  did not ask that question.
16  Q. But it was a concern?
17  A. Yes, it was.
18  Q. Did you want to believe that to be true,
19  that Brent gave the data dictionary to someone?
20  MR. HILLIARD: Objection to the form.
21  MR. SHUPENUS: Go ahead and answer.
22  A. I don't know how to answer that one.
23  BY MR. SHUPENUS:
24  Q. Have any reason to want Brent Qualls to

get in trouble?
2  A. No.
3  Q. Now, did anyone at -- well, you discussed
4  this complaint with a number of different people, did
5  you tell Agnes that you really didn't know if Brent
6  Qualls had disclosed the data dictionary or not?
7  A. I don't recall that conversation with
8  her.
9  Q. Okay. What about Carol Kitchen? Did you
10  tell Carol Kitchen that you knew that Brent had
11  disclosed it?
12  A. No.
13  Q. Did you tell anyone that Brent had
14  disclosed it, the data dictionary to the Miller
15  Group?
16  A. I personally cannot say that he give that
17  data dictionary to someone at Miller Group because I
18  was not there when he was there.
19  Q. Does InfoSystems 3 contain any source
20  code from Star_Base?
21  A. I do not know that. I have not worked on
22  that system at all, so I cannot answer that question.
23  Q. Now, my understanding is, correct me if I
24  am wrong, but the point of District 186 entering into

153

1  a contract with Miller was to develop a web based
2  system, right?
3  A. That's correct.
4  Q. And that web based system wasn't
5  available from Century when District 186 entered into
6  the contract with Miller, correct?
7  A. At the time they started developing it,
8  that's correct.
9  Q. In fact, Century didn't have a web based
10  system available for at least a couple of years,
11  correct?
12  A. We switched over to web based, I think it
13  was in the year 2000, and they was in their second or
14  third release of their web base. It wasn't as --
15  developed as far as we wanted a system to be developed
16  at that time, but they were expanding their web based
17  system also.
18  Q. Okay. So do you believe that in order
19  for the Miller Group to develop a web based system
20  beginning in December of 98, that to do that they
21  could use the Star_Base technology?
22  A. Ask that question again.
23  Q. I'll ask it in a different way. In your
24  opinion, how is the Star_Base source code going to be

**Page 160 (col 1)**

1 money to develop the system.

2 Q. Okay. But, it's fair to say that you
3 can't really offer any insight as to who developed
4 what on District 186s system, correct?

5 A. On the programming side, that's correct.

6 Q. Well, what other side is there? You
7 qualified your answer, I'm trying to find out why.

8 A. I was not physically over there to know
9 who developed what. I was involved in the system
10 because I used the— worked with supporting it in the
11 District, and trained people on how to use it.

12 Q. I didn't ask if you were physically
13 there. What I want to know about is your knowledge.
14 Do you have any knowledge regarding what portion of
15 District 186s system was developed by Miller?

16 A. I would assume the whole system was.

17 Q. Given that you're under oath, I want you
18 to tell me what you know, not what you assume. Do you
19 know what portion of District 186s system was
20 developed by Miller, if any?

21 A. No.

22 Q. Do you know what portion of District 186s
23 system was developed by District 186s own employees?

24 A. No.

**Page 160 (col 2, 161 label)**

1 Q. Now, you used the term "Miller Group,"
2 but my question for you is, are you certain that you
3 told Mr. Megan the name "The Miller Group" back then
4 in 1999 and 2000, or did you simply tell them that the
5 district was working with a consultant to develop some
6 new applications?

7 A. As far as I can recall, I'm certain we
8 mentioned the Miller Group.

9 Q. And did you indicate to him who the
10 Miller Group was, or did you just use the name?

11 A. I believe he knew who Mr. Miller was,
12 because he sat in on the one demo that Bob did for the
13 web based part of it.

14 Q. Mr. Miller sat in —

15 A. Yes.

16 Q. — on the demo?

17 A. If I recall.

18 Q. Other than Mr. Miller sitting in on the
19 demo, do you know if Mr. Megan knew anything about Mr.
20 Miller, who he was?

21 A. Not a — no. Not that I am aware of.

22 Q. Did you tell Mr. Megan that there was any
23 relationship between Mr. Miller and the school
24 district under which Mr. Miller would be selling a

**Page 159 (col 1)**

1 Q. Do you know what portion of the Miller
2 Group's product that it sold to other school districts
3 was developed by District 186?

4 A. No, I do not.

5 Q. Do you know what portion, if any, of the
6 Miller Group's InfoSystems 3 that it sells to other
7 school districts was developed by Century?

8 A. No, I do not.

9 MR. SHUPENUS: We're going to take a short
10 break.

11 (Whereupon at this point in the
12 proceedings, a break was taken.)

13 MR. SHUPENUS: We're done.

14 MR. HILLIARD: Just a couple of quick
15 follow-ups, Mr. Stuckey.

16 REDIRECT EXAMINATION

17 BY MR. HILLIARD:

18 Q. You told us about some conversations you
19 had with Bob Megan, one in or around 1999, and another
20 in or around the year 2000 when you talked with Mr.
21 Megan about the fact that the district was working
22 with a consultant to develop some additional
23 applications, correct?

24 A. That's correct.

**Page 161 (col 2)**

1 software package to other school districts?

2 A. I never did, no.

3 Q. Did you talk with Mr. Megan about whether
4 Mr. Miller was a competitor of Century's?

5 A. No.

6 Q. Did you tell Mr. Megan that you had
7 concerns about whether the Miller Group or Mr. Miller
8 had access to Century's source code?

9 A. Not at that time.

10 Q. That's what I'm asking. Back at that
11 time.

12 A. No, not at that time.

13 Q. Okay. I'm talking about 1999 through the
14 2001 time frame.

15 A. Well, I would say the last time I
16 probably talked with Bob was when he done the demo,
17 and then we actually implemented the web piece that
18 same year, which would have been around late '99.

19 Q. Did you share with Mr. Megan any of your
20 concerns?

21 A. Not that I recall of it at that time,
22 because Mr. Miller was only in the early stages of the
23 standard and benchmarks, and then was just taking a
24 look at what we call period by period attendance

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF ILLINOIS

                     SPRINGFIELD DIVISION

3                    NO. 2003-CV-3105

4      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

5      CENTURY CONSULTANTS, LTD.,

6                    Plaintiff,              DEPOSITION OF:

           vs.
                                            ROBERT MAGAN
7

       THE MILLER GROUP, INC., JOHN G.

8      MILLER and the SPRINGFIELD

       PUBLIC SCHOOL DISTRICT NO. 186,

9

                     Defendants.                    COPY

10

       _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11

12

13                    TRANSCRIPT OF PROCEEDINGS, taken by

14     and before KIM A. GHILARDI, a Notary Public, Certified

15     Shorthand Reporter of the State of New Jersey and

16     Registered Professional Reporter, taken at the offices

17     of STARK & STARK, P.C., 993 Lenox Drive,

18     Lawrenceville, New Jersey, on Friday, January 14,

19     2005, commencing at 9:20 a.m.

20

21

22                    GUY J. RENZI & ASSOCIATES
                         824 West State Street
23                    Trenton, New Jersey  08618
                (609) 989-9199  1-800-368-7652  (TOLL FREE)
24                    www.renziassociates.com

25

1    made by Mr. Williams to you as contained in this

2    transcript, is there any representation made by

3    Williams that indicates to you that Williams might not

4    have known proper facts with respect to the Star_Base

5    application and its use at Century?

6              MR. SCHRAMA:  Objection to form.  You

7    can answer the question, if you understand it.

8         A         Are you asking me did Dave have all the

9    facts from the source code that he delivered.

10        Q         Well, no.  I want to know if any of the

11   statements that Williams made to you as set forth in

12   this transcript, if any of those statements are

13   incorrect, to your knowledge?

14        A         Not to my knowledge, no.

15        Q         Okay.  For instance, Williams indicates

16   his interpretation of the license agreement right?

17        A         Yes.

18        Q         Do you share Williams interpretation as

19   he stated it in this transcript?

20        A         Well, the only thing that I would

21   disagree with was I believe Dave was under the

22   impression once you went off support, you were not

23   allowed to use the product and that's not true.

24   You're allowed to use the product if you're not on

25   support.  You just don't get support or get updates of

Consultants, Ltd. V. The Miller Group, et al

CONFIDENTIAL                                                    *May 29, 2003*

**Introduction**

PG Lewis & Associates, LLC (*hereinafter, "PGLA"*) was contracted by Century Consultants, LTD to perform an analysis of their proprietary application known as Star_Base, and compare those findings against a similar analysis performed on a competing product offered by The Miller Group and known as Info System 3, or IS3.

Century Consultants alleges that The Miller Group used its intellectual property as the basis for a competing product. The purpose of this report is to determine if any intellectual property belonging to Century Consultants is found in the competing product from The Miller Group.

As part of this analysis, PG Lewis & Associates received a total of five (5) data sets. The data sets are defined as follows:

| Data Set | CD Title | CD Contents | Author | Date Received |
|---|---|---|---|---|
| 1 | Century 5/14/03 | Star_Base6i_frmts.zip | Century Consultants | May 15, 2003 |
| 2 | IS3 Tables | Text file listing of the tables used by IS3 | The Miller Group | May 16, 2003 |
| 2 | IS3 Source Code | Source codes of the IS3 application | The Miller Group | May 16, 2003 |
| 2 | IS3 Scheduler | IS3 Scheduler Application | The Miller Group | May 16, 2003 |
| 3 | Springfield District 186 | IS3 Application installed at Springfield School | The Miller Group | May 22, 2003 |
| 4 | IS3 Scheduler | A different version of IS3 Scheduler Application | The Miller Group | May 22, 2003 |
| 5 | Century Schema (ZIP file emailed on 5/17/03) | Not a CD. ZIP Contains the schema and "describe" information for the Century Application | Century Consultants | May 17, 2003 |

*(handwritten left margin, top to bottom: 006, 003, 002, 001, 004, 005, 009 ZIP)*

This analysis compares each of the data sets received from The Miller Group and The Springfield School District to the "control" set of data received from Century Consultants.

*(handwritten: 007 REC'D AFTER REPORT)*
*(handwritten: 008 REC'D AFTER REPORT)*

---

P.G. Lewis & Associates LLC
DATA FORENSICS

1    hired to form an expert conclusion of similarities
2    between applications.  I was not hired to make a legal
3    determination as to whether or not one or all of those
4    applications bear a copyright or are protected by a
5    copyright.
6          Q       And on a different level, is it fair to
7    say that you don't know what is copyrighted or is it
8    fair to say that you believe that the entire
9    application was copyrighted?  I don't know which way
10   you are going, so if you could clarify that for me.
11         A       In order to conduct my analysis and
12   provide an expert report, it's not critical or even
13   necessary for me to know if anything is copyrighted.
14         Q       Do you believe that the entire Star_Base
15   application is Century's intellectual property?
16         A       I worked on the assumption that the
17   Star_Base application that was forwarded to me is
18   Century's intellectual property.
19         Q       Upon what do you base that assumption?
20               MR. SCHRAMA:  I'll just interject the
21   same objection to form with regard to the term
22   intellectual property but as far as you understand the
23   question, you can answer it.
24         Q       What is your definition of intellectual
25   property?  Let me back up.  You believe that all of

Page 58

```
1    installed with the character mode version and going

2    off support, they also went up with the Web based

3    version as well and I don't know if you had that in

4    your notes or not.  So, you know, we installed the Web

5    based version at Springfield.

6             Q        How did we refer to that earlier?

7             A        They were running Version 6i.  I believe

8    that was in late 2000, early 2001.

9             Q        So Century provided Version 6i to

10   District 186?

11            A        Yes.

12            Q        And did District 186 pay a license fee

13   for that?

14            A        They had to pay an upgrade fee, I

15   believe and they also needed new hardware, which they

16   had to purchase.

17            Q        Okay.  Well, let's, since you suggested

18   it, whatever makes you comfortable, let's talk about

19   the evolution of the product that District 186 had and

20   then we will talk about the investigation.

21            A        Okay.

22            Q        Initially, District 186 purchased the

23   character based version from Century, right?

24            A        Yes um-hum.

25            Q        And when was the initial version
```