3:03-cv-03105-RM-BGC   # 188-2   Page 1 of 10

DEC-16-98 WED 11:43 AM   BROWN HAY STEPHENS         FAX NO. 2175441978         P. 03

3:03-cv-03105-RM-BGC   # 181-6   Page 4 of 14          Wednesday, 11 April, 2007 04:50:02 PM
                                                       Clerk, U.S. District Court, ILCD

E-FILED

EXHIBIT
A

## AGREEMENT

Agreement entered into effective the 21st day of December, 1998, by and between **SPRINGFIELD SCHOOL DISTRICT NO. 186**, a body corporate and politic with principal offices at 1900 West Monroe, Springfield, Illinois ("District") and **THE MILLER GROUP**, with offices at 1028 S. Second St., Springfield, Illinois ("Miller"), WITNESSETH:

WHEREAS, District desires to develop a flexible and expandable internet-based information system that can be maintained on an economical basis; and

WHEREAS, Miller has the experience and expertise to design and guide the development of such system on a District-wide basis; and

WHEREAS, District desires to retain the consulting services of Miller to design and develop such system, and Miller is willing to perform such services in accordance with the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual promises and covenants herein provided, the parties hereto agree as follows:

1. **Term of Agreement.**   This Agreement shall commence effective December 21, 1998, and shall remain in effect until such time as design, development and implementation of the aforesaid flexible and expandable internet-based information system (the "System") has been completed, unless this Agreement shall be earlier terminated pursuant to the provisions of Section 7 hereof.

2. **Scope of Services.**   Miller shall design and guide the development and implementation of the System to support District's faculty and staff for internal uses and to facilitate external access to specified data and information. Features of the System shall include: use of

existing data structures (Starbase); harvest of legacy data; use of existing computer equipment; ubiquitous access to information without regard to platform; low maintenance costs; flexible and expandable features; low cost development of new software for standards/benchmarks, instructional units, assessments, discipline and tracking of student files; availability of data and information for internal use of District and, in limited circumstances, for external access to specified data and information; District-wide access to software; lower District training costs. The system shall be Year 2000 compliant in all respects, and specifically shall function accurately and without interruption before, during and after January 1, 2000, without change in operation associated with the advent of the new century or other date-related events.

3. **Independent Contractor.** Such services hereunder shall be performed by Miller as an independent contractor, and nothing contained in this Agreement shall be construed or implied to create an employment, agency or partnership relationship. Neither party shall have the authority to agree or incur expenses on behalf of the other except as may be expressly authorized in writing. Miller shall not, nor shall any programmer, consultant or designer associated with Miller, be deemed to be an employee of District.

4. **Compensation.** On or about the effective date hereof, District shall pay Miller the sum of $10,000.00 to defray Miller's start-up costs for delivery of services hereunder. In addition, Miller shall bill District monthly for services rendered during the immediately prior month, and each bill shall: identify by initials the person who is rendering services hereunder on behalf of Miller; summarize services rendered; identify the date and time increment for such services. All services shall be billed at a flat rate of $75.00 per hour, and District shall pay Miller for approved services within 30 days of receipt of each monthly statement.

5. **District Provision of Hardware and Software.** On or about the effective date hereof, District shall provide Miller with up to two Apple Macintosh G3 computers to act as servers

2

3:03-cv-03105-RM-BGC  # 188-2  Page 3 of 10
3:03-cv-03105-RM-BGC  # 181-6  Page 6 of 47
DEC-18-98 WED 11:45 AM   BROWN HAY STEPHENS          FAX NO. 2175449761              P. 05/

(one for data base application development and serving and the other for web connectivity serving), up to four Apple Macintosh G3 computers for desktop development and up to two Apple Macintosh G3 Power Computers. Upon issuance of a Certificate of Completion of the System by District, each such Apple Macintosh computer shall become the sole property of Miller. In the event this Agreement shall terminate prior to System completion, then Miller shall return each such Apple Macintosh computer to District.

District shall further acquire all necessary software to facilitate Miller's development of System applications hereunder, which software shall remain the sole property of District.

6. **Termination of Consulting Services.**   District shall review development progress hereunder on a monthly basis, and shall have the right to terminate this Agreement at any time if it is not satisfied with development progress or the pace of System development. In the event District shall elect to terminate this Agreement, it shall give written notice to the Miller Group of its intention to do so at the address set forth above, and shall identify in such notice the reason or reasons for the proposed termination of services. Miller shall then have 30 days from the date of such notice to resolve to District's satisfaction any such identified reasons or problems with performance. If Miller is unable to resolve any such reasons or problems to District's satisfaction, then the Agreement shall terminate 30 days from the notice date and Miller shall be paid for all services rendered through the date of termination.

7. **Non-Disclosure Agreement.**   Miller acknowledges that all personal information in respect to District students and their families and in respect to District employees and agents shall be considered confidential, and agrees that The Miller Group, its agents, employees and affiliates shall not disclose any such confidential information to third parties without the prior written consent of District.

3

8. **Ownership of Applications and Software Solutions.** Any and all applications and software solutions developed hereunder shall be the property of Miller, provided, however, that Miller shall pay to District Ten Percent (10%) (or such other percentage fee as the parties shall negotiate to their mutual satisfaction on a case-by-case basis) of the service revenues generated by Miller for developing similar applications and software solutions and rendering the same or similar services to any third party. For purposes of this section, "Miller" shall include any affiliated or successor enterprise or business.

9. **Assignment.** This Agreement shall not be assigned by either party without the prior written consent of the other party.

10. **Governing Law.** Any disputes or claims arising under this Agreement shall be governed by the laws of the State of Illinois.

11. **Entire Agreement.** This Agreement represents the entire agreement of the parties and it expressly supersedes all previous written and oral communications between the parties. No amendment, alteration or modification of this Agreement shall be valid unless executed in writing by authorized signatories of both parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate counterpart original by their duly authorized representatives to be effective as of the date and year first above written.

THE MILLER GROUP,

By:_____

SPRINGFIELD SCHOOL DISTRICT NO. 186,

By:_____

Attest:_____

December 16, 1998\\\MAMKINFELLOWP\WIN60\DIST186\GRP\MILLERGR.AGR

110

1 virtually every day?
2     A. Yes.
3     Q. So you worked almost exclusively on this
4 project with the Miller Group for nearly a two year
5 period; is that correct?
6     A. Not exclusively.
7     Q. Nearly exclusively, though?
8     A. Depends on what you mean by "nearly."
9     Q. Okay. Well, what else were you working
10 on?
11     A. Well, I still had responsibilities
12 regarding other systems.
13     Q. Okay. Were you dealing with those
14 responsibilities while you were physically over at the
15 Miller Group's offices?
16     A. Yes.
17     Q. Why was it necessary for you to be over
18 at the Miller Group's offices?
19     A. To learn how to write the interface.
20     Q. Okay. You wrote code for the interface?
21     A. Yes.
22     Q. And you were trained in PHP to do that?
23     A. Yes.
24     Q. Who trained you?

111

1     A. Hmmm... Doctor Choat, Michael David.
2     Q. What programs were you writing over at
3 the Miller Group? Describe for me what you were
4 doing. What did this web interface involve?
5     A. Well, it would be designing screens that
6 would allow our users to input, retrieve, delete; data
7 manipulation and lists, reports.
8     Q. Okay. Were you writing new programs for
9 functions like scheduling, grade reports, attendance?
10     A. Yes.
11     Q. Okay. Were you doing that?
12     A. Yes.
13     Q. Were others at the Miller Group also
14 doing that?
15     A. I don't know what the others at the
16 Miller Group were doing. I didn't direct them or
17 anything.
18     Q. Well, I'm not asking if you directed
19 them, I'm just asking you if you were aware of whether
20 they were doing anything in terms of writing programs
21 for the interface.
22     A. Yes.
23     Q. Mr. Borecky and Mr. David, for example?
24     A. Yes.

112

1     Q. They were writing pro
2 you?
3     A. With which interface?
4     Q. The web interface.
5     A. Which web interface?
6     Q. Well, which -- I'm sorry. I don't
7 understand what you're asking me. There was more than
8 one web interface?
9     A. Miller had more than one client.
10     Q. What other clients are you referring to?
11     A. I don't know.
12     Q. Other school districts?
13     A. Yes.
14     Q. Okay. So you were working on -- were you
15 working on writing programs for other school
16 districts?
17     A. No.
18     Q. His people were, though?
19     A. Yes.
20     Q. Okay. Now, when you were over at the
21 Miller Group's offices, I take it, you had some
22 connection to the server back at District 186; is that
23 correct?
24     A. Yes.

113

1     Q. And you were able to -- what type of
2 connection was it, first of all?
3     A. It was a direct connection, meaning it
4 was a T 1.
5     Q. T1 line?
6     A. Yes.
7     Q. And so you were able to dial in to the
8 unix server, and basically get anything you needed
9 from the District while you were working over at the
10 Miller Group's offices, correct?
11     A. Not dial in.
12     Q. Well, I know what you're saying. Yeah,
13 right. You were able to connect?
14     A. Yes.
15     Q. Okay. And was anyone else at the Miller
16 Group able to connect?
17     A. Yes.
18     Q. Who at the Miller Group was able to
19 connect?
20     A. I know Doctor Choat could.
21     Q. In the same fashion you could? He could
22 connect the same way you could?
23     A. No.
24     Q. Okay. What was -- what differences were

Page 114

1  there?
2      A. He didn't have the same passwords that I
3  had.
4      Q. Okay. What -- but Doctor Choat could
5  dial in to the -- "dial" in, I'm sorry. Could connect
6  to the unix server?
7      A. Yes.
8      Q. And what information did Doctor Choat
9  have access to that you were aware of?
10     A. He could get a SQL prompt.
11     Q. Okay. Did he have access to the database
12 structures?
13     A. Yes.
14     Q. Did he have access to the source code for
15 Star_Base?
16     A. Could have.
17     Q. Why do you say "could have?" He did?
18     A. Yes.
19     Q. Okay. So if Doctor Choat wanted to see
20 the Star_Base source code, he could do it?
21     A. Yes.
22     Q. Okay. And as far as you knew, could any
23 of the other programmers at the Miller Group have
24 access to the source code in the same fashion Doctor

Page 115

1  Choat did?
2      A. I don't know of all of them.
3      Q. In other words, you're not sure what
4  restrictions Miller placed on his own employees?
5      A. That's correct.
6      Q. But if Doctor Choat had access as you
7  just testified, he could certainly have had anybody
8  else within the Miller Group come sit in his chair and
9  have them -- and view whatever was on the screen if he
10 wanted to, right?
11     A. Yes.
12     Q. Including Mr. Miller himself, right?
13     A. Yes.
14     Q. And while you were working over at the
15 Miller Group's offices with that connection to the
16 unix server, am I correct that you were aware that The
17 Miller Group was developing a student administration
18 software package to sell to other school districts?
19 You knew that, correct?
20     A. Yes.
21     Q. Okay. Did you ever assist The Miller
22 Group in any way in developing that software other
23 than the web interface that you were working on with
24 District 186s system?

Page 116

1      A. No.
2      Q. Did you ever assist him in writing a
3  scheduler?
4      A. No.
5      Q. Did you have an understanding of what he
6  was calling his product that he was selling to other
7  school districts?
8      MR. SHUPENUS: Objection. Vague. And it's
9  not limited to a time. If you know, you can answer.
10     MR. HILLIARD: Okay. I'll cut through this.
11 BY MR. HILLIARD:
12     Q. You've heard the terms InfoSystems 3, or
13 IS3 for short?
14     A. Yes.
15     Q. Did you understand that was the name of
16 what he was selling to other school districts?
17     MR. SHUPENUS: Same objection.
18     MR. HILLIARD: Sure.
19     A. Depends on the time frame.
20 BY MR. HILLIARD:
21     Q. Okay. Initially that was not the case?
22     A. Correct.
23     Q. All right. You didn't call it IS3 within
24 the school district, did you?

Page 117

1      MR. SHUPENUS: Same objection.
2      A. Maybe. I don't recall.
3  BY MR. HILLIARD:
4      Q. I've heard the term -- I've heard of the
5  more generic term "SIS."
6      A. Yes.
7      Q. Right. What is SIS?
8      A. Student information system.
9      Q. Is that what you typically referred to it
10 as, the SIS?
11     A. I typically referred to it as Infosys or
12 InfoSystem.
13     Q. InfoSystem. Okay. InfoSystem 3?
14     A. No.
15     Q. Do you know why Mr. Miller used the term
16 three, used the term InfoSystems 3?
17     A. At what time?
18     Q. All right. Maybe I should pinpoint the
19 time. At some point he decided on a name for the
20 product. Is that fair to say?
21     A. Yes.
22     Q. Do you recall when he decided on the
23 name?
24     A. No.

118

1  read in the contract that I had from Century. I don't
2  know if you have a contract here. I haven't seen it
3  -- I haven't read it for the last couple years to
4  remember exactly what was in it.
5      Q. Was the data dictionary provided to
6  Miller?
7      A. I'm sure it was, yes.
8      Q. How do you know that?
9      A. Because they could not have done what
10 they've done without it.
11     Q. How do you know that?
12     A. Well, maybe I don't. I just don't feel
13 they could have done what they've done without it.
14     Q. You're under oath today, Mr. Stuckey --
15     A. I realize that.
16     Q. So it's very important that you speak
17 about what you know, and if you don't know, be sure
18 and tell me, because I don't want to trick you, and we
19 just need to keep the record very clean.
20     Is it fair to say that you're assuming
21 that Miller had the data dictionary?
22     A. (Long pause.) Yes.
23     Q. Do you know that Miller had the Star_Base
24 source code?

119

1      A. I do not know that Miller had it on their
2  site. It was on the server that it was being used
3  through The Miller Group. So I know they had access
4  to it, yes.
5      Q. But the source code was stored at
6  District 186, right?
7      A. Yes.
8      Q. Okay. Do you know of anyone at the
9  Miller Group who viewed the source code?
10     A. Not personally. I do not.
11     Q. Okay. And then what files were you
12 referring to that you believe could not have been
13 given to Miller?
14     A. I'm sorry?
15     Q. You said "files." Could you be more
16 specific with respect to what files shouldn't be shown
17 to the Miller Group?
18     A. Well, the system was made up of modules
19 of files for scheduling, attendance and grade
20 reporting, and all those different modules within the
21 system. And those definitions of those files and so
22 on was given with the data dictionary information.
23     Q. They were?
24     A. That's part of the data -- that I assume

120

1  was given to them.
2      Q. Okay. Have you ever had any
3  conversations with Bob Megan about the arrangement
4  between the Miller Group and District 186?
5      A. Yes.
6      Q. What conversations -- tell me the
7  substance -- well, first, how many conversations did
8  you have with Bob Megan about the relationship between
9  the Miller Group and District 186?
10     A. I'm not exactly sure of the number.
11 Maybe two or three.
12     Q. Two or three?
13     A. Uh-huh.
14     Q. Approximately, when did the conversation
15 take place? What time frame?
16     A. Probably in '99, 2000 time frame. 2001
17 at the latest.
18     Q. But it's fair to say that as of '99, it's
19 your understanding that Bob Megan knew that there was
20 a relationship between the District and the Miller
21 Group?
22     MR. HILLIARD: Objection to the form.
23     MR. SHUPENUS: Go ahead and answer.
24     A. The only thing that I ever talked with

121

1  Bob Megan about with Miller Group that early, he --
2  was that the Miller Group was working on standard and
3  benchmarks for the District, which was something that
4  Century did not have in their system at that point in
5  time.
6  BY MR. SHUPENUS:
7      Q. That's it?
8      A. That early, yes.
9      Q. Okay. Then you had another conversation,
10 at least one more?
11     A. That's correct.
12     Q. Tell me the substance of that
13 conversation.
14     A. I think it was around 2000, he come down
15 and installed -- or come down and did a demo for the
16 graphic -- or web based interface for Star_Base, and
17 at that time, we had a conversation about Miller and
18 where they was at with what they was doing.
19     Q. When you say "we had a conversation," who
20 were the parties to the conversation?
21     A. At that time, I believe me and Bob and
22 Mr. Williams.
23     Q. Okay. What did you tell Meg[an]
24 that conversation?

EXHIBIT

1  information on its Internet Web site concerning Info
2  System 3, correct?
3      A    Correct.
4      Q    How did you discover that?
5      A    Well, I was with Joe Shearn when we went
6  onto the Internet and we did a search for Miller Group
7  and one of their products that came up was Info System
8  3.
9      Q    You conducted the search on the Internet
10 with Mr. Shearn?
11     A    Yes.  I went over to his office and we
12 did a search on his computer for The Miller Group and
13 their Web site came up.
14     Q    Is that what you told me earlier today?
15     A    Yes.
16     Q    You state that the Info System 3 product
17 was marketed on Miller's Web site on an on-line
18 student information system and that's precisely the
19 type of system that Century licensed to the school
20 district, correct?
21     A    Correct.
22     Q    Okay.  Now, you then reference Exhibit
23 B, right?
24     A    Yes.
25     Q    Let's look at Exhibit B.  Do other

Page 132

1   companies sell on-line student information systems
2   besides Miller and Century?
3       A    Yes.
4       Q    Do other companies sell precisely the
5   type of system that Century sells?
6       A    Define precisely.
7       Q    Let's use the definition that you use in
8   paragraph eight.
9       A    "Which is precisely the type of system
10  we licensed to the school district."
11      Q    Right. Do other companies sell
12  precisely the type of system that Century licensed to
13  District 186?
14      A    Yes.
15      Q    Who?
16      A    Well, I don't know all of them but as I
17  mentioned before, I know Chancery and Power School are
18  one of the bigger companies that marketed a student
19  information system.
20      Q    Well, is it an on-line student
21  information system?
22      A    Yes.
23      Q    And that's what various other companies
24  sell, correct?
25      A    Yes.

```
 1         Q       What do you think the life of 6i is
 2   going to be?
 3         A       Well, the life of 6i would probably be
 4   another year or so, since Oracle would be
 5   de-supporting Version 6i.  We usually follow Oracle's
 6   lead on support.  The next version we would be going
 7   to would probably been 10g, which is Oracle's current
 8   release.
 9         Q       Between the character based version of
10   Star_Base and --
11         A       Client server version.
12         Q       The client server version, how much of
13   the source code based on percentage, or a rough
14   percentage, remains the same?
15         A       Maybe five percent.
16         Q       Okay.  What about, I think we discussed
17   earlier that you believe, I'm not trying to trick you,
18   I might have the wrong numbers, but you believed that
19   the first version of Star_Base had 250 to 300 tables,
20   is that right?
21         A       Correct.
22         Q       How many tables were there in the first
23   version of the second version, the first version of
24   the client server based application?
25         A       How many tables from the character mode
```

EXHIBIT