## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

CENTURY CONSULTANTS, LTD.,        )
                                  )
    Plaintiff,                    )
                                  )
    v.                            )
                                  )        NO. 03-3105
THE MILLER GROUP, INC., JOHN      )
G. MILLER, and the SPRINGFIELD    )
PUBLIC SCHOOL DISTRICT NO.        )
186,                              )
                                  )
    Defendants.                   )
                                  )
                                  )

## <u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

The Court now considers Defendants' Motions for Summary Judgment (d/e 171, 174) as well as Plaintiff's Motion for Summary Judgment as to Liability (d/e 173).

For the reasons discussed below, Defendants' motions (d/e 171, 174) are denied, and Plaintiff's motion is granted (d/e 173).

# I.  BACKGROUND

## A.    Facts

### 1.    Development and Registration of "Star_Base"

In 1976, Plaintiff Century Consultants, Ltd. ("Century") began developing and marketing computer programs and associated software. Century's flagship software product (and its number one revenue producer) is a school administration software package called "Star_Base."  This program assists elementary and secondary schools in record keeping and reporting, covering fields such as student demographics, attendance, class scheduling, grades, and discipline.

Since its initial creation,[1] Star_Base has gone through several changes. The original, called "Version 1," was a character-based program.  Around 1995, Century produced "Version 2,"[2] a client server version of the original

---

[1]Star_Base itself derives from an earlier program called S.T.A.R.S., which was also developed by Century.

[2]For technical reasons, "Version 2" was sometimes referred to as "Version 3" in the record.

program.[3]   A few years later another modification occurred and Century released "Version 6i," which was web-based.   Nevertheless, despite the various incarnations of "Star_Base," the underlying tables and other structures for all of these versions remained relatively the same.[4]

### 2.   Licensing of "Star_Base" to District 186

Beginning in 1995, Century and Defendant Springfield Public School District 186 ("District 186") entered into a series of contracts relating to Star_Base.   On January 25, 1995, the parties executed a document entitled "Non-Disclosure of Business Information," which was to remain in effect for a period of three years.[5]   An October 28, 1995 agreement soon followed,

---

[3]Version 2.1 was also created, but this program was not widely distributed.

[4]There is some dispute as to how much of the source code remains unaltered among the various Star_Base versions.   Regardless, the testimony of Century employees establishes that the tables and fields in all of the versions remained almost identical, although each subsequent version added to the total number of tables.   No evidence is offered to the contrary.

[5]Robert Magan, Century's supervisor of product development, testified that such non-disclosures were often used when non-licensees wished to view the source code.

granting District 186 a license to use Star_Base within the school district. This licensing contract contained the following confidentiality provision:

> Licensee shall not use the package for the benefit of any other party, whether or not for a consideration; shall not sell, rent, loan, disclose, or otherwise communicate or make available the package or any part or modification thereof to any person, and shall maintain the confidentiality of the package unless otherwise agreed to by CENTURY in writing.[6]

Under the license, District 186 was obligated to make regular payments to Century for maintenance, but could cease such payments and continue using Star_Base if it elected to do so (called "going off maintenance"). Whether making maintenance payments or not, the District retained the right to access Star_Base's source code and make any modifications it wished, subject only to the requirement of confidentiality.[7] District 186 initially used Version 2 of Star_Base. At a later date, it upgraded to Version 6i.

---

[6]The parties executed a similar contract on February 23, 2001. This contract contained an identical confidentiality provision.

[7]Century, however, did not provide maintenance for any modifications made by licensees.

4

### 3.   Agreements between District 186 and the Miller Group

On September 1, 1998, John G. Miller and The Miller Group, Inc. (collectively, "Miller" or "the Miller Group") began to perform consulting services for District 186. Overtime, District 186, then using Version 2 (the client-server) of Star_Base, began discussing with the Miller Group the possibility of developing a web-based system that could run with its Macintosh system. Though the Miller Group had never written any software applications for schools, it nevertheless agreed, on December 21, 1998, to "design and guide the development and implementation of [an internet-based information system] to support [District 186's] faculty and staff for internal uses and to facilitate external access to specified data and information." The agreement further specified that the system would include, *inter alia*, the "use of existing data structures (Starbase) . . . ."

Aside from service compensation and start-up costs, the Miller Group also received rights in "[a]ny and all applications and software solutions developed," provided that it pay District 186 "[t]en [p]ercent (10%) (or such other percentage fee as the parties shall negotiate to their mutual

satisfaction on a case-by-case basis) of the service revenues generated by Miller for developing similar applications and software solutions and rendering the same or similar services to any third party."

Over the next few years, the Miller Group and District 186 worked together on the development of this system, with the District offering significant assistance even beyond the contractual requirements. For example, District 186 established a T-1 link between its computer system and the offices of the Miller Group. Through this link, employees of the Miller Group could obtain nearly unfettered[8] access to the whole of Star_Base's source code. Further, the school assigned one of its employees, programmer Brent Qualls ("Qualls"), to work at Miller's office. Qualls remained there for nearly two years. General supervisory power over the project was vested in another District employee, Mike Holinga ("Holinga"), who met with the Miller Group at least once per week. Holinga later retired from District 186 and became an employee of the Miller Group.

---

[8]Defendants dispute that the Miller Group had complete access. The testimony they cite, however, shows that at least one of Miller's employees, Dr. Choat, had access to all of Star_Base's structures and source code, and that other employees could gain access through him.

During the period of collaboration between District 186 and the Miller Group, Defendants claim that two products emerged. First, the Miller Group created InfoSystems 3 ("IS3"), a computer software system that would work on Macintosh systems and perform the same general record-keeping functions as Star_Base. This program was marketed to other school districts. Second, District 186 had a "Student Information System" ("SIS"), which it describes as a unique amalgamation of Star_Base, IS3, and other elements created by District 186 employees. This program was not marketed and remained only at District 186.

### 4. Warnings to Century from District 186 employees

In February of 2003, Don Randle ("Randle"), a former District 186 employee, contacted Robert Magan ("Magan"), Century's supervisor of product development. Randle expressed his concern that the Miller Group was using Century's database structures and scheduler program in violation of the license agreement.

Shortly thereafter, Dave Williams ("Williams") contacted Magan. Williams, then District 186's lead systems analyst, expressed his concern

7

that Miller was improperly using Star_Base source code and structures in violation of the licensing agreement to create a new computer program at District 186.  Magan told Williams to obtain copies of the tables being used at the school and send them to Century.  Williams sent five such tables. Century compared the tables to those of Star_Base and discovered they were nearly identical.

Concerned, Magan called Williams back several times.  During the first callback, Magan reported Century's findings.  Unbeknownst to Williams, Magan unsuccessfully attempted to record this phone conversation.  In late February 2003, Magan called Williams again.  He requested that Williams send code from District 186's scheduler.  This phone call was successfully recorded without Williams' knowledge.

Around this time, Century employees discovered that the Miller Group had begun marketing their IS3 school administration software program.  Assuming that IS3 was the same program as the software in use at the school (which Defendants' refer to as "SIS"), Century filed suit against the Miller Group and District 186.

8

## B.    Procedural History

### 1.    First Amended Complaint

On April 30, 2004, Century filed its First Amended Complaint, alleging (1) copyright infringement, (2) contributory infringement, (3) vicarious infringement, (4) misappropriation of trade secrets, (5) intentional interference with contractual relations, (6) common law unfair competition, and (7) breach of license agreement.  On January 16, 2007, after years of discovery and numerous rulings, the Miller Group and District 186 filed their motions for summary judgment (d/e 171, 174) and Century filed its motion for summary judgment as to liability (d/e 173).[9] These motions, however, are not presented on a clean slate.  Rather, the parties assert that several earlier rulings impact the resolution of the present

---

[9]These were not the first summary judgment motions to be filed in this case.  On September 17, 2004, this Court entered an order (d/e 61) converting one of District 186's motions to dismiss (d/e 57) into a motion for summary judgment.  After a slew of discovery, sanction, and suppression motions, as well as a bankruptcy-related stay, the Miller Group moved for summary judgment on November 1, 2005, adopting District 186's prior filings as its own (d/e 124).  On March 22, 2006, Defendants filed a motion to withdraw their summary judgment motions (d/e 137), which the Court granted.

motions.   Therefore, a few of this Court's earlier opinions will be briefly recounted.

### 1.   November 2005 Opinion - Suppression Motion

First, the Defendants filed motions to suppress Magan's recording of his conversation with Williams (d/e 91, 96).  In a November 2005 opinion (d/e 127), this Court held that the recording was inadmissible under the Illinois Eavesdropping Act, 720 ILCS 5/14-1 *et seq.*, and suppressed it with respect to Century's state law claims.  The evidence, however, remains admissible in support of Century's federal law claims under 18 U.S.C. § 2511(2)(d).

### 2.   March 2006 Opinion - Century's Expert

In support of its claims of copyright infringement, Century offered the expert testimony and reports of Paul Lewis.  During discovery, the Defendants provided Lewis with several versions of IS3 as well as the SIS installed at District 186.  Lewis first compared the SIS with Version 6i of Star_Base and found numerous similarities.  He ultimately concluded that SIS was copied from Star_Base.  Lewis also compared SIS to IS3 and

concluded that both products were substantially similar in logic, function, structure, and, in some aspects, language.  Further, Lewis performed a three-way comparison between two versions of IS3's scheduler function and the same function in Star_Base (Version 6i).  Again, Lewis opined that all three of the programs were substantially similar and noted that many of the differences resulted solely from last-minute tampering by the Defendants.[10]

The Defendants vigorously attacked Lewis and his report, bringing motions to bar him (d/e 105, 109).  The Court conducted a *Daubert* hearing and, at its conclusion, the Defendants claimed that Lewis compared the wrong data.  First, the Defendants contended that Lewis' report proved nothing because he did not know where the data came from.  Since the Defendants themselves had provided the data, however, this Court, in a March 2006 order (d/e 135), rejected this argument as "mystifying."

The Defendants also suggested that Lewis had erred by comparing the

---

[10]Although the issue is only tangentially raised in these motions, Lewis' report strongly indicates that Defendants' IS3 source code was substantially and intentionally altered during the course of this litigation (and in violation of a stay order) with the purpose of hiding further similarities and other verbatim references to Star_Base.  The Court takes this opportunity to express its concern over these serious allegations.

SIS installed at District 186 with Century's own Star_Base. Since District 186 had a right to continue using Star_Base at the school itself, the Defendants asserted that Lewis' testimony on the similarities between the two programs proved nothing. Further, they claimed that IS3 was never compared to Century's Star_Base. The March 2006 opinion ultimately rejected this theory as well, finding that the evidence at the hearing showed that Lewis had compared IS3 to Star_Base.

### 3. July 2006 Opinion - Validity of Copyright

Finally, the Defendants filed a motion to dismiss (d/e 138, 140) for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Defendants argued that Century's claims were based on unregistered derivative works rather than the copyrighted version of Star_Base, because only Version 1 was, at that time, copyrighted, whereas Defendants only possessed Versions 2 and 6i. In a July 2006 opinion (d/e 152), this Court rejected these arguments, noting that Century's Amended Complaint related to the copyrighted version of Star_Base.

## II.  APPLICABLE STANDARDS

"Summary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). Genuine issues of material fact exist where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In the context of cross-motions, courts "construe all inferences in favor of the party against whom the motion under consideration is made."  *Tegtmeier*, 390 F.3d at 1045 (citations and internal quotations omitted).  "However, '[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.'"  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)).

13

## III.  ANALYSIS

### A.    Federal Law Claims

Century asserts three interrelated infringement actions: (1) primary copyright infringement by the Miller Group, (2) contributory infringement by District 186, and (3) vicarious infringement by District 186.  Both Century and the Defendants seek summary judgment on these claims.

### 1.    Direct Infringement of Copyright by Miller Group

In order to succeed on an infringement claim, Century must show "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991)).  *See also* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01 (2007) ("Reduced to most fundamental terms, there are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant." (internal footnotes omitted)).

### a.  Ownership of a Valid Copyright

Century has proven ownership of a valid copyright in the 1995 version of Star_Base.  Century provided the Court with a registration certificate, which "constitute[s] prima facie evidence of the validity of the copyright . . . ."  17 U.S.C. § 410(c); *see also Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F. Supp. 2d 877, 884 (N.D. Ill. 2005).  Defendants offer no evidence to overcome the presumption of validity.[11]

### b.  Copying by Defendant

The second element, evidence of copying by the defendants, can be shown either by direct or indirect evidence.  *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 832-33 (10th Cir. 1993) (citations omitted).  Century has offered copious amounts of both types of evidence.

First, Century's direct evidence of copying consists of admissions by several District 186 employees.  Concerned about infringement, these employees contacted Century to warn them of Miller's alleged copying.

---

[11]If that were not enough, this Court has previously held that Century provided evidence demonstrating that the 1995 version of Star_Base was protected by copyright.

Defendants contend, however, that these employees were mistaken, and that the code they forwarded to Century in support of their claims was actually Century's own code taken from SIS, not IS3.  Thus, Defendants suggest that an issue of material fact prevents the entry of summary judgment with respect to Century's direct evidence of copying.

Even if true, Century does not rely wholly, or even primarily, on direct evidence of copying.[12]   Rather the bulk of Century's compiled evidence is circumstantial.   Proof of copying through circumstantial evidence turns on the plaintiff's ability to demonstrate two elements: access and substantial similarity.  *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1169-70 (7th Cir. 1997).

Century has offered undisputed evidence showing that the Miller Group had direct access to its Star_Base program.  First, a contract existed between the Miller Group and District 186, which expressly required the

---

[12]The Court notes, parenthetically, that it rejects Defendants curious suggestion that Century should be barred from presenting circumstantial evidence, because they relied on direct evidence in prior motions.  Century is not trying to "mend the hold"; rather, they have asserted throughout this litigation that SIS and IS3 are substantially similar programs derived from Star_Base.

former to use Star_Base in its work.  Indeed, the Defendants readily admit that the Miller Group had access to Star_Base in writing a front-end program for District 186.[13]  Second, Century has also offered evidence showing that a T-1 line connected District 186 to the Miller Group's offices, allowing them direct access to Star_Base off-site.  Defendants do not deny that such a connection existed but contend that no evidence shows that Miller employees actually used it to view Star_Base code.  Regardless, Century has still proved its case, because proof of access is shown where "'the defendant had an opportunity to view the protected item.'"  *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 450 (7th Cir. 2001) (quoting *Wildlife Express*, 18 F.3d at 508 n.5).

Century also offers proof of substantial similarity between the Miller Group's IS3 and its own Star_Base programs through the expert testimony and reports of Paul Lewis.  Lewis, who compared Star_Base with both SIS and several versions of IS3, concluded that all the programs contained

---

[13]Dr. William Choat, an employee of the Miller Group and chief architect of IS3, was shown portions of Star_Base code and went so far as to state that he had "used [those codes] like crazy."

17

substantial similarities, including similar language, structure, and logic.[14]
Lewis ultimately concluded that both SIS and IS3 were created from
Star_Base.

Defendants do not offer the testimony of an expert witness to counter
the assertions of Lewis. Rather, they make two arguments attacking Lewis'
report. First, Defendants renew one of their arguments from a previous
motion and assert that Lewis only compared Star_Base and SIS.
Defendants claim that SIS was merely Star_Base with a few additional
components, and that they had a contractual right to continue using and
modifying Star_Base in such a manner. They contend that Lewis, in
conducting his analysis, improperly assumed that SIS and IS3 were the

---

[14]Star_Base and IS3 were written in different programming
languages. To the extent that Defendants suggest that this relieves them
of any liability for infringement, they are incorrect, as "'copyright
protection of computer programs may extend beyond the programs'
literal code to their structure, sequence, and organization. . . .'" *qad. inc.
v. ALN Assocs., Inc.*, 770 F. Supp. 1261, 1265 (N.D. Ill. 1991), *aff'd*, 974
F.2d 834 (7th Cir. 1992) (quoting *Whelan Assocs., Inc. v. Jaslow Dental
Lab., Inc.*, 797 F.2d 1222, 1248 (3d Cir. 1986)).

same[15] and that this error infected and invalidated his entire analysis.

Defendants' argument, however, lacks factual and evidentiary support.[16]  Defendants' sole piece of evidence is the fact that Lewis could not identify which data set he used in one of his comparisons.  This evidentiary "support" is somewhat disingenuous: Lewis testified only that he was uncertain whether he used data set 2 or 4, both nearly identical versions of IS3.  This statement does not support the inference that Lewis may have used data set 3, which was SIS.[17]

Further, nothing in Lewis' report itself supports Defendants' theory. Throughout, Lewis treats SIS and IS3 as separate programs which were independently compared to Century's Star_Base.  First, Lewis' report goes

---

[15]More particularly, Lewis assumed that SIS was an IS3 application installed at Springfield.

[16]Presumably, such evidence would be simple to obtain: Lewis' report contains lengthy excerpts from the data he was analyzing, so Defendants would only need to provide those portions of their SIS and IS3 programs to see whether the wrong data was used.  They did not do so.

[17]Defendants repeatedly imply that Lewis was analyzing code provided by Williams.  This is not true, as Defendants themselves provided Century with the IS3 source code.

to some length to conclude that SIS and IS3 are substantially similar to each other.  Second, Lewis performed a separate comparison of two versions of the IS3 scheduler and Star_Base, again concluding that substantial similarities existed.  As a reading of the report makes clear, SIS did not factor into this analysis at all.[18]  Thus, no record evidence supports the contention that Lewis compared only SIS and Star_Base.  Rather, the only support derives from Defendants' baseless speculation about a possible error.  This is insufficient to stave off summary judgment.[19]  *See Dorsey*, 507 F.3d at 627 (citing *McDonald*, 371 at 1001).

Next, the Defendants argue that Lewis' opinion only shows that IS3 was copied from a later, unregistered version of Star_Base.  "[W]here the

---

[18]Only data sets 2 and 4 were labeled as "IS3 Scheduler."  Data set 3, which contained the SIS program, was not a scheduler application, but the entire source code.  As such, it was not part of the scheduler comparison.

[19]Indeed, even assuming that Defendants had offered some modicum of evidence, their theory would still be unreasonable for its failure to explain how Lewis would have obtained multiple versions of the "unique" SIS program.  For example, Defendants' theory would not explain how Lewis performed a three-way comparison while relying only on two programs: Star_Base and SIS.

preexisting work[] is registered, but the derivative work is not, a suit for infringement may be maintained as to any preexisting work, but not as to any element original to the unregistered derivative work." *Video Pipline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F. Supp. 2d 543, 556 (D.N.J. 2003).

Defendants base their claim on the undisputed fact that Lewis, in conducting his comparisons, used Version 6i of Star_Base rather than the earlier copyrighted version. As such, they argue, Century has only proven substantial similarity between IS3 and a later, unprotected version of Star_Base. However, as the Defendants themselves point out, District 186 did not have possession of Version 6i of Star_Base until late 2000 or early 2001. Since the alleged copying took place prior to that time, it could only have been from an earlier version of Star_Base from which Version 6i is derived. Therefore, by proving that Version 6i and Defendants' IS3 share substantial similarities, Century has proved that both systems share a common ancestor, namely a prior version of Star_Base.

Since the Defendants have failed to undermine Century's evidence, and because they fail to offer any evidence suggesting that copying did not

occur,[20] Century is entitled to summary judgment on this issue.

## 2.      Infringement Claims against District 186

Century also seeks to hold District 186 liable for the copying of Star_Base by seeking summary judgment on its contributory and vicarious infringement claims.

### a.      Contributory Infringement

"A defendant is liable for contributory copyright infringement when it 'with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another.'" *Monotype Imaging*, 376 F. Supp. 2d at 883 (citing *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 649 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003)).  A claim for contributory copyright infringement has three elements: "(1) direct infringement by a primary infringer, (2) the defendant's knowledge of the

---

[20]Normally, once the plaintiff establishes a *prima facie* case of infringement through indirect evidence, the defendant may rebut the inference of copying by presenting evidence of independent creation. *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 450 (7th Cir. 2001) (citing *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997)).  In this case, however, Defendants have offered no evidence of independent creation, instead focusing all of their attention on trying to undermine Century's *prima facie* case.

infringement, and (3) the defendant's material contribution to the infringement." *Id.* (citing *Marobie-Fl, Inc. v. Nat'l Ass'n of Fire Equip. Distribs. & Nw. Nexus, Inc.*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997)).  As discussed above, Century has established primary copyright infringement by the Miller Group.  Thus, this Court must ask whether District 186 had knowledge of and materially contributed to that infringement.

"The knowledge element for contributory copyright infringement is met in those cases where a party has been notified of specific infringing uses of its technology and fails to act to prevent . . . such infringing uses [in the future], or willfully blinds itself to such infringing uses."  *Id.* at 886 (citing *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996)).  In this case, knowledge is shown on the face of the contract between District 186 and the Miller Group.  The contract, which directs Miller to create a new program for the school and for later sale to other districts, expressly requires the incorporation of the Star_Base database structures.[21]  Thus, the contract

---

[21]Defendants claim that this fact is disputed, but fail to explain why

(continued...)

shows that District 186 knew (and demanded) that Miller's program contained Star_Base structures.

Further, the undisputed facts show that District 186 materially and substantially contributed to the Miller Group's infringement. Again, the contract itself constitutes damaging evidence against the Defendants, as District 186 was paying the start-up costs for the creation of the Miller Group's IS3, including the purchase of the computers used. Nor did the aid end there. To take just one example of District 186's assistance, the school had a T-1 line installed to connect the office of the Miller Group directly to its own network. As a District 186 employee testified, this connection gave Miller employees direct access to Star_Base's source code.

Thus, the undisputed evidence shows that District 186 knew the Miller Group's application incorporated elements of Star_Base and that the Miller Group could not have gained access to Century's software without the District's assistance. As such, Century is entitled to summary judgment

---

[21](...continued)
the clear import of the contract should be disregarded. The only cite they provide is to the contract itself.

24

and District 186 is liable for contributory copyright infringement.

### b.    Vicarious Infringement

"[T]o state a claim for vicarious copyright infringement, a plaintiff must allege that the defendant: (1) at all material times possessed the right and ability to supervise the infringing activity; and (2) has a direct financial interest in the infringer's activity." *QSRSoft, Inc. v. Restaurant Tech., Inc.*, 2006 WL 3196928, *4 (N.D. Ill. Nov. 2, 2006) (citing *In re Aimster Copyright Litig.*, 252 F. Supp. 2d at 654).[22]

Century offers numerous pieces of evidence demonstrating District 186's actual supervision of Miller.  First, they point to Qualls, a District employee continually stationed at the Miller Group's offices for nearly two years.  Defendants, however, vigorously assert that Qualls only worked on creating a front-end application for Star_Base, rather than assisting Miller employees with IS3.  Thus, a question of material fact exists as to whether Qualls supervised the Miller Group.  Defendants, however, do not dispute the rest of Century's evidence, including Miller's statement that he "worked

---

[22]A plaintiff must also show the existence of a primary infringer, which, as discussed in preceding sections, Century has done.

according to the desires of [District 186]," or the fact that the District held weekly meetings with the Miller Group for the very purpose of supervising their work.  Nor do the Defendants offer any evidence suggesting that the Miller Group was working unsupervised.  Finally, putting aside the question of whether supervisory power was actually exercised, the relevant question is simply whether the District possessed the right and ability to supervise. The contract between the Miller Group and District 186 is quite clear on this point: "District [186] shall review development progress hereunder on a monthly basis, and shall have the right to terminate this Agreement at any time if it is not satisfied . . . ."  Thus, Century has shown, as a matter of law, that District 186 had the power and ability to supervise the infringing conduct.

The contract between the District and the Miller Group also shows that District 186 had a direct financial interest in the infringer's activity, unambiguously stating that "Miller shall pay to District [186] Ten Percent (10%) . . . of the service revenues generated by Miller for developing similar applications and software solutions and rendering the same or similar

services to any third party."

Having demonstrated that District 186 could have supervised the Miller Group's infringing activities and that the District had a direct financial interest in IS3, Century is entitled to summary judgment on the issue of vicarious liability.

### 3.    Proof of Damages

Finally, Defendants challenge the sufficiency of Century's proof of damages relating to the Miller Group's profits.  Under 17 U.S.C. § 504(a), a copyright infringer has liability for "(1) the copyright owner's actual damages and any additional profits of the infringer . . .; or (2) statutory damages . . . ."  The statute further elaborates that "[t]he copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages."  § 504(b).

Section 504(b) specifically addresses the proof necessary to recover profits: "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the

27

infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." The courts have added a slight gloss to this straight-forward rule: a nexus must exist to link the infringement to the profits. *See Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983). The plaintiff bears the burden of establishing this nexus. *See id*.

In *Taylor*, the Seventh Circuit rejected a plaintiff's attempt to recover a percentage of a defendant's total net profits based on the infringement of a map, where only a portion of defendant's business related to the sale of maps. *Id*. The Court explained:

> It was not enough to show [defendant's] gross revenues from the sale of everything he sold, which is all, really, that [plaintiff] did. If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.

*Id.* Rather, a plaintiff establishes a prima facie case for a profits award by showing the defendant's gross revenues from the sale of the infringing product. *Id.*

28

Despite Defendants' claims, Century has complied with these rules. Unlike the general profits provided by the plaintiff in *Taylor*, Century's evidence consists of a summation of the Miller Group's gross revenues *from the sale of IS3 to schools*. Thus, this Court rejects the notion that Century has failed to comply with § 504(b) and finds that Century's evidence of damages suffices for purposes of surviving Defendants' summary judgment motion.[23]

## B.    State Law Claims

### 1.    Suppression of Evidence Related to All State Law Claims

As an initial matter, Defendants assert a general evidentiary challenge to Century's state law claims. As mentioned above, this Court previously held that Magan's recording of his conversation with Williams was inadmissible with respect to any state law claims, because it was evidence obtained in violation of the Illinois Eavesdropping Act. *See* 720 ILCS 5/14-5. Having convinced the Court to take this small step, the Defendants now invite it to take a huge leap and suppress all the evidence relating to any

---

[23]Century only seeks summary judgment as to liability.

state law claim.

Section 14-5 of the Illinois Eavesdropping Act provides, *inter alia*, that "[a]ny evidence obtained in violation of this Article is not admissible in any civil or criminal trial . . . ."   720 ILCS 5/14-5.   "Illinois courts have interpreted this provision to be the legislature's express adoption of the 'fruit of the poisonous tree' doctrine."   *In re Marriage of Almquist*, 299 Ill. App. 3d 732, 737, 234 Ill. Dec. 910, 913-14, 704 N.E.2d 68, 71-72 (Ill. App. Ct. 1998) (citing *People v. Maslowsky*, 34 Ill.2d 456, 216 N.E.2d 669 (1966)).   Under this doctrine, both the offending evidence and evidence derived from it are excluded.   *Id.*

After stating these rules, Defendants do nothing more than summarily assert that the recorded conversation acted as a catalyst for all other evidence uncovered by Century.   Thus, reason the Defendants, all subsequent evidence (including the last three years of discovery) must be suppressed under the fruit of the poisonous tree doctrine.   This claim, lacking in any evidentiary support, must be rejected.   Indeed, the undisputed record evidence shows that two District 186 employees warned

Century of the agreements between Miller Group and the District, and that these warnings, not the recorded conversation with Williams, prompted Century's investigation. Indeed, it was these very warnings that inspired Magan to call and record Williams in the first place. Thus, Defendants' proposed application of the fruit of the poisonous tree doctrine cannot be accepted.

### 2.    Breach of License Agreement

Century also moves for summary judgment on its breach of contract claim. Under Illinois law, a plaintiff alleging a breach of contract[24] has the burden of showing "the existence of a contract, the performance of its conditions by the plaintiff, a breach by the defendant, and damages as a result of the breach." *Kopley Group V., L.P. v. Sheridan Edgewater Props., Ltd.*, 376 Ill. App. 3d 1006, 1014, 315 Ill. Dec. 218, 226, 876 N.E.2d 218, 226 (Ill. App. Ct. 2007) (citing *Associated Underwriters of Am. Agency, Inc. v.*

---

[24]Although its First Amended Complaint contains several state law claims, Century only moves for summary judgment on its breach action. Because the summary judgment motion was not labeled as a partial summary judgment motion, this Court assumes that Century is no longer pursing those other state actions.

*McCarthy*, 356 Ill. App. 3d 1010, 1019, 292 Ill. Dec. 724, 826 N.E.2d 1160, 1168 (Ill. App. Ct. 2005)).   The only issue in this case is whether Century has demonstrated a breach. Century argues that the undisputed evidence  shows that District 186 breached the confidentiality provisions of its licensing contract by giving Miller access to Star_Base.  District 186 argues that no breach occurred because the confidentiality provision had expired.

In support of its claim of breach, Century points to the language of its licensing agreements with District 186.  Both contracts, executed in October 1995 and February 2001, forbid any disclosure of Star_Base without Century's written permission.  As evidence of breach, Century points to District 186's contracts with Miller, which expressly authorize him to modify and use Star_Base.  Further, several District 186 employees admitted that the Miller Group had direct access to Star_Base in clear contravention of the agreement.  For example, Brent Qualls supplied an affidavit on behalf of the Defendants which candidly admitted that "Miller gained access to [Century's] data structures."

In response, District 186 does not offer any evidence to contradict Century's claim, but merely argues that the confidentiality provision had expired.[25]   Specifically, District 186 asserts that the confidentiality provision in the "Non-Disclosure of Business Information" contract had, by its own terms, expired before any contracts with Miller were made. Century's claims, however, are not based on this agreement, but rather on the subsequent licensing agreements, which were in effect.[26]   Thus, the undisputed evidence shows that Miller breached the licensing agreement. Century is entitled to summary judgment on this claim.

## IV.  CONCLUSION

For the preceding reasons, Defendants' motions for summary judgment (d/e 171, 174) are DENIED.  Century's motion for summary

---

[25]District 186 alternatively argues that any evidence of the breach is inadmissible.  This argument was rejected in the previous section.

[26]Alternatively, the District argues that Miller's claims are based solely on the February 2001 licensing agreement and thus no breach could have occurred since the contracts with Miller predated it.  As Century points out, however, this argument is disingenuous, as Miller itself provided this Court with a copy of the 1995 licensing agreement containing an identical confidentiality provision.

33

judgment as to liability for its infringement and breach of contract claims

(d/e 173) is GRANTED.

IT IS SO ORDERED.

ENTER:    February 6, 2008

FOR THE COURT:                              /s Richard Mills
                                           United States District Judge